UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:05-cv-40030FDS

JOHN A. BOLDUC, JR.,
　　　　Plaintiff

v.

TOWN OF WEBSTER,  ROBIN LEAL,
RICHARD BERGERON, and
WILLIAM KEEFE,
　　　　Defendants.

## DEFENDANT ROBIN LEAL'S
## MEMORANDUM IN SUPPORT OF HER
## MOTION FOR SUMMARY JUDGMENT

Defendant Robin Leal (also known as Robin Leal Carver), who is sued individually and in her capacity as Administrator of the Town of Webster, ("Leal") respectfully moves for Summary Judgment because all of the evidence taken in the light most favorable to plaintiff fails to show that the plaintiff John Bolduc ("Bolduc") is entitled to judgment as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted because there is no genuine issue of fact relating to the Plaintiff's claim and because the facts entitle Leal to prevail as a matter of law.  F.R. Civ. P. Rule 56; *See* Polaroid Corp. v. Rollins Env'tl Svcs. (N.J.), Inc., 416 Mass. 684, 696 (1993).  When a motion for summary judgment is filed, the opposing party "must set forth specific facts showing that there is a genuine issue for trial," and if not, summary judgment shall be entered against the opposing party.  F.R. Civ. P. Rule 56(e).

Summary judgment is appropriate in this case because the uncontested facts show that there is no evidence supporting Bolduc's claim that Leal retaliated against him with acts up to

and including termination for his corroboration of Deputy Chief Thomas Ralph's ("Ralph")

complaint that fellow officer Brian Barnes ("Barnes") had made racist comments. To avoid

summary judgment in a public employee's action based on an alleged politically motivated

demotion, the record must permit the fact finder to conclude by preponderance of the evidence

that the changes in the nonmoving employee's work situation were motivated by discrimination.

Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34 (1st Cir. 1993). Here, that standard is not met

and summary judgment should be granted in favor of Leal.

## STATEMENT OF UNDISPUTED FACTS

The Parties

1.    Bolduc began working for the Webster Police Department as a part-time police officer in

       1995 and became full-time 1996. His employment was terminated in 2004. Bolduc

       Deposition, Exhibit 1 at 11:4-8; 11:16-23.

2.    Leal was the Town Administrator for the Town of Webster from December 2003 until

       she resigned in early 2005. Leal Deposition, Exhibit 2 at 171:9-172:8; 178:14-21. She is

       sued both individually and in her capacity as Town Administrator.

3.    Defendant Town of Webster is a municipal corporation located in Worcester County,

       Massachusetts.

4.    The Webster Police Department consists of twenty-nine full time officers, the Chief, and

       approximately twenty-five part time officers. Exhibit 1 at 36:10-12.

5.    Defendant Richard Bergeron, Jr. ("Bergeron") was the Chief of Police in Webster from

       June 1996 until he retired in early 2004. Bergeron Deposition, Exhibit 3 at 5:16-6:6;

       13:1-5.

6.    Defendant William Keefe ("Keefe") began working for the Webster Police Department as

a part-time Police Officer in 1985, and he became full-time in 1986. In July 2003 Keefe became the acting Chief of Police in Webster, and he became provisional Chief of Police in 2004, which appointment lasted until December 2005. Keefe Deposition, Exhibit 4 at 10:4-22; 44:13-18; 109:9-13; 125:11-21.

## Bolduc's Employment Prior to 2003

7.    Bolduc and Deputy Chief Tom Ralph were, and continue to be, close friends. Exhibit 1 at 16:10-15.

8.    While the Police Department was under Chief Bergeron, and Ralph was the Deputy Chief, Bolduc was never punished or reprimanded. Exhibit 1 at 294:18-21.

9.    Under Chief Bergeron, patrol officers were allowed to participate in investigations and Bolduc was part of a team who re-opened the "cold case" of Andrew Amato, a child who had been missing since September 30, 1978. Exhibit 1 at 25:1-28:6.

## Bolduc Removes Detainee John Mayotte's Facial Piercing With A Bolt-Cutter

10.    On or about February 19, 2002, Bolduc forcefully removed detainee John Mayotte's necklaces with his hands, rather than simply unclasping the necklace. Exhibit 1 at 115:12-118:18.

11.    Bolduc then used a ring cutter and, when that did not work, used a bolt cutter that he described as "two foot hedge trimmers" to remove a small left earring from the detainee. Then he used the bolt cutter to forcefully cut off an eyebrow ring above Mayotte's left eye. Exhibit 1 at 119:11-23; 125:16-128:12; 129:5-130:6; 388:13-15.

12.    This incident was not investigated while Bergeron was Chief. Exhibit 1 at 204:8-22.

## Bolduc Punches Handcuffed Detainee Heath Greenwood On the Chin

13.    On or about November 9, 2002 Bolduc made an arrest of Heath Greenwood and another

officer brought Greenwood back to the Police Station to be booked. Bolduc thereafter responded to a radio call for help at the station where he discovered that Greenwood had his handcuffs in front of him and was acting aggressive toward the booking officer. Bolduc punched Greenwood in the face.[1] Exhibit 1 at 151:13-164:21; 388:16-18.

14. Bolduc reports that Ralph performed an investigation of the Greenwood matter by informing Bolduc of the charges against him for excessive use of force and asking Bolduc for an explanation. Exhibit 1 at 200:2-201:7.

15. There is no evidence that this investigation was ever recorded in writing, and Bolduc's understanding that the investigation was closed came from fellow officers' statements that Bolduc should not worry about the incident. Exhibit 1 at 202:3-24.

16. Ralph, in performing the investigation into the Greenwood matter a month after it occurred, never interviewed the booking officer or Greenwood. Exhibit 1 at 300:6-301:15.

<u>The Barnes Incident</u>

17. On or about February 22, 2003, Webster Police Officer Brian Barnes allegedly made racist comments during a lunch with co-workers, including Bolduc and the then Deputy Chief Thomas Ralph. Bolduc did not complain about Barnes' racist comments at that time. Exhibit 1 at 56:13-23; 60:5-12.

18. Almost two months later, on or about April 15, 2003, Deputy Chief Ralph formally complained about Barnes' allegedly racist comments to Chief Bergeron. Deputy Chief Ralph named Bolduc as a witness to the comments. Exhibit 1 at 69:8-70:10.

19. Chief Bergeron asked Bolduc whether he had in fact witnessed Barnes making the racist

---

[1] There is some dispute as to how many times Bolduc punched Greenwood in the face, but there is no dispute that Bolduc did, in fact, punch Greenwood in the face.

comments.  Bolduc confirmed that he had.  Exhibit 1 at 402:13-22.

20.    Bolduc maintains that he did not freely involve himself in Barnes' comments, he only did

so in response to an order from Chief Bergeron.  Exhibit 1 at 402:13-22.

21.    The Chief then allegedly told Bergeron that his friendship, loyalty and support of Ralph

would cost him.  This is the source of Bolduc's claim that he suffered threats, intimidation

and coercion in violation of his First Amendment rights.  Exhibit 1 at 322:14-21; 322:22-

323:17; 331:22-333:22.

22.    Chief Bergeron took Bolduc off the Amato investigation and put Bolduc on regular shift

duty.  Exhibit 1 at 43:6-9; 80:21-81:1.

23.    Chief Bergeron asked Bolduc to return the keys to an office he had been using with a co-

worker.  Bolduc did not ask to use any alternate office or other space at the Police Station

for his work, instead choosing to work out of his home as did some other officers.

Exhibit 1 at 38:20-39:9; 40:10-21; 41:22-42:3.

24.    Bolduc believes his personnel file was lost sometime in 2003.  Exhibit 1 at 292:10-17.

<u>Chief Bergeron Goes On Paid Administrative Leave</u>

25.    In or about April 2003, Barnes made a claim that he witnessed Ralph communicating

exam answers to Bolduc the night prior to an oral portion of the Sergeant's exam, which

exam resulted in Bolduc becoming Sergeant.  Exhibit 2 at 31:5-32:5; 53:12-17.

26.    Chief Bergeron was placed on administrative leave and Keefe was appointed acting

Chief.  Exhibit 2 at 110:1-15.

27.    Retired Judge Barton was hired to perform an investigation of the Police Department and

provide a report to the Town.  Keefe Deposition at 45:11-46:2.

<u>Robin Leal is Hired As Town Administrator</u>

28.    Leal applied for the position of Town Administrator, was interviewed by the Search

Committee and then by the Webster Board of Selectmen, and was hired in or about

October 2003.  Exhibit 2 at 9:14-12:19; 18:7-19:17; 27:9-28:15.

29.    The Selectmen initially voted to hire Leal by a vote of two (out of five) and Leal

indicated hesitation to take the job unless the Board unanimously voted to hire her, which

they then did.  Exhibit 2 at 23:17-26:6.

<u>Robin Leal's Interactions With The Selectmen</u>

30.    Leal had an "open door policy" when she first came to the Town; she allowed anyone to

come in and talk to her about "what was going on and what their opinions were."  Exhibit

2 at 100:14-21.

31.    The Selectmen communicated their likes, dislikes and other opinions to Leal.  Exhibit 2

at 33:1-4.

32.    Leal was aware of a split with Board of Selectmen members Stawiecki, Regis and Miller

supporting Ralph and Bolduc in the Police Department and Board of Selectmen members

Martel and Dowgiewicz supporting Barnes and Bergeron.  Exhibit 2 at 26:3-12; 30:21-

31:4.

33.    Indeed, Bolduc testified that he frequently spoke with Selectmen Miller, Regis and

Stawiecki.  Bolduc was under the impression that although Regis was a Selectman and

Leal was Town Administrator, their relationship was strained at times.  Bolduc had no

actual knowledge of the relationship between Leal and Selectmen Miller and Regis.

Exhibit 1 at 43:10-18; 44:5-12; 260:17-261:6; 308:15-23.

34.    Leal testified that Stawiecki was one of her bosses, and he had an opinion on what should

be done about the Police Department issues but she did not always agree with him. For example, Leal and Stawiecki disagreed on how the Judge Barton report should be implemented and whether or not it required Bolduc to be terminated. Leal did not believe that the report indicated that termination was warranted. Exhibit 2 at 89:4-91:9; 107:20-108:8.

### Robin Leal's Interactions With Chief Bergeron

35.    When she began her tenure as Town Administrator, Leal met with Chief Bergeron at his home, with then acting Chief Keefe, to discuss Chief Bergeron's possible return and/or retirement. Exhibit 2 at 94:20-95:22; Exhibit 3 at 112:4-113:7.

36.    Leal met with Bergeron a second time after the Judge Barton report came out, and she informed Bergeron that he should seriously consider retiring. Exhibit 2 at 185:17-23; Exhibit 3 at 114:1-24.

37.    These were the only two meetings between Bergeron and Leal. Exhibit 3 at 118:2-4.

### Robin Leal's Interactions With Chief Keefe

38.    Keefe was new to the role of Chief and was not sure of the things the Chief of Police could and could not do. He therefore frequently sought advice and guidance from the Town Administrator. Exhibit 4 at 83:14-20.

### Concerns About Bolduc's Temper and the Ethics of His Appointment to Sergeant

39.    Among concerns brought to Leal when she became Town Administrator were concerns about Bolduc's explosive temper and his brutality. For example, a complaint had come in from one Carol Smith whose son lost an eye when Bolduc refused him medical attention. There were also the concerns that Bolduc had fraudulently obtained his promotion to Sergeant. Exhibit 2 at 51:1-23; 52:9-12; 53:12-17; 55:4-20; 56:9-22; 57:17-20.

40.     Keefe felt that Ralph and Bolduc's presence in the Department was disruptive.  Exhibit 2 at 47:13-19.

41.     No one, however, stated that Bolduc must be removed.  Exhibit 2 at 66:11-18.

<u>Bolduc Forces Detainee Catherine Abbe's Head Still and Eyelids Open for Photograph</u>

42.     On or about December 11 or 12, 2003, Chief Keefe was provided with booking pictures of detainee Catherine Abbe whose forced her face between Bolduc's gloved hands, and whose eyelids were pried open by Bolduc's gloved hand.  Exhibit 4 at 75:3-79:18.

<u>Bolduc is Charged With Excessive and Unnecessary Force</u>

43.     Keefe brought the Abbe incident to Leal's attention and he informed her of prior instances of abuse by Bolduc.  Exhibit 2 at 191:15-19; Exhibit 4 at 67:16-70:6.

44.     Leal charged Bolduc with violation of a use of force policy.  Exhibit 2 at 160:13-161:1.

45.     Bolduc was placed on paid administrative leave pending an investigation into the Abbe incident and others.  Exhibit 2 at 63:17-19.

<u>The Investigation Into Bolduc's Use Of Excessive and Unnecessary Force</u>

46.     The investigation of Bolduc's use of force included in its scope incidents reported in the Judge Barton report.  Accordingly, Keefe met with Officer Pysell who had submitted an affidavit to Judge Barton regarding the Greenwood matter.  Pysell informed Keefe that Bolduc may have struck Greenwood two or three times which was not reflected in the affidavit; Keefe asked Pysell to write that on his affidavit and to date it, which he did.  Exhibit 4 at 67:1-15; 70:15-72:20; 80:13-15.

47.     Keefe later asked Pysell whether he had ever said that he had been forced to change his affidavit to reflect multiple blows; in a post-it note, Keefe recorded that Pysell denied ever stating he that the affidavit notation was forced.  Exhibit 4 at 91:5-92:14.

48.   Of the Greenwood, Mayotte and Abbe incidents that Keefe investigated, Greenwood is

the only one that had been previously investigated.  Exhibit 1 at 325:16-326:7.

## Amato Commendation

49.   While Bolduc was on administrative leave, the Selectmen voted to award him a

commendation for his work on the Amato case.  The Selectmen later rescinded that vote.

Bolduc assumes the vote was rescinded because it would reflect poorly in the Town's

defense of Bolduc's MCAD charge.  Exhibit 1 at 272:6-11.

50.   Before the hearing, Leal's only substantive contact with Bolduc was a conversation with

him about being taken off the Amato case, which occurred long before Leal became

employed by Webster.  Exhibit 2 at 73:20-74:8.

## Selectmen Miller and Regis Allegedly Ask Bolduc to Resign

51.   Bolduc states that Selectman Miller spoke with him about possibly resigning from the

Webster Police Department and that Selectman Regis thereafter indicated that Leal would

terminate Bolduc and Ralph if they did not resign and that each of the three incidents

alone (Abbe, Mayotte and Greenwood) was "no big deal" but that together they were

enough to terminate him.  Exhibit 1 at 44:23-47:19; 48:2-6.

52.   Leal did not ask Regis or Miller to ask Bolduc and Ralph to resign.  Exhibit 2 at 118:20-

119:20.

53.   Leal did tell Regis and Miller that it was the opinion of many people that the Police

Department would be better off without Ralph, Bolduc, Barnes or Bergeron; this

information was provided to Regis and Miller as part of Leal's update to them on her

conversations with Town officials, citizens and members of the Police Department.

Exhibit 2 at 119:21-120:7.

9

54.    Leal may have suggested that Ralph, Bolduc, Barnes and Bergeron's resignations may be

a positive move for the Town, but she did not ask that they take any action on her

opinion.  She did not discuss disciplining Bolduc or trying to terminate anyone's

employment at that time.  Exhibit 2 at 120:8-16; 191:7-14.

55.    Leal further did not tell Regis that she had enough to terminate Bolduc.  She did say that

if everything said about Bolduc was true, it was reason for termination.  Exhibit 2 at

123:8-21.

Polizoti

56.    Leal requested that Bolduc be psychologically evaluated because she wanted an objective

analysis of his suitability to be a police officer, given his aggressive behavior.  This

examination was performed by psychologist Leo Polizoti.  Exhibit 2 at 71:12-22; 75:12-

77:1.

57.    Prior to meeting Bolduc, Dr. Polizoti received a letter from Keefe and a summary of the

Mayotte, Greenwood and Abbe incidents.  Exhibit 1 at 173:13-23.

58.    Bolduc believes that positive information about him was withheld from Polizoti but is

unable to provide any examples.  Exhibit 1 at 254:5-13.

The Hearing

59.    Bolduc was aware before the Leal hearing that Mayotte, Greenwood and Abbe were the

subject of the hearing.  He received a large envelope in the mail containing the

termination decision along with Civil Service statutes M.G.L. c.31 §§41-45 and a recap

of Chief Keefe's investigation.  Exhibit 1 at 264:1-18.

60.    Leal never prevented Bolduc from having witnesses or exhibits on his behalf; in fact, she

sent him a letter stating that he could be represented by counsel and call witnesses to his

defense. Exhibit 2 at 190:4-16.

61.    Bolduc was present at the hearing held by Leal, and he was represented by counsel. Exhibit 1 at 146:23-147:13.

62.    Bolduc called Officer Melendez as a witness on his behalf in the Abbe incident, while Officers Young and Difusco testified on the Town's behalf in the Abbe incident. Exhibit 1 at 232:2-10.

63.    No one testified on Bolduc's behalf in the Mayotte incident because the witnesses either could not be found or were testifying on the Town's behalf in the hearing. Exhibit 1 at 147:22-150:13.

64.    Although he called Officer Melendez to testify on his behalf, and asked Deputy Chief Ralph to testify on his behalf, Bolduc claims that he was unable to call witnesses and that his hearing was therefore patently unfair. He further claims that he called as witnesses officers who had come to observe the proceedings, although he claims that officers were told to stay away from Town Hall during the meeting. Bolduc further states that the hearing was unfair because a packet of information was delivered to his house the night before the hearing and his attorney was unable to review that material. Exhibit 1 at 310:19-311:14; 319:9-321:2.

65.    Bolduc made no attempt to contact Officers Gevry, Kelley, Novick, Langevin, EMT Becker, or Detective Hoover who he claims could have aided his case by their testimony. Exhibit 1 at 312:2-319:8.

66.    Keefe did not instruct officers of the Webster Police Department to avoid Town Hall during Bolduc's hearing. Exhibit 4 at 120:15-19. Nor does Bolduc have any actual knowledge to the contrary. Exhibit 1 at 321:3-17.

67.    Leal decided to terminate John Bolduc following the hearing.  Exhibit 2 at 191:20-192:6.

<u>Bolduc Appeals His Termination</u>

68.    Bolduc, with the representation of counsel, appealed his termination through the civil

service process.  Exhibit 1 at 291:9-16.

<u>Bolduc Admits He Has No Evidence On Which To Base His Claims</u>

69.    When asked at length to explain the conspiracy or corroboration by defendants to punish

or discipline him or otherwise take negative action by him, Bolduc was unable to provide

one single shred of evidence that there had been any common motive to conspire against

him.  He vaguely hinted that individuals had unspecified information that would show a

conspiracy to terminate his employment but he could not support this claim.  Bolduc has

no evidence on which to base his belief that he was placed on paid administrative leave

by Leal because he verified facts in Ralph's complaint.  Exhibit 1 at 326:20-331:15;

408:8-409:1.

70.    Bolduc bases his claims that Leal conspired against him on the fact that Leal had a

friendship with Keefe, that Leal called Leo Polizoti before he evaluated Bolduc, and that

Leal instructed Keefe to look back over the incidents within the Webster PD without any

limit as to scope and time.  Exhibit 1 at 392:20-393:9; 404:15-407:13.


## **ARGUMENT**

Counts III, IV, V and VI of Plaintiff's Complaint are not claims against Leal.

Bolduc's only claims against Leal are Counts I and II of his complaint in which he

alleges that she, in collaboration with Bergeron, Keefe and with the Town, (1) acted to retaliate

against Bolduc for the exercise of his free speech, association and inquiry by denying him due

process in violation of 42 U.S.C. §1983 and (2) violated the First, Fifth and Fourteenth Amendments of the U.S. Constitution by depriving Bolduc of his liberty interest in free speech and association and of his property interest in his job without due process and equal protection in retaliation for Bolduc's confirmation of Ralph's complaint of racist comments by officer Barnes, in violation of 42 U.S.C. §1985.[2]  Both these claims fail.

These claims fail first and foremost because Leal acting in her capacity as Town Administrator is entitled to qualified immunity and is protected from liability for her actions related to Bolduc.  Further, the claims fail because Bolduc has failed to present even one shred of evidence that he engaged in any protected activity that would entitle him to recovery, that Leal had any intention to deprive Bolduc of his rights or to collaborate with others to do so.  Finally, Bolduc's claims fail because even if he engaged in a protected activity and he was retaliated against for that activity, there is a rational basis for Leal's actions that she had become aware of Bolduc's detainee abuse and had to take action to prevent a recurrence of that brutality.

I.    Leal Is Entitled To Qualified Immunity For Her Actions Related To Bolduc

Leal's investigation of Bolduc, the hearing she held and the decision to terminate Bolduc were all performed in her official capacity as Town Administrator.  Leal is therefore shielded from 42 U.S.C. §§1983 and 1985 liability under the doctrine of qualified immunity if her actions were objectively reasonable, or if it was objectively reasonable for her to believe that her actions were lawful.  Borges Colon v. Roman-Abreu, 438 F.3d 1 (1st Cir. 2006) (qualified immunity shields individuals from §1983 liability); Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87 (1st Cir. 1994) (qualified immunity shields individuals from §1985 liability).  When Leal saw the picture of Bolduc's two gloved hands forcing a detainee to look at the camera, with his fingers

---

[2] Note that Bolduc makes the claim in his Complaint that Leal was wrong to communicate her specific request to Dr. Polizoti before his evaluation, but it is unclear what law he alleges this violates or why it would be improper for the Town to express the purpose for its request for an evaluation.

forcefully prying the woman's eyes open, any objectively reasonable Town Administrator would recommend that Bolduc be investigated as Leal did. When further incidents were revealed, such as Bolduc's use of a bolt cutter to remove a detainee's earring and eyebrow ring, Bolduc's punch or punches of a detainee in the face, and a young man's loss of an eye because Bolduc did not seek medical attention when he was injured and these incidents were verified (several officers testified for the Town in the hearing), Leal was objectively reasonable in determining that Bolduc should be terminated.

Nor has Bolduc made any claim related to Leal that in any way alleges that she acted outside her official capacity. By Bolduc's allegations, and in fact, Leal's actions against Bolduc were made solely in her official capacity. Leal was only in a position to counsel Keefe to investigate the Abbe incident and other incidences of Bolduc's detainee abuse because Leal was then Town Administrator. Leal would not, and could not have held a hearing and made the determination that Bolduc's employment should be terminated had she not been Town Administrator. In fact, given the scandal that had hit the Police Department in the year before Leal became employed by the Town, it would have been objectively unreasonable for Leal to ignore the charges against Bolduc and the compelling picture of Abbe.

II.    Bolduc's §1983 Due Process Claim Fails Because He Has An Available Postdeprivation Remedy In The Civil Service Process.

Bolduc's claim in part relies upon §1983 to claim that he was deprived of his property right in his job but this claim is not available to him because he has a postdeprivation remedy available to him in the Massachusetts Civil Service appeals process. The U.S. Supreme Court held in Hudson v. Palmer, 468 U.S. 517 (1984) that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the due process clause . . . if a meaningful postdeprivation remedy for the loss is available". In

Cronin v. Amesbury, 81 F.3d 257 (1st Cir. 1996), the First Circuit held that the Massachusetts civil service appeals process is just such a meaningful postdeprivation remedy.  In Cronin, a former Chief of Police in Amesbury, Massachusetts claimed that he was deprived of his due process rights when he was terminated for falsely denying he had written a pornographic letter found in his desk.  The First Circuit held that the former Chief's due process §1983 claims failed because he was unable to show that the state failed to provide him with an adequate postdeprivation remedy.  Id. at 260.  Specifically, the civil service hearing and appeal, MASS. GEN. LAWS c.31 §§41-44 was sufficient remedy.  Id.  Bolduc has had a civil service hearing and appeal and those have provided an adequate alternate remedy such that his §1983 due process claim against Leal fails.

Further, Bolduc was not deprived of any due process rights, including his Fifth Amendment rights against self incrimination, right to a fair hearing and right to confrontation in his hearing process under Leal.  Bolduc claims that he was denied the opportunity to call witnesses to testify on his behalf, but he did in fact call witnesses to testify on his behalf.  He made no attempt to call other witnesses who he now says are essential to a fair hearing.  He says the hearing was unfair because officers were ordered not to appear in Town Hall at the time the hearing was held, but in the next breath Bolduc states that some of the officers who testified on his behalf were present because they had come to watch the hearing.  Bolduc claims that he was prejudiced by the receipt of information the night before the hearing, but he did not ask for any extension of time or delay of the hearing to provide he and his attorney the opportunity to fully examine these materials.  Bolduc's sole claims to an unfair trial fail on his own facts, and his claim against Leal should fail.

III.    Bolduc Has Not Presented Evidence Of Leal's Intent Or Of Any Deprivation Of A Constitutional Right To Support His 42 U.S.C. §§1983 and 1985 Claims.

As a preliminary matter, Bolduc claims he was retaliated against for exercising his right to free association but he has not alleged any association other than his friendship with Ralph. Friendship is not a constitutionally protected association, and this portion of his claim fails. *See, e.g.* NAACP v. State of Alabama, 357 U.S. 449, 460 (1958) (association "for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment").

In the course of discovery, Bolduc has not (because he cannot) produced information beyond his bald assertions that indicate that Leal acted in any way to deprive him of the constitutional rights he claims were violated. "In order to state a claim under §1983, a plaintiff must show both the existence of a federal constitutional or statutory right, and a deprivation of that right by a person acting under color of state law." Storlazzi v. Bakey, 894 F.Supp. 494, 500 (D.Mass. 1995) (citing Lugar v. Edmonson Oil Co., 457 U.S. 922, 924 (1982); Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993)). The plaintiff must set forth evidence that illustrates motivation to deprive plaintiff of that right. *Id.* (citing Gerena v. Puerto Rico Legal Svcs., Inc., 697 F.2d 447, 450 (1st Cir. 1983)). That same standard applies to violations of §1985. *See* Harrison v. Brooks, 519 F.2d 1358 (1st Cir. 1975). Here, Bolduc has presented no evidence that either he was deprived of any constitutionally protected right, or that Leal had any intention or motivation to deprive him of that right.

a)    Bolduc Not Shown Any Protected Right.

Bolduc's claim that he was deprived of his Fifth Amendment rights apparently relate to his hearing process and allegations that he was not allowed to call witnesses on his own behalf. By his own testimony, as described above, this claim is patently false.

16

Bolduc also appears to claim in his Complaint that actions taken against him by Leal, the Town and Chiefs Bergeron and Keefe were in response to his exercise of his First Amendment rights including freedom of speech, freedom of expression and freedom of association and his subsequent termination was therefore in violation of his Fourteenth Amendment rights. This claim fails because Bolduc was not engaged in any protected activity because his verification of facts alleged in Ralph's complaint was made solely within the scope of his employment. As is clearly shown in the recent U.S. Supreme Court case Garcetti v. Ceballos, 126 S.Ct. 1951 (2006), public employees are not protected by the First Amendment from discipline from their employer for expressions made pursuant to their performance of their duties. While police officers and other public employees have strong First Amendment free speech protection related to "matters of public concern," that right is not absolute. Pickering v. Board of Educ., 391 U.S. 563 (1968). Matters of public concern are subjects of legitimate news interest at the time they are publicized (such as a complaint that the School District requires more funding, or that police shifts are not adequately staffed), or private comments such as negative comments about the President of the United States. City of San Diego v. Roe, 543 U.S. 77 (2004). Bolduc's expression of a factual observation in response to a direct order from his superior officer, by any stretch of the imagination, is not protected free speech.

Like the public employee in Garcetti who received no First Amendment protection from discipline after writing a disposition memorandum as part of his job duties in which he recommended dismissing a case because of governmental misconduct, Bolduc's comments do not give him First Amendment protection from discipline. The comments for which Bolduc was allegedly disciplined are not First Amendment protected speech because the comments were made in the course of his duties as a police officer, in response to a direct order from a superior

17

officer. *Id.* These comments were not free expression or speech because they concerned an internal police department matter, they were made strictly within the employment context, and they consisted of observed facts with no opinion. Although no doubt racist comments from a police officer are a matter of public concern, Bolduc never came forward with a complaint about Barnes' comments, and never intended to make a complaint or to inform the public of the comments. This is not protected free speech, and Bolduc is not protected under the U.S. Constitution from job actions related to that speech.

b) Leal Had No Motivation to Deprive Bolduc Of Any Constitutional Right.

Even if Bolduc did show that he engaged in a protected right, which he has not, Leal and others' decision to investigate and ultimately terminate Bolduc's employment would have been the same had he not affirmed Ralph's complaint. Where a plaintiff satisfies the burden of asserting (1) First Amendment expression provoked a retaliatory action (2) the retaliatory action deprived him of some valuable benefit and (3) there is a causal relationship between the protected expression and the retaliatory action, the defendant then has the defense that the decision regarding plaintiff's employment would have been the same regardless of plaintiff's protected speech. Storlazzi v. Bakey, 894 F.Supp. 494, 501 (D.Mass. 1995). For example, where a teacher claimed a conspiracy by the union and school committee to retaliate against him for engaging in protected speech, his claim did not withstand summary judgment because, in part, the school committee was able to show that actions taken against the teacher were related to facts independent of the teacher's speech, and would have happened regardless of his engaging in the protected speech. *Id.* Here, even if Bolduc had presented a case of retaliation for First Amendment protected speech, which he has not, Leal's decision to initiate an investigation and eventually to terminate Bolduc for detainee abuse would have been the same regardless of

Bolduc's witness to Barnes' comments. [3]  When Leal became aware of the Abbe abuse and Bolduc's history of detainee abuse shortly after she was hired, she had no choice but to take that information seriously and perform a full investigation, and to take job action when those allegations were sustained.  Therefore, even if actions taken against Bolduc had any relation to his confirmation of Ralph's complaint, which even he admits they do not, Leal still may not be held liable for retaliation in violation of 42 U.S.C. §§1983, 1985.

Nor has Bolduc shown that Leal shared any intent with Bergeron, Keefe or the Town to retaliate against Bolduc for protected activity.  Bolduc relies upon bald assertions and vague insinuations to support his position but has not presented an iota of evidence that Leal's actions were taken against him for his support of Ralph's complaint of racism by Barnes.  Leal had no involvement in actions attributable to Bolduc's confirmation of Ralph's complaint; Leal was not employed by the Town, and in fact had not even applied for employment with the Town, when Bolduc's office was taken away and he was taken off the Amato case in April 2003.  Leal did not know anyone in Webster's government or in the Police Department prior to becoming employed by Webster in October 2003.  Instead of showing a conspiracy to retaliate against Bolduc for protected activity, Leal's actions against Bolduc (initiating a hearing, placing him on paid administrative leave, holding a hearing and terminating his employment) are clearly a response to Leal's discovery that Bolduc undisputedly brutalized detainees.

Bolduc has produced specific comments from Chief Bergeron in response to Bolduc's confirmation of Ralph's complaint, but he has not produced any comments or other evidence that

---

[3] Bolduc's claim that Leal wanted to punish him for verifying Ralph's complaint in April 2003 is objectively unreasonable.  It is entirely illogical that Leal, who was a stranger to the Defendants in this case before coming to the Town of Webster, who was hired in the midst of scandal surrounding the Police Department and who repeatedly took precautions to avoid even an appearance of allegiance among the Selectmen, would participate in a scheme with two Selectmen (with whom Bolduc reports she had a poor relationship) to punish Bolduc for his one statement made months prior that he had witnessed racist comments by fellow officer Barnes.

show that Leal in any way collaborated with Bergeron or even discussed Bolduc with Bergeron; Leal's sole interactions with Bergeron consist of two meetings to discuss retirement.

Nor has Bolduc shown any indication that Leal, Keefe or the Town alone or in concert[4] took any action against Bolduc other than investigating detainee abuse that Bolduc admits occurred, and taking action on that abuse once it was confirmed in a hearing. Bolduc's sole allegations of unfair treatment by Leal consist of hearsay claims that Regis opined that Leal had made up her mind in advance of the hearing, and claims that the hearing itself was unfair which claim is shown false by Bolduc's own testimony. The alleged Regis comments (which are nothing more than hearsay) are best explained by Leal's direct testimony that she informed Regis and others that, if true, the acts attributed to Bolduc could warrant termination. Without any evidence that Leal had the intent, along with Keefe, Bergeron and the Town, to deprive him of his protected rights, Bolduc's 42 U.S.C. §§1983 and 1985 claims fail.

## CONCLUSION

For the foregoing reasons, there is no dispute as to facts and summary judgment should be entered in favor of Robin Leal as a matter of law.

## Certificate of Service

I, Geoffrey McCullough, hereby certify that a true copy of the above document complete with exhibits was served upon the attorney of record for Plaintiff, John A. Green, at Green, Miles, Lipton, White & Fitz-Gibbon, 77 Pleasant Street, Northampton, Massachusetts 01060, (413) 586-8218 and upon Counsel for Defendants the Town of Webster, Richard Bergeron and William Keefe, Carole Sakowski Lynch, at Morrison Mahony, 1500 Main Street, Springfield, Massachusetts 01115, (413) 737-4373, by first class mail, postage prepaid on this 14th day of November, 2006.

/s/ Geoffrey McCullough
Geoffrey McCullough

---

[4] Further indicating a lack of conspiracy between Miller, Regis and Leal, Leal prepared but did not file an MCAD sexual harassment complaint against Miller and Regis. Leal Deposition at 175:18-176:4.

EXHIBIT 1

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

JOHN BOLDUC
DATE: AUGUST 31, 2006

---

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

VOLUME I - 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:05-CV-40030-FDS
Pages 1-210

JOHN A. BOLDUC

vs.

TOWN OF WEBSTER, ROBIN LEAL,
RICHARD BERGERON and WILLIAM KEEFE

-------------------------------------------------
DEPOSITION OF: JOHN BOLDUC
-------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Morrison Mahoney, LLP, 10
Chestnut Street, Worcester, Massachusetts on
AUGUST 31, 2006, commencing at 10:25 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

---

VOLUME I - 2

APPEARANCES:

FOR THE PLAINTIFF:

GREEN, MILES, LIPTON, WHITE & FITZ-GIBBON
77 Pleasant Street
Northampton, Massachusetts 01060
BY: JOHN A. GREEN, ESQUIRE

FOR THE DEFENDANT TOWN OF WEBSTER:

MORRISON MAHONEY, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQUIRE

FOR THE DEFENDANT ROBIN LEAL:

MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, Massachusetts 02169
BY: GEOFFREY B. McCULLOUGH, ESQUIRE

Also Present: Robin Leal

---

VOLUME I - 3

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN BOLDUC | 5 | | | |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Photograph of Mayotte | 120 |
| 2 | 2/4/04 Milliard Statement | 139 |
| 3 | 2/4/04 Wrubaleski Statement | 141 |
| 4 | 1/5/04 Novick to Keefe E-Mail | 143 |
| 5 | Nelson Statement | 143 |
| 6 | 2/2/04 Ralph Handwritten Statement | 144 |
| 7 | Kelley to Keefe Memo | 144 |
| 8 | Photograph of Heath Greenwood | 171 |
| 9 | Gevry Statement | 173 |
| 10 | Pysell Statement | 174 |
| 11 | Bolduc Report Re Greenwood | 177 |
| 12 | 2/26/03 Ralph to Bergeron Letter | 201 |

---

VOLUME I - 4

STIPULATIONS

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

*****

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

## JOHN BOLDUC          AUGUST 31, 2006

### VOLUME I - 9

1     A.    My Class A I obtained in 2004.  I also
2 have a Class A pistol permit for Massachusetts,
3 non-residential pistol permit for the State of New
4 Hampshire.  That's it.
5     Q.    Can you tell me about your employment
6 since -- well, since high school?  What year did
7 you graduate from high school?
8     A.    1982.
9     Q.    Which high school did you go to -- you
10 said Baypath Vocational, 1982?
11     A.    Correct.
12     Q.    If you could tell me about your
13 employment history since then?
14     A.    Since high school I had worked for my
15 family's contracting business.
16     Q.    What's the name of that?
17     A.    That was Bolduc Contracting Company.
18     Q.    How long did you work there?
19     A.    From '78 to '91.
20     Q.    Is that still in business?
21     A.    No.
22     Q.    Okay.
23     A.    I worked for -- I had a real estate
24 company, Apple Grove Realty, with a partner.

### VOLUME I - 10

1     Q.    When did you have that?
2     A.    That was '93, '94 -- I don't know.
3 Forward Financial Company as a mortgage
4 originator.
5     Q.    That was your next job, you mean, after
6 Apple Grove?
7     A.    That's why I left Apple Grove; right.
8     Q.    When did you work there?
9     A.    '93 to '95 I believe.  In between I
10 drove trucks for different companies.  My family's
11 business was seasonal so if we did not have work
12 or the weather was not permitting us to work I
13 would take either temporary jobs or work part time
14 for places.  I did that for G & S Security.  That
15 was the early eighties.
16     Q.    When did your family business go out of
17 business?
18     A.    Right around the '91 -- 1990, 1991.
19     Q.    Have you had any other employment up
20 until the time you became a police officer with
21 the Town of Webster?
22     A.    Sporadically, either short term or
23 temporary.  I drove Class B trucks for Tech
24 Bearing, Demietra Foods, a variety of -- like I

### VOLUME I - 11

1 say, different places.
2         That would be -- that's the most
3 prevalent for the most.
4     Q.    When did you begin working for the
5 Webster Police Department?
6     A.    I was hired March, '95.  That was part
7 time.  Then full time in May, '96 is when I
8 went -- I was sent to the Agawam Academy.
9     Q.    When you were working for the Town of
10 Webster Police Department did you hold any other
11 employment?
12     A.    Yes; Dimietra Foods in Shrewsbury.
13     Q.    When was that?  Was it before you became
14 full time?
15     A.    Correct.
16     Q.    After you became full time you didn't
17 hold any other employment, is that correct?
18     A.    After I became full time in '99 I was a
19 domestic violence instructor at the Agawam Academy
20 in conjunction with my employment with the
21 Webster PD.
22     Q.    When did you hold that position?
23     A.    1999 until 2004.
24     Q.    Any other teaching positions that you've

### VOLUME I - 12

1 held?
2     A.    Not as employed, just volunteer.
3 Grafton Job Corps.
4     Q.    Are you on any medication or have you
5 taken any substance today that would impede your
6 ability to testify?
7     A.    No.
8     Q.    Do you have any problems with your
9 vision at all such that you wear glasses or
10 contact lenses?
11     A.    I wear reading glasses if I have a lot
12 of reading to do.
13     Q.    Do you have any problems with your
14 hearing?
15     A.    No.
16     Q.    Why did you decide to become a police
17 officer?
18     A.    To help people; to defend those who
19 couldn't defend themselves; to make a positive
20 difference within the community.
21     Q.    Did you like being a police officer?
22     A.    Yes.
23     Q.    Prior to March, 2003 can you describe
24 your relationship with Brian Barnes?

Case 4:05-cv-40003-FDS Document 40-8 Filed 06/21/2007 Page 5 of 28

**VOLUME I - 13**

1    A.   Brian Barnes -- I wouldn't say that we
2  had any type of relationship.
3    Q.   Just let me just stop you.  The reason
4  I've used March, 2003 -- that time period -- is
5  because that appears to me at least when there was
6  some sort of change in relationships regarding the
7  allegations of cheating and allegations of racism,
8  okay?
9    A.   Okay.
10   Q.   So before those allegations came out,
11  can you describe your relationship with Brian
12  Barnes?
13   A.   We got along fine.  We were cordial,
14  professional.
15   Q.   Did you have any type of relationship
16  with him outside of work?
17   A.   No.
18   Q.   You never socialized with him in any
19  way?
20   A.   No.
21   Q.   How about within work?  Did you
22  socialize with him such as going to lunch
23  together, that type of thing?
24   A.   There would be occasions where he would

**VOLUME I - 14**

1  be part of a group but just he and I to go to
2  lunch together, no.
3    Q.   Did you ever work together?
4    A.   Yes.
5    Q.   Would that be being partners in a
6  cruiser or can you describe in general the
7  circumstances where you would work together?
8    A.   Working the same shift.  There were
9  occasions where we were contributing to the same
10  investigation -- in other words officers, there
11  could be three or four officers all contributing
12  to a single investigation.  There were times that
13  he and I would serve in that capacity.
14       At one time I had -- the office space
15  that I had, I had three or four officers allowed
16  to -- or to have keys to have a private place to
17  work some of their investigations.
18   Q.   He was one of them?
19   A.   Yes.
20   Q.   How often would you work the same shift,
21  on average?
22   A.   Early on Brian was a vacation fill-in.
23  That means that he would literally fill in for
24  vacationing officers, he'd get bounced around a

**VOLUME I - 15**

1  lot.
2        My best guess is thirty percent of the
3  time, maybe.
4    Q.   From what you observed, how would you
5  describe his relationship with Thomas Ralph --
6  again prior to the cheating allegations and the
7  racism allegations?
8    A.   Brian and Tom got along good for the
9  most part.  They were just somewhat adversarial if
10  Brian had to take direction from Tom.
11   Q.   From what you could tell, did they get
12  along better than you and Brian Barnes got along?
13   A.   I would say no.
14   Q.   Worse?
15   A.   I thought Brian and I got along better
16  than Tom and Brian did.
17   Q.   The time period when you observed that
18  it was adversarial if Brian Barnes had to take
19  direction from Thomas Ralph, was that after Thomas
20  Ralph became the Deputy Chief?
21   A.   That was after Tom became a sergeant.
22   Q.   After Tom became a sergeant?
23   A.   Yes.
24   Q.   Okay.  How would you -- again the same

**VOLUME I - 16**

1  time period, prior to the allegations of cheating
2  and racism for these questions I'm going to be
3  asking you.
4        How would you describe your relationship
5  with Richard Bergeron?
6    A.   I would describe my relationship with
7  Chief as excellent.
8    Q.   Excellent prior to that?
9    A.   Yes.
10   Q.   Same question with regard to Thomas
11  Ralph?  How would you describe your relationship
12  with him?
13   A.   Same way.  Tom and I are friends.
14   Q.   Are you still friends?
15   A.   Yes.
16   Q.   Prior to those allegations, how would
17  you describe your relationship with William Keefe?
18   A.   We were able to work together fine, a
19  professional relationship.
20   Q.   Did you socialize with him outside of
21  work?
22   A.   No.
23   Q.   Did you socialize outside of work with
24  Richard Bergeron?

## VOLUME I - 25

1   Q.   When did the Amato murder occur?

2   A.   September -- well, Andrew Amato was a
3   missing child September 30th, 1978.

4   Q.   Has it ever been solved as far as you
5   know?

6   A.   Not yet.

7   Q.   Who were the other officers that were
8   working on it when you first started?

9   A.   Thomas Ralph, Timothy Bent, and David
10  Brody.

11  Q.   How do you spell Brody?

12  A.   B-R-O-D-Y.

13  Q.   You said that they stopped being
14  involved in it at some point?

15  A.   Yes.

16  Q.   Is that correct?

17  A.   Yes.

18  Q.   Do you recall when each of them stopped
19  being involved in it?

20  A.   Brody was immediately.  At the first
21  meeting with the Chief as he was explaining all of
22  this said that he had no interest and no time.

23  Q.   That was back in '97 that he stopped?

24  A.   Correct.  Tom Ralph, around that time,

## VOLUME I - 26

1   was to assist and oversee.  He had a lot of things
2   going and eventually went to the Attorney
3   General's Office on the YACS case -- it's an
4   acronym.

5   Q.   Do you know approximately when he
6   stopped being involved in the Amato case?

7   A.   Very soon after we were -- very soon
8   after he was assigned to it, a short time.  I
9   don't have a date for you -- which left Tim Bent
10  and I.

11       Tim had a heavy caseload.  He was the
12  Department's detective.  Then he had to basically
13  step away when he was promoted to sergeant.  At
14  the time in '97 when Tim and I started to go
15  forward with this he had said to me that he wanted
16  me to take the lead.  He would work with me but
17  his caseload was very heavy in the Detective
18  Bureau.

19  Q.   Was there something in particular as far
20  as you know that caused Chief Bergeron to have the
21  four of you work on the Amato case again in '97?

22  A.   Yes.

23  Q.   What was that?

24  A.   A call from the Connecticut State

## VOLUME I - 27

1   Police.  There was a gentleman who suffered from
2   paranoid schizophrenia who was wondering if he was
3   responsible for a missing child in or around
4   Connecticut.  The Connecticut State Police
5   referred him to Chief Bergeron.  Chief Bergeron,
6   Timothy Bent, Tom Ralph, and I believe Rodney
7   Budrow all met with this person.

8       The Andrew Amato case was one of the
9   cases that Bergeron had looked at prior to -- he
10  had already been hired by the Webster Police
11  Department, Town of Webster but looked at -- it
12  was one of the cases he looked at before taking
13  this office and thought that there was something
14  that could be -- or modern police sciences could
15  be applied to this case, a cold case resurrection
16  type of thing.

17  Q.   With respect to this paranoid
18  schizophrenic from Connecticut, was that fully
19  investigated and resolved in some way?

20  A.   He had been looked at.  He had been
21  investigated and that's what brought the four
22  officers together then in around that time to go
23  forward; and that gentleman was linked to the
24  person that ultimately we liked for this -- the

## VOLUME I - 28

1   suspect in the case.

2   Q.   I'm sorry, I didn't follow that.  In
3   other words did you conclude that he wasn't
4   involved in the Amato missing person?

5   A.   Concluded that he didn't have an active
6   part in the physical abduction.

7   Q.   Do you recall when that conclusion was
8   reached?

9   A.   No.  He was a part of that case for
10  quite some time, linked to the person that
11  ultimately we developed into a suspect so it was
12  ongoing.

13       I don't remember exactly when we
14  eliminated him as having a part in the actual
15  abduction itself.  It was later on in that case.

16  Q.   Do you recall how long it was prior to
17  your termination that you eliminated him,
18  approximately?

19  A.   Sometime in '99 is my best guess.

20  Q.   Then you said that you linked -- through
21  him you found another suspect, is that correct?

22  A.   Correct.

23  Q.   Did you then investigate that?

24  A.   Yes.

## VOLUME I - 33

1  to me.

2        When Derrick came back from the Academy,
3  he had asked -- he always had an interest in the
4  Amato case and would ask what was going on and
5  that sort of thing.  I asked him to take the case
6  file and look at it and I would be interested in
7  any notes or questions or things that struck him
8  odd, just another angle, a fresh set of eyes, I
9  would be interested in his thoughts.

10       When he came back and he and I sat and
11 went over what he was thinking or what he was
12 doing, I was impressed, number one that he did
13 this in a very short amount of time and I also
14 thought that he put a lot of thought into it.

15       At that point I went to Chief Bergeron
16 and asked him that anybody that could do that that
17 quickly and that deeply should be assigned -- in
18 my mind should have a part of that, would
19 contribute to that case.  Chief Bergeron agreed
20 and Derrick and I began working together.

21     Q.   For the time that you worked with him,
22 did you think that he did a good job?

23     A.   Absolutely.

24     Q.   Did you think that he did a good job

## VOLUME I - 34

1  after you were no longer involved in it, from what
2  you could observe or heard?

3        A.   Derrick would call me and update me as
4  to what he had found, what he was doing.  He would
5  ask what my thoughts were.

6        The other agencies that we had worked
7  with and established relationships with, I would
8  hear from some of them from time to time.  If the
9  cadaver dogs were going to be out, Derrick
10 would -- Derrick and the Rhode Island State
11 Police, Burriville Police Department, they'd get
12 word to me and invite me down so I could watch the
13 search sites and observe the dogs and see what was
14 going on.

15       I think Derrick Stokes is very good.  I
16 think he did a great job.

17     Q.   At some point did you have an office
18 that you would use in the Police Department?

19     A.   Yes.

20     Q.   When did you get that office and where
21 was it?

22     A.   It was the lower level of the police
23 station.  I believe that was -- I believe that's
24 when Michaela and I began working on the Nathaniel

## VOLUME I - 35

1  Bar-Jonah case.

2        Q.   Do you remember what year that was?

3        A.   I don't.

4        Q.   Was it before you became an acting
5  sergeant?

6        A.   Yes.

7        Q.   With respect to offices, was it just
8  typically sergeants that had offices?

9        A.   No.

10       Q.   Can you explain how it was that
11 individuals had certain office spaces available to
12 them?

13       A.   Yes; it started out that -- it started
14 out basically your specialty officers such as your
15 detectives, your DARE officers, your court
16 officers, I guess the communication officer, the
17 person who would take care of TURRET tapes and
18 phone lines -- the 911 tapes.

19       As Chief Bergeron incorporated this idea
20 of investigating officers the office space
21 allotted to these specialty positions ended up --
22 those officers would have either more desks
23 brought in or they'd divide a desk, one set of
24 drawers for one officer, one set for another as

## VOLUME I - 36

1  more space was needed.

2        It's an old building so there's not a
3  lot of empty rooms.

4        Q.   Actually let me ask you that question
5  then.  How many rooms were there available for
6  offices besides the Chief's office?

7        A.   Seven.

8        Q.   I'm sorry, seven?

9        A.   Seven.

10       Q.   How many officers were there?

11       A.   Twenty-nine full time officers, the
12 Chief, and a number of twenty-five part time.

13       Q.   The Chief had his own office, right?

14       A.   Correct.

15       Q.   Did all of the officers have an office
16 space that they could use?

17       A.   Not all of them; no.

18       Q.   Where would they go if they didn't have
19 an office space to write reports and so forth?

20       A.   There were two booking rooms with a work
21 station -- computer and that sort of thing in each
22 booking room.  There was a computer in the
23 conference room that could be utilized for police
24 reports.  There was a computer in the dispatch

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          AUGUST 31, 2006

**VOLUME I - 37**

1  that could be utilized for police reports aside
2  from the dispatcher's console.  There was a
3  computer at the court officer's desk to write
4  reports if needed.
5          Typically with three or five officers
6  per shift not all the officers would be working on
7  reports at the same time.
8      Q.   Other than writing reports, why else
9  would an officer need office space?
10     A.   To keep some of their investigation
11 materials or simply to write a report that would
12 be stored in the computer itself, print it and
13 then turn it in to the appropriate places.
14         Other times, if an officer was to keep
15 witness or suspect statements, physically build a
16 photo array, things that would aid the officer in
17 whatever he or she was working on at the time.
18     Q.   If an officer did not have a designated
19 space in an office where would they keep their
20 investigative materials?
21     A.   They would -- officers would either, if
22 they had a locker they would try and keep it
23 there.  If they brought in a file cabinet and
24 found a place to keep it, they would do that.

**VOLUME I - 38**

1  There were officers who shared a file cabinet,
2  each officer taking a drawer type of thing.
3          If you needed to store something in any
4  one of the offices you could do that, whether you
5  needed to keep something in the detective office
6  or one of the sergeant's offices, that was fine.
7      Q.   Going back to my original question -- or
8  one of my original questions -- you did say that
9  you started using the office in the lower level
10 before you became an acting sergeant, is that
11 correct?
12     A.   Correct.
13     Q.   Did you continue to use that same office
14 until you said that -- or until you were told by
15 Chief Bergeron to turn in your keys?
16     A.   Yes.
17     Q.   Did anyone else use that office with
18 you?
19     A.   Aaron Suss.
20     Q.   After you turned in your keys, what did
21 you use for office space?
22     A.   A desk at my home.
23     Q.   Why didn't you use one of the other
24 areas in the Department?

**VOLUME I - 39**

1      A.   Lack of room for the amount of stuff
2  that I had.
3      Q.   How much stuff did you have?
4      A.   File cabinet, things pertaining to
5  trainings, things pertaining to the Reserve Unit,
6  my own investigation -- investigatory items.
7      Q.   Did you ask to use another space in the
8  Department?
9      A.   No.
10     Q.   Why not?
11     A.   I was ordered to vacate the space that I
12 had.  I didn't believe that I was going to be
13 afforded any other space.
14     Q.   Do you know what Aaron Suss used after
15 he was asked to vacate?
16     A.   He kept things at home as well.
17     Q.   Do you know, with respect to the other
18 sergeants, did they all have office space?
19     A.   Yes.
20     Q.   With respect to the office space that
21 you had used in the lower level of the Police
22 Department had anyone specifically said, "This is
23 your desk"?  Did anyone specifically designate it
24 to you?

**VOLUME I - 40**

1      A.   Chief Bergeron.
2      Q.   Did other people use the same desk?
3      A.   Not the same desk.  There's another desk
4  in there that they used.
5      Q.   On other shifts would officers use that
6  desk that you had used?
7      A.   No.
8      Q.   You're saying it was only used by you?
9      A.   The desk that I had; yes.
10     Q.   After you said you were asked to turn in
11 your keys why didn't you use one of the other
12 desks when it wasn't being used by an officer, say
13 when they were on a different shift than you and
14 the desk was not being used?
15     A.   If I had any type of reports I'd use the
16 work stations that we all would use.
17         As far as keeping paper files or keeping
18 the items that I had, it was a space issue.  As
19 far as having a surface to write on or to organize
20 files, that could be done anywhere but as far as
21 storage and that sort of thing, there was no room.
22     Q.   Wasn't there a requirement though that
23 documents that pertained to police work be kept in
24 the police station?

JOHN BOLDUC vs. TOWN OF WEBSTER ET AL.
JOHN BOLDUC                    AUGUST 31, 2006

## VOLUME I - 41

1  A.  No.
2  Q.  There was no central filing system
3  where, for instance, if you were working on the
4  Amato case you'd go to this particular section of
5  the file cabinets?
6  A.  No.
7  Q.  You're saying everybody kept things in
8  different places?
9  A.  Correct.
10  Q.  On the same cases?
11  A.  Correct.  Not on the same cases.
12  Michaela Kelley and I would work the Bar-Jonah
13  case.  We would keep the files between us.
14  Anything that we needed, we'd trade back and forth
15  and work together.
16        The Amato case, Derrick and I would do
17  the same thing.  There was no central location for
18  case files being actively worked on.  There was a
19  central location for reports pending court
20  appearances or cases where there was a final
21  disposition.
22  Q.  Other than yourself, do you know of any
23  other officer -- I believe you mentioned Officer
24  Suss -- other than the two of you, do you know of

## VOLUME I - 42

1  anyone else that kept things at home that belonged
2  to the Police Department?
3  A.  Jim Hoover, Tim Bent, Jim Young.
4  Q.  Do you know why they kept things at
5  home?
6  A.  Space issues.
7  Q.  In terms of the paperwork that you kept
8  at home, were they actually documents pertaining
9  to the cases as opposed to training manuals and
10  things like that?
11  A.  All of that.
12  Q.  It was actually related to the cases,
13  too?
14  A.  Yes.
15  Q.  The same with the other as far as you
16  know?
17  A.  Yes.
18  Q.  What was your salary when you were
19  working at the Webster Police Department when you
20  left?
21  A.  Twenty-five twelve an hour -- $25.12 an
22  hour.
23  Q.  Do you remember what it was when you
24  started?

## VOLUME I - 43

1  A.  Eight dollars an hour.
2  Q.  So it steadily went up?
3  A.  Yes.
4  Q.  Did it ever go down when you were there?
5  A.  No.
6  Q.  Had you ever been taken off of any other
7  investigation that you had been working on besides
8  the Amato investigation?
9  A.  No.
10  Q.  When you were employed at the Webster
11  Police Department did you have any relationship
12  with any of the selectmen outside of just doing
13  your regular duties?
14  A.  Speaking to -- if I saw one of the
15  selectmen such as -- I'd speak to Bob Miller, I'd
16  speak to Ray Regis, I'd speak to Bob Stawiecki.
17  When Roy Myer was alive, I spoke with him.  By
18  relationship?
19  Q.  Meaning any kind of a relationship
20  beyond just doing your regular duties, for
21  instance any type of socialization with them
22  outside if work, any kind of friendships, things
23  like that?
24  A.  No.

## VOLUME I - 44

1  Q.  Did you know these four individuals that
2  you just mentioned before you became a police
3  officer?
4  A.  No.
5  Q.  How would you describe your relationship
6  with Mr. Miller?
7  A.  Friendly.  If I saw -- if I were to see
8  Bob Miller I could stop at any time and converse.
9  Q.  Did you ever converse with him about
10  your own employment issues outside of just doing
11  regular police work?
12  A.  Yes.
13  Q.  Do you recall what you discussed and
14  when?
15  A.  After I was on paid administrative leave
16  I was called to Bob Miller's funeral home and he
17  had actually summoned Tom Ralph and I.
18        He had asked that we resign from the
19  Police Department.  If we did he said he would
20  give us what he called glowing recommendations
21  from the Town of Webster.
22  Q.  Did he actually say to resign?
23  A.  He had called us at the request of the
24  town administrator.

PERLIK and COYLE REPORTING

VOLUME I - 53

1 someone of the Select Board.
2     I wanted him to provide the opportunity
3 to completely answer your question.
4     MS. LYNCH: I would appreciate it if
5 you didn't do that. I just want your witness' own
6 memory.
7    Q.  (BY MS. LYNCH) With respect to the note
8 that your attorney wrote to you, what significance
9 does that have?
10    A.  Bob Miller had left a phone message on
11 Tom Ralph's answering machine instructing Tom to
12 get ahold of me because Ms. Leal had asked the
13 Board to rescind a commendation for the Amato case
14 that the board voted to give to me.
15    Q.  We'll get to that later. I was asking
16 you about Mr. Stawiecki.
17     Did you ever have any discussions with
18 him regarding your employment?
19    A.  No.
20    Q.  Do you have any sort of background in
21 martial arts, anything like that?
22    A.  No formal martial arts training.
23    Q.  I'd like to draw your attention to
24 apparently a luncheon that occurred on

VOLUME I - 54

1 February 22, 2003 at the Colonial Club Restaurant?
2    A.  Yes.
3    Q.  Do you recall being there?
4    A.  Yes.
5    Q.  Who was present?
6    A.  Myself; Tom Ralph; Pamela Laduc who is
7 now Pamela Laduc Regis; Heidi Courtenay; Lee Ellen
8 Olmstead; and Brian Barnes.
9    Q.  You said Pamela Laduc Regis. Is she
10 related to the Selectmen Regis?
11    A.  Daughter-in-law.
12    Q.  Daughter-in-law?
13    A.  Yes.
14    Q.  What occurred at that luncheon that was
15 significant with respect to Brian Barnes?
16    A.  Brian Barnes repeated a story of an
17 unpleasant airplane flight that he had.
18    Q.  And what was that?
19    A.  That he was seated between two
20 African-Americans. He also spoke about an obese
21 woman and her snacking habits.
22    Q.  Can you recall what you said?
23    A.  He had said that he took a plane flight
24 to Florida. He went on to say why the flight was

VOLUME I - 55

1 unpleasant as he felt like an Oreo cookie stuck
2 between two niggers; and then the flight attendant
3 who was asking the woman behind him who should
4 have bought two tickets because she was so large
5 and took up so much room, if she wanted snacks
6 when Brian went on this tirade to the stewardess
7 of course she wants snacks, look at her type of
8 thing.
9    Q.  The woman who was large, was she
10 African-American, do you know?
11    A.  I don't know.
12    Q.  I want to make sure I understand. There
13 was a large woman behind him and he had two
14 African-Americans next to him, is that correct?
15    A.  That's correct.
16    Q.  Did he say anything else of a racial
17 nature?
18    A.  Not that I recall.
19    Q.  What was your response when he told that
20 story?
21    A.  My response was that -- nobody said
22 anything. There was silence. Brian wasn't
23 getting the reaction he was looking for so he went
24 on to something different.

VOLUME I - 56

1    Q.  Did anyone chastise him for making that
2 statement or anything like that?
3    A.  No.
4    Q.  How did you feel about the statement?
5    A.  I felt that the statement was wrong. He
6 was loud, he had people looking at him at some of
7 the other tables. It was apparent that more
8 people had heard what he had said than who were
9 seated at the table.
10     Of course Brian was in the full Webster
11 police uniform. It wasn't very appropriate was my
12 thought.
13    Q.  Why didn't you say something to him?
14    A.  It would have fallen on deaf ears.
15    Q.  Why do you say that?
16    A.  There would be no repercussion for
17 Brian.
18    Q.  What do you mean by that?
19    A.  That again, being outside of the chain
20 of command or not being subject to discipline
21 under Chief Bergeron, to say something to Brian,
22 have him chuckle and nothing come of it, what
23 would be the point.
24    Q.  Had you ever witnessed him make a racial

## VOLUME I - 57

1   statement at any other time?

2   A.   No.

3   Q.   Had you ever heard him use the word

4   nigger, chink or spic other than at that occasion?

5   A.   No.

6   Q.   Do you know of anyone else that did --

7   who says they did?

8   A.   Aaron Suss, Jim Hoover, Joseph Brooks,

9   Michael Kehoe, Jim Young, Jim Fersenheim.

10   Q.   What was that name?

11   A.   Jim F-E-R-S-E-N-H-E-I-M.

12   Q.   Is he a police officer?

13   A.   He's a dispatcher.

14   Q.   Okay; anyone else?

15   A.   I don't know.

16   Q.   Did these individuals tell you that they

17   witnessed Mr. Barnes making a racial statement?

18   A.   At different times just stories

19   repeated.

20   Q.   Starting with Officer Suss, what did he

21   tell you and when?

22   A.   I don't remember the date. Suss drove

23   Barnes and Phillip Charbonneau, the assistant

24   principal of the high school, they were going to

## VOLUME I - 58

1   some conference for school resource officers and

2   they were making -- the two of them talking back

3   and forth referring to African-Americans as

4   niggers on the way to the airport, whenever that

5   conference took place.

6   The other officers I mentioned were

7   talking about Brian Barnes' statements when he

8   came back after a New England Cable News panel

9   discussion for racial profiling where Senator

10   Dianne Wilkerson was also part of the panel. The

11   talk of Brian referring to her in front of those

12   people that I mentioned --

13   Q.   (Interposing) That's Hoover, Brooks,

14   Kehoe, Young, and Fersenheim?

15   A.   There were other officers present as

16   well -- or other Police Department personnel --

17   but referring to Senator Wilkerson as nothing but

18   a dumb nigger and whatnot.

19   I was not -- that's not firsthand

20   knowledge from me.

21   Q.   Did they say that he said that as

22   opposed to he was repeating that another police

23   chief said that about her?

24   A.   No; not that I recall.

## VOLUME I - 59

1   Q.   The statement that Suss told you he

2   heard between Barnes and Charbonneau, you said

3   that occurred on the way to the airport?

4   A.   Correct.

5   Q.   Did he say that the statement was about

6   the Oreo cookie?

7   A.   No; Aaron had said to me that there was

8   conversation back and forth between Barnes and

9   Charbonneau, both of them using the word "nigger"

10   quite a lot. The two of them laughing and joking.

11   Q.   Have you, yourself, ever used the terms

12   nigger, chink or spic to refer to individuals?

13   A.   No.

14   Q.   Have you ever heard Richard Bergeron

15   make racist type comments?

16   A.   No.

17   Q.   How about William Keefe?

18   A.   No.

19   Q.   Have you ever heard any other officers

20   or supervisors at the Police Department make

21   racial type comments besides the time that you

22   said that you heard Officer Barnes at the

23   restaurant?

24   A.   No.

## VOLUME I - 60

1   Q.   Do you have any knowledge to believe

2   that Chief Bergeron had ever heard Brian Barnes

3   make these type of racial comments?

4   A.   I don't know.

5   Q.   Do you know if, prior to Thomas Ralph

6   reporting the incident at the restaurant to Chief

7   Bergeron, whether any other police officers or

8   Police Department civilian employees had ever

9   reported to Chief Bergeron or to any other

10   supervisor that Brian Barnes had made racial

11   comments?

12   A.   Jim Hoover -- Detective Hoover.

13   Q.   What do you understand he reported?

14   A.   He reported to Tom Ralph about an

15   incident at the Bartlett High School about Brian

16   Barnes refusing to room with a black man when they

17   were in one of the orders of --

18   Q.   Seminary?

19   A.   Something along that line; yes. They

20   had to work in a soup kitchen in New York or

21   something to that effect and they would be there

22   for a week. Space was limited. Brian refused to

23   sleep in the same room so he slept in his car or

24   something along those lines. I was not there for

VOLUME I - 65

1    after the Colonial Club.
2         I wasn't at the bomb scare.  I don't
3    remember when exactly it was.
4         Q.   Do you know when the statement that was
5    reportedly made about Ms. Wilkerson was made?
6         A.   Either the day of or the day after,
7    whenever that NECN piece aired.
8         Q.   Do you know when that was?
9         A.   No.
10        Q.   Do you recall whether it was before or
11   after the Colonial Club Restaurant statement in
12   February, '03?
13        A.   I don't remember.
14        Q.   In terms of the racial profiling law, is
15   it your understanding that there was a period
16   where it was voluntary and then it became
17   mandatory?
18        A.   Right; if I remember correctly there
19   was -- I think there was a test period and then it
20   became mandatory.
21        Q.   When there was this test period, did you
22   comply with it?
23        A.   Yes; it amounted to adding a person's
24   race on the citation.

VOLUME I - 66

1         Q.   How did you -- I'm sorry, I interrupted
2    you.  Are you done?
3         A.   Yes.
4         Q.   How did you do that?  Did you just check
5    a box?  Did you write in a code?
6         A.   At first it was a box check but then
7    there was a set of -- I believe it was a
8    three-character code.
9         Q.   As far as you know you always complied?
10        A.   Yes.
11        Q.   Did you know whether or not Brian
12   Barnes -- strike that.
13        When it was in the testing stage you
14   said that you always complied?
15        A.   Yes.
16        Q.   And then after it became mandatory, did
17   you always comply as far as you know?
18        A.   Yes.
19        Q.   Was there ever a time when you were
20   aware that Brian Barnes was not doing it, either
21   during the test stage or when it became mandatory?
22        A.   Yes.
23        Q.   How did you become aware of that?
24        A.   Brian freely announced that he was not

VOLUME I - 67

1    going to do that.
2         Q.   Was that when it was mandatory or during
3    the testing stage?
4         A.   Both.
5         Q.   What did he say?
6         A.   I'm not doing that.
7         Q.   Did he say why?
8         A.   No -- or not to me, anyway.
9         Q.   Do you know if he -- from anyone else
10   that you spoke to as to whether he told anyone
11   else as to why he wasn't going to comply?
12        A.   No.
13        Q.   Do you know of anyone else that did not
14   comply -- meaning at the Webster Police
15   Department?
16        A.   No.
17        Q.   Did you ever see any statistics,
18   anything like that that showed the compliance of
19   other officers besides yourself?
20        A.   The only thing I saw was a Boston Globe
21   article that Brian Barnes was the number one
22   non-compliant officer in the state.
23        Q.   Was any other officer from the Webster
24   Police Department listed?

VOLUME I - 68

1         A.   No.
2         Q.   Do you know when that article was
3    published by any chance?
4         A.   Very close to that NECN piece.  That's
5    why he was asked to -- or contacted and asked to
6    be on the panel.  I don't remember when that piece
7    aired.
8         Q.   The reference that you stated to the
9    bomb scare where you said that Brian Barnes
10   reportedly talked about sleeping in the car, did
11   you ever hear anything about him being at a
12   seminary in Philadelphia?
13        A.   No; just his seminary days.  I heard him
14   talk about New York or New York City but never --
15   I never heard him speak of Philadelphia.
16        Q.   Before Thomas Ralph filed his complaint
17   with Chief Bergeron about Brian Barnes, did you
18   discuss it with him?
19        A.   No.
20        Q.   You had no idea he was going to do that?
21        A.   Correct.
22        Q.   It is your understanding that he did
23   that based on the statement made at the bomb
24   scare?

Case 4:05-cv-40134-FDS   Document 212   Filed 07/21/2008   Page 13 of 28

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC                    AUGUST 31, 2006

## VOLUME I - 69

1    A.   Correct -- again if that was a bomb
2  scare but at the event or incident at the school.
3  I'm assuming it was a bomb scare but I don't know
4  that for sure.
5    Q.   Were you present when he gave his
6  complaint to Chief Bergeron?
7    A.   No.
8    Q.   When did you first hear about it?
9    A.   In Chief Bergeron's office when I went
10  in to talk to him about the Amato case.
11    Q.   Can you tell us what was discussed then?
12    A.   Chief Bergeron, when I entered, was very
13  angry.  He accused me of collaborating with Ralph
14  on a letter that he had -- a tri-folded piece of
15  white paper that he kept waving back and forth and
16  accused me of -- he kept accusing me of working
17  with Ralph on this, you had a part in this.  He
18  didn't do this by himself and I had no idea what
19  he was talking about.
20        I asked him and he just shoved the paper
21  forward to me and told me to read it.  I read it.
22  I saw that it was from Ralph to Bergeron outlining
23  racial bigotry or racial behavior from Brian
24  Barnes and that he wanted a response from

## VOLUME I - 70

1  Bergeron.  Bergeron had fourteen days to respond
2  or Ralph would go to other agencies.
3        The Chief was upset because he was
4  telling me that the fourteen-day paragraph, he
5  called that as "downtown," that's "downtown."  He
6  said to me that Ralph had to have someone help him
7  with this; that that was nothing he did on his
8  own; that I made a big mistake; that my
9  friendship, loyalty, and support of Deputy Chief
10  Ralph was going to cost me.
11    Q.   Did he say why he thought that you were
12  involved in it?
13    A.   He didn't.  He didn't say.
14    Q.   Did you ever have any discussion with
15  Ralph as to why he decided to make that complaint
16  at that time?
17    A.   No.
18    Q.   When you went into the Chief's office
19  that day and he showed you the letter, do you know
20  if that was the same day that Ralph turned in the
21  letter?
22    A.   I believe so.
23    Q.   Do you happen to know what Ralph did
24  after he turned in the letter?

## VOLUME I - 71

1    Q.   Do you have any knowledge of that --
2  where he went, what he did?
3    A.   No.
4    Q.   When is the first time you did discuss
5  that letter with Ralph?
6    A.   Actually I need to clarify.  The Chief
7  had also, when we were in the office -- it had to
8  be that day because earlier that day Derrick
9  Stokes and I had met with John Bish and the Chief
10  accused me of lying to cover Tom Ralph.
11        He was at -- when Derrick and I were at
12  the East Brookfield Courthouse Ralph had showed
13  up.  Derrick, John, and I were getting ready to go
14  to lunch so we invited Tom to come with us.
15    Q.   Just for a second.  Do you know if that
16  was after he turned in the letter?
17    A.   Right; it had to be.
18    Q.   Okay.  Did he go to lunch with you?
19    A.   He did.
20    Q.   Did he discuss the fact that he turned
21  in the letter?
22    A.   No; we were -- he was very quiet but the
23  reason Derrick and I were there was to share with
24  John timetables of people that we were looking at

## VOLUME I - 72

1  or suggested to us by other agencies of possible
2  suspects -- today they are people of interest --
3  but suspects in the Amato case but the timetable
4  in the area -- those people that give or have John
5  give those to the investigators for the Molly Bish
6  case so it was all involved in that and the Center
7  For Missing and Exploited Children so Ralph had
8  very little to say during that whole time.
9        As we were finishing lunch he said to
10  Derrick and I that he had to get back to the
11  station and he left.
12    Q.   Do you have any knowledge of him
13  ignoring requests by Chief Bergeron to return to
14  the station?
15    A.   I don't know.
16    Q.   Incidentally, is there an officer
17  Bates -- B-A-T-E-S?
18    A.   Brian Bates; yes.
19    Q.   Did he ever make any statement or
20  statements to you about Brian Barnes and alleged
21  racial statements?
22    A.   Not that I remember.
23    Q.   How about Officer Shaw?
24    A.   Not that I remember.  I don't remember

**VOLUME I - 77**

1    He asked me if I thought Brian Barnes
2  was a racist and if I had ever witnessed Brian
3  Barnes making any racially derogatory statements.
4  I told him I had.
5    He got angry again.  He wanted to know
6  when, where, dates, people and there and then
7  ordered me to put it in writing.
8    Q.   Do you think there was anything wrong
9  with him asking you to put it in writing?
10   A.   No.
11   Q.   Did he express an opinion as to whether
12 he thought that Brian Barnes a racist?
13   A.   He didn't express an opinion; no.
14   Q.   Do you recall telling anyone prior to
15 that meeting that you felt threatened by Chief
16 Bergeron?
17   A.   Prior to May first?
18   Q.   Prior to that meeting where he said to
19 you, "so you feel threatened."
20   A.   I probably would have.  I don't remember
21 speaking specifically.
22    As this is all ongoing, everybody began
23 talking to everyone about everything so it's --
24 all of this started almost a whirlwind type of

**VOLUME I - 78**

1  atmosphere.
2    Q.   We discussed earlier after you were
3  taken off the Amato investigation you returned to
4  uniform duty, is that correct?
5    A.   Correct.
6    Q.   What did he tell you when he told you
7  that he was taking you off the Amato
8  investigation?
9    A.   He told me that William Keefe complained
10 to him about staffing shifts or manning shifts.
11   Q.   Do you have any reason to doubt that
12 that occurred?
13   A.   Yes.
14   Q.   And why is that?
15   A.   That was on May 12th that Bergeron had
16 said that to me but on May 8th William Keefe and I
17 had a long conversation about shift or manning on
18 shifts in the conference room of the police
19 station and he and I agreed that if there was a
20 shift that was short that either myself or Stokes
21 would come back to uniform, work that shift or
22 stay in uniform until that particular coverage was
23 resumed and then we'd go right back to the Amato
24 case again.

**VOLUME I - 79**

1    Q.   What would be a full work shift on the
2  eleven-to-seven shift that you worked on when it
3  was fully staffed?
4    A.   I don't understand.
5    Q.   In other words would there be one
6  sergeant and a certain number of patrolmen?
7    What would be the full compliment on the
8  eleven-to-seven shift?
9    A.   Usually there would be a sergeant.  In
10 the absence of a sergeant, the officer with the
11 most seniority would be the OIC -- or officer in
12 charge.  He would be the shift supervisor for that
13 shift.
14    Now depending upon time of the year, day
15 of the week, on an eleven-to-seven shift, for
16 example on a Tuesday overnight to Wednesday in the
17 middle of January there would be a shift
18 supervisor and two patrol officers.
19    In the summertime there would be a shift
20 supervisor and three or four patrol officers.
21 There may or may not be a permanent part-time
22 intermittent officer assigned to the downtown
23 area.  There may be reserve officers that
24 volunteer their time to come in and either ride

**VOLUME I - 80**

1  with an officer or work patrol so that they can
2  build experience and eventually go to other police
3  departments.
4    There's not a single complement that
5  fits the eleven-to-seven shift as a permanent
6  structure.  That's always a state of flux
7  depending upon need and availability.
8    Q.   Would there generally be at least two
9  patrolmen and one shift supervisor?
10   A.   That's fair to say; yes.
11   Q.   When it was at its best so to speak, how
12 many would you have on that shift -- if it was an
13 ideal situation?
14   A.   There were times in the summer where
15 I've worked that shift with as many as six or
16 eight officers, a combination of full time, part
17 time.
18   Q.   This was May, '03.  What would you
19 normally have then to be ideal?
20   A.   Three officers and a supervisor.
21   Q.   Do you remember what the situation was
22 when Chief Bergeron told you that he wanted to put
23 you back on regular patrol?
24   A.   There was adequate coverage for the

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC                                    AUGUST 31, 2006

VOLUME I - 81

1  eleven-to-seven shift.
2      Q.   Do you remember what was adequate
3  though?  What the numbers were?
4      A.   A supervisor and three police officers.
5      Q.   When Chief Bergeron told you that that
6  was the reason that he was putting you back on
7  regular patrol, did you question him at all or
8  tell him about your conversation with William
9  Keefe?
10     A.   No.
11     Q.   Did you ever have a discussion with
12 William Keefe about that afterwards?
13     A.   Yes.
14     Q.   What did he say -- what did you both
15 say?
16     A.   I told Keefe what Bergeron had said --
17 that he complained and said to him that I thought,
18 was I mistaken or did we have that worked out.
19 Keefe had said to me, he said I never said that to
20 Bergeron, he said, but he's the Chief, do what he
21 tells you to do and that's what we did.
22     Q.   I think you stated in your Answers to
23 Interrogatories that you had been using your
24 office for about three years before it was taken

VOLUME I - 82

1  away.  Is that correct?
2      A.   Approximately; yes.
3      Q.   Prior to that what did you use to store
4  your materials and do your work?
5      A.   A file cabinet, the mailbox in the
6  hallway.
7      Q.   Why couldn't you go back to that?
8      A.   The addition of quite a lot more items.
9  As time would go on I would work larger cases,
10 more in-depth cases.
11          I would get better at what I was doing.
12 I would collect more.
13     Q.   When Chief Bergeron told you that you
14 and Officer Suss had to turn in your keys, did he
15 tell you why you would no longer be able to use
16 that office?
17     A.   No.
18     Q.   Did you ever find out what the office
19 was used for after you were no longer using it?
20     A.   It remained empty for a long time.
21     Q.   Are you certain of that?
22     A.   Yes.
23     Q.   In other words did you ever go in and
24 look?

VOLUME I - 83

1      A.   No.
2      Q.   Why do you believe it was empty then?
3      A.   I was told that it was empty.
4      Q.   Who told you that?
5      A.   Hoover, Ralph, Bates.
6      Q.   Do you know how they know that?
7      A.   I don't.
8      Q.   Did you ever hear that Chief Bergeron
9  wanted that office because he was doing an
10 investigation of his own and had a lot of
11 documents that he wanted to put in there to be
12 kept confidential?
13     A.   No.
14     Q.   To this day you've never received any
15 information about that?
16     A.   No.
17     Q.   Do you still have the e-mail that Chief
18 Bergeron sent you telling you that you should
19 relinquish your office keys?
20     A.   Yes.
21     Q.   I'm going to ask you to produce that.
22     A.   I don't have it with me.
23     Q.   No; I understand.
24     A.   Okay; sure.

VOLUME I - 84

1      Q.   I believe in your complaint you've
2  alleged that Richard Bergeron contacted various
3  individuals and requested negative information
4  about you?
5      A.   Yes.
6      Q.   Starting with John Stevens, why do you
7  believe that Chief Bergeron requested negative
8  information from him?
9      A.   John Stevens was an apprentice for Bob
10 Miller at the funeral home.  He -- "he" being John
11 Stevens -- told Miller about the conversation that
12 Bergeron and Alfred Beland had with Stevens, that
13 if they had any negative information regarding Tom
14 Ralph or myself, that JP Stevens would be
15 reinstated to the Webster Police Reserve Unit.
16          Stevens was -- sometime before that --
17 was given the option to either resign from the
18 reserve unit or be -- not be reappointed.
19     Q.   By who?
20     A.   By the Town.  He wouldn't necessarily --
21 from the Reserve Unit you wouldn't be fired or
22 terminated.  It is a one-year appointment.
23     Q.   In other words though, was it Chief
24 Bergeron that wanted that or someone else?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC                    AUGUST 31, 2006

VOLUME I - 113

1   Barnes but Chief Bergeron would not permit it?
2       A.   I heard that indirectly a number of
3   times.
4       Q.   Do you recall who you heard it from?
5       A.   Jim Hoover -- of course Hoover was the
6   union president then.  At various times Tim Bent,
7   Rod Budrow, different officers at different times,
8   the officers making jokes that, well, Barnes did
9   it, he'll get away with it, those types of things;
10  all secondhand hearsay type thing.
11      Q.   Do you have any reason to believe that
12  Barnes did have a close relationship with regard
13  to Chief Bergeron with respect to his prior work
14  experience at Quincy or in Webster that expanded
15  outside of the workplace?
16      A.   I don't think I'm clear.
17      Q.   Do you have any personal information to
18  confirm whether or not Chief Bergeron and Brian
19  Barnes had a relationship outside of work either
20  in Quincy or in Webster?
21      A.   When Chief Bergeron bought his house in
22  New Hampshire there was one day in the dispatch
23  room that Brian was telling us about his -- the
24  indoor pool.

VOLUME I - 114

1           According to Brian he had been up there
2   to the New Hampshire property.  He was telling us
3   all about pools and fruit trees.
4       Q.   Was that when Chief Bergeron was still
5   actively employed?
6       A.   Yes.
7       Q.   Before he was put on administrative
8   leave?
9       A.   Yes.
10      Q.   Any other information that you have
11  about their relationship?
12      A.   Just stories of the days in Quincy,
13  different names of officers and some of the things
14  that they did, some of the war stories type of
15  things that Brian would repeat to us and tell us
16  about.
17      Q.   Did you ever have any discussions with
18  Michaela Kelley about the cheating allegations?
19      A.   No.
20      Q.   Any particular reason why not?
21      A.   I never gave the cheating allegations
22  any credence.
23      Q.   Did you ever discuss that topic with
24  William Keefe?

VOLUME I - 115

1       A.   No.
2       Q.   With respect to Brian Barnes and his
3   assignment at the school, did you disagree with
4   that?
5           In other words, did you think he should
6   just be doing patrol as opposed to working at the
7   school?
8       A.   No.
9       Q.   Do you know whether Thomas Ralph
10  disagreed with that assignment?
11      A.   That, I don't know.
12      Q.   I want to refer you now to the first of
13  the three incidents that have been discussed
14  involving Jonah Mayotte on February 19, 2002.
15          Did you first become involved with him
16  within the police station?
17      A.   Yes.
18      Q.   Can you tell us why it is that you got
19  involved with removing the jewelry?
20      A.   I was called in off the road.  I was on
21  patrol.
22          I was called in and briefed by Steven
23  Novick that they were trying to remove jewelry,
24  couldn't, that they've been trying for a half

VOLUME I - 116

1   hour, forty-five minutes, it's not working so they
2   needed help.
3       Q.   You said Novick actually called you and
4   asked you to come in and help?
5       A.   Yes.
6       Q.   And then what did you do?
7       A.   I went into the booking room, observed
8   Mayotte on the floor.  I removed his necklace,
9   instructed Novick and Pysell to sit him in a
10  chair -- pick him up off the floor, sit him in a
11  chair.
12      Q.   With respect to the necklace, can you
13  describe the necklace?
14      A.   He had a couple of necklaces on.  The
15  necklace that I removed was -- I was able to pull
16  away from his neck.
17          It was a long gold chain and a small
18  medallion or something on it.
19      Q.   How long was it, do you know,
20  approximately?
21      A.   I don't know.
22      Q.   But it wasn't flush against his neck?
23      A.   No.
24      Q.   Do you know how much space there was

JOHN BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC          AUGUST 31, 2006

## VOLUME I - 117

1  between his skin and the necklace?

2       A.   Six inches, ten inches.

3       Q.   Did you ever testify at any proceeding

4  that it was flush up against his neck?

5       A.   He was wearing one that was flush.  He

6  had an eagle or a bird or something -- something

7  long that sat much like my tie is here.

8       Q.   Did you remove that one?

9       A.   He removed that one later on.

10      Q.   How did you remove the necklace that you

11 removed?

12      A.   My utility knife -- my duty knife.

13      Q.   Why did you remove it with a knife as

14 opposed to just unclasping it?

15      A.   I had duty gloves on.

16      Q.   What are duty gloves?

17      A.   Duty gloves are a -- the outside is

18 black leather.  There is a Kevlar mesh inside so

19 they are cut resistant, puncture resistant but it

20 diminishes fine finger dexterity.  You have to

21 take them off to write with a pen or to unclasp

22 jewelry, which I didn't do.

23      Q.   He was on the ground though facing the

24 floor, is that correct, at that point?

## VOLUME I - 118

1       A.   He was on the floor.

2            He was almost on his belly, not quite.

3  He wasn't -- he was more on his belly than he was

4  on his side but he wasn't laying flat, face down

5  on the floor.

6       Q.   Was there a reason, though, as to why

7  either you -- if you didn't have your gloves on or

8  someone else couldn't remove the necklace by just

9  unclasping it?

10           In other words is there a reason why you

11 didn't just unclasp it?

12      A.   My understanding was he would try and

13 grab it and pull to make it difficult.  According

14 to Novick for some thirty or forty-five minutes

15 they had been trying to do that unsuccessfully.

16           In Sergeant Kelley's report she states

17 that they were unsuccessful in attempting to

18 forcefully remove his jewelry.

19      Q.   What did you do after you got the

20 necklace cut off?

21      A.   I dropped his necklace in a property

22 bag.

23           I had instructed Officers Novick and

24 Pysell to pick him up off the floor and sit him in

## VOLUME I - 119

1  a chair in the booking room.

2       Q.   And then what happened next?

3       A.   I told Mayotte who I was and told him

4  that his jewelry had to come out; that if he

5  didn't take it out himself then we would take it

6  out for him.

7       Q.   Prior to cutting off his necklace, did

8  you say anything to him?

9       A.   No.

10      Q.   Why not?

11      A.   I had three of my officers in there for,

12 as Novick put it, thirty to forty-five minutes,

13 the three of them attempting to remove jewelry.

14 They were unsuccessful in their attempts so for

15 the thirty or forty-five minutes they are allowing

16 Mayotte to have control over what they're doing in

17 that room.

18           By removing his necklace with him having

19 no say whatsoever and then sitting up in the

20 chair, it was apparent to him that jewelry could

21 be removed.  It was demonstrated for that.  That

22 was for the purpose and assuming control of that

23 situation.

24

## VOLUME I - 120

1            (Defendant's Deposition Exhibit
             No. 1 offered and marked.)

2

3       Q.   (BY MS. LYNCH)  I'm going to show you

4  what's been marked Exhibit Number 1.  Is that

5  Mr. Mayotte?  (Indicating.)

6       A.   Yes.

7       Q.   Which necklace was it that you cut off?

8       A.   The longer one that's not in full view

9  of this picture, the one that would go longer.

10 There's one necklace here and there's one there.

11      Q.   Why did you believe that necklace had to

12 come off?

13      A.   Why did I believe the longer --

14      Q.   (Interposing) Why did you want it to

15 come off?

16      A.   Mr. Mayotte is someone who fits the

17 classic model for a suicide risk.  Jewelry that

18 could be either used to commit suicide or to

19 injure himself or to be fashioned into weapons to

20 be used against an officer, all of that had to be

21 removed for those purposes.

22      Q.   Let me ask you first:  What

23 characteristics did he display that you thought

24 fit the classic model for suicide?

**PERLIK and COYLE REPORTING**

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL.**
**JOHN BOLDUC**      **AUGUST 31, 2006**

## VOLUME I - 125

1  Q.  About six inches or so?
2  A.  Yes; it's very small.
3  Q.  With respect to that earring though on
4  the top of his left ear, why did you think that
5  should come off?
6  Why did you think that posed a danger to
7  anyone?
8  A.  It could be fashioned into weapons; yes.
9  Q.  How so?
10  A.  Any type of jewelry used to cut his own
11  skin; any type of jewelry that could be rubbed on
12  concrete in a cell and used to make some sort of
13  incision if he wanted to hurt himself; anything
14  that could be pinched between fingers and struck
15  or scraped or punched at an officer.
16  Q.  Were you successful in removing that
17  earring?
18  A.  No.
19  Q.  What was the next thing that happened?
20  A.  Matt Langevin who was a part-time
21  officer, full-time dispatcher who was working as a
22  uniform patrol officer suggested that the bolt
23  cutters from the rescue truck from the fire
24  department next door to the police station.

## VOLUME I - 126

1  Q.  Where was Matt Langevin when this was
2  all happening?  .
3  A.  Standing in the room.
4  Q.  Where was Jeff Becker when this was
5  happening?
6  A.  Standing in the room.
7  Q.  Do you know where Jeff Becker is at this
8  time?
9  A.  He's a full-time firefighter paramedic
10  somewhere in Massachusetts.
11  Q.  How about Matt Langevin?
12  A.  Still works for the Webster PD,
13  full-time dispatcher.
14  Q.  What happened after Mr. Langevin
15  suggested the bolt cutters?
16  A.  I shook my head, I told him go ahead, go
17  get them, let's see them.
18  Q.  Did he get them for you?
19  A.  He did.
20  Q.  How would you describe the bolt cutters?
21  A.  Bolt cutters look like -- they were much
22  like a common hedge trimmer would, two handles.
23  There are two pin points and then a -- what's
24  referred to as either a bull nose or a snub nose

## VOLUME I - 127

1  and cutters like scissors.
2  Q.  How big were they?
3  A.  Probably two feet.
4  Q.  What happened after he got those for
5  you?
6  A.  I showed them to Mayotte, told him that
7  if he didn't take his jewelry out we would use
8  these to remove his jewelry.
9  Q.  What was his response?
10  A.  I think he swore at us again.
11  Q.  What position was he in at that point?
12  A.  Sitting in a chair facing me.
13  Q.  Who else was in the room?
14  A.  Steven Novick, Thomas Pysell, Michaela
15  Kelley, Scott Nelson, Jeff Becker, Gary
16  Wrubaleski, Matt Langevin, Yvette Roseland, and
17  Tom Ralph was in the hallway watching into the
18  room.
19  Q.  I'm sorry, who is Roseland again?
20  A.  She was a dispatcher.
21  Q.  Did you eventually use those bolt
22  cutters on Mr. Mayotte?
23  A.  Yes.
24  Q.  Before you did so, did anyone say that

## VOLUME I - 128

1  they didn't think you should?
2  A.  No.
3  Q.  Did anyone say they didn't think you
4  should use the ring cutter?
5  A.  No.
6  Q.  Which piece of jewelry did you use the
7  bolt cutters on?
8  A.  That same piece.
9  Q.  The ring above his ear?
10  A.  Top of the left ear; yes.
11  Q.  Did you get it off?
12  A.  Yes.
13  Q.  And then what happened?
14  A.  Prior to cutting that I asked Wrubaleski
15  and Becker to stay in the room.  I told Novick and
16  Pysell to stand on each side of Mayotte and hold
17  him still.
18  They did and I cut the ring, took it
19  off, had Novick and Pysell release him, told him
20  to remove the rest of his jewelry.
21  Q.  What did you do with the ring that you
22  took off?
23  A.  Dropped it in the property bag.
24  Q.  Do you know if that jewelry was ever

### VOLUME I - 129

1  inventoried?
2       A.   I would assume so.
3       Q.   Is it supposed to be?
4       A.   It's supposed to be; yes.
5       Q.   So after you removed that ring what
6  happened?
7       A.   He said something along the lines of you
8  guys are crazy, he was not going to take his
9  jewelry off.
10      Q.   So then what happened?
11      A.   I instructed Pysell and Novick again to
12 steady Mayotte and I cut a second piece of
13 jewelry.
14      Q.   Which one did you cut off?
15      A.   I believe that it's the piece on the --
16 I believe it is the piece above the left eye.
17      Q.   Is that a ring also?
18      A.   Yeah, not quite a ring. There's a
19 break -- this is the one I'm looking at. It's the
20 ring with two large balls on each end.
21 (Indicating.)
22      Q.   I'm sorry, did you say that you did cut
23 that off?
24      A.   Yes.

### VOLUME I - 130

1       Q.   The reason for cutting that one off was?
2       A.   Same reason.
3       Q.   You thought it could be used as a
4  weapon?
5       A.   Right; and those two pieces were the
6  safest.
7            When the rings were brought up, they
8  were the two that protruded the most from him and
9  could be cut the safest.
10      Q.   What happened after you cut that one
11 off?
12      A.   He took all the rest of his jewelry off.
13      Q.   Can I see that picture?
14      A.   Sure.
15      Q.   Did you ever give as a reason for
16 cutting off the jewelry that he had an injury to
17 his face -- a laceration or anything like that?
18      A.   Only when we were -- in my conversation
19 with Christopher Browne.
20      Q.   Your attorney?
21      A.   At that time he was the IBPO attorney;
22 yes. I had no information as to Mayotte as far as
23 a name. It was Hoover -- Jim Hoover who mentioned
24 something about a guy from a bar fight.

### VOLUME I - 131

1       Chris Browne and I met with William
2  Keefe at one point. It was only then that he had
3  a picture of Mayotte. He didn't identify Mayotte
4  but in all of my questioning and talking to people
5  and trying to figure out who and when and all of
6  this, I had questioned or thought that Mayotte was
7  one of these guys. The Maple Leaf was a common
8  place to be called to.
9            MS. LYNCH:  Can you go back on that,
10 please?
11           (Scrolling on computer screen.)
12      Q.   (BY MS. LYNCH)  So with regard to the
13 issue of the laceration, what did you say about
14 that with respect to your reason for cutting off
15 the jewelry?
16      A.   My thought was to have it removed at the
17 request of the EMTs, under the direction of the
18 EMTs.
19      Q.   Are you saying that the EMTs thought the
20 jewelry should come off?
21      A.   No.
22      Q.   I'm not following you, then. Can you
23 explain what you mean when you say that it was to
24 be removed at the direction of the EMTs?

### VOLUME I - 132

1       A.   Before Mayotte was identified to me,
2  before I knew that this is what we were looking
3  at, that I had asked, after finding out that they
4  were talking about someone from a bar fight and we
5  removed jewelry, I was questioning as to
6  lacerations or was it something the EMTs wanted.
7  I had no idea what anybody was talking about.
8       Q.   You're saying that you were thinking
9  these things before you arrived at the station
10 after you had been asked to intercede?
11      A.   No. What I'm saying is this had taken
12 place in February of 2002 so then all of a sudden
13 in 2004 I had -- I didn't remember Mayotte.
14           It wasn't until all of this started to
15 come about and we were talking about all of this
16 and the jewelry. I had a list of names of people
17 who were -- that I could remember who were in bar
18 fights. I had no idea who anybody was talking
19 about.
20      Q.   You're saying that in 2004 when you were
21 questioned about it you were thinking that it was
22 removed because he had a laceration?
23      A.   Correct.
24      Q.   But in fact it wasn't removed because he

# JOHN BOLDUC v. TOWN OF WEBSTER ET AL
## JOHN BOLDUC        AUGUST 31, 2006

### VOLUME I - 145

1  Q.   When did you first see that?
2  A.   Along with the other information from
3  Chris Browne.
4  Q.   The day before your hearing?
5  A.   (Witness examining document.)  Yes.
6  Q.   Was there anyone present with regard to
7  this Jonah Mayotte incident who was not
8  interviewed?
9  A.   Not interviewed by William Keefe?
10  Q.   Right.
11  A.   Matt Langevin, Yvette Roseland,
12  Pysell -- Thomas Pysell; and myself.
13  Q.   Do you know whether in fact these other
14  three individuals were not interviewed?
15  A.   Both Roseland and Pysell had said that
16  they were never interviewed regarding Mayotte.
17  Langevin didn't say anything.
18  Q.   Did you have a discussion with Roseland
19  and Pysell on that issue?
20  A.   After I was terminated both of them
21  asked me why Keefe never asked them any questions.
22  I told them I didn't know.
23  Q.   Do you have any knowledge as to why he
24  didn't -- why he didn't interview them?

### VOLUME I - 146

1  A.   No.
2  Q.   With respect to this issue of Jonah
3  Mayotte at your hearing, did you call any
4  witnesses -- meaning your attorney on your behalf?
5  A.   Thomas Pysell.
6  Q.   He testified at the hearing on your
7  behalf?
8  A.   Yes.
9  Q.   Okay.
10  A.   Gary Wrubaleski, Gary Milliard.  That is
11  all for Mayotte.
12  Q.   Do you know why Matt Langevin and Yvette
13  Roseland didn't testify on your behalf?
14  A.   I don't.
15  Q.   Did you speak to either of them about
16  testifying on your behalf?
17  A.   No; I was told from Pysell that William
18  Keefe had put the Town Hall off limits to police
19  officers but some showed up anyway.
20  Q.   How was it that Pysell testified on your
21  behalf then?
22  A.   He showed up at the Town Hall.
23  Q.   Did your attorney subpoena him as far as
24  you know?

### VOLUME I - 147

1  A.   My attorney did not have subpoena
2  powers.
3  Q.   You know that for a fact that he did not
4  have subpoena powers at the hearing?
5  A.   Correct; that's what he told me himself.
6  Q.   Do you know if he requested that
7  Roseland or Matt Langevin testify in your behalf?
8  A.   I don't know about those two.  He
9  requested Gevry and Kelley.
10  Q.   He asked them to testify with regard to
11  the Jonah Mayotte incident?
12  A.   He wanted them at my hearing but they
13  were unavailable.
14  Q.   With regard to the Jonah Mayotte
15  incident?
16  A.   Kelley for Mayotte, Gevry for Greenwood.
17  Q.   We'll get to Greenwood in a moment.  Did
18  Roseland or Langevin tell you that they wanted to
19  testify on your behalf with regard to the Jonah
20  Mayotte incident?
21  A.   No.
22  Q.   With regard to the recent Civil Service
23  hearing with regard to the issue of Jonah Mayotte
24  who did you have testify on your behalf?

### VOLUME I - 148

1  A.   Thomas Pysell.
2  Q.   Anyone else?
3  A.   No.
4  Q.   Why didn't you have Roseland or Langevin
5  testify at that?
6  A.   According to my attorney at that point,
7  Mike Clancy, neither one have any memory.
8  Q.   Do you know whether he subpoenaed them?
9  A.   I don't.
10  Q.   Do you know whether he had subpoena
11  power at the Civil Service hearing?
12  A.   I only assume he did.  I don't know for
13  sure.
14  Q.   Why didn't you have Gary Wrubaleski and
15  Gary Milliard testify at the Civil Service hearing
16  with regard to the Jonah Mayotte incident?
17  A.   I don't know.  I talked with my
18  attorney -- with Mike Clancy about it.
19  Q.   How about with respect to Michaela
20  Kelley?
21       Why didn't you have her testify at the
22  Civil Service hearing?
23  A.   She did.
24  Q.   She did?

## PERLIK and COYLE REPORTING

VOLUME I - 149

1    A.  Yes.

2    Q.  With regard to the Jonah Mayotte

3 incident?

4    A.  Yes.

5    Q.  Did your attorney subpoena her as far as

6 you know?

7    A.  No; the Town brought her.

8    Q.  How about Novick?  Why didn't you have

9 him testify at either the hearing before Ms. Leal

10 or the Civil Service hearing?

11   A.  He was not available for the hearing

12 before Ms. Leal and he -- the Town wanted to

13 subpoena him but he did not answer the subpoena.

14 They couldn't find him, something to that effect.

15   Q.  With regard to the hearing before

16 Ms. Leal?

17   A.  The hearing before Civil Service.

18   Q.  So he didn't show up at the Civil

19 Service hearing?

20   A.  Right; he didn't show up for either one.

21 For the hearing in front of Ms. Leal, he was

22 unavailable.  For Civil Service he didn't answer

23 the subpoena.

24   Q.  How about Officer Nelson?  Why didn't

VOLUME I - 150

1 you have him testify before Ms. Leal?

2    A.  He did.

3    Q.  He did?  For who?

4    A.  For the Town.

5    Q.  Did he testify at the Civil Service

6 hearing?

7    A.  For the Town; yes.

8    Q.  How about Mr. Becker?  Why didn't you

9 have him testify before Ms. Leal?

10   A.  Supposedly he couldn't be found.

11   Q.  Why didn't you have him testify at the

12 Civil Service hearing?

13   A.  Same reason.

14   Q.  Is he still employed, though?

15   A.  I don't know; not with the Town.

16   Q.  When you said that William Keefe stated

17 that officers were not supposed to be around the

18 Town Hall, was that your testimony?

19   A.  Right; I was told that Keefe told

20 officers that the Town Hall was off limits for --

21 while the hearings were going on.

22   Q.  What did you understand that to mean?

23   A.  To stay away from the Town Hall while

24 the hearing was going on.

VOLUME I - 151

1    Q.  Did you understand that to mean that if

2 they didn't have any business there they weren't

3 supposed to be there or are you saying that they

4 just weren't supposed to attend the hearing even

5 if they wanted to be a witness?

6    A.  I'm saying that because Chris Browne did

7 not have subpoena power that they were not to be

8 there even if they wanted to be so that they could

9 testify.

10   Q.  Is that your interpretation or were you

11 specifically told that?

12   A.  That's my interpretation.

13   Q.  Calling your attention to the Heath

14 Greenwood incident of November 9, 2002, when did

15 you first have involvement with him?

16   A.  The night of the 911 call.

17   Q.  Did you have involvement before he was

18 brought into the police station?

19   A.  At the scene.

20   Q.  But you didn't go back to the police

21 station with him, is that correct?

22   A.  Correct.

23   Q.  Was he under the influence of alcohol or

24 drugs as far as you know?

VOLUME I - 152

1    A.  Both.

2    Q.  Was that actually proven in terms of any

3 blood work, anything like that, breathalyzer?

4    A.  I don't know.

5    Q.  How was it that you ended up going back

6 to the Police Department and had contact with him?

7    A.  There was a panic tone and radio call

8 sent out by the dispatcher for a fight in the

9 station.  She was calling all units to the

10 station.

11   Q.  Just before we go on to this topic, back

12 with regard to the Jonah Mayotte incident, did you

13 ever see any other statements introduced into

14 evidence at that hearing besides the ones that you

15 had seen the night before?

16   A.  I don't recall.  I thought Chris Browne

17 introduced Michaela Kelley's original report

18 written at the time of the incident itself, which

19 is not here.

20   Q.  The actual police report you're talking

21 about?

22   A.  Michaela Kelley's actual report and

23 narrative; yes.

24   Q.  Back with respect to Mr. Greenwood,

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 153

1  then.

2          You said that you were -- you heard the
3  dispatcher make a call to all units?

4      A.   To come back to the station.

5      Q.   Okay.

6      A.   That there was a fight in the station.
7  You could hear a ruckus going on in the background
8  so myself, Pysell, Kehoe, and a Mass. trooper
9  responded.

10     Q.   Who was the Mass. trooper that
11 responded?

12     A.   Pat Robinson.

13     Q.   Why would -- you're saying a state
14 trooper?

15     A.   Yes, Ma'am.

16     Q.   Why would a state trooper respond as far
17 as you know?

18     A.   Webster is a very active town.  The
19 Sturbridge State Police barrack or C-5, their
20 troopers are -- Webster is part of their patrol
21 area for the state roads, 395 in particular.

22          Oftentimes the state troopers at C-5
23 know or knew that the overnight shift in Webster,
24 they were welcome to come in and train with my

VOLUME I - 154

1  officers.  Oftentimes in Sturbridge there are a
2  lot of newer troopers so we welcome the help.
3  They were able to do more of the municipal type of
4  policing.

5          They would take our frequency.  They had
6  the ability in their cruisers to scan our radio.
7  They would often show up at major accidents, at
8  house fires, at bar fights, any type of major
9  incident where they thought they could lend a
10 hand, they would come right in.

11     Q.   Did the state trooper stay for the
12 entire incident?

13     A.   It was over when he got there.  He came
14 from 395.

15     Q.   So as far as you know he is not a
16 witness to any relevant fact?

17     A.   As far as I know.

18     Q.   You said it was you, Pysell, Kehoe, and
19 Robinson that did show up?

20     A.   Robinson is the trooper.

21     Q.   Right; anyone else that showed up?

22     A.   Travis Gould was in the station as well
23 as Bonnie O'Leary.  Travis Gould was a reserve
24 officer, part-time police officer.

VOLUME I - 155

1  Bonnie O'Leary was the dispatcher on
2  duty.

3      Q.   When you arrived at the station, what
4  did you observe with respect to Heath Greenwood?

5      A.   I observed Greenwood with his hands
6  grabbed on the collar of Gevry's uniform.  He was
7  forcing Gevry backward.

8          He had the advantage over Gevry and he
9  caught Gevry in the back over the hamstring.  One
10 leg was in the air.  He was forced back to the
11 wall.  Gevry's head couldn't go back any further
12 because it was pressed against the wall.

13          Gevry had one hand holding onto the edge
14 of the table, of the counter.  He had one hand
15 grasped on Greenwood's forearm.

16          Greenwood was forcing the chain of the
17 handcuff under Gevry's chin and he was choking
18 Gevry.

19     Q.   Was anyone else in the room besides
20 those two?

21     A.   Just those two.

22     Q.   Were there any other police officers in
23 the Department before you arrived besides Gevry?

24     A.   Travis Gould.

VOLUME I - 156

1      Q.   He was the reserve officer?

2      A.   He interceded on Gevry's behalf the
3  first time.

4      Q.   What do you mean?

5      A.   When the 911 call came in, Officer
6  Pysell had a woman in the other booking room who
7  was in protective custody.  She was intoxicated
8  but cooperative, very still.

9          Travis Gould was actually filling out
10 the booking screens on the computer for the
11 experience to do so.  He wasn't working and was in
12 there on his own time.  The 911 call came in.
13 Pysell secured the woman to the chair and directed
14 Travis Gould to finish the booking process, keep
15 an eye on her and we'll be back.  When we
16 responded, Gevry brought Greenwood back.

17          There was a time where Greenwood and
18 Gevry began arguing.  Gevry slapped Greenwood in
19 the face and Greenwood came out of the chair and
20 attacked Gevry.  Travis Gould either heard the
21 commotion going on or Bonnie O'Leary yelled to
22 Travis Gould.

23          Gould went into the booking room and
24 Gevry and Gould subdued Greenwood.  According to

Case 4:00-cv-40310-FDS   Document 172   Filed 08/16/2007   Page 23 of 28

**VOLUME I - 157**

1 Travis he waited a few minutes, things seemed
2 okay, went back to the screen where the woman was
3 secured and continued the booking process.  After
4 that again there was a problem between Gevry and
5 Gould.
6          MR. GREEN:  Just for the record, you
7 mean Greenwood?
8          THE WITNESS:  Yes; a problem between
9 Gevry and Greenwood again.  That's what set off
10 the panic tones and that's when we came back.
11          Upon entering the station -- when the
12 panic tones had gone off we were on our way back
13 to the station anyway.  We were very close so we
14 were there in a matter of seconds.
15          When Pysell and myself ran into the
16 building Gould was on his way to help Gevry but
17 saw myself and Pysell go into the room at the same
18 time so he decided to stay with his prisoner and
19 finish the booking process.
20     Q.   (BY MS. LYNCH) I'm sorry, where was
21 Pysell prior to coming into the room with
22 Greenwood?  Did you say he was in the next room?
23     A.   No; Pysell was in my cruiser with me.
24 We arrived at the station at the same time.

**VOLUME I - 158**

1     Q.   I thought you said that Pysell had been
2 in another room with someone in protective
3 custody?
4     A.   I did.  Pysell had a woman who was in
5 protective custody.  He was in another booking
6 room with Travis Gould when this 911 call came in.
7          Pysell and I left from the station but
8 he left Gould to oversee the witness and continue
9 the booking process.
10     Q.   All right; that clarifies that.  As far
11 as you know, then, when Gevry and Greenwood were
12 in the room together the only other officer in the
13 Department was Gould?
14     A.   Correct.
15     Q.   You mentioned that there had been a
16 prior incident that Gould had helped Gevry in
17 where you said Gevry slapped Greenwood in the
18 face?
19     A.   Yes.
20     Q.   How do you know about that?
21     A.   It's in -- it's either in one of the
22 statements or Gevry admitted to that on his own.
23     Q.   At the hearing before Ms. Leal was there
24 any testimony from Officer Gould?

**VOLUME I - 159**

1     A.   I don't believe so.
2     Q.   How about at the Civil Service hearing
3 recently?  Did Officer Gould testify there?
4     A.   Yes.
5     Q.   Who called him as a witness?
6     A.   I did -- Mike Clancy did.
7     Q.   Do you know why he didn't testify at the
8 hearing before Ms. Leal?
9     A.   No.  Again my understanding is that
10 Chris Browne was not allowed to call witnesses.
11     Q.   But he did call some witnesses, isn't
12 that correct?
13     A.   The ones who showed up anyway.
14     Q.   He introduced documents at the hearing
15 before Ms. Leal, is that correct?
16     A.   He did.
17     Q.   With respect to the slapping in the face
18 of Mr. Greenwood, do you have any idea what
19 prompted that?
20     A.   I don't.
21     Q.   You said that Mr. Greenwood got out of
22 his chair at that point and that Mr. -- Officer
23 Gould had to intercede?
24     A.   Yes.

**VOLUME I - 160**

1     Q.   How were Mr. Greenwood's hands
2 handcuffed at that point, do you know?
3     A.   They were handcuffed in front.
4     Q.   In front?
5     A.   Mmm-hmm, palms facing each other.
6     Q.   At some point did that change?
7     A.   No -- well, he was changed to being
8 handcuffed in front.
9          When I handcuffed him he was handcuffed
10 behind his back, the tops of the backs of his
11 hands facing one another, palms out, at the scene.
12     Q.   Let's go back over this then because
13 this is important.
14          At the scene you're saying that you
15 handcuffed him?
16     A.   I handcuffed him.
17     Q.   How did you handcuff him at the scene?
18     A.   Behind his back, the backs of his hands
19 facing one another so his palms would have been
20 facing out this way, only behind his back.
21 (Indicating.)
22     Q.   At some point you believe that was
23 changed?
24     A.   Yes.

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC                    AUGUST 31, 2006

VOLUME I - 161

1    Q.   When do you think it was changed and who
2  changed it?
3    A.   It was changed en route to the station
4  by Officer Gevry.
5    Q.   How do you know that?
6    A.   When Greenwood was placed in the cruiser
7  he was handcuffed behind his back and when I got
8  to the station, when he had his -- when he had
9  Gevry's collar and he was forcing the chain up
10  under Gevry's neck.
11    Q.   You're saying his hands were handcuffed
12  in the front at that point?
13    A.   Right.  When I asked Gevry in the
14  hallway how did his handcuffs get changed he had
15  said that Greenwood had a bad shoulder or a bad
16  arm or something and he moved them.
17    Q.   Who was driving the cruiser with
18  Greenwood back to the station?
19    A.   Gevry.
20    Q.   At what point do you think he switched
21  the handcuffs then?
22    A.   At any point.  It could have been when
23  they got to the station.
24    Q.   Is that against Department policy to

VOLUME I - 162

1  handcuff someone in the front?
2    A.   There is no policy for handcuffing
3  somebody.  It's against defensive tactics
4  training.  It's against the rules for officer
5  safety.
6    Q.   When the incident happened where he
7  reportedly got out of his chair and went after
8  Gevry and Officer Gould had to help him, do you
9  know whether or not his handcuffs were handcuffed
10  in front or in back?
11    A.   I would assume they were in the front.
12    Q.   You don't know though?
13    A.   I don't know.
14    Q.   After that incident reportedly happened,
15  do you know if any effort was made to handcuff him
16  in the back?
17    A.   I don't know.
18    Q.   Can you provide any other information
19  about that incident where Greenwood got out of his
20  chair that first time and went after Gevry?
21    A.   No.
22    Q.   Did you ever discuss that with Gevry?
23    A.   No.
24    Q.   Just Gould?

VOLUME I - 163

1    A.   Right.
2    Q.   Do you know how long after that incident
3  occurred that Greenwood reportedly went after
4  Gevry which is what you said you walked into --
5  how much time was there between those two
6  incidents?
7    A.   I don't know exactly.  It was a very
8  short amount of time.
9    Q.   When you say short, a matter of minutes?
10    A.   Matter of minutes; yes.
11    Q.   If I understand you correctly you and
12  Pysell entered the room at the same time because
13  you had been in the cruiser together for the 911
14  call?
15    A.   Right.
16    Q.   Let's just go over this then to the
17  extent there was any overlap.
18         When you both entered the room what did
19  you see again?
20    A.   I saw Heath Greenwood with an advantage
21  over Gevry choking him with his handcuffs.
22    Q.   What did Pysell do?
23    A.   He was right behind me.  We were -- I
24  was a step ahead of him.  The two of us were

VOLUME I - 164

1  rushing in together.
2    Q.   Was Gevry saying anything?
3    A.   Nothing at all.
4    Q.   What did you do when you observed that?
5    A.   I yelled.  Greenwood ignored that.
6    Q.   What did you yell?
7    A.   "Let him go, get off," something to that
8  effect, something to immediately gain Greenwood's
9  attention.
10    Q.   What happened when you yelled?
11    A.   Nothing.  Greenwood completely ignored
12  the fact that Pysell and I were in the room and
13  yelling.
14    Q.   And then what happened?
15    A.   I reached across Greenwood, grabbed his
16  shirt from the far shoulder, spun him toward me
17  and punched him in the chin.
18    Q.   Then what happened?
19    A.   Greenwood fell to the ground -- fell to
20  the floor, began apologizing, saying "I'm sorry,
21  I'm sorry."
22    Q.   Greenwood was?
23    A.   Yes.  Then I stepped over Greenwood.  I
24  was going to reach down and pick him up.  Pysell

**JOHN BOLDUC**　　　　**AUGUST 31, 2006**

## VOLUME I - 165

1  bumped me out of the way and by that time Kehoe
2  was in the room.  They grabbed Greenwood and sat
3  him in the chair.
4  　　　I told -- at that point I told Gevry to
5  come into the hallway with me.
6  　　Q.  When you said that Pysell bumped you out
7  of the way what do you mean?  Can you describe
8  what happened?
9  　　A.  Well, it is a very small room.  He
10  was -- Pysell is one of the bigger guys on the
11  force.
12  　　　I think as we were both reaching for
13  him -- as I was straddling over Greenwood to pull
14  him off the floor, I think in Pysell's attempt to
15  help, he bumped into me and instead of stepping on
16  Greenwood I stepped over him.
17  　　　Kehoe again is a very large man.  He and
18  Pysell picked Greenwood up.
19  　　Q.  I'm sorry, did you say that Kehoe
20  grabbed Greenwood?
21  　　A.  Kehoe and Pysell.
22  　　Q.  You said you took Gevry in the hallway?
23  　　A.  Right; I told Pysell and Kehoe to chain
24  Greenwood to the pipe which is -- there's a -- it

## VOLUME I - 166

1  is a pipe in the wall made for handcuffs so if you
2  had someone that you would handcuff, one cuff on
3  them and one handcuff back so he couldn't reach
4  the officer doing the booking.
5  　　Q.  Okay.
6  　　A.  And I went into the hallway with Gevry.
7  　　Q.  You're saying at that point the booking
8  process was completed with Mr. Greenwood?
9  　　A.  No; Gevry was only part way through the
10  booking process when this got out of hand a couple
11  of times.
12  　　　After all of that was stopped, Greenwood
13  was photographed, the booking process went on and
14  then Gevry wrote his report.  This was part way
15  through the booking process.
16  　　Q.  You stated that you punched
17  Mr. Greenwood in the chin?
18  　　A.  Mmm-hmm.
19  　　Q.  At what point on his chin -- meaning the
20  center, right, left?
21  　　A.  The center of his chin.
22  　　Q.  Did you hit him any other time?
23  　　A.  No.
24  　　Q.  You only hit him once?

## VOLUME I - 167

1  　　A.  Right; right.
2  　　Q.  Did you ever kick him?
3  　　A.  No.
4  　　Q.  Did you ever step on him?
5  　　A.  No.
6  　　Q.  When this was occurring who else was in
7  the room besides Gevry, Greenwood, you, and
8  Pysell, if anyone?
9  　　A.  No one; that's it.
10  　　Q.  Do you know if anyone else could observe
11  what was going on in the room?
12  　　A.  No.
13  　　Q.  In other words Gould and O'Leary weren't
14  in the vicinity, is that correct?
15  　　A.  Correct.
16  　　Q.  Do you know whether or not Greenwood
17  injured Gevry?
18  　　A.  Gevry claimed that he didn't have any
19  injuries.
20  　　Q.  Did you notice any injuries on him?
21  　　A.  No; just from the side, from the obvious
22  red marks, that sort of thing.
23  　　Q.  Where were the red marks?
24  　　A.  In the front of his neck.

## VOLUME I - 168

1  　　Q.  When you say panic tones what do you
2  mean?
3  　　A.  There are, with the radio, the
4  dispatcher has the ability to -- when a dispatcher
5  would call a cruiser or call a portable radio
6  there's a couple of quick beeps to let you know
7  that there's an open mic, somebody is talking,
8  that sort of thing but the dispatcher has the
9  ability to send out what we call a panic tone.
10  It's a series of quick beeps that as an officer
11  when you hear that, you stop what you're doing,
12  something really wrong is about -- you're going to
13  be dispatched to something that is far above and
14  beyond the ordinary.  The tone is not used very
15  often.
16  　　　As soon as we heard the panic tones on
17  the radio and then immediately Bonnie O'Leary
18  calling for officers to the station, I need
19  officers in here now, we knew that that was
20  urgent.
21  　　Q.  Do you know why Gould didn't go to
22  assist Gevry prior to your getting there, given
23  that he was right in the station at the time?
24  　　A.  He was on his way.  Pysell and I beat

**JOHN A. BOLDUC v. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC**     **AUGUST 31, 2006**

## VOLUME I - 173

1      It was four months, six months, I'm not
2 sure.
3      (Defendant's Deposition Exhibit
       No. 9 offered and marked.)
4
5      Q.    (BY MS. LYNCH) Showing you what's been
6 marked as Exhibit Number 9, have you seen that
7 before? (Indicating.)
8      A.    Yes.
9      Q.    Do you recall when it was that you first
10 saw it?
11      A.    No, but in these -- surrounding this
12 whole thing, looking at it with Chris Browne.
13      Q.    Do you recall if you saw that before the
14 hearing before Ms. Leal?
15      A.    Yes; I believe Doctor Polizoti gave me a
16 copy of this.
17      Q.    Do you know how he got it?
18      A.    From the Town.
19      Q.    Do you know whether he received any
20 other information from the Town?
21      A.    Yes; he received a letter from William
22 Keefe along with a summary for Mayotte, Greenwood,
23 and Abbe.
24      I don't know if he received any more

## VOLUME I - 174

1 than that but those are the things that he shared
2 with me.
3      Q.    The summaries, were they each on a
4 single piece of paper, do you recall?
5      A.    I don't recall.
6      Q.    Do you know if this Exhibit Number 9 was
7 introduced at the hearing before Ms. Leal?
8      A.    I'm not sure. I'd have to look at the
9 list of exhibits because --
10      Q.    (Interposing) That's okay.
11      (Defendant's Deposition Exhibit
       No. 10 offered and marked.)
12
13      Q.    (BY MS. LYNCH) Showing you what's been
14 marked as Exhibit Number 10. (Indicating.)
15      A.    (Witness examining document.)
16      Q.    Have you seen that before?
17      A.    Yes.
18      Q.    You'll note that is a statement by
19 Officer Pysell?
20      A.    Yes.
21      Q.    Referring you down about two-thirds of
22 the way down where there's handwriting it says,
23 "Sergeant Bolduc then struck," and it's in
24 handwriting "two to three times."

## VOLUME I - 175

1      Are you alleging that the writing of the
2 "two to three times" was somehow inappropriate?
3      A.    Yes.
4      Q.    And why?
5      A.    Tom Pysell had called me and told me
6 that -- he said that Keefe keeps bugging me to say
7 that it was two or three times" so he said on the
8 affidavit -- he had given me a copy and Judge
9 Barton a copy and all of that.
10      He says "Keefe kept asking me, couldn't
11 it, is it possible. I said all right, fine, two
12 or three times, is that what you want? I said
13 give it to me, I wrote two or three times, signed
14 it and handed it to Keefe." That's what he told
15 me.
16      Q.    You're saying that Pysell did not
17 believe that it was two to three times but wrote
18 it anyway?
19      A.    He told me that he was sick and tired of
20 getting badgered by Keefe so he wanted him off his
21 back.
22      He said -- he asked Keefe, "Do you want
23 me to write two or three times?" Keefe said yes,
24 so he said, "So I did."

## VOLUME I - 176

1      Q.    Did you think that was credible?
2      A.    Did I think what was credible?
3      Q.    What Pysell told you?
4      A.    Yes. Shortly after that Pysell began
5 talking about resigning and then ultimately
6 resigned from the Department.
7      Q.    Where did he go?
8      A.    Truck driving school.
9      Q.    With respect to report writing by police
10 officers, is it fair to say that you do receive
11 training on that?
12      A.    Yes.
13      Q.    Is it fair to say that police officers
14 are trained to write accurate reports and to be
15 honest in their reports?
16      A.    Yes.
17      Q.    Did you consider this, if it wasn't true
18 then, to be dishonest on the part of Pysell?
19      A.    I thought it more to be Pysell trying to
20 survive and that we would take this issue up as we
21 are.
22      Q.    Do you stay in contact with him now?
23      A.    Yes.
24      Q.    Did he indicate whether William Keefe

VOLUME I - 197

1  would think so.
2          With Brian Barnes I would think that
3  there was some ulterior motive for his
4  involvement.
5      Q.   Did you ever speak to Mr. Greenwood
6  after that phone call?
7      A.   Only during the Court proceedings with
8  him and Bill Pepka and his attorney and Tom
9  Methias, the ADA.
10     Q.   So you only spoke to him with others
11 present?
12     A.   Yes.
13     Q.   Was there a time when you went to
14 court -- the East Brookfield District Court -- and
15 William Keefe was there as well acting as the
16 court officer when Mr. Greenwood was there?
17     A.   I don't think he was the court officer.
18 There was a time where East Brookfield, William
19 Keefe, myself, Attorney Greenwood, and Ms. Leal.
20     Q.   Was it in East Brookfield?
21     A.   Correct.
22     Q.   In the Court?
23     A.   At the Courthouse.  That's the Webster's
24 District Court is Dudley, Webster Superior Court

VOLUME I - 198

1  is now East Brookfield.  It was moved from
2  Worcester years ago.
3      Q.   But with Mr. Greenwood there?
4      A.   Yes.
5      Q.   Do you know whether William Keefe had
6  any contact with him?
7      A.   I don't know.  It was his -- it was
8  Greenwood's -- the disposition of this case.
9      Q.   You stated that Robin Leal was there as
10 well?
11     A.   She accompanied William Keefe; yes.
12     Q.   Do you know why she was present?
13     A.   I have no idea.
14     Q.   When you say the disposition of his
15 case, you're talking about the criminal charges
16 that were brought against him?
17     A.   Correct.
18     Q.   Did it have anything to do with you and
19 these allegations, meaning this Greenwood incident
20 being one of the three incidents that disciplinary
21 action was brought against you?
22     A.   No; it was his -- he pleaded out.
23 William Keefe and Ms. Leal informed myself and
24 Attorney Green that he was -- whatever it was he

VOLUME I - 199

1  pleaded to.
2          He pleaded guilty and I don't know if he
3  got probation or whatever the final disposition
4  was but it was -- that was the reason for being
5  there.
6      Q.   During the altercation with Greenwood
7  did Pysell move you over to Kehoe and say to put a
8  leash on you?
9      A.   No.
10     Q.   Do you recall anything like that being
11 said -- anything similar?
12     A.   No; I know that Pysell and Kehoe were
13 involved in securing Greenwood but as that was
14 going on Gevry and I were going into the hallway.
15     Q.   I believe that Mr. Greenwood has stated
16 that at the time that you punched him that he was
17 actually being taken around the corner after being
18 asked to go to the cell.  Have you ever heard that
19 before?
20     A.   No.
21     Q.   You don't recall him testifying in that
22 manner?
23     A.   No.
24     Q.   Are you saying that that's not true?

VOLUME I - 200

1      A.   That's not true.
2      Q.   When did you first learn that Officer
3  Gevry had made an allegation that you used
4  excessive force on Mr. Greenwood?
5      A.   Sometime after that incident later in
6  November or December.
7      Q.   Who do you believe he told?
8      A.   Sergeant Bent.
9      Q.   Do you know why he told him?
10     A.   No.
11     Q.   What were you told?
12     A.   I was told to come in to -- called into
13 Tom Ralph's office; went in there with Jim Hoover
14 who at that time was the union representative.
15 Ralph told me about Gevry's complaint or
16 conversation with Tim Bent, read to me from the
17 Miranda card, asked if I wanted a union attorney;
18 I declined.
19          He asked me what happened with the
20 Greenwood case.  I explained and he said that,
21 okay, he'd let us know.  Hoover asked him how long
22 and Ralph said that once he had a conclusion.
23 That's the last I ever heard.
24     Q.   Are you aware that Thomas Ralph stated

**VOLUME I - 201**

1 that he investigated that incident?

2 A. Yes.

3 Q. When do you believe he did an

4 investigation?

5 A. I believe at the time that he spoke to

6 Bent, at the time that he had Hoover and I in his

7 office.

8 (Defendant's Deposition Exhibit
No. 12 offered and marked.)

9

10 Q. (BY MS. LYNCH) Showing you what's been

11 marked as Exhibit Number 12, have you seen that

12 before? (Indicating.)

13 A. Yes.

14 Q. Do you recall when it was that you first

15 saw it?

16 A. With Chris Browne but this wasn't --

17 this third page, last page -- wasn't attached when

18 Chris had this.

19 We have this but it wasn't attached. It

20 wasn't like it is now.

21 Q. When Officer Ralph was reportedly doing

22 his investigation, did he tell you about it?

23 A. About the investigation? It was Jim

24 Hoover first who said to me that the Greenwood

**VOLUME I - 202**

1 thing was nothing; that the Chief didn't have a

2 problem with it at all.

3 Then sometime after Hoover said that to

4 me I had asked Ralph. I said -- Jimmy Hoover --

5 Jimmy said we're all set, he says yeah, the Chief

6 said there was no problem. He was all right with

7 everything.

8 Q. Are you talking about this meeting that

9 occurred in Ralph's office following that?

10 A. No; this is sometime after that. Hoover

11 was stating to me that this Greenwood thing was

12 nothing at all, that everything was fine.

13 After Hoover had said that, this is, I

14 don't know, a couple of months after Hoover and I

15 were in Ralph's office.

16 Q. Did he indicate to you what information

17 Chief Bergeron had been given about the Greenwood

18 incident?

19 A. No. Later on Pysell -- at one point

20 Pysell told me that Tom Ralph had talked to him

21 and another time Kehoe told me that Tom Ralph had

22 talked to him but...

23 Q. I'm sorry, are you finished?

24 A. I am.

**VOLUME I - 203**

1 Q. Do you recall discussing this incident

2 with the Chief while you and Ralph were driving

3 with him to some sort of seminar or other

4 police-related event?

5 A. I don't remember attending any seminars

6 or events with --

7 Q. (Interposing) Or training?

8 A. I don't recall any type of conversation

9 like that at all.

10 Q. But going back to Ralph's reported

11 investigation, did he ever discuss that with you,

12 why he was investigating, how he conducted his

13 investigation, anything like that?

14 A. No; only that when we were in the

15 office -- Hoover and I were in Tom Ralph's

16 office -- that Gevry had gone to Bent; Bent had

17 talked with Ralph; and Ralph said that he'd look

18 into it and this is why Hoover and I were there.

19 Q. Do you believe that Ralph conducted an

20 investigation following that meeting?

21 A. Yes.

22 Q. Did he discuss with you how he was going

23 to do it or afterwards what he did do?

24 A. No.

**VOLUME I - 204**

1 Q. Do you know whether Chief Bergeron knew

2 that he was going to be conducting an

3 investigation?

4 A. I don't know. I assume he did.

5 Q. Did you ever discuss this Greenwood

6 incident with Chief Bergeron?

7 A. No.

8 Q. And incidentally, did you ever discuss

9 the Jonah Mayotte incident with Chief Bergeron?

10 A. Yes.

11 Q. When was that?

12 A. A short time after that took place.

13 Q. What do you recall about that

14 discussion?

15 A. Explaining to him what took place,

16 basically where I was coming from with that whole

17 idea and thought pattern.

18 I remember him saying to me, "Well, it's

19 unconventional but effective" -- and that's how we

20 left it.

21 Q. Is that an exact quote?

22 A. "Unconventional but effective"; yes.

23 Q. Why was it that you discussed that with

24 him?

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

JOHN BOLDUC
DATE:  SEPTEMBER 13, 2006

---

## PERLIK and COYLE REPORTING
### *Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC            SEPTEMBER 13, 2006

---

**VOLUME II - 211**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:05-CV-40030-FDS
Pages 211-422


JOHN A. BOLDUC

vs.

TOWN OF WEBSTER, ROBIN LEAL,
RICHARD BERGERON and WILLIAM KEEFE


-------------------------------------------------
**DEPOSITION OF: JOHN BOLDUC**
-------------------------------------------------


Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Morrison Mahoney, LLP, 10
Chestnut Street, Worcester, Massachusetts on
SEPTEMBER 13, 2006, commencing at 9:15 a.m.


Joanne Coyle
Certified Shorthand Reporter
License No. 106693


**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

---

**VOLUME II - 212**

APPEARANCES:


FOR THE PLAINTIFF:

  GREEN, MILES, LIPTON, WHITE & FITZ-GIBBON
  77 Pleasant Street
  Northampton, Massachusetts 01060
BY: JOHN A. GREEN, ESQUIRE


FOR THE DEFENDANT TOWN OF WEBSTER:

  MORRISON MAHONEY, LLP
  1500 Main Street
  Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQUIRE


FOR THE DEFENDANT ROBIN LEAL:

  MURPHY, HESSE, TOOMEY & LEHANE, LLP
  300 Crown Colony Drive, Suite 410
  Quincy, Massachusetts 02169
BY: GEOFFREY B. McCULLOUGH, ESQUIRE


Also Present: Robin Leal
              William Keefe

---

**VOLUME II - 213**

1          I N D E X

2

3    WITNESS        DIRECT CROSS REDIRECT RECROSS

4    JOHN BOLDUC         215   363   409

5

6

7

8              E X H I B I T S

9    NO.    DESCRIPTION              PAGE

10   13  Abbe Photograph                     219
     14  Abbe Photograph                      10
11   15  12/18/03 Young Statement            236
     16  12/17/03 Difusco Statement          236
12   17  12/12/03 Letter                     237
     18  1/5/04 Keefe to Polizoti Letter     239
13   19  Keefe Bolduc Investigation
         Recommendation                      240
14   20  1/27/04 Polizoti Report             252
     21  3/1/04 Leal to Bolduc Letter        261
15   22  3/1/04 Specification of Change &
         Recommendation of Disciplinary Action 262
16   23  3/19/04 Leal to Bolduc Letter       265
     24  5/21/03 Keefe to Bolduc Potential
17       Letter of Reprimand                 297
     25  3/19/04 Leal to Bolduc Letter &
18       Attachments                         389
     26  1/27/04 E-Mail Re Police Matters    412
19   27  Preliminary Investigation Re Bolduc 414
     28  1/8/04 Handwritten Notes            416
20   29  Bolduc Résumé                       417

21

22   *EXHIBITS RETAINED BY MS. LYNCH

23

24

---

**VOLUME II - 214**

1          S T I P U L A T I O N S

2

3       It is agreed by and between the parties

4    that all objections, except objections as to the

5    form of the question, are reserved to be raised at

6    the time of trial for the first time.

7

8       It is further agreed by and between the

9    parties that all motions to strike unresponsive

10   answers are also reserved to be raised at the time

11   of trial for the first time.

12

13      It is further agreed that the deponent will

14   read and sign the deposition and that the sealing

15   of said deposition will be waived.

16

17      It is further agreed by and between the

18   parties that notification to all parties of the

19   receipt of the original deposition transcript is

20   also hereby waived.

21

22              * * * * *

23

24

---

**PERLIK and COYLE REPORTING**

Case 4:05-cv-40030-FDS    Document 22-3    Filed 11/14/2006    Page 3 of 23

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 231

1  you think you could have done?
2      A.   Yes.
3      Q.   What is that?
4      A.   In all of my hearings I've testified
5  that the idea of not allowing her to be bailed by
6  placing her in the cell and not allowing her to be
7  bailed until she took a photograph I thought was a
8  good idea.
9      Q.   Was anyone else present in the room
10  besides you, Ms. Abbe, and Officer Difusco when
11  the photographs were taken with your hands on her?
12      A.   Officer Melendez.
13      Q.   He was present?
14      A.   Yes.
15      Q.   Anyone else?
16      A.   Officer Young was standing in the
17  doorway.
18      Q.   Did any of them say anything in an
19  effort to deter you from placing your hand on her?
20  In other words, did any of them say they didn't
21  think it was a good idea to place your hands on
22  her?
23      A.   No.
24      Q.   Or anything of that nature?

VOLUME II - 232

1      A.   No.
2      Q.   At the hearing that you had before
3  Ms. Leal and the Civil Service hearing, did any of
4  those officers testify in your behalf?
5      A.   Officer Melendez.
6      Q.   Did either Officer Young or Difusco
7  testify at the hearings?
8      A.   They did.
9      Q.   Did they testify for the Town?
10      A.   For the Town; yes.
11      Q.   What is your understanding as to how
12  these photographs Exhibit 13 and 14 surfaced
13  within the Department?
14          In other words did you become aware that
15  Acting Chief Keefe received the photographs?
16      A.   Yes.
17      Q.   What is your understanding as to how he
18  got them?
19      A.   From Officer Difusco.
20      Q.   What do you know about that?
21      A.   As far as?
22      Q.   How he got those?
23      A.   Officer Difusco had them on a disk and
24  he either gave them to or left them for Acting

VOLUME II - 233

1  Chief Keefe.
2      Q.   Did you ever have any discussion with
3  Officer Difusco about that -- his giving the
4  photographs to Acting Chief Keefe?
5      A.   Briefly.
6      Q.   What was that discussion?
7      A.   Officer Difusco came to me after Tom
8  Ralph's hearing in December of '03, said that he
9  was being teased by officers so he gave Acting
10  Chief Keefe the photographs.
11      Q.   Did he tell you anything else about the
12  teasing and who was doing it?
13      A.   No.
14      Q.   In other words exactly what was said?
15      A.   He had said to me that officers were --
16  at the shift break -- were laughing at him and
17  asking about a new booking procedure or something
18  that they didn't hear about or something to that
19  effect.
20      Q.   Did you ever tell Acting Chief Keefe
21  that the photographs were no big deal because you
22  spoke to Ms. Abbe's family or anything similar to
23  that?
24      A.   Yes.

VOLUME II - 234

1      Q.   What exactly -- what was that
2  discussion?
3      A.   Acting Chief Keefe showed me the
4  photographs that Officer Difusco had left for him
5  or the disk and he brought it up on the -- on his
6  computer in his office.
7          We looked at them and I had said to him
8  I didn't think it was any big deal at all, that
9  she was not hurt or being hurt.
10          At Hubbard Hospital her brother-in-law,
11  who is a retired Webster police sergeant, pulled
12  up alongside me in a pickup truck as I was walking
13  in the parking lot.  He was laughing.  He said, "I
14  see you met my sister-in-law," said something
15  along the lines of "she's a firecracker or a
16  spitfire," something to that effect and told me
17  that now I understood why, when there was a call
18  over there, he would have officers go in and he
19  would stay back and not get involved or not engage
20  her at all.
21      Q.   You mean when he was a police officer?
22      A.   When he was an officer and then a
23  sergeant.
24      Q.   What is his name?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 251

1 than being unavailable?
2      A.   I don't.
3      Q.   Other than that, you've had no other
4 phone conversations with him, is that correct?
5      A.   Correct.
6      Q.   Do you know why he left the message on
7 your phone as opposed to, say, contacting your
8 attorney?
9      A.   I don't.
10      Q.   You hadn't called him, had you?
11      A.   No.
12      Q.   Did you communicate with him at any
13 other time other than at the two-day examination
14 either by phone, in person, e-mail, writing -- any
15 other way?
16      A.   No.  The examination, the phone message,
17 and him saying that he wasn't available for the
18 hearing that I believe it was Attorney Clancy
19 wanted him for.
20      Q.   Did he give you the impression at all
21 based on what he said that he was going to support
22 you in your efforts to keep your position with the
23 Webster Police Department?
24      A.   Yes.

VOLUME II - 252

1      Q.   Is there anything that that's based upon
2 besides what you've already testified to?
3      A.   No.
4           MS. LYNCH:
5           (Defendant's Deposition Exhibit
              No. 20 offered and marked.)
6
7      Q.   (BY MS. LYNCH)  Showing you what's been
8 marked as Exhibit Number 20, can you identify
9 that? (Indicating.)
10      A.   (Witness examining document.)  This is
11 part of Doctor Polizoti's report.
12      Q.   Had you received that before the hearing
13 before Ms. Leal?
14      A.   I'm not sure when Attorney Browne
15 received it but he had a report that was much
16 larger than what I'm looking at here.
17      Q.   From Doctor Polizoti?
18      A.   Yes.
19      Q.   Do you recall what else it consisted of?
20      A.   There were other pages relating to some
21 of the different tests.  There were -- I think all
22 total there are eight or nine pages, I think.  I'd
23 have to look.
24      Q.   You'll notice there it says, "Date of

VOLUME II - 253

1 assessment, January 14, 2004" meaning -- implying
2 just one day.
3           Are you saying that's not correct, that
4 you did have this exam for more than one day?
5      A.   Right; there was a second day that I
6 went back, yes.
7      Q.   In light of the phone message that was
8 left on your machine by Doctor Polizoti with
9 regard to apparent statements made by your
10 attorney, does that refresh your memory as to
11 whether you received Exhibit 20 prior to the
12 hearing before Ms. Leal?
13      A.   No.
14      Q.   Or whether your attorney received it
15 prior to the hearing before Ms. Leal?
16      A.   As best as I remember this was -- all of
17 this documentation was part of the appeal.  Again,
18 maybe it was in that packet the night before; I
19 don't know what was in there.  I know that
20 Attorney Browne wasn't able to go through that.  I
21 handed it to him that morning and we went on with
22 the hearing.
23           As the appeal process went on, that's
24 when I've seen a lot of the documentation so I

VOLUME II - 254

1 can't say.
2      Q.   Your hearing before Ms. Leal was on
3 March 10, 2004, is that correct?
4      A.   Correct; March 10th and 11th, yes.
5      Q.   Do you believe that any information was
6 withheld from Doctor Polizoti prior to his
7 examination?
8      A.   Yes.
9      Q.   What specifically do you believe was
10 withheld?
11      A.   Anything positive for me.
12      Q.   Do you have anything specific in mind?
13      A.   No.
14      Q.   Do you consider the statement made by
15 Acting Chief Keefe that you were -- I think he
16 said you can be a good police officer.  Would you
17 consider that to be positive?
18      A.   By itself, yes.
19      Q.   Would you consider the statement that
20 you're well educated and knowledgeable to be
21 positive?
22      A.   By itself I would; yes.
23      Q.   When was the last time you had contact
24 with Doctor Polizoti?

**PERLIK and COYLE REPORTING**

**JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL**
**JOHN BOLDUC         SEPTEMBER 13, 2006**

VOLUME II - 259

1 approached by then Acting Chief Keefe he had
2 declined.
3     Q.   Did he offer any statement or opinion as
4 to what he thought about the statement that was
5 made by Sergeant Keefe about you and Ralph not
6 staying on the force?
7     A.   I don't recall.  I'd have to look at the
8 transcript.  I don't remember.
9     Q.   But based on your memory of the
10 conversation is the only thing that you recall him
11 stating is that he thought that you should stay
12 on?
13    A.   Right; that he disagreed with Acting
14 Chief Keefe.
15    Q.   Did he say anything more than just that
16 he disagreed with Acting Chief Keefe?
17    A.   Not that I remember; not that I can
18 recall.
19    Q.   Do you know if he made any notes or any
20 other documentation of the discussion with
21 Sergeant Keefe?
22    A.   I don't know.
23    Q.   I believe you discussed last time the
24 meeting between yourself, Thomas Ralph, Selectman

VOLUME II - 260

1 Miller and Selectman Regis at the funeral home
2 where you testified that you had been asked to
3 resign.  Do you recall that testimony?
4     A.   Yes.
5     Q.   Did you ever have any other discussions
6 with either Selectman Miller or Regis or both
7 regarding the issues surrounding your employment?
8     A.   As far as resigning?
9     Q.   Why don't we start with that.
10    A.   No.
11    Q.   Any other discussions regarding your
12 employment?
13    A.   Only what I testified earlier to at
14 Sparky's Gun Shop.
15    Q.   Besides that?
16    A.   No.
17    Q.   Do you know anything about the
18 relationship between Selectman Miller and Robin
19 Leal prior to your termination?
20    A.   No.
21    Q.   How about after the termination?
22    A.   Only what I had testified to before.
23    Q.   How about -- same question with regard
24 to Selectman Regis?

VOLUME II - 261

1     Do you know anything about his
2 relationship with Ms. Leal prior to your
3 termination?
4     A.   No.
5     Q.   How about after your termination?
6     A.   No.
7     Q.   In other words, did you believe that
8 they were supportive of her as the town
9 administrator or do you believe that they were not
10 supportive of her?
11    A.   Well again, they worked together, more
12 or less had to, but I don't believe one way or
13 another.
14    Q.   Did you stay on paid administrative
15 leave until your employment was terminated?
16    A.   Yes.
17              (Defendant's Deposition Exhibit
                 No. 21 offered and marked.)
18
19    Q.   (BY MS. LYNCH)  I'm going to show you
20 what's been marked as Exhibit Number 21.
21    Do you recall receiving that?
22 (Indicating.)
23    A.   (Witness examining document.)  Yes.
24    Q.   You received that prior to the hearing?

VOLUME II - 262

1     A.   Yes.
2              (Defendant's Deposition Exhibit
                 No. 22 offered and marked.)
3
4     Q.   (BY MS. LYNCH)  You have before you
5 Exhibit Number 22.
6     Do you recall receiving that prior to
7 your hearing? (Indicating.)
8     A.   (Witness examining document.)  No.
9     Q.   You didn't receive that?
10    A.   I don't believe so; no.
11    Q.   It indicates it was given to you by hand
12 and first class mail but you don't recall
13 receiving that?
14    A.   I don't recall; no.
15    Q.   When you received Exhibit 22 do you
16 recall it being accompanied by anything else?
17    A.   I don't recall -- this one, 22?
18    Q.   When you received 21, do you recall it
19 being accompanied by anything else?
20    A.   No; just this single page.
21    Q.   Are you certain that you didn't get
22 Exhibit 22 prior to the hearing before Ms. Leal or
23 do you just not recall?
24    A.   No; I'm certain I didn't.

JOHN BOLDUC
JOHN BOLDUC                    SEPTEMBER 13, 2006

VOLUME II - 263

1    Q.   Do you know whether your attorney got
2  it?
3    A.   I don't believe so.
4    Q.   Well, let me ask you this question and
5  if you'd like to refer to the exhibits, feel free
6  to do so.
7         What do you recall receiving prior to
8  the hearing before Ms. Leal with regard to the
9  charges that were being brought against you and
10 the overall topic of the hearing?
11   A.   Obviously I remember the letter, having
12 a letter given to me on the twelfth of December,
13 2003 and then receiving that same -- a copy of
14 that same letter in the mail.
15   Q.   Can you just find which exhibit that is
16 in there, if you don't mind?
17   A.   Sure.  Exhibit 17.
18   Q.   That's the December 12th letter?
19   A.   Yes.
20   Q.   Okay.
21   A.   So this one in hand -- given to me at
22 the station, the Webster PD and then the same
23 letter, identical copy mailed to me and
24 Exhibit 21 notifying me of the hearing date.

VOLUME II - 264

1         I believe Acting Chief Keefe called me
2  by phone and told me when the appointment for
3  Doctor Polizoti was.  I don't remember receiving
4  anything in -- by mail or in writing.
5         Then I remember a larger envelope coming
6  in the mail with the decision that I was
7  terminated and paperwork in there -- Civil Service
8  statutes or chapters and sections for Civil
9  Service and there was a recap of the Chief's
10 investigation.
11   Q.   That was part of the termination
12 package?
13   A.   Correct.
14   Q.   But you were aware before the hearing
15 before Ms. Leal that the incidents of Jonah
16 Mayotte, Heath Greenwood, and Catherine Abbe were
17 the subject matter, is that correct?
18   A.   Yes.
19   Q.   Were you ever told that there was any
20 other -- that there were any other subjects that
21 were going to be considered at the hearing before
22 Ms. Leal?
23   A.   Nothing more; no.
24   Q.   Were you informed that your position was

VOLUME II - 265

1  being terminated when you got the letter in the
2  mail?
3    A.   Yes.
4    Q.   In other words you hadn't received any
5  other notice of that prior to getting the package
6  in the mail?
7    A.   Only what Selectman Regis had told me.
8    Q.   What had he told you?
9    A.   That I was going to be terminated
10 regardless.
11   Q.   You're saying before the hearing
12 occurred?
13   A.   Right; in those instances where he had
14 told me of his conversations with Town
15 Administrator Leal.
16   Q.   Have you now testified to all of those
17 here today?
18   A.   Yes.
19   Q.   Or last time?
20   A.   Yes.
21         (Defendant's Deposition Exhibit
              No. 23 offered and marked.)
22
23   Q.   (BY MS. LYNCH)  Showing you what's been
24 marked as Exhibit Number 23, is that the

VOLUME II - 266

1  termination letter that you received along with
2  enclosures that are not attached to Exhibit 23?
3  (Indicating.)
4    A.   Yes.
5    Q.   Other than the copies of General Laws
6  Chapter 31, Sections 41 and 45 that are not
7  attached to Exhibit 23 were there any other
8  documents attached to the termination letter that
9  you received?
10   A.   Could you say that again, please?
11   Q.   Yes; other than General Laws Chapter 31,
12 Section 41 through 45 that are not attached to
13 Exhibit Number 23, were there any other documents
14 that were attached to the termination letter that
15 you received?
16   A.   Yes; I believe the letter from Acting
17 Chief Keefe to Town Administrator Leal recapping
18 his investigation.
19         I'd have to look but I believe it was a
20 copy of Exhibit 22.
21   Q.   Exhibit 22 --
22   A.   (Interposing) Or that same information.
23   Q.   Exhibit Number 22 you believe was
24 included with the termination letter?

VOLUME II - 271

1    Q.   So you didn't receive it for a period
2  and then it was rescinded?
3    A.   Correct; the Board of Selectmen brought
4  it up and voted to do that and then the next week
5  two members voted to rescind it and the other two
6  members did not.  There was a vacancy at that
7  time -- so I never received it.
8    Q.   Are you saying that the first time you
9  learned that you were going to be getting a
10 commendation was when you were watching on TV and
11 seeing the Select Board voting in favor of it?
12   A.   Yes.
13   Q.   No one had mentioned it to you at all
14 prior to that?
15   A.   No.
16   Q.   Who introduced the proposal to give you
17 the commendation from the Select Board?
18   A.   Selectman Miller I believe.
19   Q.   Do you know who else voted in favor of
20 it?
21   A.   Selectman Regis, Selectman Dowgiewicz,
22 and Selectwoman Martel.
23   Q.   Have you ever spoken to Selectman Miller
24 about that commendation?

VOLUME II - 272

1    A.   No.
2    Q.   Not to this day?
3    A.   Correct.
4    Q.   How about Selectman Regis?
5    A.   No.
6    Q.   What is your understanding as to why it
7  was rescinded?
8    A.   It would have a negative impact on the
9  Town's position at both MCAD and at my hearing.
10   Q.   Who told you that?
11   A.   That's my assumption based on the --
12 Selectman Miller left Tom Ralph an answering
13 machine message directing him to get in touch with
14 me and tell me that Town Administrator Leal was
15 asking the Select Board members to rescind their
16 commendation.
17   Q.   And Tom Ralph passed that information on
18 to you?
19   A.   Yes.
20   Q.   Do you know why that message was left
21 for him instead of for you directly?
22   A.   I don't.
23   Q.   He was also on paid administrative leave
24 at the time, is that correct?

VOLUME II - 273

1    A.   Yes.
2    Q.   Did he ever give you any information
3  prior to your receiving the commendation in the
4  first place that you were being considered for it?
5    A.   No.
6    Q.   What is your understanding as to why you
7  were given that commendation originally?
8    A.   My thought was the great strides we were
9  making with Amato.
10        The Amato case has always been something
11 that is talked about in and around town.
12   Q.   Can you point to anything in particular
13 that you thought was worthy of that commendation
14 that you had done with respect to the Amato
15 investigation?
16   A.   Having a general area where Andy Amato's
17 remains are buried; the fact that the information
18 gathered in that investigation was enough to have
19 the state of Rhode Island, the FBI, the National
20 Grid all devote resources to this area that we
21 were looking at.
22        It's the most advanced that the Amato
23 case has ever been.
24   Q.   Do you recall when it was that you got

VOLUME II - 274

1  that general idea?
2    A.   That was ongoing from information
3  beginning in March -- it would have been March,
4  2003 through right up until I was placed on paid
5  administrative leave.
6    Q.   Do you know if any other selectmen
7  provided any other information about the issue of
8  the commendation to Ralph -- to Thomas Ralph
9  besides Miller?
10   A.   I don't know.
11   Q.   Other than what you've already testified
12 to, do you recall any other information that
13 Thomas Ralph has given to you to this date to
14 assist you with regard to your claims and to
15 prevent your termination?
16   A.   That's a couple of part question.  Do
17 you want to take that one at a time so I
18 understand?
19        MR. GREEN:  Can we read the question
20 back?
21        (Reporter read back as
22         requested.)
23        MR. GREEN:  Can we take a minute?
24        MS. LYNCH:  Go ahead.

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC                    SEPTEMBER 13, 2006

VOLUME II - 283

1   A.   I don't.
2   Q.   When you say Tuesday, do you mean
3   yesterday or do you mean last week?
4   A.   I apologize.  I'm a day ahead of myself.
5   Today is Wednesday?
6   A.   Yes; Monday.  I'm sorry.  Monday, not
7   Tuesday.
8   Q.   So two days ago he told you this?
9   A.   Right.
10  Q.   Do you know when he received the
11  information?
12  A.   That day -- that same day.  It was a
13  brief conversation in the afternoon so it would
14  have been that day.
15  Q.   Do you recall anything else about this
16  subject matter that either you got from Tom Ralph
17  or anyone else?
18  A.   No.  He was supposedly looking for more
19  information as that goes.  I don't know who he
20  would have talked to or needed to talk to.
21       It was again a brief conversation and he
22  said he would let me and my attorney know if and
23  when he found out more information.  That's
24  basically what I have.

VOLUME II - 284

1   Q.   Did you talk to Heidi Courtenay or Pam
2   Regis yourself about that subject matter?
3   A.   No.
4   Q.   You have not?
5   A.   I have not.
6   Q.   You also mentioned Deborah Keefe.  Who
7   is she?
8   A.   Select Board member -- was and is again.
9   There was a brief intermission between her serving
10  on the Board.
11  Q.   But she's a Select Board member now?
12  A.   Yes.
13  Q.   What is your understanding as to her
14  knowledge about either the e-mails or the computer
15  virus or any related topic?
16  A.   Supposedly she has documentation to that
17  fact.  I don't know what or how much.
18  Q.   To which fact?
19  A.   To the e-mails and the computer being
20  cleaned and all of that.
21  Q.   Do you know whether -- strike that.
22  Have you spoken to Deborah Keefe about that?
23  A.   No.
24  Q.   Do you have any more specific

VOLUME II - 285

1   information as to what knowledge she supposedly
2   has?
3   A.   I don't.
4   Q.   Do you know whether any of these
5   individuals -- Heidi Courtenay, Pam Regis or
6   Deborah Keefe -- ever raised this issue about the
7   e-mails prior to this Monday with either yourself,
8   Tom Ralph, your respective attorneys or anyone
9   affiliated with the Select Board, the Police
10  Department, or any town administrator?
11  A.   Not to my knowledge; I don't know.
12  Q.   Do you know why they're now suddenly
13  coming forward?
14  A.   I do not.
15  Q.   What is your understanding of Heidi
16  Courtney's relationship with William Keefe?
17  A.   Professional I guess.  I don't know.
18  Q.   Do you know if she dislikes him in any
19  way?
20  A.   I have no idea.
21  Q.   What is your understanding of her
22  relationship with Robin Leal?
23  A.   I don't know for certain.  I would
24  assume that it is friendly.  They were the Town

VOLUME II - 286

1   Administrator and Town Administrator secretary so
2   I would assume they had to work together.
3       I would imagine it's good.  I don't know
4   for certain.
5   Q.   Do you interpret this information that
6   you got to mean that she's accusing either
7   Sergeant Keefe or Ms. Leal of doing something
8   inappropriate?
9   A.   I would think so.
10  Q.   But you still think she had a friendly
11  relationship with Ms. Leal?
12  A.   When I say friendly, Ms. Leal is no
13  longer the Town administrator in Webster.  I don't
14  even know if they have any type of relationship
15  now.
16       When I said friendly that was based on
17  Heidi Courtenay working for Robin Leal.
18  Q.   You think that when she worked for
19  Ms. Leal that they had a good relationship?
20  A.   I don't know for certain but that's just
21  an assumption.  I would think so.
22  Q.   Do you know if it changed at all?
23  A.   I don't know.
24  Q.   How about -- same questions with regard

PERLIK and COYLE REPORTING

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**

**JOHN BOLDUC        SEPTEMBER 13, 2006**

## VOLUME II - 291

1  Bergeron when this conversation took place,
2  according to Brian Barnes.
3      Q.   When did he tell you that?
4      A.   At the time that the personnel file
5  requests and whatnot were going back and forth,
6  that they couldn't be found and where a part was
7  found or something to that effect.  As that was
8  ongoing, around that time.
9      Q.   Before your hearing he told you that?
10      A.   No; it was after the hearing because
11  Michael Clancy was my attorney then so it was
12  after Chris Browne so the hearing had been -- it
13  had to be in preparation for the appeal.
14          It was after the hearing -- in between
15  the hearing for the Town and Civil Service appeals
16  hearing.
17      Q.   You're saying it was between the hearing
18  that Ms. Leal conducted and the Civil Service
19  hearing?
20      A.   After the hearing that Ms. Leal
21  conducted and prior to the Civil Service hearing.
22      Q.   Now is it your position that Brian
23  Barnes was very friendly with Chief Bergeron?
24      A.   Yes.

## VOLUME II - 292

1      Q.   And yet you're testifying that he told
2  you that Chief Bergeron ordered that your
3  personnel file be destroyed?
4      A.   Yes.
5      Q.   Why do you believe that he would tell
6  you something like that?
7      A.   I don't know.  I don't begin to guess
8  why Brian Barnes does anything Brian Barnes does.
9  I don't know.
10      Q.   Actually Chief Bergeron hadn't even been
11  working at the station at the time that your
12  hearing was being conducted, isn't that correct?
13      A.   Correct; but my personnel file was lost
14  long before the hearing for the Town in '04.
15      Q.   When do you believe your personnel file
16  was lost?
17      A.   Sometime in 2003.
18      Q.   You did introduce documents at the
19  hearing that were also contained in your personnel
20  file of a positive nature, is that correct, such
21  as letters from citizens and so forth?
22      A.   Correct.
23      Q.   How did you get those?
24      A.   At the time that those were given or

## VOLUME II - 293

1  sent or presented, I made a copy and I have a book
2  called a brag book, copies of citations or awards
3  or training certificates, that sort of thing.
4      Q.   Do you believe that there were documents
5  contained in your personnel file that you did not
6  already have a copy of that would have been
7  helpful to you at your hearing if you had had the
8  complete personnel file?
9      A.   Yes.
10      Q.   What do you believe you didn't have that
11  would have been helpful?
12      A.   I'm not certain how to answer that.  I
13  don't know how to articulate what would be there
14  if I don't know what was in there.  Do you
15  understand?
16      Q.   Had you ever reviewed your personnel
17  file before it was missing?
18      A.   I may have.  I don't remember
19  specifically doing that.  I remember asking
20  whether it was the Chief or Sergeant Latour or
21  whoever was overseeing them.
22          As I received different things if they
23  were in there or I'd make a copy of what I
24  received and leave it for them to put it in there.

## VOLUME II - 294

1  Possibly documents or items that I wouldn't know
2  about necessarily.  I don't know what's in there.
3      Q.   In terms of -- what's in your brag book?
4  You said letters?
5      A.   Right; any type of training certificate
6  that I received, letters of recognition from
7  either inside or outside of the Department.
8      Q.   How did you get those -- copies of those
9  for your own brag book?
10      A.   They were given to me.
11      Q.   By whom?
12      A.   Either the Chief or one of my
13  supervisors.
14      Q.   In other words is it your understanding
15  that when such a letter came into the station you
16  were given a copy of it?
17      A.   Yes.
18      Q.   At your hearing there was no testimony
19  that you had had prior discipline, is that
20  correct?
21      A.   I never have.
22      Q.   So why do you think that the personnel
23  file would have been helpful to you given that
24  there wasn't any testimony that you had ever had

**PERLIK and COYLE REPORTING**

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 295

1 discipline prior to that hearing?
2     A.   Exactly that.
3     Q.   I'm not following you. There was no
4 testimony at the hearing that you had had prior
5 discipline, is that correct?
6     A.   Right, by me.
7     Q.   Did any witness come forward at the
8 hearing before Ms. Leal and state that there was
9 prior discipline taken against you before that
10 hearing?
11     A.   No; but I've never had any discipline,
12 I've never had any counselling by a supervisor or
13 anybody. It was an exemplary personnel record.
14 That -- as I say, that in and of itself because
15 it's exemplary is positive for me.
16     Q.   But was there any testimony at that
17 hearing that you had had counselling or that there
18 was anything negative about you before that
19 hearing?
20     A.   No.
21     Q.   So you just think that the personnel
22 file would have just been confirmation of the fact
23 that there wasn't anything negative stated about
24 you?

VOLUME II - 296

1     A.   Correct.
2     Q.   Any other reason it would be
3 important -- it would have been important to you
4 at the hearing?
5     A.   To show that of all of the personnel
6 within the Webster Police Department --
7 everybody's file can be located except for mine
8 and Sergeant Kelley's.
9     Q.   Do you know if yours had been
10 segregated -- yours and Ms. Kelley's had been
11 segregated because there was an investigation with
12 regard to the cheating allegations?
13     A.   I don't believe so.
14     Q.   Did you ever discuss Brian Barnes'
15 allegation that Chief Bergeron ordered the
16 personnel files destroyed with Chief Bergeron?
17     A.   No.
18     Q.   Did you ever discuss it with Officer
19 Novick?
20     A.   No.
21     Q.   Why not?
22     A.   I would assume that any conversation
23 with either Bergeron or Novick, I would assume
24 that it would be an adversarial environment. I

VOLUME II - 297

1 wouldn't contact either one of them.
2     Q.   Did you essentially introduce the
3 contents of the brag book at your hearing before
4 Ms. Leal?
5     A.   Some of it; yes.
6     Q.   To this day other than what Mr. Barnes
7 told you, do you have any other information as to
8 what happened to your personnel file?
9     A.   No.
10     Q.   I'm sorry, I'm not sure I asked you this
11 or not.
12     Do you know at what point in time Chief
13 Bergeron allegedly ordered your personnel file
14 destroyed?
15     A.   I don't.
16         (Defendant's Deposition Exhibit
          No. 24 offered and marked.)
17
18     Q.   (BY MS. LYNCH)  I show you what's been
19 marked as Exhibit Number 24.
20     Have you seen that before today?
21 (Indicating.)
22     A.   Yes.
23     Q.   You'll notice that the subject matter
24 there says "Potential Letter of Reprimand"?

VOLUME II - 298

1     A.   Yes.
2     Q.   Did you ever get a letter of reprimand
3 with regard to the incident that occurred on
4 May 14, 2003?
5     A.   No.
6     Q.   Just briefly, what was the subject of
7 that, quote, "Potential Letter of Reprimand"?
8     A.   Chief Bergeron was angry that he was not
9 informed by either myself or the officer on the
10 shift as to a major incident with an injury.
11     He decided not to issue any type of
12 reprimand when he found out that that morning
13 everything was turned over to William Keefe and it
14 was in fact William Keefe that didn't inform him.
15     Q.   Was there a discussion then after
16 May 21, 2003 where he stated that he did not think
17 you deserved a letter of reprimand?
18     A.   He said I wouldn't receive the letter;
19 that he took care of it with William Keefe.
20     Q.   Was that the end of this issue?
21     A.   That was the end of it.
22     Q.   In terms of the incidents involving
23 Catherine Abbe, Jonah Mayotte, and Heath
24 Greenwood, do you know whether or not Thomas Ralph

VOLUME II - 299

1  ever conducted any type of investigation regarding
2  them?
3      A.   He would have been on -- no; he observed
4  Jonah Mayotte, investigated Greenwood, and he
5  wasn't on a shift or he wasn't in any type of
6  supervisory capacity for Abbe.
7          He would never have had any involvement
8  in that.
9      Q.   It is your understanding that he
10 investigated the Greenwood incident?
11     A.   Correct; he observed the Mayotte
12 incident as the deputy chief.
13     Q.   What did he -- strike that. How did you
14 learn that he was going to be investigating the
15 Greenwood incident?
16     A.   He had had myself and James Hoover come
17 into his office. James Hoover was the union
18 representative.
19     Q.   What was discussed?
20     A.   Greenwood; that Tom Ralph -- Tom Ralph
21 Mirandized me and then asked if I wanted a union
22 attorney. I said no. He told me that he was
23 going to -- he was looking into the Greenwood
24 incident; asked me what happened. I told him. He

VOLUME II - 300

1  said that he would let us know when he wrapped
2  that up.
3          James Hoover asked him how long that
4  would be. He said he didn't know but he'd get
5  back to us.
6      Q.   Do you know how long it was after the
7  Greenwood incident happened that he spoke to you
8  about it?
9      A.   About a month or so, I thought.
10     Q.   About a month after?
11     A.   Yes.
12     Q.   Do you know what prompted him to do the
13 investigation?
14     A.   He said that he had -- he told us that
15 he had a conversation with Sergeant Tim Bent; that
16 Officer Gevry related everything to Sergeant Bent,
17 Sergeant Bent then to Ralph, and Ralph said that
18 he was going to speak with me, Pysell and Kehoe.
19     Q.   Did he say why he chose the three of
20 you?
21     A.   We were there.
22     Q.   Do you know whether or not Chief
23 Bergeron was involved at all in the fact that
24 Ralph was doing an investigation of the Greenwood

VOLUME II - 301

1  incident?
2      A.   I would assume he was. I don't know.
3      Q.   Do you recall ever speaking with Chief
4  Bergeron about that incident?
5      A.   No.
6      Q.   Do you know why Ralph didn't interview
7  Gevry?
8      A.   I don't know.
9      Q.   Do you know why he didn't interview
10 Greenwood?
11     A.   I don't think anybody could find
12 Greenwood.
13     Q.   Do you know what efforts were made to
14 find him?
15     A.   I don't know.
16     Q.   Do you receive a copy of his final
17 report on that incident?
18     A.   Not then, no.
19     Q.   You've seen one now, is that correct --
20 or up until now, right?
21     A.   Correct.
22     Q.   I show you actually what was marked as
23 Exhibit 3 at Thomas Ralph's deposition.
24          Is that a copy of the report?

VOLUME II - 302

1  (Indicating.)
2      A.   (Witness examining document.) Yes. I
3  have these two pages and I have this as another
4  page.
5          I have all three documents but not all
6  as one.
7      Q.   It was not -- the third page was not
8  attached to his report?
9      A.   Not that I have. I have a copy of both
10 but they're not stapled together.
11     Q.   Do you remember when you were first
12 given that -- a copy of that report dated
13 February 26, 2003?
14     A.   When all of this was coming about as
15 part of all these documents collected given out
16 back and forth.
17     Q.   Do you mean after you left your
18 employment?
19     A.   Yes.
20     Q.   How was that incident resolved? In
21 other words, did anyone call you in and say you've
22 been absolved, anything like that?
23     A.   Jim Hoover said to me -- we were in the
24 hallway of the station. Jim Hoover said to me,

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          SEPTEMBER 13, 2006

### VOLUME II - 307

1  Q. That was something different?

2  A. Correct.

3  Q. Were you there as well?

4  A. No.

5  Q. That was Tom Ralph?

6  A. Correct.

7  Q. What was your understanding of that

8  meeting?

9  A. That Regis had informed O'Donnell that

10  Ms. Leal intended to fire me but that she needed

11  to have a hearing to make things look good and

12  didn't know if O'Donnell could use that for his

13  newspaper or something.

14  Q. Who wanted to know if it could be used

15  for the newspaper?

16  A. My understanding is Regis didn't know if

17  O'Donnell could use it for his newspaper.

18  O'Donnell is a publisher of a once-a-week

19  newspaper.

20  Q. So you believe that Regis who was a

21  selectman at the time was offering it as a

22  possible story to the publisher of a newspaper?

23  A. I don't know for certain.

24  Q. That's your understanding?

### VOLUME II - 308

1  A. But they're in that office.

2  Q. What is your understanding of the

3  relationship between Mr. O'Donnell and Mr. Regis?

4  A. I would assume it's friendly. I don't

5  know for sure.

6  Paul O'Donnell is somebody basically who

7  everybody knows who he is.

8  Q. Was anything ever published as far as

9  you know?

10  A. Not as far as I know.

11  Q. Do you know why not?

12  A. I don't.

13  Q. I can't recall if I asked you this or

14  not before.

15  What is your understanding of Regis'

16  relationship with Ms. Leal?

17  A. I don't know. That as selectman and

18  town administrator that they have to work

19  together.

20  Q. Do you believe that they were

21  adversaries?

22  A. I'm under the impression that at times

23  it was a strained relationship.

24  Q. Do you -- I'm sorry; go ahead?

### VOLUME II - 309

1  A. No.

2  Q. Do you have any information to believe

3  that Mr. Regis did not agree with the way that

4  Ms. Leal was conducting the hearing pertaining to

5  you?

6  A. I don't think he agreed with all of

7  that; no.

8  Q. What do you base that upon?

9  A. His willingness to tell people of his

10  conversation with Ms. Leal about me being

11  terminated before a hearing and having a hearing

12  to keep up appearances as it was put.

13  Q. Do you know whether or not he ever

14  informed Ms. Leal that he didn't agree with what

15  she was doing with regard to your termination

16  hearing or that he tried to prevent her from going

17  forward with the hearing, anything like that?

18  A. I don't know.

19  Q. The Select Board were Ms. Leal's boss

20  though, right?

21  A. As far as I know; yes.

22  Q. Did you testify last time with regard to

23  information about alleged statements by Ms. Leal

24  involving Paul Adams? Was that the incident at

### VOLUME II - 310

1  the store?

2  A. I testified to Regis being in Paul

3  Adams' store, the store he owns; yes.

4  Q. Was there a Charles Tomasso there as

5  well?

6  A. Yes.

7  Q. It was just the one incident in the

8  store, is that correct?

9  A. Correct.

10  Q. At your hearings, either the Civil

11  Service hearing or the hearing before Ms. Leal,

12  did either Mr. Miller or Mr. Regis testify in your

13  behalf?

14  A. Mr. Miller at both hearings; Mr. Regis

15  at Civil Service I believe -- or just Civil

16  Service.

17  Q. Mr. Regis?

18  A. Yes.

19  Q. Is it fair to say that at the hearing

20  before Ms. Leal that -- strike that.

21  Are you asserting that the hearing that

22  was conducted by Ms. Leal was unfair?

23  A. Yes.

24  Q. What are you basing that upon?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          SEPTEMBER 13, 2006

## VOLUME II - 311

1    A.   The fact that Chris Browne could not
2  call witnesses; the fact that both Kelley and
3  Gevry were unavailable but their work product was
4  turned in and used; the fact that officers were
5  told to stay away from the Town Hall during the
6  hearing; the fact that a sizable packet of
7  information was delivered to my house some ten
8  hours before the hearing where my attorney was not
9  able to go through that packet of information; the
10  number of occasions that the information that
11  Ms. Leal intended to fire me but needed to have a
12  hearing so everything looked good.
13         Based on all of those things I don't
14  think it was a fair hearing.
15    Q.   When you said that Attorney Browne was
16  not able to call witnesses, what do you mean by
17  that?
18    A.   Exactly that.  There were people that he
19  wanted to question but he, himself, stated in the
20  transcript that he didn't have any type of
21  subpoena power at all; that there were people very
22  pertinent to that hearing that weren't required to
23  be there.
24         He had no way to require them to be

## VOLUME II - 312

1  there.
2    Q.   Who did you want to testify that did not
3  testify?
4    A.   Gevry, Kelley, Novick, Langevin, Becker.
5  That may be it.
6    Q.   Starting with Gevry, what information do
7  you think that he would have been able to provide
8  that would have been helpful to you?
9    A.   I think that rambling narrative that was
10  introduced, I think that Chris Browne should have
11  had the opportunity to cross-examine Gevry on
12  that.
13         I think that there is information
14  contained in his statement that is not factual or
15  inflamed.  I think it would be presented
16  differently under cross-examination.
17    Q.   Why do you believe that he was not
18  available to testify?
19    A.   He was in Amsterdam.
20    Q.   Amsterdam, Europe?
21    A.   Yes; that's where he vacations.
22    Q.   Do you know if it was a planned
23  vacation?
24    A.   That, I don't know.

## VOLUME II - 313

1    Q.   Did you or as far as you know your
2  attorney or anyone on your behalf ask him to
3  testify at the hearing?
4    A.   I was told that we couldn't.
5    Q.   Who told you that?
6    A.   My attorney, Chris Browne.
7    Q.   So you did not contact Gevry to testify
8  at the hearing?
9    A.   I did not.
10    Q.   Do you know if the Town tried to get him
11  to testify?
12    A.   I don't know.
13    Q.   Now Kelley, what information do you
14  believe that she could have provided that would
15  have been helpful to you?
16    A.   Again cross-examination on the Mayotte
17  incident.
18    Q.   Anything else?
19    A.   It was her report that was introduced
20  but I think that Chris Browne should have had the
21  opportunity to cross-examine her on that
22  information.
23    Q.   What is your understanding as to why she
24  was unavailable to testify?

## VOLUME II - 314

1    A.   I don't know.
2    Q.   Did you or as far as you know your
3  attorney or anyone on your behalf try to get her
4  to testify at the hearing?
5    A.   Again, I was told that I couldn't.
6    Q.   So you didn't talk to her about it?
7    A.   No.
8    Q.   Do you know where she was at the time of
9  the hearing?
10    A.   I don't know.
11    Q.   How about Novick?  What information do
12  you believe he would have had that would have been
13  helpful to you?
14    A.   Mayotte and Abbe.
15    Q.   Anything in particular?
16    A.   When Catherine Abbe was arrested that
17  was the third time that the multiple cruisers were
18  sent to that residence within a half hour,
19  forty-five minute span or something.
20         Novick was one of the first officers on
21  the scene for the first call.  I believe he was on
22  the scene for the second call.  I relieved him on
23  the second call so he was there for the front part
24  of all of that.

PERLIK and COYLE REPORTING

**JOHN A BOLDUC VS. TOWN OF WEBSTER ET AL**

**JOHN BOLDUC**      **SEPTEMBER 13, 2006**

## VOLUME II - 315

1    Q.   That was all on the same day?

2    A.   All within the same hour; yes.

3    Q.   Anything else you think he could have

4 been helpful to you with regard to the hearing?

5    A.   No.

6    Q.   You mentioned Mayotte. Anything in

7 particular with regard to that or did you think

8 that he should have been available for

9 cross-examination?

10    A.   Exactly; right.

11    Q.   Do you know why he didn't attend the

12 hearing?

13    A.   I don't know.

14    Q.   Did you or as far as you know your

15 attorney or anyone on your behalf try to get him

16 to testify at the hearing?

17    A.   No.

18    Q.   Was he still employed at the Webster

19 Police Department when the hearing occurred?

20    A.   I'm not sure.

21    Q.   Officer Langevin, how do you believe he

22 would have been helpful to you at the hearing?

23    A.   For Mayotte.

24    Q.   Was it that you thought he could add

## VOLUME II - 316

1 information or did you want him to be

2 cross-examined?

3    A.   Both.

4    Q.   What information do you think that he

5 might have added that would have been helpful to

6 you?

7    A.   He observed the incident. It was

8 Officer Langevin who retrieved the bolt cutters.

9 He was the person who supplied them.

10    Q.   Do you know why he didn't testify?

11    A.   I don't know.

12    Q.   Did you, your attorney or anyone on your

13 behalf contact him to try to get him there?

14    A.   No; again according to Chris Browne we

15 weren't allowed to call or subpoena witnesses.

16    Q.   How about Officer Becker? What

17 information do you believe that he would have had

18 that would have been helpful to you?

19    A.   EMT. He was the second EMT there.

20    Q.   At which incident?

21    A.   Mayotte, I'm sorry.

22    Q.   What information do you believe that he

23 would have had that would have been helpful to

24 you?

## VOLUME II - 317

1    A.   His observations from an EMT medic

2 standpoint that precautions were taken not to

3 injure Mayotte.

4    Q.   Anything else?

5    A.   Detective Hoover I think should have

6 been called.

7    Q.   With regard to Becker, though?

8    A.   No.

9    Q.   What precautions do you believe were

10 taken not to injure Mayotte?

11    A.   The fact that when I removed the jewelry

12 it was done in such a manner that it was a safe,

13 controlled environment that he was not in danger

14 of being injured and he wasn't injured.

15    Q.   Did you, your attorney or anyone on your

16 behalf try to contact him to get him to the

17 hearing?

18    A.   No.

19    Q.   Do you know why he didn't attend the

20 hearing?

21    A.   I don't know.

22    Q.   You mentioned Hoover as well. What

23 information do you believe that he would have

24 provided that would have been helpful to you at

## VOLUME II - 318

1 the hearing?

2    A.   I think that James Hoover has a lot of

3 information.

4      Hoover -- in all of my testimony Hoover

5 is a large part of a lot of things so for both the

6 ability for Chris Browne to question him.

7    Q.   Do you mean cross-examine or provide

8 information?

9    A.   Both. If he was brought in by the Town,

10 then cross-examined and if not, then called by us

11 or called by me but I think that James Hoover is

12 somebody that has a lot of information.

13    Q.   But the three subjects of the hearing

14 were the Mayotte, Greenwood, and Abbe incidents,

15 right?

16    A.   Right.

17    Q.   What information do you think he had

18 about any of those?

19    A.   He was present for the telephone call

20 for Heath Greenwood in William Keefe's office that

21 day.

22      With Greenwood he was with me as my

23 union representative for Ralph's questioning of

24 me. He was present for that.

**PERLIK and COYLE REPORTING**

**JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          SEPTEMBER 13, 2006**

VOLUME II - 319

1  Q.  Anything else?
2  A.  No.
3  Q.  When you mentioned the telephone call
4  from Greenwood, you're referring to the call that
5  he made when he received an anonymous
6  letter stating that you were under investigation,
7  is that correct?
8  A.  Correct.
9  Q.  You did have several witnesses testify
10  on your behalf, is that correct, in the hearing
11  before Ms. Leal?
12  A.  Yes.
13  Q.  What is your understanding as to how
14  they were contacted and brought to the hearing?
15  A.  They came to the hearing to observe.
16  Q.  Did anyone prevent them from staying?
17  A.  No.
18  Q.  Are you saying that neither you, your
19  attorney nor anyone else on your behalf actually
20  called individuals ahead of time and told them to
21  come to the hearing?
22  A.  The only person that I asked, that was
23  asked, was Stephen Boudreau.
24  Q.  That was the only person that was asked?

VOLUME II - 320

1  A.  Right.
2  Q.  By you or your attorney?
3  A.  By me.
4  Q.  Why didn't you ask anyone else?
5  A.  In my conversation with Chris Browne
6  when he had said that we didn't have the ability
7  to call witnesses, he didn't have subpoena power,
8  that's exactly what I took that for.
9  Q.  But did you think that meant that you
10  couldn't call someone and ask them to testify on
11  your behalf even though you couldn't compel them
12  to be there?
13  A.  Yes.
14  Q.  That's how you interpreted it?
15  A.  I did.
16  Q.  Is it your understanding that Ralph
17  didn't testify at your hearing at the advice of
18  his attorney?
19  A.  Yes.
20  Q.  In other words, you asked him to testify
21  and he declined?
22  A.  It was Chris Browne I think talked to
23  Jim Simpson.
24  Q.  Do you have any understanding as to why

VOLUME II - 321

1  his attorney didn't want him to testify?
2  A.  I don't know.
3  Q.  You said that officers were told to stay
4  away from the Town Hall during the hearing.  What
5  do you base that upon?
6  A.  On Pysell and Melendez telling me that
7  officers were told to stay away from the Town
8  Hall.
9  Q.  Isn't it true that it was officers who
10  weren't to be involved in the hearing that were
11  told by Acting Chief Keefe to stay away from the
12  Town Hall?
13  A.  That's not what was repeated to me.
14  Q.  Do you have any personal knowledge as to
15  what Acting Chief Keefe did say to the officers
16  about going to the Town Hall during the hearing?
17  A.  No.
18  THE WITNESS:  Can I ask for a brief
19  break?
20  MS. LYNCH:  Sure; that's fine.
21  (A recess was taken.)
22  Q.  (BY MS. LYNCH)  Mr. Bolduc, while you
23  were employed by the Town of Webster what is your
24  understanding of William Keefe's relationship to

VOLUME II - 322

1  Robin Leal when she was the Town Administrator?
2  A.  Friendly, good relationship.
3  Q.  Were you involved at all in the Judge
4  Barton investigation?
5  A.  Involved?
6  Q.  In other words, did he interview you?
7  A.  Yes.
8  Q.  Did you give him any documents, anything
9  like that?
10  A.  No; I don't believe so.
11  Q.  How long was this interview of you,
12  approximately?
13  A.  An hour.
14  Q.  Do you believe that your First Amendment
15  rights have been violated by any of the
16  Defendants; and if so, how?
17  A.  When I was asked about any knowledge
18  from -- about Brian Barnes and statements and all
19  of that and when I said that I was, I was ordered
20  to put that in writing which I did, and from that
21  point on all of this began.
22  Q.  You have alleged that you had a right to
23  association that was violated.  What do you mean
24  by that?

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          SEPTEMBER 13, 2006**

VOLUME II - 323

1    A:    Bergeron told me that my friendship,
2    support, and loyalty to Thomas Ralph would cost
3    me.
4        Q.    Anything else that you base that upon?
5        A.    I'd have to speak with my attorney.
6        Q.    You want to speak to your attorney right
7    now, is that what you're saying?
8        A.    I would have to, to elaborate more on
9    your question; yes.
10       Q.    If you want to speak to your attorney,
11   you can do so?
12       A.    Okay.
13           (A recess was taken.)
14       Q.    (BY MS. LYNCH)  Now that you've spoken
15   to your attorney, do you want to add anything to
16   your answer?
17       A.    No.
18       Q.    You are alleging that the Defendants
19   have retaliated against you.
20           How do you believe you've been
21   retaliated against?
22       A.    By having my duty assignment changed; by
23   being essentially evicted from my office; by being
24   pulled from the Amato investigation; by

VOLUME II - 324

1    reexamining or reopening issues that were taken
2    care of at the time going back over -- or looking
3    back over just an unspecified amount of time and
4    reexamining these things; to be soliciting
5    negative information from people who are thought
6    to have maybe know of anything; to have been
7    terminated without ever being disciplined or
8    reprimanded or counseled.
9           Once William Keefe was installed as the
10   acting chief of police, never once did he mention
11   to me that he would want anything done differently
12   by me or anybody else; that any type of behavior
13   alleged by him were to be altered, stopped,
14   changed, unacceptable, anything to that effect;
15   never said anything about the performance of my
16   duties or how I went about them.
17       Q.    You're talking about prior to the actual
18   hearing he never said anything to you -- meaning
19   prior to the charges being made?
20       A.    Ever -- exactly.  From the time that he
21   was the acting chief of police and the number one
22   cop in the Department, when it was essentially his
23   administration there was never any mention of him
24   wanting me personally to do anything different

VOLUME II - 325

1    than I had ever done.
2        Q.    Any other reasons you believe you were
3    retaliated by the Defendants?
4        A.    All of those.  Everything that we're
5    here for.
6        Q.    When you said that your duty assignment
7    was changed, are you referring to being taken off
8    of the Amato investigation?
9        A.    Yes.
10       Q.    When you said you were evicted from your
11   office, was there any reason why you couldn't use
12   any of the offices that had been occupied by
13   officers or sergeants on other shifts -- when you
14   were on a different shift than them?
15       A.    I don't know.
16       Q.    You also said that you feel you were
17   retaliated over old issues that had been
18   reexamined.
19           Is it fair to say that reportedly only
20   the Greenwood incident had been examined prior to
21   the charges brought against you in the hearing?
22       A.    No; Bergeron was aware of Mayotte and
23   had no issue with the Mayotte incident at that
24   time.

VOLUME II - 326

1        Q.    But there was no investigation of that
2    incident, was there?
3        A.    Not that I'm aware of; no.
4        Q.    There was no investigation of the Abbe
5    incident until the hearing, is that correct -- or
6    the events leading up to the hearing?
7        A.    Until Ralph's hearing; correct.
8        Q.    Other than the town administrators that
9    you've already mentioned, did you discussed the
10   charges brought against you with any other Webster
11   town administrator?
12       A.    No.
13       Q.    Or your employment in general?
14       A.    No.
15       Q.    Is it fair to say that you had a
16   satisfactory relationship with Acting Chief Keefe
17   up until the point that those charges were brought
18   against you?
19       A.    Yes.
20       Q.    You have alleged that the Defendants
21   have conspired essentially to bring about damage
22   to you.  I believe you stated in your complaint
23   that they have corroborated to punish you for
24   expressing your opinions.

**PERLIK and COYLE REPORTING**

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 327

1  How do you believe that they have
2  conspired?
3      A.  I believe that all of this is
4  retaliatory against me; that through their --
5  basically a group effort with them.
6      Q.  Do you have any information that they
7  got together or somehow communicated with each
8  other to support the termination of your
9  employment -- and I'm referring to all of the
10  Defendants?
11      A.  My belief that they all agreed and acted
12  together to further my termination.
13      Q.  For instance Richard Bergeron, he wasn't
14  even employed by the Webster Police Department at
15  the time of your termination hearing, is that
16  correct?
17      A.  Correct -- well, right, he retired I
18  believe at the time of my termination.
19      Q.  So do you believe that he was involved
20  in any conspiracy to have you terminated?
21      A.  In the beginning; yes.
22      Q.  What are you referring to?
23      A.  At the times when he was soliciting
24  officers and civilians for negative comments.

VOLUME II - 328

1      Q.  But he never took any disciplinary
2  action against you before he left, did he?
3      A.  No.
4      Q.  How do you believe that William Keefe
5  has conspired against you?
6      A.  My belief is that where Bergeron --
7  where they started this and Keefe furthered this
8  to -- in part my belief is to clear the way for
9  him to the Chief's office; that I would have been
10  seen as either standing in his way or competition
11  for him in testing.
12      I think that his attempt to influence
13  Polizoti, along with Robin Leal's telephone calls
14  to Polizoti ahead of time, I think that was to
15  influence the outcome in favor of their position.
16      Q.  Do you believe that any other official
17  of the Town of Webster did anything to conspire
18  against you to bring about your termination?
19      A.  No; I believe that the e-mail from Bob
20  Stawiecki to Robin Leal where he was aware that
21  myself and Ralph were targeted.
22      Q.  Do you believe that Mr. Stawiecki was
23  somehow conspiring against you?
24      A.  I don't know if he was conspiring or if

VOLUME II - 329

1  he -- or if he knew what was going on or if he
2  could see what was happening or if he wanted some
3  sort of action taken; I don't know.
4      Q.  You identified -- or your attorney
5  identified in initial disclosure on
6  October 19, 2005, several witnesses.  One was
7  Heidi Courtenay.
8      Other than what you testified today
9  related to her, what information do you believe
10  that she has that is significant with respect to
11  your claim?
12      A.  I think Heidi Courtenay has a lot of
13  information, some that I don't know of but would
14  have to be subpoenaed and asked under oath so as
15  to protect her job type of thing.
16      I think that she was present also at the
17  Colonial Club for -- where Barnes made the
18  statements that I heard and gave the written
19  report about but I think that there's more
20  information that Heidi Courtenay would have.
21      Q.  Incidentally, do you have any
22  understanding of what her relationship is to Brian
23  Barnes?
24      A.  I don't know.

VOLUME II - 330

1      Q.  Who is Karen Dean Smith, Esquire?
2      A.  She was the assistant to Judge Barton.
3      Q.  Mark Dowgiewicz, does he have any
4  knowledge other than what you've already testified
5  to?
6      A.  I don't know.
7      Q.  You've identified Paula Laduc.  What
8  information does she have?
9      A.  That would be Pamela.  It might be a
10  typo.
11      Q.  Here it's written P-A-U-L-A.
12      A.  It's the Town accountant, Pamela Laduc.
13      Q.  What information do you believe that she
14  has that would be relevant to your claim?
15      A.  Other than what we had discussed about
16  my conversation with Ralph on Monday, along the
17  same lines as Heidi Courtenay.
18      I think that she has information that
19  she'd be able to give freely under oath when she
20  was subpoenaed to do so, again in preservation for
21  her job and all of that.
22      Q.  Do you have any knowledge as to what you
23  think she knows that would be helpful to your
24  claim?

PERLIK and COYLE REPORTING

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC                SEPTEMBER 13, 2006**

VOLUME II - 331

1    A.    Other than what we talked about today,
2    no.
3    Q.    But that you just found out about on
4    Monday?
5    A.    Right.
6    Q.    And this was obviously completed about a
7    year ago?
8    A.    Prior to that; right.
9    Q.    Do you have any specific information as
10   to what she knew back when this was completed?
11   A.    Not that I recall at the moment but
12   with -- as I go over or as I would reexamine a lot
13   of the stuff that I have, too -- files and all of
14   that -- something may come up but at the moment I
15   don't know.
16   Q.    How about George Tetreault, what
17   information does he have?
18   A.    He is the polygraphist that examined me
19   so his reports and credentials.
20   Q.    Did he take a polygraph test of you?
21   A.    On two separate occasions; yes.
22   Q.    Do you believe that anyone from the Town
23   or Richard Bergeron threatened you?
24   A.    Bergeron told me that -- in his

VOLUME II - 332

1    office -- again that my friendship, loyalty, and
2    support of Deputy Chief Ralph would cost me.  So
3    far he was right.
4    Q.    You're referring to your corroborating
5    the alleged racial statements made by Barnes, is
6    that correct?
7    A.    Yes.
8    Q.    In other words your friendship, loyalty,
9    and support for Tom Ralph had nothing to do with
10   the Mayotte, Greenwood or Abbe incidents, right?
11   A.    I don't know.  He just said it would
12   cost me.
13   Q.    Did either Richard Bergeron or anyone
14   from the Town intimidate you?
15   A.    Bergeron.
16   Q.    What do you base that upon?
17   A.    His demeanor.  Again, the open threat
18   that -- in his office that day.
19   Q.    Are you talking about the prior
20   statement --
21   A.    (Interposing) Correct.
22   Q.    -- that you just testified to?
23   A.    Yes.
24   Q.    Did either Richard Bergeron or anyone

VOLUME II - 333

1    from the Town engage in any conduct of coercion
2    toward you?
3    A.    By coercion toward me, how would you
4    define that?
5    Q.    How would you define the word coercion?
6    A.    Well, what I'm asking is coerce me or
7    coerce others regarding me?
8    Q.    Actually it's part of your complaint so
9    I need to know what you mean by it.
10   A.    I think that goes to all of this
11   Bergeron that goes to me corroborating at least in
12   part Ralph's letter to him regarding Brian Barnes
13   and the fact that by me appearing as blowing the
14   whistle so to speak, I think that's what Bergeron
15   receiving that written narrative from me regarding
16   Barnes and his racial statements from the Colonial
17   Club was all about.
18   Q.    So the acts of coercion are your
19   corroborating Ralph's letter regarding Barnes?
20   A.    For me speaking out, his acts of
21   retaliating against me to basically to keep quiet,
22   to not go forward with any of that.
23   Q.    Who is Travis Gould?
24   A.    Travis Gould is a part-time Dudley

VOLUME II - 334

1    police officer, part-time Douglas police officer.
2    He may still dispatch at the Webster Police
3    Department.  He's a former Webster Reserve police
4    officer.
5    Travis Gould was the first person to
6    intercede on Officer Gevry's behalf the first time
7    he lost control of Heath Greenwood.
8    Q.    Did you ever discuss any of the issues
9    pertaining to your case with the district attorney
10   or anyone on his staff?
11   A.    No.
12   Q.    Did you ever discuss any of the issues
13   pertaining to your claim with the Attorney
14   General's Office or anyone on that staff?
15   A.    Not regarding my complaint; no.
16   Q.    You produced letters of recommendation
17   from William Keefe and Sergeant Bent going back to
18   1998.
19   What do those have to do with your
20   claim?
21   A.    That in William Keefe's letter to Doctor
22   Polizoti -- and going back to Exhibit -- today's
23   Exhibit 18, in the second paragraph where the
24   sentence that "prior to his promotion there was a

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          SEPTEMBER 13, 2006**

VOLUME II - 387

1   to introduce yourself?
2       A.   Yes.
3       Q.   And her office was where?
4       A.   In the Town Hall.
5       Q.   So you drove over to the Town Hall to
6   introduce yourself to Robin Leal?
7       A.   Yes.
8       Q.   How did that meeting go?
9       A.   It went well.
10      Q.   You introduced yourself and it was
11  pleasantries and then it ended?
12      A.   Yes; there was brief conversation,
13  something along the lines of how long have I -- do
14  I live in town, how long type of thing but
15  pleasantries and that was it.
16      Q.   I want to ask about specifically the
17  conversation.
18          She asked how long you lived in town or
19  you asked her that?
20      A.   Something along that -- something along
21  those lines.  Whether I lived in town or outside
22  of town or something.  Whatever one would say as
23  far as like an introduction type thing.  That's
24  all it was.

VOLUME II - 388

1       Q.   Prior to your meeting with her to
2   introduce yourself, had you heard anything about
3   Robin Leal?
4       A.   Only what was in the newspaper as far as
5   she was a former town administrator in Georgetown.
6   Nothing of significance I don't think.
7       Q.   You read about her in the newspaper.  Do
8   you remember as you sit here today anything
9   anybody told you about her before you met her?
10      A.   No.
11      Q.   Nothing?
12      A.   No.
13      Q.   You did use bolt cutters on the
14  detainee, correct?
15      A.   Yes.
16      Q.   And you did punch a detainee who was
17  handcuffed, correct?
18      A.   Yes.
19      Q.   And you did grasp the head of the woman
20  and hold her eyelids open for the picture,
21  correct?
22      A.   Yes.
23      Q.   If you could look at Exhibit Number 21?
24      A.   (Witness complying.)

VOLUME II - 389

1       Q.   Was it your testimony that you didn't
2   receive this before your March 10 hearing?
3       A.   Yes; this paper is telling me that the
4   hearing is Thursday, March 10th.
5       Q.   But you didn't receive this letter
6   before March 10 -- the letter is dated March 1.
7   You didn't get it in the mail before the hearing
8   date?
9       A.   Yes; this was telling me when my hearing
10  was.
11          MR. McCULLOUGH:  Maybe I've
12  misnumbered the exhibits.  I apologize; I have the
13  wrong document.  I've been informed that I have
14  the documents confused.
15          Can I have that marked, please?
16          (Defendant's Deposition Exhibit
17          No. 25 offered and marked.)
17
18      Q.   (BY MR. McCULLOUGH)  Exhibit 25 is a
19  document of many pages but the first page is a
20  letter dated March 19, 2004.
21          Have you seen that letter before this
22  litigation? (Indicating.)
23      A.   (Witness examining document.)  Yes.
24      Q.   That is the first page, the March 19,

VOLUME II - 390

1   2004 letter.
2           Have you seen that one page before the
3   litigation?
4       A.   Yes.
5       Q.   When you saw the letter, were the
6   attachments that are included in this 25 attached
7   when you first saw it?
8       A.   (Witness examining document.)  Yes.
9       Q.   You received this letter on or about
10  March 19, 2004?
11      A.   Yes, 19th, 20th, right around there.
12      Q.   The second page is a March 1, 2004
13  letter to you from Acting Police Chief William
14  Keefe.
15          Is it your testimony then that the first
16  time you saw that letter was on or about March 20,
17  2004?
18      A.   Yes.
19      Q.   With respect to your hearing that you
20  received before Ms. Leal, it is your testimony
21  that you were informed you couldn't subpoena
22  anyone to appear at the hearing?
23      A.   Yes.
24      Q.   Yet you, yourself, and your attorney

**PERLIK and COYLE REPORTING**

VOLUME II - 391

1    didn't make any attempt to call anyone to testify
2    in your behalf, is that true?
3        A.   Except for Boudreau.
4        Q.   Your attorney attempted or reached
5    Boudreau to testify or was that you?
6        A.   That was me.
7        Q.   You didn't call anybody else but
8    Boudreau to testify in your behalf?
9        A.   No; I called Boudreau prior to Chris
10   Browne saying that we did not have the ability or
11   weren't allowed to call witnesses so I didn't.
12       Q.   I'm sorry, you did or did not call
13   Boudreau to testify?
14       A.   I did.
15       Q.   Did you call anyone else --
16       A.   (Interposing) No.
17       Q.   -- other than Boudreau to testify on
18   your behalf?
19       A.   No.
20       Q.   Did your attorney call anyone to testify
21   on your behalf?
22       A.   I don't know.
23       Q.   It's your position in this case, is it
24   not, that all of this that's befallen you -- your

VOLUME II - 392

1    termination -- is a result of your having relayed
2    what you heard Barnes say?
3        A.   Yes.
4        Q.   With respect to Robin Leal specifically,
5    upon what information do you base that claim?
6        A.   On what I see as two parts of this where
7    what -- with Bergeron beginning this retaliatory
8    conduct, behavior in response to my information
9    regarding Brian Barnes, and then gaining the
10   support of William Keefe where Keefe then sees an
11   opportunity to clear out his -- at least two of
12   his major competitors in the Chief's examination,
13   then having his friendship with Robin Leal, her
14   agreeing to further that or bring that to
15   fruition.
16       MR. McCULLOUGH:   Could you read that
17   back, the question, too?
18       (Reporter read back as
         requested.)
19
20       Q.   (BY MR. McCULLOUGH)   So by that answer
21   is it that you base your entire claim against
22   Robin Leal on what you believe to be her
23   friendship with William Keefe?
24       A.   And her conspiring with William Keefe.

VOLUME II - 393

1        Q.   What evidence do you have that she
2    conspired with William Keefe?
3        A.   Information from Leo Polizoti; the
4    instructing William Keefe to look back over
5    incidents of the -- within the Webster Police
6    Department regarding me without any limit of scope
7    and time in a time limitless investigation.
8        Q.   Anything else?
9        A.   Not right now; no.
10       Q.   With respect to the Doctor Polizoti,
11   what is it that Robin Leal did with Polizoti that
12   you construe to be furtherance of a conspiracy
13   against you?
14       A.   According to Polizoti she telephoned him
15   prior to my appointment with him, informed him
16   that the Town was already aware that I had anger
17   or temper issues, something to that effect, and
18   that as far as his evaluation, that was already
19   done, that's already known.
20           That coupled with Keefe's letter to
21   Polizoti leads me to believe that the two
22   conspired.
23       Q.   You learned of this from Polizoti in
24   what way?

VOLUME II - 394

1        A.   During the evaluation.   At the end of
2    the evaluation he had said to me that he thinks
3    that I seem all right to him; that he felt as
4    though the Town was setting me up, as he put it;
5    and then sometime after that when he left the
6    phone message for me stating that he was contacted
7    by the Town and they said that witnesses recanted
8    their statements, which was untrue.
9        Q.   When he said that to you in person at
10   the end of your meeting with him that the Town was
11   setting you up, did he say Robin Leal specifically
12   or did he just say generally the Town is setting
13   you up?
14       A.   He said the Town.
15       Q.   He did not say the words "Robin Leal,"
16   correct?
17       A.   Correct.
18       Q.   Then the other way in which you make the
19   claim that she was involved in a conspiracy
20   evidenced by what you learned through Leo Polizoti
21   is by the message machine?
22       A.   Where Polizoti said that he was
23   contacted by the Town who told him that witnesses
24   recanted their statements.

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC            SEPTEMBER 13, 2006

VOLUME II - 399

1 it goes on and then it ends in the first sentence,
2 "February 19, 2002, November 9, 2003, and then
3 November 30, 2003?
4    A.   Yes.
5    Q.   Is it fair to say November 30th, the
6 2003 is a typographical error, that should be
7 2002?
8    A.   The November 9, 2003.
9    Q.   I see, that should be November 9, 2002?
10    A.   Correct.
11    Q.   Have you ever heard any of the selectmen
12 make derogatory remarks about Ms. Leal?
13    A.   No.
14    Q.   You've never heard Mr. Miller make a
15 derogatory remark about Ms. Leal?
16    A.   No.
17    Q.   With respect to your conversation with
18 Mr. Ralph on this past Monday?
19    A.   Yes.
20    Q.   Regarding the e-mails, where did that
21 conversation take place?
22    A.   On the telephone.
23    Q.   Where were you in that telephone call?
24 Were you on a cell phone or at home?  Where were

VOLUME II - 400

1 you?
2    A.   I was on my cell phone at work.
3    Q.   Do you know where he was when he
4 telephoned you?
5    A.   I do not.
6    Q.   He didn't tell you where he was?
7    A.   No.
8    Q.   Did he say whether or not anyone else
9 was in a room with him or near him at the time he
10 was speaking to you?
11    A.   He didn't say.
12    Q.   Did he indicate in any way that he had,
13 himself -- and I know that we've talked about
14 this, I just want to be clear for the
15 transcript -- did he indicate in any way that he
16 had seen the e-mails, himself, that he was
17 referring to?
18    A.   No.
19    Q.   When you received your hearing before
20 Ms. Leal certainly you understood that the hearing
21 was going to be conducted as an investigation into
22 the events cited in Exhibit Number 21, correct?
23    A.   Yes.
24    Q.   And you, yourself, in that hearing had

VOLUME II - 401

1 an opportunity to respond regarding those
2 incidents, correct?
3    A.   Yes.
4    Q.   Your relation with Miller and Regis and
5 Leal, Bergeron and Keefe was just professional,
6 correct?
7    A.   Yes.
8    Q.   And your relation with Barnes was just
9 professional, correct?
10    A.   Yes.
11    Q.   There's been testimony by you the other
12 day and by Mr. Ralph concerning Officer Gevry of a
13 nature that is less than pleasant.  Do you know
14 what I'm referring to?
15       (Discussion off the record.)
16    Q.   (BY MR. McCULLOUGH)  There's been
17 testimony about Officer Gevry and his bringing up
18 various forms of pornography to the Police
19 Department computer.
20       Do you remember your testimony about
21 that?
22    A.   Yes.
23    Q.   Why is it that -- or is the reason why
24 you didn't make a complaint about Gevry due to

VOLUME II - 402

1 what you testified to about his wife?
2    A.   Just so I'm clear, are you asking at any
3 time involving Gevry?
4    Q.   Right.
5    A.   No.
6    Q.   Why didn't you complain about Gevry's
7 behavior if you knew that it was inappropriate?
8    A.   Early on it was geared toward me for
9 whatever reason.  I was just starting out as a
10 patrolman, Gevry was senior to me.  Oftentimes he
11 was my OIC.  Cops have a tough enough job without
12 being cry babies.
13    Q.   Why is it that you complained about
14 Barnes and not Gevry?
15    A.   I didn't complain about Barnes.
16    Q.   Why is it that you implicated Barnes or
17 why is it that you involved yourself in Barnes'
18 inappropriate behavior yet you didn't involve
19 yourself in Gevry's inappropriate behavior?
20    A.   With Barnes I was ordered to do so.
21    Q.   You were ordered to do so by the Chief?
22    A.   Correct.
23    Q.   Going back finally to the e-mails that
24 you learned about from Ralph last Monday, did

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC                    SEPTEMBER 13, 2006

## VOLUME II - 403

1  Ralph tell you under what circumstances he learned
2  of these e-mails?
3      A.   No.
4      Q.   Tell me please the entirety of what you
5  remember Ralph told you.  It was only two days
6  ago, tell me exactly what Ralph told you on the
7  phone?
8      A.   Ralph had called me.  He had said to me,
9  he says "Hey" he says, "Listen, you need to get
10  ahold of your attorney.  I was talking with Heidi.
11  Heidi said she felt what was done to me and
12  you" -- meaning Ralph and myself -- "was wrong,
13  that John's attorney needs to look at the e-mails
14  between Leal and Keefe prior to his hearing."
15  Ralph said, "Yeah, he knows that."
16          Heidi then said to Ralph, "No; John's
17  attorney really, really needs to see those
18  e-mails.  Whatever they got to do, they need to
19  get it.  Pam's got a receipt that the hard drive
20  was professionally cleaned, that there was no
21  virus, so get ahold of John, have him tell his
22  attorney and good luck."
23      Q.   Did Ralph tell you where he was talking
24  with Heidi?

## VOLUME II - 404

1      A.   No.
2      Q.   So he didn't tell you that he went to
3  her office or that they met anywhere?  He didn't
4  tell you anything about where he had this
5  conversation?
6      A.   Correct.
7      Q.   Did he tell you when he had this
8  conversation with Heidi?
9      A.   Monday.  He said that he -- well, he
10  said, "I just talked to Heidi," and that's when he
11  gave me that information as well.
12      Q.   Did he say whether he talked to her in
13  phone or in person or by e-mail himself?
14      A.   He didn't say.
15      Q.   What did you say in response?
16      A.   I said to Tom, I said, "Well," I asked
17  him how reliable that information was.  He said to
18  me that it's very reliable.  I asked him, "Why
19  now?  Are we the only two people on the planet
20  that think this is important?"
21          He said, "Look what happened to us?
22  People are afraid for their jobs."  He says, "If
23  this gets out," he said, "Heidi's not going to
24  have a job, Pam is not going to have a job.

## VOLUME II - 405

1  People want to help, people have information but
2  they can't volunteer it because you and I are
3  prime examples of what will happen if they do."
4          I took it at face value and have had
5  some conversation with that, with Attorney Green.
6      Q.   I don't want to hear about that.
7      A.   Right.
8      Q.   Do you believe what Ralph told you so
9  far as people losing their jobs is a valid
10  statement?
11      A.   Yes.
12      Q.   Bergeron is gone, Keefe is no longer
13  chief, Robin Leal is no longer town administrator.
14  Do you still hold that belief?
15      A.   Yes.
16      Q.   Why?
17      A.   Jim Hoover had said to me once that he
18  will freely testify to all that he knows but he's
19  got to be subpoenaed and it's got to be under
20  oath, that way when the reprisal comes -- and it
21  will -- when the reprisal comes, he is free to
22  tell anybody that he was subpoenaed and under oath
23  otherwise he will not volunteer any information
24  because someone is not in a position such as -- he

## VOLUME II - 406

1  gave me the example of former chief of police Paul
2  Minarik who, according to Jim Hoover still had
3  plenty of friends in proper places and all of that
4  sort of thing.
5          Absolutely I believe that people would
6  be in tough spots.
7      Q.   I want to make sure I understand your
8  answer.
9          All the statements you just made about
10  Jim Hoover, did you bring that up to say that you
11  believe it and Jim Hoover believes it, therefore
12  it should be believed or did I misunderstand what
13  your statement was?
14      A.   Along those lines.
15      Q.   I'm asking you what you based your
16  belief on, not what Hoover bases his belief upon,
17  given that Leal is no longer there, Keefe is no
18  longer chief, Bergeron is gone?
19      A.   I believe that anyone of those three can
20  still reach the chair of the office that they were
21  in.
22      Q.   What do you base that belief upon?
23      A.   My conversations with people.
24      Q.   Conversations with whom?

## PERLIK and COYLE REPORTING

## VOLUME II - 407

1    A.  Jim Hoover, Tom Ralph.

2    Q.  And in your conversations with Hoover

3 and Ralph, have they cited any specific concrete

4 evidence to support your opinion or to help form

5 your opinion that Keefe, Leal, and others can

6 reach back and cause people's jobs to be

7 terminated?

8    A.  No.

9    Q.  I believe you testified that you were

10 put on administrative leave -- or put on paid

11 administrative leave the day after you testified

12 for Ralph, is that correct?

13    A.  No.

14    Q.  Have you testified for Ralph in any form

15 or proceeding?

16    A.  In December of 2003.

17    Q.  What proceeding was that?

18    A.  His -- I believe it was his demotion

19 hearing from his deputy chief position.

20    Q.  You testified in his favor?

21    A.  Yes.

22    Q.  Did you suffer any negative impact in

23 your view by having testified for Ralph in that

24 proceeding?

## VOLUME II - 408

1    A.  Yes.

2    Q.  What was that?

3    A.  I was placed on paid administrative

4 leave forty-eight hours later.

5    Q.  Who presided over that December 2003

6 hearing for Tom Ralph?

7    A.  Robin Leal.

8    Q.  Do you have any -- do you believe that

9 Robin Leal caused you to be put on paid

10 administrative leave forty-eight hours later other

11 than what you've already testified to in this

12 deposition?

13    A.  Yes.

14    Q.  What?  What evidence do you have that

15 she was instrumental in causing that other than

16 what you've already testified to?

17    A.  Evidence that I don't have.

18    Q.  What evidence is that?

19    A.  Evidence I don't have.  Didn't you ask

20 me if I believed?

21    Q.  Yes.

22    A.  And I believe.

23    Q.  Yes.

24    A.  But then you asked me what I have for

## VOLUME II - 409

1 evidence and I have none.

2    MR. McCULLOUGH:  That's all.  Thank

3 you, sir.

4    MS. LYNCH:  Just a few follow-ups.

5    *****

6   REDIRECT EXAMINATION BY MS. LYNCH

7    Q.  Mr. Bolduc, with regard to the shooting

8 incident of January 30, 1999, was there any kind

9 of investigation done of that?

10    A.  Yes.

11    Q.  Who did the investigation?

12    A.  C-PAC I think.

13    Q.  What was the outcome of it?

14    A.  We handled ourselves properly.  It was a

15 good shoot.  Things were done as they should have

16 been.

17    Q.  No charges were brought against you or

18 Officer Shaw?

19    A.  No.

20    Q.  It was Officer Shaw that pulled the

21 trigger?

22    A.  Yes.

23    Q.  You testified earlier that everything

24 happened because of the information that you

## VOLUME II - 410

1 relayed about what you heard Barnes say at the

2 restaurant.

3    Do you know whether or not Chief

4 Bergeron ever spoke to William Keefe about that --

5 about your report of the alleged racial statements

6 by Barnes?

7    A.  I don't know.

8    Q.  You also stated that you believed that

9 you were one of two major competitors for the

10 Chief's position against William Keefe.

11    Do you recall that testimony a few

12 minutes ago?

13    A.  Yes.

14    Q.  Do you know whether or not William Keefe

15 wanted to be chief before he was appointed acting

16 chief?

17    A.  Yes.

18    Q.  How do you know that?

19    A.  From -- I was told that he took the

20 Chief's exam along with Sergeants Bent and Budrow

21 and Ralph so I would draw the conclusion that he

22 tested for a position he wanted.

23    Q.  And that was before he was appointed

24 acting chief that he took the exam?

EXHIBIT 1

ATTACHEMENT 1



Bolduc 1

# EXHIBIT 1

# ATTACHEMENTS
# 13 & 14



Bolduc 14



Bolduc 13

EXHIBIT 2

**IN THE MATTER OF:**

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

**DEPOSITION OF:**

ROBIN LEAL
DATE:   SEPTEMBER 15, 2006

---

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

Case 4:05-cv-40030-FDS    Document 22-6    Filed 11/14/2006    Page 3 of 32

JOHN A. BOLDUC vs.   TOWN OF WEBSTER ET AL
ROBIN LEAL          SEPTEMBER 15, 2006

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:05-CV-40030-FDS
Pages 1-195

JOHN A. BOLDUC

vs.

TOWN OF WEBSTER, ROBIN LEAL,
RICHARD BERGERON and WILLIAM KEEFE

-----------------------------------------------
DEPOSITION OF: ROBIN LEAL
-----------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Morrison Mahoney, LLP, 10
Chestnut Street, Worcester, Massachusetts on
SEPTEMBER 15, 2006, commencing at 9:15 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

**2**

APPEARANCES:

FOR THE PLAINTIFF:

GREEN, MILES, LIPTON, WHITE & FITZ-GIBBON
77 Pleasant Street
Northampton, Massachusetts 01060
BY: JOHN A. GREEN, ESQUIRE

FOR THE DEFENDANT TOWN OF WEBSTER:

MORRISON MAHONEY, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQUIRE

FOR THE DEFENDANT ROBIN LEAL:

MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, Massachusetts 02169
BY: GEOFFREY B. McCULLOUGH, ESQUIRE

Also Present: William Keefe

**3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| ROBIN LEAL | 5 | 189 | | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | 12/12/03 Leal to Bolduc Letter | 62 |
| 2 | 3/1/04 Leal to Bolduc Letter | 69 |
| 3 | 1/15/04 Browne to Leal Letter | 72 |
| 4 | 6/17/03 Reagon to Boudreau Letter | 79 |
| 5 | 11/10/03 HRD to Bolduc Letter & Attachments | 81 |
| 6 | 1/28/04 Browne to LaBella Letter | 82 |
| 7 | 2/24/04 Browne to LaBella Letter | 84 |
| 8 | 1/27/04 Stawiecki to Leal E-Mail | 86 |
| 9 | Barton Report | 89 |
| 10 | 1/27/04 Leal to Stawiecki E-Mail | 106 |
| 11 | 3/8/04 Leal to HRD Letter | 109 |
| 12 | 5/4/04 Leal to Keefe Letter | 111 |
| 13 | Bolduc Investigation Recommendation | 114 |
| 14 | 2/11/04 Browne to LaBella Letter | 118 |
| 15 | 3/9/04 Keefe to Browne Letter | 127 |
| 16 | List of Exhibits for Bolduc Hearing | 128 |
| 17 | 3/19/04 Leal to Bolduc Letter | 131 |
| 18 | 3/2/04 Moran E-Mail | 134 |
| 19 | 4/1/04 Leal to Ralph Letter | 141 |
| 20 | 11/2/04 Kopelman and Paige to Browne Letter | 144 |
| 21 | Articles for Town Meeting | 161 |
| 22 | Use-of-force Policy | 164 |
| 23 | Leal Response to Request for Production of Documents | 165 |
| 24 | Robin Leal Craver Affidavit | 170 |

*Exhibits retained by Mr. Green

**4**

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

*****

**9**

1  A.  Yes.
2  Q.  What is that degree?
3  A.  Master's in Public Administration.
4  Q.  Is that from Bridgewater?
5  A.  Yes.
6  Q.  Where did you do your undergraduate
7  work?
8  A.  University of Hartford.
9  Q.  When did you graduate from the
10 University of Hartford?
11 A.  2000 I think.  I'm not sure.
12 Q.  That would be reflected in your résumé?
13 A.  It would be in the résumé.
14 Q.  How did you learn of a position being
15 available in the Town of Webster?
16 A.  The Beacon.
17 Q.  What is the Beacon?
18 A.  A periodical that -- a publication that
19 comes out from the Mass. Municipal Association.
20 Q.  As a result of seeing this notice of
21 availability in the Beacon, what did you do?
22 A.  Sent a résumé to Webster.
23 Q.  Did you send it to anyone in particular?
24 A.  No.

**10**

1  Q.  Was there a cover letter attached to
2  that?
3  A.  I usually do a cover letter.
4  Q.  Do you have a copy of the cover letter
5  that you sent to the Town of Webster?
6  A.  I don't know.
7  Q.  Do you recall when your first contact
8  with any individual who was employed by the Town
9  of Webster first occurred?
10 A.  Do I remember the specific conversation
11 and who it was?
12 Q.  Right.
13 A.  No.
14 Q.  Do you recall when the first time -- as
15 a result of your having filed the application for
16 the position in Webster, what happened?
17 A.  I was contacted by the search committee.
18 By who, I don't know but the first contact would
19 have been by someone from the search committee
20 inviting me to an interview.
21 Q.  Do you recall who the members of the
22 search committee were?
23 A.  Some members that I remember were Mark
24 Becker, Ginger Cotton, Peter Sloter -- there was

**11**

1  about nine of them -- seven to nine; I don't know.
2  Q.  You were interviewed by that committee?
3  A.  Yes.
4  Q.  Do you recall when that interview
5  occurred?
6  A.  I don't know.
7  Q.  Do you recall when it occurred?
8  A.  I do not.
9  Q.  Do you recall when it was that you
10 applied for the position at Webster?
11 A.  I don't recall when I sent the letter or
12 the résumé.  Being hired, it had to be just before
13 that.  I don't know.
14 Q.  Did you meet with this committee --
15 search committee?
16 A.  Yes.
17 Q.  Where did that meeting take place?
18 A.  I want to say the Selectmen's room.
19 Q.  But it occurred in Webster?
20 A.  It did.
21 Q.  It occurred at a Webster municipal
22 building?
23 A.  Yes.
24 Q.  Were any members of the Select Board

**12**

1  present or part of the search committee?
2  A.  Not that I remember.
3  Q.  How long did this meeting with the
4  search committee last?
5  A.  I don't remember -- oh, I do remember
6  another person that was on it.  Jackie Regis was
7  also on the search committee.
8  Q.  Was she related to the Select Board
9  member?
10 A.  His wife.
11 Q.  Do you recall what -- so you do or do
12 not recall if there were other members -- if there
13 were members of the Select Board on the search
14 committee?
15 A.  Not that I remember.
16 Q.  What happened at this interview at the
17 search committee?
18 A.  I was asked questions and answered the
19 questions.
20 Q.  Were you given any indications from
21 members of the search committee of any particular
22 issues that would be confronting a new town
23 administrator?
24 A.  Nothing in particular that I can

Case 4:05-cv-40030-FDS    Document 22-6    Filed 11/14/2006    Page 5 of 32

JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
ROBIN LEAL        SEPTEMBER 15, 2006

**17**

1   Q.   Do you recall --
2   A.   (Interposing) Just to add to that,
3   usually a town will send information such as their
4   town report, their budget, their last warrant,
5   their charter or bylaws so that usually you get a
6   package.
7        You can assume -- I could assume that
8   there would be questions according to the package
9   that I received.
10  Q.   Do you recall specifically having
11  received such a packet from Webster?
12  A.   I don't recall specifically but if I
13  didn't, I would have asked for it -- the
14  information.
15  Q.   After your interview with the search
16  committee what was the next step in your --
17  leading to your employment by the Town of Webster?
18  A.   I believe I was offered an interview
19  with the Board of Selectmen.
20  Q.   Do you recall how soon after your
21  interview with the search committee that offer
22  occurred?
23  A.   No.
24  Q.   Do you recall who it was that

**18**

1   communicated that to you?
2   A.   Probably whoever the chair of the
3   committee was but I don't remember who it was.
4   Q.   You say the chair of the committee, you
5   mean the search committee?
6   A.   Yes.
7   Q.   Do you recall having an interview with
8   the Select Board?
9   A.   Yes.
10  Q.   Do you recall when that happened?
11  A.   No -- you mean the date?
12  Q.   Yes; the date.
13  A.   No.
14  Q.   Do you recall who was there for that?
15  A.   It was at the police station.  There
16  were many people there with the Board of
17  Selectmen.  I can't recall everyone.
18       I remember Irene Martel, Mark
19  Dowgiewicz.  One of the selectmen I think was
20  missing.  I think it might have been Stawiecki or
21  Regis or -- well, I think Stawiecki and Miller
22  were there, I can't say for sure -- and people
23  from the community.
24  Q.   Was this like an open interview process?

**19**

1   A.   Yes.
2   Q.   Do you recall where specifically that
3   interview process occurred?
4   A.   I believe it was in the police station
5   basement.
6   Q.   Is there a community room in the police
7   station basement?
8   A.   Yes.  It's a little bit bigger than
9   this.
10  Q.   So it was not in the Select Board's --
11  A.   (Interposing) I don't think so.
12  Q.   Do you recall what if any questions you
13  were asked by members of the Select Board?
14  A.   I can only assume that they were the
15  normal questions that you get at interviews.  I
16  don't remember any specific question I was asked
17  during that interview.
18  Q.   Were you given an indication that there
19  were any particular areas that the Select Board
20  anticipated would need to be addressed by the town
21  administrator?
22  A.   Oh, I do remember one question.  One was
23  how I felt about contracting out for water and
24  sewer.  I do remember that.  I'm sorry, I don't

**20**

1   remember.
2   Q.   That's fine.  At that interview with the
3   Select Board it's your recollection that the
4   entire board was not present?
5   A.   I can't say for sure but I'm left with
6   that thought.
7   Q.   Did you have more than one meeting with
8   the Select Board before being hired?
9   A.   I don't think so.
10  Q.   How soon after that meeting with the
11  Select Board were you hired?
12  A.   Excuse me?
13  Q.   How soon -- how long after that meeting
14  with the Select Board were you hired?
15  A.   I don't know.  I can't tell you if it
16  was three days or four days or two weeks.  I think
17  they still had other interviews to do.
18  Q.   Were there any negotiations between
19  yourself and the Town with respect to the terms of
20  your contract?
21  A.   Yes.
22  Q.   Who conducted the negotiations on the
23  part of the Town?
24  A.   The five members of the Board.

21

1     Q.   Were you represented or did you conduct
2  the negotiations individually?
3     A.   Individually.
4     Q.   Just for the record, do you recall at
5  the time that you were hired who the individual
6  members of the Select Board were?
7     A.   Yes; Irene Martel, Mark Dowgiewicz,
8  Raymond Regis, Robert Miller, and Robert
9  Stawiecki.
10    Q.   From whom did you learn that the Select
11 Board had decided to hire you?
12    A.   I received a phone call at my home from
13 Irene Martel.
14    Q.   After receiving that phone call, what is
15 the next thing that happened leading to your
16 beginning your employment with the Town of
17 Webster?
18    A.   There was several things that happened.
19 I don't know that I can tell you in which order it
20 happened.
21    Q.   These are things that happened before
22 you actually began your employment?
23    A.   Yes.
24    Q.   What were those things?

22

1     A.   Some conversations with some of the
2  selectmen -- the different individual selectmen.
3     Q.   Which individual selectmen in particular
4  did you have these conversations with?
5     A.   I think I had a conversation with -- I
6  had a conversation with two of them and I believe
7  it was Regis and Stawiecki.
8          I'm not sure if Miller -- actually it
9  could have been all of them at some point.
10    Q.   At any of those conversations with the
11 members of the Select Board before you began your
12 employment was the subject of the status of the
13 Police Department raised?
14    A.   No; I don't think so.
15    Q.   It's your testimony that prior to -- do
16 you recall the date that you actually began
17 working full time as the town administrator for
18 the Town of Webster?
19    A.   October, 2003. I don't know the exact
20 date.
21    Q.   As I understand your testimony you had
22 conversations with members of the Select Board
23 before you began your employment but none of them
24 mentioned the status of the Police Department

23

1  prior to your beginning your employment?
2     A.   I didn't say that. I said I didn't
3  recall all of the subjects that we spoke about.
4  The intent of the conversations were basically
5  focussed on whether or not I was going to be
6  appointed.
7          Whether or not they explained what was
8  going on in town, that may have happened.
9     Q.   I'm assuming that after your
10 conversation with Irene Martel you knew that you
11 were going to be appointed?
12    A.   No.
13    Q.   You didn't?
14    A.   No.
15    Q.   What exactly was the substance of the
16 conversation you had with Irene Martel?
17    A.   Irene Martel called me and said
18 congratulations, you have been appointed as the
19 town administrator and my question to her was what
20 was the vote. She said the vote was two
21 affirmative.
22          I had questions about that as I had done
23 some research on Webster and knew that the Board
24 was divided, the Town was divided, and there were

24

1  a lot of problems with the Town and that the Town
2  administrator had been -- my impression was they
3  had been forced out so her telling me that two
4  members of a five member board voted to appoint me
5  gave me concern.
6          I informed her that if that was the
7  vote, that I was very hesitate to accept the
8  position.
9     Q.   Who was it that you were under the
10 impression had been forced out as town
11 administrator?
12    A.   At the time I didn't really know who it
13 was and I probably couldn't have even pronounced
14 his name. I know now who it was.
15    Q.   Who was that?
16    A.   Mark Stankiewicz.
17    Q.   As a result of your indicating your
18 reluctance to Irene Martel, what happened next?
19    A.   My understanding is that the Board
20 contacted Kopelman and Paige. There was
21 objections on how the vote went.
22          I had a conversation with a couple of
23 the selectmen who were -- did not vote that
24 evening when the vote was taken. I was asked

# JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL
## ROBIN LEAL          SEPTEMBER 15, 2006

---

**25**

1  about whether I could do the job.  There were some
2  comments.
3      Q.   Do you recall specifically who those
4  Select Board members were that did not vote that
5  you had conversations with?
6      A.   I believe it was Regis and Stawiecki.
7      Q.   What was the substance of your
8  conversation with Regis?
9      A.   At the time, since I didn't know either
10  one of them, I can't really differentiate which
11  conversation was with which person.  I just knew I
12  was talking to two of the selectmen.
13      I remember one of them asking me if I
14  had the balls to do the job.
15      Q.   In those terms?
16      A.   That was a quote -- and that they
17  weren't present at the meeting; that they didn't
18  like the way it had happened; and they weren't
19  sure whether or not they wanted -- I explained my
20  concerns to them about a divided board.
21      I explained to them that I felt it was
22  extremely important that whoever came on --
23  whether it was me or anyone else -- that they come
24  on as a unanimous decision otherwise that he would

---

**26**

1  be viewed as this person or that person's person
2  so to speak.
3      I had concerns because, again, as I
4  said, my research led me to believe that the Board
5  was split strongly and it was almost a Hatfield
6  and McCoy atmosphere.
7      Q.   Did you have any particular knowledge of
8  what the issues were that were dividing the Board
9  at that point?
10      A.   Yes.
11      Q.   And what were those?
12      A.   The Police Department.
13      Q.   When you had this conversation with a
14  Select Board member and were asked if you had the
15  balls to take on the job, was it in the context of
16  what was happening in the Police Department?
17      A.   I don't remember that.  I remember one
18  of the comments was that there was a lot of money
19  in town and was I intimidated by people with a lot
20  of money.
21      I know that was one of the questions.  I
22  don't know what context that was.
23      Q.   Do you have a sense of who it was in
24  particular that someone was referring to as having

---

**27**

1  a lot of money.
2      A.   No.
3      Q.   As a result -- in addition to I think
4  you said it was Regis and Stawiecki that were not
5  present?
6      A.   I think so.
7      Q.   As a result of your conversations with
8  them what happened?
9      A.   I'm thinking Stawiecki was the chairman.
10  Whichever one was -- the gist of one of the
11  conversations was that they would go back and
12  reaffirm.  They were going to revote.
13      I guess they informed me that they had
14  called town counsel.  They had objected to the way
15  the vote had gone.  Town counsel confirmed that
16  the vote was a legitimate vote.
17      They had concerns about me suing the
18  Town if I didn't get the position and I assured
19  them that I had no intention of doing that; that
20  if it wasn't a full unanimous decision I wasn't
21  sure I could be effective in the position.
22      Then they went back, they revoted and
23  they voted me as town administrator unanimously.
24      Q.   Do you know when that vote occurred?

---

**28**

1      A.   No.
2      Q.   In addition to your conversations with
3  Stawiecki and Regis, did you confer with any other
4  Select Board member prior to that revote?
5      A.   I don't remember doing so.
6      Q.   How soon after the revote did you begin
7  your duties as town administrator for the Town of
8  Webster?
9      A.   Shortly thereafter.
10      Q.   Within a week?
11      A.   I think it was pretty quick.  Once they
12  voted they had me come in like within a couple of
13  days.
14      We sat down and negotiated the contract
15  and I started like the following week.
16      Q.   Between the time you were aware that
17  there had been a review and an intention to hire
18  you, did you have any further conversations with
19  members of the Select Board prior to beginning
20  your duties?
21      A.   I'm not sure what you're asking me.
22      Q.   I'm asking if you had -- after the
23  revote did you then have -- and prior to beginning
24  your duties in Webster -- physically reporting to

---

## PERLIK and COYLE REPORTING

29

1 perform the tasks -- did you have any additional
2 conversations with members of the Select Board?
3     A.   We negotiated the contract.
4     Q.   Who represented the Town with respect to
5 the negotiation of the contract?
6     A.   There was the five selectmen and myself
7 in the room.
8     Q.   That was done in Webster in a Webster
9 municipal building?
10    A.   Yes.
11    Q.   I assume at some point you reached terms
12 that were acceptable to both parties to the
13 discussion.
14        What I'm asking is after having reached
15 that point and prior to beginning your duties did
16 you have any member of the Select Board or any
17 other town official give you a briefing of any
18 sort prior to you beginning your duties as the
19 town administrator?
20    A.   Are you looking for specific briefings
21 as to what was going on in the Town?
22    Q.   Yes; did any such occur?
23    A.   I don't remember any.  It doesn't mean
24 it didn't happen.  I don't recall any

30

1 conversations.
2        For me it was an exciting time.  It was
3 a new town, there were a lot of challenges that I
4 could see coming up but I don't think I had any
5 specific conversations.
6     Q.   When did you first become -- what did
7 you understand the situation to be at the Webster
8 Police Department on the day you began your duties
9 as town administrator?
10    A.   I knew that the Chief and Deputy Chief
11 were out on paid administrative leave.  I knew
12 that there was a split on the Board, that two
13 members supported two of the, I'll say players and
14 three members of the Board supported two other
15 members.
16        It seemed like there were a lot of
17 lawsuits or complaints going back and forth.  It
18 appeared to me like a mess and I know that there
19 was a lot of play in the newspaper.  It was
20 impacting very negatively on the town as a whole.
21    Q.   Do you recall which members of the
22 Select Board supported which individuals with
23 respect to this divide on the Board?
24    A.   Yes.

31

1     Q.   Who were they and who did they support?
2     A.   Stawiecki, Regis, and Miller supported
3 Ralph and Bolduc; and Martel and Dowgiewicz
4 supported Barnes and Bergeron.
5     Q.   What did you understand Bolduc's
6 situation to be when you began your duties as the
7 town administrator?
8     A.   He was a sergeant.  There was -- what
9 was the question?
10    Q.   What did you understand Bolduc's
11 situation to be when you began your duties as town
12 administrator?
13        MR. McCULLOUGH:  May I ask you to
14 clarify "situation"?
15    Q.   (BY MR. GREEN)  With respect to being a
16 police officer for the Town of Webster, what was
17 your understanding of Bolduc's status on the day
18 you began your duties as town administrator?
19    A.   He was an active sergeant.
20    Q.   As an active sergeant, what was it about
21 Bolduc that had particular Select Board members
22 supporting him as opposed to other members of the
23 Police Department?
24    A.   The controversy seemed to surround a

32

1 question of his appointment as sergeant.
2     Q.   At the time you began your duties as
3 town administrator Bolduc had been a sergeant for
4 well over a year, is that not true?
5     A.   I believe so.
6     Q.   Did you ever have any discussions with
7 Irene Martel or Mark Dowgiewicz with regard to
8 Bolduc?
9     A.   I don't remember specific conversations.
10 I had a lot of conversations with all of the
11 selectmen once I began my position.  I don't
12 remember specific.
13    Q.   Do you recall having received any
14 specific guidance from the Select Board with
15 respect to what your relationship with the Police
16 Department was to be?
17    A.   Did I get guidance from the Board as a
18 board?
19    Q.   As a board.
20    A.   No.
21    Q.   Did you receive suggestions from any
22 particular members of the Select Board with
23 respect to any actions you should take regarding
24 Bolduc?

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## ROBIN LEAL          SEPTEMBER 15, 2006

33

1   A.   Each selectman had their own idea of
2   what ought to be happening and who they liked and
3   who they didn't like and they were pretty free in
4   communicating all of that to me.
5          Do I remember any selectman that
6   specifically said you have to do this with Bolduc?
7   No. Like I said, there were some in favor of him
8   and some that weren't but -- I also need to know
9   your time frame of what you're talking about.
10          Are you talking about right when I was
11  hired.
12   Q.   Right at the point you began your duties
13  as town administrator?
14   A.   No; I don't think he was much of a topic
15  at the time.
16          Whatever his status issue was, it had
17  been -- there was an ongoing investigation at the
18  Department of Human Services -- Civil Service.
19   Q.   To the best of your knowledge, was the
20  review at the Human Resources Division the extent
21  to which there was an inquiry involving Bolduc at
22  the time you began your duties as town
23  administrator?
24   A.   No.

34

1   Q.   What else were you aware of in addition
2   to what was before the Division of Human
3   Resources?
4   A.   The Town Meeting had taken a vote to
5   appropriate ten thousand dollars for a study to be
6   done for the Police Department which would have
7   included any actions by Bolduc.
8   Q.   Did the study at the Police Department
9   and the Town vote specifically mention studying
10  actions by Bolduc?
11   A.   No; I believe it was just for the Police
12  Department in general -- the overall management of
13  the Police Department.
14   Q.   Was that the study that was conducted by
15  Judge Barton?
16   A.   Yes.
17   Q.   Did you actually have occasion to meet
18  with Judge Barton with respect to his study?
19   A.   Yes.
20   Q.   When did you first meet with Judge
21  Barton?
22   A.   To put the contract together for Judge
23  Barton to begin work for the Town.
24   Q.   Did Judge Barton receive any written

35

1   document from the Town of Webster with respect to
2   what the scope of his inquiry was to be?
3   A.   I think so.
4   Q.   Who prepared that?
5   A.   Most likely myself and Kopelman and
6   Paige along with the Board of Selectmen.
7   Q.   Is that a document that you have in your
8   possession?
9   A.   No.
10   Q.   Who was it from Kopelman and Paige that
11  assisted in the preparation of that document?
12   A.   I don't remember.
13   Q.   It is your recollection, however, that
14  it did include the scope of the inquiry?
15   A.   I have no solid memory of seeing this
16  document and knowing what was in it. I'm mostly
17  stating this from procurement law, what you have
18  to do, so I'm assuming that there was a document
19  put together.
20          I do believe I worked on it but I
21  couldn't tell you if it's one page, six pages. We
22  would have had a contract with Judge Barton.
23   Q.   Aside from the meeting with Judge Barton
24  for the purposes of developing this contract as

36

1   part of the procurement process, did you have any
2   subsequent meetings with Judge Barton?
3   A.   I worked with him but more so his
4   assistant, Mrs. Dean, to set up the interviews. I
5   provided him a place to hold the interviews.
6   Q.   Where were these interviews conducted?
7   A.   The Veterans Home -- house.
8   Q.   Is that a facility of the Town of
9   Webster?
10   A.   Yes; it is.
11   Q.   When you say Mrs. Dean, you're referring
12  to Karen Dean-Smith that worked with Judge Barton
13  on that report?
14   A.   Yes.
15   Q.   Aside from your working with Mrs. Dean
16  to establish a sequence of interviews at the
17  Veterans Home, did you have any other meetings
18  with Judge Barton?
19   A.   Yes.
20   Q.   When were those meetings?
21   A.   I don't know. I can't recall the dates
22  of those meetings or the circumstances.
23          I know I met with him a couple of times
24  to make sure things were going okay, that he was

45

1  recommendations and what we did was work on goals
2  and objectives for each Department.
3      Q.   As a result of these conferences I
4  understand from your testimony there would have
5  been developed some goals and objectives for the
6  Police Department?
7      A.   Yes.
8      Q.   Were those goals and objectives put into
9  any form of document?
10     A.   Yes.
11     Q.   What was that document called?
12     A.   "Town of Webster Goals and Objectives."
13  What we were doing was we were starting to move
14  into holding the department heads responsible and
15  for the first time in the Town of Webster have
16  performance reviews.
17          What we did was we created goals and
18  objectives, we created a mission statement and
19  then we created a work plan for the year of what
20  they needed to accomplish and what they were going
21  to do and then they were going to be held
22  accountable at the end of the year for those
23  duties being taken care of.
24     Q.   As part of the goals and objectives for

46

1  the Police Department, do you recall any goals and
2  objectives that were established during that
3  process for the Police Department?
4      A.   One of them was to create and revise,
5  renew policies and procedures as it seemed that
6  that had been lacking.
7      Q.   Do you recall any of the goals and
8  objectives that were established related to any
9  ongoing personnel matters?
10     A.   I'm not sure how specific we were in
11  those objectives.  I'm trying to remember if we
12  would have dove-tailed that or kept it general.
13          Policies and procedures -- I just
14  remember as being the big one and that would have
15  included personnel.
16     Q.   Do you recall at any point did then
17  Acting Chief Keefe make any recommendation to you
18  with respect to either Bolduc or Ralph prior to
19  the issuance of the Barton report?
20     A.   I can't recall specifics.
21     Q.   You recall that he did make
22  recommendations but you can't recall the specifics
23  or you don't recall -- what do you recall?
24     A.   I don't recall the order in which things

47

1  happened.
2          I know that at some point through
3  reviewing documents and things that I received a
4  letter.  There was --
5      Q.   (Interposing) A letter from whom?
6      A.   Can you repeat your question?
7          MR. GREEN:  Could you read that
8  back, please?
9          (Reporter read back as
9          requested.)
10
11         MR. McCULLOUGH:  Can you ask the
12  question again?
13     Q.   (BY MR. GREEN)  Do you recall what
14  recommendations were made by Acting Chief Keefe
15  with respect to Bolduc and Ralph initially -- when
16  he first made any recommendations with respect to
17  either of those two individuals?
18     A.   It was his opinion that in the
19  Department their presence was disruptive.
20     Q.   When did he first express that to you?
21     A.   I don't remember and I don't remember
22  the exact words he used.  I'm clearly
23  paraphrasing.  That was my initial impression.
24          I also met with the sergeants which also

48

1  concurred that same sentiment.
2      Q.   Did you keep any kind of written record
3  of this conference with the sergeants?
4      A.   I don't recall.  If there is, it would
5  be in a file.  I don't know.
6      Q.   Did he give you any specific examples of
7  how they were disruptive -- strike that.
8          Did he give any specific examples of
9  Bolduc being disruptive?
10     A.   I'm going to tell you that my difficulty
11  in answering your questions is that you are
12  drawing lines between initially when I got there
13  and I don't know where that line crosses over into
14  actual -- an actual identification of problems.
15          If you can be more clear in your time
16  frame, I can fast forward to my serious concerns.
17     Q.   Well, let's do it this way.  At some
18  point in time you received a copy of a decision
19  that was made by the Human Resources Division, did
20  you not?
21     A.   Yes.
22     Q.   And that decision involved allegations
23  that Bolduc had been supplied information by Ralph
24  prior to his selection to be a permanent sergeant

# JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
## ROBIN LEAL          SEPTEMBER 15, 2006

49

1  that was significant for the purposes of the oral
2  review?
3      A.   Mmm-hmm.
4      Q.   That's a yes?
5      A.   Yes.
6          MR. McCULLOUGH:  You have to answer
7  verbally, Robin, and if you would please speak up.
8          THE WITNESS:  Yes.
9      Q.   (BY MR. GREEN)  Did then Acting Chief
10  Keefe make any recommendations to you -- strike
11  that.
12         Did Acting Chief Keefe suggest to you
13  that Bolduc was disruptive to the Department prior
14  to your having received that Human Resources
15  decision -- at any time, either initially but
16  prior to the Human Resources decision being
17  issued?
18      A.   I'm going to say I don't recall.  I was
19  getting a lot of information from a lot of
20  different people telling me this was going on,
21  that was going on.
22         I mean I had citizens, I had finance
23  committee members, I had Board of Selectmen, I had
24  individual police officers, I had sergeants, the

50

1  Chief.  There were so many people coming at me in
2  the office about their opinions to all four of the
3  people I mentioned that were going on.  For
4  specifics I can't.
5      Q.   Do you recall any specific event or
6  behavior prior to the issuance of the Human
7  Resources Division's decision of Bolduc's -- prior
8  to the issuance of the Human Resource Division's
9  findings that constituted disruptive behavior by
10  Bolduc?
11         MR. McCULLOUGH:  Can you read that
12  back, please?
13         MR. GREEN:  I'll withdraw the
14  question.
15      Q.   (BY MR. GREEN)  What specifics were you
16  provided by Acting Chief Keefe with respect to
17  Bolduc being disruptive?
18      A.   I had a phone call from a mother who was
19  concerned that she felt that her attempt to get
20  information was being blocked.  I contacted Chief
21  Keefe and inquired about that.
22         At the time I didn't even -- I don't
23  think I even knew it was Bolduc.  It was later I
24  found out.  The woman was trying to get a tape of

51

1  her son's arrest and she was complaining about an
2  officer.  That would have been at one point --
3      Q.   (Interposing) Do you recall --
4          MR. McCULLOUGH:  Did you finish your
5  answer?
6          THE WITNESS:  So there was a
7  conversation on Bolduc's behavior then, that he
8  acted improperly.
9          The woman was contending that because of
10  inaction by this officer her son lost his eye and
11  that he had set the son down at -- on the sidewalk
12  and not gotten him medical attention for a
13  considerable amount of time.
14         She was trying to get the tape to be
15  able to prove that that was not responsive on the
16  part of the police officer.
17      Q.   (BY MR. GREEN)  What was the name of
18  this woman?
19      A.   Carol Smith.
20      Q.   Did Carol Smith ever file a complaint?
21      A.   Not to my knowledge.  I called Acting
22  Chief Keefe and asked him to please give her the
23  tape which I believe she received.
24      Q.   In what respect did Bolduc's involvement

52

1  with that matter constitute a disruption of the
2  Department?
3      A.   You asked me for my first conversation
4  about his behavior and working.  That was the
5  first thing that came to my mind.
6          Like I said, I had many people coming
7  and talking to me about what was going on.  That
8  was one of the first things I heard.
9          I also heard that he had thrown
10  something -- Bolduc.  I was starting to hear from
11  many different people, not just Officer Keefe,
12  that Bolduc had a temper and --
13      Q.   (Interposing) Who specifically told you
14  other than Acting Chief Keefe that Bolduc had a
15  temper?
16      A.   Lenny Gevry's father came into the
17  office at one point and relayed a story about
18  Bolduc threatening his son and that his son
19  wouldn't come forward to say anything to me but
20  that I had to do something about Bolduc.  That was
21  one person that came forward.
22      Q.   Did you ask Bolduc about that allegation
23  that was made by Mr. Gevry?
24      A.   I can't recall.  I did ask Gevry later

53

1  when I had seen him.  I asked once.
2        I started to get the feeling through
3  many conversations that there was a problem with
4  Bolduc's temperament in the Department.
5      Q.  Who other than Officer Gevry's father
6  told you that Bolduc had a temper?
7      A.  The meeting with the Acting Chief Keefe
8  and the sergeants also relayed a concern about
9  Bolduc's temper.
10      Q.  What specifically did they relay at that
11  meeting about Bolduc?
12      A.  I can't recall whether or not it was in
13  the meeting exactly that -- how do I put this?  I
14  was left with the impression that he had somewhat
15  of an explosive temper; that people were afraid of
16  him; that he had some free rein around the
17  Department.  People had concerns about that.
18      Q.  What was it that constituted free rein?
19      A.  Not necessarily accountable.  It seemed
20  to me that there were certain --
21            MR. McCULLOUGH:  (Interposing) Wait
22  for the question, Robin, and answer only the
23  questions.
24            THE WITNESS:  Okay.

54

1      Q.  (BY MR. GREEN)  Well, you've given me
2  two examples.
3        Did you inquire of Acting Chief Keefe if
4  Bolduc had ever been disciplined?
5      A.  Yes; at some point.
6      Q.  Was it close in time to your getting
7  these initial indications from a variety of
8  sources about Bolduc?
9      A.  Probably.
10      Q.  Were you informed that Bolduc had ever
11  been disciplined?
12      A.  I don't recall.
13      Q.  Did you inquire of Acting Chief Keefe
14  if, since assuming his responsibilities as acting
15  chief, he had counseled Bolduc?
16      A.  I don't recall.
17      Q.  Did you, after receiving the letter from
18  that -- from Carol Smith I believe you said her
19  name was?
20      A.  I did not say that I received a letter.
21      Q.  No; I meant a call from the mother of
22  the boy.
23        Did you inquire of Acting Chief Keefe if
24  he was going to take any action?

55

1      A.  I probably inquired whether or not there
2  was an investigation and what happened with the
3  complaint.  I don't remember the outcome of that.
4      Q.  You don't remember the outcome.  Do you
5  recall when it was that you received the HRD
6  decision and findings with respect to the
7  allegations of cheating by Ralph and Bolduc?
8      A.  Do I recall when?  Are you looking for a
9  date?
10      Q.  Yes; do you recall when that decision
11  came down?
12      A.  I'm sure the date is in the documents.
13  I did get it.
14      Q.  Did you review that -- you had a meeting
15  with Ralph after that decision was received, did
16  you not?
17      A.  I did.
18      Q.  Acting Chief Keefe was present at that
19  meeting?
20      A.  He was.
21      Q.  If you can, relate to me just what the
22  subject matter of that meeting was?
23      A.  I'm going to be very honest.
24      Q.  I would hope so, you're under oath.

56

1      A.  In listening to Bolduc talk about being
2  at that hearing, I do not have recollection of
3  that hearing.  I am aware of it from documents
4  that I've gone through.
5        I cannot remember what happened at that
6  meeting so -- you're talking about the hearing and
7  specifics of the hearing and I don't remember.  I
8  do not recall the hearing.
9      Q.  Just to refer you back, I'm talking
10  about a meeting that you and Deputy Chief --
11  strike that -- a meeting that you and Acting Chief
12  Keefe had with Deputy Chief Ralph at receipt of
13  the Human Resources Division findings on the
14  cheating incident?
15      A.  Yes; I do recall that meeting.
16      Q.  My question to you is what do you
17  recall -- do you recall the specifics of that
18  meeting?
19      A.  I do.
20      Q.  What was the purpose of that meeting?
21      A.  It was the first time I was meeting
22  Deputy Ralph.
23      Q.  Who was on paid administrative leave?
24      A.  I had not met him until that day.  The

**JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL**
**ROBIN LEAL            SEPTEMBER 15, 2006**

57

1  purpose was to discuss the findings.  I remember
2  he came in and was very -- he had kind of a chip
3  on his shoulder.
4      Q.   What was it about the findings that you
5  wished to discuss with Ralph at that meeting?
6      A.   I had concerns about the findings that
7  he had tailored the questions to suit his best
8  friend, Officer -- Sergeant Bolduc; that the
9  allegations in the findings that the outcome was
10  pre-determined; that the findings stated that
11  Officer Ralph -- Deputy Chief Ralph had been the
12  sole person who had put together the questions and
13  organized that component; that I think in the
14  findings they said that the chief wasn't even in
15  favor of the orals, he just wanted to make an
16  appointment.
17      I had concerns on the ethics and what it
18  seemed to me through the report was that the
19  promotion did not follow standard operating
20  procedures for a merit promotion based on merit.
21      Q.   Based on your experiences you're aware
22  that the appointing authority was free to select
23  any of the top three individuals, are you not?
24      A.   I am.

58

1      Q.   I believe you've been present when
2  there's been testimony that in fact other members
3  of the oral board did ask questions in addition to
4  the questions asked by Ralph?
5      A.   Correct.
6      MR. McCULLOUGH:  When it's good for
7  you, I'd like to take a bathroom break.
8      MR. GREEN:  Do it right now.
9      (A recess was taken.)
10      Q.   (BY MR. GREEN)  Were you aware when you
11  began your duties as town administrator for the
12  Town of Webster that Bolduc had filed an MCAD
13  complaint against the Town?
14      A.   When I began my duties?  No.
15      Q.   When did you become aware of the fact
16  that he had filed an MCAD complaint?
17      A.   At some point after I had started
18  working there and started to review the cases.
19      Q.   You say review the cases.  What cases
20  are you referring to?
21      A.   I went to Kopelman and Paige and we sat
22  down -- either I went up there or they came down;
23  I'm not clear; I think I went up there and they
24  went through all the litigation that the Town of

59

1  Webster was going through.
2      Q.   Was that before or after you had your
3  meeting with the sergeants and Acting Chief Keefe?
4      A.   I don't recall.
5      Q.   When you had your meeting with the
6  sergeants and Acting Chief Keefe did anyone make
7  any recommendations to you at that point as to
8  what steps should be taken regarding Bolduc?
9      A.   Did anyone -- I don't understand the
10  question.
11      Q.   Did any one of the attendees at that
12  meeting with yourself, Acting Chief Keefe, and the
13  sergeants make recommendations as to what steps
14  should be taken to address what has been referred
15  to as Bolduc's disruptive behavior?
16      MR. McCULLOUGH:  I object -- I don't
17  object -- well, I object to the form of the
18  question.  My memory is that there is a couple of
19  meetings, one with the Chief and one with the
20  sergeants so if you could clarify.
21      Q.   (BY MR. GREEN)  When you met with the
22  sergeants, was Acting Chief Keefe present?
23      A.   Yes.
24      Q.   Was Bolduc's behavior discussed at that

60

1  meeting?
2      A.   I believe so.
3      Q.   Were recommendations made by anyone
4  present at that meeting as to what steps should be
5  taken regarding Bolduc?
6      A.   I don't recall.
7      Q.   Did you have meetings subsequent to the
8  meeting with the sergeants with Acting Chief Keefe
9  in which Bolduc's behavior was discussed?
10      A.   As a group?  I don't understand the
11  question.
12      Q.   No; with Acting Chief Keefe?
13      A.   Did I have conversations with Acting
14  Chief Keefe after the meeting with the sergeants?
15      Q.   Yes.
16      A.   Yes.
17      Q.   About Bolduc?
18      A.   Yes.
19      Q.   At any of those meetings did he make any
20  recommendations to you as to what should be done
21  with regard to Bolduc?
22      A.   I'm not sure how to answer that.
23      Q.   Well, let me put it to you this way:
24  Did you have any discussions with -- between

JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL
ROBIN LEAL            SEPTEMBER 15, 2006

61

1    yourself and Stankiewicz there was an acting town
2    administrator named Stephen Boudreau.
3            Do you recall or did you have any
4    discussions with Boudreau after you assumed your
5    responsibilities as town administrator?
6        A.    Not that I recall.
7        Q.    Did he leave any written notes or
8    memoranda in any file to which you had access
9    about recommendations made to him by Acting Chief
10   Keefe?
11       A.    There were many files and I didn't go
12   through all of the files.
13       Q.    Did Acting Chief Keefe at any point tell
14   you that he had recommended to Boudreau that Ralph
15   and Bolduc be removed from the Department?
16       A.    Did somebody tell me that?
17       Q.    Did Acting Chief Keefe tell you that he
18   had recommended to Boudreau to remove Ralph and
19   Bolduc from the Department?
20       A.    I don't recall.
21       Q.    Did you ever have access to the
22   statements that were taken by Judge Barton from
23   all of the individuals he interviewed?
24       A.    Did I have access to his notes?

62

1        Q.    Yes.
2        A.    I don't believe so.
3        Q.    Did you have access to the statements
4    that he took from the various individuals in
5    preparing his report?
6        A.    I don't remember.  He was pretty
7    independent in what he was doing and I tried to
8    stay out of it for the most part.
9        Q.    What I'm asking is before or at any time
10   after the issuance of his report were you provided
11   access to the written statements or interview
12   notes that he had from people as a result of
13   having interviewed these different people in the
14   course of the investigation?
15       A.    I don't recall.
16            MR. GREEN:  Could you mark this as
17   Exhibit 1?
18            (Plaintiff's Deposition Exhibit
                No. 1 offered and marked.)
19
20       Q.    (BY MR. GREEN)  Ms. Leal, I'm going to
21   ask you to look at what's has been marked for the
22   purposes of today's deposition as Exhibit Number 1
23   and ask you if you recognize that document?
24   (Indicating.)

63

1        A.    It's a document that I signed and sent
2    to Sergeant Bolduc.
3        Q.    It's dated December 12, 2003.  In the
4    first paragraph it says, "Please be advised I have
5    become aware of several incidences of excessive
6    and/or unnecessary force that you have used during
7    bookings, calls and interviews."
8            How did you become aware -- first of
9    all, what were the incidences that you are
10   referring to in this letter?
11       A.    The booking of a woman whose face was
12   being scrunched and held very tightly.  There was
13   a situation that I had been informed of, of a
14   woman being put in her car, kind of rough, thrown
15   into a car; and cutting off jewelry from someone's
16   face with bolt cutters.
17       Q.    How did you become aware of these
18   incidences?
19       A.    From Acting Chief Keefe.
20       Q.    At any point prior to your preparing
21   this letter had Acting Chief Keefe recommended to
22   you that Bolduc be removed from the Webster Police
23   Department?
24       A.    I don't recall an official request.  I

64

1    do recall a lot of concern on behalf of Chief
2    Keefe that this person was not suitable as a
3    police officer.
4        Q.    When did he first indicate that to you?
5        A.    Again people were coming to me --
6        Q.    (Interposing) I'm asking you --
7        A.    (Interposing) I don't remember when he
8    first communicated that.
9        Q.    Do you believe it was before
10   December 12th, 2003?
11       A.    His concerns about Officer Bolduc's
12   behavior?  Yes; it was before December 12th.
13       Q.    Were his concerns reduced to any form of
14   writing and delivered to you?
15       A.    I did receive something with concerns
16   prior to this.
17            If you're talking about specific
18   documents, if you show me the documents it would
19   help me to remember what you're referring to.
20       Q.    In the second sentence of this exhibit
21   you refer to "the Town of Webster has regulations
22   that prohibit the use of force."
23            Were you shown those regulations prior
24   to drafting this letter?

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## ROBIN LEAL          SEPTEMBER 15, 2006

65

1    A.   I don't recall if I actually personally
2  saw the policy.
3    Q.   So you were relying on a representation
4  made to you that such regulations existed?
5    A.   I believe so.
6    Q.   From whom did you receive that
7  indication?
8    A.   That would have been Acting Chief Keefe
9  or town counsel.
10   Q.   Have you ever seen what has been
11  referred to at several prior depositions as the
12  Blue Book?
13   A.   Yes.
14   Q.   Where did you see that?
15   A.   In the Chief's office.
16   Q.   When you say the Chief's office, you
17  mean Acting Chief Keefe's office?
18   A.   It would have been in his office or his
19  secretary's office.
20        It was part of the planning for the
21  goals and objectives.
22   Q.   Did you ever determine that the
23  particular regulation that is referred to in this
24  letter was contained in that Blue Book?

66

1    A.   Excuse me?
2    Q.   Did you ever determine that the
3  particular regulation that is referred to in this
4  letter was contained in the Blue Book?
5    A.   I don't recall.  It was a large book.  I
6  didn't read it cover to cover.
7        I was aware we had policies and
8  procedures.  I was aware that the policies and
9  procedures required updating; that it had been a
10  long time.
11   Q.   When you had your meeting with Acting
12  Chief Keefe and the sergeants did anyone at that
13  meeting recommend that Bolduc be removed from the
14  Webster Police Department?
15   A.   I don't recall that specific statement.
16  They weren't pleased with his behavior but for
17  someone to actually say you should take him out or
18  off the Department, I don't recall that.
19   Q.   Was there any indication given to you
20  that he had been counseled by anyone with regard
21  to his behavior?
22   A.   Who?
23   Q.   Bolduc.
24   A.   Was there any indication to me that he,

67

1  Bolduc, had been counseled on his behavior?
2    Q.   Yes.
3        MR. McCULLOUGH:  Can you rephrase
4  the question, John?  It is vague.
5    Q.   (BY MR. GREEN)  Did anyone at that
6  meeting indicate to you that Bolduc's behavior and
7  the problems with his alleged behavior had been
8  brought to his attention by anyone?
9    A.   I don't recall.  Again, I don't remember
10  the specifics.
11        Some people remember conversations word
12  for word; I don't.  I'm not trying to evade your
13  questions; I just don't recall.
14   Q.   You don't recall whether you kept any
15  notes or minutes of what was discussed at that
16  meeting?
17   A.   No; generally I don't take minutes
18  unless I have an agenda or something and I write
19  the minutes on the agenda.
20   Q.   In the last sentence of this
21  December 12th letter you say, "I will inform you
22  when the investigation is complete."
23   A.   Mmm-hmm.
24   Q.   When was the investigation complete?

68

1    A.   I would need a document to jog my memory
2  on that.  I don't have the date in my head.  If I
3  can go back and try to answer a question as my
4  memory --
5        MR. McCULLOUGH:  (Interposing) I
6  would wait for the questions and answer only
7  questions as they're asked.
8        You'll have an opportunity to review the
9  transcript and if there's something you wish to
10  raise then, you can raise it with me but for the
11  purpose of this deposition, answer only
12  Mr. Green's questions.
13        THE WITNESS:  If he asks --
14        MR. McCULLOUGH:  (Interposing) We'll
15  have that discussion privately.
16        If you wish to take a break, we can do
17  that.
18        MR. GREEN:  Do you want to do that?
19        MR. McCULLOUGH:  Let's do that.  I
20  don't want her discomforted by something.  Why
21  don't we do that.
22        (A recess was taken.)
23        MR. GREEN:  If you can mark this as
24  Exhibit 2.

69

1            (Plaintiff's Deposition Exhibit
             No. 2 offered and marked.)
2
3            MR. GREEN:  Are we all set?
4            MR. McCULLOUGH:  Yes; thank you.
5       Q.   (BY MR. GREEN)  Referring you back to
6   Exhibit Number 1 which you have before you, when
7   you wrote this letter did you know the names of
8   the individuals who -- against whom Bolduc is
9   alleged to have used excessive or unnecessary
10  force?
11      A.   I don't recall.
12      Q.   Did you -- were you aware -- were any
13  steps taken to inform Bolduc by you of who the
14  people were that he is alleged to have used
15  excessive force against in conjunction with your
16  having issued that letter?
17      A.   Not at the time of the issuance of the
18  letter.
19      Q.   Why not?
20      A.   The investigation wasn't complete.
21      Q.   Was a determination made by you or
22  someone else that it was inappropriate to inform
23  him who the individuals were that he is alleged to
24  have used excessive force against?

70

1       A.   I don't recall him requesting the
2   information and I don't recall offering it.
3       Q.   Why would you not offer it?
4       A.   I was working with town counsel and
5   pretty much followed their lead.
6       Q.   I'm going to show you what has been
7   marked as -- strike that.
8            Before we go to this, was it your
9   recollection that it was suggested to you to
10  refrain from informing him of who the people were
11  that he allegedly used excessive force against?
12      A.   I didn't say that.
13      Q.   Do you recall being specifically told to
14  not provide that information?
15      A.   I do not.
16      Q.   I'll show you what's been marked as
17  Exhibit Number 2 and ask if, on the basis of
18  examining Exhibit Number 2 you have a recollection
19  as to when the investigation into the incidents
20  mentioned in the December 12th letter was
21  complete? (Indicating.)
22      A.   (Witness examining document.)  I would
23  assume that it was just before March.
24      Q.   Do you know if at any time before this

71

1   letter which has been marked as Exhibit Number 2
2   that Bolduc was made aware of who the individuals
3   were that he was alleged to have used excessive
4   force against?
5       A.   Am I aware whether or not he was told?
6       Q.   Right.
7       A.   No.
8       Q.   You're not aware?
9       A.   No.
10      Q.   Of whether he was told?
11      A.   No.
12      Q.   At some point in time John Bolduc was
13  directed to make himself available to Doctor
14  Polizoti for the purposes of a fitness-for-duty
15  examination.  How did that come about?
16      A.   After seeing the picture of the woman's
17  head squished and concerns about his fitness for
18  duty, his aggressive temperament and the things
19  that I had been hearing I requested him to go for
20  an exam.
21      Q.   That was your initiative?
22      A.   Yes.
23           MR. GREEN:  Would you mark this
24  as 3?

72

1            (Plaintiff's Deposition Exhibit
             No. 3 offered and marked.)
2
3       Q.   (BY MR. GREEN)  I'm going to show you a
4   letter that's been -- that's addressed to you.
5   You'll notice on page two it's from Christopher
6   Browne who is advising you that he represents
7   Sergeant Bolduc.
8            Do you recall having received this
9   letter? (Indicating.)
10      A.   Yes.
11      Q.   On receipt of this letter, what did you
12  do?
13      A.   I forwarded it to town counsel.
14      Q.   As a result of your forwarding it to
15  town counsel were any steps taken to provide this
16  information to Attorney Browne?
17      A.   Yes.
18      Q.   What steps were those, if you recall?
19      A.   The information requested began to be
20  gathered and sent to town counsel.
21      Q.   On the second page of what has been
22  marked as Exhibit Number 3 Attorney Browne
23  suggests that Acting Chief Keefe had been
24  communicating directly with Doctor Polizoti.

73

1        Are you aware of any contact that was
2  made by Acting Chief Keefe with Doctor Polizoti?
3        A.   Yes.
4        Q.   Was that at your direction?
5        A.   Yes.
6        Q.   What was the purpose of directing Acting
7  Chief Keefe to confer with Polizoti?
8        A.   He was assisting in providing Polizoti
9  with information regarding why we were sending
10  John Bolduc up.
11        Q.   Did Polizoti request that assistance?
12        A.   No.
13        Q.   It's my understanding from prior
14  deposition testimony that Doctor Polizoti was
15  provided a packet with an outline of the incidents
16  that were being inquired into.
17        Was that forwarded to him by Acting
18  Chief Keefe?
19        A.   I believe so.
20        Q.   At this point had you had any personal
21  contact with -- when I say at this point, as of
22  January first, 2004, had you had any personal
23  interaction with John Bolduc?
24        A.   At some point John Bolduc came into my

74

1  office and introduced himself.
2        Q.   How long did that -- do you recall
3  anything that transpired between you at that
4  meeting?
5        A.   It was a pleasant conversation, hi, how
6  are you.
7        He also talked about the Amato case and
8  being taken off of that.
9        Q.   Was that the only interaction you had
10  with John Bolduc directly aside from the hearings
11  that were conducted in March?
12        A.   Probably passed him in the hall but I
13  don't remember anything else -- specific
14  conversations.
15        Q.   So the only substantive discussion you
16  recall having with John Bolduc prior to the
17  hearing process was -- and that brief initial
18  conference in which he raised the Amato case?
19        A.   That's what I remember; yes.
20        Q.   You personally did not know John Bolduc
21  other than that one meeting, is that true?  Your
22  only contact with him was at that initial greeting
23  conference you had?
24        A.   Other than any hearings; whether it was

75

1  Civil Service hearings that I held.  I'm not clear
2  of your question.
3        Q.   The next opportunity you had to engage
4  with Bolduc in one form or another was at Ralph's
5  hearing on December 9th?
6        A.   I don't know that that's true.  There
7  were some hearings at Civil Service that he may
8  have attended and I attended and I don't know the
9  order and how that went.
10        Again, as I said, there was several
11  cases going at once.
12        Q.   At some point did you also call Doctor
13  Polizoti?
14        A.   Yes; I did.
15        Q.   If you recall, what was the reason that
16  you called Doctor Polizoti?
17        A.   To introduce myself and to speak about
18  my concerns about why Sergeant Bolduc was being
19  sent.
20        Q.   If you could, what exactly did you
21  convey to Doctor Polizoti?
22        A.   I believe what I conveyed was that I had
23  a concern about his temperament; that I had heard
24  through officers and the public that he had a

76

1  temper problem.  I think I relayed a couple of the
2  stories that people had told me.
3        I was looking for -- what I wanted to
4  know was whether or not his temperament actually
5  would interfere with his being a police officer
6  and that I was very concerned about the picture of
7  the woman with the hands.
8        Q.   In your previous experience as a town
9  administrator in other communities had you had the
10  occasion to refer police officers for
11  fitness-for-duty evaluations?
12        A.   I think we did -- yes; we did it when we
13  were hiring police officers.
14        Q.   Did you have occasion prior to this
15  situation involving Bolduc to refer an officer for
16  a fitness-for-duty evaluation on the basis of some
17  incident that occurred while he was already -- he
18  or she were already serving as a police officer?
19        A.   Not that I recall.
20        Q.   Would it be a fair statement to say that
21  the reason that in referring Bolduc to Polizoti
22  you were looking for an objective analysis of his
23  suitability to continue service as a police
24  officer?

77

1    A.   Yes.
2    Q.   Was it your intention to influence
3  Polizoti's determinations by making contact with
4  him?
5    A.   To influence?  No.
6    Q.   Are you aware of Polizoti having
7  requested that you call him and alert him as to
8  the purposes or your intent for the referral?
9    A.   I don't recall.
10   Q.   When you sent the letter to John Bolduc
11 that's been marked as Exhibit Number 1 had you
12 begun your Civil Service hearings with respect to
13 then Deputy Chief Ralph?
14   A.   Deputy Chief Ralph was still out on paid
15 administrative leave.  I don't know what you mean
16 by --
17   Q.   (Interposing) Didn't you conduct a
18 hearing at which he was the subject of the hearing
19 on December 9th, 2003?
20   A.   Yes.
21   Q.   What were the charges against Ralph that
22 were being reviewed at that December 9th hearing?
23   A.   Lack of investigative -- I don't know
24 the exact -- I can't recall the exact wording of

78

1  the -- within the hearing notice there.
2         It was in relation to the Barton and the
3  HRD -- not the Barton but the HRD report.
4    Q.   Well, the HRD report only dealt with the
5  alleged cheating incident, didn't it?
6    A.   Yes; it did.
7    Q.   Who was it that scheduled the
8  December 9th hearing for Ralph?
9         Was that scheduled by you as the
10 appointing authority or had it been scheduled by a
11 previous appointing authority?
12   A.   As I said before, I don't have recall of
13 that hearing.
14   Q.   Do you recall Bolduc testifying on
15 behalf of Ralph at that hearing?
16   A.   I do not recall that hearing.
17   Q.   When did you first learn of the incident
18 involving the picture taking?
19   A.   Involved hearing about it or seeing?
20 I'm not sure of the question.
21   Q.   When did you first learn that Bolduc had
22 been involved in what you refer to as, quote, the
23 booking picture taking of a woman, unquote?
24   A.   I believe Acting Chief Keefe had talked

79

1  about it.
2    Q.   How soon before you issued this letter
3  had you learned of it?
4    A.   It would have been a couple of days.  I
5  would have gone to town counsel.  I don't know the
6  exact date.
7    Q.   Was it before or after you conducted the
8  Ralph hearing?
9    A.   I don't recall.
10   Q.   Did you become aware when you became --
11 well, you indicated earlier that you were briefed
12 on the cases that were pending with the Town by
13 town counsel?
14   A.   Yes.
15   Q.   As a result of those briefings from town
16 counsel did you become aware of the allegations of
17 racism or racist activities by Officer Barnes?
18   A.   Yes.
19        MR. GREEN:  Would you mark this?
20        (Plaintiff's Deposition Exhibit
          No. 4 offered and marked.)
21
22   Q.   (BY MR. GREEN)  In the course of your
23 being alerted as to what matters had been pending
24 before the Town did you have occasion to see what

80

1  I've marked as Exhibit Number 4 for the purposes
2  of this deposition? (Indicating.)
3    A.   (Witness examining document.)  Have I
4  had occasion to see it before now?
5    Q.   Right -- well, let me put it this way:
6  Were the matters involving Barnes' alleged racist
7  activity still pending by the time you had become
8  the town administrator?
9    A.   What I recall, there was an
10 investigation and it was complete.
11   Q.   Who was it that -- were you informed as
12 to who conducted the examination?
13   A.   I was told that the Town had hired a
14 private investigator to do an investigation on the
15 situation and that was not done -- that was done
16 previous to my coming on board.
17   Q.   Did you ever have occasion to review
18 that investigation?
19   A.   At some point.
20   Q.   Did you review it in the context of
21 hearing about complaints about Barnes?
22   A.   I believe there was still some Civil
23 Service Commission complaints -- something that
24 was happening up there.

85

1  quite a few of the documents that he had needed,
2  as his earlier letter stated he had eighty percent
3  of what he needed already.
4      Q.   Do you know, there's a request in the
5  first section of the letter about transcripts
6  regarding a July 29th, 2003 and August first, 2003
7  Civil Service hearing.
8          Do you know what -- who the parties were
9  to those particular hearings?
10     A.   I do not.
11         MR. GREEN:  If you could mark this
12  as 8?
13             (Plaintiff's Deposition Exhibit
               No. 8 offered and marked.)
14
15     Q.   (BY MR. GREEN) Ms. Leal I'm going to
16  ask you if you recognize what's been marked as
17  Exhibit Number 8 for the purposes of your
18  deposition? (Indicating.)
19     A.   Yes.
20     Q.   In the first paragraph -- this is an
21  e-mail from Robert Stawiecki to yourself.  Is that
22  e-mail account address for you, was that your
23  personal account?
24     A.   Yes; it was.

86

1      Q.   So this was at your home?
2      A.   Yes.
3      Q.   Besides that account, did you also have
4  an account on the Town's system?
5      A.   Yes.
6      Q.   In the first paragraph, Mr. Stawiecki is
7  talking about what he refers to as, quote-unquote,
8  the Barnes situation.
9          Do you recall what circumstances in
10  particular he's complaining about in that first
11  paragraph?
12     A.   I'm not sure of your question.
13     Q.   Well, he says "I needed to drop you a
14  note to tell you I'm not pleased with the Barnes
15  situation," quote-unquote.
16         Do you have any sense of what he's
17  referring to when he talks about the Barnes
18  situation?
19     A.   Yes.
20     Q.   What is it, to the best of your
21  recollection that he is referring to?
22     A.   He wanted Barnes fired.
23     Q.   He makes a statement in the next to last
24  sentence in that paragraph in which he says "you

87

1  keep telling me that you want him gone, too.  I'm
2  beginning to wonder how much of that is
3  patronage."
4          First of all, had you indicated to
5  Stawiecki that you wanted Barnes gone?
6      A.   I had indicated to Stawiecki that Barnes
7  was disruptive in the Police Department.  I had
8  indicated to Stawiecki, as he had been asking me
9  to fire him, that his behavior hadn't warranted
10  that.
11         MS. LYNCH:  It hadn't warranted?
12         THE WITNESS:  Had not warranted
13  termination.
14     Q.   (BY MR. GREEN) Do you have any sense of
15  what he's referring to when you uses the word
16  "patronage"?
17     A.   No.
18     Q.   In the body of the e-mail he makes a
19  statement, "you've got your cross hairs on two
20  cops that were mentioned in the Barton report,
21  Ralph and Bolduc, one of which had a turn of
22  conscience and assisted us in dealing with the
23  Department."
24         Do you know who he's referring to when

88

1  he says a turn of conscience?
2      A.   I think it was Ralph.
3      Q.   From your perspective was Stawiecki
4  someone who was supportive of Bolduc and Ralph?
5      A.   Yes.
6      Q.   Do you know what he's referring to when
7  he says "you've got your cross hairs on two cops
8  that were mentioned in Barton's report"?
9      A.   No.
10     Q.   Do you know what he's referring to when
11  he says you have chosen to use it as a bible for
12  Barnes?
13     A.   Where is that?
14     Q.   It's in the second paragraph starting
15  with the sentence, "The board voted to use the
16  Judge's report as a road map for action"?
17     A.   And your question?
18     Q.   It says -- he goes on to say, "You have
19  chosen to use it as a bible for Barnes. "
20         Do you have any sense of what he means
21  by that?
22     A.   That I'm doing what the Board told me to
23  do and he wasn't pleased.
24     Q.   Is it your testimony that Stawiecki did

JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
ROBIN LEAL          SEPTEMBER 15, 2006

---

**89**

1  not want the Barton report to be implemented --
2  the recommendations of the Barton report to be
3  implemented?
4      A.   It was my understanding that he may have
5  wanted some of the parts of the Barton report to
6  be implemented and some that he did not agree with
7  not implemented but it was voted by the Board in
8  whole.
9      Q.   Is it a fair statement on his part that
10  the Board had instructed you to use the Barton
11  report as a road map for changes in the Police
12  Department?
13      A.   Correct.
14          MR. GREEN:  Let's mark this.
15          (Plaintiff's Deposition Exhibit
            No. 9 offered and marked.)
16
17      Q.   (BY MR. GREEN) I'm going to show you
18  what has been marked as Exhibit 9 for the purposes
19  of the deposition here and ask you if you
20  recognize that document? (Indicating.)
21      A.   Yes; it's the Barton report.
22      Q.   When did the Board of Selectmen direct
23  you to use the Barton report as a road map for
24  action?

---

**90**

1      A.   After they reviewed it.
2      Q.   Was it done as part of a -- I mean was
3  it actually voted on at a Select Board meeting
4  directing you to take the report and use it as a
5  basis for changes in the Police Department?
6      A.   I believe so.
7      Q.   Did the Barton report recommend that
8  Bolduc be terminated?
9      A.   Did not.
10      Q.   Did the Barton report recommend that
11  anger management counselling be applied to the
12  Police Department?
13      A.   Yes.
14          MR. McCULLOUGH:  Object to the form.
15  The Barton report obviously, as you know, speaks
16  for itself.
17          Is your question what's her memory of
18  the report or do you want her to go to the page
19  that you're referring to?
20          MR. GREEN:  Fair enough.
21      Q.   (BY MR. GREEN) How did you go about
22  implementing the recommendations of the Barton
23  report?
24      A.   I'm not clear of your question.

---

**91**

1      Q.   Well, the Select Board directed you to
2  use the Barton report as a road map for changes to
3  be made in the Police Department, did it not?
4      A.   Yes.
5      Q.   What did you do to implement that
6  directive that you received from the Select Board?
7      A.   I went through the report and identified
8  recommendations from Judge Barton and began to
9  implement those and carry them out.
10      Q.   Can you recall as we sit here -- did you
11  distill the Barton report down into some form of
12  local action document?
13      A.   I don't recall.
14      Q.   Do you recall -- I believe you testified
15  earlier that you had had a meeting with the Acting
16  Chief, for example, from the Police Department in
17  which one of the purposes of the meeting was to
18  identify and establish goals and objectives for
19  the Department?
20      A.   Mmm-hmm.
21      Q.   On the basis -- and I believe you said
22  that that was collected into a document?
23      A.   (Witness nodding.)
24      Q.   On the basis of the Barton report, was

---

**92**

1  that document revised and reissued?
2      A.   I don't recall.  We may still have been
3  working on that at the time the Barton report came
4  out.  I don't recall when that document was
5  completed.
6      Q.   When you say that --
7      A.   (Interposing) Meaning the goals and
8  objectives of the Police Department.
9      Q.   Okay; but is it your recollection that
10  at some point a goals and objectives document for
11  the Police Department was produced?
12      A.   Correct.
13      Q.   As I understood you earlier, that that
14  document was to be the basis of department head
15  reviews in the future?
16      A.   Correct.
17      Q.   What I'm asking:  Is it your
18  recollection that the goals and objectives
19  document that was ultimately produced incorporated
20  recommendations of the Barton report?
21      A.   I can't recall.
22      Q.   Referring you back to Exhibit 8 again
23  which is Stawiecki's e-mail, would it be fair to
24  say that Stawiecki was not pleased with Acting

---

**PERLIK and COYLE REPORTING**

93

1    Chief Keefe serving as the interim police chief?
2        A.   Yes.
3        Q.   Did he give you any specific reasons as
4    to what his objections were to Acting Chief Keefe
5    serving as the interim?
6        A.   He said that Chief Keefe acted in his
7    own best interest.
8        Q.   Did he give you any specific examples of
9    that, that you recall?
10       A.   Not that I recall.
11       Q.   This e-mail was on January 27th, 2004.
12   Do you recall, had previous Chief Bergeron retired
13   by that point?
14       A.   No.
15       Q.   When did his retirement, if you recall,
16   actually -- was it actually effective?
17       A.   I think it was December, 2003.
18       Q.   Well this e-mail is January 27th, 2004?
19       A.   Then it would have been before that;
20   sorry.
21       Q.   In the process of his terminating his
22   relationship with the Town of Webster, was there
23   any type of a document produced like a settlement
24   document or a departure agreement or anything

94

1    along those lines?
2        A.   Yes.
3        Q.   Did that agreement require his
4    participation in any of the Civil Service hearings
5    as a witness for the Town?
6        A.   I don't recall the specifics of the
7    document.
8        Q.   You were present when Chief Bergeron
9    testified several weeks ago?
10       A.   Yes.
11       Q.   Do you recall him indicating that he had
12   a meeting with you in which you suggested to him
13   that he was subject to reduction in rank to a
14   patrolman?
15           MR. McCULLOUGH:  I believe Ms. Leal
16   was not here for the Bergeron deposition.
17           THE WITNESS:  I was not.
18       Q.   (BY MR. GREEN)  You were not?  All
19   right.
20           Let me ask you this:  Do you recall
21   having any meetings with Chief Bergeron -- strike
22   that.  When is the first time you had face-to-face
23   contact with Chief Bergeron?
24       A.   I went to his home.

95

1        Q.   Do you recall when that was?
2        A.   No.
3        Q.   What was the purpose of -- when you say
4    his home, do you mean his home in Webster?
5        A.   Yes.
6        Q.   I presume that you called ahead and
7    coordinated a meeting with him?
8        A.   (Witness nodding.)
9        Q.   Yes?
10       A.   Yes.
11       Q.   Besides yourself, who else was present?
12       A.   Chief Keefe.
13       Q.   What was the purpose of that meeting
14   with Chief Bergeron?
15       A.   I can't -- I believe I had two meetings
16   with him.
17           I can't recall which time -- I believe
18   that that was the meeting that I went to him and
19   talked about his return and retirement.
20       Q.   Was Acting Chief Keefe with you for both
21   of those meetings?
22       A.   Yes.
23       Q.   What specifically was discussed with
24   Chief Bergeron with respect to his, as you put it,

96

1    return and retirement.  Actually let me withdraw
2    that question and I'll have it read back.
3            Were these meetings before or after the
4    issuance of the Barton report?
5        A.   I don't recall.  The first one may have
6    been before; it may have been a direct result of
7    the Barton report.
8        Q.   As I understand it you said the first
9    meeting was a result of the Barton report?
10       A.   I don't recall if it was when I first
11   got there and went to meet him and have a
12   conversation about what he was thinking.
13       Q.   Your testimony is that Acting Chief
14   Keefe was present for that meeting, that first
15   one?
16       A.   Yes; I requested him to take me --
17   escort me there.
18       Q.   Do you have any recollection of what the
19   substance of your discussion was at that meeting?
20       A.   The recollection that I have in meeting
21   with Chief Bergeron was discussion about the
22   atmosphere -- the political atmosphere, the Board
23   of Selectmen's split.
24           We talked a little about what had

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
ROBIN LEAL          SEPTEMBER 15, 2006

97

1 happened prior to me getting there and some of my
2 findings.
3    Q.   When you say your findings, what are you
4 referring to?
5    A.   In talking with the Board of Selectmen
6 and talking with the officers in the Department,
7 talking with citizens in general.
8    Q.   How would you characterize the tone of
9 that meeting in the discussions -- the first
10 meeting -- and the discussions between yourself
11 and Chief Bergeron?
12    A.   Cautious.
13    Q.   When you say cautious are you indicating
14 that you were cautious or he was cautious?
15    A.   I think we both were for the tone.  I
16 think we were kind of both feeling each other out.
17    Q.   Did you have any sense at that first
18 meeting whether or not Chief Bergeron was likely
19 to be returning to service as the Chief?
20    A.   He wanted to.
21    Q.   Well aside from what he expressed as his
22 desire, did you have any independent sense of
23 whether that was likely to come to pass or not?
24    A.   I had conflicting thoughts about whether

98

1 or not he would return.  I didn't have a sense of
2 which direction we were going -- we would end up.
3    Q.   Was your meeting with Chief Bergeron the
4 first meeting at the direction of the Select
5 Board?
6    A.   I don't recall.
7    Q.   Prior to your first meeting with Chief
8 Bergeron had Acting Chief Keefe made any
9 recommendation to you with respect to whether or
10 not Chief Bergeron should return to the force for
11 duty?
12    A.   I think Chief Keefe had informed me that
13 the Department's -- some members of the Department
14 were afraid of retaliation if he returned.
15    Q.   Did he indicate who those members were?
16    A.   Yes.
17    Q.   Who were they that were identified?
18    A.   Let me back up.  I'm not sure if he
19 identified them by name or if I was already aware
20 of some of the people that Bergeron had had
21 conflicts with so I'm not sure in that
22 conversation whether or not he had specifically
23 said names but I am aware of some of the people
24 who were -- felt that they would be retaliated

99

1 against.
2    Q.   Who might they have been?
3    A.   Tim Moran.
4    Q.   Is this a result of your having had a
5 discussion with Moran personally?
6    A.   That in a combination of other stories
7 that had been going around.
8    Q.   What other stories were going around?
9    A.   That Bergeron was -- you were either for
10 him or against him; there was no middle ground.
11 If an officer might have done anything that might
12 have thwarted anything, he wasn't going to be
13 pleased with them.
14    Q.   Was there anyone in the Department that
15 indicated to you that they thought it would be
16 appropriate for Bergeron to return to duty?
17    A.   Within the Department?
18    Q.   Within the Department.
19    A.   Yes.
20    Q.   Who was that?
21    A.   The only one I remember is Brian Barnes.
22    Q.   Did you have a discussion with Brian
23 Barnes specifically on the subject of whether
24 Bergeron should or should not return?

100

1    A.   There were several conferences with
2 Brian Barnes coming into the office and I can't
3 recall a specific actual wording but I do remember
4 he was a big supporter of Chief Bergeron and felt
5 that Chief Bergeron had been railroaded.
6    Q.   How did Barnes happen to be coming into
7 your office?
8    A.   His best friend was my assistant
9 secretary -- my confidential secretary was one
10 reason.
11    Q.   Was he doing this during duty hours?
12    A.   It was often that during duty hours he
13 would stop by the Town Hall.
14    Q.   Did you consider it appropriate for him
15 to address you directly on matters of staffing in
16 the Police Department?
17    A.   I had an open door policy, especially
18 when I got there at first.
19         I allowed anyone to come in and talk to
20 me about what was going on and what their opinions
21 were.
22    Q.   Would you alert Acting Chief Keefe if
23 Barnes came in to talk to you?
24    A.   Yes.

---

**105**

1    Q.    Did you make any effort to determine who
2  those other officers were?
3    A.    What I did from this was to instruct
4  Acting Chief Keefe to have a management -- and I
5  worked with him to have this done -- a management
6  seminar for all of the police.
7    Q.    A management seminar?
8    A.    An anger management -- well, stress
9  management.
10    Q.    When was that conducted?
11    A.    I don't recall the date.  It was
12  conducted for the officers.
13    Q.    You don't recall when it was?
14    A.    I do not.
15    Q.    How is it that you know that it was
16  conducted?
17    A.    I was told it was conducted.
18    Q.    You weren't present?
19    A.    I don't believe so.  I attended a lot of
20  trainings but I don't believe I was at that one.
21    Q.    To the best of your recollection it was
22  reported to you that the anger management training
23  for other officers as suggested in the Barton
24  report was conducted?

**106**

1    A.    The stress management training.
2    Q.    He specifically refers to anger
3  management training on page thirty-eight.
4    A.    Okay.
5    Q.    It's anger management training or stress
6  training that it's your recollection was
7  conducted?
8    A.    I don't recall which one at the moment.
9  I think I'm blending the two together.
10        I know we had a training -- a
11  Department-wide training that was stress or anger
12  training.
13    Q.    But as you sit here today you're not
14  sure which it was?
15    A.    I'm not sure right now; no.
16        MR. GREEN:  Would you mark this,
17  please?
18        (Plaintiff's Deposition Exhibit
            No. 10 offered and marked.)
19
20    Q.    (BY MR. GREEN) Robin, I'm going to ask
21  you to look at what's been marked as Exhibit 10
22  for the purposes of today deposition and ask if
23  you recall -- if you recognize it, first of all?
24  (Indicating.)

**107**

1    A.    Yes.
2    Q.    Do you recall what -- first of all, this
3  was directed to Mr. Stawiecki and it's -- was it
4  sent in response to his e-mail to you that was of
5  the same subject matter on the same date which has
6  been marked as Exhibit Number 8?
7    A.    Yes.
8    Q.    As a result of this, did you in fact
9  have occasion to talk to Mr. Stawiecki about his
10  e-mail to you?
11    A.    He sent me another e-mail saying he
12  didn't have time; his wife was ill.  She was
13  actually dying of cancer.
14    Q.    Did she in fact pass away?
15    A.    She did.
16    Q.    Did you have any occasion subsequent to
17  that event to confer with Mr. Stawiecki about the
18  subject matter of his January 27th e-mail?
19    A.    I'm sure I did.
20    Q.    How would you characterize your
21  relationship with Mr. Stawiecki?
22    A.    He was my boss -- he was one of five
23  bosses.
24        He had an opinion on what should be done

**108**

1  in relation to this matter with the Police
2  Department.  We didn't always agree.
3    Q.    What was Stawiecki's -- what was his
4  recommendation as to what should be done with the
5  Police Department?
6    A.    If I remember, Barnes and Bergeron
7  should go and Ralph should be chief and Bolduc
8  should be sergeant.
9    Q.    That was Stawiecki's recommendation?
10    A.    Yes; I think that's what he wanted.
11  Whether he said it directly I don't know but that
12  was the sense that I had.
13    Q.    How did you acquire that sense if he
14  didn't say it?
15    A.    I didn't say he didn't say it.  I said
16  he may not have used the words I just used.
17    Q.    With respect to the makeup of the Select
18  Board in January of 2004 was there any other
19  member of the Board that shared that view or are
20  you contending with five distinct sets of
21  recommendations?
22    A.    I believe Regis and Miller also felt the
23  same way at a point in time.
24    Q.    Not necessarily this point in time?

---

109

1    A.   At this point in time I believe Regis
2   and Miller believed the same.
3    Q.   What was the -- that left Mark
4   Dowgiewicz and Irene Martel as the other two?
5    A.   Yes.
6    Q.   What was their recommendation as to how
7   the Department should proceed?
8    A.   Ms. Martel was a very strong advocate of
9   Chief Bergeron; that she felt he should be brought
10  back, that he did nothing wrong and that he was
11  good for the Town and the Department.
12        She also was in favor of Brian Barnes
13  and she felt that Ralph and Bolduc had been
14  problematic -- and I believe -- I would probably
15  say Dowgiewicz's opinion was the same.
16   Q.   Have the Select Board as of January of
17  2004 had an opportunity to review the Barton
18  report?
19   A.   Yes.
20   Q.   You conducted -- strike that.
21        MR. GREEN:  If you would mark this,
22  please?
23        (Plaintiff's Deposition Exhibit
          No. 11 offered and marked.)
24

---

110

1    Q.   (BY MR. GREEN)  I'll show you what's
2   been marked as Exhibit 11 and ask if you recognize
3   that document? (Indicating.)
4    A.   (Witness examining document.)  Yes.
5    Q.   By this document you are making a -- as
6   it states, a provisional appointment?
7        When you did this in March 8th of 2004
8   had Deputy Chief -- strike that.  Had Acting Chief
9   Keefe requested that you make his appointment
10  provisional?
11   A.   Had he requested?
12   Q.   Yes; he was serving as the acting chief
13  when you assumed your duties as town
14  administrator, is that not true?
15   A.   Correct.
16   Q.   Was he being paid as a chief in his
17  capacity as acting chief?
18   A.   As I recall as acting chief I think he
19  was still being paid the same amount -- whatever
20  was negotiated.  I'm not even sure he had actually
21  had a raise.
22   Q.   What I'm asking is at any time between
23  the time that you assumed your duties as town
24  administrator and March 8th, 2004 did Deputy Chief

---

111

1   Keefe request that you process the paperwork
2   necessary for him to be appointed as provisional
3   chief of police?
4    A.   I'm sure we had that discussion.
5    Q.   Do you recall when the -- on or about
6   when you had the initial discussion on that
7   subject?
8    A.   I don't recall when.
9    Q.   What was required -- what were you
10  required to do in order to secure his appointment
11  as provisional chief of police?
12   A.   What was I required to do?
13   Q.   Right.
14   A.   Submit this form to Human Resources,
15  Department of Civil Service.
16        MR. GREEN:  Would you mark this?
17        (Plaintiff's Deposition Exhibit
          No. 12 offered and marked.)
18
19   Q.   (BY MR. GREEN)  I'll show you what's
20  been marked as 12 for the purposes of today's
21  depo.
22        Do you recognize this document?
23  (Indicating.)
24   A.   (Witness examining document.)  It's a

---

112

1   document that I wrote to William Keefe.
2    Q.   This letter is dated May 4th, 2004 and
3   it says in the first paragraph, "In the upcoming
4   year a priority will be to institute policies and
5   procedures for the Department."
6        As of May 4th, 2004 had any steps been
7   taken up to that point to revise the policies and
8   procedures of the Department?
9    A.   I would consider that answer yes.
10   Q.   You've testified that in conjunction
11  with Acting Chief Keefe you established goals and
12  objectives but my understanding was that those
13  discussions had taken place shortly after your
14  arrival in October of 2003.
15        What I'm asking is as of May 4th, 2004
16  what specific progress had been made with respect
17  to implementing a revision of policies and
18  procedures?
19   A.   Your question states a policy and
20  procedure.  There were many policies and
21  procedures separate among themselves.
22        We addressed issues as they came along
23  with policies.  That had been going on since I got
24  there.  When we would find that we needed

---

**JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL**
**ROBIN LEAL            SEPTEMBER 15, 2006**

---

**117**

1  Exhibit 1, this investigation that has been marked
2  as 13 identifies three individuals -- Catherine
3  Abbe, Keith Greenwood, and Jonah Mayotte as the
4  incidents that were being investigated but would
5  you agree that Greenwood was not one of the
6  incidences that was suggested as the subject of
7  the investigation by the terms of your letter of
8  December 12th?
9      A.  It was not included.
10     Q.  Do you have any recollection as to when
11  it was that the Greenwood matter became the
12  subject of Acting Chief Keefe's investigation?
13     A.  I believe Chief Keefe was working on
14  several things.  I'm not sure exactly what all the
15  investigations were.  There were more than three
16  or four.
17         At the time of this writing these were
18  at least three that I knew of from Chief Keefe.
19     Q.  Do you know if this Bolduc investigation
20  recommendation was ever provided to John Bolduc or
21  his counsel?
22     A.  Most things went through our town
23  counsel so I do not know whether or not it was or
24  how much of the information went between counsel,

**118**

1  I think.  Actually, that would be later on.
2         Could you ask me the question again?
3         MR. GREEN:  Could you read it back,
4  please?
5         (Reporter read back as
           requested.)
6
7         THE WITNESS:  I stand on my answer.
8         MR. GREEN:  Would you mark this,
9  please?
10        (Plaintiff's Deposition Exhibit
           No. 14 offered and marked.)
11
12     Q.  (BY MR. GREEN)  I think you've heard
13  testimony from Thomas Ralph and John Bolduc about
14  a meeting that they had with Raymond Regis in
15  which they were asked to resign.  Do you recall
16  that testimony?
17     A.  I do.
18     Q.  Do you recall the meeting that they're
19  referring to -- well, strike that.
20        Do you recall directing or requesting
21  that Raymond Regis ask Bolduc and Ralph to resign?
22     A.  No.
23     Q.  You don't recall that, having been
24  asked -- asking Regis to ask them to resign and if

**119**

1  they did, they would both be given
2  recommendations?
3      A.  No.
4      Q.  How about Robert Miller?
5      A.  What about Robert Miller?
6      Q.  Did you ask Robert Miller to ask Bolduc
7  and Ralph to resign?
8      A.  I did not.
9      Q.  How would you characterize your
10  relationship with Miller in December of 2003?
11     A.  I thought it was a good relationship
12  although we did not agree on some issues; and it
13  could be strained at the same time because of the
14  disagreement of issues.
15     Q.  Issues related to the Police Department?
16     A.  Predominantly; yes.
17     Q.  So as I understand your testimony you
18  did not request in December of 2003 either Miller
19  or Regis to request that Ralph and Bolduc resign?
20     A.  I did not request them to ask them.
21     Q.  Did you suggest to them that resignation
22  of Ralph and Bolduc might be an appropriate
23  resolution to problems then facing the Police
24  Department?

**120**

1      A.  In a conversation with them, which they
2  were my bosses and in trying to update them on the
3  information that I had received in researching,
4  talking with town officials, citizens, members of
5  the Police Department, I told them it was the
6  opinion of many people that the Police Department
7  would be better off without all four of them.
8      Q.  Did you suggest to either of them in the
9  context of those discussions that it would be --
10  that their resignations might be a vehicle to
11  begin to address the issues confronting the Police
12  Department?
13     A.  I may have suggested that that would
14  have been a positive move for the Town.
15        I did not request them to take any
16  action on that opinion.
17     Q.  Did you express a similar opinion with
18  respect to Chief Bergeron and Barnes?
19     A.  I did.
20     Q.  Do you know if anyone ever -- in
21  December of 2003 had you had your second meeting
22  with Chief Bergeron yet?
23        I believe you testified earlier there
24  were two meetings, both of which were attended by

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
ROBIN LEAL                    SEPTEMBER 15, 2006

121

1  yourself, Deputy Chief Keefe, and Chief Bergeron.
2  The first one as I understand it -- correct me if
3  I'm wrong -- the first one was just your going
4  there trying to get a sense of what was going on
5  at least from his perspective?
6       A.   Not just to do that. I think I had
7  already started to form an opinion that because of
8  everything that had happened it would be
9  beneficial if he chose to retire.
10      I think both of those meetings had an
11 element of asking him to retire or consider
12 retiring.
13      Q.   At the second meeting you had with him,
14 do you recall when that was?
15      A.   I do not.
16      Q.   Do you know if it was after the Barton
17 report?
18      A.   It is highly possible.
19      Q.   We have -- I think it's Exhibit 10; let
20 me just check here -- 9. The Barton report for
21 the purposes of this deposition is Exhibit 9.
22      Was there any other report prepared and
23 filed with the Town by Judge Barton that dealt
24 specifically with Chief Bergeron?

122

1       A.   Was there any other report?
2       Q.   A separate report other than what's been
3  admitted here as Exhibit 9 that was submitted to
4  the Town by Judge Barton, the subject matter of
5  which was Chief Bergeron, himself?
6       A.   I don't recall a separate report from
7  the Barton report.
8       Q.   Well, I'm just asking you if there was
9  more than one Barton report. That's really what
10 I'm asking.
11      A.   Not that I recall.
12      Q.   When the Barton report was issued, did
13 Judge Barton come to the Select Board with the
14 report and discuss it with them or you?
15      A.   I'm thinking it was mailed and then
16 possibly after the Selectmen had an opportunity to
17 review it, he came but I don't recall.
18      Q.   You have no specific recollection of
19 meeting with Judge Barton and discussing his
20 report with him?
21      A.   A specific recollection? No.
22      Q.   Do you recall -- strike that. Had you
23 concluded by the end of December, 2003 that you
24 were going to proceed with disciplinary hearings

123

1  on Bolduc?
2       A.   What was the -- can you repeat the
3  question?
4       Q.   Had you determined by the end of
5  December of 2003 that you were going to proceed
6  with disciplinary hearings for Bolduc?
7       A.   Yes.
8       Q.   Do you recall having a discussion with
9  Raymond Regis in February of 2004 in which you
10 told him that you had enough to terminate John
11 Bolduc?
12      A.   No. Let me rephrase. What I said was
13 that if everything was true it was reason for
14 termination. If you remember, these were my
15 bosses.
16      I was a resource for them on the
17 legalities and procedures of personnel management.
18 In that sense what I said was all of these things
19 are terminable -- are cause for termination.
20      Q.   If they're true?
21      A.   Right.
22      Q.   As I understand your testimony you were
23 still awaiting the results of the investigation or
24 not?

124

1       A.   I was in many conversations with the
2  Selectmen individually and collectively on these
3  matters and all the matters in litigation. I'm
4  not sure of your question.
5       Q.   I'm asking if by the end -- if in
6  February of 2004 when you made that suggestion
7  about whether the -- if the events were true, you
8  had acquired sufficient information to justify, in
9  your view, termination?
10      A.   First of all I think the date that you
11 just said was the date that Regis made the
12 comment. I don't believe it's been said and I
13 don't remember when my comment to Regis was about
14 this. When the picture of the woman's head being
15 squished, Regis' comment to me was he should be
16 fired.
17      Somewhere between that and whenever the
18 comment was, we're having conversations about what
19 the findings were and what was going on and was
20 there cause for hearings. I'm not sure what
21 you're asking.
22      Q.   How did -- I take it from your testimony
23 that you showed Regis the picture?
24      A.   Yes; that is actually why the

157

1  of anonymity in that they were detainees.  It was
2  a recommendation from town counsel.
3           MR. McCULLOUGH:  I instruct the
4  witness not to -- not that the questions would
5  invite it but as a cautionary measure not to
6  discuss any discussions that you had with town
7  counsel.
8      Q.   (BY MR. GREEN) I am not intending to ask
9  you to tell me anything that Attorney LaBella told
10 you or that, in the context of his representation
11 of you as an employee of the Town of Webster what
12 you told him.  Although we may have skirted the
13 edge of that at some time, that's not my intent.
14          There's a reference in the Barton report
15 to your having provided Judge Barton a book of
16 policies and procedures that were uncovered by
17 you.  Do you recall that?
18     A.   No.
19     Q.   I'll just refer you to it for a second.
20 It's probably on page fourteen or something like
21 that.
22          It says on page fourteen, "When the
23 investigators first inquired about rules and
24 regulation, they were told that there were not

158

1  any.  Subsequently, the new town administrator" --
2  who I presume was yourself -- "discovered a
3  long-forgotten set of regulations buried in a file
4  drawer."
5           Do you know who it was that had told
6  them that there were not any rules and
7  regulations?
8      A.   It could have been -- no; I don't know.
9      Q.   Does it refresh your recollection as you
10 read this that it was you that provided them with
11 the, quote, "long-forgotten set of regulations,"
12 unquote?
13     A.   I can't picture the document that was
14 provided and it doesn't state -- and I don't
15 remember whether or not it was rules and
16 regulations of the Police Department or if it
17 was -- there was also a lot of question around the
18 charter at the time.
19          This would lead me to believe that it
20 was to do with the Police Department and we didn't
21 know that there was one and then we found one.
22     Q.   Referring you to Exhibit 16 which is the
23 list of exhibits for the Bolduc hearing?
24     A.   Okay.

159

1      Q.   First of all who was it that introduced
2  these -- the Town's exhibits at this March 10th
3  hearing?
4      A.   Town counsel.
5      Q.   Do you know where it was that town
6  counsel obtained what are listed as Exhibits 12
7  and 13 on that list?
8      A.   Do I know?
9      Q.   Right.
10     A.   No; not at the moment.
11     Q.   Do you know if Exhibits 12 and 13 were
12 included in that book of rules, regulations that
13 were referred to in the Barton report on page
14 fourteen?
15     A.   I do not.
16     Q.   Do you have any reason to take issue
17 with Judge Barton's finding that with respect to
18 the rulings and regulations it was, quote, "very
19 doubtful" -- strike that -- quote, "whether they
20 are still in effect in whole or in part is very
21 doubtful even if they can still be considered
22 filed with the Town Clerk," unquote?
23          MS. LYNCH:  Are you reading from
24 Exhibit 9?

160

1           MR. GREEN:  I'm reading from
2  Exhibit 9 on page fourteen.
3           THE WITNESS:  And your question was?
4      Q.   (BY MR. GREEN)  Do you have any reason
5  to take issue with Judge Barton's finding that it
6  was doubtful that the rules and regulations could
7  be considered still in effect?
8      A.   No.
9      Q.   Referring you to I think Exhibit
10 Number 1 which I can't locate but hopefully you
11 can in your pile?
12     A.   Which one?
13     Q.   Exhibit Number 1.  You refer to rules
14 and regulations -- you refer to regulations in
15 that letter.
16          What regulations were you referring to
17 as Bolduc having violated?
18     A.   (Witness examining document.)
19 Use-of-force policy.
20     Q.   As it was understood as what -- strike
21 that.
22          Did you ever see the use-of-force
23 policy?
24     A.   I did see a use-of-force policy.  I'm

161

1  not exactly sure when I saw it.
2          MR. GREEN:  If you could mark this,
3  please?
4          (Plaintiff's Deposition Exhibit
5          No. 21 offered and marked.)
6      Q.   (BY MR. GREEN)  I'm going to give you
7  what's been marked as 21 and ask if you would take
8  a look at article twenty-eight.
9          Are you familiar with the circumstances
10  that led to article twenty-eight being placed on
11  the warrant for the Town meeting in May of 2004?
12  (Indicating.)
13      A.   (Witness examining document.)  I was not
14  at -- let me think.
15      Q.   Let me try it a different way.  Did you
16  participate in the assembly of the town warrant
17  for presentation at the Town meeting?
18      A.   I put the warrant together -- strike
19  that -- in the town before Webster I was solely
20  responsible for putting the town warrant together.
21          This town warrant in the Town of Webster
22  is put together by the Selectmen's secretary.  All
23  articles are submitted to her and she compiles
24  them after the Board of Selectmen approved them.

162

1      Q.   Do you recall who the moderator was for
2  the Town meeting in May of 2004 in Webster?
3      A.   It was either Stawiecki or Borski --
4  Joseph B-O-R-S-K-I.
5      Q.   Did you have any discussion with any
6  other town officials for the Town of Webster with
7  respect to abolishing Civil Service for the
8  Webster Police Department effective July, 2004?
9      A.   Did I have conversations with the Board
10  of Selectmen regarding abolishing it?
11      Q.   Yes.
12      A.   I don't remember any specifics but, yes,
13  I would assume so if that's on the warrant.
14      Q.   Was it a recommendation of yours to
15  abolish Civil Service for the Webster Police
16  Department in July of 2004?
17      A.   No.
18      Q.   Do you have any knowledge as to what the
19  origin of that proposal was?
20      A.   I believe it was the finance
21  committee -- wait -- yes.  Some members of the
22  finance committee.
23      Q.   Do you recall what their rationale was
24  for removing the Webster Police Department from

163

1  Civil Service?
2      A.   Not at this time.
3      Q.   Do you have a recollection of any
4  particular individual who was responsible for that
5  initiative?
6      A.   I can't remember exactly who it was.
7  Joe Barezik or Mike Finimore.  They were finance
8  committee members.
9      Q.   Had the proposal -- at least the best of
10  your knowledge, had that article been
11  affirmatively voted upon, would it have removed
12  all of the positions from the Police Department
13  from Civil Service?
14      A.   I don't know.  It was ruled out of order
15  so I'm not quite sure what your question is.
16      Q.   As you read article twenty-eight,
17  assuming that it was crafted in a way that was in
18  order and had been adopted as proposed, would it
19  have removed all of the police positions from
20  Civil Service?
21      A.   It appears that way.
22      Q.   Did you have an opportunity to review
23  that article prior to its being placed on the town
24  warrant?

164

1      A.   I don't believe I did.  I don't believe
2  I was -- I was not a part of this; no.
3      Q.   Did anyone from the finance committee
4  indicate to you what the rationale was that they
5  had for removing the police from Civil Service?
6      A.   I don't remember.  As I'm looking here
7  it says it's a citizens petition and the Selectmen
8  and finance committee refers to sponsor which
9  means it wasn't sponsored by the finance
10  committee; it was sponsored by an individual and I
11  don't recall what the circumstances were at that
12  time.
13          MR. GREEN:  Would you mark this?
14          (Plaintiff's Deposition Exhibit
15          No. 22 offered and marked.)
16      Q.   (BY MR. GREEN)  Have you got that list
17  of exhibits in front of you, Ms. Leal, from the
18  Bolduc hearing?  I have one here somewhere but in
19  the interest of time I don't want to go looking
20  for it.  I just want it in front of you.
21          I'm going to show you what's been marked
22  as Exhibit 22 for the purposes of today's
23  deposition and ask you whether you recognize that
24  document? (Indicating.)

169

1  litigation so I don't know.

2      Q.   Was it your understanding that documents

3  that were sent to you and provided by you to your

4  attorney were not subject to this request for

5  production?

6      A.   That was my understanding -- I'm not

7  sure what you're asking.

8      Q.   I guess what I'm asking you to do -- and

9  I don't want to get into at this stage of the

10  day -- I would like to have an affirmation of one

11  sort that there were no documents that you had

12  provided to your attorney that, had they been in

13  your possession at home, you would have provided

14  in response to this request that haven't been

15  provided already?

16      A.   Anything that I had in my possession

17  that I gave to my attorney at home, I've given to

18  this attorney.  I'm not clear on your question.

19      MR. McCULLOUGH:  Is your question

20  did she provide all documents within her custody

21  or control, whether it's her home or whether it's

22  in her car or in any private office or anywhere?

23      MR. GREEN:  Right.

24      MR. McCULLOUGH:  Did she provide all

170

1  of those documents to me?  Or did she make an

2  attempt in response to this request for production

3  of documents to round up all documents within her

4  custody and control to be responsive to this

5  request for production?  Is that your question?

6      MR. GREEN:  Yes; that's the

7  question.

8      THE WITNESS:  I gave everything I

9  had to you and then you decided what was part of

10  this.

11      MR. GREEN:  This is Exhibit

12  Number 24.

13      (Plaintiff's Deposition Exhibit

       No. 24 offered and marked.)

14

15      Q.   (BY MR. GREEN)  I'm going to show you

16  what's been marked as Exhibit Number 24.

17  (Indicating.)

18      A.   (Witness examining document.)

19      Q.   Do you recognize this document?

20      A.   Yes; I do.

21      Q.   This document appears to have been

22  prepared with respect to a civil action before the

23  Worcester Superior Court in which you are named as

24  a defendant?

171

1      A.   Correct.

2      Q.   Is that matter still pending?

3      A.   No.

4      Q.   Were you deposed with respect to that

5  matter?

6      A.   No.

7      Q.   What were the circumstances that led to

8  the Town of Webster filing this suit?

9      A.   I resigned my position as town

10  administrator.  When I resigned my position as

11  town administrator I was cleaning out my office in

12  the company of the chairman of the Board, Debra

13  Keefe.  I was eliminating my e-mails and told her

14  that I was eliminating my e-mails and printing

15  anything substantial.  With her knowledge I

16  cleaned out my e-mail account.

17      After I resigned and left the Town's

18  employment, when I was asking for my severance of

19  six months I was told by the Town's counsel that

20  they were not going to pay me and that they wanted

21  to know about some e-mails.

22      My attorney sent an e-mail -- sent a

23  letter to them stating that if there was any

24  missing documents that we would assist in the

172

1  recovery of those documents.  I did not hear from

2  the Town and then shortly after that I received

3  this and there was no communication from the Town

4  to my attorney that they were even contemplating a

5  civil suit.

6      In my opinion this civil suit was

7  nothing but a way to try and get -- prevent -- to

8  block them from having to pay me my severance pay.

9      Q.   Did the e-mails that you removed --

10  first of all, you said you removed some e-mails

11  from your computer in the company of Debra Keefe.

12      How did she happen to be there when you

13  did that?

14      A.   She was going to be taking over as

15  interim town administrator and I was giving her

16  files and going over things that pertained to my

17  office so she could take over when I walked out

18  the door.

19      Q.   Would there be any particular reason to

20  eliminate -- were all of the materials that were

21  on your computer at the Town Hall in that office

22  materials that related to Town business?

23      A.   Some.  Some were just comments, some

24  were quips back and forth to department heads.

177

1  happened?
2      A.   Mmm-hmm.
3            MR. McCULLOUGH:  You have to answer
4  verbally.
5            THE WITNESS:  Yes.
6      Q.   (BY MR. GREEN)  At the time that that
7  question was put to you that way, did you consider
8  filing an MCAD complaint at that point?
9      A.   No.
10     Q.   What later behaviors -- you said it was
11  Regis and Miller?
12     A.   Yes.
13     Q.   Was this activity they engaged in from
14  your perspective jointly or was it just individual
15  actions they took directed against you?
16          Do you have any reason to believe that
17  they were coordinating their efforts against you?
18     A.   Yes.
19     Q.   So as I understand it you filed or were
20  prepared to file an MCAD complaint after being
21  made aware of the complaint that the Town had
22  filed against you related to the e-mail business?
23     A.   (Witness nodding.)
24          MR. McCULLOUGH:  Verbally -- you

178

1  have to answer verbally.
2            THE WITNESS:  Yes.
3      Q.   (BY MR. GREEN)  Did you ever actually
4  file a counterclaim in the Superior Court suit?
5      A.   I don't remember.
6      Q.   Were both the assertions of sexual
7  harassment that were put forth by you and this
8  matter settled together -- I mean were they both
9  resolved at the same time?
10     A.   Yes.
11     Q.   Were you represented by Mr. McCullough's
12  firm resolving those matters?
13     A.   No.
14     Q.   When was the date of your resignation
15  from the Town of Webster?
16     A.   I think it was February, 2005.  It was
17  either the end of February or the beginning of
18  March -- I think the first of March might have
19  been the final date.
20     Q.   Of 2005?
21     A.   Yes.
22     Q.   I think you indicated that you thought
23  that the Town's suit against you was to allow them
24  to avoid paying you a severance pay?

179

1      A.   Correct.
2      Q.   I think you testified it was six months'
3  severance?
4      A.   Correct.
5      Q.   Was that a benefit that you had
6  negotiated as part of your contract with the Town?
7      A.   Yes.
8      Q.   Just exactly what circumstances would
9  have entitled you to the six-month salary
10  termination benefit?
11     A.   If the Town terminated me for just cause
12  and it was not in relation to any criminal act or
13  if the Town made a formal or informal request that
14  I resign and I resign.
15     Q.   I just want to make sure I understand
16  this.
17          The six-month benefit was payable to you
18  by the Town even if they were to terminate you for
19  just cause?
20     A.   Yes.
21     Q.   As a result of having put forth the
22  allegations of -- having put forth these
23  allegations in response to this lawsuit, did you
24  receive any compensation over and above the six

180

1  months' termination benefit?
2      A.   Did I receive any compensation over and
3  above the six months?
4      Q.   Yes.  As I understand your testimony you
5  resigned, you put forth your claim for the
6  termination benefit pursuant to your employment
7  contract, and the next thing you heard you got
8  served with a lawsuit by the Town.
9          Then you, in conjunction with whoever
10  was representing you presented -- at least
11  asserted some claims that may well have ended up
12  at the MCAD but for the fact that you settled this
13  case and the issues that you raised in your MCAD
14  allegations, is that correct?
15     A.   That was a long one.
16     Q.   It was long.  What I'm trying to get to
17  is as I understand it by virtue of your responding
18  to this lawsuit by putting forth claims of your
19  own related to both the contract and behaviors by
20  some of the Select Board you resolved both -- you
21  resolved everything.  You got your six months'
22  severance pay?
23     A.   Correct.
24     Q.   Did you get anything -- with the

185

1  was concerned. The Police Department was coming
2  around. It had calmed down. He had done a good
3  job. I had told him on occasions that I had
4  appreciated the work that he had done.
5         I didn't offer the position to him
6  because I'm very clear that it is through a Civil
7  Service -- he couldn't ask me for one because it
8  goes by a Civil Service test which is what we had
9  scheduled.
10       Q.   When was the Civil Service test
11  scheduled?
12       A.   I don't know. May comes to my mind but
13  I don't know when we scheduled it.
14             As soon as Bergeron retired we scheduled
15  the -- because we couldn't do it before he
16  retired. Once he retired we scheduled it.
17       Q.   In your second meeting with Chief
18  Bergeron do you recall what it is that you
19  discussed with him?
20       A.   I do.
21       Q.   What was that?
22       A.   I told him that he needed to retire;
23  that I was not going to reinstate him back.
24       Q.   What was his reaction to your making

186

1  that statement?
2       A.   He was not pleased.
3       Q.   What did he say?
4       A.   By the end of the conversation I would
5  say that he said he would think about it.
6       Q.   Was he represented by anybody at that
7  meeting?
8       A.   Not that I recall.
9       Q.   To the best of your recollection that
10  meeting was yourself, Acting Chief Keefe, and
11  Chief Bergeron?
12       A.   It was, that were in the house.
13       Q.   If you had -- as I understand it you had
14  testified that you informed him that you had
15  decided that you would not reinstate him.
16             If he had declined to resign, what would
17  have been your next step?
18             MS. LYNCH: Objection.
19             MR. McCULLOUGH: Object to form.
20       Q.   (BY MR. GREEN) You indicated to me that
21  you went to see Chief Bergeron and told him that
22  it was not your intention to reinstate him, is
23  that correct?
24       A.   Yes.

187

1       Q.   If he -- and I believe you testified
2  that by the time you left he was considering
3  retiring -- or at least that was your
4  understanding?
5       A.   (Witness nodding.)
6             MR. McCULLOUGH: You have to say yes
7  or no or whatever your answer is.
8             THE WITNESS: I'm sorry; yes.
9       Q.   (BY MR. GREEN) If he had declined to
10  resign, what would you have done next?
11             MR. McCULLOUGH: Object; you can
12  answer.
13             THE WITNESS: I don't recall what my
14  next move would have been. I can't say for sure
15  exactly what I told him I would do.
16             I'm thinking I had a plan but I don't
17  remember exactly what it was at the moment.
18       Q.   (BY MR. GREEN) Would you have had to
19  file some form of discipline against him in order
20  to effect an involuntary termination?
21       A.   I assume I would.
22       Q.   Did you tell him that it was your
23  intention to reduce him in rank if he stayed?
24       A.   No.

188

1       Q.   Did Acting Chief Keefe ever indicate,
2  prior to December first of -- strike that --
3  December 12th of 2003 that he was conducting an
4  investigation of Bolduc?
5       A.   Did he inform me, is that your question?
6       Q.   Yes; referring you back to Exhibit 1,
7  just to be clear, which is your letter of
8  December 12th, 2003 by which you placed Bolduc on
9  administrative leave, as I understand your
10  testimony that letter was precipitated by Acting
11  Chief Keefe showing you a letter of the Abbe
12  booking and then your conferring with some Select
13  Board members.
14             What I'm asking is: Were you aware
15  prior to Acting Chief Keefe showing you the
16  picture of Catherine Abbe being booked that Acting
17  Chief Keefe was conducting an investigation of
18  John Bolduc?
19             MR. McCULLOUGH: Object.
20             THE WITNESS: I'm not sure if I
21  answer that or not.
22       Q.   (BY MR. GREEN) Were you aware of any
23  ongoing investigation of the Greenwood matter or
24  the Mayotte matter prior to the Abbe incident?

189

1    A.   No; when the Abbe -- no.
2         MS. LYNCH:  Can I ask you read back
3    that question and answer?
4         (Reporter read back as
     requested.)
5
6         MS. LYNCH:  Thank you.
7         MR. GREEN:  Okay; I'm all set.
8         MS. LYNCH:  I just have a couple of
9    questions for you.
10                    *****
11       CROSS-EXAMINATION BY MS. LYNCH
12   Q.   When you stated a few minutes ago that
13   when you had discussions with Acting Chief Keefe
14   about his I guess being the permanent chief, he
15   said -- you said most of the time he said no
16   thanks, lady.  Can you tell me what the discussion
17   was?
18   A.   I got the impression that Acting Chief
19   Keefe would like to be chief but if he didn't, it
20   would be fine and he would be just as happy going
21   back to sergeant and often he complained about
22   being the Chief and that there was too much
23   baloney going on and would blame me on getting him
24   in trouble.

190

1         I didn't get the -- he didn't respond to
2    me as I really want the job, I really want the
3    job.  I never got that impression.
4    Q.   At the termination hearing for John
5    Bolduc did you ever prevent him from calling --
6    him or his attorney on his behalf -- calling any
7    witnesses?
8    A.   No.
9    Q.   To testify in his behalf?
10   A.   No; on the contrary I sent him a letter
11   stating that he could be represented by counsel
12   and call witnesses to his defense.
13   Q.   Did you ever prevent him from -- or his
14   attorney on his behalf -- introducing any exhibits
15   at the hearing?
16   A.   No; not that I recall.
17   Q.   When you testified this morning that you
18   had a discussion with Acting Chief Keefe in which
19   he stated that Bolduc -- I guess and others --
20   were disruptive to the Department, was there any
21   discussion about taking disciplinary action
22   against John Bolduc at that time?
23   A.   I'm sorry, I'm not sure the time period
24   you're talking about.

191

1    Q.   You testified I believe this morning
2    that you had had a discussion with Acting Chief
3    Keefe regarding John Bolduc and Thomas Ralph prior
4    to receiving the Barton report and you stated that
5    his opinion was that their presence was disruptive
6    to the Webster Police Department.
7         My question is:  Was there any
8    discussion beyond their just being disruptive?
9    Was there any discussion about disciplining either
10   of them, trying to terminate either of them at
11   that time?
12   A.   Ralph or Bolduc?
13   Q.   Let's just focus on Bolduc.
14   A.   Bolduc?  No.
15   Q.   Is the first time there was any
16   discussion about taking disciplinary action
17   against Bolduc when you became aware of the Abbe
18   photographs?
19   A.   Yes.
20   Q.   Was it your decision to terminate John
21   Bolduc following the hearing?
22   A.   Yes.
23   Q.   Prior to placing John Bolduc on paid
24   administrative leave did you discuss that with

192

1    Richard Bergeron at all?
2    A.   No.
3    Q.   How about prior to terminating John
4    Bolduc before you made your decision?  Did you
5    discuss that with Richard Bergeron?
6    A.   No.
7         MS. LYNCH:  Okay; thank you.
8         (The deposition was concluded.)
9                    *****
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

EXHIBIT 3

1

Volume I, Pages 1-128

Exhibits 1-15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOHN A. BOLDUC, JR.,

        Plaintiff

vs.                    No. 05-40030FD5

TOWN OF WEBSTER, ROBIN LEAL,

RICHARD BERGERON, and WILLIAM KEEFE,

        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF: RICHARD BERGERON

10:15 a.m. - 2:04 p.m.

Friday, August 18, 2006

MORRISON MAHONEY LLP

One Chestnut Place, Suite 470

Worcester, Massachusetts


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

PERLIK AND COYLE REPORTING

1331 Main Street

Springfield, Massachusetts  01103

413.731.7931    Fax 413.526.2316

**Richard Bergeron**
**August 18, 2006**

(Pages 2 to 5)

---

**2**

APPEARANCES:
Representing the Plaintiff:
   GREEN, MILES, LIPTON & FITZ-GIBBON, LLP
   BY: JOHN J. GREEN, JR., ESQ.
   77 Pleasant Street
   P.O. Box 210
   Northampton, Massachusetts  01061-0210
   413.586.8218    Fax 413.584.6278
Representing the Town of Webster, Richard Bergeron,
and William Keefe:
   MORRISON MAHONEY LLP
   BY: CAROLE SAKOWSKI LYNCH, ESQ.
   1500 Main Street, Suite 2400
   P.O. Box 15387
   Springfield, Massachusetts  01115-5387
   413.737.4373    Fax 413.739.3125
Representing Robin Leal:
   MURPHY, HESSE, TOOMEY & LEHANE, LLP
   BY: GEOFFREY B. McCULLOUGH, ESQ.
   World Trade Center East
   Two Seaport Lane
   Boston, Massachusetts  02210
   617.479.5000    Fax 617.338.1324
   gmccullough@mhtl.com

---

**3**

INDEX

WITNESS:          EXAMINATION BY:      PAGE:
Richard Bergeron   Mr. Green            4

EXHIBITS:                    PAGE:
Exhibit 1, Organizational Flow Chart.......13
Exhibit 2, Procedures - Use of Force.......17
Exhibit 3, Policy and Procedure...........24
Exhibit 4, 6/18/01 Memorandum.........28
Exhibit 5, 2/26/03 Letter.................54
Exhibit 6, 4/15/03 Letter.................58
Exhibit 7, 4/17/03 Letter.................70
Exhibit 8, 4/25/03 Letter.................72
Exhibit 9, James A. Hoover's Affidavit.....72
Exhibit 10, 4/17/03 Memorandum...........78
Exhibit 11, 4/27/03 Memorandum...........79
Exhibit 12, 5/2/03 Memorandum...........84
Exhibit 13, 4/30/03 E-Mail...........86
Exhibit 14, 6/17/03 Letter.................95
Exhibit 15, 9/30/03 Letter...............104

---

**4**

1              RICHARD BERGERON,
2 having been satisfactorily identified and duly sworn
3 by the Notary Public, was examined and testified as
4 follows:
5          MR. GREEN:  Usual stipulations?
6          MS. LYNCH:  Yes.
7          MR. GREEN:  Objections reserved until
8 time of trial except for the form of the question
9 and what was -- the motions to strike?
10          MS. LYNCH:  Motions to strike are
11 reserved.
12          MR. GREEN:  Okay.
13              EXAMINATION
14 BY MR. GREEN:
15      Q.  Chief, my name is John Green.  I represent
16 John Bolduc in a federal case that's been filed.  If
17 at any time during this morning or afternoon you
18 wish to take a break for any reason, just so
19 indicate.  We'll be happy to allow you to talk to
20 counsel or for any reason.
21      If at any time during the deposition you
22 don't understand the question as I put it to you,
23 just so indicate and I'll try to put it into a form
24 that you can respond to.  Are you under any course

---

**5**

1 of medication or other substance that affects the
2 way you are able to answer questions here today?
3      A.  Just blood pressure medicine which does
4 sometimes dull your memory.
5      Q.  What's that medication?
6      A.  Toprol.
7      Q.  Would you please state your full name.
8      A.  Richard Bergeron.  Richard E., Junior.
9      Q.  Are you currently employed?
10      A.  No.
11      Q.  Do you currently live in the Town of
12 Webster?
13      A.  No.
14      Q.  Do you currently live in Massachusetts?
15      A.  No.
16      Q.  Are you retired?
17      A.  Yes.
18      Q.  So you are engaged in no form of
19 employment?
20      A.  Nothing, no.  Nothing at all.  Just doing
21 hobby stuff.  Doing a little farming on my own.
22 That's it.
23      Q.  Did you retire from the Town of Webster?
24      A.  Yes.

---

**Richard Bergeron**
**August 18, 2006**

6

1  Q. When did that happen?
2  A. Early 2004.
3  Q. Do you recall what month?
4  A. I don't recall what official month it was.
5  January, February, I don't know.  Not exactly sure
6  what month originally.
7  Q. Where were you born?
8  A. Boston, Mass.
9  Q. Were you educated there?
10  A. No.  Well, yes.  But I moved to the suburbs
11  and actually went to Northeastern University, so I
12  guess you could say I was educated in Boston.
13  Q. You graduated from Northeastern?
14  A. Yes.
15  Q. What year was that?
16  A. Good question now.  Seventies, I believe.
17  '78.  Something like that.
18  Q. What was your degree?
19  A. I had an associate's degree and bachelor's
20  degree in criminal justice.
21  Q. How old are you?
22  A. 61.
23  Q. After graduating from Northeastern, did you
24  obtain any additional education?

7

1  A. Yes.
2  Q. What was that?
3  A. Went on to Anna Maria College.
4  Q. Did you obtain a degree from Anna Maria
5  College?
6  A. Yes, I did.
7  Q. What was that?
8  A. Master's degree.
9  Q. What specialty was that?
10  A. Criminal justice.
11  Q. After graduating, did you attend Anna Maria
12  while you were employed as a police officer?
13  A. Yes.
14  Q. Did you begin your employment as a police
15  officer immediately after graduating from
16  Northeastern?
17  A. No.  I was a police officer before I had
18  any degree.
19  Q. Okay.  So what year and in what department
20  did you begin your employment as a police officer?
21  A. In Quincy in 1970.
22  Q. Did you have any military service?
23  A. Yes.
24  Q. With what service was that?

8

1  A. U.S. Army.
2  Q. In what years?
3  A. I went in 1965.  I got out, extended and
4  amended an enlistment, so it was close to six years
5  but not quite six years.  Went six years without the
6  obligation.  Actual time in there was five and
7  three-quarter years.  Something like that.
8  Q. Where did you serve while you were in the
9  Army?
10  A. I served in Vietnam, served in Okinawa.
11  Q. With what unit did you serve?
12  A. 5th special forces group and 1st special
13  forces group.  And I was also -- you want the whole
14  thing or you just want the active time?
15  Q. Well, did you remain in the reserves after
16  you left active duty?
17  A. No.  But I had another assignment after
18  leaving Okinawa.
19  Q. What was that?
20  A. That was how the extended and amended came
21  into play.  I put in for a special agent course,
22  which is a civilian.  You're still a military, but
23  you're in civilian clothes.  I was in Okinawa at the
24  time, and I had to extend my -- I think that was

9

1  that course or another course, one of the military
2  intelligence courses I had to extend my enlistment
3  one more time.  That's why I was originally in for
4  three years and I extended and amended and that's
5  why the enlistment was almost six years.
6  Q. This special agent, what type of activities
7  were you engaged in as a special agent?
8  A. Well, it was -- it's a big name, sabotage,
9  and all that kind of stuff.  Probably did one
10  sabotage investigation, a few others, predominantly
11  background investigations for people with top secret
12  security clearances.
13  Q. So at that point you were not assigned to
14  the special forces --
15  A. Right.
16  Q. -- you were CID; right?
17  A. Well, I wasn't, no.  It was military
18  intelligence.  They keep them separate in the army.
19  Some of them they pull them all together.  CID is a
20  criminal investigation.  This is strictly
21  intelligence.
22  Q. Counterintelligence?
23  A. Right.
24  Q. With what department did you begin your

**Richard Bergeron**
**August 18, 2006**

(Pages 10 to 13)

|  | 10 |
|---|---|

1  service as a police officer?
2      A.  Quincy.
3      Q.  I believe you testified that was 1971?
4      A.  I believe it was '70 or '71.  It was in
5  December anyway.
6      Q.  What grade were you when you were in your
7  last -- when you left military service?
8      A.  I was an E6 staff sergeant.
9      Q.  I believe you testified you began your
10  service with Quincy in 1971 as a police officer?
11      A.  (Nods)
12      Q.  How long did you remain as a police officer
13  with the department in Quincy?
14      A.  I left there in '96, so I won't do the
15  math.  20 some-odd years anyway.
16      Q.  In 1996 where did you continue employment?
17      A.  I came to Webster.
18      Q.  At the time you applied for the job as
19  chief, was that the job you applied for, Chief?
20      A.  Actually I applied for it, but in a way I
21  didn't apply for it.  I was taking -- I was a
22  sergeant in Quincy.  I was taking, which is common
23  for people to do, is take the police chief's test to
24  warm up for the lieutenant's test on the civil

|  | 11 |
|---|---|

1  service because a lot of the same basic questions.
2  So the guys that get the good marks they take the
3  chief's exam and maybe some of the questions will be
4  on the lieutenant's exam.
5      So as a common practice, I had taken that
6  and I hadn't put Webster down.  But Webster was
7  doing a statewide search, and they sent me a card.
8  I was, hey, I'll give it a whirl.  I was just going
9  to do it for the oral interview part.  The oral
10  interview, you know, you go in and talk to people.
11      Q.  So your original intent in taking the
12  chief's exam was simply as a preparatory step to
13  taking the lieutenant's exam?
14      A.  Correct.
15      Q.  Continuing your career in Quincy?
16      A.  Correct.
17      Q.  As a result of taking the oral exam in
18  Webster, were you offered the position?
19      A.  Yes.
20      Q.  Do you recall who the town administrator
21  was in 1996?
22      A.  Mark Stankiewicz.
23      Q.  Was he on the committee that reviewed you
24  for the position?

|  | 12 |
|---|---|

1      A.  I don't think he was actually on the
2  committee.  They had a lot of trouble in that town,
3  unfortunately.  They had had a search committee
4  because everybody was fighting everybody from the
5  selectmen on, and they had some police officers that
6  were using drugs.  More stuff than I ever knew,
7  unfortunately.
8      So they had people that they had, you know,
9  different either the moderator had appointed them
10  and maybe the selectmen had appointed so many
11  people.  It was like they weren't all there that
12  day.  There were a few missing.  I think it was
13  something between seven and ten people were on this
14  committee.
15      Q.  So there was actually an oral interview in
16  which seven or more people were sitting there?
17      A.  Yes.  There was business people, people
18  from the radio station.  There was a selectman on
19  it.  It was somebody from the school committee was
20  on it.  Mostly business people.
21      Q.  As a result of the interview process, you
22  ended up being offered the job; is that right?
23      A.  Yes, much faster than it was supposed to
24  happen.

|  | 13 |
|---|---|

1      Q.  Do you recall exactly when you began your
2  service as chief?
3      A.  June.  Sometime early June.
4      Q.  1996?
5      A.  Right.
6      Q.  Now, when you began your service as chief
7  in June of 1996, how large was the department?
8      A.  Depends on how you look at the department.
9  If you are talking about sworn --
10      Q.  Just full-time police officers.  Not
11  reference to the reserves or --
12      A.  So people when they measure departments,
13  you measure dispatchers and all that.  It was in the
14  twenties.  If you are talking about just full-time
15  police officers, it was in the twenties, I believe.
16      Q.  Okay.  Do you recall who the sergeants were
17  when you began your service in 1996?
18      A.  Oh, boy.  Eddie Latour was one of them.
19  Sergeant Budrow was another one.  I think there was
20  a sergeant's position open.  I'm not sure.  Might
21  have only been those three sergeants.
22      MR. GREEN:  Could you mark that as
23  Exhibit 1.
24      (Marked, Exhibit 1, Organizational Flow

4

Richard Bergeron
August 18, 2006

(Pages 110 to 113)

110

1    A. Right.
2    Q. Were you ever provided a copy of what is
3 referred to as the Barton report?
4    A. Yes. I wasn't provided it, no. I went and
5 sought it myself. They never gave me a copy myself.
6    Q. How did you get it?
7    A. It was public. The first investigation
8 they had on Barnes they made it all confidential.
9 Barnes himself stood up at the town meeting and
10 said, hey, listen, I'm going to start investigating
11 people, let's make these reports public. And the
12 town meeting voted to make that a public report.
13 Anybody can go get a copy of it.
14    Q. When you say it's a public report, where is
15 it on file?
16    A. They were handing them out left and right
17 at the town hall. I got it from a third party in
18 town came across it and gave it to me.
19    Q. Were you personally interviewed by Judge
20 Barton?
21    A. Oh, absolutely.
22    Q. On more than one occasion?
23    A. Yes. In the beginning and the end.
24    Q. Did you keep any notes of your discussions

111

1 with Judge Barton?
2    A. No, I didn't bring a lawyer or do anything
3 because, you know, no.
4    Q. So did you, aside from the copy of the
5 Barton report that you say you obtained actually
6 from a third party, did you ever see any other
7 published document that was published and signed by
8 Judge Barton making recommendation to the town about
9 how to address the situation?
10    A. No.
11    Q. I think you testified earlier that you
12 never had after you were placed on paid
13 administrative leave any discussions with Stephen
14 Boudreau.
15    A. I wouldn't say I didn't have any. I
16 probably didn't though. I know there was
17 correspondence with my lawyer, which is Jim Donnelly
18 now that I think about it. Jim Donnelly sent him a
19 letter saying, listen, you should be giving some
20 reason. Just because selectmen direct you to do
21 something, you should have a reason for doing what
22 you do. Be professional about it not just because
23 politics is dictating you to do something.
24    Q. Did you ever get anything from the town

112

1 signed by a town administrator or some other party
2 specifying the reason?
3    A. No.
4    Q. Did you ever have any discussions with
5 Robin Leal?
6    A. Yes.
7    Q. When did you first have a discussion with
8 Robin Leal?
9    A. She came to my house when I was on
10 administrative leave. We had somewhere between
11 probably less than or close to an hour, maybe even a
12 half.
13    Q. Was it before or after the Barton report
14 was issued?
15    A. That one I don't know if it had been -- I
16 think it was before it actually came out. Probably
17 the investigation had probably been done, but I
18 think it was before the report, but I couldn't say a
19 hundred percent.
20    Q. Who else was present at this?
21    A. Just myself. And my wife was walking
22 around the house. She wasn't actually, you know.
23    Q. What was the subject that was discussed at
24 this meeting?

113

1    A. I think in some way she was trying to get a
2 feel for the town. She was new. I think in some
3 way she was trying to encourage me to retire because
4 they wanted me out of there.
5    Q. Did she say that?
6    A. Did she say that in those terms? No, I
7 don't think so.
8    Q. At some point in time would it be fair to
9 say that you negotiated a severance understanding
10 with the town?
11    A. Forced negotiation.
12    Q. Were you represented by counsel in any of
13 those negotiations?
14    A. Yes.
15    Q. Was that Jim Donnelly?
16    A. No.
17    Q. Who was that?
18    A. Jack Collins from the Chiefs of Police
19 Association. Well, I guess he actually, he wasn't
20 there, but they did confer, the two lawyers
21 conferred later on.
22    Q. Chief, do you have any recollection of who
23 the lawyer is that you, that Mr. Collins was
24 discussing the situation with?

(Pages 114 to 117)

---

114

1   A. Well, see, Jim Donnelly I had as an
2 attorney. I engaged Jim Donnelly as an attorney.
3 She called me for a meeting in the office which I
4 knew wasn't going to be a regular-type meeting so I
5 brought my attorney with me --
6   Q. You're talking about Ms. Leal?
7   A. Yeah. Which was kind of a surprise to her.
8   Q. Do you recall when that happened?
9   A. Shortly after the report came out. She was
10 pretty much being pressured by Stawiecki, the
11 chairman of the board of selectmen, to get rid of me
12 and it was pretty much put to me. You know, you
13 either, you'll be a patrolman tomorrow, and you can
14 fight it if you want; or if you want to stay and be
15 chief, you either be sergeant but most likely we'll
16 make you a patrolman.
17   Q. She said that?
18   A. Yeah. Oh, yeah. Absolutely said that. So
19 then they said, you know, we'll give you $75,000 to
20 go away basically. Stawiecki was, unbeknownst to,
21 you know, she was getting phone calls and cell phone
22 was ringing. She was running in and out of the
23 office, and they were all confused because I had an
24 attorney there.

---

115

1   But Novick just happened to be, I didn't
2 even send him downtown, he just happened to be
3 downtown. And Stawiecki's circling the town hall,
4 he's on his cell phone, back and forth. It's like,
5 you know, it's like they were basically telling me
6 to take a hike. And Stawiecki had stood up at the
7 town meeting and spoke very emotionally against me,
8 saying blue lights in the mirror, you can't trust.
9 Nobody was targeting him. He was just out of
10 control.
11   Q. He was on the board of selectmen at that
12 time?
13   A. Oh, yeah.
14   Q. Do you have any inclination as to what it
15 was that caused Stawiecki to have such a strong
16 attitude about yourself?
17   A. Sure.
18   Q. What was that?
19   A. The reason I was using my office
20 downstairs, there was -- I was getting ready to
21 retire. People were coming whispering in my ear
22 saying you should clean this town up before you
23 leave. There's a lot of corruption here. And
24 people starting furnishing me documents, building

---

116

1 inspectors and all kinds of people. I was just
2 looking things over. Not that I was going to do
3 anything.
4   I did end up turning them over to a federal
5 agency. They knew that I was working with a federal
6 agency. I asked that judge, I can remember this
7 real clear, because I said, judge, what did they
8 want in my office, why would they break in to my
9 office that way.
10   Q. Someone broke into your office?
11   A. Theoretically. They put me on
12 administrative leave and went into my office the
13 next day and looked around and then they changed the
14 lock, and, you know, I never went back except under
15 supervision.
16   Q. Is that the one time you said you went back
17 to pick up, what, personal items?
18   A. Right. That was put in the agreement.
19   Q. So there was a written severance agreement?
20   A. Written agreement, yes.
21   Q. That was negotiated by?
22   A. Jack Collins pretty much. But he conferred
23 with the other attorney. I had him run it by my own
24 personal attorney too.

---

117

1   Q. Okay. I presume that that was
2 confidentiality clauses that were attached to that?
3   A. I don't think so. That's a good question.
4 I didn't see anything confidential. I didn't sign
5 it as confidential. I wanted to go, but my daughter
6 was in the school system there. I was constantly --
7 it was either positive or negative in the newspaper.
8 Every day it was the same front page. It was one
9 thing or another. You know, you just, I had my 32
10 years in. But it was pretty much, you know, I would
11 probably have tried to stay six months to straighten
12 a few things out, but it was already too late for
13 part of that. It was pressure from the selectmen.
14   Q. Did you ever any inclination as to who was
15 going to be named as interim chief on your
16 departure? Were you informed as to that?
17   A. No. Well, contrary --
18   Q. Do you want to supplement that answer?
19   A. Well, I mean, the people say that there was
20 a conspiracy between Billy Keefe, myself, and Robin
21 Leal. That's just not true. Billy Keefe, I only
22 had a few sergeants, we aren't personal friends.
23 That was the best professional choice I could make
24 was to ask him to be elevated to the deputy chief.

---

30

**Richard Bergeron**
**August 18, 2006**

(Pages 118 to 121)

---

**118**

1  I put that in writing to the town administrator.
2  And Robin Leal, I think we only had two meetings.
3  That's the only time -- I really couldn't even
4  comment. I don't know her that well, you know.
5     Q. When you first met with Robin Leal, you
6  said you thought that was before the Barton report
7  came out?
8     A. Pretty sure it was before. If it wasn't, I
9  certainly hadn't seen it, you know.
10    Q. This suggestion on your part to her that at
11 least I'm interpreting what you answered as saying
12 that you suggested to Leal that --
13    A. No.
14    Q. You didn't suggest that?
15    A. Not that I can recall. It was already done
16 before she could -- there was another interim,
17 Boudreau was the interim town administrator, that I
18 think I had said that to. Because Billy had already
19 assumed that he was like the chief at that point and
20 I wasn't coming back so you know how power struggles
21 go.
22    Q. At any point in time did you have any sort
23 of transitional discussions with Keefe about running
24 the department?

---

**119**

1     A. Almost none. I'd say none. As far as the
2  way you phrased the question, no. They repainted
3  the cruiser, new schemes, everything else while I
4  was still out on administrative leave, so, no, there
5  was nothing as far as no advice from me.
6     Q. Did you ever have occasion to talk to a guy
7  by the name of Earl Burgess about John Bolduc?
8     A. Yes, absolutely.
9     Q. Do you recall when that discussion took
10 place?
11    A. I don't. But it's sort of disappointing
12 and disturbing to me that that got right back to
13 John Bolduc immediately. The guy's parting words to
14 me, this is what he said when he left, I'm a Hells
15 Angel and I'll always be a Hells Angel. So
16 basically he told me whatever I told you I probably
17 didn't tell you the truth because Hell's Angels
18 don't talk to cops.
19    Q. How did you happen to be talking to
20 Burgess?
21    A. There was rumors around. I was trying to
22 put some rumors to beds. I already tried to put
23 this rumor to bed. John was well aware of it that
24 they said that John was using cocaine and that

---

**120**

1  Burgess was the bartender in the place when they
2  were using cocaine.
3        At the time, you know, you're not going to
4  really go -- I asked some people. I couldn't prove
5  it one way or the other. I didn't believe it, to be
6  honest with you. But then later on when things
7  happen, erratic behavior, I said I better
8  double-check this situation myself.
9     Q. Was there other officers with you?
10    A. Yes. Novick.
11    Q. What was Novick's role in the department at
12 this point?
13    A. Probably he was seeing, he was just trying
14 to be a good guy. I hate to that say. He's another
15 lawyer. He's passed the bar, and he's actually a
16 public defender right now. He saw they were trying
17 to jam me up more than I saw they were trying to jam
18 me up. He said, Chief, if you need help, here's my
19 home phone number. For a couple of weeks, I didn't
20 pay attention to it.
21    Q. Pay attention to what?
22    A. Him going to give me a hand. And then I
23 said I probably do need some help here. He's a
24 lawyer. He can probably give me some good advice.

---

**121**

1  Maybe he gave me some good advice. Maybe he didn't.
2  We had a situation where the town administrator,
3  people came to me and said the previous one before
4  Leal that they had pornography on the town computer.
5  Some other selectmen had convinced me that I almost
6  went in there with a search warrant, not a search
7  warrant, but I almost went down there because it was
8  the town property.
9        He started telling me you shouldn't go in
10 there because it was expectation. And I thought his
11 arguments were pretty logical so I never did
12 anything about the situation. Other things came
13 up --
14    MS. LYNCH: You need to focus on his
15 question.
16    A. I'm trying to explain how Novick came into
17 the picture. He's got my best interest at heart
18 here.
19    Q. You indicated in a letter, I believe in
20 this letter to Keefe by Ralph in September regarding
21 those personnel records, Ralph states "the Chief
22 informed me that he and Officer Novick had just left
23 the district attorney's office and Officer Novick
24 would now be handling all internal affairs

---

EXHIBIT 4

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

WILLIAM KEEFE
DATE:   AUGUST 17, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**WILLIAM KEEFE                AUGUST 17, 2006**

---

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 4:05-CV-40030-FDS
Pages 1-129

JOHN A. BOLDUC

vs.

TOWN OF WEBSTER, ROBIN LEAL,
RICHARD BERGERON and WILLIAM KEEFE

---------------------------------------------
**DEPOSITION OF: WILLIAM KEEFE**
---------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Morrison Mahoney, LLP,
10 Chestnut Street, Worcester, Massachusetts
on AUGUST 17, 2006, commencing at 10:15 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931   Fax (413) 731-7451

---

3

I N D E X

WITNESS            DIRECT CROSS REDIRECT RECROSS

WILLIAM KEEFE           5

E X H I B I T S

NO.   DESCRIPTION                              PAGE
1   Chain of Command Chart                    15
2   Inventory Policy & Procedure              27
3   Use of Force Policy                       32
4   Keefe Letter of Reference for Bolduc      37
5   Bergeron Potential Letter of
    Reprimand Re Bolduc                       39
6   9/30/03 Ralph to Keefe Letter             60
7   Pysell Statement                          66
8   12/12/03 Leal to Bolduc Letter            73
9   12/12/03 Keefe Memo to Webster Police
    All                                       81
10  12/17/03 Difusco Voluntary Statement      85
11  12/18/03 Young Voluntary Statement        87
12  12/29/03 Kelley Statement                 89
13  Keefe Handwritten Note & Wrubaleski
    2/4/04 Note                               90
14  2/14/04 Wrubaleski Statement              92
15  2/4/04 Milliard Statement                 94
16  2/2/04 Keefe Meeting with Ralph Notes     95
17  12/29/03 Kelley to Keefe E-Mail           97
18  1/5/04 Novick to Keefe E-Mail             99
19  12/29 Nelson Notes                       101
20  2/26/03 Ralph to Bergeron Letter         103
21  1/5/04 Keefe to Polizoti Letter &
    Attachments                              113

---

2

A P P E A R A N C E S:

FOR THE PLAINTIFF:

GREEN, MILES, LIPTON, WHITE & FITZ-GIBBON
77 Pleasant Street
Northampton, Massachusetts 01060
BY: JOHN A. GREEN, ESQUIRE

FOR THE DEFENDANT TOWN OF WEBSTER:

MORRISON MAHONEY, LLP
1500 Main Street
Springfield, Massachusetts 01115
BY: CAROLE SAKOWSKI LYNCH, ESQUIRE

FOR THE DEFENDANT ROBIN LEAL:

MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, Massachusetts 02169
BY: GEOFFREY B. McCULLOUGH, ESQUIRE

Also Present: Robin Leal

---

4

S T I P U L A T I O N S

It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

* * * * *

---

**PERLIK and COYLE REPORTING**

**9**

1  MR. GREEN:  Would you read that
2  back, please?
3        (Reporter read back as
              requested.)
4
5        THE WITNESS:  Her name is Maxine.
6  Q.  (BY MR. GREEN)  Maxine Keefe?
7  A.  Right.
8  Q.  How long have you been married, sir?
9  A.  It will be three years next Wednesday.
10  Q.  If you could, were you married prior
11  to -- previously, to another person?
12  A.  I was.
13  Q.  What was her name?
14  A.  Deborah Lavalle.
15  Q.  If you could, where were you born?
16  A.  Webster, Massachusetts.
17  Q.  If you could give me a summary of your
18  education?
19  A.  I graduated from Bartlett High School,
20  Webster, Mass. and then I have a master's degree
21  from the Western New England College.
22  Q.  What year did you graduate from Bartlett
23  High School?
24  A.  1972.

**10**

1  Q.  What year did you get your master's
2  degree from Western New England College?
3  A.  I think it was 2002.
4  Q.  How long have you been a police officer
5  for the Town of Webster?
6  A.  It will be twenty years in October.
7  Q.  I take it you've been a police officer
8  for the Town of Webster since sometime in October
9  of 1986?
10  A.  That is correct -- full time.
11  Q.  Were you a police officer for the Town
12  of Webster prior to -- in any capacity prior to
13  October of 1986?
14  A.  I was a part-timer for one year.  In
15  1985 I was appointed.
16  Q.  How long were you a part-timer?
17  A.  In the Town of Webster?
18  Q.  In the Town of Webster?
19  A.  Probably about a year -- most of the
20  year.
21  Q.  So from sometime in 1985 through 1986?
22  A.  Correct.
23  Q.  Were you a police officer for any other
24  town in any capacity prior to being employed by

**11**

1  the Town of Webster?
2  A.  I was a part-timer in the Town of Dudley
3  for five years from 1979 until 1985.
4  Q.  During that period of time were you also
5  employed in any other capacity?
6  A.  I was.
7  Q.  In what capacity was that?
8  A.  During my part-time for Dudley?
9  Q.  From 1979 to 1985?
10  A.  I worked at International Paper Company
11  in Putnam, Connecticut.
12  Q.  What type of work did you do for them?
13  A.  Corrugated factory.
14  Q.  Were you in the military service?
15  A.  I was.
16  Q.  What years were you in the military
17  service?
18  A.  I joined the military in 1974.  I was a
19  military police officer.
20  Q.  For how long were you in the service?
21  A.  Active service I was in for three years,
22  until 1977.
23  Q.  Did you continue in your military
24  service in any other capacity?

**12**

1  A.  I did.  I joined the National Guard --
2  Massachusetts National Guard in 1977 and I left
3  the National Guard I believe it was in 1990.
4        At that time I went from -- up the ranks
5  to the rank of captain and I went to the Army
6  Reserve.  I retired in 1995.
7  Q.  Where were you stationed in the Army
8  Reserve?
9  A.  First when I joined I was stationed in
10  the South station out in the old Fargo building in
11  Boston and then we moved our unit to Brockton.
12  Q.  What type of unit was it?
13  A.  I was originally an infantry officer in
14  the Guard but when I joined the Reserves we were
15  terminal transportation.  We loaded stips for
16  deployment and redeployment.
17  Q.  Have you retired from the Army Reserve?
18  A.  Yes, sir.
19  Q.  When you began your duties with the
20  Webster Police Department I believe you testified
21  in 1986?
22  A.  Correct.
23  Q.  As a full time, what were your duties
24  when you began your service with the Webster

JOHN A. BOLDUC vs.   TOWN OF WEBSTER ET AL
WILLIAM KEEFE          AUGUST 17, 2006

**41**

1  by the Chief.  It came to me and I -- he drafted
2  this letter up and I had to give it to Sergeant
3  Bolduc.
4       Q.   Aside from transmitting the memorandum
5  from the Chief to Sergeant Bolduc, did you have
6  any further involvement with the resolution of
7  that issue?
8       A.   I believe I did.
9       Q.   What was that?
10      A.   I had Sergeant Bolduc come in in the
11  morning for a meeting with the Chief and myself on
12  this issue.
13           We were in the booking room two.  The
14  Chief was upset because Sergeant Bolduc failed to
15  present any information on a serious incident the
16  night before -- or during this date.  The Chief
17  was very upset.
18      Q.   As a result of that interaction, did a
19  letter of reprimand in fact issue?
20      A.   I don't believe a letter of reprimand
21  was issued.  I think it was more of a verbal
22  warning, don't do it again.
23      Q.   With respect to the don't do it again,
24  was it because Bolduc's report was considered

**42**

1  incomplete by the Chief?
2       A.   There was not report at the time.
3       Q.   When you say at the time, you mean as of
4  the time that you had the meeting?
5       A.   No; I can't recall the exact date of the
6  meeting but on this date, May 14th, 2003, the next
7  morning if I recall correctly the Chief comes in
8  and he got a phone call from the family member of
9  the individual who lost an eye and he went to look
10 for some information on the call and there wasn't
11 any.
12           That's when he was upset because nothing
13 was -- he had nothing to tell these individuals
14 about the incident.
15      Q.   Was Sergeant Bolduc a shift sergeant at
16 that point?  Was he responsible for a shift?
17      A.   Yes, sir.
18      Q.   Do you recall what that shift was?
19      A.   Eleven to seven.
20      Q.   Do you recall if there was an arrest
21 made with respect to that incident?
22      A.   During this time?
23      Q.   Yes.
24      A.   No; I don't believe there was.

**43**

1       Q.   I believe you testified that Sergeant
2  Bolduc was warned about failing to report.  Was
3  that the issue with respect to the Chief at that
4  point?
5       A.   Not to report it; it was recorded on the
6  log -- on the police log.  What he failed to do I
7  believe was that he failed to enter a summary or a
8  gist of what happened that night.
9            The Chief had nothing to go by.  He had
10 no knowledge of any of the events occurring that
11 night on this case.
12      Q.   Aside from the log entry, the Chief
13 considered the information that was entered
14 inadequate?
15      A.   Correct.
16           MS. LYNCH:  Can I just have one
17 second?
18           MR. GREEN:  Sure.
19           (Pause in proceedings.)
20      Q.   (BY MR. GREEN)  Do you know Aaron Suss?
21      A.   Yes, sir.
22      Q.   Who is he?
23      A.   He's a patrolman in the Webster Police
24 Department.

**44**

1       Q.   Is he still with the Webster Police
2  Department?
3       A.   Yes, sir.
4       Q.   How long has he been with the Webster
5  Police Department?
6       A.   I can't say.  Again, he was an
7  auxiliary, went to an intermittent stage, and then
8  he became a full-timer so he's been there for
9  several years.
10      Q.   He's been a patrolman for his entire
11 tenure with the police department in Webster?
12      A.   Yes; that's correct.
13      Q.   At some point in 2003 you were --
14 assumed the position as chief -- acting chief,
15 would that be a fair statement?
16      A.   Yes, sir.
17      Q.   When did that occur?
18      A.   I believe it was in July of 2003.
19      Q.   What were the circumstances that led to
20 your appointment as acting chief?
21      A.   The town administrator put Chief
22 Bergeron on paid administrative leave.
23      Q.   Did the town administrator offer you any
24 explanation as to why he did that -- strike that.

45

1  That was Stephen Boudreau, was it not?

2      A.   Yes.

3      Q.   Did he offer any explanation as to why

4  he did that?

5      A.   He didn't -- I don't believe he offered

6  me an explanation.  He just appointed me.

7          It was common knowledge again in the

8  Department why he was on paid administrative

9  leave.

10     Q.   What was the common knowledge?

11     A.   Well, they put him on leave pending an

12 investigation through Judge Barton.

13         They hired a retired judge I believe to

14 do a mismanagement study on the Webster Police

15 Department.

16     Q.   Do you have any personal knowledge under

17 what circumstances it was that led to the

18 appointment of Judge Barton?

19     A.   Why they hired Judge Barton?

20     Q.   Yes.

21     A.   Again they claimed it was mismanagement.

22 There was problems within the police department.

23     Q.   When you say "they," who are the "they"?

24     A.   The selectmen are the ones who came up

46

1  with the idea of having a study done of the police

2  department.

3      Q.   Some time in July Stephen Boudreau

4  appoints you as the acting chief and at that point

5  was Chief Bergeron completely out of the picture?

6  Was he out of -- he was completely relieved of all

7  of his operational duties?

8      A.   Correct.

9      Q.   Did Mr. Boudreau give you any specific

10 instructions as to what you were to do with

11 respect to the Department during the conduct of

12 this study by Barton?

13     A.   He told me I was in charge of the police

14 department and I had full authority over the

15 police officers.

16     Q.   Did he have any specific areas that he

17 wanted you to pay particular attention to as a

18 result of -- during the period that you would be

19 acting as chief?

20         MS. LYNCH:  Objection; you can

21 answer.

22         THE WITNESS:  No.

23     Q.   (BY MR. GREEN)  Did he give you any

24 written instructions as to how to begin to conduct

47

1  your duties as chief?

2      A.   No; I don't recall.

3      Q.   Do you recall having any discussions

4  with Mr. Boudreau with respect to changes that you

5  wanted to make in the Department?

6      A.   As far as changes -- what kind of

7  changes?

8      Q.   Personnel changes.

9      A.   I had no -- my line of thinking was to

10 get back the police department in a stable manner,

11 basically.

12     Q.   Was it your opinion at the time you were

13 appointed as acting chief that the Department was

14 unstable?

15     A.   We had a lot of disgruntled police

16 officers; yes.

17     Q.   Did you have any particular ideas as to

18 how to put the Department on a stable basis?

19     A.   I had my own ideas; yes.

20     Q.   What were those?

21     A.   Treat everybody fairly and equally.

22     Q.   Who was it that you felt was responsible

23 for unequal treatment within the Department?

24     A.   I didn't feel it was one specific person

48

1  that was unfairly treating the Department but

2  there was -- Chief Bergeron overlooked a lot of

3  things and his deputy was going against a lot of

4  the people that didn't do things their way.

5      Q.   When you say their way, you mean --

6  you're referring to Ralph?

7      A.   Correct.

8      Q.   At the time I became acting chief,

9  what was Ralph's situation?

10     A.   I believe he was on paid administrative

11 leave also.

12     Q.   Did you appoint -- in your capacity as

13 acting chief, did you appoint any other officers

14 to act as a deputy or an administrative officer?

15     A.   I think after awhile I had Sergeant Bent

16 come to days and be the day shift supervisor

17 because I was -- I had my hands full.

18         I couldn't run the day shift operation

19 and do the assignment of the chief of police; and

20 also the secretary had resigned so I was doing

21 both jobs.

22     Q.   What particular tasks -- what were the

23 tasks that the Chief was performing that made it

24 difficult for him to perform without an assistant?

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**WILLIAM KEEFE        AUGUST 17, 2006**

---

65

1    Q.   Did you make any inquiry with Boudreau
2  as to when or how Ralph's status was going to be
3  resolved?
4    A.   I don't think we have ever had that
5  conversation.
6    Q.   Referring you back to this exhibit, were
7  Kelley and Bolduc's personnel files ever found?
8    A.   No, sir.
9    Q.   Did you inquire of -- did you have any
10  communications with Chief Bergeron after he
11  departed the Department?
12    A.   Very little communications.
13    Q.   Did you have any communication with him
14  about these personnel files?
15    A.   I asked him if he had any idea where
16  they might be.
17    Q.   What did he say?
18    A.   I don't recall.
19    Q.   Did you have any discussions with
20  Attorney Novick about these files?
21    A.   Yes; I did.
22        MS. LYNCH:  Attorney Novick?
23    Q.   (BY MR. GREEN)  I'm sorry, strike
24  that -- Officer Novick?

---

66

1    A.   Yes; I did.
2    Q.   Did he give you any indication as to
3  what happened with these personnel files?
4    A.   No; he did not.
5    Q.   Did he make any statement whatsoever
6  with respect to these files?
7    A.   I remember speaking to him in -- after
8  reading Ralph's letter here about the big large
9  envelope.
10        I mentioned that to, I believe, Officer
11  Novick and he didn't recall anything like that.
12    Q.   He didn't recall having received these
13  files from Ralph?
14    A.   That's his statement to me, to the best
15  of my recollection, sir.
16    Q.   Did the Chief give any indication of
17  having received the files?
18    A.   Not that I can recall at this point.
19        MR. GREEN:  If you can mark this,
20  please?
21        (Plaintiff's Deposition Exhibit
         No. 7 offered and marked.)
22
23    Q.   (BY MR. GREEN)  Sergeant, if you could
24  take a look at this document.

---

67

1        I'm going to ask you if you recognize
2  it? (Indicating.)
3    A.   (Witness examining document.)  I do.
4    Q.   This is dated November 19th, 2003 by
5  Thomas E. Pysell.  Who is Mr. Pysell?
6    A.   He was a police officer for the Town of
7  Webster.
8    Q.   Was this a statement that was solicited
9  by you from Officer Pysell?
10    A.   The original contents -- this was an
11  affidavit.
12        I asked -- I was doing an investigation
13  on an incident of abuse of Mr. Greenwood and asked
14  Pysell if he had any recollection of what went on
15  during that incident.
16    Q.   What prompted your investigation into
17  the incident involving Greenwood?
18    A.   A incident occurred with Sergeant Bolduc
19  abusing a -- or I should say I had received
20  pictures of Sergeant Bolduc squeezing a female
21  prisoner's face to get a mug shot.
22    Q.   From whom did you receive those
23  pictures?
24    A.   Officer Daniel Difusco.

---

68

1    Q.   As a result of seeing those pictures,
2  what did you do?
3    A.   I notified the town administrator.
4    Q.   Who was the town administrator at that
5  time?
6    A.   Ms. Leal.
7    Q.   When did you notify the town
8  administrator?
9    A.   I notified her the day I received --
10  well, back up.
11        I had knowledge of the incident maybe a
12  day or so earlier than I received the disk of
13  pictures.
14        I made Ms. Leal aware of it and then a
15  couple of days went by.  Then I received the disk
16  with the pictures on it and that afternoon I
17  showed Ms. Leal.
18    Q.   This was Abbe, do you recall?
19    A.   Catherine Abbe; yes.
20    Q.   Had Catherine Abbe filed a complaint?
21    A.   No.
22    Q.   Had you had any discussions prior to the
23  pictures of Catherine Abbe with Ms. Leal prior to
24  Sergeant Bolduc?

---

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
WILLIAM KEEFE                    AUGUST 17, 2006

69

1    A.   I just told you I informed her a couple
2  of days earlier that there was a possible abuse of
3  a prisoner.
4    Q.   When you say a prisoner, you're
5  referring to?
6    A.   Ms. Abbe.
7    Q.   Had you had any discussions with
8  Ms. Leal about Officer Bolduc prior to that,
9  informing her about the Abbe situation, about
10 Bolduc?
11   A.   About the Abbe situation?
12   Q.   No; had you had any conversations with
13 Ms. Leal about Sergeant Bolduc prior to the Abbe
14 situation?
15   A.   I don't know if I had any conversations
16 with -- specifically about John Bolduc.
17   Q.   You don't know?
18   A.   Well, what kind of conversation are you
19 looking for?
20   Q.   I'm just asking if --
21   A.   (Interposing) We might have.  She was my
22 boss and we talked about the police department.
23        Again, she was new.  I was filling her
24 in on the police department.  Sergeant Bolduc's

70

1  name could have popped up.
2    Q.   What is it about the Abbe situation that
3  prompted you to ask Pysell for an affidavit about
4  Greenwood?
5    A.   Because I had knowledge of other abuse
6  cases that Sergeant Bolduc was involved with.
7    Q.   Did Greenwood ever file a complaint?
8    A.   No.
9    Q.   As of November 19th, 2003 Greenwood had
10 not filed a complaint?
11   A.   Correct.
12   Q.   Is Officer Pysell still an officer with
13 the Webster police force?
14   A.   No.
15   Q.   On the fifth paragraph down of the first
16 page of this exhibit there are some notes --
17 handwritten notes.  Do you see those?
18   A.   Yes, sir.
19   Q.   Who placed that handwritten note down
20 there?
21   A.   That was my writing.
22   Q.   It's dated I believe by your signature
23 February 8th, '04, is that correct?
24   A.   I think it's the third, sir.  2/3/04.

71

1    Q.   2/3/04?
2    A.   Yes, sir.
3    Q.   How did that note happen to end up on
4  this affidavit of November 19th, 2003?
5    A.   During my investigation into the -- of
6  the alleged abuse cases I asked Mr. Pysell --
7  Officer Pysell if he had any knowledge of any
8  occurrence of the Greenwood case on I believe it
9  was -- during that time frame I asked him.
10        He produced this document and said to me
11 that this document was an affidavit he had made
12 and he gave to the Judge Barton's investigation.
13   Q.   This was an affidavit that Pysell
14 provided to Judge Barton?
15   A.   Yes.
16   Q.   When did you first see this affidavit?
17   A.   I believe it was a couple of days --
18 Officer Pysell dropped this off, said he completed
19 an affidavit, he gave it to me.
20        I reviewed it.  I called him back into
21 my office and I asked him after going over the
22 affidavit if, when he stated here that -- if I
23 might take a minute? (Witness examining document.)
24        When it says right above the writing,

72

1  "Sergeant Bolduc then struck Greenwood to make him
2  release his grip of Officer Gevry," I asked him
3  the question did he hit him once or did he hit him
4  more than once.
5        Officer Pysell stated to me he could
6  have hit him two or three times.  I said okay, is
7  that your recollection.  He said yes.  I said then
8  you only put that he struck Greenwood.  I said
9  would you write that he struck him two or three
10 times.  That's his writing, two or three times.
11 Those are his initials and that's his signature
12 with a date.
13   Q.   Again if you've already answered this,
14 when was it -- was the first time you saw this
15 affidavit in February of '04 or was it in November
16 of '03?
17   A.   No; February of '04.
18   Q.   So prior to February of '04 you had not
19 seen this affidavit?
20   A.   That is correct.
21   Q.   In the course of your discussions with
22 Pysell you arranged for him to effectively
23 supplement his answer on this affidavit that he
24 gave Judge Barton?

73

1    A.   Correct.
2    Q.   When did Officer Pysell leave the
3 Department?
4    A.   I think it was towards the end of 2005.
5        MR. GREEN:  Want to take a half hour
6 now?
7        MR. McCULLOUGH:  Sure.
8        MR. GREEN:  Why don't we take a half
9 hour.
10       (A luncheon recess was taken.)
11       (Plaintiff's Deposition Exhibit
         No. 8 offered and marked.)
12
13   Q.   (BY MR. GREEN)  Sergeant, I'm going to
14 give you a document which has been marked as
15 Exhibit 8 for the purposes of today's deposition.
16 It's a letter to Sergeant Bolduc dated
17 December 12, 2003 to Ms. Leal in which you are
18 cc'd.
19       She notes in paragraph one of Exhibit 8,
20 quote, "I've become aware of several incidences of
21 excessive and/or unnecessary force that you have
22 used during bookings and, calls and interviews,"
23 unquote.
24       Was it from you that she became aware of

74

1 these incidents? (Indicating.)
2        MS. LYNCH:  Objection; you can
3 answer.
4        THE WITNESS:  (Witness examining
5 document.)
6        I believe we had spoke about the other
7 incidents; yes.
8    Q.   (BY MR. GREEN)  When you say the other
9 incidents, you mean --
10   A.   (Interposing) That I was aware of
11 Sergeant Bolduc in abuse of other prisoners.
12   Q.   Specifically with the Abbe case which
13 was one that occurred in November of 2003, did it
14 not or do you recall?
15   A.   I believe it was in November, 2003.
16   Q.   How did you learn of a problem involving
17 Abbe?
18       MS. LYNCH:  Did you say Abbe?
19       MR. GREEN:  Abbe; right.
20       THE WITNESS:  It was brought to my
21 attention by an officer in the Department.  I
22 don't know which one informed me.
23   Q.   (BY MR. GREEN)  Was it Difusco?
24   A.   No.

75

1    Q.   It was not Difusco?
2    A.   No.
3    Q.   As a result of becoming aware that
4 something had occurred involving Abbe, what did
5 you do next?
6    A.   When I was aware of the incident with
7 Abbe I had a meeting in Holden with Officer
8 Difusco.
9        We were going to a grant seminar
10 meeting.  He was driving and at that point I
11 brought up to him that I was aware of an incident
12 that took place with a female and Sergeant Bolduc
13 to Officer Difusco.
14   Q.   Do you recall who the officer was that
15 brought it to your attention?
16   A.   I don't recall who told me.
17   Q.   Did you keep any written memorandum of
18 that?
19   A.   No.
20   Q.   As a result of your discussions with
21 Officer Difusco, what happened?
22   A.   When I mentioned that to Officer
23 Difusco.  I caught him off guard and he was
24 surprised that I had found out.

76

1    Q.   Did you instruct him to do anything as a
2 result of your interaction with him at that point?
3    A.   No; I asked him exactly what happened.
4 At that point he told me that he had brought in an
5 unruly female.  They were in the booking room, him
6 and Officer Young.  She wasn't cooperating taking
7 a mug shot.
8        Sergeant Bolduc came in and squeezed her
9 face, pried her eyes open with his other hand
10 after he squeezed her jaw and Sergeant Bolduc told
11 Officer Difusco to snap the photo.
12   Q.   After Difusco told you that what
13 happened?
14   A.   During that same conversation Difusco
15 also told me that after the whole incident was
16 over and Abbe was placed in the cell, he had
17 deleted the pictures from the camera.
18   Q.   What did you do then?
19   A.   I went on to the meeting we were
20 supposed to go to and came back.
21   Q.   At any point did you direct Difusco to
22 do anything further?
23   A.   No.
24   Q.   I believe you testified earlier that he

77

1  provided you with some pictures?
2      A.  At a later point.
3      Q.  You were at this point the superior
4  officer of the Department, were you not?
5      A.  Yes, sir.
6      Q.  Did you confront Sergeant Bolduc with
7  respect to the Abbe incident?
8      A.  Initially, no.
9      Q.  Did you inform Ms. Leal of the situation
10  prior to addressing it with Sergeant Bolduc?
11      A.  Yes.
12      Q.  Would it be a fair statement to say as
13  of the date that this letter was received by
14  Bolduc, you had not talked to him about the Abbe
15  incident?
16      A.  I spoke to him this day.  He came in at
17  three o'clock.
18      Q.  Was it for the purposes of getting this
19  letter?
20      A.  No; that's the day I received the
21  pictures.
22      Q.  You received the pictures on
23  December 12th?
24      A.  It's either the twelfth or the eleventh,

78

1  one of those days.  I can't recall exactly what
2  day right now it was either that morning or
3  the day before but I think it was -- I can't
4  exactly.
5          It's either the day before, the eleventh
6  or the twelfth.
7      Q.  I believe you just testified that you
8  informed Ms. Leal about the situation prior to
9  addressing it with Sergeant Bolduc?
10      A.  Yes; when I first found out about it.
11      Q.  Was there any point at which you
12  addressed this issue with Sergeant Bolduc prior to
13  the issuance of this letter?
14      A.  We -- myself and Sergeant Bolduc
15  discussed this letter that afternoon prior to him
16  getting this, about the pictures.  I had told him
17  I received pictures.
18      Q.  But this letter was already in the
19  process of being produced, was it not?
20      A.  After I showed the pictures to Ms. Leal
21  we decided to -- she decided to tell him that
22  we're going to put him on paid administrative
23  leave pending investigation.
24      Q.  Was it at the same time you related the

79

1  circumstances of the Abbe situation that you
2  informed Ms. Leal of the other incidences that are
3  referred to in paragraph one or had you done that
4  prior to discussing the Abbe incident?
5      A.  I think when I informed Ms. Leal of the
6  Abbe incident -- the original notification that I
7  had received prior to the pictures -- I informed
8  her of an abuse case before she heard it from
9  somebody else.
10          At that point we discussed other -- I
11  told her about the other incidences that I was
12  aware of.
13      Q.  You're referring to Greenwood I'd
14  imagine is one?
15      A.  Correct.
16      Q.  What was the other one?  Mayotte, is it
17  not?
18      A.  Correct.
19      Q.  Were you aware of -- did Mayotte ever
20  file a complaint?
21      A.  No, sir.
22      Q.  How did you learn of Mayotte?
23      A.  By Officer Kelley right after the
24  incident occurred.

80

1      Q.  Which was over a year earlier, right?
2      A.  I believe it was.
3      Q.  How did Officer Kelley happen to inform
4  you?
5      A.  She was present when it took place.
6      Q.  In fact she was the arresting officer,
7  was she not?
8      A.  I believe so; yes.
9      Q.  She left the station before the booking
10  process was complete, did she not?
11      A.  She left the room after the bolt cutters
12  incident; yes.
13      Q.  Were you aware of the incident involving
14  Greenwood having been investigated previously?
15      A.  No.
16      Q.  What did you do with the information you
17  received from Officer Kelley about the Mayotte
18  incident?
19      A.  I went to -- I believe it was either the
20  next day or the next time I saw Deputy Chief Ralph
21  at the station and I asked him if it was true and
22  if he saw what happened.
23      Q.  What did Ralph relay to you?
24      A.  He made the comment that he was there,

**81**

1  he left the room, he went to get his keys and he
2  left the station and went home.
3      Q.  Did you file a complaint?
4      A.  Did I file a complaint?
5      Q.  Yes.
6      A.  No.
7      Q.  Did you recommend that Officer Kelley
8  file a complaint?
9      A.  No.
10     Q.  Did you ever interview Mayotte?
11     A.  He died.  He was deceased.
12     Q.  As of when?
13     A.  Shortly after he got arrested.
14           MR. GREEN:  This is 9.
15           (Plaintiff's Deposition Exhibit
             No. 9 offered and marked.)
16
17     Q.  (BY MR. GREEN)  Sergeant, if you could
18 look at this document which has been marked as
19 Exhibit 9 for the purposes of this deposition.
20         I'll ask if you recall this memo?
21 (Indicating.)
22     A.  (Witness examining document.)  Yes, sir;
23 that's from me.
24     Q.  That was issued at, it looks like

**82**

1  six-thirty p.m. December 12th, the same date as
2  Exhibit 8.
3          I believe you said that you talked to
4  Bolduc on that afternoon?
5      A.  I talked to him when he came in on his
6  shift at three o'clock.
7      Q.  Did you deliver him the letter that day?
8      A.  This letter?
9      Q.  Yes.
10     A.  Exhibit 8?
11     Q.  Yes.
12     A.  Ms. Leal brought it to the station.
13     Q.  Did she deliver it to John Bolduc?
14     A.  Yes.
15     Q.  In hand?
16     A.  Yes.
17     Q.  Was that before or after you issued this
18 memorandum?
19     A.  This was given to him before I sent out
20 the memorandum.
21     Q.  Were you aware at the time you talked to
22 Bolduc that Ms. Leal was going to issue an
23 administrative leave?
24     A.  Was I aware of it?

**83**

1      Q.  Were you aware before talking to Bolduc
2  that he was going to be placed on administrative
3  leave?
4      A.  Yes.
5      Q.  Did you inform him of that?
6      A.  I believe I might have because I had to
7  keep him in my office until Ms. Leal arrived at
8  the police station.
9      Q.  Did you have authority as the Chief to
10 have placed him on any type of suspension or paid
11 administrative leave?
12     A.  I believe as the Chief of Police you do;
13 yes.
14     Q.  Why didn't you do that on your own?
15     A.  Well, I'd been the acting chief probably
16 about five months.  I'm not -- wasn't sure of all
17 the things that the Chief of Police could and
18 could not do.
19         That's why I looked at the town
20 administrator for advice most of the time.
21     Q.  Prior to December 12th -- strike that.
22 Did you have the conversation with Ms. Leal that
23 led to the letter of December 12th on the twelfth
24 or on the eleventh?

**84**

1      A.  I'm not sure exactly how the dates fell.
2  When I received the disk with the pictures on it
3  is when I showed Ms. Leal.
4      Q.  Did you have any communications with
5  Ms. Leal about Bolduc and this situation that were
6  communicated by e-mail?
7      A.  I don't believe so.
8      Q.  Did you use e-mail?
9      A.  Yes; I used e-mail.
10     Q.  Did you ever communicate with the town
11 administrator using e-mail?
12     A.  Probably.
13     Q.  How did you first inform her of the Abbe
14 incident or situation?
15     A.  I either called her up or I was down at
16 her office.
17         Like I said, there was a lot of things
18 going on and I had to get advice from the town
19 administrator.
20     Q.  Would it be a fair statement to say that
21 at no time prior to the letter of December 12th,
22 2003 was Bolduc counseled by you regarding the use
23 of force during the booking procedure?
24     A.  Against Abbe?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
WILLIAM KEEFE          AUGUST 17, 2006

89

1     A.   The questions and answers I just had him
2  sign to verify that he was asked those questions.
3     Q.   And that's his signature on the last
4  page?
5     A.   Yes, sir.
6          MR. GREEN:  Mark that.
7          (Plaintiff's Deposition Exhibit
              No. 12 offered and marked.)
8
9     Q.   (BY MR. GREEN) If you could look at
10 what's been marked as Exhibit Number 12 and let me
11 ask you if you recognize that? (Indicating.)
12    A.   (Witness examining document.)  Yes, sir.
13    Q.   What is that?
14    A.   This looks like a report from Officer
15 Kelley about the Mayotte case.
16    Q.   Was that a report prepared at your
17 direction?
18    A.   This looks like a report that was a
19 report taken from our in-house management -- our
20 recordkeeping, so -- no, this was already done by
21 Officer Kelley.
22    Q.   What would explain the date as being
23 an '03 date when the Mayotte incident happened
24 in '02?

90

1     A.   Probably the date when it was printed
2  off.  I don't know.  I don't know why that 12/29
3  is there.
4     Q.   Did Officer Kelley ever make any
5  supplemental statements at your direction for the
6  purpose of facilitating your investigation of
7  Sergeant Bolduc?
8     A.   I think I used the record that she had
9  written.
10         MR. GREEN:  Mark that.
11         (Plaintiff's Deposition Exhibit
              No. 13 offered and marked.)
12
13    Q.   (BY MR. GREEN) Sergeant, do you
14 recognize this note? (Indicating.)
15    A.   Yes; I do.
16    Q.   Is that your handwriting?
17    A.   It is.
18    Q.   There's two different dates on this.
19 There's a note -- appears to be a note of
20 December 29th, '03.  Do you recall the
21 circumstances under which you made that initial
22 note?
23    A.   (Witness examining document.)  The one
24 on the top, sir?  12/29/03?

91

1     Q.   Yes.
2     A.   I think that's when I spoke to Officer
3  Pysell about his recollection of the Greenwood
4  case.
5     Q.   What is the note below that?
6     A.   That's what he told me at that time and
7  where it was changed in his affidavit later on.
8     Q.   What is it that you took it to mean --
9  is it your note -- all of writing here is yours?
10    A.   This was on one of those pink little
11 sticky pads.
12    Q.   What is the "stated he never said that
13 to Bolduc" represent?
14    A.   I had information that got back to me
15 that -- I can't recall exactly but I asked Tommy
16 when he came into my office on this other date,
17 2/12.  I asked him what he said to Bolduc and
18 that's when I wrote down he states he never said
19 that to Bolduc.
20         I don't recall what the question was at
21 this time.
22    Q.   The interaction that led to you making
23 that note is not in your present memory?
24    A.   Yes; at this time I don't recall what

92

1  the exact question was.
2     Q.   Did Officer Pysell --
3     A.   (Interposing) Oh, yes, I do.  I do.  The
4  question was that it got back to me that I forced
5  Pysell into writing, changing his affidavit to
6  write two to three times when I asked him are you
7  sure he didn't hit him more than once.  It got
8  back to me that Bolduc was saying that I forced
9  Tommy Pysell into changing his affidavit.  That's
10 when I specifically asked Tommy Pysell on this
11 date, 2/12.
12         I told him I was told I forced you into
13 changing your statement and he says I never said
14 that to John Bolduc.  That's what that is.
15    Q.   Did Officer Pysell ever relate to you
16 that at the time Bolduc struck Greenwood that
17 Officer Gevry was being attacked by Greenwood?
18    A.   That's what they said in their reports.
19         MR. GREEN:  Would you mark that?
20         (Plaintiff's Deposition Exhibit
              No. 14 offered and marked.)
21
22    Q.   (BY MR. GREEN) 14, do you recognize
23 that document? (Indicating.)
24    A.   Yes, sir.

PERLIK and COYLE REPORTING

105

1           MS. LYNCH: Objection; you can
2    answer.
3           THE WITNESS: I don't know how Chief
4    Bergeron did it.
5      Q.   (BY MR. GREEN) I take it then that when
6    you began your investigation after December 12th,
7    2003 there were no Departmental records other
8    than -- there were no Departmental records of any
9    inquiries into the Mayotte incident?
10     A.   I have no knowledge of that.
11     Q.   I take it then that by that -- did you
12   look for any within the Department prior to
13   initiating your investigation?
14     A.   The Mayotte incident -- the incident
15   report was where it was supposed to be.
16          There was no investigation outside the
17   normal incident.
18     Q.   An incident report?
19     A.   Yes, sir.
20     Q.   This was actually Greenwood so this was
21   investigating the alleged mishandling by Bolduc
22   with respect to the Greenwood incident.
23          I guess my question is: Were there any
24   records associated with the Greenwood incident

106

1    other than the incident report available to you
2    when you began your investigation?
3      A.   No.
4      Q.   Are you aware of any contact ever being
5    made by Greenwood with the Webster Police
6    Department subsequent to this investigation --
7    this inquiry by Ralph?
8           MS. LYNCH: Objection; you can
9    answer.
10          THE WITNESS: There was contact with
11   Greenwood to the Webster Police Department after
12   this.
13     Q.   (BY MR. GREEN) What was the nature of
14   that contact?
15     A.   Of Greenwood?
16     Q.   Let me hone in on it. Were you present
17   when Greenwood made a phone call to the Webster
18   Police Department?
19     A.   Yes.
20     Q.   Indicating that someone had contacted
21   him and informed him that there was an
22   investigation of Bolduc underway?
23     A.   Yes.
24     Q.   How did you happen to be present for

107

1    that?
2      A.   That day Sergeant Bolduc came downstairs
3    to my office -- at that time my office was
4    downstairs. He sat across from me on the desk and
5    he made -- was talking about this case Greenwood
6    that he just had in court, how he spoke to
7    Greenwood about the case in East Brookfield.
8           He tells me Greenwood wanted to have him
9    go to the judge and work out some deal. It didn't
10   work out and John said he couldn't do that and
11   Greenwood left the Court prior to his -- the Court
12   case so he was in default.
13          The phone happens to ring. I pick up
14   the phone not knowing who this person was and he
15   mentions that his name is Greenwood. Again, I had
16   no knowledge of this Greenwood incident. I put
17   him on speaker phone because Sergeant Bolduc who
18   was sitting across from me was just talking about
19   this person.
20          Not knowing anything of anything -- any
21   abuse or anything about this guy when Greenwood
22   says that he had received an anonymous letter
23   saying that he wanted to bring charges or file a
24   complaint against Sergeant Bolduc. I believe that

108

1    was the conversation.
2    .       I said, well, Sergeant Bolduc is right
3    here, you can talk to him yourself and Sergeant
4    Bolduc spoke to him on speaker phone. It was
5    given back to me. I told him that if you wanted
6    us to investigate this I would be happy to look at
7    it -- the paperwork that he received in the mail;
8    the anonymous letter -- but of course he wasn't
9    going to come in because he had a warrant.
10          I told him just to fax it to me. I gave
11   him the fax number and I never heard anything else
12   after that.
13     Q.   At that point in time you were in a
14   capacity as a sergeant, is that right?
15     A.   I don't know what capacity. I could
16   have been the assistant deputy; I'm not sure.
17     Q.   At some point later, in fact in July
18   of -- actually November of 2004 you were present
19   at the East Brookfield District Court when
20   Greenwood's case came before the Court again, were
21   you not?
22     A.   Yes.
23     Q.   In fact you and Ms. Leal both were
24   present that day, do you recall?

109

1    A.   I don't recall Ms. Leal being at the
2  Courthouse.
3    Q.   Would it have been -- were you aware
4  that Greenwood's attorney had requested the
5  personnel records of Sergeant Bolduc for
6  consideration by the District Court in resolution
7  of his case?
8    A.   No.
9    Q.   Was it in your capacity as chief,
10 because in November of 2004 you were the interim
11 chief or provisional chief at that point, were you
12 not?
13   A.   Yes, sir.
14   Q.   Was it common practice for you to attend
15 District Court sessions as the Court officer for
16 the Department?
17   A.   I did it on occasion; yes.
18   Q.   How often would you do it?
19   A.   It wouldn't be that often.  Just when
20 the Court officer wasn't there.
21   Q.   Were you consulted -- do you recall
22 being there in November of 2004 for the
23 disposition of Greenwood's case before the East
24 Brookfield District Court?

110

1    A.   Yes, sir; I was.
2    Q.   Were you consulted as to the disposition
3  that Greenwood would receive by the district
4  attorney?
5    A.   I spoke with the district attorney.
6    Q.   As a result of the appearance that day,
7  are you aware of what the disposition was for
8  Greenwood?
9    A.   No; I don't.  I can't say.  I know there
10 was some charges dismissed but I don't know the
11 disposition.
12   Q.   At a later point in time, in fact
13 specifically at the civil service hearings that
14 were conducted in Boston involving Sergeant
15 Bolduc's appeal to the Civil Service Commission,
16 did you obtain the testimony of Greenwood to be
17 entered as evidence against Sergeant Bolduc?
18   A.   Yes.
19   Q.   Did you in fact solicit that testimony
20 from him at the Worcester County House of
21 Correction?
22   A.   I did.
23   Q.   Do you have a recollection of Sergeant
24 Bolduc being referred for assessment by Leo

111

1  Polizoti?
2    A.   Yes, sir.
3    Q.   At whose initiative was that reference
4  done?  Was that by you?
5    A.   I don't believe so.
6    Q.   How did that happen to take place?
7    A.   I believe myself and Ms. Leal had a
8  conversation and we -- it was brought up to send
9  him for a fit-for-duty screening.
10   Q.   Was it a common practice -- was it a
11 standard practice of the Webster Police Department
12 to refer officers for a fit-for-duty screening?
13   A.   I guess it's not a practice but it has
14 happened.
15   Q.   Can you recollect any other officers
16 aside from Sergeant Bolduc that had been referred
17 to a fit-for-duty screening by the Webster Police
18 Department?
19   A.   I can.
20   Q.   Whom might they be?
21   A.   Can I say?
22       MS. LYNCH:  Do you need to talk to
23 me?  Can I just have a moment with him?
24       MR. GREEN:  Sure.

112

1        (A recess was taken.)
2    Q.   (BY MR. GREEN)  Do you want me to
3  restate that question?
4    A.   Please.
5        MR. GREEN:  Could you read that
6  back?
7            (Reporter read back as
              requested.)
8
9        THE WITNESS:  Can we go back further
10 than that?
11           (Reporter read back as
              requested.)
12
13       THE WITNESS:  I believe I answered
14 yes.
15       At this time I don't feel comfortable
16 under the HIPA rule that I should refer to any
17 other officer by name and for where they went or
18 what they went for.
19   Q.   (BY MR. GREEN)  Well, without reference
20 to -- were any other additional officers referred
21 for that purpose during your tenure as acting
22 chief?
23   A.   For what purpose?
24   Q.   A fit-for-duty evaluation?

**117**

1    A.   Right.
2    Q.   There was a disciplinary hearing
3 involving Deputy Chief Ralph in December of 2003.
4 Did you participate in that hearing?
5    A.   I don't believe so.  I'm not a hundred
6 percent sure.
7    Q.   You were the acting chief at the time?
8    A.   I was but this was prior to me taking
9 over.
10    Q.   When you say this was prior?
11    A.   I mean his -- when he was on paid
12 administrative leave.  I didn't put him on paid
13 administrative leave.
14        I think it was whatever it was that put
15 him on paid administrative leave so I don't
16 believe I had anything to do with that hearing.
17    Q.   Were you aware that Bolduc testified at
18 that hearing on behalf of Deputy Chief Ralph?
19    A.   Not that I recall.
20    Q.   Have you had occasion to review the
21 transcript of the disciplinary hearing for Deputy
22 Chief Ralph?
23    A.   No.
24    Q.   Never?

**118**

1    A.   I have read so many reports, I don't
2 even know who did the hearing or anything about
3 it; no.
4    Q.   Did you have any conversations with
5 Ms. Leal about the Ralph hearings?
6    A.   Probably.  We probably had because there
7 was going to be -- there was going to be hearings
8 I think after the Bolduc hearings with Ralph.
9    Q.   Ralph's initial hearing was in December
10 of 2003?
11    A.   Okay.
12    Q.   As I understand your testimony you're
13 telling me you don't believe that you played any
14 role in that hearing?
15    A.   I don't have any recollection of --
16 unless it was for the -- I'm just trying to think
17 back.
18    Q.   For the record, I'll tell you that
19 Ralph's hearing was on December 9th, 2003 and
20 Bolduc testified.
21        I guess my question is:  Did you have
22 any discussions after December 9th, 2003 with
23 Ms. Leal regarding the fact that Bolduc had
24 testified on behalf of Ralph?

**119**

1    A.   If he testified on behalf of Ralph
2 that's his doing, that's not my doing.
3    Q.   Well, that wasn't my question.  The
4 question is:  Were you advised or informed in any
5 fashion by Ms. Leal that Bolduc had testified on
6 behalf of Ralph at that hearing -- at Ralph's
7 hearing in December?
8    A.   No; I don't recall the hearing.  I just
9 don't have any recollection of that hearing.
10    Q.   Aside from the hearing, do you recall
11 having any discussions with Ms. Leal about
12 Bolduc's testifying at the Ralph hearing?
13    A.   In December of 2003?
14    Q.   Yes, sir.
15    A.   No.
16    Q.   Did you ever -- were you aware that
17 Chief Bergeron had removed Bolduc from the Amato
18 investigation?
19    A.   Yes, sir.
20    Q.   He was working with another officer on
21 that.  Do you recall who that was?
22    A.   Derrick Stokes.
23    Q.   Is Derrick Stokes still a police officer
24 with the Town of Webster?

**120**

1    A.   No.
2    Q.   Do you know to where he moved on?
3    A.   I want to say Weston.  I'm not a hundred
4 percent sure.
5    Q.   At any time while you were in the
6 capacity as acting chief, did you reassign
7 officers to the Amato investigation?
8    A.   I would have to say yes to that.
9    Q.   Did you testify in Sergeant Bolduc's
10 hearing?
11    A.   Which one?
12    Q.   The one in March of 2003 that was
13 conducted by Ms. Leal?
14    A.   I believe I did; yes.
15    Q.   Did you instruct officers for the
16 Webster Police Department to avoid the Town Hall
17 on the night of Bolduc's civil service hearing in
18 front of Ms. Leal?
19    A.   No.
20    Q.   In April and May of 2003 you were a
21 sergeant on the Webster Police Department.
22        Were you serving in the capacity at that
23 point of the administrative sergeant?  This was
24 subsequent to Ralph being placed on administrative

JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL
WILLIAM KEEFE          AUGUST 17, 2006

125

1    Q.    As a group?

2    A.    Yes, sir.

3    Q.    When you were appointed as acting chief,

4    did that result in any compensation changes for

5    you?

6    A.    Not in the beginning; no.

7    Q.    At some point did you end up getting

8    compensated over and above your -- what had been

9    your sergeant's pay?

10   A.    Yes.

11   Q.    Was that coincident with you being

12   appointed as the provisional police chief?

13   A.    Yes.

14   Q.    When did that happen?

15   A.    It might have been around the beginning

16   of '05 maybe. I'm not a hundred percent sure.

17   Actually it was '04 because I got paid as the

18   provisional chief for two years.

19   Q.    I take it you continued in that capacity

20   until when?

21   A.    December of '05.

22   Q.    Were you -- I think you testified

23   earlier that you recall that you did take the exam

24   to be considered for permanent appointment as

126

1    chief?

2    A.    Yes.

3    Q.    During the period of time that you

4    served as a police officer for the Town of Webster

5    were you ever present when Brian Barnes made any

6    racially inappropriate remarks?

7    A.    No.

8    Q.    Were you aware of complaints by other

9    officers that he had done so?

10   A.    There were rumors.

11   Q.    Were the rumors being distributed by

12   members of the Webster Police Department?

13   A.    I think they were distributed by both

14   police officers and citizens.

15   Q.    You personally never had the occasion to

16   actually hear him make such a remark?

17   A.    No; no, sir.

18       MR. GREEN:  Okay. Thank you.

19       MS. LYNCH:  All set?

20       MR. GREEN:  Yes.

21       (The deposition was concluded.)

22              * * * * *

23

24

127

1              SIGNATURE PAGE - ERRATA SHEET

2        To be signed by deponent and returned to
3    counsel within thirty (30) days.

4        I, the undersigned, WILLIAM KEEFE, do
     hereby certify that I have read the foregoing
5    transcript of my testimony given in the matter of
     JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL, on
6    AUGUST 17, 2006 and that, to the best of my
     knowledge, said transcript is true and accurate
7    (with the exception of the following corrections
     listed below:)

8

9

10   PAGE : LINE:  CHANGE AND REASON

11   ___ : ___ : _____

12   ___ : ___ : _____

13   ___ : ___ : _____

14   ___ : ___ : _____

15   ___ : ___ : _____

16   ___ : ___ : _____

17   ___ : ___ : _____

18   ___ : ___ : _____

19   ___ : ___ : _____

20   DEPONENT'S SIGNATURE: _____

21   Signed under the pain and penalties of perjury
     this____ of _____ , 2006.
22

23   NOTARY PUBLIC

24   My Commission expires: _____

128

1    COMMONWEALTH OF MASSACHUSETTS
          COUNTY OF HAMPDEN
2

3        I, JOANNE COYLE, a Notary Public within and
     for the Commonwealth of Massachusetts at large, do
4    hereby certify that I took the deposition of
     WILLIAM KEEFE, pursuant to the Federal Rules of
5    Civil Procedure, at the offices of Morrison
     Mahoney, LLP, 10 Chestnut Street, Worcester,
6    Massachusetts, on AUGUST 17, 2006.

7        I further certify that the above-named
     deponent was by me first duly sworn to testify to
8    the truth, the whole truth and nothing but the
     truth concerning his knowledge in the matter of
9    the case of JOHN A. BOLDUC vs. TOWN OF WEBSTER ET
     AL, now pending United States District Court,
10   District of Massachusetts.

11       I further certify that the within testimony
     was taken by me stenographically and reduced to
12   typewritten form under my direction by means of
     COMPUTER ASSISTED TRANSCRIPTION; and, I further
13   certify that said deposition is a true record of
     the testimony given by said witness.

14       I further certify that I am neither counsel
     for, related to, nor employed by any of the
15   parties to the action in which this deposition was
     taken; and further, that I am not a relative or
16   employee of any attorney or counsel employed by
     the parties hereto, nor financially or otherwise
17   interested in the outcome of the action.

18       WITNESS my hand and seal this _____day of
     SEPTEMBER, 2006.
19

20       _____
          Joanne Coyle
21       Notary Public
          Certified Shorthand Reporter
22       License No. 106693

23   My Commission Expires
     May 12, 2011
24

PERLIK and COYLE REPORTING