UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:05-CV-40030-FDS

| | |
|---|---|
| JOHN A. BOLDUC, JR., | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF WEBSTER, ROBIN LEAL, | ) |
| RICHARD BERGERON and WILLIAM | ) |
| KEEFE, | ) |
| Defendants | ) |

## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS', TOWN OF WEBSTER, RICHARD BERGERON AND WILLIAM KEEFE, MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

This is an action brought by John A. Bolduc, Jr., a former police officer with the Town of Webster Police Department, against the Town of Webster, a former Webster Town Administrator, and two former Webster Police Chiefs, alleging civil rights violations, employment discrimination and retaliation, both individually and in their official capacity. *42 U.S.C. § 1983; 42 U.S.C. § 1985(3);* Title VII, *M.G.L. c. 12, § 11I; M.G.L. c. 151B, § 4* and *M.G.L. c. 149, § 185.*

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

## Parties

1.    The plaintiff, John A. Bolduc, Jr. ("Bolduc"), was appointed to the Webster Police Department in March 1995 and terminated on March 19, 2004.[2]

---

[1] The defendants do not dispute these facts for purposes of summary judgment only.
[2] *See* First Amended Complaint at ¶¶ 18 and 66.

2.     The defendant, the Town of Webster ("Town"), is a municipal corporation located in Worcester County, Massachusetts.[3]

3.     The defendant, Richard Bergeron ("Bergeron"), was appointed Chief of the Webster Police Department in June 1996.  He was placed on paid administrative leave on July 14, 2003 and subsequently retired in early 2004[4].  Bolduc is suing Bergeron both individually and in his capacity as Chief of Police.[5]

4.     The defendant, William Keefe ("Keefe"), became the Acting Chief of the Webster Police Department on or about July 16, 2003.  Bolduc is suing Keefe both individually and in his capacity as Chief of Police.[6]

5.     The defendant, Robin Leal ("Leal"), was appointed the Town Administrator on October 1, 2003.  She resigned this position in February 2005.  Bolduc is suing Leal both individually and in her capacity as Town Administrator.[7]

## Other Key Individuals

6.     Thomas Ralph ("Ralph") became a police officer in 1996.  He was promoted to sergeant in August 1999.  Ralph was appointed Acting Deputy Chief in October 2001.  He was appointed Deputy Chief in October 2002[8].

7.     Mark Stankiewicz  ("Stankiewicz") was the Town Administrator from January 23, 1993 until April 15, 2003.[9]

8.     Steven Boudreau ("Boudreau") was the Town Administrator from April 2003 until October 2003 when Leal was appointed.[10]

---

[3] *See* First Amended Complaint at ¶ 11.
[4] Exhibit 1, Deposition of Richard Bergeron at pp. 5-6.
[5] *See* First Amended Complaint at ¶¶ 13 and 46.
[6] *See* First Amended Complaint at ¶ 47.
[7] *See* First Amended Complaint at ¶¶ 12 and 49.
[8] Exhibit 2, Deposition of Thomas Ralph at pp. 10-12.
[9] *See* First Amended Complaint at ¶ 39.

9.      Brian Barnes ("Barnes") was a police officer with the Town of Webster Police Department at all times relevant hereto.[11]

## Chronology of Events

10.     In March 1995, Bolduc became a police officer with the Webster Police Department.[12]

11.     On October 22, 2001, Bolduc was promoted to Provisional Sergeant.[13]

12.     In June 2002, a civil service examination was conducted and oral interviews were held for the position of sergeant.  There were three candidates for the position:  Bolduc, Officer Michaela Kelley, and Officer Aaron Suss.[14]

13.     On June 30, 2002, Bolduc was promoted to Sergeant.[15]

14.     Bolduc was promoted to Sergeant by Chief Bergeron despite the fact that Bolduc did not receive the highest score on the civil service examination.  Bolduc was appointed following an oral interview on June 13, 2002 in which he scored the highest grade.  Michaela Kelley had received the highest score on the civil service exam[16].

## Racial Comments By Barnes and Cheating Allegations Against Bolduc and Ralph

15.     According to Bolduc, on February 22, 2003, Bolduc, Ralph and Barnes, as well as several other Town employees, were having lunch at the Colonial Club Restaurant in the Town of Webster to celebrate the birthday of the Town Administrator's Secretary, Heidi Courtenay.[17]

16.     During this luncheon, Barnes reportedly related the following story:

---

[10] *See* First Amended Complaint at ¶¶ 46, 47, 48, 49.
[11] Exhibit 3, Deposition of Brian Barnes at p.35.
[12] *See* First Amended Complaint at ¶ 18.
[13] *See* First Amended Complaint at ¶ 20.
[14] Exhibit 1, Deposition of Richard Bergeron at pp. 40-41.
[15] *See* First Amended Complaint at ¶ 21.
[16] Exhibit 1, Deposition of Richard Bergeron at pp. 41-42
[17] The other employees were Lee Ellen Olmstead, Pamela Leduc and Heidi Courtenay.  *See* First Amended Complaint at ¶¶ 22 and 34 and Exhibit D thereto.

> ... about an unpleasant airplane flight he had recently taken. He first began talking about an overweight woman who was seated in front of him....
>
> Officer Barnes then elaborated as to why he did not find the flight pleasant, at one point stating, "I had to sit in the middle seat between two niggers. I felt like a fuckin' orea cookie...."[18]

17.    Bolduc admits that he never witnessed Barnes make any racial statement at any other time. He also admits that he has never observed Barnes treat someone of a different racial background differently.[19]

18.    Bolduc further admits that he has never heard either Bergeron or Keefe make racist comments.[20]

19.    On March 6, 2003, Barnes informed Detective Michael Shaw, a union representative, that he believed that Bolduc cheated on the oral interview for the position of sergeant.[21]

20.    According to Barnes, he was in a room with Deputy Chief Ralph on the night before the interview and he heard Ralph reading the oral interview questions to Bolduc over the phone. Barnes claims that he remembers the questions "vividly." Ralph reportedly told Barnes "not to 'fucking say anything to anybody' about the conversation."[22]

21.    On March 6, 2003, Barnes told Officer Kelley and Bergeron about the cheating allegations. However, he did not prepare a written report.[23]

---

[18] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 54-56; _see also_ First Amended Complaint at ¶¶ 22 and 34 and Exhibit D thereto.
[19] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 56-57 and 64.
[20] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 59.
[21] Exhibit 5, Report from Barnes to Bergeron dated April 17, 2003; Exhibit 8, Letter to Bergeron from Shaw, dated April 25, 2003.
[22] Exhibit 5, Report from Barnes to Bergeron dated April 17, 2003.
[23] Exhibit 3, Deposition of Brian Barnes at pp. 130-133.

22.     On April 15, 2003, over one month after Barnes made the allegation that Bolduc and Ralph cheated on the sergeant's oral interview, Ralph went into Bergeron's office and dropped a letter on Bergeron's desk purporting to be a "formal complaint" against Barnes for acting in a "manner that is racist, slanderous and libelous."[24]

23.     Ralph reported that Barnes, while on duty, made racist statements in public by referring to "blacks as 'niggers,' Hispanics as 'spics' and Asians as 'chinks.'  Ralph also noted that, in early 2003, the Webster Police Department had received negative media publicity because Barnes was "the number one Officer in the state failing to comply with the state mandated racial profiling law.[25]

24.     Reportedly, Bergeron became upset and threw Ralph out of his office.[26]

25.     Ralph left the police station and drove to the Town Hall to see Town Administrator Stankiewicz about the matter.  Stankiewicz could not take any action, however, as it was his last day in office.  Ralph then drove around making phone calls.  He received a message from the dispatcher that he should return to the station and report to Bergeron.  Ralph did not comply until after attending a meeting with Bolduc and two others and after going to lunch.  When he returned to the station, Bergeron told him to turn in his keys to the police car. Ralph then left the station by taking sick leave, personal days and a day for time worked[27].

26.     Bergeron investigated the claims of racism against Barnes by interviewing numerous individuals at the police department and the high school where Barnes was stationed,

---

[24] Exhibit 6, Letter from Ralph to Bergeron dated April 15, 2003; _see also_ First Amended Complaint at ¶ 25; Exhibit 1, Deposition of Richard Bergeron at pp. 58-59.
[25] Exhibit 6, Letter from Ralph to Bergeron dated April 15, 2003; _see also_ First Amended Complaint at ¶ 25.
[26] _See_ First Amended Complaint at ¶ 26.
[27] Exhibit 1, Deposition of Richard Bergeron at pp. 65-66 and Exhibit 7, insubordination letter from Bergeron to Ralph dated April 17, 2003.

as well as Town selectmen.  He could not find anyone who believed Barnes was a racist except for Ralph and Bolduc.[28]

27.    On April 15, 2003, Bolduc claims that he stopped by Bergeron's office to discuss an investigation.  Reportedly, Bergeron showed him the letter from Ralph alleging racial bigotry by Barnes.  During this meeting, Bolduc claims that Bergeron accused Bolduc of "displaying inappropriate loyalty to Ralph."  Bolduc alleges that Bergeron said, "Your friendship, support and loyalty to the Deputy Chief is going to cost you."[29]

28.    Bergeron maintains that he told Bolduc that if he and Ralph concocted false allegations of racial behavior it would cost them both.[30]

29.    On April 16, 2003, Ralph sent a letter to Bergeron inquiring about his status.  The following day, Bergeron ordered Ralph to report regarding his insubordination and his allegations about Barnes' racism.[31]

30.    Bergeron then left for vacation and Ralph returned to work.  While Bergeron had left Sergeant Keefe in charge, Ralph proceeded to suspend Barnes for not following the proper chain of command, refusal to obey a direct order and insubordination and discourtesy. Following a hearing on May 6, 2003, Barnes was reinstated with back pay.[32]

31.    On April 17, 2003, Bolduc allegedly learned from Ralph that Ralph had provided Bergeron with a list of witnesses to Barnes' racist remarks during the lunch on February 22, 2003 at the Colonial Club Restaurant.  Ralph told Bolduc that Bolduc's name was on that list.[33]

---

[28] Exhibit 1, Deposition of Richard Bergeron at pp. 58-65.
[29] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 69-70; *see also* First Amended Complaint at ¶ 28.
[30] Exhibit 4, Deposition of Richard Bergeron at pp. 87-88.
[31] Exhibit 7, insubordination letter.
[32] Exhibit 2, Deposition of Thomas Ralph at pp. 32-35.
[33] See First Amended Complaint at ¶ 30.

32.     On April 17, 2003, Ralph also informed Bolduc that his name would appear on a list of witnesses in a discrimination suit that Ralph was filing against the Webster Police Department.[34]

33.     On April 17, 2003, as part of his investigation, Bergeron requested that Bolduc put the racial allegations regarding Barnes in writing.  Bolduc concedes that he does not think Bergeron did anything wrong in making this request.[35]

34.     On April 17, 2003, Barnes gave a statement to Bergeron in which he detailed his knowledge of the cheating incident involving Ralph and Bolduc.[36]

35.     On April 25, 2003, Shaw gave a statement to Bergeron regarding the Ralph and Bolduc cheating issue as reported to him by Barnes on March 6, 2003.[37]

36.     Bolduc never discussed the cheating allegations with Keefe.[38]

37.     On May 1, 2003, Ralph filed a discrimination claim against the Webster Police Department with the MCAD.[39]

38.     On May 1, 2003, Bolduc claims that he entered Bergeron's office to discuss an investigation.  During this meeting, Bergeron asked Bolduc if he had ever heard Barnes make racial comments.  Bolduc informed Bergeron that he had.  Bergeron then ordered Bolduc to provide him "a written statement with names and dates.[40]

39.     On May 12, 2003, Bolduc maintains that Bergeron asked him if he had written the narrative regarding Barnes.  Bolduc provided Bergeron with a one-page statement dated May 2,

---

[34] *See* First Amended Complaint at ¶ 31.
[35] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 77; Exhibit 1, Deposition of Richard Bergeron at pp. 77-78.
[36] Exhibit 5, Report from Barnes to Bergeron dated April 17, 2003; Exhibit 1, Deposition of Richard Bergeron at p. 71.
[37] Exhibit 8, Letter to Bergeron from Shaw dated April 25, 2003.
[38] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 114-115.
[39] *See* First Amended Complaint at ¶ 32.
[40] *See* First Amended Complaint at ¶ 33.

7

2000. Bolduc's narrative reported the single incident at the Colonial Club luncheon on February 22, 2003.[41]

40.    After Bolduc gave the narrative to Bergeron, Bergeron reportedly told Bolduc that he was to return to uniform patrol duty, effective immediately. Bolduc also maintains that his schedule of duties was changed from the day shift to the night shift.[42]

41.    According to Keefe, however, Bolduc was already assigned to the night shift at that time but had been allowed to work days, if necessary, in connection with the special investigation of the Andrew Amato cold case regarding a child that went missing on September 30, 1978. In fact, Bolduc admitted at his deposition that he continued to work the night shift after he became sergeant in June 2002 and only left his shift when leads for the Amato cold case developed or came to light.[43]

42.    On May 14, 2003, Bolduc alleges that Bergeron and reserve Officer Alfred Beland met with former reserve Officer John Stevens and offered to reinstate Stevens if Stevens could provide negative information regarding Bolduc or Ralph.[44]

43.    On May 15, 2003, Bolduc sent a memo to Town Administrator Boudreau informing Mr. Boudreau that he had filed an intimidation complaint with the MCAD on the grounds that he was the "target of retaliation by Webster Police Chief Richard Bergeron, Jr." as having been identified as a witness in a pending MCAD claim filed by Ralph[45].

---

[41] Exhibit 9, Written Narrative Regarding Officer Barnes dated May 2, 2003 and First Amended Complaint at ¶ 34. (The Written Narrative is attached to the First Amended Complaint as Exhibit D).
[42] *See* First Amended Complaint at ¶¶ 35 and 36.
[43] Exhibit 10, Deposition of William Keefe at pp. 18-19; Exhibit 4, pp. 23 and 25.
[44] *See* First Amended Complaint at ¶ 37.
[45] Exhibit 11, Memorandum dated May 15, 2003 and First Amended Complaint at ¶ 2.

44.     On May 18, 2003, Ralph was placed on administrative leave. This action supposedly occurred because he suspended Barnes without merit[46].

45.     On May 19, 2003, Bolduc alleges that both he and Officer Suss were told by Bergeron to relinquish their lower level office space and that, as a result, he and Suss had to maintain records at home.[47]

46.     Bolduc concedes that not every officer had office space in the department at that time. In particular, he concedes that Officer Hoover, Sergeant Bent and Officer Young all kept documents at home due to lack of office space. He also acknowledged that he used the work stations to write reports such that storage was the only issue in performing his job.[48]

47.     Bergeron maintains that he asked both Bolduc and Officer Suss to vacate the office because the department had limited space and he and Officer Novick needed the office space for an on-going political corruption investigation.[49]

48.     On May 19, 2003, Bolduc sent a letter to Town Administrator Boudreau stating that Bergeron was retaliating against him.[50]

49.     On June 13, 2003, Ralph apparently filed his MCAD complaint. However, the Town did not receive it until June 23, 2003. Ralph's complaint made no mention of Bolduc being a witness to the alleged racism.[51]

50.     On June 15, 2003, Bolduc alleges that a town resident, E. Burgess, was questioned by Bergeron and Police Officer Novick as to whether Burgess had any negative information to provide regarding Bolduc.[52]

---

[46] Exhibit 2, Deposition of Thomas Ralph at pp. 33-35.
[47] Exhibit 4, Deposition of John Bolduc (Vol. 1) at pp. 34-39; *see also* First Amended Complaint at ¶ 38.
[48] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 36, 40-42.
[49] Exhibit 1, Deposition of Richard Bergeron at pp. 89-90.
[50] *See* First Amended Complaint at ¶ 42.
[51] Exhibit 12, Ralph's MCAD Complaint.

338726v1

51.    Bergeron admits that he and Officer Novick talked to Mr. Burgess with respect to rumors that were circulating in the police department to the effect that Bolduc was using cocaine in a local bar at which Burgess was a bartender.  According to Bergeron, Burgess refused to discuss the issue.[53]

52.    In fact, Bolduc admits that he confronted Bergeron about his conversation with Mr. Burgess.  Bolduc claims that he told Bergeron he would submit to blood and urine tests to prove that he was not doing drugs.  Bolduc concedes that Bergeron told Bolduc not to worry about it because Bergeron "never put any credence" in the allegation.  Bolduc admits that Bergeron said, "forget it and it was forgotten."[54]

53.    On June 16, 2003, Bolduc filed a complaint with the MCAD which contained a violation date of April 15, 2003.  His complaint was lodged against the Webster Police Department and Bergeron.  He claimed that by changing his rotation schedule from days to nights in the middle of the Amato investigation, he was discriminated against.  He also claimed retaliation and a hostile work environment.[55]

54.    On July 14, 2003, Bergeron was placed on paid administrative leave by Town Administrator Boudreau.[56]

55.    Subsequently, Keefe was appointed Acting Chief.[57]

56.    Bolduc did not work with Bergeron again after July 14, 2003.  Bolduc concedes that Bergeron did not take any disciplinary action against Bolduc before he left office.[58]

---

[52] _See_ First Amended Complaint at ¶ 43.
[53] Exhibit 1, Deposition of Richard Bergeron at pp. 119-120.
[54] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 93.
[55] Exhibit 13, MCAD Complaint dated June 16, 2003 and First Amended Complaint at ¶ 3.
[56] _See_ First Amended Complaint at ¶ 46.
[57] Exhibit 10, Deposition of William Keefe at p. 44.
[58] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 269 and 328.

57.    On July 16 and August 15, 2003, Bolduc claims that Keefe, in his capacity as Acting Chief, approached Town Administrator Boudreau and requested that Boudreau terminate Bolduc and Ralph.  According to Bolduc, Boudreau refused to do so.[59]

58.    On July 29 and August 1, 2003, the Human Resources Division for the Commonwealth held an investigative hearing on Barnes' allegations that Bolduc cheated on the sergeant's oral interview with the assistance of Ralph.  Bergeron, Ralph, Barnes, Kelley, Beland and Bolduc were witnesses at the hearing.[60]

59.    On October 1, 2003, Leal was appointed as Town Administrator.[61]

60.    On November 10, 2003, the Human Resources Division issued a decision in Bolduc's favor, upholding his promotion to sergeant.  The hearing officer concluded that Barnes' testimony was diminished by the fact that he waited almost nine months to reveal the information.[62]

61.    On October 16, 2003, the Town entered into an agreement with retired judge Robert Barton.  Specifically, Judge Barton was asked to investigate the Webster Police Department.[63]

62.    Bergeron was interviewed by Judge Barton as part of the investigation.[64]

63.    Judge Barton issued a report as a result of his investigation on December 8, 2003.

### Catherine Abbe Incident

64.    On November 30, 2003, Catherine Abbe ("Abbe") was arrested (the "Abbe incident").[65]

---

[59] See First Amended Complaint at ¶¶ 47 and 48.
[60] Exhibit 15, Decision dated November 10, 2003.
[61] See First Amended Complaint at ¶ 49.
[62] Exhibit 15, Decision dated November 10, 2003.
[63] See Exhibit 10, Deposition of William Keefe at pp. 45-46.
[64] Exhibit 1, Deposition of Richard Bergeron at p. 110.

65.     During the booking process, Abbe was uncooperative with respect to the booking photograph in that she put her hair in front of her face and refused to look at the camera.[66]

66.     Bolduc was present for the booking photograph together with Officer DiFusco, Officer Young and Officer Melendez.[67]

67.     According to Bolduc, he attempted to get Abbe to comply for five or six minutes. He then put on his gloves.  Bolduc claims Abbe continued to be uncooperative; closing her eyes and swearing at the officers.  Bolduc then admits that he held Abbe's head and raised her eyelids with his fingers so that DiFusco could take the booking photograph.[68]

68.     Bolduc admits that Abbe was crying during the entire incident.[69]

69.     An officer in the police department told Keefe about the Abbe incident.[70]

70.     The following day, Keefe was traveling with Officer DiFusco who had been present during the Abbe incident.  Officer DiFusco told Keefe that he had brought Abbe in for booking and that she was unruly and uncooperative.  He said that Bolduc "came in and squeezed her face, pried her eyes open with his other hand and squeezed her jaw."  Bolduc then told DiFusco to take the picture.[71]

71.     Officer DiFusco stated that he had deleted the photos from the booking camera.[72]

72.     Keefe promptly notified Leal about the Abbe incident.[73]

---

[65] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 215-216.
[66] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 216-217.
[67] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 231.
[68] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 217-218 and Exhibit 25, photographs of Abbe.
[69] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 220.
[70] Exhibit, 10 Deposition of William Keefe at p. 74.
[71] Exhibit 10, Deposition of William Keefe at p. 76.
[72] Exhibit 10, Deposition of William Keefe at p. 76.
[73] Exhibit 10, Deposition of William Keefe at pp. 67-68.

338726v1

73.     On December 10, 2003, Bolduc alleges that Miller, the Chairman of the Select Board, met with him on behalf of Administrator Leal, and requested that Bolduc and Ralph resign.[74]

74.     According to Bolduc, both he and Ralph refused to resign.  At that time, Regis, another member of the Select Board, entered and told Bolduc that Leal told him she intended to fire Bolduc after a hearing.[75]

75.     On December 11 or 12, 2003,  Officer DiFusco provided Keefe with a disk containing the booking photographs of Abbe.  Keefe showed the photographs to Leal that afternoon.[76]

76.     On December 12, 2003, Bolduc came into the station and told Keefe not to worry about the incident as he had spoken to Ms. Abbe's family who thought it was no big deal.[77] During this discussion, Bolduc enacted his Weingarten rights under the union not to speak about the incident.[78]

77.     As a result of the Abbe incident, and after hearing about other complaints of excessive use of force by Bolduc, Leal asked Keefe to investigate two incidents that occurred on February 19, 2002 and November 9, 2002 involving the arrests of Jonah Mayotte and Heath Greenwood.[79]

---

[74] *See* First Amended Complaint at ¶ 50.
[75] *See* First Amended Complaint at ¶ 50.
[76] Exhibit 10, Deposition of William Keefe at p. 67-68 and 78.
[77] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 233-234.
[78] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 235.
[79] Exhibit 10, Deposition of William Keefe at pp. 73-74; Exhibit 24, Deposition of Robin Leal at p. 115.

13

**Jonah Mayotte Incident**

78.     On February 19, 2002, an incident occurred involving a detainee named Jonah Mayotte ("Mayotte"). Officer Michaela Kelley arrested Mr. Mayotte following an altercation at the Maple Leaf Lounge (the "Mayotte incident").[80]

79.     When Mayotte was brought to the station, he was uncooperative and refused to remove his jewelry. Both Officer Kelley and Officer Novick tried to remove the jewelry but were unsuccessful.[81]

80.     Officer Novick then asked for assistance in removing the jewelry. Bolduc and Ralph responded.[82]

81.     According to Bolduc, he observed Mayotte laying face down on the floor. Bolduc removed Mayotte's necklace by using his utility knife rather than simply unclasping the necklace. He then instructed Pysell and Novick to sit Mayotte in a chair.[83]

82.     Per Bolduc's request, Gary Wrubleski, an EMT, gave a ring cutter to Bolduc to remove Mayotte's facial jewelry.[84] When Bolduc attempted to use it, it did not work. A part-time officer then suggested that Bolduc use a pair of bolt cutters from the fire department rescue truck. The bolt cutters were approximately two feet long.[85]

83.     Bolduc admits that he showed the bolt cutters to Mayotte and told him that if he did not remove his jewelry himself, Bolduc would use the bolt cutters to do it. Bolduc admits that he told Pysell and Novick to hold Mayotte still. He then used the bolt cutters to cut off

---

[80] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 115.
[81] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 115-120.
[82] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 115-120.
[83] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 115-118.
[84] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 123.
[85] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 125-127.

14

facial jewelry from Mayotte's left ear and above his left eye.  After doing so, Mayotte removed the rest of his jewelry himself.[86]

84.    When the Mayotte issue was later investigated, Bolduc attempted to say that he removed the jewelry at the request of Webster EMS because Mayotte had a laceration on his face.  However, at his deposition, Bolduc admitted that Mayotte did not have any lacerations and that the jewelry was not removed for that reason.[87]

85.    At his deposition, Bolduc admitted that, in retrospect, he could have handled the Mayotte situation in a different manner.[88]

86.    Keefe took written statements about the Mayotte incident from EMTs, Wrubleski and Gary  Milliard.[89]

### Heath Greenwood Incident

87.    On November 9, 2002, Heath Greenwood ("Greenwood") was arrested after breaking into a home.[90]

88.    Officer Leonard Gevry filed a  written report on the Greenwood incident.  In his report, Gevry stated Greenwood was handcuffed behind his back at the scene and transported to the station for booking.  As Gevry was booking him, Greenwood became unruly and began physically fighting against Gevry.  According to Gevry, Bolduc "rushed in out of nowhere yelling, 'You want to fuck with my guys, huh?  Then you are fucking with me too!'"  Bolduc then pushed Officer Gevry away and grabbed and spun away Greenwood who fell to the floor. Bolduc then pulled back and punched him below his left eye three times.  When Gevry hooked

---

[86] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 127-130; see Exhibit 26, photo of J. Mayotte before his jewelry was removed.
[87] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 132-133.
[88] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 138.
[89] Exhibit 10, Deposition of William Keefe at pp. 93-96.
[90] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 151-152.

338726v1

elbows with Bolduc to stop him from punching Greenwood, Bolduc then kicked Greenwood on the right side of his chest.  When Gevry pulled him back, he then stomped on Greenwood once. Officer Pysell then jumped in.  He handed Bolduc to Officer Kehoe and said, 'Put a leash on him, and get him out of here.'"[91]

89.     Bolduc claims that he observed Greenwood forcing his handcuffs under Gevry's chin and choking Gevry.  Bolduc claims that he saw Greenwood's handcuffs in front, rather than behind his back.[92]

90.     Bolduc claims that he yelled but Greenwood ignored the fact that both Bolduc and Officer Pysell were in the room.  At that point, Bolduc claims he "reached across Greenwood, grabbed his shirt from the far shoulder, spun him toward [him] and punched him in the chin." Greenwood then fell to the ground.[93]

91.     Bolduc denies that he hit Greenwood again.  He also denies stepping on Greenwood and kicking Greenwood.[94]

92.     Despite the fact that Bolduc wrote the report on the incident, he never charged Greenwood with assault and battery on an officer.[95]

93.     Bolduc never discussed the Greenwood incident with Bergeron.[96]

94.     In his statement, Gevry mentioned that he had been threatened by Bolduc previously.  He also heard from other officers that Bolduc was out to get him and another officer. He relayed details of other difficulties that he had had with Bolduc and Ralph.[97]

---

[91] Exhibit 18, Gevry's Report.
[92] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 155-162.
[93] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 164.
[94] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 166-167.
[95] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 177-178.
[96] Exhibit 4, Deposition of John Bolduc (Vol. I) at p. 204.
[97] Exhibit 18, Gevry's Report.

16

95.    On February 26, 2003, Ralph reportedly made a report to Bergeron based on his investigation of the November 9, 2002 Greenwood incident  As a result of his investigation, Ralph absolved plaintiff of any wrongdoing with respect to Greenwood.  However, at his deposition, Bergeron testified that he never assigned Ralph to investigate the Greenwood incident since he was not aware of any wrongdoing in November 2002, given Ralph's and Bolduc's description of the incident which placed blame on Gevry.[98]

96.    Bergeron was not made aware of the full details of the Greenwood incident until Officer Gevry called him to discuss the matter when he was already on administrative leave.[99]

97.    Following the Abbe incident, Keefe interviewed Officer Pysell regarding the Greenwood incident.  Officer Pysell gave Keefe an affidavit on the Greenwood incident which Pysell had given to Judge Barton.[100]

98.    Subsequently, Pysell informed Keefe that he observed Bolduc strike Greenwood two or three times.  Because Pysell had not mentioned this fact in his original affidavit, Keefe asked Pysell to supplement his affidavit accordingly.[101]  Pysell complied and initialed the additions to the affidavit.[102]

### Termination Notice

99.    On December 12, 2003, a disciplinary hearing was held with regard to Ralph. Bolduc testified on behalf of Ralph at this hearing.[103]

---

[98] Exhibit 1, Deposition of Richard Bergeron at p. 55-57.
[99] Exhibit 1, Deposition of Richard Bergeron at pp. 94-95.
[100] Exhibit 10, Deposition of William Keefe at pp. 69-70.
[101] Exhibit 10, Deposition of William Keefe at pp. 71-73.
[102] Exhibit 10, Deposition of William Keefe at pp. 71-72.
[103] *See* First Amended Complaint at ¶ 51.

100.    On December 12, 2003, Bolduc was placed on paid administrative leave pending the outcome of the excessive use of force investigations concerning the Abbe, Mayotte and Greenwood incidents.[104]

101.    Leal went to the police station and delivered the letter to Bolduc in-hand which set forth the specific allegations against Bolduc, as well as the recommendations of disciplinary action.  In addition, the letter notified Bolduc of his rights under the civil service law, *G.L. c. 31, §§ 41-45*.[105]

### "Fit For Duty" Examination by Leo Polizoti, Ph.D.

102.    Keefe and Leal decided to send Bolduc to a "fit-for-duty" screening.[106]

103.    On January 5, 2004, Keefe arranged for a "fit for duty" assessment of Bolduc to be performed by Leo Polizoti, Ph.D., licensed psychologist/health service provider.[107]

104.    Prior to the assessment, Keefe sent Dr. Polizoti a summary of the three detainee incidents.[108]

105.    Bolduc admits that he received a copy of this summary before his screening with Dr. Polizoti.[109]

106.    Bolduc claims that the summary contained "negative information, and characterizing Bolduc as being manipulative."  In addition, Bolduc claims that Keefe's summary "warned Polizoti of Bolduc's high intelligence, ability to deceive, and ability to perform well on

---

[104] Exhibit 10, Deposition of William Keefe at pp. 81-82; Exhibit A17, Paid Leave Notification Letter dated December 12, 2003; *see also*, First Amended Complaint at ¶ 53.
[105] Exhibit 17, Paid Leave Notification Letter.
[106] Exhibit 10, Deposition of William Keefe at p. 111.
[107] *See* First Amended Complaint at ¶ 54.
[108] Exhibit 14, Deposition of John Bolduc (Vol. II) at 238.
[109] Exhibit 14, Deposition of John Bolduc (Vol. II) at 238.

tests."[110]  Keefe concedes that he sent Dr. Polizoti a letter explaining why Bolduc was being sent for an assessment.[111]

107.    Bolduc also claims that Leal telephoned Dr. Polizoti and informed him "that Bolduc had anger problems about which the Town was already aware."[112]

108.    On January 14, 2004, Bolduc maintains that Dr. Polizoti informed him of Keefe's summary and Leal's telephone call.  According to Bolduc, Dr. Polizoti told him that Keefe only provided negative information for Dr. Polizoti to review.  However, at his deposition, Bolduc acknowledged that Keefe did make some positive statements about Bolduc in the summary that he provided to Dr. Polizoti.[113]

109.    Bolduc claims that Dr. Polizoti said he believed the Town was "setting up" Bolduc.[114]

110.    In his report, dated January 27, 2004, Dr. Polizoti stated that if the excessive force occurred involving Greenwood, Mayotte and Abbe, he believed that Bolduc was unfit for law enforcement duty and he would recommend that Bolduc not return to full duty status.  Dr. Polizoti reported that, if the incidents occurred, he believed that Bolduc had personality issues that are detrimental to functioning appropriately as a police officer.[115]

111.    Bolduc admits that he has shown his temper "in performance of duty."[116]

112.    On February 1, 2004, Bolduc claims that Leal informed Selectman Regis that she "had enough to terminate Bolduc."[117]

---

[110] _See_ First Amended Complaint at ¶ 54.
[111] Exhibit 10, Deposition of William Keefe at p. 113.
[112] _See_ First Amended Complaint at ¶ 54.
[113] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 254; _see also_ First Amended Complaint at ¶ 55
[114] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 244 and 394; _see also_ First Amended Complaint at ¶ 55.
[115] Exhibit 19, Dr. Polizoti's Report.
[116] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 249.
[117] Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 307; _see also_ First Amended Complaint at ¶ 56.

113.     On February 23, 2004, Bolduc claims that the Town Select Board "unanimously voted to award Bolduc a commendation for his work on the Amato murder investigation."[118]

114.     According to Bolduc, on March 1, 2004, Leal requested that each member of the Select Board rescind the commendation because it would weaken her position at the disciplinary hearing and in matters pending before the MCAD.  Bolduc claims that two members agreed to change their votes and the commendation was rescinded.[119]

115.     On March 1, 2004, Bolduc claims that Keefe, in his capacity as Chief, sent a letter to Leal recommending Bolduc's termination.  However, at his deposition, Bolduc admitted that he had a satisfactory relationship with Keefe up until the point that the changes were brought against him.[120]

### Termination Hearing

116.     On March 9, 2004, the Town informed Bolduc that his personnel file had been lost.  While Bolduc alleges that he was, thus, disadvantaged at his termination hearing, at his deposition he testified that the file was only relevant to confirm that there was nothing negative in his file.  At the same time, he acknowledged that there was no such evidence at the hearing to contradict.[121]

117.     Bolduc claims that he did not receive information that had been requested by his attorney until twelve hours before the start of his termination hearing.  However, he was offered a postponement and his attorney declined it.[122]

---

[118] *See* First Amended Complaint at ¶ 59.
[119] Exhibit 14, Deposition of John Bolduc (Vol. II) at pp. 271-272; *see also* First Amended Complaint at ¶ 61.
[120] *See* First Amended Complaint at ¶ 62; Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 326.
[121] *See* First Amended Complaint at ¶ 64; Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 294-296.
[122] *See* First Amended Complaint at ¶ 63; Exhibit 16, Hearing Transcript, pp. 15 and 16.

338726v1

118.    On March 10, 2004, Bolduc's termination hearing was held before Ms. Leal.  The three subjects of the hearing were the Mayotte, Greenwood and Abbe incidents.  Bolduc was represented by counsel.  The following witnesses were called by the Town:  Defusco, Nelson and Keefe.  The following witnesses were called by Bolduc:  Lieutenant Eva O'Connell of the Holyoke Police Department, Bolduc, Officer Pysell, Selectman Miller, Boudreau, Wrubleski, Milliard and Melendez.  Interestingly, Thomas Ralph did not testify.[123]

119.    Officer Pysell testified on behalf of Bolduc with respect to the Mayotte Incident.[124]

120.    On March 19, 2004, Leal terminated Bolduc.[125]

121.    On March 25, 2004, Bolduc filed a civil service appeal pursuant to *M.G.L. c.31, § 41-44*.  As of the date hereof, no decision has been rendered on the appeal.[126]

122.    Bolduc claims that on April 15, 2004, Regis told Ralph and P. O'Donnell that Leal had told him prior to the termination hearing that she intended to fire Bolduc, but had to conduct the hearing "to make it look good."[127]

123.    On May 11, 2004, Bolduc's MCAD claim was dismissed.[128]

## Whistleblower Allegations

124.    On August 5, 2004, Bolduc sent a letter to the Town Board of Selectmen purporting to be a "Notice pursuant to *M.G.L. c. 149, § 185(c)(1)*", the Massachusetts "Whistleblower Statute" (the "Whistleblower Letter").[129]

---

[123] Exhibit 16, pp. 1-4; Exhibit 14, Deposition of John Bolduc (Vol. II) at p. 318.
[124] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 146-148.
[125] Exhibit 20, Termination Letter; *see also* First Amended Complaint at ¶ 66.
[126] Exhibit 21, Notice of Appeal.
[127] *See* First Amended Complaint at ¶ 67.
[128] Exhibit 22, Notice of Dismissal.
[129] Exhibit 23, Whistleblower Letter dated August 5, 2004 and First Amended Complaint at ¶ 5.  (The Whistleblower Letter is attached to the First Amended Complaint as Exhibit C).

125.    In the Whistleblower Letter, Bolduc alleged that "employees" of the Town retaliated against him because he "substantiated racist public behavior by a uniformed officer" of the Town.  In addition, he alleged that the Town Police Department violated "Massachusetts and Federal law, both in practice generally and specifically as applied to him" as follows:

1.    Failure to comply with the administrative requirement of recording the race of individuals detained by the police for traffic violations;

2.    Failure to discipline officers for making overly (sic) racist remarks while in uniform, on duty, and in a public place;

3.    Taking adverse employment action against the plaintiff for reporting and substantiating racist behavior of Officer Barnes.[130]

126.    Bolduc admits that he is not aware of any other officer in the Webster Police Department besides Barnes who did not comply with the racial profiling law.  In fact, he concedes that the only information he had regarding Barnes' alleged failure to comply with the law was an article written in the *Boston Globe* which identified Barnes as the number one non-compliant officer in the Commonwealth.[131]

## Overview of Complaint

127.    On February 16, 2005, Bolduc filed his complaint in the above-entitled action.

128.    In Count I, Bolduc alleges that the defendants violated *42 U.S.C. § 1983*. Specifically, Bolduc alleges that he was denied substantive and procedural due process when his employment was terminated on March 19, 2004.  Bolduc further alleges that the defendants intended and did punish and retaliate against him for the exercise of his freedoms of speech, association and inquiry.[132]

---

[130] Exhibit 23, Whistleblower Letter.
[131] Exhibit 4, Deposition of John Bolduc (Vol. I) at pp. 66-68.
[132] *See* First Amended Complaint at ¶ 84.

338726v1

129.     In Count II, Bolduc  alleges that the defendants violated *42 U.S.C. § 1985.* Specifically, Bolduc alleges that all of the defendants acted in concert to deprive him of his liberty interests in free speech and association of his protected property interest in his occupation.  Bolduc claims that he was deprived of due process and equal protection when his employment was terminated on March 19, 2004.  Bolduc also claims that his termination was accomplished by the defendants acting in concert and pursuant to invidious race-based and class-based animus to retaliate against him for his support of the investigation of complaints of racism made by Ralph.[133]

130.     In Count III, Bolduc alleges that the Town and Bergeron violated *M.G.L. c. 151B, § 4, ¶¶ 4, 4A and 5.*  Specifically, Bolduc alleges that these defendants are liable for termination, retaliation, intimidation and aiding and abetting.[134]

131.     In Count IV, Bolduc alleges that the Town and Bergeron, in his capacity as Chief of Police, violated *42 U.S.C. 2000e, § 1 et seq.* (Title VII).  Specifically, Bolduc alleges that the actions of the Town and Bergeron "constitute retaliation and intimidation."[135]

132.     In Count V, Bolduc alleges that the Town violated the Whistleblower Statute (*M.G.L. c. 149, § 185*).[136]

133.     In Count VI, Bolduc alleges that the Town and Bergeron deprived  him of his civil rights pursuant to the First and Fourteenth Amendments and Articles I and X of the Declaration of Rights of the Commonwealth of Massachusetts, in violation of *M.G.L. c. 12, § 111.*[137]

---

[133]  *See* First Amended Complaint at ¶ 85.
[134]  *See* First Amended Complaint at ¶¶ 86-88.
[135]  *See* First Amended Complaint at ¶¶ 89-91.
[136]  *See* First Amended Complaint at ¶¶ 92-94.
[137]  *See* First Amended Complaint at ¶¶ 95-96.

23

**STANDARD OF REVIEW**

Under *Rule 56(c)* of the *Federal Rules of Civil Procedure*, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A 'genuine' issue is one that reasonably could be resolved in favor of either party, and a material fact is 'one that might affect the outcome of the suit under the governing law.'" *Wagner v. City of Holyoke*, 241 F. Sup.. 2d 78, 82 (D. Mass. 2003)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986)). In order to avoid summary judgment, the plaintiff must establish the existence of every element essential to his case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrell*, 477 U.S. 317, 322 (1986). The plaintiff cannot rely on "mere allegations or evidence that is less than significantly probative." *Maldanado-Denis v. Costillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). A summary judgment opponent must do more than show that there is some metaphysical doubt as to the material facts. Instead, the opponent must present definite, competent evidence in order to survive the motion. *Maldanado-Denis* at 581. Not every genuine factual conflict necessitates a trial. *Wagner, supra* at 83. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Id.* (quotations and citation omitted).

**ARGUMENT**

**I.    42 U.S.C. § 1983 v. Town, Bergeron and Keefe (Count I)**

In Count I, Bolduc alleges that he was denied substantive and procedural due process when his employment was terminated in violation of *42 U.S.C. § 1983*.

24

*Title 42 U.S.C. § 1983* was enacted in order to provide redress for violations of federally protected rights committed by individuals acting under color of law. *Monroe v. Pape*, 365 U.S. 167 (1961). According to the United States Supreme Court, *§ 1983* "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). In order to succeed on a *§ 1983* claim, the plaintiff must establish that (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived him of a constitutional right. *Lockridge v. Board of Trustees*, 294 F.3d 1010, 1017-18 (8th Cir. 2002).

Different standards are used to determine liability for individuals and municipal defendants under *§ 1983*. *Kelley v. LaForce*, 288 F.3d 1, 6 (1st Cir. 2002).

### A. Bergeron and Keefe Are Entitled to Summary Judgment Because Bolduc Cannot Show That a Clearly Established Right Was Violated, And Said Defendants Are Entitled to Qualified Immunity.

"Although government officials are subject to suit for federal constitutional or statutory violations under *§ 1983*, they are generally shielded from civil damages liability under the principle of qualified immunity so long as their actions do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelley at 6.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

"A court evaluating a claim of qualified immunity must engage in a two-step inquiry." *Kelley at 6.* "First, the court must determine whether plaintiff has alleged a deprivation of a constitutional or federal right by the defendant official. If so, the court must determine whether that right was clearly established at the time of the official's alleged violation." *Id.* (internal citations and quotations omitted). Only after both of these questions are answered affirmatively should the court address whether an "objectively reasonable official" would have believed his

25

conduct was lawful in light of the clearly established law and the information available to the official at the time of the conduct. *Id*. In short, the court must consider the constitutional question before the qualified immunity question. *Id*.

In this instance, Bolduc alleges that the Town, Bergeron and Keefe deprived him of his civil rights as guaranteed by the First, Fifth and Fourteenth Amendments in that he was retaliated against for exercising his freedoms of free speech, association and inquiry and was denied substantive and procedural due process. Essentially, Bolduc is alleging that he was deprived of a property right, namely his job, without due process of law in violation of the Fourteenth Amendment. Such a claim gives rise to two theories of recovery: procedural due process and substantive due process. *See O'Neill v Baker, 210 F.3d 41, 48 (2000)*. Procedural due process insures that a person is not deprived of life, liberty or property unless fair procedures are used in making that decision. Whereas, substantive due process guarantees that an individual is not deprived of those rights for an arbitrary reason regardless of how fair the procedures used in making the decision are.

1.    **The "Constitutional Question"**

a.    **Procedural Due Process – 14th Amendment**

Bolduc maintains that he was denied due process because he was terminated without a fair hearing.

In order to prevail on a claim based on denial of procedural due process, Bolduc must show that the defendants, acting under color of law, deprived him of the property interest of continued employment without "the minimum amount of process that was due under the Constitution." *See Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 102 (1st Cir. 2002)*.

First, Bolduc cannot maintain a claim of denial of due process against Bergeron because Bergeron was not involved in the "process" of Bolduc's termination since he was on paid administrative leave before the "process" even began. Furthermore, he retired while still on administrative leave before Bolduc was terminated.

With respect to the allegations against Keefe, it is undisputed that Bolduc was provided an opportunity to be heard as required pursuant to *G.L. c. 31, §§ 41-45*. On March 1, 2004, Bolduc was provided a letter outlining the specific charges against him and the recommendation of disciplinary action.[138] Along with the letter, Bolduc was notified of his procedural rights under *G.L. c. 31, §§ 41-45*. A hearing was held on March 10, 2004 at which Bolduc was present with his attorney. Bolduc was allowed to address the allegations against him, as well as introduce evidence and witnesses on his behalf. There is no basis for concluding that the hearing was unfair since the missing personnel file was irrelevant and Bolduc waived any claim that he was prejudiced by the late receipt of documents since his attorney declined to request a postponement. While Bolduc claims that Leal made statements inferring that she prejudged the hearing, they are based on nothing more than unsupported hearsay, and, thus, should be disregarded.

Moreover, Bolduc cannot succeed on his procedural due process claim because he had an adequate post-deprivation remedy. *Cronin v. Town of Amesbury, 81 F.3d 257, 260 (1*[st] *Cir. 1996)*. As the Court of Appeals for the First Circuit explained,

> If a state provides adequate post-deprivation remedies – either by statute or through the common law tort remedies available in its courts – no claim of a violation of procedural due process can be brought under Section 1983 against the officials whose random and unauthorized conduct caused the deprivation.

---

[138] Exhibit 20.

<u>Lowe v. Scott</u>, *959 F.2d 323, 340-41 (1ˢᵗ Cir. 1992).*

In this case, Bolduc had an adequate post-deprivation remedy in the form of an appeal pursuant to *M.G.L. c. 31, §§ 42 and 43* of which he availed himself on March 25, 2004 (which matter is still pending). In addition, Bolduc had an adequate post-deprivation remedy in the form of common law tort remedies. Therefore, Bolduc's procedural due process claim cannot stand.

### b.    Substantive Due Process – 14ᵗʰ Amendment:

Bolduc's substantive due process claim is also without merit since there is no evidence that the termination was arbitrary or capricious.

In order to establish a substantive due process violation, the plaintiff must establish that he has a property interest in continued employment and that an arbitrary or capricious termination of that interest occurred.

Again, since Bergeron was not involved in the termination process, he cannot be liable for violation of Bolduc's due process.

With respect to the allegations against Keefe, Bolduc cannot meet his burden of proving that his termination was arbitrary or capricious since there was just cause to support the decision pursuant to *G.L. c. 31*. That is, Bolduc was not raised for termination until the photographs of Catherine Abbe came to light which showed that he used excessive force. While that issue was being investigated, the older issues regarding Greenwood and Mayotte were also investigated. They, too, showed that Bolduc used excessive force. Furthermore, while Keefe was in favor of terminating Bolduc, based on the evidence of excessive force that his investigation uncovered, Keefe did not terminate Bolduc since he did not have the authority to do so. As such, Bolduc cannot maintain a substantive due process claim against Keefe.

28

### c.    Retaliation – 1st and 14th Amendment

Bolduc alleges that he was retaliated against in violation of his First and Fourteenth Amendment rights.

The law recognizes that the free speech protections offered to public employees, including police officers, must balance the employee's interest in free expression against the interest of the governmental entity, and the public, in the reasonably smooth operation of public business. *Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 89 (D. Mass. 2003)*.  In fact, the United States Supreme Court has recognized "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Conick v. Meyers, 461 U.S. 138, 143, 103 S. Ct. 1684 (1983)*.  Furthermore, the law makes clear that police officers' "free speech rights, at least in certain circumstances, may be more restricted than the rights of the citizenry at large." *Wagner, supra* at 90.

In order to establish a First and Fourteenth Amendment retaliation claim, a plaintiff must show (1) the speech at issue involves matters of public concern; (2) the plaintiff's interest in speech outweighs the government's interest in efficiency; and (3) the speech was a "substantial or motivating factor in the adverse employment decision." *Wagner* at 90; *Pickering v. Board of Educ., 391 U.S. 563, 88 S. Ct. 1731 (1968)*.  If the plaintiff meets that test, the defendant, government entity, is afforded an opportunity to show by a preponderance of the evidence, that it would have reached the same decision even in the absence of the protected conduct. *Id*.

With respect to the second factor, "the court must consider the time, place and manner of the employee's expression in balancing the interests served by [the plaintiff's] statements against the police department's legitimate interest in avoiding disruption of its public service mission." *Wagner at 91*.  "In addressing this second factor, it is important to underline the fact that law

29

enforcement agencies, as para-military organizations, have been recognized as qualitatively different from other governmental branches; law enforcement employees are subject to greater First Amendment restraints than most other citizens." *Id.* (internal quotations omitted). In fact, police departments have "a more significant interest than the typical government employer in regulating the speech activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence." *Id.* at 91-92 (internal quotations omitted).

In this instance, there is no evidence that either Bergeron's or Keefe's actions were "substantially motivated" by protected speech by Bolduc. Again, Bergeron was not involved in any adverse employment decision against Bolduc after the alleged protected speech occurred. That is, he did not discipline Bolduc. And to the extent that the change in his schedule and the loss of his office are alleged to be adverse employment actions, Bergeron had legitimate, non-discriminatory reasons for both of them. Moreover, they are virtually unremarkable. Bolduc was not the only officer not to have an office and was not deprived of working space. In addition, there really was no change in his schedule but for his lack of involvement in the Amato case, a 30-year-old cold case. As for Keefe, the evidence clearly shows that the substantial motivating factor for his action was the factual evidence which was brought to his attention with respect to the Greenwood, Mayotte and Abbe incidents. In fact, Bolduc acknowledged that he had a satisfactory relationship with Keefe up until the time the charges were brought against him. Therefore, Bolduc's retaliation in violation of free speech claims against Bergeron and Keefe cannot stand.

In addition, Bolduc's First Amendment claim is barred pursuant to *M.G.L. c. 149, § 185(f)*. As set forth above, Bolduc has filed a claim under the Whistleblower Statute (*G.L. c.*

*149, § 185*) in which he alleges that his employment was terminated because he was a whistleblower. By filing such a claim, Bolduc has waived all rights and remedies available to him under statutory and common law arising out of the retaliatory action. *M.G.L. c. 149, § 185(f)*. Since the allegations set forth concerning Bolduc's First Amendment claim are not substantially separate from and independent of the whistleblower claim, Bolduc cannot maintain a claim under the First Amendment.

Finally, while the statement attributed to Barnes was clearly derogatory, it does not rise to the level of being a matter of public concern, given that it was a stray remark made over lunch when Barnes was not acting within the scope of his employment. Indeed, Bolduc never witnessed Barnes make any other racially derogatory remark, and never witnessed him mistreating individuals because of their race. Taken in total, these facts do not support allegations of racism within the Webster Police Department.

**2.    The "Qualified Immunity" Question**

**Bergeron and Keefe Are Entitled to Qualified Immunity.**

In addition to the foregoing, Bolduc's *§ 1983* claims against Bergeron and Keefe must fail because Bergeron and Keefe are entitled to qualified immunity.

"Under well-established law, the individual defendants are entitled to qualified immunity for official action unless (1) their conduct violated [the plaintiff's] constitutional rights and, in addition, (2) the law to this effect was 'clearly established' under then-existing law so that a reasonable [public official] would have known that his behavior was unlawful." *Dwan v. City of Boston*, 329 F.3d 275, 278 (1st Cir. 2003). The standard for judging a motion for summary judgment brought by a government official seeking qualified immunity is "whether a reasonable official could have believed his actions were lawful in light of clearly established law." *Febus-*

_Rodriquez v. Betancourt-Lebron_, 14 F.3d 87, 91 (1st Cir. 1994).  The focus should be not on the merits of the plaintiff's underlying claim, but instead on the objective legal reasonableness of the official's conduct, as measured by reference to clearly established law and the information the individual possessed at the time of the allegedly unlawful conduct.  _Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995); Febus-Rodriguez, 14 F.3d at 91._  Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." _Lowinger, 50 F.3d at 65._  Indeed, government agents are not always required to err on the side of caution.  _Davis v. Scheret_, 468 U.S. 183, 196 (1984).  The qualified immunity standard is "specifically designed to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." _Malley v. Briggs, 475 U.S. 340, 341 (1986), quoting Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)._

In order to determine whether Bergeron and Keefe are entitled to qualified immunity, the court must inquire as to whether reasonable police chiefs would have believed that their actions regarding Bolduc were lawful, based upon the information that they possessed at the time of their alleged unlawful conduct, and in light of clearly established law.  Lowinger, _50 F.3d at 65._  A reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability.  _Cookish v. Powell_, 945 F.2d 441, 443 (1st Cir. 1991)._

A determination of "objective reasonableness" requires an examination of the information possessed by the defendant officials.  _Kelley_, _supra at 7._

In this instance, Bergeron and Keefe reasonably believed their actions regarding Bolduc were lawful in light of the facts known to them at the time.  Specifically, Keefe learned of the Abbe incident from an officer.  After investigating that incident and the Mayotte and Greenwood

incidents, he concluded that Bolduc used excessive force.  It was for that reason that he recommended Bolduc's termination.  Since Bergeron played absolutely no role in Bolduc's termination, it appears that he cannot be liable in any way with respect to Bolduc's termination.  Therefore, Bergeron and Keefe are entitled to qualified immunity with respect to Bolduc's *§ 1983* claims against them.

**B.    Summary Judgment Should be Granted in Favor of The Town Because Bolduc Has Failed to Establish Any Policy or Custom of The Town or to Establish a § 1983 Claim**.

Bolduc also alleges that the Town violated his rights protected under *§ 1983.*

Municipalities may only be sued under § 1983 in limited circumstances.  *Kelley, supra* at 9.  A municipality cannot be held liable pursuant to *§ 1983* under a theory of *respondeat superior.  Chaabouni v. City of Boston, 133 F. Supp. 2d 93 (D. Mass. 2001)*.  In order to impose liability on the Town under *§ 1983*, the plaintiff must identify a policy or custom that is causally related to Bergeron's or Keefe's conduct, and which caused him injury.  *Id.*; *see also Monell v. New York City Dep't of Soc. Serv., 436 U.S. 658 (1978)*.  Under *Monell*, the alleged unconstitutional action must implement or execute a policy statement, ordinance or decision officially adopted and promulgated by the government's officers.  As the Supreme Court explained, Congress did not intend *§ 1983* liability to attach unless action, pursuant to an official municipal policy of some nature, caused a constitutional tort.  *Monell, 436 U.S. at 691*.  The existence of an unconstitutional policy cannot be inferred from an isolated instance of unconstitutional activity.  *Oklahoma v. City of Tuttle, 471 U.S. 808, 823-35 (1985)*.  Rather, an unconstitutional policy must reflect the policymaker's deliberate indifference to the rights of its citizens.  *City of Canton v. Harris, 489 U.S. 378, 388 (1989)*.  In essence, a municipality will be

found liable under *§ 1983* only where the municipality itself causes the constitutional violation at issue.

In this instance, Bolduc cannot meet his burden of proof with respect to his *§ 1983* claims against the Town because there is no evidence that the Town maintained a policy or custom which was causally related to the individual defendants' alleged conduct in this case. Bolduc has failed to identify any officially adopted policy, ordinance or decision of the Town which amounts to a constitutional violation. *See Chaabouni*, *supra* (plaintiff did not establish policy or custom of City with respect to alleged assault by two city police officers); *Rochleau v. Town of Millbury*, *115 F. Supp. 2d 173, 178 (D. Mass. 2000)* (plaintiff failed to allege Town had policy or custom with respect to conditions of jail). As such, Bolduc cannot prevail on his *§ 1983* claim against the Town as a matter of law. Therefore, this Court should enter judgment in favor of the Town on Count I of the First Amended Complaint.

### C.    Bergeron And The Town Are Entitled to Judgment as a Matter of Law Because Bolduc's Title VII Claim Against These Defendants is Inadequate.

In addition to the foregoing, neither the Town nor Bergeron can be liable under *§ 1983* as a matter of law since Bolduc's Title VII claim against this defendants is inadequate.

"When a plaintiff attempts to use *§ 1983* as a parallel remedy to a Title VII claim, the prima facie elements to establish liability are the same under both statutes. In either case, the plaintiff must prove that the defendants acted with discriminatory intent." *Rivera v. Puerto Rico Aqueduct and Sewers Auth.*, *331 F.3d 183, 192 (1st Cir. 2003)*(internal citations and quotations omitted). As a matter of law, the inadequacy of a plaintiff's Title VII claim likewise establishes the inadequacy of his *§ 1983* claim. *Id*. Because Bolduc's Title VII claims against Bergeron and the Town are inadequate, as set forth fully below, they are entitled to judgment as a matter of law on the plaintiff's *§ 1983* claims (Count I) against them as a matter of law.

**II.**     <u>**Violation of 42 U.S.C. § 1985 v. Town, Bergeron and Keefe (Count II)**</u>

In Count II, Bolduc alleges that Bergeron, Keefe and the Town, acting in concert, violated *42 U.S.C. § 1985* in their decision to terminate Bolduc, which termination:

> a.     was based on invidious, race-based animus to retaliate against [Bolduc] for his refusal to ignore racist conduct by a fellow officer and for his support of the investigation of complaints of racism made by the then Deputy Chief Ralph; and
>
> b.     was accomplished by two or more of the Defendants acting in concert and pursuant to invidious, race-based and class-based animus, and the purpose of which was to obstruct the due course of justice....[139]

Presumably, Bolduc is bringing this claim under *42 U.S.C. § 1985(3)* which concerns conspiracies to deprive a person of his rights or privileges. In order to state a claim under this section, the plaintiff "must show that the defendants (1) conspired (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws (3) causing to be done an act in furtherance of the object of the conspiracy (4) resulting either in injury to another person or his or her property or in depriving him or her of having or exercising any right or privilege of a United States citizen." *Butner v. Dept. of State Police, 60 Mass. App. Ct. 461, 468-469 (2004)*.

To demonstrate conspiracy, the plaintiff must show " 'an actual abridgement of some federally secured right.'" *Torres-Rosado v. Rotger-Sabat, 335 F. 3d 1, 14 (1st Cir. 2003)* (quoting *Nieves v. McSweeney, 241 F. 3d 46, 53 (1st Cir. 2001)*("The fact that a plaintiff styles her claim as a conspiracy . . . does not diminish her need to show a constitutional deprivation.")). A plaintiff cannot survive summary judgment under *§ 1985(3)* based on conspiracy if his underlying constitutional claims fail. *Id.*

---

[139] *See* First Amended Complaint at ¶ 85.

The United States Supreme Court has interpreted the second element to mean that the conspirators' action must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus. _Griffin v. Breckenridge_, 403 U.S. 88, 102, 91 S. Ct. 1790 (1971); _LaManque v. Massachusetts Dept. of Employment & Training_, 3 F. Supp. 2d 83, 91 (D. Mass. 1998)._ The plaintiff must show that the defendants exhibited animus toward a protected race or class in general and that their "predominate purpose" was to discriminate against that race or class. _Butner, supra at 470._ Defendants are entitled to summary judgment if the plaintiff fails to set forth either direct or circumstantial evidence of animus. _Butner, supra._

The plaintiff must show that the actions of the particular defendants was motivated by racial or class-based animus. _Burns v. State Police Ass'n of Massachusetts_, 230 F.3d 8, 12 (D. Mass. 2000)._ For example, in _Burns_, the United States Court of Appeals for the First Circuit found that the actions of the defendants (the State Police Association and one of its officers) were not motivated by racial animus simply based on racial comments made by a couple of police officers who were not defendants. _Id._ at 13-14.

The conspiracy must be aimed at depriving a race or class of its constitutional rights. _Baxter v. Conte_, 190 F. Supp. 2d 123, 129 (D. Mass. 2001)._ The plaintiff cannot prevail on a claim under _§ 1985(3)_ "on a legal theory that the defendants are particularly targeting him because of his actions as an individual." _Baxter, at 129_ (emphasis in the original).  In addition, a plaintiff cannot maintain an action under _§ 1985(3)_ on the basis that the defendants targeted him as a "whistleblower" who makes public disclosures of corruption and wrongdoing. _LaManque supra at 90-93_ (finding that "whistleblowers" were not a "class" for purposes of _§ 1983_).

In this instance, Bolduc cannot prevail on his _§ 1985_ claims because he cannot show a constitutional deprivation by Bergeron, Keefe or the Town.  In addition, there is no evidence that

Bergeron, Keefe and the Town conspired to deprive a race or class of individuals of its constitutional rights. Bolduc cannot maintain an action under *§ 1985* simply on the grounds that the defendants targeted him as an individual. Likewise, Bolduc is not a member of a protected race or class. Bolduc himself is not a person of color and he cannot prove racial animus simply because one officer, Barnes, made racial comments in his presence on one occasion, namely during a lunch when they were not within the scope of their employment. Finally, Bolduc is not a member of any protected class. Bolduc's status as a whistleblower is not sufficient to form a basis for a claim under *§ 1985(3)*. As such, this Court should enter judgment in favor of Bergeron, Keefe, and the Town on Count II of the First Amended Complaint.

III.    **Violation of M.G.L. c. 151B, § 4(4), § (4A) and § (5) v. Town and Bergeron (Count III)**

In Count III, Bolduc alleges that the Town and Bergeron, both individually and in his official capacity as Chief of Police, violated M.*G.L. c. 151B, § 4(4), § 4(4A) and§ 4( 5)*.

*Chapter 151B, § 4(4)* provides that it shall be an unlawful practice for any employer to discharge, expel or otherwise discriminate against any person because he has opposed any practice forbidden under *Chapter 151B* or because he has filed a complaint, testified, or assisted in any proceeding under § 5. *Section 4(4A)* holds that it shall be unlawful for any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by *Chapter 151B*. *Section 4(5)* provides that it is unlawful for any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under *Chapter 151B* or to attempt to do so.

37

A.    **Chapter 151B, § 4(4) and (4A)**

Claims under *Chapter 151B, §§ 4(4) and (4A)* are commonly called "retaliation claims" even though the statute does not use that term.  *Pontremoli v. Spaulding Rehab. Hospital, 51 Mass. App. Ct. 622, 624 (2001).*  To maintain a claim of retaliation under *G.L. c. 151B, §§ 4(4) and 4(4A)*, the plaintiff has the burden of establishing a prima facie case of retaliation by showing:  (1) that he engaged in protected conduct; (2) that he suffered adverse action; and (3) that a causal connection existed between the protected conduct and the adverse action.  *Mole v. University of Massachusetts, 442 Mass. 582, 591 (2004).*

If the plaintiff makes out a prima facie case, the burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for its employment decision.  *Wooster v. Abdow Corp., 46 Mass. App. Ct. 665, 668 (1999).*  If the defendants meet their burden, the plaintiff must show that the defendants' proffered reason was not, in fact, the real reason for the decision and that the decision was the result of the defendants' retaliatory animus.  *Melnychenko v. 84 Lumber Co., 424 Mass. 285, 293 (1997).*

A plaintiff's retaliation claim fails as a matter of law if the plaintiff cannot prove a causal connection between protected activity and adverse employment action.  *See Mole, supra.*  A plaintiff cannot meet his burden of proving a causal link on the mere fact that one event followed another.  *Mole at 592.*  Furthermore, the plaintiff cannot meet his burden of proof where the adverse action takes place before the defendants were aware of the protected activity.  *Mole at 593.*  Where "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." *Mole at 594.*

In addition an inference of causation cannot be drawn where there is a time span between the protected activity and the adverse actions. _Mole, at 595._ As "the elapsed time between those two events becomes greater, the inference weakens and eventually collapses." _Mole, at 595._

Finally, a plaintiff cannot meet his burden of proving a causal link between protected activity and adverse action where the adverse decisions were made by someone other than the defendant. _Mole, at 598._ Even if the defendant made complaints about the plaintiff which were "motivated by retaliation," there is no causal connection where the adverse action is taken by someone other than the defendant. _Mole, at 598_ (even though supervisors made complaints which were motivated by retaliation, the adverse actions were taken by the evaluation committee and the chancellor, not by the defendants). "Despite a retaliatory or discriminatory motive on the part of a supervisor who recommends that some adverse action be taken against an employee, a third person's independent decision to take adverse action breaks the causal connection between the supervisor's retaliatory or discriminatory animus and the adverse action." _Mole, at 598._ "The mere fact that a retaliating supervisor provides some of the information on which a decision is based, or initially recommends the adverse employment action to someone higher up in the organization, does not necessarily mean that the decision maker lacks sufficient independence from the supervisor for these purposes." _Mole, at 599._

"When assessing the independence of the ultimate decision maker, courts place considerable emphasis on the decision maker's giving the employee the opportunity to address the allegations in question, and on the decision maker's awareness of the employee's view that the underlying recommendation is motivated by bias or desire to retaliate." _Mole, at 600._ "Where those factors are present, they indicate that the decision maker has not merely accepted the tainted recommendation at face value, but has in fact made a sufficient independent

338726v1

determination as to whether discipline or adverse action is appropriate." *Mole, at 600-602* (finding no causal connection where plaintiff was represented by counsel, had a full opportunity to be heard and to present his own version of events).

Where the defendants are not the sole source of information provided to the decision maker and where the decision maker gives the plaintiff the opportunity to present his version of events and explain his conduct, the plaintiff cannot establish a causal connection. *Mole, at 600.*

In this instance, Bolduc claims the "protected activity" was his support of Ralph's MCAD complaint, as well as his own MCAD complaint. Bolduc filed his MCAD complaint on June 16, 2003. The Town received notice of Ralph's MCAD complaint on June 23, 2003. Ralph's MCAD complaint did not identify Bolduc as a witness in his favor. Bergeron was placed on paid administrative leave on July 14, 2003. There is no evidence in the record that Bergeron took any retaliatory action against Bolduc between June 16, 2003 and July 14, 2003. As discussed above, there is no support for Bolduc's claim that he was retaliated with respect to his schedule and office space because he was always assigned to the night shift and he was not guaranteed an office, especially since he had work space available to him. Furthermore, Bergeron had a legitimate, nondiscriminatory reason for reassigning the office space. In addition, Bolduc only occasionally worked on the 30-year-old Amato cold case so that his removal from that investigation can hardly be considered an adverse employment action. As such, Bolduc's *Chapter 151B* claims against Bergeron must fail as a matter of law.

In addition, Bolduc cannot make out a prima facie case against the Town because there is no evidence of any causal connection between the protected activity and Bolduc's termination. The mere fact that Bolduc was terminated after the protected activity occurred is not sufficient to withstand summary judgment. First, it is undisputed that the Mayotte and Greenwood incidents,

338726v1

as well as the cheating allegations, predated his involvement in any protected activity. Furthermore, the protected activity occurred in June of 2003 and Bolduc was not terminated until March 19, 2004. Finally, the decision to terminate Bolduc was made by Leal after a hearing in which she received information from various sources and in which Bolduc had the opportunity to address the allegations against him.

Moreover, even if this Court finds that Bolduc makes out a prima facie case in this instance, Bolduc still cannot prevail on his Chapter 151B retaliation claims as a matter of law because the Town has articulated a legitimate, nondiscriminatory reason for terminating Bolduc. (*See* Discussion regarding this standard under Title VII below). That is, there was evidence of excessive use of force on three separate occasions. And while Bolduc attempts to downplay the amount of force that he used, he does not dispute that he used force in each instance. Specifically, he forcibly held and squeezed Abbe's face. He used bolt cutters to remove Mayotte's facial jewelry. And he punched Greenwood.

As such, the Town and Bergeron are entitled to judgment as a matter of law on Count III of the First Amended Complaint.

**B.    Chapter 151B, § 4(5)**

A claim for aiding and abetting under § 4(5) is premised on the existence of an underlying occurrence of discrimination, as a threshold to raising the question of another's individual liability for aiding and abetting. *See Chapin v. University of Mass. at Lowell*, 977 F. Supp. 72 (D. Mass. 1997); *Beaupre v. Cliff Smith Assoc.*, 50 Mass. App. Ct. 480, 494 (2000). As discussed, since Bolduc has no reasonable expectation of proving the underlying discriminatory action in this instance, there can be no claim under *G.L. c. 151B, § 4(4)(5)* as a matter of law. *Id.*

Therefore, this Court should enter judgment in favor of the Town and Bergeron on Count III of the First Amended Complaint.

**IV.** **Violation of Title VII v. Town and Bergeron (as Chief of Police) (Count IV)**

In Count IV, Bolduc alleges that the Town and Bergeron, in his official capacity, violated Title VII on the basis that the defendants' actions "constitute retaliation and intimidation."

**A.** **Bergeron Cannot be Liable as a Matter of Law Because There is no Individual Liability Under Title VII.**

In this instance, Bolduc claims that Bergeron, in his official capacity as Chief of Police, violated Title VII. To the extent that this is just another way of asserting a claim against the Town, it should be dismissed against Bergeron. *Hafer v. Melo, 502 U.S. 21 (1999)*. Moreover, Bolduc cannot prevail on this claim against Bergeron as a matter of law because "this court has recognized previously, 'there is no individual liability under Title VII.'" *Bourbeau v. City of Chicopee, 445 F. Supp. 2d 106, 111 (D. Mass. 2006)*(quoting *Homey v. Westfield Gage Co., 95 F. Supp. 2d 29, 33-36 (D. Mass. 2000)*).

To date, the First Circuit has not resolved the issue as to whether there is individual liability under Title VII. However, the United States District Court for the District of Massachusetts has addressed the issue and found that there is no individual liability under Title VII. *Bourbeau, supra; Horney, supra*. The District Court ruled conclusively that "there is no individual supervisor liability under Title VII. *Horney, at 33*. The court outlined in detail five reasons for its decision, which are briefly summarized as follows:

1. Title VII requires that employers keep employment records and post notices summarizing Title VII provisions and filing requirements. If supervisory individuals were subject to liability under Title VII, they would also bear the burden of complying with these requirements.

2.  The intent of Congress in using the term "any agent" favors a finding of no individual liability.

3.  Since Title VII exempts companies with fewer than 15 employees from liability, it would be inconceivable for Congress to contemporaneously allow for liability against individual employees.

4.  The original remedies available under Title VII were "reinstatement" and "back pay." These types of remedies are naturally linked to the employer.

5.  Under Title VII, damage awards are calibrated and ultimately capped, depending on the size of the employer. However, there is no mention of individual limits. *Id*. at 33-35.

Although the First Circuit has yet to decide whether a Title VII plaintiff may maintain a suit against an individual in his personal capacity, most circuits have held that no personal liability can be attached to agents or supervisors under Title VII." *Canabal v. Aramark Corp.*, 48 F. Supp. 2d 94 (D.P.R. 1999); *see also Owen v. Regional Transit Authority* 7 Fed. Appx. 496, 500 n.3 (6^th^ Cir. 2001); *Cardenas v. Massey*, 269 F.3d 251, 268 (3^rd^ Cir. 2001); *Haynes v. Williams*, 88 F.3d 898 (10^th^ Cir. 1996); *Williams v. Banning*, 72 F. 3d 552 (7^th^ Cir. 1995); *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2^nd^ Cir. 1995); *Gary v. Long*, 59 F. 3d 1391 (D.C. Cir. 1995); *Lenhardt v. Basic Institute of Technology, Inc.*, 55 F. 3d 377 (8^th^ Cir. 1995); *Smith v. Lomax*, 45 F. 3d 402 (11^th^ Cir. 1995); *Miller v. Maxwell's International, Inc.*, 991 F. 2d 583 (9^th^ Cir. 1993); *cf.*, *Santiago v. Lloyd*, 33 F. Supp. 2d 99 (D.P.R. 1998).

Under the overwhelming case law, Bolduc cannot maintain a Title VII claim against Bergeron. As such, this Court should enter judgment in favor of Bergeron on Count IV of the First Amended Complaint.

43

**B.**   **There is no Causal Connection Between The Protected Activity And Any Adverse Employment Action And The Town Has Set Forth a Legitimate, Nondiscriminatory Reason For Terminating Bolduc.**

"Title VII prohibits employers from discriminating against any employee 'because he has opposed any practice made unlawful by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'"   _Ianetta v. Putnam Investments, Inc.,_ _2002 U.S. Dist. LEXIS 3277, *23 (D. Mass.)_(quoting _42 U.S.C. § 2000e-3_).

As with claims under _Chapter 151B_, Title VII claims are analyzed "under the McDonnell-Douglas burden-shifting framework." _McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006)_[140]; _McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973)._ "Under McDonnell-Douglas, the plaintiff must make a prima facie showing that (i) he engaged in the protected conduct, (ii) he was thereafter subject to an adverse employment action, and (iii) a causal connection exists between the protected conduct and the adverse action." _McDonough, supra._ "If the plaintiff makes this showing, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant presents such a reason, the plaintiff must demonstrate that the defendant's proffered reason is pretext masking illegal retaliation." _Id._ (internal citation omitted).

"Under the McDonnell Douglas framework, in order to rebut the presumption that arises upon the establishment of a prima facie case, the employer need only produce enough competent evidence that would permit a rational fact finder to conclude that the challenged employment

---

[140] On summary judgment however, " 'the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.'" _Szabo v. Trustees of Brown University, 1998 U.S. App. LEXIS 32720, *8 (D. Mass.)_(quoting _Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)_).

action was taken for a 'legitimate, nondiscriminatory reason.'" *Ianetta, supra at \*28* (quoting *Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 166 (1st Cir. 1998)*).

If the employer produces evidence that the challenged employment action was taken for a legitimate, nondiscriminatory reason, the plaintiff cannot avoid summary judgment by asserting pretext "'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Ianetta at \*29-30* (quoting *DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)*). The mere fact that the plaintiff was discharged from employment shortly after engaging in protected activity is not sufficient to establish "pretext" and avoid summary judgment. *Id. at 33.* An employer is entitled to summary judgment under Title VII if the employer had legitimate reasons for discharging the employee before the employee engaged in the protected activity. *Id. at 35.* "It is settled law that if an employer has set a course of action regarding employee discipline, it need not change that course of action because a Title VII claim has been made against it." *Id.* Furthermore, "it is insufficient for a plaintiff merely to undermine the veracity of an employer's proffered justification; instead [h]e must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998)*.

For the same reasons as were set forth above with respect to Bolduc's *Chapter 151B* claims, Bergeron and the Town are entitled to summary judgment on Bolduc's Title VII claims as a matter of law. As such, this Court should enter judgment in favor of the Town on Count IV of the First Amended Complaint.

**V.**    **Violation of M.G.L. c. 149, § 185 (Whistleblower Statute) v. Town (Count V)**

In Count V, Bolduc alleges violations of *M.G.L. c. 149, § 1985*, the Massachusetts Whistleblower Statute, against the Town.  As set forth above, Bolduc sent the Whistleblower Letter to the Town Board of Selectmen.  He did not send the Whistleblower Letter to either Chief Keefe or Town Administrator Leal.

In the Whistleblower Letter, Bolduc essentially maintains that the Town violated the Whistleblower Statute by:  (1) failing to comply with the administrative requirement of recording the race of individuals detained by the police for traffic violations; (2) failing to discipline officers for making overly (sic) racist remarks while in uniform, on duty, and in a public place; and (3) taking adverse employment action against Bolduc for reporting and substantiating racist behavior of Officer Barnes.

"The Massachusetts Whistleblower Statute gives a municipal employee a civil claim for damages against a city or town that takes 'retaliatory action' against him 'because he engages in certain protected conduct.  Conduct protected by the statute includes disclosing 'to a supervisor or to a public body' conduct which the employee 'reasonably believes' is in violation of law or poses a risk to the public." *Wagner, supra at 97*.  " 'Retaliatory action' is defined to include 'the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" *Diranne v. The Brookline Police Department, 315 F.3d 65, 72 (1st Cir. 2002)*(quoting *M.G.L. c. 149, § 185(a)(5)*).

In order to receive the protection of the Whistleblower Statute, the plaintiff must "bring the 'activity, policy or practice in violation of a law . . . to the attention of a supervisor of the employee by written notice' and afford the employer a 'reasonable opportunity to correct the activity, policy or practice.'" *Wagner supra*.

338726v1

In this instance, Bolduc cannot prevail on his Whistleblower claim because there is no causal connection between Bolduc's so-called whistleblowing activity and his ultimate termination in that the termination related solely to the three incidents of excessive force as discussed extensively above. Furthermore, Bolduc was not reporting an "activity, policy or practice" of his employer. Bolduc concedes that, to his knowledge, Barnes was the only officer who did not comply with the racial profiling procedure, and the only instance of an officer making racial comments in public was a story told by Barnes during a private lunch. Neither one of these incident is sufficient to establish an "activity, policy or practice" of the Town. In addition, given that Bolduc learned of Barnes' failure to comply with the racial profiling law from the Boston Globe, he can hardly be considered a whistleblower. Furthermore, while Barnes' alleged statement is certainly derogatory, Bolduc could not have reasonably believed that it violated the law or posed a risk to the public.

Finally, even if this Court finds that Bolduc reported an activity, policy or practice in violation of law and that the Town retaliated against him for that report, Bolduc still cannot prevail on his Whistleblower claim because he failed to give adequate notice as mandated under *G.L. c. 149, § 185*. In *Dirrane v. The Brookline Police Dept., 315 F.3d 65 (1st Cir. 2002)*, the First Circuit "makes clear as a general matter that in order to enjoy the protection of that statute, absent an exception[141], an employee must give his **employer** written notice of the misconduct he wishes to disclose to an outside 'public body.'" *Wagner v. City of Holyoke, 241 F. Supp. 2d 78, 97-98 (D. Mass. 2003)*(emphasis added). The law is clear that where an employee becomes

---

[141] The exceptions are set forth at *G.L. c. 149, § 185(c)(2)* which provides that an employee is not required to comply with the written notice requirement "(1) if he: (A) is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer and the situation is emergency in nature; (B) reasonably fears physical harm as a result of the disclosure provided; or (C) makes the disclosure to a public body as defined in clause (B) or (D) of the definition of 'public body' in subsection (a) for the purpose of providing evidence of what the employee reasonably believes to be a crime.

aware of misconduct, reports it to his superior and suffers retaliation but fails to report the misconduct in writing to his **employer** before filing suit, "his [whistleblower] claim must be dismissed." _Id_. _at 98._

In this case, Bolduc allegedly became aware of misconduct, reported it to his superior and was allegedly retaliated against. However, Bolduc never reported the misconduct to his **employer** in writing prior to filing suit. Instead, Bolduc sent written notice to the Town Selectmen – who are/were not Bolduc's employer. No exception applies in this instance. Moreover, Bolduc was no longer an employee of the Town when he sent his August 5, 2004 notice, given that he had been terminated on March 19, 2004. As such, Bolduc cannot maintain his whistleblower claim against the Town as a matter of law. Therefore, this Court should enter judgment in favor of the Town on Count V of the First Amended Complaint.

## VI.    Violations of M.G.L. c. 12, § 11I v. Town and Bergeron (Count VI)

In Count VI, Bolduc alleges that the Town and Bergeron deprived him of his civil rights under the First and Fourteenth Amendments of the United States Constitution and Articles I and X of the Declaration of Rights of the Commonwealth of Massachusetts, in violation of _M.G.L. c. 12, §11I_ (the "Massachusetts Civil Rights Act" or the "MCRA"). The MCRA provides that any person whose exercise or enjoyment of rights secured by the Constitution or the laws of the Commonwealth has been interfered with, or attempted to be interfered with, may institute a civil action. _Section 11I_ requires that the interference be by threats, intimidation or coercion.

### A.    Bolduc's Claim Against the Town Must Fail Because A Municipality Cannot be Sued Under the MCRA.

The Town is entitled to summary judgment on Bolduc's claim under the MCRA because "under Massachusetts law a municipality cannot be sued under the MCRA." _Kelley v. LaForce,_

*288 F.3d 1, 10, n.9 (1ˢᵗ Cir. 2002);* *Howcroft v. City of Peabody,* *51 Mass. App. Ct. 573, 593 (2001)* (concluding that, unlike *§ 1983*, a municipality is not a "person" within terms of MCRA). As such, this Court should enter judgment in favor of the Town on Count VI of the First Amended Complaint.

        **B.**        **Bolduc's Claim Against The Town Must Fail Because a Municipality Cannot be Liable Under The MCRA on The Theory of *Respondeat Superior.***

        Further, to the extent that Bolduc is attempting to establish liability with respect to the Town for Bergeron's alleged conduct, it is well established in Massachusetts that claims under the MCRA cannot rest on the doctrine of *respondeat superior.*  *See* *Lyons v. National Car Rental Sys.,* *30 F.3d 240, 245 (1ˢᵗ Cir. 1994);* *see* *also* *Chaabouni,* *supra at 103* ("This Court, therefore, rules that the MCRA does not permit holding a municipality liable under the theory of vicarious liability.").  The <u>Lyons</u> Court derived its decision, in part, from *Monell v. New York Dep't of Soc. Servs.,* *436 U.S. 658 (1978),* which specifically held that municipalities cannot be held liable on the theory of *respondeat superior* under *42 U.S.C. § 1983.*  In short, as a matter of law, Bolduc's claim against the Town must fail because the Town cannot be liable for the alleged actions of Bergeron.  As such, this Court should enter judgment in favor of the Town on Count VI of the First Amended Complaint.

        **C.**        **Bolduc's Claim Against Bergeron Must Fail Because Bergeron Did Not Deprive Bolduc of His Constitutional or Statutory Rights by Threats, Intimidation or Coercion.**

        Bolduc's claims against Bergeron must fail because there is no evidence in the record that Bergeron used threats, intimidation or coercion to interfere with or to attempt to interfere with Bolduc's civil rights.

Under the MCRA, "threat" involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm, and "intimidation" involves putting in fear for the purpose of compelling or deterring conduct. _Planned Parenthood League of Mass. v. Blake_, 417 _Mass. 467, 474 (1994), cert. denied, 513 U.S. 868 (1994)._ "Coercion" has been defined as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." _Id._ There must be an "actual or potential _physical_ confrontation accompanied by a threat of harm" to prevail on a civil rights claim. _LaManque v. Massachusetts Dep't of Employment and Training, 3 F. Supp. 2d 83, 93 (D. Mass. 1993)_ (emphasis in original) (citations omitted). An objective standard is to be used to determine if a reasonable person in the plaintiff's position would have been threatened, intimidated or coerced by the defendant's conduct. _Planned Parenthood League, 417 Mass. at 474-75._

First, as discussed in detail above, there is no evidence that Bergeron attempted to interfere with, or did interfere with, Bolduc's civil rights. Second, there is no evidence of any threats, intimidation or coercion by Bergeron with respect to Bolduc. Bolduc simply makes the bare allegation that Bergeron told him his support of Ralph's racial bigotry claim against Barnes would "cost him" during a meeting on April 15, 2003. The only people present during this meeting were Bolduc and Bergeron. Bergeron denies that he threatened Bolduc in this manner. Bergeron maintains that he merely told Bolduc that if he and Ralph were lying about the racial bigotry claim, it would "cost" both Ralph and Bolduc from a professional stand point. Since there are no other witnesses to this incident, Bolduc cannot meet his burden of proving a threat by a preponderance of the evidence. In addition, it is significant to note that Bergeron never took any disciplinary action against Bolduc.

50

Furthermore, even if this Court accepts Bolduc's version of the alleged "threat" by Bergeron, there is no evidence of a physical confrontation involving a threat of harm. As such, Bolduc cannot meet his burden of proving any alleged threats, coercion or intimidation with respect to Bergeron as a matter of law. Therefore, this Court should enter judgment in favor of Bergeron on Count VI of the First Amended Complaint.

### D. Bolduc's Claim Against Bergeron Must Fail Because Bergeron is Entitled to Qualified Immunity.

The same qualified immunity standard that applies under *§ 1983* also applies to claims under the MCRA. *Kelley, supra* at 10; *see also Duarte v. Healy*, 405 Mass. 43, 46 (1989). Therefore, Bolduc cannot prevail on his state civil rights claim against Bergeron because Bergeron is entitled to qualified immunity under *M.G.L. c. 12, §111* to the same extent that he is entitled to qualified immunity under *§1983*.

"The same qualified immunity standard that applies under *§ 1983* has also been held to apply to claims under the MCRA." *Kelley, supra*; *see also, Duarte, supra*. "Therefore, a state official cannot be held liable under the MCRA for discretionary official actions that violate (federal or state) constitutional or statutory rights unless those rights were clearly established at the time of the violation and the official's actions were objectively unreasonable." *Id*.

In this instance, Bergeron is entitled to qualified immunity under *§ 1983* for the reasons set forth previously in this Memorandum. As such, he is likewise entitled to qualified immunity under the MCRA as a matter of law. Therefore, this Court should enter judgment in favor of Bergeron on Count VI of the First Amended Complaint.

**E.    Bolduc's Claims Against The Town And Bergeron Must Fail Because The MCRA Does Not Create an Independent Right to Relief.**

In addition to the foregoing, this Court should enter judgment in favor of the Town and Bergeron on Bolduc's MCRA claims because the MCRA does not create an independent right to relief in this instance.

As a matter of law, a plaintiff has no independent right to seek relief by means of a claim against his former employer for violation of the MCRA, *M.G.L. c. 12, §§ 11H* and *11I*, where the plaintiff's allegations would also give rise to a claim under *G.L. c. 151B, § 4*. *See Butner v. Department of State Police*, 60 Mass. App. Ct. 461, 467-468 (2004); *Mouradian v. General Elec. Co.*, 23 Mass. App. Ct. 538, 543 (1987)(noting that the only right "secured by the commonwealth" was a right which could have been enforced under *c. 151B*); *see also*, *Kuketz v. MDC Fitness Corp.*, 9 Mass. L. Rep. 261 (1998), aff'd., 443 Mass. 355 (2005); *Blick v. Pitney Bowes Mgmt. Services, Inc.*, 1996 Mass. Super. LEXIS 370, affid., 44 Mass. App. Ct. 1106 (1997). "Complaints constituting *c. 151B* claims cannot be refashioned into MCRA claims to avoid the exclusivity provision." *Butner, supra*. In short, "[a] plaintiff may not pursue a claim under *G.L. c. 12, 11I* where an adequate remedy exists for his or her claimed injury under c. 151B." *Blick, supra* at *10.

In this instance, Bolduc's allegations against the Town and Bergeron for violation of the MCRA clearly also give rise to claims under *Chapter 151B*. In fact, Bolduc has maintained claims against the Town and Bergeron for violation of *Chapter 151B, § 4(4),(4A)* and (5) (Count III). As such, Bolduc has an adequate remedy under *Chapter 151B* and Bolduc cannot seek an independent right to relief under the MCRA as a matter of law. Therefore, this Court should enter judgment in favor of the Town and Bergeron on Count VI of the First Amended Complaint.

## **CONCLUSION**

In light of the foregoing, this Court should enter judgment in favor of the defendants, Town of Webster, Richard Bergeron, and William Keefe on all counts of the First Amended Complaint against them.

> The Defendants
> Town of Webster, Richard Bergeron
> and William Keefe
>
> By Their Attorneys
> MORRISON MAHONEY LLP
>
>
> ____/s/ Carole Sakowski Lynch_____
> Carole Sakowski Lynch, BBO#547718
> 1500 Main Street, Suite 2400
> P.O. Box 15387
> Springfield, MA  01115-5387
> (413) 737-4373
> (413) 739-3125 (Fax)

I hereby certify that this document, filed through the ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on November 17, 2006.

> /s/ Carole Sakowski Lynch_____

338726v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:05-CV-40030-FDS

| | |
|---|---|
| JOHN A. BOLDUC, JR., | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| TOWN OF WEBSTER, ROBIN LEAL, | ) |
| RICHARD BERGERON and WILLIAM | ) |
| KEEFE, | ) |
| Defendants | ) |

### AFFIDAVIT OF CAROLE SAKOWSKI LYNCH

I, Carole Sakowski Lynch, hereby depose and state as follows:

1.     I am an attorney at Morrison Mahoney LLP, 1500 Main Street, Springfield, Massachusetts which law firm represents the defendants, Town of Webster, Richard Bergeron, and William Keefe, in the above matter.

2.     Attached hereto as Exhibit 1 is a true and accurate copy of excerpts of the deposition transcript of Richard Bergeron.

3.     Attached hereto as Exhibit 2 is a true and accurate copy of excerpts of the deposition transcript of Thomas Ralph.

4.     Attached hereto as Exhibit 3 is a true and accurate copy of excerpts of the deposition transcript of Brian Barnes.

5.     Attached hereto as Exhibit 4 is a true and accurate copy of excerpts of the deposition transcript of John Bolduc (Volume I).

6.     Attached hereto as Exhibit 5 is a true and accurate copy of a report from Officer Brian Barnes to Police Chief Richard Bergeron, dated April 17, 2003.

7.    Attached hereto as Exhibit 6 is a true and accurate copy of a letter from Deputy Chief Thomas Ralph to Chief Richard Bergeron, dated April 15, 2003.

8.    Attached hereto as Exhibit 7 is a true and accurate copy of a letter from Deputy Chief Thomas Ralph to Chief Richard Bergeron, dated April 16, 2003.

9.    Attached hereto as Exhibit 8 is a true and accurate copy of a letter from Detective Michael Shaw to Chief Richard Bergeron, dated April 25, 2003.

10.    Attached hereto as Exhibit 9 is a true and accurate copy of a written narrative report prepared by John Bolduc, dated May 2, 2003.

11.    Attached hereto as Exhibit 10 is a true and accurate copy of excerpts of the deposition transcript of William Keefe.

12.    Attached hereto as Exhibit 11 is a true and accurate copy of a memorandum from John Bolduc to Town Administrator Steven Boudreau, dated May 15, 2003.

13.    Attached hereto as Exhibit 12 is a true and accurate copy of an MCAD Complaint filed by Thomas Ralph, dated June 13, 2003.

14.    Attached hereto as Exhibit 13 is a true and accurate copy of and MCAD Complaint filed by John Bolduc, dated June 16, 2003.

15.    Attached hereto as Exhibit 14 is a true and accurate copy of excerpts of the deposition transcript of John Bolduc (Volume II).

16.    Attached hereto as Exhibit 15 is a true and accurate copy of a Human Resources Division decision, dated November 17, 2003.

17.    Attached hereto as Exhibit 16 is a true and accurate copy of a hearing transcript, dated March 10, 2004.

2

18.    Attached hereto as Exhibit 17 is a true and accurate copy of a letter from Robin Leal to John Bolduc, dated December 12, 2003.

19.    Attached hereto as Exhibit 18 is a true and accurate copy of a written report prepared by Patrolman Leonard Gevry, dated December 30, 2003.

20.    Attached hereto as Exhibit 19 is a true and accurate copy of a report by Leo Polizoti, Ph.D., dated January 27, 2004.

21.    Attached hereto as Exhibit 20 is a true and accurate copy of a letter from Robin Leal to John Bolduc, dated March 19, 2004.

22.    Attached hereto as Exhibit 21 is a true and accurate copy of a Notice of Appeal, dated March 25, 2004.

23.    Attached hereto as Exhibit 22 is a true and accurate copy of a Notice of Dismissal, dated May 11, 2004.

24.    Attached hereto as Exhibit 23 is a true and accurate copy of a letter from Attorney John J. Green, Jr. to the Town of Webster, Board of Selectmen, dated August 5, 2004.

25.    Attached hereto as Exhibit 24 is a true and accurate copy of excerpts of the deposition transcript of Robin Leal.

26.    Attached hereto as Exhibit 25 is a true and accurate copy of a photo of Catharine Abbe.

27.    Attached hereto as Exhibit 26 is a true and accurate copy of a photo of Jonah Mayotte.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 17th DAY OF NOVEMBER, 2006.

_____
Carole Sakowski Lynch

3

340594v1

# EXHIBIT 1

1

Volume I, Pages 1-128

Exhibits 1-15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOHN A. BOLDUC, JR.,

　　　　Plaintiff

vs.                                No. 05-40030FD5

TOWN OF WEBSTER, ROBIN LEAL,

RICHARD BERGERON, and WILLIAM KEEFE,

　　　　Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  RICHARD BERGERON

10:15 a.m. - 2:04 p.m.

Friday, August 18, 2006

MORRISON MAHONEY LLP

One Chestnut Place, Suite 470

Worcester, Massachusetts


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

PERLIK AND COYLE REPORTING

1331 Main Street

Springfield, Massachusetts  01103

413.731.7931    Fax 413.526.2316

**2**

APPEARANCES:
Representing the Plaintiff:
    GREEN, MILES, LIPTON & FITZ-GIBBON, LLP
    BY: JOHN J. GREEN, JR., ESQ.
    77 Pleasant Street
    P.O. Box 210
    Northampton, Massachusetts 01061-0210
    413.586.8218    Fax 413.584.6278
Representing the Town of Webster, Richard Bergeron,
and William Keefe:
    MORRISON MAHONEY LLP
    BY: CAROLE SAKOWSKI LYNCH, ESQ.
    1500 Main Street, Suite 2400
    P.O. Box 15387
    Springfield, Massachusetts 01115-5387
    413.737.4373    Fax 413.739.3125
Representing Robin Leal:
    MURPHY, HESSE, TOOMEY & LEHANE, LLP
    BY: GEOFFREY B. McCULLOUGH, ESQ.
    World Trade Center East
    Two Seaport Lane
    Boston, Massachusetts 02210
    617.479.5000    Fax 617.338.1324
    gmccullough@mhtl.com

**3**

# INDEX

WITNESS:          EXAMINATION BY:      PAGE:
Richard Bergeron      Mr. Green          4


EXHIBITS:                    PAGE:
Exhibit 1, Organizational Flow Chart.......13
Exhibit 2, Procedures - Use of Force.......17
Exhibit 3, Policy and Procedure............24
Exhibit 4, 6/18/01 Memorandum.............28
Exhibit 5, 2/26/03 Letter..................54
Exhibit 6, 4/15/03 Letter..................58
Exhibit 7, 4/17/03 Letter..................70
Exhibit 8, 4/25/03 Letter..................72
Exhibit 9, James A. Hoover's Affidavit.....72
Exhibit 10, 4/17/03 Memorandum.............78
Exhibit 11, 4/27/03 Memorandum.............79
Exhibit 12, 5/2/03 Memorandum..............84
Exhibit 13, 4/30/03 E-Mail.................86
Exhibit 14, 6/17/03 Letter.................95
Exhibit 15, 9/30/03 Letter................104

**4**

```
 1          RICHARD BERGERON,
 2 having been satisfactorily identified and duly sworn
 3 by the Notary Public, was examined and testified as
 4 follows:
 5          MR. GREEN:  Usual stipulations?
 6          MS. LYNCH:  Yes.
 7          MR. GREEN:  Objections reserved until
 8 time of trial except for the form of the question
 9 and what was -- the motions to strike?
10          MS. LYNCH:  Motions to strike are
11 reserved.
12          MR. GREEN:  Okay.
13          EXAMINATION
14 BY MR. GREEN:
15     Q.  Chief, my name is John Green.  I represent
16 John Bolduc in a federal case that's been filed.  If
17 at any time during this morning or afternoon you
18 wish to take a break for any reason, just so
19 indicate.  We'll be happy to allow you to talk to
20 counsel or for any reason.
21     If at any time during the deposition you
22 don't understand the question as I put it to you,
23 just so indicate and I'll try to put it into a form
24 that you can respond to.  Are you under any course
```

**5**

```
 1 of medication or other substance that affects the
 2 way you are able to answer questions here today?
 3     A.  Just blood pressure medicine which does
 4 sometimes dull your memory.
 5     Q.  What's that medication?
 6     A.  Toprol.
 7     Q.  Would you please state your full name.
 8     A.  Richard Bergeron.  Richard E., Junior.
 9     Q.  Are you currently employed?
10     A.  No.
11     Q.  Do you currently live in the Town of
12 Webster?
13     A.  No.
14     Q.  Do you currently live in Massachusetts?
15     A.  No.
16     Q.  Are you retired?
17     A.  Yes.
18     Q.  So you are engaged in no form of
19 employment?
20     A.  Nothing, no.  Nothing at all.  Just doing
21 hobby stuff.  Doing a little farming on my own.
22 That's it.
23     Q.  Did you retire from the Town of Webster?
24     A.  Yes.
```

**6**

1    Q. When did that happen?
2    A. Early 2004.
3    Q. Do you recall what month?
4    A. I don't recall what official month it was.
5  January, February, I don't know. Not exactly sure
6  what month originally.
7    Q. Where were you born?
8    A. Boston, Mass.
9    Q. Were you educated there?
10   A. No. Well, yes. But I moved to the suburbs
11 and actually went to Northeastern University, so I
12 guess you could say I was educated in Boston.
13   Q. You graduated from Northeastern?
14   A. Yes.
15   Q. What year was that?
16   A. Good question now. Seventies, I believe.
17 '78. Something like that.
18   Q. What was your degree?
19   A. I had an associate's degree and bachelor's
20 degree in criminal justice.
21   Q. How old are you?
22   A. 61.
23   Q. After graduating from Northeastern, did you
24 obtain any additional education?

**7**

1    A. Yes.
2    Q. What was that?
3    A. Went on to Anna Maria College.
4    Q. Did you obtain a degree from Anna Maria
5  College?
6    A. Yes, I did.
7    Q. What was that?
8    A. Master's degree.
9    Q. What specialty was that?
10   A. Criminal justice.
11   Q. After graduating, did you attend Anna Maria
12 while you were employed as a police officer?
13   A. Yes.
14   Q. Did you begin your employment as a police
15 officer immediately after graduating from
16 Northeastern?
17   A. No. I was a police officer before I had
18 any degree.
19   Q. Okay. So what year and in what department
20 did you begin your employment as a police officer?
21   A. In Quincy in 1970.
22   Q. Did you have any military service?
23   A. Yes.
24   Q. With what service was that?

**8**

1    A. U.S. Army.
2    Q. In what years?
3    A. I went in 1965. I got out, extended and
4  amended an enlistment, so it was close to six years
5  but not quite six years. Went six years without the
6  obligation. Actual time in there was five and
7  three-quarter years. Something like that.
8    Q. Where did you serve while you were in the
9  Army?
10   A. I served in Vietnam, served in Okinawa.
11   Q. With what unit did you serve?
12   A. 5th special forces group and 1st special
13 forces group. And I was also -- you want the whole
14 thing or you just want the active time?
15   Q. Well, did you remain in the reserves after
16 you left active duty?
17   A. No. But I had another assignment after
18 leaving Okinawa.
19   Q. What was that?
20   A. That was how the extended and amended came
21 into play. I put in for a special agent course,
22 which is a civilian. You're still a military, but
23 you're in civilian clothes. I was in Okinawa at the
24 time, and I had to extend my -- I think that was

**9**

1  that course or another course, one of the military
2  intelligence courses I had to extend my enlistment
3  one more time. That's why I was originally in for
4  three years and I extended and amended and that's
5  why the enlistment was almost six years.
6    Q. This special agent, what type of activities
7  were you engaged in as a special agent?
8    A. Well, it was -- it's a big name, sabotage,
9  and all that kind of stuff. Probably did one
10 sabotage investigation, a few others, predominantly
11 background investigations for people with top secret
12 security clearances.
13   Q. So at that point you were not assigned to
14 the special forces --
15   A. Right.
16   Q. -- you were CID; right?
17   A. Well, I wasn't, no. It was military
18 intelligence. They keep them separate in the army.
19 Some of them they pull them all together. CID is a
20 criminal investigation. This is strictly
21 intelligence.
22   Q. Counterintelligence?
23   A. Right.
24   Q. With what department did you begin your

**38**

1  sergeants?
2      A.  I may have discussed -- nothing that I can
3  recall that was anything in detail.  Could have been
4  informal.  I don't have any real recollection of
5  that.
6      Q.  Did you have any procedure or system for
7  periodically meeting with the sergeants and the
8  other members of the chain of command?
9      A.  We did occasionally.  My door was wide
10 open.  I had a total open-door policy.  If you were
11 the most junior officer, if you were the most senior
12 officer, anybody was welcome in my office.  We did
13 do that from time to time.  We probably got away
14 from it.
15     Q.  So it was nothing like a monthly or
16 quarterly meeting?
17     A.  There was from time to time.  I think that
18 we did have that, but I wouldn't say that took place
19 during my whole tenure.  Their office was right down
20 the hall.  My office was there.  You didn't have any
21 problem talking to me if you wanted to come in.
22     Q.  Subsequent to Bolduc being designated as a
23 provisional officer, did -- a provisional sergeant,
24 did that start the process for having an exam --

**40**

1      Q.  And aside from appointing a patrol officer
2  as a provisional sergeant, was there any other
3  mechanism available to place an officer in charge of
4  a shift other than as a sergeant?
5      A.  Seniority.  That's what it's been in the
6  past.  It's sort of a crazy situation.  I don't know
7  if you want to elaborate.
8      Q.  I guess the question is could you have just
9  simply designated a patrol officer on the basis of
10 seniority as a shift commander, to kind of cut to
11 the chase?
12     A.  It wouldn't work that way because of the
13 way they are scheduled.  You could have a situation,
14 let's say, and this is how Webster works, there
15 might be five guys that got out of the academy.  And
16 these are junior guys.  And all of them end up on
17 that midnight shift because they're junior guys.
18 You could have a guy who has less than a year on the
19 street being in charge of anything that goes on in
20 the Town of Webster.  That gets to be kind of a
21 tough situation when you are just going by strictly
22 seniority, who's in charge if there isn't a
23 sergeant.  You really have no choice but to make a
24 sergeant.

**39**

1      A.  Yes.
2      Q.  -- conducted and filling the slot on a
3  permanent place basis?
4      A.  Yes.
5      MS. LYNCH:  You need to let him finish
6  the question before you start to answer.
7      Q.  Was there any alternative when you appoint
8  an officer as a provisional sergeant, does he
9  actually put the stripes on, he or she put the
10 stripes on and -- they do?  You have to give me a
11 yes or no.
12     A.  I'm not sure what you are saying.
13     Q.  For example, a provisional appointment as a
14 sergeant isn't a permanent appointment so it's
15 subject to other things happening like getting the
16 permanent appointment.  But does the sergeant in his
17 or her provisional status actually put on sergeant
18 stripes?
19     A.  Yes.
20     Q.  And do they have all the powers with
21 respect to operational control of a shift that any
22 other sergeant would have in the performance of
23 their duties?
24     A.  Yes.

**41**

1      Q.  Okay.  At some point in time an exam was
2  conducted and the process for selecting a permanent
3  appointment as a sergeant was done.  Just for the
4  purposes of refreshing your recollection, this was
5  June of 2002 there was an interview process for
6  that position.  Do you recall who the candidates
7  were?
8      A.  I don't know if I got them all.  Let's see,
9  it was Michaela Kelley, Aaron Suss, John Bolduc.  I
10 think there might have been other people.
11     Q.  You were interviewing those three?
12     A.  Correct.
13     Q.  Do you have any recollection of what steps
14 you took to prepare for the interview?
15     A.  I've done a lot of interviews of people.
16 I've even done interviews for other departments.  As
17 far as me, I directed it to -- I actually didn't
18 want the interview process, put it that way.  Ralph
19 wanted it, and the town administrator wanted it to
20 process so pretty much was left up to Ralph.
21     Q.  Okay.  What was it about the interview
22 process that disinclined you to have it done?
23     A.  John is a sergeant, was a good friend of
24 mine at the time.  He's a very good presenter, okay.

(Pages 42 to 45)

---

**42**

1  And I think, my opinion he would have beaten anybody
2  that he was up against in the presentation part.
3  That's why he was my choice. He basically, on the
4  civil service you have a right to pick from the top
5  three, and I was willing to say he was my choice.
6      Q. So from your standpoint given the fact you
7  could make a selection from within the top three,
8  the interview process was really kind of
9  unnecessary; would that be a fair statement?
10     A. In my opinion, yeah. Other people might
11 have a different perspective on it.
12     Q. Is the interview process a mandated part of
13 the civil service selection process?
14     A. No.
15     Q. So --
16     A. They were all good candidates. I had no
17 problem with the candidates. They were all good.
18 One was too young, didn't have enough experience.
19     Q. Being who?
20     A. Aaron Suss. I think he had less than --
21 something like -- probably was just barely eligible
22 to take the exam. You had to have a year --
23     Q. Based on his seniority or --
24     A. Right.

---

**43**

1      Q. Now, you are aware, I'm sure, that, but if
2  you are not, please so indicate, that at some point
3  in time Officer Brian Barnes suggested that Ralph
4  engaged in some inappropriate conduct previous to
5  the interview process?
6      A. Yes.
7      Q. Do you recall when it was that Officer
8  Barnes joined the department?
9      A. It was a year or so after I got there, I
10 believe.
11     Q. Do you recall under what circumstances he
12 happened to join the department?
13     A. Took a civil service exam and wanted to
14 come out to Webster.
15     Q. As I understand it, correct me if I'm
16 wrong, he was already a police officer in the Town
17 of Quincy?
18     A. No.
19     Q. He was not?
20     A. No.
21     Q. I see. His appointment as a police officer
22 in the Town of Webster was to your knowledge first
23 appointment as a police officer?
24     A. Yes.

---

**44**

1      Q. Had he been a police officer like a reserve
2  officer in any other department to your knowledge?
3      A. No.
4      Q. Did you know Officer Barnes from any prior
5  contact before he joined the police department in
6  the Town of Webster?
7      A. He was a call taker. I had been
8  communication sergeant, booking sergeant, street
9  sergeant, bounced around in Quincy. He had been a
10 call taker in their dispatch center was basically
11 what he did.
12     Q. Just to enlighten those of us not familiar
13 with the internal mechanisms, so a call taker would
14 be a person that takes 9-1-1 calls?
15     A. Yes.
16     Q. Is this differentiated from a dispatcher?
17     A. I don't think it is now, but it was at the
18 time. At the time there could only be a cop to be a
19 dispatcher. Now I think cops fill in or they have
20 civilians dispatching, so things have changed.
21 There was no civilian dispatching at that time.
22     Q. Did you have, were you familiar, for
23 example, did you have any social contact with Brian
24 Barnes or any of his relatives prior to his becoming

---

**45**

1  a member of the Webster Police Department?
2      A. No.
3      Q. But I believe you testified you knew him
4  simply as a call taker who had been associated with
5  the Quincy Police Department?
6      A. Correct.
7      Q. And your contact with him had been in the
8  context of your duties as a Quincy police officer?
9      A. My contact?
10     Q. Your contacts with him prior to him coming
11 to Webster were in the context of your duties as a
12 Quincy police officer?
13     A. Correct.
14     Q. With respect to his appointment as a patrol
15 officer in the Town of Webster, how did that
16 selection process proceed?
17     A. Just a normal selection process. He
18 decided he wanted to be a Webster police officer.
19 He took the civil service exam. He came out for the
20 interview. He started as a part-time officer like
21 everybody else does in Webster.
22     Q. Was it in response to an advertisement for
23 an opening in the Webster Police Department?
24     A. Potentially. They advertised statewide for

---

12

Richard Bergeron
August 18, 2006

(Pages 54 to 57)

---

54

1 involved informally. Never anything formal like
2 when you become a police chief.
3    Q. As you were participating in the interview,
4 did anything about the questions that were presented
5 to the three candidates strike you as being odd or
6 unusual?
7    A. In retrospect the way it was answered it
8 was odd and unusual.
9    Q. In what sense do you mean that?
10   A. I mean, it was like a verbatim recital of
11 what was asked about policies. You know, I don't
12 know if it was the policy was even in my office, per
13 se. It was like repeated almost verbatim, but there
14 again, at the time it didn't raise my hackles really
15 at that particular time. They were all answered
16 quite succinctly.
17   Q. Succinctly, you mean accurately?
18   A. Accurately.
19      MR. GREEN: If you could mark this.
20      (Marked, Exhibit 5, 2/26/03 Letter)
21      (Break taken)
22   Q. Chief, I've just given you a letter dated
23 February 26 of 2003 addressed to you. Do you recall
24 receiving this letter from Thomas Ralph?

---

55

1    A. Frankly, I don't.
2    Q. Do you have any recollection of the
3 Greenwood incident, independent recollection of that
4 incident?
5    A. Yes.
6    Q. What is the basis of your recollection? Is
7 it independent of this letter?
8    A. Absolutely. I just, as far as I know, I
9 never assigned Thomas Ralph to investigate this
10 case. I first heard about it the next morning. We
11 were riding to a computer class in Grafton, and they
12 brought it up. Ralph and Bolduc brought it up.
13      Said the officer, Larry Gevry, couldn't
14 control the prisoner and he had to get in there to
15 mix it up with the prisoner. The way it was
16 explained to me, it seemed justified. So I don't
17 ever recall Bent coming to me saying anything about
18 it.
19      So as far as I was concerned, it was
20 justified until a later time where I met Officer
21 Gevry on a call. He started to tell me a little bit
22 more about it, which was somewhat different than
23 what Sergeant Bolduc had told me. And subsequent he
24 got called away on a call and he never got finished

---

56

1 with it. I was a little disappointed, but even at
2 that time I was disappointed but not as bad as the
3 second time.
4    Q. Well, this conversation, let me ask you to
5 elaborate on this, you said you had an initial
6 conversation with Ralph, Bolduc --
7    A. They brought it up to me.
8    Q. -- on the way to a training session.
9    A. Right.
10   Q. Then at some time subsequent to that, you
11 had a conversation with Gevry. Was that
12 conversation you had with Gevry prior to the date on
13 this letter?
14   A. When was he actually arrested?
15   Q. It's in November of 2002. I think it's
16 actually --
17   A. I don't know why. It doesn't make sense
18 that I would be asking him to investigate this thing
19 in February if it happened in November.
20      MS. LYNCH: I think it's November 9,
21 2002.
22   Q. So to the best of your recollection, you
23 did not request him to investigate it?
24   A. No. It wasn't until, like I said, I had a

---

57

1 second conversation. I wasn't really -- I guess,
2 you'd have to say at least agitated until I had the
3 second or third conversation. I think it was only
4 the second with Officer Gevry. I was just, I was
5 just taken back by --
6    Q. Do you recall having related the substance
7 of the conversation you had with Gevry to Ralph?
8    A. Possibly the first one but not the second
9 one.
10   Q. The first conversation you had with Gevry?
11   A. Yeah, I might have. If that was in
12 November of 2002, I should have been on good terms
13 at that point. Can't see why I wouldn't have.
14   Q. So it's your recollection that you did not
15 direct that this --
16   A. Absolutely. I mean, if I directed an
17 investigation, I think I would remember it.
18   Q. Did the deputy chief have the authority to
19 do an independent investigation of a situation that
20 could be subject --
21   A. Probably wouldn't be the best thing for him
22 to do. But it wouldn't be anything that I would
23 have been upset about it. I mean, he had pretty
24 much free rein to do that, yeah.

---

**Richard Bergeron**
**August 18, 2006**

(Pages 58 to 61)

| | 58 |
|---|---|

1    Q.  Okay.  At some time in, referring you back
2  to April 2003, at some point during that month --
3  let's mark this.
4        (Marked, Exhibit 6, 4/15/03 Letter)
5    Q.  Chief, I'm referring you to a document
6  dated April 15, 2003 directed to you by Thomas Ralph
7  which has been marked as Exhibit 6 for the purposes
8  of this deposition.  Do you recall -- I didn't give
9  it to you -- do you recall receiving this document?
10    A.  Yeah, I don't know if it was exactly the
11  same wording, but I recall a document similar to
12  this.
13    Q.  Why don't you just take a chance to read it
14  through.
15    A.  I know what it's all about.  I know what it
16  was all about when I read the first paragraph when
17  you gave it to me.
18    Q.  So do you recall having a meeting with
19  Thomas Ralph in your office on April 15, 2003 on the
20  subject of Barnes --
21    A.  I wouldn't call it a meeting.
22    Q.  Well, you certainly had an interaction with
23  him?
24    A.  Yes.

| | 59 |
|---|---|

1    Q.  How did that come about?
2    A.  He came in.  He dropped a letter on my
3  desk.  I opened it and started reading.  I could
4  obviously see he's basically calling the officer a
5  racist.  I knew the officer at the time not to be a
6  racist.
7        I mean, after I read it, I started
8  questioning my own mind maybe I'm missing something
9  here.  I made a number of phone calls.  I did an
10  investigation, I ran up to the school.  I took
11  another sergeant with me.  We talked to the
12  principals.
13    Q.  Who did you take with you?
14    A.  I took Sergeant Budrow with me who didn't
15  particularly like the officer.  He was just there as
16  a witness.
17    Q.  Budrow you're speaking to?
18    A.  Yes.  But the principals were highly upset.
19  One guy gave me a letter right back stating that
20  some of the facts were not what they were.
21    Q.  Let's go back.  Aside from the substantive
22  allegations being made by Ralph, had Ralph prior to
23  April 15, 2003 indicated to you that he was having
24  difficulty with Officer Barnes in any capacity?

| | 60 |
|---|---|

1    A.  Well, this is going to be a complicated
2  answer, unfortunately.  Ralph was -- he had a
3  different style than I did.  Ralph wanted to take
4  over as the chief.  He was going to be like a
5  dictator style.  He wanted these cops to jump for
6  him.  I was over that.  So him and Barnes,
7  apparently they were very good, close, personal
8  friends at one time.  He helped him move furniture
9  to his house when he moved.  They saw each other
10  socially more than I saw them.
11    Q.  More than you saw who?
12    A.  Barnes or Ralph sometimes, you know.  So he
13  prepared this letter.  And I knew what it was going
14  to be because Barnes, just like it says in that
15  letter, one of the things Barnes gives 110 percent.
16  If you're giving somebody 110 percent and you get
17  this letter outlining A, B, C, D, I knew it was
18  going to explode on him to be honest with you.  But
19  I never envisioned the way that it would explode.  I
20  figured it would be a good learning experience to
21  Ralph how people would respond when he does
22  something like that to somebody.
23        I didn't want to get into it personally
24  because everybody thought they were all my friends.

| | 61 |
|---|---|

1  So I was taking care of everybody.  So I said just
2  let them work it out.  But what happened is I guess
3  he came in that night, and they had been friends,
4  they hung around together.  Barnes was in the office
5  with him at night lots of times when I wasn't there.
6  And apparently Barnes had something on him.  And
7  basically it came out when that particular letter --
8  you know, like I said, I don't know all the details
9  probably and lot of them are in question but
10  something was there.
11    Q.  Prior to April 15, 2003, had Barnes
12  suggested, prior to this letter had Barnes suggested
13  to you that there was something inappropriate that
14  Ralph had done with respect to Bolduc's promotion?
15    A.  This particular letter?
16    Q.  This is the letter that was provided you by
17  Ralph about Barnes?
18    A.  Yeah.  It was within, I think, a couple of
19  weeks that something had come up.  But nothing
20  contemporaneously with the exam.
21    Q.  When Barnes raised that question with you,
22  what did you do?
23    A.  I was a little shocked, I mean, that it
24  could happen.  But I mean, on the other hand knowing

16

---

**62**

1 the close relationship at that time --
2    Q. Between who?
3    A. Ralph and Barnes. That it was certainly
4 possible that he could have known something like
5 that.
6    Q. Oh, I see what you mean. That Barnes could
7 have understood things that Ralph was doing that
8 might not have been generally known because they
9 were friends?
10    A. Right. Plus, Barnes is a very sharp guy.
11 You are not going to put much by him.
12    Q. Had you suggested to either Barnes or Ralph
13 that they somehow deal with the exam or personal
14 interview issues that Barnes had raised?
15    A. Yes. I think I tried to get them to sit
16 down, but they wouldn't. But they eventually went
17 with, I think, Shaw, and they just really didn't
18 discuss it, but.
19       There was that problem and then there was
20 the ethical problem with the female officer who had
21 been bypassed. I hadn't asked people to put things
22 in writing because I wanted to let it sort of settle
23 down. Maybe we could never prove anything one way
24 or another.

---

**63**

1       Apparently, unbeknownst to me, the rumor had
2 been around the department for some time. If fact,
3 I think it was almost the next day. But it was -- I
4 think it was even a different situation. Rumors
5 just fly in that particular town. But I thought we
6 had the ethical dilemma that we had to make her a
7 sergeant, first step to make this thing go away.
8    Q. Make who a sergeant?
9    A. Michaela Kelley.
10    Q. If you could look at this Exhibit 6. On
11 the second page at the top it says "when Officer
12 Barnes first made the unfounded accusations against
13 me, you informed me to deal with it before we both
14 lose our jobs."
15    A. See, I'm not sure that this was the same
16 wording. I haven't looked at the thing in a long
17 time, but, I mean, sounds a little different. I
18 couldn't tell you. It's years ago, over two years
19 that I looked at this thing.
20    Q. You haven't seen this letter in two years?
21    A. Probably so. I haven't seen it in two
22 years, I don't believe. It looks pretty similar,
23 yeah. I couldn't say a hundred percent.
24    Q. At the top of what's on the next page, it

---

**64**

1 says "when Officer Barnes first made the unfounded
2 accusations against me, you informed me to deal with
3 it before we both lose our jobs." Do you recall
4 having done something --
5    A. Certainly something very close to that,
6 yeah.
7    Q. Did you instruct Ralph not to talk to the
8 town administrator about it?
9    A. Did I instruct him? I don't believe that I
10 did. I think some other selectmen did.
11    Q. Were there any limitations in place with
12 respect to Ralph's authority to go directly to the
13 town administrator?
14    A. No.
15    Q. Now, I take it that the reason that after
16 receiving this letter you went to the school is
17 because Ralph, if you'll look at the second to last
18 paragraph here, actually asserts that there were
19 statements made. On page two next to the last
20 paragraph -- he actually suggested that statements
21 were made in front of school personnel.
22    A. Yeah, well, it wasn't true because I
23 couldn't -- I'll be honest with you, the only two
24 people that thought he was a racist was John Bolduc

---

**65**

1 and Thomas Ralph. I even called the selectman who
2 didn't like him, and I said, gee, what do you think
3 about Brian, do you think he's a racist. He said,
4 no, basically I don't like him but he ain't a
5 racist.
6    Q. After receiving this letter from Ralph,
7 what did you do, do you recall?
8    A. I probably finished reading. He kind of,
9 supposedly other people said he raised his voice and
10 ran down the hall. I was so disturbed that he made
11 a false allegation like that, it was going to
12 complicate everything that was going on.
13       He left, and he basically refused to talk to
14 me. Went down to see the town administrator. The
15 town administrator, I guess it was his last day.
16 Then he rode around and then they kind of had all
17 kinds of excuses why. He never really talked to me
18 again.
19       I came and asked him for his keys to his
20 car. He's my deputy chief and he's not going to
21 talk to me and he's just going to ride around and do
22 what he wants, he's not going to be my deputy chief.
23 I took the car away. I said turn the keys in for
24 the car, and he was supposed to wait for me. But I

(Pages 66 to 69)

66

1  was sitting in the office, I think, with Shaw and
2  Hoover, and I heard the keys hit in the box, the
3  little box on the door so people can drop papers in
4  and things.
5      As far as I can recall, I don't think we
6  ever had another conversation.  It was several weeks
7  before I put him on administrative leave.  In fact,
8  I signed him up for an FBI course basically made for
9  chiefs or deputy chiefs, and it was made to make you
10 a better chief.  And I figured I'm retiring, what am
11 I going to be taking up this particular space for.
12 This was a couple of months earlier I had scheduled
13 Ralph for it.  I had actually forgotten that I had
14 scheduled for it with all the stuff that was going
15 on.
16     Next thing I know, he's up in Maine at the
17 course, calls and leaves a message on my secretary's
18 thing after hours that he's there.  I'm not gonna --
19 just let it sit for now, let him go through the
20 course.  So he did but he refused to answer his
21 Nextel, just decided he didn't have to talk to me
22 because he had selectmen on his side.
23    Q.  Is it your recollection that that
24 interaction as we want to refer to it between

67

1  yourself and Ralph in your office on April 15, 2003
2  was the last time you had a face-to-face --
3     A.  Probably face-to-face because I had him
4  come in, bring things in, I had to start directing
5  everything in writing to him.
6     Q.  But that's the last time that you had any
7  substantive conversation --
8     A.  I believe I had a call once he suspended --
9  I went to Florida on vacation.  Friend of mine was
10 dying of cancer down there.  So when I went to
11 Florida, he ended up suspending Barnes in a very
12 unprofessional way.  And of course Bolduc, who
13 doesn't even work days, just happened to be a
14 witness who was there.
15     So there, again, just -- beyond my military,
16 beyond my police training, one thing you don't do in
17 the military, if you have a problem with a guy, and
18 two guys have a problem with a guy, you don't start
19 disciplining the guy and have the two guys that have
20 the problem with the guy there.  I mean, that's the
21 first thing, shouldn't have even been there.  Bolduc
22 shouldn't have been there for the situation.  And of
23 course, he's the only person that heard anything and
24 then nobody else heard anything.

68

1     Q.  What situation is this?
2     A.  Yelling, screaming in the dispatch area.
3     Q.  Between Ralph --
4     A.  Between Ralph and swears, four-letter
5  words.  It was all testified to at a town hearing in
6  the town hall.  It was disgraceful.
7     Q.  You were in Florida when this happened?
8     A.  Yes.  I had a conversation on the phone,
9  they keep telling me they have it recorded, which
10 they probably do.  I basically told Ralph you're
11 going to be lucky if you don't get suspended the way
12 you are acting.  I mean, you're just not acting
13 professional here.  If do you have a legitimate
14 problem, that's not the way to handle it.
15     You got to go back to the school thing
16 because it all goes back to the school resource
17 officer because Barnes was being what he
18 considering, whether it was or wasn't, he was being
19 harassed by Ralph, he didn't want to work at the
20 school anymore.  So I don't want anybody in a
21 position like that that doesn't want to be there.
22 Principals in the school were calling me up saying,
23 hey, listen, we want this guy, he's great with the
24 kids, he speaks Spanish.  They're telling me that

69

1  it's my problem that I don't want him there.  I said
2  no.  That's not me, not that I don't want him.  He
3  doesn't want to be there.
4     So apparently Ralph had told them that I
5  didn't want him there; that I was making the
6  decision to pull him out of the school.  That wasn't
7  the case at all.
8     Q.  It's your recollection that his decision --
9  that the absence of Barnes from the school was a
10 decision made by Barnes to avoid criticism from
11 Ralph?
12     A.  Yeah.  It was people who had been -- it's a
13 big personality conflict of former friends, let's
14 put it that way.
15     Q.  This trip to Florida that you are referring
16 to, is this the trip you were on when you were
17 informed by Boudreau that you were placed on paid
18 administrative leave?
19     A.  No.  That came afterwards, I believe.  I
20 was placed on administrative leave along with Barnes
21 the day before the hearing that was supposed to be
22 at the civil service about the cheating.  That's
23 when I was placed on administrative leave and so was
24 Barnes.  Prior to that, Barnes and I weren't even

18

**Richard Bergeron**
**August 18, 2006**

70

1  that friendly, believe it or not.
2      MR. GREEN: Well, want to take our break
3  now?
4      MS. LYNCH: Sure.
5      (Lunch break taken)
6      (Marked, Exhibit 7, 4/15/03 Letter)
7      MR. GREEN: Back on the record.
8  Q. Referring you back to, I think you have it,
9  the April 15 letter that was provided to you by -- I
10  think it's the next one down -- by Ralph. On the
11  front page, first paragraph up from the bottom of
12  the page it starts out "these types of remarks bring
13  the police department into a negative light." Did
14  you -- it says "I can no longer follow, I have
15  remained obedient to your requests to leave him --
16  meaning Barnes -- alone." Did you in fact at some
17  point prior make a specific request to Ralph to
18  avoid or leave, quote, Barnes alone?
19  A. Probably not exactly in those terms. But
20  that would be for anybody. I mean, if I had a
21  person up at the school, then I wouldn't want
22  somebody interfering with what they're doing up at
23  the school. They are basically under the control of
24  -- theoretically, they're under the control of the

71

1  principal. That's, you know, I think he was -- at
2  one point I told him just let him do his job up
3  there.
4  Q. Now, in this April 15 letter Ralph raises
5  the issue of Barnes accusing him of providing oral
6  board questions to Bolduc. And had you had any
7  discussions with any other -- I think, well, I think
8  you testified earlier that you were aware of those
9  accusations prior to April 15 and that you had
10  suggested that --
11  A. You mean the day Barnes came up?
12  Q. No. That you were aware of Barnes'
13  accusations before Ralph gave you this letter on the
14  15th and that you had asked them to try to work it
15  out?
16  A. Yes. But it was only several weeks, I
17  think. It wasn't a long period of time.
18  Q. Would it be a fair, just to speed things
19  along, with respect to your recollection, did you
20  request that Officer Hoover get involved, Officers
21  Hoover and Shaw get involved in trying to sort
22  things out between Barnes and Ralph?
23  A. I don't remember actually making anything
24  formal, but I knew about it. I talked to Hoover

72

1  right after they had the interview. He called me.
2  I was in New Hampshire, I think, when I had that
3  talk with him. And I can still remember some of the
4  conversation. But I don't know that I --
5  Q. Let's --
6  A. -- directed them to do that.
7      MR. GREEN: Let's mark this as 8.
8      (Marked, Exhibit 8, 4/25/03 Letter)
9  Q. I'm going to give you two in a row here,
10  put them side by side. The first one that has been
11  marked as Exhibit 7 for purposes of the deposition
12  is a memorandum dated April 17, 2003 directed to
13  yourself by Patrolman Barnes. For the moment, just
14  take a look at that.
15  A. Looks pretty much like the document. I
16  haven't read it in a couple of years.
17      MR. GREEN: Actually going to just mark
18  one more here.
19      (Marked, Exhibit 9, James A. Hoover's
20  Affidavit)
21  A. This was something I actually directed to
22  have done.
23  Q. I'm going to get into that, Chief.
24  Actually, now I'm going to ask you to look at what

73

1  has been marked as Exhibit 8 for the purposes of the
2  deposition, which is a memorandum directed to
3  yourself from Detective Michael Shaw.
4      MS. LYNCH: Did you give us copies of
5  that one or no?
6      MR. McCULLOUGH: I don't think I have
7  that.
8      MS. LYNCH: It's 8.
9  Q. Lastly, Chief, there is one which has been
10  marked as Exhibit 9, which is an affidavit executed
11  by Officer Hoover.
12  A. Okay. You want me to read the whole thing.
13  Q. Well, I'd like you to look, if you would,
14  at this point at 9, which is Hoover's affidavit. If
15  you look at the last page of that, you'll see it's
16  dated July 25, '03 which is the same date as Shaw's
17  memorandum to you which is directed to you.
18      But what I'd like to call your attention to
19  on Exhibit 9, which is Hoover's affidavit, at the
20  bottom of the first page it says, actually, it's the
21  second paragraph, says "on Thursday, March 6, 2003,
22  Officer Barnes approached Detective Michael Shaw"
23  and the substance of it is about the allegations
24  that Ralph provided oral answers. Then it goes, in

**Richard Bergeron**
**August 18, 2006**

(Pages 74 to 77)

74

1 the last paragraph, it says "later this evening I
2 spoke with Chief Bergeron on the phone regarding
3 this allegation."
4    A. Correct.
5    Q. You recall that?
6    A. I don't recall it being in this form.
7 Maybe it was. But I don't recall it coming in this
8 affidavit form. I know I probably directed Hoover
9 to write me a report.
10    Q. Well, if you look, let's go about it this
11 way: If you look at the last page, 3, of Hoover's
12 affidavit, it's dated July 25, '03 which is in fact
13 after you had been placed on paid administrative
14 leave, was it not?
15    A. This was? Yeah, I probably would have
16 never seen this document. I don't have a
17 recollection of it because he's never turned a
18 report in that format to me.
19    Q. I'm not suggesting that he did. All I'm
20 trying to determine, Chief, is whether or not you
21 agree that sometime on or about March 6, 2003 would
22 have been approximately a time that you would have
23 learned of Barnes' allegations against Ralph on --
24    A. It would be before then. I knew about that

75

1 before I was ever put on administrative leave.
2    Q. Okay. That's what Hoover is saying is that
3 he spoke to you about it on March 6.
4    A. Yeah, he spoke to me on the phone. No
5 question about it. In fact, we had quite a long
6 conversation on the phone about that, matter of fact
7 my battery went out. I had to call him back.
8 Probably went on well over an hour.
9    Q. In fact, the last sentence on that page of
10 Hoover's affidavit said "the Chief suggested Barnes
11 and Ralph should get together and resolve this
12 matter," which is consistent with your earlier
13 testimony that you had hoped, I think you said, as
14 friends that were having a spat that they could try
15 to work something out.
16    So looking now at Shaw's affidavit, I mean,
17 Shaw's memorandum to you which I think is 8, this is
18 dated April 25, 2003. And I also notice Exhibit 7
19 we have Barnes' memorandum to you regarding, well,
20 he calls it an investigation --
21    A. I think I was doing an investigation at the
22 time so probably I had asked all these people for
23 reports.
24    Q. So subsequent to -- it would be fair to say

76

1 that -- did you request Barnes to make his
2 allegations with respect to the oral board review
3 after having received the April 15 letter that was
4 delivered to you in hand by Ralph?
5    A. Yes.
6    Q. And if you can recall, with respect to
7 Detective Shaw's memorandum to you it indicates it
8 was a requested report regarding the sergeant's oral
9 exam, and it's directed to you. Is that
10 specifically also requested by you?
11    A. Yes.
12    Q. Actually looking at Shaw's affidavit or
13 Shaw's memorandum, I should say, there is in the
14 upper right-hand corner there is an R-E-C. It says
15 appears to be 4/28/2003. Then some initials. Are
16 those your initials?
17    A. No. Are you talking about here?
18    Q. Yeah.
19    A. No.
20    Q. I know the C-M is not yours.
21    A. I'm R-E-B. You know, you scribble, it's
22 easy to recognize. I don't have great handwriting.
23    Q. Do you recall having received or directed
24 that Shaw provided you a report?

77

1    A. Yes.
2    Q. Now, do you recall encountering Sergeant
3 Bolduc on the day that Ralph handed you the letter
4 alleging racist remarks by Barnes?
5    A. No. I have no recollection of talking to
6 him. Not for several days after that. I'm not
7 saying it couldn't happen.
8    Q. Bolduc?
9    A. Right. It was at least several days to my
10 recollection. Because that was in contention way
11 back before from my older memory, and I'm almost a
12 hundred percent sure that I didn't have any
13 conversation with Bolduc.
14    Q. Do you recall when the first contact, do
15 you recall having any discussion with Bolduc about
16 Ralph's allegations against Barnes?
17    A. Oh, yeah, because I asked Bolduc, at some
18 point in time I asked him do you think this guy is a
19 racist, come on, you know better than that. Put the
20 stuff in writing that you got that he's a racist.
21 And I directed him to write a report about him being
22 a racist. I think I kind of complimented him in a
23 way. I said at least you're coming to work, John.
24 Because at the time once Ralph threw that thing, he

20

Richard Bergeron
August 18, 2006

78

1 just basically, he wasn't going to be at work when I
2 was there. He might come to work when I wasn't
3 there. But he wasn't to work when I was there.
4      So John was showing up basically like
5 nothing was wrong because that's what I had
6 expected. If somebody makes an allegation, you just
7 say, hey, I didn't do it. You don't counter with a
8 false allegation.
9      Q. Well, had Bolduc ever made any allegations
10 to you prior to Ralph's having submitted that
11 letter?
12     A. No. As I recall, when I had that
13 conversation, oh, you don't know, this has been
14 that, and, you know, no one's telling you. And like
15 I said, I went out and investigated on my own. I
16 couldn't find anybody other than Ralph and Bolduc
17 that thought he was a racist.
18        MR. GREEN: Now, mark this as 10.
19        (Marked, Exhibit 10, 4/17/03 Memorandum)
20     Q. Chief, if you could look at what's been
21 marked as Exhibit 10 for the purposes of the
22 deposition here today, which is a memorandum
23 directed to Ralph dated April 17. Do you recall
24 having issued this document?

79

1      A. Yeah. This is when I started to get formal
2 with Ralph. Because I never would have had to do
3 this. I think I had directed him to the station to
4 call his house and have him come in the station, to
5 sign for this. We put it into a letter form when it
6 started getting formal.
7        MR. GREEN: If you could mark this as
8 11.     (Marked, Exhibit 11, 4/27/03
9 Memorandum)
10     A. That's definitely mine.
11     Q. You earlier said that you do an R-E-B?
12     A. I kind of scribble an R-E-B
13     Q. That's your signature R-E-B there?
14     A. Is this the same one? Oh, yeah.
15     Q. Actually, if you look at the one that's
16 just been marked 11.
17     A. It looks like someone went over my
18 signature on this one. This is my signature right
19 here, but this one is -- why would I do that?
20     Q. Well, look at the subject line of 11.
21 Compare that to the subject line in 10. Well, the
22 date line actually.
23     A. This is different. If you look at the
24 date, it says requested on April 27, 2000.

80

1      Q. It's reissued is what it says. But the
2 question is it says after that "your first response
3 is inadequate." In Exhibit No. 10 --
4      A. Oh, this isn't the same document.
5      Q. No, it's a different document. But your
6 letter or your memorandum to Ralph on April 17, the
7 subject "is your apparent insubordination." And you
8 direct him to complete a detailed report concerning
9 the above. Now, did in fact Ralph prepare a
10 detailed report concerning the above and provide it
11 to you, do you recall?
12     A. Yes, I believe he did.
13     Q. If you look at the other document, No. 11,
14 it says, it's also directed, you know, apparently by
15 you to Ralph. And it says "reissued April 27, 2003,
16 your first response is inadequate." But it has, if
17 you'll see, different questions. It says "reference
18 your serious allegations concerning Officer Barnes
19 being a racist in your letter of April 15." It says
20 "you are ordered to complete a detailed report
21 concerning the above allegations. Your report is to
22 be completed by the end of your next working shift
23 and shall include all witnesses to the allegations
24 who corroborated with you concerning these

8

1 allegations."
2      With respect to the first one now, I think
3 you testified you did get some kind of a written
4 report from him?
5      A. At some point in time. A lot of time's
6 gone by. I don't remember the exact sequence. At
7 some point in time. You must have it here.
8      Q. Well, you'd be surprised. I may or may
9 not. There is a lot of paper flying around here.
10     A. Because I investigated some of what he put
11 in there about jokes being told at a restaurant, and
12 that's where some of the things didn't start to make
13 sense.
14     Q. Did you start some kind of an investigative
15 file of your own?
16     A. Oh, yeah.
17     Q. With all the stuff?
18     A. Yep. I shipped some of it right off to the
19 town's attorney.
20     Q. Which attorney was that?
21     A. They had so many. It's Kopelman & Page
22 anyway.
23     Q. You shipped the results of your
24 investigation?

86

1  basis back and forth. At one time way earlier than
2  that, they had been assigned to it much more
3  heavily. They had taken trips to Florida to
4  interview witnesses, and for some reason they were
5  trying to resurrect this case again.
6        (Marked, Exhibit 13, 4/30/03 Memorandum)
7    Q. Going to give you what's been marked as
8  Exhibit 13 which is a memorandum directed to
9  yourself from John Bolduc dated April 30, 2003 and
10 ask if that refreshes your recollection as to the
11 status of Bolduc's involvement in the Amato case on
12 that day?
13   A. Yeah, it really says nothing. It
14 basically, you know, this is one of the things that
15 may be suspect of the investigation as to what he
16 was doing. There is no medical examiner assigned to
17 the case. It's a lot of bravado, and it basically
18 says nothing.
19   Q. Aside from what it substantively says --
20   A. This is what he gave to me to try to stay
21 on the case. Actually, I did let him stay on the
22 case a little longer.
23       MS. LYNCH: You should really try to
24 wait for a question.

87

1    Q. It would be fair to say, would it not, that
2  he was investigating the Amato matter with your
3  consent and agreement?
4    A. I guess in the -- ultimately, but it was
5  his prodding that I allowed him to do this. This
6  young fellow named Derrick Stokes was a newer
7  officer. He really didn't have an any experience.
8  I didn't think it would be a bad idea to have him
9  review some of the documents and see where that case
10 was going, but.
11   Q. Okay. Now, do you recall having any
12 conversations with Sergeant Bolduc in which you at
13 about this time, on or about the point in time where
14 Ralph delivered you the letter alleging that Barnes
15 was a racist and telling Bolduc that his support of
16 the chief was going to cost him?
17   A. What?
18   Q. Do you recall making any statement to
19 Bolduc that his support of Deputy Chief Ralph was
20 going to quote, unquote cost him?
21   A. Well, probably in so many words I probably
22 told him that I didn't believe the story. If they
23 were going to get together and concoct a story, it
24 was going to cost them both. In so many -- in a

88

1  general way. You are going to make false
2  allegations, it's going to cost you.
3    Q. When you say that, you mean false
4  allegations of racist behavior?
5    A. (Nods)
6        MS. LYNCH: You have to answer verbally.
7    A. Yes.
8    Q. Did you receive any corroboration of racist
9  remarks by Barnes from any other source other than
10 Ralph and Bolduc?
11   A. No. I mean, what they were alleging was
12 not even necessarily racism. It was a joke at a
13 restaurant over privacy with friends. They were all
14 friends at the time when the thing was made. Two of
15 the people couldn't even remember the joke that was
16 being told. If it was a racist joke, everybody'd
17 remember if it was a real racist joke.
18   Q. Well, that may be or not. Do you recall
19 having any discussions with Aaron Suss with respect
20 to Barnes having made racially negative remarks?
21   A. If he was mentioned, I may have sent
22 something to him to write a report too. Ralph may
23 have mentioned him in his report. I'm not sure. He
24 was that same clique. It was a little clique of

89

1  guys. He was in the same clique.
2    Q. Do you recall if when Deputy Chief Ralph
3  was responding to your second memorandum, the one
4  that you reissued on April 27, he included any
5  statements or names of other officers that were
6  alleged to have overheard Barnes engage in racially
7  provocative behavior?
8    A. Probably Suss but I don't remember the
9  exact circumstances but probably.
10   Q. Did Ralph identify Suss as -- do you recall
11 specifically that he identified him?
12   A. I don't recall specifically, but he could
13 have.
14   Q. At some point do you recall directing that
15 Bolduc and Suss were to vacate an office that was
16 being utilized by them in the Webster police
17 station?
18   A. I think it was more than them. Michaela
19 Kelley had been in there for a while, but I think
20 she may have already been out of there. Yes.
21   Q. Do you recall what it was that prompted you
22 to render that office unavailable to them for --
23   A. Yes.
24   Q. What was that?

**Richard Bergeron**
**August 18, 2006**

(Pages 90 to 93)

---

**90**

1  A. It was very limited space in the
2 department. In fact, John had been assigned that
3 before he was a sergeant. They were assigned that
4 for investigations. And that's why Michaela had
5 been there. And they worked a couple of other
6 serious cases. I needed that office to -- Novick
7 and myself, we had a ton of documents that needed to
8 be sorted out, needed to be charted out for another
9 investigation. And it was an investigation that I
10 couldn't do out of my own office. It involved
11 potential political corruption anyway. We needed
12 that office to store the documents and sort the
13 documents and talk about the documents and work with
14 the documents. That was the reason.
15  Q. Do you recall, was there a patrolman on the
16 Webster Police Department named Joseph Brooks?
17  A. Yes.
18  Q. And Byron Bates?
19  A. Brian Bates, yeah.
20  Q. Do you recall them having submitted any
21 reports regarding Barnes having made racially
22 provocative statements?
23  A. Nothing significant. They might have sent
24 me reports. If Ralph named them, I asked them for

---

**91**

1 reports.
2  Q. Do you recall having a discussion with
3 Officer Bates regarding his report specifically?
4  A. No.
5  Q. Do you recall having a discussion with
6 Detective -- was Hoover a detective by the way?
7  A. Yes.
8  Q. At that time?
9  A. Yes.
10  Q. Was Shaw also?
11  A. I don't know if he formally was. At times
12 he had pretty good interest doing drug stuff. So
13 sometimes he worked with Hoover. Sometimes he was
14 in uniform. At one point near the end, I might have
15 formally directed him. But I don't think he was
16 formally a detective to have that position where he
17 worked it full time.
18  Q. Was the characterization of someone's duty
19 as a detective, did that remove them from patrol
20 shifts?
21  A. While they were doing the particular work.
22 But if you were, you know, there was -- we had Timmy
23 Bent at one time was a detective and Hoover was a
24 detective and that's all they did on a five-day

---

**92**

1 week. But most of the other people were in and out.
2  See, I didn't have a problem with anybody
3 working doing investigation. Just come to me and
4 explain to me why you are doing it. Work with the
5 regular detectives. So it wasn't like some places
6 where the patrol and, oh, you can't touch that,
7 that's detective's work, you can't do that. I had a
8 pretty open situation. If someone had a drug house
9 that needed to be worked on, they were welcome to
10 work with the detectives on it to work on them.
11  Q. Would that necessarily relieve them from
12 that patrol shift?
13  A. During that period of time.
14  Q. How would you then make up the body on the
15 patrol shift?
16  A. I had a very unique situation. Off and on.
17 I had an agreement with the union, which didn't
18 always work, but, in other words, if I'm going to
19 take you out and you're going to be allowed to work
20 investigations, you are going to allow me to take a
21 part-time person to fill that position. And we paid
22 that guy ten bucks an hour, so it didn't kill my
23 budget. A lot of times that's what I would do. I'd
24 let them work the investigation, and I would fill it

---

**93**

1 in with a part-time civil service employee.
2  Q. Oh, part-time civil service employee.
3  A. Well, the agreement went a little further.
4 If there wasn't any of them, then we could do it
5 with a reserve. That happened anyway because
6 sometimes people couldn't work.
7  Q. From the standpoint of the individual
8 officer that would be reciprocal benefits because
9 they could get investigative experience; is that a
10 fair statement?
11  A. I'd say 99 percent. There was some times
12 when people really didn't care, certain people.
13  Q. Do you recall having a discussion with
14 Officers Hoover and Shaw stating that you didn't
15 want to see any more reports about racial
16 allegations concerning Barnes?
17  A. Not to -- in fact, we were having a
18 discussion that day when Ralph came back. Probably
19 not in that terminology but probably told him,
20 listen, if you got something, do it, but let's not
21 put all this garbage in writing. If it's everyone
22 sometimes telling a joke, doesn't make somebody a
23 racist. Because I could do that.
24  I could go through the whole department and

---

24

---

94

1 try to find out who told what joke. And if a
2 Chinese guy's mentioned in the joke. You know, I
3 guess I'd be in trouble myself, you know. A Polish
4 guy. It's a Polish town. Ton of Polish jokes.
5 Everybody tells Polish jokes. I'd be in a lot of
6 trouble for that.
7    Q. Did you solicit, did you begin at that
8 point in time to solicit information from other
9 officers about Bolduc's involvement in the Greenwood
10 incident?
11    A. No, I really didn't solicit.
12 Unfortunately, it started coming to me.
13    Q. From whence did it come?
14    A. The first time it came that I actually have
15 a real recollection of it, it was a weekend. For
16 some reason I went to a call about a stolen car. We
17 actually got the stolen car. And so I went to that
18 particular call where the car was. And Officer
19 Gevry arrived at the call. And somehow we got into
20 a conversation about, it was really bothering Gevry
21 about this incident, which I guess I wasn't as
22 familiar with the incident as I should have been.
23    He started to tell me the way that it
24 happened. It was totally different from what Bolduc

95

1 and Ralph had told me. So he never got a chance to
2 really -- he got called off on another call. He
3 never really got a chance to go into the real deep
4 detail on it. I didn't have a real chance to look
5 him in the eye and say is that what really happened
6 and that type of thing.
7    Later on when I was on administrative leave,
8 I think he got a hold of me through a third-party
9 police officer. He wanted to talk to me about that
10 particular case, okay?
11    Q. Gevry?
12    A. Yes. I met with him. And I was just
13 disappointed, flabbergasted at this unbelievable
14 situation.
15    Q. You think Gevry was a credible person?
16    A. Unfortunately, I do. Unfortunately, I do.
17    Q. Did you --
18    A. What would his reason to lie be, you know?
19 I don't know. I know.
20    (Marked, Exhibit 14, 6/17/03 Letter)
21    Q. Show you a communication dated June 17,
22 2003 that's been marked as Exhibit 14 for the
23 purposes of our deposition today. Ask you if you've
24 -- actually, have you ever seen this document

96

1 before?
2    A. No, I've never seen it.
3    Q. Just out of curiosity, were you present for
4 duty on June 17 as opposed to being on vacation?
5    A. I don't know.
6    Q. Did you keep any type of an office log or?
7    A. Not as -- no. No. I had a lot of notes in
8 there. No, I didn't keep a formal-type log, no.
9 But this was going on behind my back down at the
10 town hall between Bolduc and Ralph. That's why it
11 didn't come through my office.
12    Q. Well, so you were not aware that Boudreau
13 was going to be referring any portions of these
14 matters to the district attorney's office?
15    A. Absolutely. It was a big conversation at
16 most every selectmen's meeting. But that exact
17 thing, no.
18    Q. For example, it says "please be advised
19 that the office of the district attorney is in
20 receipt of your letters requesting assistance." Had
21 you seen these letters that Boudreau sent to the
22 district attorney?
23    A. I don't believe so. There was, I know they
24 made a formal request to the district attorney. It

97

1 was more than that. I think they wanted everything
2 investigated.
3    Q. Were you consulted by Boudreau before the
4 letters were sent to the district attorney?
5    A. I don't believe so.
6    Q. So you didn't see the drafts of the letters
7 for any comments or anything along those lines?
8    A. No. Not that I recall.
9    Q. Referring you to the bottom of that
10 exhibit, do you know who -- it says cc BOS, oh,
11 board of selectmen perhaps?
12    A. Yes.
13    Q. Who is Theresa Dowdy?
14    A. She's an attorney at Kopelman & Page.
15    Q. Going back to the Ralph letter that was
16 provided to you on the 15th of April. I want to
17 call your attention to that for a second.
18    MS. LYNCH: Which exhibit is that?
19    MR. GREEN: I think it's 6.
20    Q. Under the front page, turn to the front
21 page if you would, Chief. Just as a matter of
22 internal processing at the Webster PD at this point
23 in time, was there any particular or administrative
24 significance as far as you are concerned to Ralph

110

1    A. Right.
2    Q. Were you ever provided a copy of what is
3 referred to as the Barton report?
4    A. Yes. I wasn't provided it, no. I went and
5 sought it myself. They never gave me a copy myself.
6    Q. How did you get it?
7    A. It was public. The first investigation
8 they had on Barnes they made it all confidential.
9 Barnes himself stood up at the town meeting and
10 said, hey, listen, I'm going to start investigating
11 people, let's make these reports public. And the
12 town meeting voted to make that a public report.
13 Anybody can go get a copy of it.
14    Q. When you say it's a public report, where is
15 it on file?
16    A. They were handing them out left and right
17 at the town hall. I got it from a third party in
18 town came across it and gave it to me.
19    Q. Were you personally interviewed by Judge
20 Barton?
21    A. Oh, absolutely.
22    Q. On more than one occasion?
23    A. Yes. In the beginning and the end.
24    Q. Did you keep any notes of your discussions

111

1 with Judge Barton?
2    A. No, I didn't bring a lawyer or do anything
3 because, you know, no.
4    Q. So did you, aside from the copy of the
5 Barton report that you say you obtained actually
6 from a third party, did you ever see any other
7 published document that was published and signed by
8 Judge Barton making recommendation to the town about
9 how to address the situation?
10    A. No.
11    Q. I think you testified earlier that you
12 never had after you were placed on paid
13 administrative leave any discussions with Stephen
14 Boudreau.
15    A. I wouldn't say I didn't have any. I
16 probably didn't though. I know there was
17 correspondence with my lawyer, which is Jim Donnelly
18 now that I think about it. Jim Donnelly sent him a
19 letter saying, listen, you should be giving some
20 reason. Just because selectmen direct you to do
21 something, you should have a reason for doing what
22 you do. Be professional about it not just because
23 politics is dictating you to do something.
24    Q. Did you ever get anything from the town

112

1 signed by a town administrator or some other party
2 specifying the reason?
3    A. No.
4    Q. Did you ever have any discussions with
5 Robin Leal?
6    A. Yes.
7    Q. When did you first have a discussion with
8 Robin Leal?
9    A. She came to my house when I was on
10 administrative leave. We had somewhere between
11 probably less than or close to an hour, maybe even a
12 half.
13    Q. Was it before or after the Barton report
14 was issued?
15    A. That one I don't know if it had been -- I
16 think it was before it actually came out. Probably
17 the investigation had probably been done, but I
18 think it was before the report, but I couldn't say a
19 hundred percent.
20    Q. Who else was present at this?
21    A. Just myself. And my wife was walking
22 around the house. She wasn't actually, you know.
23    Q. What was the subject that was discussed at
24 this meeting?

113

1    A. I think in some way she was trying to get a
2 feel for the town. She was new. I think in some
3 way she was trying to encourage me to retire because
4 they wanted me out of there.
5    Q. Did she say that?
6    A. Did she say that in those terms? No, I
7 don't think so.
8    Q. At some point in time would it be fair to
9 say that you negotiated a severance understanding
10 with the town?
11    A. Forced negotiation.
12    Q. Were you represented by counsel in any of
13 those negotiations?
14    A. Yes.
15    Q. Was that Jim Donnelly?
16    A. No.
17    Q. Who was that?
18    A. Jack Collins from the Chiefs of Police
19 Association. Well, I guess he actually, he wasn't
20 there, but they did confer, the two lawyers
21 conferred later on.
22    Q. Chief, do you have any recollection of who
23 the lawyer is that you, that Mr. Collins was
24 discussing the situation with?

Richard Bergeron
August 18, 2006

(Pages 118 to 121)

| 118 |
|---|

1  I put that in writing to the town administrator.
2  And Robin Leal, I think we only had two meetings.
3  That's the only time -- I really couldn't even
4  comment. I don't know her that well, you know.
5      Q. When you first met with Robin Leal, you
6  said you thought that was before the Barton report
7  came out?
8      A. Pretty sure it was before. If it wasn't, I
9  certainly hadn't seen it, you know.
10     Q. This suggestion on your part to her that at
11 least I'm interpreting what you answered as saying
12 that you suggested to Leal that --
13     A. No.
14     Q. You didn't suggest that?
15     A. Not that I can recall. It was already done
16 before she could -- there was another interim,
17 Boudreau was the interim town administrator, that I
18 think I had said that to. Because Billy had already
19 assumed that he was like the chief at that point and
20 I wasn't coming back so you know how power struggles
21 go.
22     Q. At any point in time did you have any sort
23 of transitional discussions with Keefe about running
24 the department?

| 119 |
|---|

1      A. Almost none. I'd say none. As far as the
2  way you phrased the question, no. They repainted
3  the cruiser, new schemes, everything else while I
4  was still out on administrative leave, so, no, there
5  was nothing as far as no advice from me.
6      Q. Did you ever have occasion to talk to a guy
7  by the name of Earl Burgess about John Bolduc?
8      A. Yes, absolutely.
9      Q. Do you recall when that discussion took
10 place?
11     A. I don't. But it's sort of disappointing
12 and disturbing to me that that got right back to
13 John Bolduc immediately. The guy's parting words to
14 me, this is what he said when he left, I'm a Hells
15 Angel and I'll always be a Hells Angel. So
16 basically he told me whatever I told you I probably
17 didn't tell you the truth because Hell's Angels
18 don't talk to cops.
19     Q. How did you happen to be talking to
20 Burgess?
21     A. There was rumors around. I was trying to
22 put some rumors to beds. I already tried to put
23 this rumor to bed. John was well aware of it that
24 they said that John was using cocaine and that

| 120 |
|---|

1  Burgess was the bartender in the place when they
2  were using cocaine.
3      At the time, you know, you're not going to
4  really go -- I asked some people. I couldn't prove
5  it one way or the other. I didn't believe it, to be
6  honest with you. But then later on when things
7  happen, erratic behavior, I said I better
8  double-check this situation myself.
9      Q. Was there other officers with you?
10     A. Yes. Novick.
11     Q. What was Novick's role in the department at
12 this point?
13     A. Probably he was seeing, he was just trying
14 to be a good guy. I hate to that say. He's another
15 lawyer. He's passed the bar, and he's actually a
16 public defender right now. He saw they were trying
17 to jam me up more than I saw they were trying to jam
18 me up. He said, Chief, if you need help, here's my
19 home phone number. For a couple of weeks, I didn't
20 pay attention to it.
21     Q. Pay attention to what?
22     A. Him going to give me a hand. And then I
23 said I probably do need some help here. He's a
24 lawyer. He can probably give me some good advice.

| 121 |
|---|

1  Maybe he gave me some good advice. Maybe he didn't.
2  We had a situation where the town administrator,
3  people came to me and said the previous one before
4  Leal that they had pornography on the town computer.
5  Some other selectmen had convinced me that I almost
6  went in there with a search warrant, not a search
7  warrant, but I almost went down there because it was
8  the town property.
9      He started telling me you shouldn't go in
10 there because it was expectation. And I thought his
11 arguments were pretty logical so I never did
12 anything about the situation. Other things came
13 up --
14     MS. LYNCH: You need to focus on his
15 question.
16     A. I'm trying to explain how Novick came into
17 the picture. He's got my best interest at heart
18 here.
19     Q. You indicated in a letter, I believe in
20 this letter to Keefe by Ralph in September regarding
21 those personnel records, Ralph states "the Chief
22 informed me that he and Officer Novick had just left
23 the district attorney's office and Officer Novick
24 would now be handling all internal affairs

**EXHIBIT 2**

1

Volume I, Pages 1-253

Exhibits 1-5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*************************************************

JOHN A. BOLDUC, JR.,

        Plaintiff

vs.                              No. 05-40030FD5

TOWN OF WEBSTER, ROBIN LEAL,

RICHARD BERGERON, and WILLIAM KEEFE,

        Defendants

*************************************************

DEPOSITION OF:  THOMAS V. RALPH

10:10 a.m. - 4:23 p.m.

Friday, September 8, 2006

MORRISON MAHONEY LLP

One Chestnut Place, Suite 470

Worcester, Massachusetts


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

PERLIK AND COYLE REPORTING

1331 Main Street

Springfield, Massachusetts  01103

413.731.7931    Fax 413.526.2316

(Pages 10 to 13)

|  | 10 |
|---|---|
| 1 | A. Distance. I wear them for distance. |
| 2 | Q. Any problems with your hearing? |
| 3 | A. No, ma'am, not that I'm aware of. |
| 4 | Q. Are you on any medication today that would |
| 5 | affect your ability to testify? |
| 6 | A. No, ma'am. |
| 7 | Q. Can you tell me when you first started |
| 8 | working for the Webster Police Department? |
| 9 | A. December 1995 part time. |
| 10 | Q. Now, was that as a reserve officer? |
| 11 | A. Intermittent officer, yes. |
| 12 | Q. When did your status change to full time? |
| 13 | A. March of '96. |
| 14 | Q. Who was the chief when you started? |
| 15 | A. Paul Minarik. |
| 16 | Q. At some point were you promoted? |
| 17 | A. Yes, ma'am, August of '99. |
| 18 | Q. To what position? |
| 19 | A. Sergeant. |
| 20 | Q. Were you then promoted from that position? |
| 21 | A. Yes, ma'am. I was promoted to deputy |
| 22 | chief, acting deputy chief in October of '01. |
| 23 | Q. Did you ever become the deputy chief? |
| 24 | A. October of '02. |

|  | 11 |
|---|---|
| 1 | Q. What is your understanding as to why you |
| 2 | were in an acting position first? |
| 3 | A. They had requested legislation be filed to |
| 4 | exempt that position from civil service. |
| 5 | Q. Was it Chief Bergeron that appointed you to |
| 6 | acting deputy chief and deputy chief? |
| 7 | A. It would be the town administrator was the |
| 8 | appointing authority so Bergeron would make the |
| 9 | recommendation but it was ultimately the town |
| 10 | administrator's decision. |
| 11 | Q. It was your understanding Chief Bergeron |
| 12 | did recommend you for that position? |
| 13 | A. Yes. |
| 14 | Q. Do you know whose idea that was to create |
| 15 | that position of deputy chief? |
| 16 | A. Chief Bergeron's. He wanted a -- it was |
| 17 | Chief Bergeron's. |
| 18 | Q. Do you know how it was that he chose you to |
| 19 | hold that position? |
| 20 | A. I was acting as administrative sergeant at |
| 21 | the time. Basically the deputy chief did all the |
| 22 | same things as the administrative sergeant. |
| 23 | Q. Who appointed you to administrative |
| 24 | sergeant? |

|  | 12 |
|---|---|
| 1 | A. Chief Bergeron. |
| 2 | Q. Okay. Was it his idea or your idea that |
| 3 | you be appointed to that position? |
| 4 | A. His idea. |
| 5 | Q. Now, was John Bolduc appointed to the |
| 6 | police department before you? |
| 7 | A. Yes, ma'am. |
| 8 | Q. Now, with respect to your becoming a |
| 9 | sergeant, were you appointed pursuant to a bypass? |
| 10 | A. Yes, ma'am. |
| 11 | Q. How did your score compare to the other |
| 12 | officers who took it? |
| 13 | A. I don't recall what the scores were. John |
| 14 | Bolduc was number one, I was number two, Jim Hoover |
| 15 | was number three. |
| 16 | Q. Whose idea as far as you know was it to |
| 17 | bypass Bolduc? |
| 18 | A. I believe it was the oral board committee's |
| 19 | vote. I wasn't on the -- I was a candidate. I |
| 20 | don't know whose ultimate decision it was |
| 21 | collectively. But I assume the chief had the |
| 22 | majority of the input. I don't know. |
| 23 | Q. When you were appointed sergeant, you took |
| 24 | a written exam; is that correct? |

|  | 13 |
|---|---|
| 1 | A. That's correct. |
| 2 | Q. Did you also have an oral interview? |
| 3 | A. I did. |
| 4 | Q. Who was on the committee that interviewed |
| 5 | you? |
| 6 | A. Chief Bergeron, Mark Stankiewicz and I |
| 7 | believe it was Sergeant Budrow. |
| 8 | Q. There wasn't a panel of three sergeants, |
| 9 | just one? |
| 10 | A. Just one. |
| 11 | Q. Did you have any discussion with Chief |
| 12 | Bergeron before you were appointed sergeant about |
| 13 | the issue of the bypass of John Bolduc? |
| 14 | A. No, ma'am. |
| 15 | Q. Did you ever receive any information from |
| 16 | any source that you would get the position over John |
| 17 | Bolduc but that he would get the next position for |
| 18 | sergeant? |
| 19 | MR. LICHTEN: You mean before or after |
| 20 | the promotion? |
| 21 | MS. LYNCH: I'm sorry? |
| 22 | MR. LICHTEN: It's not clear from your |
| 23 | question whether you mean before or after he was |
| 24 | promoted. Your question was open-ended. |

4

Thomas V. Ralph
September 8, 2006

---

30

1    Q. Do you know if they had any relationship
2  outside of work when they were both in Quincy?
3    A. I don't know that, ma'am.
4    Q. Do you know if they had any relationship
5  outside of work when they were both at the Webster
6  Police Department?
7    A. Off the top of my head, I don't know. Most
8  of my time focused on the police department. What
9  people did outside on their own time wasn't my
10 concern.
11   Q. When you were the deputy chief, did the
12 chief typically review your work?
13   A. We discussed it. Talked about it. He
14 reviewed what he wanted to review. I would say that
15 he wasn't a hundred percent diligent. If he wanted
16 to review it, he'd review it. If he didn't review
17 it, he didn't care.
18   Q. If you put out memos, that type of thing,
19 would he review them before they would go out?
20   A. They would all speak to him before they
21 ever went out, so he knew before anything ever went
22 out what what's going on.
23   Q. I want to go back with respect to your
24 tenure at the police department. You said that you

---

31

1  became the deputy in October of 2002. At some point
2  did that status change?
3    A. Yes, ma'am.
4    Q. When was that?
5    A. November of 2003 I was demoted for ten days
6  to sergeant. Then I was returned back as a deputy
7  chief, put back out on leave where I remained until
8  April 1 of '04 when I was demoted to patrolman.
9    Q. That's your status at this time?
10   A. Yes, ma'am.
11   Q. Was there a period prior to November 2003
12 when you were on a paid administrative leave?
13   A. Chief Bergeron put me on leave effective
14 May 18 of '03, where I remained until November of
15 '03 for ten days. Then I went back out on leave, as
16 I said, until April 1 of '04. 11 months total house
17 arrest.
18   Q. I understand you have your own appeal going
19 with civil service; is that correct?
20   A. That's correct, ma'am.
21   Q. You have a regular lawsuit in -- is it
22 Worcester Superior Court?
23   A. Yes, ma'am.
24   Q. So just those two cases; is that correct?

---

32

1    A. That's correct.
2    Q. Did you at some point have an MCAD claim as
3  well?
4    A. That's the Superior Court action. It's
5  been removed from MCAD to Superior Court.
6    Q. Did MCAD ever issue any ruling before it
7  was removed?
8    A. I believe they found probable cause, and it
9  was removed.
10   Q. They did find probable cause?
11   A. I believe there was probable cause found,
12 yes, because it was never dismissed. It was never
13 dismissed from MCAD. I believe they issued a
14 probable cause finding and it was transferred to --
15 but I'm not positive on that.
16   Q. Was it at the Springfield or Boston MCAD?
17   A. Boston MCAD. Any chance can I get a water?
18   Q. Sure. Now, with respect to your being
19 placed on administrative leave on May 18, 2003, was
20 that done by Chief Bergeron?
21   A. Correct.
22   Q. What reason were you given?
23   A. I wasn't.
24   Q. You weren't given any reason at all?

---

33

1    A. Letter says you are hereby placed on
2  administrative leave, you are to remain in your
3  residence and available between the hours of 9:00
4  a.m. and 5:00 p.m. Monday through Friday until
5  further notice. You are not allowed to come to the
6  police station without prior authorization.
7    Q. Was that paid administrative leave?
8    A. Yes, ma'am.
9    Q. Was the letter signed by the chief?
10   A. Yes, ma'am.
11   Q. Did you ever have any discussion with him
12 about that?
13   A. Jim Simpson sent him a letter, and I sent a
14 letter requesting what my status was.
15   Q. Who is Jim Simpson?
16   A. He was my attorney through the MPA, Mass.
17 Police Association.
18   Q. You said he contacted him, and you sent a
19 letter as well?
20   A. Yes.
21   Q. Did you get a response?
22   A. It said my status would be determined after
23 investigation. Didn't say what investigation.
24   Q. Did you ever learn why it was that you were

---

9

**Thomas V. Ralph**
**September 8, 2006**

(Pages 34 to 37)

---

34

1  placed on administrative leave?
2      A.  I heard several different versions.  Most
3  of them I read in the town's position statements to
4  the MCAD.  I don't know if that speaks for the town
5  or not, but it's the only place I ever got anything
6  from.
7      Q.  Did you ever speak with Chief Bergeron
8  about the issue of your administrative leave?
9      A.  No.  We haven't talked since May 18, 2003.
10     Q.  To this day?
11     A.  To this day.
12     Q.  Did any particular event occur on May 18,
13 2003 that you recall that may have led up to this?
14     A.  I was in an FBI lead seminar up in Maine
15 for a week.  I came back from being in Maine on
16 Saturday.  I got a phone message on my machine on
17 Sunday that said there's a package for you at the
18 police department.  I went.  He was on the phone.
19 He said there it is there.  I picked it up.  I left.
20 He stayed on his cell phone conversation, and that
21 was the end of it.
22     Q.  Now, you reported alleged racism on the
23 part of Barnes to Chief Bergeron on April 15, 2003;
24 is that correct?

---

35

1      A.  That's correct.
2      Q.  So between April 15, 2003 and May 18, 2003,
3  were you both working at the department?
4      A.  He was on vacation.  I went out sick for a
5  couple of days.
6      Q.  After April 15?
7      A.  I was thrown out of the station.  Told to
8  get out of the station, which I did.  Then
9  ultimately I went home sick, was out of work for a
10 couple of days.  Bergeron went away on vacation.
11 Then he came back.  I believe there was an overlap
12 of a couple of days.  Then I left and went to Maine
13 for this seminar that had been scheduled for several
14 months.  Then when I came back, I was put on a
15 leave.
16     Q.  When you say you were thrown out of the
17 station, what do you mean?
18     A.  Yelled at, told to get out.
19     Q.  By whom?
20     A.  Chief Bergeron.  He was yelling and
21 screaming at me.
22     Q.  That was with regard to the Brian Barnes --
23     A.  Letter that I gave him.
24     Q.  -- letter.  What specifically did he say to

---

36

1  you?
2      A.  Get out.  Then he told me to leave Barnes
3  alone, that no one ever bothered me when I was at
4  the DA's office or the AG's or the DEA and that
5  Brian does a good job, just to leave him alone.  I
6  told him that I had abided by his wishes for this
7  long, and I could no longer in good conscience do
8  that.
9      Q.  When you say that you were out sick for a
10 few days, what's your best memory?
11     A.  I think it was three or four days, ma'am.
12     Q.  Then how long was Chief Bergeron on
13 vacation?
14     A.  He was out for a week.
15     Q.  One week.  Then you said there was an
16 overlap of a few days.  What do you mean by a few
17 days?
18     A.  I believe, going back a while, pretty sure
19 my daughter's first communion or confirmation was
20 happening on one of those weekends that week he was
21 back.  I think I took a couple of personal days get
22 the yard ready and stuff like that.  And I think we
23 might have worked like the beginning of the week
24 when he first came back and then I was out for a

---

37

1  couple of days, then I went off to the seminar.  I
2  think, again, I apologize, without seeing an actual
3  schedule in front of me from back then.
4      Q.  When you say an overlap of a few days --
5      A.  Two or three days.
6      Q.  Did you have communication with him during
7  that time?
8      A.  Yeah, he ordered me back to the station to
9  write a report about anything that I knew with
10 regards to any racial statements that Brian Barnes
11 made.  To list any, list any and all times I heard
12 him say it.  He told me I couldn't leave the office
13 until I did that.  So I sat at the office and did
14 that.  Al Beland had come in and wanted records.
15 They were at my house.  Got permission from Bergeron
16 to leave my desk to take Al Beland to my house.
17 Came back, finished the report, was continuing doing
18 the report.  The chief and Steve Novick left.  Then
19 they came back and told me to turn over all of the
20 internal affairs files, all the Bolduc files, all
21 the Kelley files to them.  Then I turned in my
22 report.  It was the end of the day, and I went home.
23     Q.  Then you went up to Maine?
24     A.  Correct.

---

10

# EXHIBIT 3

# Miniscript and Word Index

*THOMAS RALPH*

*VS*

*TOWN OF WEBSTER, ET AL*

*AND*

*JOHN A. BOLDUC, JR.*

*VS*

*TOWN OF WEBSTER, ET AL*

*DEPOSITION OF*

*BRIAN J. BARNES*

*AUGUST 24, 2006*

*Leavitt Reporting, Inc.*
*1207 Commercial Street, Rear, Weymouth, MA 02189*
*781-335-6791*

35

1    **A.** I don't remember specifically, no.

2    **Q.** Do you know if you ever talked with Heidi Courtney

3    about this incident of your going to Philadelphia and

4    working in the soup kitchen?

5    **A.** I don't remember.

6    **Q.** Do you ever recall telling anyone in Webster

7    connected with the Town at all that the reason you slept in

8    the car is that they had assigned you to sleep in a room

9    with a black person?

10   **A.** No.

11   **Q.** And so that we're clear, you have no recollection

12   of that, any such conversation?

13   **A.** No.

14   **Q.** Okay. So you went back to Cataldo in '94?

15   **A.** Right.

16   **Q.** And then went to the Quincy PD?

17   **A.** That's right.

18   **Q.** And what, when was it that you went to the Quincy

19   PD approximately?

20   **A.** About October of 2004; September, October, 2004.

21   **Q.** And that was in the capacity as a dispatcher?

22   **A.** That's right.

23            MS. PONTIKES: September, October, did you

34

1    say 2004?

2            THE WITNESS: 2004.

3    **Q.** That would have been a civilian position?

4    **A.** That's right.

5    **Q.** And, again, just for the record, what was the job

6    of a civilian dispatcher in Quincy?

7    **A.** Basically answering business and 911 calls and

8    dispatching the police units.

9    **Q.** How long did you stay as a dispatcher?

10   **A.** I was there full-time until 2001.

11   **Q.** I'm going to follow up on Rebecca's because I may

12   have...

13            You said that you went back to Cataldo --

14   **A.** Right.

15   **Q.** -- in September of 1994?

16   **A.** No, not in September of '94. I was there until

17   September of '94.

18   **Q.** Okay. And you then went to the Quincy PD as a

19   dispatcher in --

20   **A.** 1994.

21   **Q.** -- September or October of 1994?

22   **A.** That's right.

23   **Q.** Okay, I apologize, I may have misspoken. And how

1    long did you stay as a dispatcher in Quincy?

2    **A.** Until 2001.

3    **Q.** So you were a full-time dispatcher from

4    approximately September of '94 until 2001?

5    **A.** That's right.

6    **Q.** And what happened in 2001?

7    **A.** I had been working part-time for the Town of

8    Webster from 1997 until 2001, and in 2001 I became

9    full-time in the Town of Webster as a patrolman and I left

10   the Quincy police.

11   **Q.** You've been employed as a full-time police officer

12   in Webster from 2001 until the present?

13   **A.** That's correct.

14   **Q.** During that period of time have you had any other

15   outside employment of any kind?

16   **A.** Since my appointment at Webster, no.

17   **Q.** Is there some employment that you have that I

18   haven't asked you about?

19   **A.** No, I think you hit it all. That's it.

20   **Q.** So there's no other personal organization that

21   you've ever worked for other than those we've reviewed here

22   this morning?

23   **A.** Right.

36

1    **Q.** You were a part-time police officer in Webster

2    starting in 1997?

3    **A.** That's right.

4    **Q.** Was that a Civil Service position?

5    **A.** It was.

6    **Q.** And you took a Civil Service examination?

7    **A.** I did.

8    **Q.** When was it that you took the Civil Service

9    examination if you remember?

10   **A.** I'm guessing approximately around 1996.

11   **Q.** You had then been placed on a certification list?

12   **A.** That's right.

13   **Q.** Were you on the Quincy list?

14   **A.** I was.

15   **Q.** Would you have received any sort of preference for

16   your residency in Quincy?

17   **A.** I would have.

18   **Q.** Were you ever invited to join the Quincy

19   department?

20   **A.** No, I never made it down that far.

21   **Q.** There were people above you on that list?

22   **A.** A lot of veterans, right.

23   **Q.** What was your Civil Service status in 1997 when you

129

1   **Q.** So you saw it as a little bit of pay back?

2   **A.** Pretty much, yea.

3   **Q.** Was Mr. Bolduc eventually appointed sergeant?

4   **A.** He made, he was, prior to that he was a sergeant

5   but he was provisional until everything was done.

6   **Q.** Well, let me ask the question in the right way

7   then. At some point after that did he become a permanent

8   sergeant?

9   **A.** He did.

10  **Q.** And how much after June 13th, '02, was it that he

11  was appointed?

12  **A.** I don't think it was that long. Over the summer.

13  Maybe a few weeks, I don't know.

14  **Q.** Were you aware as to whether or not Michaela Kelley

15  took any action with respect to the, to her bypass?

16  **A.** Well, I talked to Michaela about what I had seen

17  and I called to meet her, and I was, like I said, I was all

18  dry mouthed. I never spoke to her before I mean other than

19  a friendly conversation we had here this morning and I told

20  her what I knew.

21  **Q.** When was that?

22  **A.** I don't remember the date but I called her and I

23  met her at an office building in town.

130

1   **Q.** Office building in Webster?

2   **A.** In Webster, right.

3   **Q.** Would that have been during calendar year 2002?

4   **A.** It was, it was probably 2003. It was probably, it

5   was, the day I came forward with the information on the

6   cheating, then within days I became a racist, so it was

7   right at that time.

8   **Q.** Okay. Do you recall when it was that you

9   complained about the activity that you say you observed on

10  June 13th?

11  **A.** Well, I went, I went to Michaela first and then I

12  spoke to the Chief.

13  **Q.** Do you recall when that was?

14  **A.** I don't have the date. It was right at the time,

15  whenever they're alleging the cheating thing.

16  **Q.** If I said to you that it was on or about March 6,

17  2003, would that be consistent with your recollection?

18  **A.** It would be right around that time, right.

19  **Q.** So March 6th, '03, is about 9 months after

20  June 13th, '02 --

21  **A.** Right.

22  **Q.** -- is that right? So during that 9-month interval

23  from June '02 to March '03, did you tell anybody about what

131

1   you observed on the 13th of June?

2   **A.** No, I told nobody.

3   **Q.** Not a soul in the world?

4   **A.** (Nods head.)

5   **Q.** And was there something that happened on March 6th

6   that caused you to change your mind there?

7   **A.** I had been thinking about it, and I finally, that's

8   when I called Michaela up and asked to meet her.

9   **Q.** So you talked to Michaela first?

10  **A.** Right.

11  **Q.** And then you talked to the Chief?

12  **A.** Right.

13  **Q.** So, again, the question I guess I'm asking you is

14  there something that happened on or about March 6, 2003,

15  that caused you to go to Michaela?

16  **A.** Um, nothing in particular. We had been going back

17  and forth, Tom Ralph and I, with some E-mails, and when I

18  was up at the high school, he was asking me about what time

19  I was reporting to work and everything, and, you know, but

20  nothing, nothing that was major, you know, nothing was a

21  result of anything.

22  **Q.** When you went to the Chief on the 6th of March,

23  2003, did you prepare any written complaint at that time?

132

1   **A.** No. The Chief was never a big guy on anything

2   being in writing anyway.

3   **Q.** What was the relationship between the Chief and Tom

4   Ralph as of March of '03?

5   **A.** They were inseparable. They were -- you'd find

6   them riding around in a car at night together, pulling

7   people over at 2 o'clock in the morning, and they were

8   really, they ate together all the time. They were almost

9   like a father and son type of thing. They both love police

10  work.

11  **Q.** So as of the time that you went in there and

12  reported this to the Chief, the Chief and Ralph were still

13  friends?

14  **A.** Right.

15  **Q.** I still, I want to make sure I'm understanding what

16  you're saying, Brian.

17  **A.** Yes.

18  **Q.** You're saying that nothing happened on March 6th,

19  '03, that prompted you to make these revelations?

20  **A.** No, nothing that I'm aware of.

21       MR. JENKINS: Why don't we go off for a

22  second, okay.

23       (Lunch recess taken at 12:56 p.m.)

135

AFTERNOON SESSION

(Back on the record at 1:35 p.m.)

3  Q. (By Mr. Jenkins) I just want to review quickly the
4  discipline that we talked about or the counseling. You
5  said you received a letter to adhere to higher standards
6  and that was in connection with racial issues?

7  A. Miss Engdahl's thing, right.

8  Q. Did you receive a suspension at any point?

9  A. There was a suspension that had happened prior to
10  this that was overturned.

11  Q. Now, you've given various versions of some of the
12  things that, I don't mean different versions, but you've
13  been asked these questions before in a different context,
14  is that right?

15  A. Right.

16  Q. You've spoken to Miss Engdahl?

17  A. Right.

18  Q. And Attorney Engdahl was retained by the Town to
19  investigate claims of racial animus by yourself?

20  A. Right.

21  Q. Judge Barton at one point was retained by the Town
22  to conduct a management study of the Police Department, is
23  that right?

134

1  A. Right.

2  Q. And did you speak to Judge Barton or his
3  representative?

4  A. I spoke to him.

5  Q. Was that a recorded conversation or was it --

6  A. I don't remember. He had some woman there with him
7  writing stuff down.

8  Q. You've never seen any transcript of that
9  conversation?

10  A. No.

11  Q. You also testified at the, if I have the name
12  right, if I don't have the correct name, I apologize, but
13  the Human Resources Division?

14  A. The Civil Service?

15  Q. Right.

16  A. Yea.

17  Q. Whether it was Civil Service or the Human Resources
18  Division or the Division of Personnel Administration, you
19  testified at an administrative proceeding regarding the
20  matter of Mr. Bolduc's promotion?

21  A. Right.

22  Q. And that was on one day, is that right?

23  A. I think I was there one day. I think we went in

136

1  for two but I was only needed for one. I don't remember to
2  be honest with you.

3  Q. Have you talked to any other investigators
4  regarding these matters apart from Attorney Engdahl and
5  Judge Barton?

6  A. Not that I can remember.

7  Q. And have you testified at any other administrative
8  agencies regarding these matters besides the matter that
9  we'll call the Civil Service proceeding?

10  A. No.

11  Q. Now, Mr. Ralph was deputy chief, is that right?

12  A. Right.

13  Q. And do you understand that he was reduced in rank
14  to sergeant and then to patrolman?

15  A. Right.

16  Q. Is he currently working?

17  A. He works as a patrolman.

18  Q. And what is your relationship with him?

19  A. We get along fine.

20  Q. Does he know you're here today?

21  A. Yes, he does.

22  Q. How does he know that?

23  A. I thought that he -- it didn't say who it was. It

136

1  was typewritten at the top on the second page. I thought
2  he subpoenaed or summonsed me or whatever the correct term
3  is, and I had worked with him the day before, so I said to
4  him "Gee, you couldn't have told me you subpoenaed me?"
5  And he said "I didn't subpoena you," and I said "It's got
6  your name on the case," and he said "No," and then I saw
7  David Jenkins at the top of it and I realized it was my
8  mistake.

9  Q. Is that the only conversation you've had with him
10  about any of these matters?

11  A. Yea.

12  Q. Did you play any role in the decision to remove
13  Mr. Ralph from deputy chief to the position of sergeant?

14  A. No.

15  Q. Did you have any conversations with any town
16  administrator regarding Mr. Ralph's removal from deputy
17  chief to sergeant?

18  A. No.

19  Q. Did you have any considerations with any of the
20  people who have served as chief of police regarding the
21  removal of Ralph from deputy chief to sergeant?

22  A. No.

23  Q. Have you ever been asked for your opinion on, as to

# EXHIBIT 4

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

_____

DEPOSITION OF:

JOHN BOLDUC
DATE:  AUGUST 31, 2006

_____

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

VOLUME I - 21

1  received a small plate that went under the name

2  tag.

3          In other words, you unpinned the name

4  tag, the name tag fastened with two pins on the

5  uniform pocket. You would remove that and slip

6  the pins on the plate. The plate said I'm serving

7  since and then there was a year. Everybody, the

8  year that you had become a police officer, that

9  year was there.

10         Brian Barnes had told William Keefe that

11  he thought that that was a stupid idea; he wasn't

12  going to do that. He and Keefe exchanged words

13  and Brian had left the station. Nothing else had

14  ever come of that.

15     Q.  From the time that you became a

16  full-time police officer in May, 1996 until the

17  end of your employment can you describe your

18  duties and state the dates when they changed?

19     A.  I had always had uniform patrol duties.

20  Though the Town of Webster -- or the Department --

21  had a small Detective Bureau that was usually

22  Timothy Bent and James Hoover, there were a number

23  of officers who would be better classified as

24  investigating officers.

VOLUME I - 22

1          Under Bergeron if, for example, a motor

2  vehicle stop while you were in uniform or on

3  patrol led to something deeper or something

4  greater, you were able, as an officer, to either

5  investigate that or assist the detectives in

6  investigating that, gaining a lot of experience.

7  I did that.

8          There were times that I had worked

9  plainclothes investigations. In 1997 I was

10  assigned -- I was one of four officers assigned to

11  the Andrew Amato case. As the other three

12  officers dropped out, that became my case as the

13  lead investigator.

14         My time would be from '97 to 2004 I

15  would have a variety of both uniform patrol duties

16  as well as either uniform investigative or

17  plainclothes investigative duties ranging from

18  domestic issue investigations, some drugs, some

19  missing persons.

20     Q.  When you became a sergeant -- I believe

21  that was in June of 2002, is that correct?

22     A.  October of 2001.

23     Q.  That was the acting?

24     A.  That was provisional; yes.

VOLUME I - 23

1      Q.  Let's start with that.

2      A.  Okay.

3      Q.  How did your duties change when you

4  became the acting sergeant in October, 2001?

5      A.  I was assigned as the third shift -- the

6  three to eleven -- sorry; the eleven-to-seven

7  shift supervisor for uniform patrol.

8      Q.  And then when you became a sergeant in

9  June of 2002 did your duties change at all?

10     A.  I was still the eleven-to-seven shift

11  sergeant. In and around that time previous to

12  that I would, as leads for the Amato case would

13  develop or come to light, I would leave my shift

14  or my assigned uniform shift and exhaust those

15  leads.

16         Then when that was done, I would return

17  unless there was another assignment for me.

18     Q.  When you say you would leave your shift,

19  would you go to another shift or what would you

20  do?

21     A.  I would go to plainclothes and I would

22  work generally the hours that would cover both the

23  first and/or second shift depending upon when I

24  could meet with people or continue the

VOLUME I - 24

1  investigation, but rather than do that on overtime

2  I was to use the time that I would normally be

3  working a shift and do it then.

4      Q.  Were there any other changes in your

5  duties from June 2002 until your employment ended?

6      A.  At one point I was to be the reserve --

7  the Webster Police Reserve Unit liaison sergeant.

8  That was to be included in my regular duties.

9          I was to be the Department training

10  coordinator. That was to be incorporated in as

11  well and whatever else was needed.

12     Q.  You said that you -- were you actually

13  the Reserve Unit liaison?

14     A.  Yes.

15     Q.  You were?

16     A.  Yes.

17     Q.  When was that?

18     A.  That was October 2001 roughly up until

19  my termination.

20     Q.  When were you the training coordinator?

21     A.  At that same time.

22     Q.  Did you do that on the eleven-to-seven

23  shift?

24     A.  When I could; yes.

**JOHN A. BOLDUC    vs    TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          AUGUST 31, 2006**

VOLUME I - 25

1    Q.   When did the Amato murder occur?
2    A.   September -- well, Andrew Amato was a
3  missing child September 30th, 1978.
4    Q.   Has it ever been solved as far as you
5  know?
6    A.   Not yet.
7    Q.   Who were the other officers that were
8  working on it when you first started?
9    A.   Thomas Ralph, Timothy Bent, and David
10  Brody.
11    Q.   How do you spell Brody?
12    A.   B-R-O-D-Y.
13    Q.   You said that they stopped being
14  involved in it at some point?
15    A.   Yes.
16    Q.   Is that correct?
17    A.   Yes.
18    Q.   Do you recall when each of them stopped
19  being involved in it?
20    A.   Brody was immediately.  At the first
21  meeting with the Chief as he was explaining all of
22  this said that he had no interest and no time.
23    Q.   That was back in '97 that he stopped?
24    A.   Correct.  Tom Ralph, around that time,

VOLUME I - 26

1  was to assist and oversee.  He had a lot of things
2  going and eventually went to the Attorney
3  General's Office on the YACS case -- it's an
4  acronym.
5    Q.   Do you know approximately when he
6  stopped being involved in the Amato case?
7    A.   Very soon after we were -- very soon
8  after he was assigned to it, a short time.  I
9  don't have a date for you -- which left Tim Bent
10  and I.
11        Tim had a heavy caseload.  He was the
12  Department's detective.  Then he had to basically
13  step away when he was promoted to sergeant.  At
14  the time in '97 when Tim and I started to go
15  forward with this he had said to me that he wanted
16  me to take the lead.  He would work with me but
17  his caseload was very heavy in the Detective
18  Bureau.
19    Q.   Was there something in particular as far
20  as you know that caused Chief Bergeron to have the
21  four of you work on the Amato case again in '97?
22    A.   Yes.
23    Q.   What was that?
24    A.   A call from the Connecticut State

VOLUME I - 27

1  Police.  There was a gentleman who suffered from
2  paranoid schizophrenia who was wondering if he was
3  responsible for a missing child in or around
4  Connecticut.  The Connecticut State Police
5  referred him to Chief Bergeron.  Chief Bergeron,
6  Timothy Bent, Tom Ralph, and I believe Rodney
7  Budrow all met with this person.
8        The Andrew Amato case was one of the
9  cases that Bergeron had looked at prior to -- he
10  had already been hired by the Webster Police
11  Department, Town of Webster but looked at -- it
12  was one of the cases he looked at before taking
13  this office and thought that there was something
14  that could be -- or modern police sciences could
15  be applied to this case, a cold case resurrection
16  type of thing.
17    Q.   With respect to this paranoid
18  schizophrenic from Connecticut, was that fully
19  investigated and resolved in some way?
20    A.   He had been looked at.  He had been
21  investigated and that's what brought the four
22  officers together then in around that time to go
23  forward; and that gentleman was linked to the
24  person that ultimately we liked for this -- the

VOLUME I - 28

1  suspect in the case.
2    Q.   I'm sorry, I didn't follow that.  In
3  other words did you conclude that he wasn't
4  involved in the Amato missing person?
5    A.   Concluded that he didn't have an active
6  part in the physical abduction.
7    Q.   Do you recall when that conclusion was
8  reached?
9    A.   No.  He was a part of that case for
10  quite some time, linked to the person that
11  ultimately we developed into a suspect so it was
12  ongoing.
13        I don't remember exactly when we
14  eliminated him as having a part in the actual
15  abduction itself.  It was later on in that case.
16    Q.   Do you recall how long it was prior to
17  your termination that you eliminated him,
18  approximately?
19    A.   Sometime in '99 is my best guess.
20    Q.   Then you said that you linked -- through
21  him you found another suspect, is that correct?
22    A.   Correct.
23    Q.   Did you then investigate that?
24    A.   Yes.

JOHN A. BOLDUC        TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

## VOLUME I - 37

1  that could be utilized for police reports aside
2  from the dispatcher's console.  There was a
3  computer at the court officer's desk to write
4  reports if needed.
5          Typically with three or five officers
6  per shift not all the officers would be working on
7  reports at the same time.
8      Q.  Other than writing reports, why else
9  would an officer need office space?
10     A.  To keep some of their investigation
11  materials or simply to write a report that would
12  be stored in the computer itself, print it and
13  then turn it in to the appropriate places.
14         Other times, if an officer was to keep
15  witness or suspect statements, physically build a
16  photo array, things that would aid the officer in
17  whatever he or she was working on at the time.
18     Q.  If an officer did not have a designated
19  space in an office where would they keep their
20  investigative materials?
21     A.  They would -- officers would either, if
22  they had a locker they would try and keep it
23  there.  If they brought in a file cabinet and
24  found a place to keep it, they would do that.

## VOLUME I - 38

1  There were officers who shared a file cabinet,
2  each officer taking a drawer type of thing.
3         If you needed to store something in any
4  one of the offices you could do that, whether you
5  needed to keep something in the detective office
6  or one of the sergeant's offices, that was fine.
7      Q.  Going back to my original question -- or
8  one of my original questions -- you did say that
9  you started using the office in the lower level
10  before you became an acting sergeant, is that
11  correct?
12     A.  Correct.
13     Q.  Did you continue to use that same office
14  until you said that -- or until you were told by
15  Chief Bergeron to turn in your keys?
16     A.  Yes.
17     Q.  Did anyone else use that office with
18  you?
19     A.  Aaron Suss.
20     Q.  After you turned in your keys, what did
21  you use for office space?
22     A.  A desk at my home.
23     Q.  Why didn't you use one of the other
24  areas in the Department?

## VOLUME I - 39

1      A.  Lack of room for the amount of stuff
2  that I had.
3      Q.  How much stuff did you have?
4      A.  File cabinet, things pertaining to
5  trainings, things pertaining to the Reserve Unit,
6  my own investigation -- investigatory items.
7      Q.  Did you ask to use another space in the
8  Department?
9      A.  No.
10     Q.  Why not?
11     A.  I was ordered to vacate the space that I
12  had.  I didn't believe that I was going to be
13  afforded any other space.
14     Q.  Do you know what Aaron Suss used after
15  he was asked to vacate?
16     A.  He kept things at home as well.
17     Q.  Do you know, with respect to the other
18  sergeants, did they all have office space?
19     A.  Yes.
20     Q.  With respect to the office space that
21  you had used in the lower level of the Police
22  Department had anyone specifically said, "This is
23  your desk"?  Did anyone specifically designate it
24  to you?

## VOLUME I - 40

1      A.  Chief Bergeron.
2      Q.  Did other people use the same desk?
3      A.  Not the same desk.  There's another desk
4  in there that they used.
5      Q.  On other shifts would officers use that
6  desk that you had used?
7      A.  No.
8      Q.  You're saying it was only used by you?
9      A.  The desk that I had; yes.
10     Q.  After you said you were asked to turn in
11  your keys why didn't you use one of the other
12  desks when it wasn't being used by an officer, say
13  when they were on a different shift than you and
14  the desk was not being used?
15     A.  If I had any type of reports I'd use the
16  work stations that we all would use.
17         As far as keeping paper files or keeping
18  the items that I had, it was a space issue.  As
19  far as having a surface to write on or to organize
20  files, that could be done anywhere but as far as
21  storage and that sort of thing, there was no room.
22     Q.  Wasn't there a requirement though that
23  documents that pertained to police work be kept in
24  the police station?

## VOLUME I - 41

1   A.   No.
2   Q.   There was no central filing system
3   where, for instance, if you were working on the
4   Amato case you'd go to this particular section of
5   the file cabinets?
6   A.   No.
7   Q.   You're saying everybody kept things in
8   different places?
9   A.   Correct.
10   Q.   On the same cases?
11   A.   Correct.  Not on the same cases.
12   Michaela Kelley and I would work the Bar-Jonah
13   case.  We would keep the files between us.
14   Anything that we needed, we'd trade back and forth
15   and work together.
16        The Amato case, Derrick and I would do
17   the same thing.  There was no central location for
18   case files being actively worked on.  There was a
19   central location for reports pending court
20   appearances or cases where there was a final
21   disposition.
22   Q.   Other than yourself, do you know of any
23   other officer -- I believe you mentioned Officer
24   Suss -- other than the two of you, do you know of

## VOLUME I - 42

1   anyone else that kept things at home that belonged
2   to the Police Department?
3   A.   Jim Hoover, Tim Bent, Jim Young.
4   Q.   Do you know why they kept things at
5   home?
6   A.   Space issues.
7   Q.   In terms of the paperwork that you kept
8   at home, were they actually documents pertaining
9   to the cases as opposed to training manuals and
10   things like that?
11   A.   All of that.
12   Q.   It was actually related to the cases,
13   too?
14   A.   Yes.
15   Q.   The same with the other as far as you
16   know?
17   A.   Yes.
18   Q.   What was your salary when you were
19   working at the Webster Police Department when you
20   left?
21   A.   Twenty-five twelve an hour -- $25.12 an
22   hour.
23   Q.   Do you remember what it was when you
24   started?

## VOLUME I - 43

1   A.   Eight dollars an hour.
2   Q.   So it steadily went up?
3   A.   Yes.
4   Q.   Did it ever go down when you were there?
5   A.   No.
6   Q.   Had you ever been taken off of any other
7   investigation that you had been working on besides
8   the Amato investigation?
9   A.   No.
10   Q.   When you were employed at the Webster
11   Police Department did you have any relationship
12   with any of the selectmen outside of just doing
13   your regular duties?
14   A.   Speaking to -- if I saw one of the
15   selectmen such as -- I'd speak to Bob Miller, I'd
16   speak to Ray Regis, I'd speak to Bob Stawiecki.
17   When Roy Myer was alive, I spoke with him.  By
18   relationship?
19   Q.   Meaning any kind of a relationship
20   beyond just doing your regular duties, for
21   instance any type of socialization with them
22   outside if work, any kind of friendships, things
23   like that?
24   A.   No.

## VOLUME I - 44

1   Q.   Did you know these four individuals that
2   you just mentioned before you became a police
3   officer?
4   A.   No.
5   Q.   How would you describe your relationship
6   with Mr. Miller?
7   A.   Friendly.  If I saw -- if I were to see
8   Bob Miller I could stop at any time and converse.
9   Q.   Did you ever converse with him about
10   your own employment issues outside of just doing
11   regular police work?
12   A.   Yes.
13   Q.   Do you recall what you discussed and
14   when?
15   A.   After I was on paid administrative leave
16   I was called to Bob Miller's funeral home and he
17   had actually summoned Tom Ralph and I.
18        He had asked that we resign from the
19   Police Department.  If we did he said he would
20   give us what he called glowing recommendations
21   from the Town of Webster.
22   Q.   Did he actually say to resign?
23   A.   He had called us at the request of the
24   town administrator.

VOLUME I - 33

1  to me.
2        When Derrick came back from the Academy,
3  he had asked -- he always had an interest in the
4  Amato case and would ask what was going on and
5  that sort of thing.  I asked him to take the case
6  file and look at it and I would be interested in
7  any notes or questions or things that struck him
8  odd, just another angle, a fresh set of eyes, I
9  would be interested in his thoughts.
10        When he came back and he and I sat and
11  went over what he was thinking or what he was
12  doing, I was impressed, number one that he did
13  this in a very short amount of time and I also
14  thought that he put a lot of thought into it.
15        At that point I went to Chief Bergeron
16  and asked him that anybody that could do that that
17  quickly and that deeply should be assigned -- in
18  my mind should have a part of that, would
19  contribute to that case.  Chief Bergeron agreed
20  and Derrick and I began working together.
21    Q.  For the time that you worked with him,
22  did you think that he did a good job?
23    A.  Absolutely.
24    Q.  Did you think that he did a good job

VOLUME I - 34

1  after you were no longer involved in it, from what
2  you could observe or heard?
3    A.  Derrick would call me and update me as
4  to what he had found, what he was doing.  He would
5  ask what my thoughts were.
6        The other agencies that we had worked
7  with and established relationships with, I would
8  hear from some of them from time to time.  If the
9  cadaver dogs were going to be out, Derrick
10  would -- Derrick and the Rhode Island State
11  Police, Burriville Police Department, they'd get
12  word to me and invite me down so I could watch the
13  search sites and observe the dogs and see what was
14  going on.
15        I think Derrick Stokes is very good.  I
16  think he did a great job.
17    Q.  At some point did you have an office
18  that you would use in the Police Department?
19    A.  Yes.
20    Q.  When did you get that office and where
21  was it?
22    A.  It was the lower level of the police
23  station.  I believe that was -- I believe that's
24  when Michaela and I began working on the Nathaniel

VOLUME I - 35

1  Bar-Jonah case.
2    Q.  Do you remember what year that was?
3    A.  I don't.
4    Q.  Was it before you became an acting
5  sergeant?
6    A.  Yes.
7    Q.  With respect to offices, was it just
8  typically sergeants that had offices?
9    A.  No.
10    Q.  Can you explain how it was that
11  individuals had certain office spaces available to
12  them?
13    A.  Yes; it started out that -- it started
14  out basically your specialty officers such as your
15  detectives, your DARE officers, your court
16  officers, I guess the communication officer, the
17  person who would take care of TURRET tapes and
18  phone lines -- the 911 tapes.
19        As Chief Bergeron incorporated this idea
20  of investigating officers the office space
21  allotted to these specialty positions ended up --
22  those officers would have either more desks
23  brought in or they'd divide a desk, one set of
24  drawers for one officer, one set for another as

VOLUME I - 36

1  more space was needed.
2        It's an old building so there's not a
3  lot of empty rooms.
4    Q.  Actually let me ask you that question
5  then.  How many rooms were there available for
6  offices besides the Chief's office?
7    A.  Seven.
8    Q.  I'm sorry, seven?
9    A.  Seven.
10    Q.  How many officers were there?
11    A.  Twenty-nine full time officers, the
12  Chief, and a number of twenty-five part time.
13    Q.  The Chief had his own office, right?
14    A.  Correct.
15    Q.  Did all of the officers have an office
16  space that they could use?
17    A.  Not all of them; no.
18    Q.  Where would they go if they didn't have
19  an office space to write reports and so forth?
20    A.  There were two booking rooms with a work
21  station -- computer and that sort of thing in each
22  booking room.  There was a computer in the
23  conference room that could be utilized for police
24  reports.  There was a computer in the dispatch

## VOLUME I - 37

1 that could be utilized for police reports aside
2 from the dispatcher's console. There was a
3 computer at the court officer's desk to write
4 reports if needed.
5      Typically with three or five officers
6 per shift not all the officers would be working on
7 reports at the same time.
8      Q. Other than writing reports, why else
9 would an officer need office space?
10      A. To keep some of their investigation
11 materials or simply to write a report that would
12 be stored in the computer itself, print it and
13 then turn it in to the appropriate places.
14      Other times, if an officer was to keep
15 witness or suspect statements, physically build a
16 photo array, things that would aid the officer in
17 whatever he or she was working on at the time.
18      Q. If an officer did not have a designated
19 space in an office where would they keep their
20 investigative materials?
21      A. They would -- officers would either, if
22 they had a locker they would try and keep it
23 there. If they brought in a file cabinet and
24 found a place to keep it, they would do that.

## VOLUME I - 38

1 There were officers who shared a file cabinet,
2 each officer taking a drawer type of thing.
3      If you needed to store something in any
4 one of the offices you could do that, whether you
5 needed to keep something in the detective office
6 or one of the sergeant's offices, that was fine.
7      Q. Going back to my original question -- or
8 one of my original questions -- you did say that
9 you started using the office in the lower level
10 before you became an acting sergeant, is that
11 correct?
12      A. Correct.
13      Q. Did you continue to use that same office
14 until you said that -- or until you were told by
15 Chief Bergeron to turn in your keys?
16      A. Yes.
17      Q. Did anyone else use that office with
18 you?
19      A. Aaron Suss.
20      Q. After you turned in your keys, what did
21 you use for office space?
22      A. A desk at my home.
23      Q. Why didn't you use one of the other
24 areas in the Department?

## VOLUME I - 39

1      A. Lack of room for the amount of stuff
2 that I had.
3      Q. How much stuff did you have?
4      A. File cabinet, things pertaining to
5 trainings, things pertaining to the Reserve Unit,
6 my own investigation -- investigatory items.
7      Q. Did you ask to use another space in the
8 Department?
9      A. No.
10      Q. Why not?
11      A. I was ordered to vacate the space that I
12 had. I didn't believe that I was going to be
13 afforded any other space.
14      Q. Do you know what Aaron Suss used after
15 he was asked to vacate?
16      A. He kept things at home as well.
17      Q. Do you know, with respect to the other
18 sergeants, did they all have office space?
19      A. Yes.
20      Q. With respect to the office space that
21 you had used in the lower level of the Police
22 Department had anyone specifically said, "This is
23 your desk"? Did anyone specifically designate it
24 to you?

## VOLUME I - 40

1      A. Chief Bergeron.
2      Q. Did other people use the same desk?
3      A. Not the same desk. There's another desk
4 in there that they used.
5      Q. On other shifts would officers use that
6 desk that you had used?
7      A. No.
8      Q. You're saying it was only used by you?
9      A. The desk that I had; yes.
10      Q. After you said you were asked to turn in
11 your keys why didn't you use one of the other
12 desks when it wasn't being used by an officer, say
13 when they were on a different shift than you and
14 the desk was not being used?
15      A. If I had any type of reports I'd use the
16 work stations that we all would use.
17      As far as keeping paper files or keeping
18 the items that I had, it was a space issue. As
19 far as having a surface to write on or to organize
20 files, that could be done anywhere but as far as
21 storage and that sort of thing, there was no room.
22      Q. Wasn't there a requirement though that
23 documents that pertained to police work be kept in
24 the police station?

VOLUME I - 53

1  someone of the Select Board.
2          I wanted him to provide the opportunity
3  to completely answer your question.
4              MS. LYNCH:  I would appreciate it if
5  you didn't do that.  I just want your witness' own
6  memory.
7      Q.  (BY MS. LYNCH)  With respect to the note
8  that your attorney wrote to you, what significance
9  does that have?
10     A.  Bob Miller had left a phone message on
11 Tom Ralph's answering machine instructing Tom to
12 get ahold of me because Ms. Leal had asked the
13 Board to rescind a commendation for the Amato case
14 that the board voted to give to me.
15     Q.  We'll get to that later.  I was asking
16 you about Mr. Stawiecki.
17         Did you ever have any discussions with
18 him regarding your employment?
19     A.  No.
20     Q.  Do you have any sort of background in
21 martial arts, anything like that?
22     A.  No formal martial arts training.
23     Q.  I'd like to draw your attention to
24 apparently a luncheon that occurred on

VOLUME I - 54

1  February 22, 2003 at the Colonial Club Restaurant?
2      A.  Yes.
3      Q.  Do you recall being there?
4      A.  Yes.
5      Q.  Who was present?
6      A.  Myself; Tom Ralph; Pamela Laduc who is
7  now Pamela Laduc Regis; Heidi Courtenay; Lee Ellen
8  Olmstead; and Brian Barnes.
9      Q.  You said Pamela Laduc Regis.  Is she
10 related to the Selectmen Regis?
11     A.  Daughter-in-law.
12     Q.  Daughter-in-law?
13     A.  Yes.
14     Q.  What occurred at that luncheon that was
15 significant with respect to Brian Barnes?
16     A.  Brian Barnes repeated a story of an
17 unpleasant airplane flight that he had.
18     Q.  And what was that?
19     A.  That he was seated between two
20 African-Americans.  He also spoke about an obese
21 woman and her snacking habits.
22     Q.  Can you recall what you said?
23     A.  He had said that he took a plane flight
24 to Florida.  He went on to say why the flight was

VOLUME I - 55

1  unpleasant as he felt like an Oreo cookie stuck
2  between two niggers; and then the flight attendant
3  who was asking the woman behind him who should
4  have bought two tickets because she was so large
5  and took up so much room, if she wanted snacks
6  when Brian went on this tirade on the stewardess
7  of course she wants snacks, look at her type of
8  thing.
9      Q.  The woman who was large, was she
10 African-American, do you know?
11     A.  I don't know.
12     Q.  I want to make sure I understand.  There
13 was a large woman behind him and he had two
14 African-Americans next to him, is that correct?
15     A.  That's correct.
16     Q.  Did he say anything else of a racial
17 nature?
18     A.  Not that I recall.
19     Q.  What was your response when he told that
20 story?
21     A.  My response was that -- nobody said
22 anything.  There was silence.  Brian wasn't
23 getting the reaction he was looking for so he went
24 on to something different.

VOLUME I - 56

1      Q.  Did anyone chastise him for making that
2  statement or anything like that?
3      A.  No.
4      Q.  How did you feel about the statement?
5      A.  I felt that the statement was wrong.  He
6  was loud, he had people looking at him at some of
7  the other tables.  It was apparent that more
8  people had heard what he had said than who were
9  seated at the table.
10         Of course Brian was in the full Webster
11 police uniform.  It wasn't very appropriate was my
12 thought.
13     Q.  Why didn't you say something to him?
14     A.  It would have fallen on deaf ears.
15     Q.  Why do you say that?
16     A.  There would be no repercussion for
17 Brian.
18     Q.  What do you mean by that?
19     A.  That again, being outside of the chain
20 of command or not being subject to discipline
21 under Chief Bergeron, to say something to Brian,
22 have him chuckle and nothing come of it, what
23 would be the point.
24     Q.  Had you ever witnessed him make a racial

Case 4:05-cv-40076-FDS Document 71-4 Filed 01/31/2008 Page 10 of 15

VOLUME I - 57

1  statement at any other time?
2      A.  No.
3      Q.  Had you ever heard him use the word
4  nigger, chink or spic other than at that occasion?
5      A.  No.
6      Q.  Do you know of anyone else that did --
7  who says they did?
8      A.  Aaron Suss, Jim Hoover, Joseph Brooks,
9  Michael Kehoe, Jim Young, Jim Fersenheim.
10     Q.  What was that name?
11     A.  Jim F-E-R-S-E-N-H-E-I-M.
12     Q.  Is he a police officer?
13     A.  He's a dispatcher.
14     Q.  Okay; anyone else?
15     A.  I don't know.
16     Q.  Did these individuals tell you that they
17 witnessed Mr. Barnes making a racial statement?
18     A.  At different times just stories
19 repeated.
20     Q.  Starting with Officer Suss, what did he
21 tell you and when?
22     A.  I don't remember the date.  Suss drove
23 Barnes and Phillip Charbonneau, the assistant
24 principal of the high school, they were going to

VOLUME I - 58

1  some conference for school resource officers and
2  they were making -- the two of them talking back
3  and forth referring to African-Americans as
4  niggers on the way to the airport, whenever that
5  conference took place.
6          The other officers I mentioned were
7  talking about Brian Barnes' statements when he
8  came back after a New England Cable News panel
9  discussion for racial profiling where Senator
10 Dianne Wilkerson was also part of the panel.  The
11 talk of Brian referring to her in front of those
12 people that I mentioned --
13     Q.  (Interposing) That's Hoover, Brooks,
14 Kehoe, Young, and Fersenheim?
15     A.  There were other officers present as
16 well -- or other Police Department personnel --
17 but referring to Senator Wilkerson as nothing but
18 a dumb nigger and whatnot.
19          I was not -- that's not firsthand
20 knowledge from me.
21     Q.  Did they say that he said that as
22 opposed to he was repeating that another police
23 chief said that about her?
24     A.  No; not that I recall.

VOLUME I - 59

1      Q.  The statement that Suss told you he
2  heard between Barnes and Charbonneau, you said
3  that occurred on the way to the airport?
4      A.  Correct.
5      Q.  Did he say that the statement was about
6  the Oreo cookie?
7      A.  No; Aaron had said to me that there was
8  conversation back and forth between Barnes and
9  Charbonneau, both of them using the word "nigger"
10 quite a lot.  The two of them laughing and joking.
11     Q.  Have you, yourself, ever used the terms
12 nigger, chink or spic to refer to individuals?
13     A.  No.
14     Q.  Have you ever heard Richard Bergeron
15 make racist type comments?
16     A.  No.
17     Q.  How about William Keefe?
18     A.  No.
19     Q.  Have you ever heard any other officers
20 or supervisors at the Police Department make
21 racial type comments besides the time that you
22 said that you heard Officer Barnes at the
23 restaurant?
24     A.  No.

VOLUME I - 60

1      Q.  Do you have any knowledge to believe
2  that Chief Bergeron had ever heard Brian Barnes
3  make these type of racial comments?
4      A.  I don't know.
5      Q.  Do you know if, prior to Thomas Ralph
6  reporting the incident at the restaurant to Chief
7  Bergeron, whether any other police officers or
8  Police Department civilian employees had ever
9  reported to Chief Bergeron or to any other
10 supervisor that Brian Barnes had made racial
11 comments?
12     A.  Jim Hoover -- Detective Hoover.
13     Q.  What do you understand he reported?
14     A.  He reported to Tom Ralph about an
15 incident at the Bartlett High School about Brian
16 Barnes refusing to room with a black man when they
17 were in one of the orders of --
18     Q.  Seminary?
19     A.  Something along that line; yes.  They
20 had to work in a soup kitchen in New York or
21 something to that effect and they would be there
22 for a week.  Space was limited.  Brian refused to
23 sleep in the same room so he slept in his car or
24 something along those lines.  I was not there for

Case 4:05-cv-40048-FDS Document 56 Filed 11/30/2006 Page 11 of 15

## VOLUME I - 61

1  that.
2      Q.  This was repeated to you by who?
3      A.  Hoover and Ralph.
4      Q.  They both told you?
5      A.  Yes.
6      Q.  Did they both say that they heard Brian
7  Barnes say that?
8      A.  Tom Ralph had told me that Hoover was
9  the one who wanted to push the complaint, was --
10 wanted something done.
11         There was some sort of assembly or bomb
12 scare or something where there were a lot of
13 people gathered around.  Hoover thought that that
14 was inappropriate, wanted to put this complaint in
15 writing.
16     Q.  You're saying at that bomb scare that's
17 where Brian Barnes repeated this story reportedly?
18     A.  Right.
19     Q.  Hoover was there at this bomb scare?
20     A.  Yes.  If that's what it was.  It was
21 something at this school.
22     Q.  Other than Hoover telling Ralph that, do
23 you know if either of them or anyone else had ever
24 reported alleged racial statements by Barnes to

## VOLUME I - 62

1  either the Chief or any other supervisor?
2      A.  I don't know.
3      Q.  Do you know if Ralph or Hoover ever
4  reported that to the Chief -- this statement that
5  reportedly was made at the bomb scare?
6      A.  I was told that's what -- that's where
7  the letter -- the April 15th letter to Chief
8  Bergeron, that's what spurred that whole thing.
9      Q.  As opposed to the Colonial Restaurant
10 incident?
11     A.  I don't know that that incident was
12 reported to the Chief.
13     Q.  Which one?
14     A.  The Colonial Restaurant.
15     Q.  You think it was just the statement at
16 the bomb scare that was reported?
17     A.  I believe the statement at the bomb
18 scare is what brought all of that forward, was the
19 reason for that letter that Ralph gave to the
20 Chief.
21         After that letter, that's when the Chief
22 questioned people and anybody who witnessed
23 anything was to then put something in writing and
24 turn it into him.

## VOLUME I - 63

1      Q.  How would you define the term "racist"?
2      A.  I would define the term that if you were
3  to interact with somebody maliciously.  If you
4  were to act or display negative actions because
5  somebody is different, whether that is the
6  obvious -- whether that's skin or heritage or
7  ethnicity, I think that goes deeper.
8          If you want to -- also anybody that's
9  just different or not what society would deem as
10 average male or female Caucasian.
11     Q.  Are you done?
12     A.  I am.
13     Q.  Do you think that Brian Barnes is a
14 racist, based upon your definition?
15     A.  I think so.
16     Q.  In other words, you think that to the
17 extent he made these types of statements he was
18 doing so with malice as opposed to in his mind
19 thinking it was funny?
20     A.  His demeanor, his speech, his delivery,
21 it didn't appear -- he didn't seem to think that
22 that was a joke or making light of something or
23 trying to be colorful or anything like that.
24         I don't -- at the Colonial Club I did

## VOLUME I - 64

1  not perceive that as a joking manner.
2      Q.  Actually with respect to that statement
3  at the Colonial Club, did he say it as the thought
4  came from him as opposed to he was repeating
5  something that this Mr. Charbonneau stated?
6      A.  As the thought came from him, first
7  person.
8      Q.  He never referenced Charbonneau?
9      A.  No.
10     Q.  Have you ever observed him treat someone
11 of a different racial background than him
12 differently?
13     A.  Not firsthand, no.
14     Q.  Did you ever at any time discuss with
15 him the racial statements that you said you heard
16 or that you heard of?
17     A.  No.
18     Q.  Do you know when that statement at the
19 bomb scare was reportedly made?
20     A.  I don't know.
21     Q.  Do you recall when it was in relation to
22 the February 22, 2003 Colonial Club Restaurant
23 statement?
24     A.  I thought it was close proximity but

VOLUME I - 65

1  after the Colonial Club.
2        I wasn't at the bomb scare.  I don't
3  remember when exactly it was.
4      Q.   Do you know when the statement that was
5  reportedly made about Ms. Wilkerson was made?
6      A.   Either the day of or the day after,
7  whenever that NECN piece aired.
8      Q.   Do you know when that was?
9      A.   No.
10     Q.   Do you recall whether it was before or
11  after the Colonial Club Restaurant statement in
12  February, '03?
13     A.   I don't remember.
14     Q.   In terms of the racial profiling law, is
15  it your understanding that there was a period
16  where it was voluntary and then it became
17  mandatory?
18     A.   Right; if I remember correctly there
19  was -- I think there was a test period and then it
20  became mandatory.
21     Q.   When there was this test period, did you
22  comply with it?
23     A.   Yes; it amounted to adding a person's
24  race on the citation.

VOLUME I - 66

1      Q.   How did you -- I'm sorry, I interrupted
2  you.  Are you done?
3      A.   Yes.
4      Q.   How did you do that?  Did you just check
5  a box?  Did you write in a code?
6      A.   At first it was a box check but then
7  there was a set of -- I believe it was a
8  three-character code.
9      Q.   As far as you know you always complied?
10     A.   Yes.
11     Q.   Did you know whether or not Brian
12  Barnes -- strike that.
13        When it was in the testing stage you
14  said that you always complied?
15     A.   Yes.
16     Q.   And then after it became mandatory, did
17  you always comply as far as you know?
18     A.   Yes.
19     Q.   Was there ever a time when you were
20  aware that Brian Barnes was not doing it, either
21  during the test stage or when it became mandatory?
22     A.   Yes.
23     Q.   How did you become aware of that?
24     A.   Brian freely announced that he was not

VOLUME I - 67

1  going to do that.
2      Q.   Was that when it was mandatory or during
3  the testing stage?
4      A.   Both.
5      Q.   What did he say?
6      A.   I'm not doing it.
7      Q.   Did he say why?
8      A.   No -- or not to me, anyway.
9      Q.   Do you know if he -- from anyone else
10  that you spoke to as to whether he told anyone
11  else as to why he wasn't going to comply?
12     A.   No.
13     Q.   Do you know of anyone else that did not
14  comply -- meaning at the Webster Police
15  Department?
16     A.   No.
17     Q.   Did you ever see any statistics,
18  anything like that that showed the compliance of
19  other officers besides yourself?
20     A.   The only thing I saw was a Boston Globe
21  article that Brian Barnes was the number one
22  non-compliant officer in the state.
23     Q.   Was any other officer from the Webster
24  Police Department listed?

VOLUME I - 68

1      A.   No.
2      Q.   Do you know when that article was
3  published by any chance?
4      A.   Very close to that NECN piece.  That's
5  why he was asked to -- or contacted and asked to
6  be on the panel.  I don't remember when that piece
7  aired.
8      Q.   The reference that you stated to the
9  bomb scare where you said that Brian Barnes
10  reportedly talked about sleeping in the car, did
11  you ever hear anything about him being at a
12  seminary in Philadelphia?
13     A.   No; just his seminary days.  I heard him
14  talk about New York or New York City but never --
15  I never heard him speak of Philadelphia.
16     Q.   Before Thomas Ralph filed his complaint
17  with Chief Bergeron about Brian Barnes, did you
18  discuss it with him?
19     A.   No.
20     Q.   You had no idea he was going to do that?
21     A.   Correct.
22     Q.   It is your understanding that he did
23  that based on the statement made at the bomb
24  scare?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 69

1  A.   Correct -- again if that was a bomb
2  scare but at the event or incident at the school.
3  I'm assuming it was a bomb scare but I don't know
4  that for sure.
5  Q.   Were you present when he gave his
6  complaint to Chief Bergeron?
7  A.   No.
8  Q.   When did you first hear about it?
9  A.   In Chief Bergeron's office when I went
10  in to talk to him about the Amato case.
11  Q.   Can you tell us what was discussed then?
12  A.   Chief Bergeron, when I entered, was very
13  angry.  He accused me of collaborating with Ralph
14  on a letter that he had -- a tri-folded piece of
15  white paper that he kept waving back and forth and
16  accused me of -- he kept accusing me of working
17  with Ralph on this, you had a part in this.  He
18  didn't do this by himself and I had no idea what
19  he was talking about.
20  I asked him and he just shoved the paper
21  forward to me and told me to read it.  I read it.
22  I saw that it was from Ralph to Bergeron outlining
23  racial bigotry or racial behavior from Brian
24  Barnes and that he wanted a response from

VOLUME I - 70

1  Bergeron.  Bergeron had fourteen days to respond
2  or Ralph would go to other agencies.
3  The Chief was upset because he was
4  telling me that the fourteen-day paragraph, he
5  called that as "downtown," that's "downtown."  He
6  said to me that Ralph had to have someone help him
7  with this; that that was nothing he did on his
8  own; that I made a big mistake; that my
9  friendship, loyalty, and support of Deputy Chief
10  Ralph was going to cost me.
11  Q.   Did he say why he thought that you were
12  involved in it?
13  A.   He didn't.  He didn't say.
14  Q.   Did you ever have any discussion with
15  Ralph as to why he decided to make that complaint
16  at that time?
17  A.   No.
18  Q.   When you went into the Chief's office
19  that day and he showed you the letter, do you know
20  if that was the same day that Ralph turned in the
21  letter?
22  A.   I believe so.
23  Q.   Do you happen to know what Ralph did
24  after he turned in the letter?

VOLUME I - 71

1  Do you have any knowledge of that --
2  where he went, what he did?
3  A.   No.
4  Q.   When is the first time you did discuss
5  that letter with Ralph?
6  A.   Actually I need to clarify.  The Chief
7  had also, when we were in the office -- it had to
8  be that day because earlier that day Derrick
9  Stokes and I had met with John Bish and the Chief
10  accused me of lying to cover Tom Ralph.
11  He was at -- when Derrick and I were at
12  the East Brookfield Courthouse Ralph had showed
13  up.  Derrick, John, and I were getting ready to go
14  to lunch so we invited Tom to come with us.
15  Q.   Just for a second.  Do you know if that
16  was after he turned in the letter?
17  A.   Right; it had to be.
18  Q.   Okay.  Did he go to lunch with you?
19  A.   He did.
20  Q.   Did he discuss the fact that he turned
21  in the letter?
22  A.   No; we were -- he was very quiet but the
23  reason Derrick and I were there was to share with
24  John timetables of people that we were looking at

VOLUME I - 72

1  or suggested to us by other agencies of possible
2  suspects -- today they are people of interest --
3  but suspects in the Amato case but the timetable
4  in the area -- those people that give or have John
5  give those to the investigators for the Molly Bish
6  case so it was all involved in that and the Center
7  For Missing and Exploited Children so Ralph had
8  very little to say during that whole time.
9  As we were finishing lunch he said to
10  Derrick and I that he had to get back to the
11  station and he left.
12  Q.   Do you have any knowledge of him
13  ignoring requests by Chief Bergeron to return to
14  the station?
15  A.   I don't know.
16  Q.   Incidentally, is there an officer
17  Bates -- B-A-T-E-S?
18  A.   Brian Bates; yes.
19  Q.   Did he ever make any statement or
20  statements to you about Brian Barnes and alleged
21  racial statements?
22  A.   Not that I remember.
23  Q.   How about Officer Shaw?
24  A.   Not that I remember.  I don't remember

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC                    AUGUST 31, 2006

VOLUME I - 77

1    He asked me if I thought Brian Barnes
2  was a racist and if I had ever witnessed Brian
3  Barnes making any racially derogatory statements.
4  I told him I had.
5    He got angry again. He wanted to know
6  when, where, dates, people and there and then
7  ordered me to put it in writing.
8    Q. Do you think there was anything wrong
9  with him asking you to put it in writing?
10   A. No.
11   Q. Did he express an opinion as to whether
12 he thought that Brian Barnes was a racist?
13   A. He didn't express an opinion; no.
14   Q. Do you recall telling anyone prior to
15 that meeting that you felt threatened by Chief
16 Bergeron?
17   A. Prior to May first?
18   Q. Prior to that meeting where he said to
19 you, "so you feel threatened."
20   A. I probably would have. I don't remember
21 speaking specifically.
22    As this is all ongoing, everybody began
23 talking to everyone about everything so it's --
24 all of this started almost a whirlwind type of

VOLUME I - 78

1  atmosphere.
2    Q. We discussed earlier after you were
3  taken off the Amato investigation you returned to
4  uniform duty, is that correct?
5    A. Correct.
6    Q. What did he tell you when he told you
7  that he was taking you off the Amato
8  investigation?
9    A. He told me that William Keefe complained
10 to him about staffing shifts or manning shifts.
11   Q. Do you have any reason to doubt that
12 that occurred?
13   A. Yes.
14   Q. And why is that?
15   A. That was on May 12th that Bergeron had
16 said that to me but on May 8th William Keefe and I
17 had a long conversation about shift or manning on
18 shifts in the conference room of the police
19 station and he and I agreed that if there was a
20 shift that was short that either myself or Stokes
21 would come back to uniform, work that shift or
22 stay in uniform until that particular coverage was
23 resumed and then we'd go right back to the Amato
24 case again.

VOLUME I - 79

1    Q. What would be a full work shift on the
2  eleven-to-seven shift that you worked on when it
3  was fully staffed?
4    A. I don't understand.
5    Q. In other words would there be one
6  sergeant and a certain number of patrolmen?
7    What would be the full compliment on the
8  eleven-to-seven shift?
9    A. Usually there would be a sergeant. In
10 the absence of a sergeant, the officer with the
11 most seniority would be the OIC -- or officer in
12 charge. He would be the shift supervisor for that
13 shift.
14    Now depending upon time of the year, day
15 of the week, on an eleven-to-seven shift, for
16 example on a Tuesday overnight to Wednesday in the
17 middle of January there would be a shift
18 supervisor and two patrol officers.
19    In the summertime there would be a shift
20 supervisor and three or four patrol officers.
21 There may or may not be a permanent part-time
22 intermittent officer assigned to the downtown
23 area. There may be reserve officers that
24 volunteer their time to come in and either ride

VOLUME I - 80

1  with an officer or work patrol so that they can
2  build experience and eventually go to other police
3  departments.
4    There's not a single complement that
5  fits the eleven-to-seven shift as a permanent
6  structure. That's always a state of flux
7  depending upon need and availability.
8    Q. Would there generally be at least two
9  patrolmen and one shift supervisor?
10   A. That's fair to say; yes.
11   Q. When it was at its best so to speak, how
12 many would you have on that shift -- if it was an
13 ideal situation?
14   A. There were times in the summer where
15 I've worked that shift with as many as six or
16 eight officers, a combination of full time, part
17 time.
18   Q. This was May, '03. What would you
19 normally have then to be ideal?
20   A. Three officers and a supervisor.
21   Q. Do you remember what the situation was
22 when Chief Bergeron told you that he wanted to put
23 you back on regular patrol?
24   A. There was adequate coverage for the

PERLIK and COYLE REPORTING

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 93

1  happened. He had said to me that it was around
2  the time that you and Jimmy were working the task
3  force so it never went anywhere, never -- nothing
4  ever came out of it.
5       I asked the Chief on the spot when he
6  had said that to me. I said, "Well," I said,
7  "Chief, now would be a perfect time, since I knew
8  nothing about this, why don't we up and go to
9  Hubbard Hospital and I will submit to a urine,
10 blood, or hair test for any substance whatsoever
11 on the spot."
12      He told me that I worry too much, he's
13 not doing that; he never put any credence in
14 anything, forget it and it was forgotten.
15      Q.  This conversation you just relayed
16 happened after he asked Burgis?
17      A.  No; this happened in the Chief's office
18 in front of Jim Hoover, myself, Alfred Beland, and
19 the Chief and that was -- it was at the time when
20 the task force was winding down, just after, so
21 that was going to be in '98 or '99. I don't
22 remember the exact year but I remember being
23 bothered by it greatly because nothing ever was
24 said to me.

VOLUME I - 94

1       When we were in the office -- that would
2  have taken place when he heard that so we were in
3  the office in the summer of 2001. I remember it
4  was good weather. He had heard that a few years
5  earlier and I remember being quite upset by the
6  whole thing, that he would hear something like
7  that and just never say anything until years
8  later.
9       Q.  The reason I thought you said he told
10 you that after he spoke to Burgis is because after
11 you were talking about Zaleski not wanting police
12 officers in the bar, you said that later Richard
13 Bergeron said someone reported the drug use to
14 you?
15      A.  That's what Burgis is relating to me.
16      Q.  I need to stop you then because I'm not
17 understanding the relationship between Zaleski's
18 bar and any of this. Can you explain that?
19      A.  Robert Zaleski, prior to owning a bar,
20 owned Z & Z Cycles. Zaleski fixed primarily
21 Harley Davidson motorcycles.
22      Zaleski and Burgis among other members,
23 were members of the Vigilante Motorcycle Club.
24 The Vigilante Motorcycle Club is an outlaw

VOLUME I - 95

1  motorcycle club. The Vigilante Motorcycle Club is
2  an underling of the Hell's Angles.
3       Zaleski and Burgis eventually broke off
4  from the Vigilantes and formed a charter of the
5  Pale Riders Motorcycle Club. Pale Riders
6  Motorcycle Club is also an outlaw motorcycle gang.
7  At one point the Pale Riders moved their chapter
8  to Brockton.
9       Zaleski and Burgis were outside of club
10 affiliations. They were retired Pale Riders.
11 Zaleski sold his motorcycle shop and opened a bar.
12      Q.  How does that relate to the drug
13 allegations or the Chief's conversation with
14 Burgis?
15      A.  Burgis was a bartender for Zaleski.
16 Zaleski's former clubmates, when they were in the
17 area, would show up at his bar.
18      Jim Hoover and I in working with the
19 outlaw motorcycle gang task force had various
20 informants to gather information. Later on, when
21 Zaleski first opened the first bar that he had,
22 Hoover and I would go in there, off duty, would
23 have a drink, would watch, see who's there, look
24 around, that sort of thing. Zaleski didn't want

VOLUME I - 96

1  us there.
2       At one point Zaleski had said to the
3  Chief that -- something along the lines of you
4  have to look at your own guys or watch your own
5  guys -- and that's where the allegations for drug
6  use, according to Bergeron, came from.
7       Q.  But he told you that you said sometime
8  prior to him approaching Burgis?
9       A.  Bergeron told me that; right.
10      Q.  Going back to the conversation in the
11 parking lot then with Burgis, what did Burgis tell
12 him?
13      A.  According to Burgis, he told Bergeron
14 and Novick that both Hoover and I were straight
15 shooters, that they do their job, they do it well,
16 and there's mutual respect but if you're looking
17 for any of that information in that nature,
18 there's none.
19      Q.  Did Burgis tell you whether Bergeron
20 stated why he was inquiring of him about you?
21      A.  No; only that he assumed it had to do
22 with all this task force stuff.
23      Q.  What is your understanding as to
24 Bergeron's relationship to Novick, why it was that

PERLIK and COYLE REPORTING

Case 4:04-cv-40077-FDS Document 44 Filed 09/12/2006 Page 1 of 15

## VOLUME I - 113

1  Barnes but Chief Bergeron would not permit it?
2      A.   I heard that indirectly a number of
3  times.
4      Q.   Do you recall who you heard it from?
5      A.   Jim Hoover -- of course Hoover was the
6  union president then.  At various times Tim Bent,
7  Rod Budrow, different officers at different times,
8  the officers making jokes that, well, Barnes did
9  it, he'll get away with it, those types of things;
10 all secondhand hearsay type thing.
11     Q.   Do you have any reason to believe that
12 Barnes did have a close relationship with regard
13 to Chief Bergeron with respect to his prior work
14 experience at Quincy or in Webster that expanded
15 outside of the workplace?
16     A.   I don't think I'm clear.
17     Q.   Do you have any personal information to
18 confirm whether or not Chief Bergeron and Brian
19 Barnes had a relationship outside of work either
20 in Quincy or in Webster?
21     A.   When Chief Bergeron bought his house in
22 New Hampshire there was one day in the dispatch
23 room that Brian was telling us about his -- the
24 indoor pool.

## VOLUME I - 114

1          According to Brian he had been up there
2  to the New Hampshire property.  He was telling us
3  all about pools and fruit trees.
4      Q.   Was that when Chief Bergeron was still
5  actively employed?
6      A.   Yes.
7      Q.   Before he was put on administrative
8  leave?
9      A.   Yes.
10     Q.   Any other information that you have
11 about their relationship?
12     A.   Just stories of the days in Quincy,
13 different names of officers and some of the things
14 that they did, some of the war stories type of
15 things that Brian would repeat to us and tell us
16 about.
17     Q.   Did you ever have any discussions with
18 Michaela Kelley about the cheating allegations?
19     A.   No.
20     Q.   Any particular reason why not?
21     A.   I never gave the cheating allegations
22 any credence.
23     Q.   Did you ever discuss that topic with
24 William Keefe?

## VOLUME I - 115

1      A.   No.
2      Q.   With respect to Brian Barnes and his
3  assignment at the school, did you disagree with
4  that?
5          In other words, did you think he should
6  just be doing patrol as opposed to working at the
7  school?
8      A.   No.
9      Q.   Do you know whether Thomas Ralph
10 disagreed with that assignment?
11     A.   That, I don't know.
12     Q.   I want to refer you now to the first of
13 the three incidents that have been discussed
14 involving Jonah Mayotte on February 19, 2002.
15         Did you first become involved with him
16 within the police station?
17     A.   Yes.
18     Q.   Can you tell us why it is that you got
19 involved with removing the jewelry?
20     A.   I was called in off the road.  I was on
21 patrol.
22         I was called in and briefed by Steven
23 Novick that they were trying to remove jewelry,
24 couldn't, that they've been trying for a half

## VOLUME I - 116

1  hour, forty-five minutes, it's not working so they
2  needed help.
3      Q.   You said Novick actually called you and
4  asked you to come in and help?
5      A.   Yes.
6      Q.   And then what did you do?
7      A.   I went into the booking room, observed
8  Mayotte on the floor.  I removed his necklace,
9  instructed Novick and Pysell to sit him in a
10 chair -- pick him up off the floor, sit him in a
11 chair.
12     Q.   With respect to the necklace, can you
13 describe the necklace?
14     A.   He had a couple of necklaces on.  The
15 necklace that I removed was -- I was able to pull
16 away from his neck.
17         It was a long gold chain and a small
18 medallion or something on it.
19     Q.   How long was it, do you know,
20 approximately?
21     A.   I don't know.
22     Q.   But it wasn't flush against his neck?
23     A.   No.
24     Q.   Do you know how much space there was

# JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          AUGUST 31, 2006

### VOLUME I - 117

1 between his skin and the necklace?

2     A.   Six inches, ten inches.

3     Q.   Did you ever testify at any proceeding

4 that it was flush up against his neck?

5     A.   He was wearing one that was flush.  He

6 had an eagle or a bird or something -- something

7 long that sat much like my tie is here.

8     Q.   Did you remove that one?

9     A.   He removed that one later on.

10     Q.   How did you remove the necklace that you

11 removed?

12     A.   My utility knife -- my duty knife.

13     Q.   Why did you remove it with a knife as

14 opposed to just unclasping it?

15     A.   I had duty gloves on.

16     Q.   What are duty gloves?

17     A.   Duty gloves are a -- the outside is

18 black leather.  There is a Kevlar mesh inside so

19 they are cut resistant, puncture resistant but it

20 diminishes fine finger dexterity.  You have to

21 take them off to write with a pen or to unclasp

22 jewelry, which I didn't do.

23     Q.   He was on the ground though facing the

24 floor, is that correct, at that point?

### VOLUME I - 118

1     A.   He was on the floor.

2          He was almost on his belly, not quite.

3 He wasn't -- he was more on his belly than he was

4 on his side but he wasn't laying flat, face down

5 on the floor.

6     Q.   Was there a reason, though, as to why

7 either you -- if you didn't have your gloves on or

8 someone else couldn't remove the necklace by just

9 unclasping it?

10          In other words is there a reason why you

11 didn't just unclasp it?

12     A.   My understanding was he would try and

13 grab it and pull to make it difficult.  According

14 to Novick for some thirty or forty-five minutes

15 they had been trying to do that unsuccessfully.

16          In Sergeant Kelley's report she states

17 that they were unsuccessful in attempting to

18 forcefully remove his jewelry.

19     Q.   What did you do after you got the

20 necklace cut off?

21     A.   I dropped his necklace in a property

22 bag.

23          I had instructed Officers Novick and

24 Pysell to pick him up off the floor and sit him in

### VOLUME I - 119

1 a chair in the booking room.

2     Q.   And then what happened next?

3     A.   I told Mayotte who I was and told him

4 that his jewelry had to come out; that if he

5 didn't take it out himself then we would take it

6 out for him.

7     Q.   Prior to cutting off his necklace, did

8 you say anything to him?

9     A.   No.

10     Q.   Why not?

11     A.   I had three of my officers in there for,

12 as Novick put it, thirty to forty-five minutes,

13 the three of them attempting to remove jewelry.

14 They were unsuccessful in their attempts so for

15 the thirty or forty-five minutes they are allowing

16 Mayotte to have control over what they're doing in

17 that room.

18          By removing his necklace with him having

19 no say whatsoever and then sitting up in the

20 chair, it was apparent to him that jewelry could

21 be removed.  It was demonstrated for that.  That

22 was for the purpose and assuming control of that

23 situation.

24

### VOLUME I - 120

1          (Defendant's Deposition Exhibit
           No. 1 offered and marked.)

2

3     Q.   (BY MS. LYNCH) I'm going to show you

4 what's been marked Exhibit Number 1.  Is that

5 Mr. Mayotte?  (Indicating.)

6     A.   Yes.

7     Q.   Which necklace was it that you cut off?

8     A.   The longer one that's not in full view

9 of this picture, the one that would go longer.

10 There's one necklace here and there's one there.

11     Q.   Why did you believe that necklace had to

12 come off?

13     A.   Why did I believe the longer --

14     Q.   (Interposing) Why did you want it to

15 come off?

16     A.   Mr. Mayotte is someone who fits the

17 classic model for a suicide risk.  Jewelry that

18 could be either used to commit suicide or to

19 injure himself or to be fashioned into weapons to

20 be used against an officer, all of that had to be

21 removed for those purposes.

22     Q.   Let me ask you first:  What

23 characteristics did he display that you thought

24 fit the classic model for suicide?

JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 121

1    A.   The intoxication, alcohol and/or drugs,
2  the white male between the ages of twenty-four and
3  forty, the lack of a previous record as I
4  understood it, the being going from a booking room
5  or a booking facility to a cell where he'd be
6  isolated.
7         All those are within a classic model --
8  the fact that he is a white male which is a higher
9  risk.
10    Q.   Did you have information that he had
11 consumed alcohol or drugs prior to coming to the
12 police station?
13    A.   The arrest occurred in the Maple Leaf
14 Lounge; yes, due to a bar fight.
15    Q.   Did anyone tell you that he was
16 intoxicated?
17    A.   Novick didn't use the words
18 "intoxicated."  As best I remember when I got in
19 there Novick said along the lines that, "Look,
20 Sarge, we've got this asshole who was in the Maple
21 Leaf.  He's all fucked up, he's giving us a hard
22 time.  We've been here for thirty, forty-five
23 minutes," so I'm assuming the bar fight at the
24 bar.

VOLUME I - 122

1    Q.   How do you think that the necklace that
2  you removed could have been used to either harm an
3  officer or harm Mr. Mayotte, himself?
4    A.   Strangulation.
5    Q.   I'm sorry, do you recall how long it
6  was?
7    A.   No.
8    Q.   How thick was it?
9    A.   I don't know.  I don't remember.
10    Q.   Looking at that picture, does that
11 refresh your memory as to how thick it was?
12    A.   It appears to me to be a rope chain or
13 rope type necklace.  I don't know; a quarter of an
14 inch?  I don't know.
15    Q.   What was the next thing that happened
16 after he was sat down in the chair and you told
17 him who you were?
18    A.   I asked him to remove his jewelry.
19    Q.   What was his response?
20    A.   There was none.
21    Q.   What was the next thing that happened?
22    A.   I looked at his jewelry to see if I
23 could tell how it would come out.
24         At that point I wasn't going to be able

VOLUME I - 123

1  to take it off manually so I asked the dispatcher
2  call EMS to bring a ring cutter.
3    Q.   What was the next thing that happened?
4    A.   I told Mr. Mayotte that the EMTs were
5  going to bring a ring cutter and if necessary we
6  would cut the jewelry off of him.  I told him
7  again to remove his jewelry.
8    Q.   What was his response?
9    A.   I think he swore at us.
10    Q.   And then what was the next thing that
11 happened?
12    A.   The EMTs arrived.  They gave me the ring
13 cutter.  I showed them to Mayotte.
14    Q.   Who were the EMTs that arrived?
15    A.   Gary Wrubaleski and Jeff Becker.
16    Q.   Not Gary Milliard?
17    A.   No.
18    Q.   Jeff Becker you said?
19    A.   Yes.
20    Q.   What was the next thing that happened?
21    A.   I attempted to cut a piece of jewelry
22 off Mayotte with the ring cutter.
23    Q.   Which piece?
24    A.   The -- one of the earrings -- one of the

VOLUME I - 124

1  loops.
2    Q.   On his right ear?
3    A.   I believe it was this top earring, this
4  one here.  (Indicating.)
5    Q.   The earring on the top of his right ear?
6    A.   Top of his left.
7    Q.   His left; okay.  Why did you want to
8  remove that?
9    A.   Because it was easy.  It was hanging out
10 there.  It was easy to get the foot of the ring
11 cutter through that loop.  It was just an easy
12 piece of jewelry.
13    Q.   How would you describe the ring cutter?
14    A.   Much like an imp cutter for a copper
15 pipe.
16    Q.   Did you say imp cutter?
17    A.   It's small; it's got a twisted wheel.
18 There's a cutter wheel, a pressure screw and by
19 bringing the wheel back and forth it should cut a
20 ring.
21    Q.   How big were the cutters, about?  How
22 many inches?
23    A.   Probably the size of a very small
24 stapler.  It had that type of basis or foot.

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 125

1    Q.   About six inches or so?
2    A.   Yes; it's very small.
3    Q.   With respect to that earring though on
4  the top of his left ear, why did you think that
5  should come off?
6         Why did you think that posed a danger to
7  anyone?
8    A.   It could be fashioned into weapons; yes.
9    Q.   How so?
10   A.   Any type of jewelry used to cut his own
11 skin; any type of jewelry that could be rubbed on
12 concrete in a cell and used to make some sort of
13 incision if he wanted to hurt himself; anything
14 that could be pinched between fingers and struck
15 or scraped or punched at an officer.
16   Q.   Were you successful in removing that
17 earring?
18   A.   No.
19   Q.   What was the next thing that happened?
20   A.   Matt Langevin who was a part-time
21 officer, full-time dispatcher who was working as a
22 uniform patrol officer suggested that the bolt
23 cutters from the rescue truck from the fire
24 department next door to the police station.

VOLUME I - 126

1    Q.   Where was Matt Langevin when this was
2  all happening?
3    A.   Standing in the room.
4    Q.   Where was Jeff Becker when this was
5  happening?
6    A.   Standing in the room.
7    Q.   Do you know where Jeff Becker is at this
8  time?
9    A.   He's a full-time firefighter paramedic
10 somewhere in Massachusetts.
11   Q.   How about Matt Langevin?
12   A.   Still works for the Webster PD,
13 full-time dispatcher.
14   Q.   What happened after Mr. Langevin
15 suggested the bolt cutters?
16   A.   I shook my head, I told him go ahead, go
17 get them, let's see them.
18   Q.   Did he get them for you?
19   A.   He did.
20   Q.   How would you describe the bolt cutters?
21   A.   Bolt cutters look like -- they were much
22 like a common hedge trimmer would, two handles.
23 There are two pin points and then a -- what's
24 referred to as either a bull nose or a snub nose

VOLUME I - 127

1  and cutters like scissors.
2    Q.   How big were they?
3    A.   Probably two feet.
4    Q.   What happened after he got those for
5  you?
6    A.   I showed them to Mayotte, told him that
7  if he didn't take his jewelry out we would use
8  these to remove his jewelry.
9    Q.   What was his response?
10   A.   I think he swore at us again.
11   Q.   What position was he in at that point?
12   A.   Sitting in a chair facing me.
13   Q.   Who else was in the room?
14   A.   Steven Novick, Thomas Pysell, Michaela
15 Kelley, Scott Nelson, Jeff Becker, Gary
16 Wrubaleski, Matt Langevin, Yvette Roseland, and
17 Tom Ralph was in the hallway watching into the
18 room.
19   Q.   I'm sorry, who is Roseland again?
20   A.   She was a dispatcher.
21   Q.   Did you eventually use those bolt
22 cutters on Mr. Mayotte?
23   A.   Yes.
24   Q.   Before you did so, did anyone say that

VOLUME I - 128

1  they didn't think you should?
2    A.   No.
3    Q.   Did anyone say they didn't think you
4  should use the ring cutter?
5    A.   No.
6    Q.   Which piece of jewelry did you use the
7  bolt cutters on?
8    A.   That same piece.
9    Q.   The ring above his ear?
10   A.   Top of the left ear; yes.
11   Q.   Did you get it off?
12   A.   Yes.
13   Q.   And then what happened?
14   A.   Prior to cutting that I asked Wrubaleski
15 and Becker to stay in the room.  I told Novick and
16 Pysell to stand on each side of Mayotte and hold
17 him still.
18        They did and I cut the ring, took it
19 off, had Novick and Pysell release him, told him
20 to remove the rest of his jewelry.
21   Q.   What did you do with the ring that you
22 took off?
23   A.   Dropped it in the property bag.
24   Q.   Do you know if that jewelry was ever

VOLUME I - 129

1   inventoried?
2       A.   I would assume so.
3       Q.   Is it supposed to be?
4       A.   It's supposed to be; yes.
5       Q.   So after you removed that ring what
6   happened?
7       A.   He said something along the lines of you
8   guys are crazy, he was not going to take his
9   jewelry off.
10      Q.   So then what happened?
11      A.   I instructed Pysell and Novick again to
12  steady Mayotte and I cut a second piece of
13  jewelry.
14      Q.   Which one did you cut off?
15      A.   I believe that it's the piece on the --
16  I believe it is the piece above the left eye.
17      Q.   Is that a ring also?
18      A.   Yeah, not quite a ring.  There's a
19  break -- this is the one I'm looking at.  It's the
20  ring with two large balls on each end.
21  (Indicating.)
22      Q.   I'm sorry, did you say that you did cut
23  that off?
24      A.   Yes.

VOLUME I - 130

1       Q.   The reason for cutting that one off was?
2       A.   Same reason.
3       Q.   You thought it could be used as a
4   weapon?
5       A.   Right; and those two pieces were the
6   safest.
7            When the rings were brought up, they
8   were the two that protruded the most from him and
9   could be cut the safest.
10      Q.   What happened after you cut that one
11  off?
12      A.   He took all the rest of his jewelry off.
13      Q.   Can I see that picture?
14      A.   Sure.
15      Q.   Did you ever give as a reason for
16  cutting off the jewelry that he had an injury to
17  his face -- a laceration or anything like that?
18      A.   Only when we were -- in my conversation
19  with Christopher Browne.
20      Q.   Your attorney?
21      A.   At that time he was the IBPO attorney;
22  yes.  I had no information as to Mayotte as far as
23  a name.  It was Hoover -- Jim Hoover who mentioned
24  something about a guy from a bar fight.

VOLUME I - 131

1            Chris Browne and I met with William
2   Keefe at one point.  It was only then that he had
3   a picture of Mayotte.  He didn't identify Mayotte
4   but in all of my questioning and talking to people
5   and trying to figure out who and when and all of
6   this, I had questioned or thought that Mayotte was
7   one of these guys.  The Maple Leaf was a common
8   place to be called to.
9            MS. LYNCH:  Can you go back on that,
10  please?
11           (Scrolling on computer screen.)
12      Q.   (BY MS. LYNCH)  So with regard to the
13  issue of the laceration, what did you say about
14  that with respect to your reason for cutting off
15  the jewelry?
16      A.   My thought was to have it removed at the
17  request of the EMTs, under the direction of the
18  EMTs.
19      Q.   Are you saying that the EMTs thought the
20  jewelry should come off?
21      A.   No.
22      Q.   I'm not following you, then.  Can you
23  explain what you mean when you say that it was to
24  be removed at the direction of the EMTs?

VOLUME I - 132

1       A.   Before Mayotte was identified to me,
2   before I knew that this is what we were looking
3   at, that I had asked, after finding out that they
4   were talking about someone from a bar fight and we
5   removed jewelry, I was questioning as to
6   lacerations or was it something the EMTs wanted.
7   I had no idea what anybody was talking about.
8       Q.   You're saying that you were thinking
9   these things before you arrived at the station
10  after you had been asked to intercede?
11      A.   No.  What I'm saying is this had taken
12  place in February of 2002 so then all of a sudden
13  in 2004 I had -- I didn't remember Mayotte.
14           It wasn't until all of this started to
15  come about and we were talking about all of this
16  and the jewelry.  I had a list of names of people
17  who were -- that I could remember who were in bar
18  fights.  I had no idea who anybody was talking
19  about.
20      Q.   You're saying that in 2004 when you were
21  questioned about it you were thinking that it was
22  removed because he had a laceration?
23      A.   Correct.
24      Q.   But in fact it wasn't removed because he

**PERLIK and COYLE REPORTING**

JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

## VOLUME I - 133

1  had a laceration?
2      A.   Correct.
3      Q.   He didn't have any lacerations on his
4  face?
5      A.   No.
6      Q.   Did you ever have any discussions with
7  either Mr. Wrubaleski, Mr. Becker or Mr. Milliard
8  about the issue of him having a laceration on his
9  face?
10     A.   With Gary Milliard I did.
11     Q.   What was that discussion?
12     A.   That was -- I asked Milliard if he had
13  had any run reports -- ambulance reports from
14  anybody -- a bar fight at the Maple Leaf Lounge.
15         I was trying to ascertain Mayotte's
16  identity.
17     Q.   This is in 2004 you're saying?
18     A.   This was January, 2004.
19     Q.   What information did Mr. Milliard give
20  you?
21     A.   He said he'd get back to me.
22     Q.   Any other discussion with him or any
23  other EMT about the issue of a laceration?
24     A.   At one point Gary had said to me that he

## VOLUME I - 134

1  didn't have any run reports, that he had checked
2  with EMTs, that there was nothing.  There was no
3  information.
4      Q.   Did you ever ask any EMT --
5  Mr. Milliard, Mr. Wrubaleski or Mr. Becker -- to
6  say that the jewelry was removed because he had a
7  laceration?
8      A.   No.
9      Q.   Did you ever hear that they said that --
10  or that one of them at least said that?
11     A.   Not one of them.  William Keefe, in
12  talking with Chris Browne and I had said something
13  about me wanting the EMTs to say something or to
14  say that they told me to do that.  We tried to
15  explain to him what was said in an attempt to
16  identify Jonah Mayotte.
17     Q.   And that's what you testified to before?
18     A.   Mmm-hmm.
19     Q.   That's a yes?
20     A.   Yes; I'm sorry.
21     Q.   What was your relationship with Gary
22  Wrubaleski prior to this incident?
23         In other words, anything outside of just
24  regular work duties?

## VOLUME I - 135

1      A.   No.
2      Q.   How about Mr. Milliard?
3      A.   Yes.
4      Q.   Did you have a friendship with him
5  outside of work?
6      A.   Yes.
7      Q.   Are you still friends with him?
8      A.   On occasion I'll see or talk to Gary
9  Milliard.
10     Q.   Why was it that you decided to remove
11  the jewelry as opposed to waiting for him to
12  voluntarily take it off and cooperate, himself?
13     A.   After forty-five minutes of this and the
14  state that he's in, he's not going to cooperate.
15  It's a time factor.
16     Q.   When you say forty-five minutes you're
17  basing it upon what others told you as opposed to
18  what you observed?
19     A.   Yes.
20     Q.   Was there a reason though why he
21  couldn't have been just watched until he
22  cooperated?
23     A.   No.
24     Q.   Why didn't you choose then to just let

## VOLUME I - 136

1  him be watched?
2      A.   This was during the overnights,
3  somewhere around two o'clock if I remember
4  correctly.
5          There were two officers leaving at three
6  o'clock.  I would have had the third officer to
7  have to sit with him so I would have been
8  depleting my shift of officers.
9      Q.   Where could he have sat?  In other
10  words, would you put him in a cell or would you
11  leave him outside?
12     A.   No; he would have to be outside of a
13  cell and have to be what we call an
14  eyeball-to-eyeball watch.
15     Q.   Have you ever had a situation where you
16  allowed someone to stay outside of the cell and
17  just watched them when they weren't being
18  cooperative?
19     A.   No.
20     Q.   Have you ever put someone in a cell with
21  their jewelry on when they wouldn't take it off?
22     A.   No.
23     Q.   This eyeball to eyeball that you call
24  it, how often is that used?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC            AUGUST 31, 2006

## VOLUME I - 137

1    A.    When you suspect someone of a suicide
2    risk or when there is a what's called a Q-5 for a
3    past attempt or threat of suicide that would come
4    up with their Board of Probation record or their
5    BOP.
6          Anyone who has attempts or threats of
7    suicide in the past or anyone who is deemed a
8    suicide risk, that's what we would do.
9    Q.    How often do you do that?
10   A.    Everyone who is arrested is checked.
11   Q.    But how often would you have an eyeball
12   to eyeball?
13   A.    Seldom -- very seldom.
14   Q.    Once a year, once a month?
15   A.    Once a year maybe.
16   Q.    Did Ralph ever participate in the
17   removal of jewelry or did he just always stay in
18   the hallway?
19   A.    He stayed in the hallway.
20   Q.    Did he stay there the whole time?
21   A.    Yes.
22   Q.    Do you recall him leaving the building
23   at all while this was going on?
24   A.    No; only after this was -- only after

## VOLUME I - 138

1    this was done and Mayotte was being escorted to
2    the holding cell.
3    Q.    Did you ever hear that he told William
4    Keefe and possibly others that when this was going
5    on he went and got his keys and left the building?
6    A.    He did that after Mayotte was escorted
7    to the holding cell.
8    Q.    Do you remember seeing him in the
9    hallway the whole time that you were removing the
10   jewelry?
11   A.    At any time that I would turn or happen
12   to look out the doorway into the hall he was
13   there.
14   Q.    At some point did you become aware that
15   Thomas Ralph did an investigation of this incident
16   involving Jonah Mayotte?
17   A.    No.
18   Q.    You're not aware of any investigation of
19   that incident?
20   A.    No.
21   Q.    In retrospect, do you think you could
22   have done something different with regard to
23   Mr. Mayotte?
24   A.    Sure.

## VOLUME I - 139

1    Q.    What were the other options?
2    A.    Authorize overtime for an officer to sit
3    with him until he was transported to court.
4    Q.    Anything else?
5    A.    It is either that or remove his jewelry.
6    Q.    You indicated that you had these eyeball
7    to eyeballs with regard to suicide watches.
8          Has there ever been a time as far as you
9    know when you did the eyeball to eyeball when
10   someone was just not being cooperative for some
11   reason before you were going to be bringing them
12   to the cell?
13   A.    I saw that done under Eddie Latour's
14   direction or supervision.
15         Eddie Latour was a retired sergeant from
16   Webster.  An eyeball-to-eyeball watch is what I
17   learned from him.
18         MR. GREEN:  Can we take about two
19   minutes?
20         MS. LYNCH:  Sure.
21         (A recess was taken.)
22         (Defendant's Deposition Exhibit
23         No. 2 offered and marked.)
24   Q.    (BY MS. LYNCH)  Mr. Bolduc, showing you

## VOLUME I - 140

1    what's been marked as Exhibit Number 2 you'll
2    notice that is a statement taken of Gary Milliard
3    on February 4, 2004.  Do you recognize that?
4    (Indicating).
5    A.    Yes.
6    Q.    Have you seen that before?
7    A.    Yes.
8    Q.    You were given that before your hearing,
9    is that correct?
10   A.    The night before my hearing of March 10,
11   2004.
12   Q.    I believe that you have alleged that
13   there was information that was not included in
14   that statement.  Do you recall that allegation?
15   A.    That's what Milliard told my attorney,
16   Chris Browne.
17   Q.    What information do you believe is not
18   included in that exhibit?
19   A.    According to Milliard in his
20   conversation with Chris Browne he said that either
21   the last line or the last paragraph -- I don't
22   remember; I'd have to look back over what Milliard
23   had said in the transcript.  I don't remember.
24   Q.    How long was your hearing -- how many

## VOLUME I - 145

1    Q.    When did you first see that?
2    A.    Along with the other information from
3  Chris Browne.
4    Q.    The day before your hearing?
5    A.    (Witness examining document.)  Yes.
6    Q.    Was there anyone present with regard to
7  this Jonah Mayotte incident who was not
8  interviewed?
9    A.    Not interviewed by William Keefe?
10    Q.    Right.
11    A.    Matt Langevin, Yvette Roseland,
12  Pysell -- Thomas Pysell; and myself.
13    Q.    Do you know whether in fact these other
14  three individuals were not interviewed?
15    A.    Both Roseland and Pysell had said that
16  they were never interviewed regarding Mayotte.
17  Langevin didn't say anything.
18    Q.    Did you have a discussion with Roseland
19  and Pysell on that issue?
20    A.    After I was terminated both of them
21  asked me why Keefe never asked them any questions.
22  I told them I didn't know.
23    Q.    Do you have any knowledge as to why he
24  didn't -- why he didn't interview them?

## VOLUME I - 146

1    A.    No.
2    Q.    With respect to this issue of Jonah
3  Mayotte at your hearing, did you call any
4  witnesses -- meaning your attorney on your behalf?
5    A.    Thomas Pysell.
6    Q.    He testified at the hearing on your
7  behalf?
8    A.    Yes.
9    Q.    Okay.
10    A.    Gary Wrubaleski, Gary Milliard.  That is
11  all for Mayotte.
12    Q.    Do you know why Matt Langevin and Yvette
13  Roseland didn't testify on your behalf?
14    A.    I don't.
15    Q.    Did you speak to either of them about
16  testifying on your behalf?
17    A.    No; I was told from Pysell that William
18  Keefe had put the Town Hall off limits to police
19  officers but some showed up anyway.
20    Q.    How was it that Pysell testified on your
21  behalf then?
22    A.    He showed up at the Town Hall.
23    Q.    Did your attorney subpoena him as far as
24  you know?

## VOLUME I - 147

1    A.    My attorney did not have subpoena
2  powers.
3    Q.    You know that for a fact that he did not
4  have subpoena powers at the hearing?
5    A.    Correct; that's what he told me himself.
6    Q.    Do you know if he requested that
7  Roseland or Matt Langevin testify in your behalf?
8    A.    I don't know about those two.  He
9  requested Gevry and Kelley.
10    Q.    He asked them to testify with regard to
11  the Jonah Mayotte incident?
12    A.    He wanted them at my hearing but they
13  were unavailable.
14    Q.    With regard to the Jonah Mayotte
15  incident?
16    A.    Kelley for Mayotte, Gevry for Greenwood.
17    Q.    We'll get to Greenwood in a moment.  Did
18  Roseland or Langevin tell you that they wanted to
19  testify on your behalf with regard to the Jonah
20  Mayotte incident?
21    A.    No.
22    Q.    With regard to the recent Civil Service
23  hearing with regard to the issue of Jonah Mayotte
24  who did you have testify on your behalf?

## VOLUME I - 148

1    A.    Thomas Pysell.
2    Q.    Anyone else?
3    A.    No.
4    Q.    Why didn't you have Roseland or Langevin
5  testify at that?
6    A.    According to my attorney at that point,
7  Mike Clancy, neither one have any memory.
8    Q.    Do you know whether he subpoenaed them?
9    A.    I don't.
10    Q.    Do you know whether he had subpoena
11  power at the Civil Service hearing?
12    A.    I only assume he did.  I don't know for
13  sure.
14    Q.    Why didn't you have Gary Wrubaleski and
15  Gary Milliard testify at the Civil Service hearing
16  with regard to the Jonah Mayotte incident?
17    A.    I don't know.  I talked with my
18  attorney -- with Mike Clancy about it.
19    Q.    How about with respect to Michaela
20  Kelley?
21    Q.    Why didn't you have her testify at the
22  Civil Service hearing?
23    A.    She did.
24    Q.    She did?

VOLUME I - 149

1    A.   Yes.

2    Q.   With regard to the Jonah Mayotte

3 incident?

4    A.   Yes.

5    Q.   Did your attorney subpoena her as far as

6 you know?

7    A.   No; the Town brought her.

8    Q.   How about Novick?  Why didn't you have

9 him testify at either the hearing before Ms. Leal

10 or the Civil Service hearing?

11    A.   He was not available for the hearing

12 before Ms. Leal and he -- the Town wanted to

13 subpoena him but he did not answer the subpoena.

14 They couldn't find him, something to that effect.

15    Q.   With regard to the hearing before

16 Ms. Leal?

17    A.   The hearing before Civil Service.

18    Q.   So he didn't show up at the Civil

19 Service hearing?

20    A.   Right; he didn't show up for either one.

21 For the hearing in front of Ms. Leal, he was

22 unavailable.  For Civil Service he didn't answer

23 the subpoena.

24    Q.   How about Officer Nelson?  Why didn't

VOLUME I - 150

1 you have him testify before Ms. Leal?

2    A.   He did.

3    Q.   He did?  For who?

4    A.   For the Town.

5    Q.   Did he testify at the Civil Service

6 hearing?

7    A.   For the Town; yes.

8    Q.   How about Mr. Becker?  Why didn't you

9 have him testify before Ms. Leal?

10    A.   Supposedly he couldn't be found.

11    Q.   Why didn't you have him testify at the

12 Civil Service hearing?

13    A.   Same reason.

14    Q.   Is he still employed, though?

15    A.   I don't know; not with the Town.

16    Q.   When you said that William Keefe stated

17 that officers were not supposed to be around the

18 Town Hall, was that your testimony?

19    A.   Right; I was told that Keefe told

20 officers that the Town Hall was off limits for --

21 while the hearings were going on.

22    Q.   What did you understand that to mean?

23    A.   To stay away from the Town Hall while

24 the hearing was going on.

VOLUME I - 151

1    Q.   Did you understand that to mean that if

2 they didn't have any business there they weren't

3 supposed to be there or are you saying that they

4 just weren't supposed to attend the hearing even

5 if they wanted to be a witness?

6    A.   I'm saying that because Chris Browne did

7 not have subpoena power that they were not to be

8 there even if they wanted to be so that they could

9 testify.

10    Q.   Is that your interpretation or were you

11 specifically told that?

12    A.   That's my interpretation.

13    Q.   Calling your attention to the Heath

14 Greenwood incident of November 9, 2002, when did

15 you first have involvement with him?

16    A.   The night of the 911 call.

17    Q.   Did you have involvement before he was

18 brought into the police station?

19    A.   At the scene.

20    Q.   But you didn't go back to the police

21 station with him, is that correct?

22    A.   Correct.

23    Q.   Was he under the influence of alcohol or

24 drugs as far as you know?

VOLUME I - 152

1    A.   Both.

2    Q.   Was that actually proven in terms of any

3 blood work, anything like that, breathalyzer?

4    A.   I don't know.

5    Q.   How was it that you ended up going back

6 to the Police Department and had contact with him?

7    A.   There was a panic tone and radio call

8 sent out by the dispatcher for a fight in the

9 station.  She was calling all units to the

10 station.

11    Q.   Just before we go on to this topic, back

12 with regard to the Jonah Mayotte incident, did you

13 ever see any other statements introduced into

14 evidence at that hearing besides the ones that you

15 had seen the night before?

16    A.   I don't recall.  I thought Chris Browne

17 introduced Michaela Kelley's original report

18 written at the time of the incident itself, which

19 is not here.

20    Q.   The actual police report you're talking

21 about?

22    A.   Michaela Kelley's actual report and

23 narrative; yes.

24    Q.   Back with respect to Mr. Greenwood,

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          AUGUST 31, 2006

### VOLUME I - 153

1  then.
2          You said that you were -- you heard the
3  dispatcher make a call to all units?
4      A.   To come back to the station.
5      Q.   Okay.
6      A.   That there was a fight in the station.
7  You could hear a ruckus going on in the background
8  so myself, Pysell, Kehoe, and a Mass. trooper
9  responded.
10     Q.   Who was the Mass. trooper that
11 responded?
12     A.   Pat Robinson.
13     Q.   Why would -- you're saying a state
14 trooper?
15     A.   Yes, Ma'am.
16     Q.   Why would a state trooper respond as far
17 as you know?
18     A.   Webster is a very active town.  The
19 Sturbridge State Police barrack or C-5, their
20 troopers are -- Webster is part of their patrol
21 area for the state roads, 395 in particular.
22          Oftentimes the state troopers at C-5
23 know or knew that the overnight shift in Webster,
24 they were welcome to come in and train with my

### VOLUME I - 154

1  officers.  Oftentimes in Sturbridge there are a
2  lot of newer troopers so we welcome the help.
3  They were able to do more of the municipal type of
4  policing.
5          They would take our frequency.  They had
6  the ability in their cruisers to scan our radio.
7  They would often show up at major accidents, at
8  house fires, at bar fights, any type of major
9  incident where they thought they could lend a
10 hand, they would come right in.
11     Q.   Did the state trooper stay for the
12 entire incident?
13     A.   It was over when he got there.  He came
14 from 395.
15     Q.   So as far as you know he is not a
16 witness to any relevant fact?
17     A.   As far as I know.
18     Q.   You said it was you, Pysell, Kehoe, and
19 Robinson that did show up?
20     A.   Robinson is the trooper.
21     Q.   Right; anyone else that showed up?
22     A.   Travis Gould was in the station as well
23 as Bonnie O'Leary.  Travis Gould was a reserve
24 officer, part-time police officer.

### VOLUME I - 155

1          Bonnie O'Leary was the dispatcher on
2  duty.
3      Q.   When you arrived at the station, what
4  did you observe with respect to Heath Greenwood?
5      A.   I observed Greenwood with his hands
6  grabbed on the collar of Gevry's uniform.  He was
7  forcing Gevry backward.
8          He had the advantage over Gevry and he
9  caught Gevry in the back over the hamstring.  One
10 leg was in the air.  He was forced back to the
11 wall.  Gevry's head couldn't go back any further
12 because it was pressed against the wall.
13          Gevry had one hand holding onto the edge
14 of the table, of the counter.  He had one hand
15 grasped on Greenwood's forearm.
16          Greenwood was forcing the chain of the
17 handcuff under Gevry's chin and he was choking
18 Gevry.
19     Q.   Was anyone else in the room besides
20 those two?
21     A.   Just those two.
22     Q.   Were there any other police officers in
23 the Department before you arrived besides Gevry?
24     A.   Travis Gould.

### VOLUME I - 156

1      Q.   He was the reserve officer?
2      A.   He interceded on Gevry's behalf the
3  first time.
4      Q.   What do you mean?
5      A.   When the 911 call came in, Officer
6  Pysell had a woman in the other booking room who
7  was in protective custody.  She was intoxicated
8  but cooperative, very still.
9          Travis Gould was actually filling out
10 the booking screens on the computer for the
11 experience to do so.  He wasn't working and was in
12 there on his own time.  The 911 call came in.
13 Pysell secured the woman to the chair and directed
14 Travis Gould to finish the booking process, keep
15 an eye on her and we'll be back.  When we
16 responded, Gevry brought Greenwood back.
17          There was a time where Greenwood and
18 Gevry began arguing.  Gevry slapped Greenwood in
19 the face and Greenwood came out of the chair and
20 attacked Gevry.  Travis Gould either heard the
21 commotion going on or Bonnie O'Leary yelled to
22 Travis Gould.
23          Gould went into the booking room and
24 Gevry and Gould subdued Greenwood.  According to

### PERLIK and COYLE REPORTING

**JOHN A. BOLDUC VS. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          AUGUST 31, 2006**

VOLUME I - 157

1    Travis he waited a few minutes, things seemed
2    okay, went back to the screen where the woman was
3    secured and continued the booking process.  After
4    that again there was a problem between Gevry and
5    Gould.
6            MR. GREEN:  Just for the record, you
7    mean Greenwood?
8            THE WITNESS:  Yes; a problem between
9    Gevry and Greenwood again.  That's what set off
10   the panic tones and that's when we came back.
11           Upon entering the station -- when the
12   panic tones had gone off we were on our way back
13   to the station anyway.  We were very close so we
14   were there in a matter of seconds.
15           When Pysell and myself ran into the
16   building Gould was on his way to help Gevry but
17   saw myself and Pysell go into the room at the same
18   time so he decided to stay with his prisoner and
19   finish the booking process.
20      Q.  (BY MS. LYNCH) I'm sorry, where was
21   Pysell prior to coming into the room with
22   Greenwood?  Did you say he was in the next room?
23      A.  No; Pysell was in my cruiser with me.
24   We arrived at the station at the same time.

VOLUME I - 158

1       Q.  I thought you said that Pysell had been
2    in another room with someone in protective
3    custody?
4       A.  I did.  Pysell had a woman who was in
5    protective custody.  He was in another booking
6    room with Travis Gould when this 911 call came in.
7            Pysell and I left from the station but
8    he left Gould to oversee the witness and continue
9    the booking process.
10      Q.  All right; that clarifies that.  As far
11   as you know, then, when Gevry and Greenwood were
12   in the room together the only other officer in the
13   Department was Gould?
14      A.  Correct.
15      Q.  You mentioned that there had been a
16   prior incident that Gould had helped Gevry in
17   where you said Gevry slapped Greenwood in the
18   face?
19      A.  Yes.
20      Q.  How do you know about that?
21      A.  It's in -- it's either in one of the
22   statements or Gevry admitted to that on his own.
23      Q.  At the hearing before Ms. Leal was there
24   any testimony from Officer Gould?

VOLUME I - 159

1       A.  I don't believe so.
2       Q.  How about at the Civil Service hearing
3    recently?  Did Officer Gould testify there?
4       A.  Yes.
5       Q.  Who called him as a witness?
6       A.  I did -- Mike Clancy did.
7       Q.  Do you know why he didn't testify at the
8    hearing before Ms. Leal?
9       A.  No.  Again my understanding is that
10   Chris Browne was not allowed to call witnesses.
11      Q.  But he did call some witnesses, isn't
12   that correct?
13      A.  The ones who showed up anyway.
14      Q.  He introduced documents at the hearing
15   before Ms. Leal, is that correct?
16      A.  He did.
17      Q.  With respect to the slapping in the face
18   of Mr. Greenwood, do you have any idea what
19   prompted that?
20      A.  I don't.
21      Q.  You said that Mr. Greenwood got out of
22   his chair at that point and that Mr. -- Officer
23   Gould had to intercede?
24      A.  Yes.

VOLUME I - 160

1       Q.  How were Mr. Greenwood's hands
2    handcuffed at that point, do you know?
3       A.  They were handcuffed in front.
4       Q.  In front?
5       A.  Mmm-hmm, palms facing each other.
6       Q.  At some point did that change?
7       A.  No -- well, he was changed to being
8    handcuffed in front.
9            When I handcuffed him he was handcuffed
10   behind his back, the tops of the backs of his
11   hands facing one another, palms out, at the scene.
12      Q.  Let's go back over this then because
13   this is important.
14           At the scene you're saying that you
15   handcuffed him?
16      A.  I handcuffed him.
17      Q.  How did you handcuff him at the scene?
18      A.  Behind his back, the backs of his hands
19   facing one another so his palms would have been
20   facing out but this way, only behind his back.
21   (Indicating.)
22      Q.  At some point you believe that was
23   changed?
24      A.  Yes.

**PERLIK and COYLE REPORTING**

VOLUME I - 161

1    Q.   When do you think it was changed and who
2    changed it?
3    A.   It was changed en route to the station
4    by Officer Gevry.
5    Q.   How do you know that?
6    A.   When Greenwood was placed in the cruiser
7    he was handcuffed behind his back and when I got
8    to the station, when he had his -- when he had
9    Gevry's collar and he was forcing the chain up
10   under Gevry's neck.
11   Q.   You're saying his hands were handcuffed
12   in the front at that point?
13   A.   Right.  When I asked Gevry in the
14   hallway how did his handcuffs get changed he had
15   said that Greenwood had a bad shoulder or a bad
16   arm or something and he moved them.
17   Q.   Who was driving the cruiser with
18   Greenwood back to the station?
19   A.   Gevry.
20   Q.   At what point do you think he switched
21   the handcuffs then?
22   A.   At any point.  It could have been when
23   they got to the station.
24   Q.   Is that against Department policy to

VOLUME I - 162

1    handcuff someone in the front?
2    A.   There is no policy for handcuffing
3    somebody.  It's against defensive tactics
4    training.  It's against the rules for officer
5    safety.
6    Q.   When the incident happened where he
7    reportedly got out of his chair and went after
8    Gevry and Officer Gould had to help him, do you
9    know whether or not his handcuffs were handcuffed
10   in front or in back?
11   A.   I would assume they were in the front.
12   Q.   You don't know though?
13   A.   I don't know.
14   Q.   After that incident reportedly happened,
15   do you know if any effort was made to handcuff him
16   in the back?
17   A.   I don't know.
18   Q.   Can you provide any other information
19   about that incident where Greenwood got out of his
20   chair that first time and went after Gevry?
21   A.   No.
22   Q.   Did you ever discuss that with Gevry?
23   A.   No.
24   Q.   Just Gould?

VOLUME I - 163

1    A.   Right.
2    Q.   Do you know how long after that incident
3    occurred that Greenwood reportedly went after
4    Gevry which is what you said you walked into --
5    how much time was there between those two
6    incidents?
7    A.   I don't know exactly.  It was a very
8    short amount of time.
9    Q.   When you say short, a matter of minutes?
10   A.   Matter of minutes; yes.
11   Q.   If I understand you correctly you and
12   Pysell entered the room at the same time because
13   you had been in the cruiser together for the 911
14   call?
15   A.   Right.
16   Q.   Let's just go over this then to the
17   extent there was any overlap.
18        When you both entered the room what did
19   you see again?
20   A.   I saw Heath Greenwood with an advantage
21   over Gevry choking him with his handcuffs.
22   Q.   What did Pysell do?
23   A.   He was right behind me.  We were -- I
24   was a step ahead of him.  The two of us were

VOLUME I - 164

1    rushing in together.
2    Q.   Was Gevry saying anything?
3    A.   Nothing at all.
4    Q.   What did you do when you observed that?
5    A.   I yelled.  Greenwood ignored that.
6    Q.   What did you yell?
7    A.   "Let him go, get off," something to that
8    effect, something to immediately gain Greenwood's
9    attention.
10   Q.   What happened when you yelled?
11   A.   Nothing.  Greenwood completely ignored
12   the fact that Pysell and I were in the room and
13   yelling.
14   Q.   And then what happened?
15   A.   I reached across Greenwood, grabbed his
16   shirt from the far shoulder, spun him toward me
17   and punched him in the chin.
18   Q.   Then what happened?
19   A.   Greenwood fell to the ground -- fell to
20   the floor, began apologizing, saying "I'm sorry,
21   I'm sorry."
22   Q.   Greenwood was?
23   A.   Yes.  Then I stepped over Greenwood.  I
24   was going to reach down and pick him up.  Pysell

VOLUME I - 165

1  bumped me out of the way and by that time Kehoe
2  was in the room.  They grabbed Greenwood and sat
3  him in the chair.
4       I told -- at that point I told Gevry to
5  come into the hallway with me.
6    Q.   When you said that Pysell bumped you out
7  of the way what do you mean?  Can you describe
8  what happened?
9    A.   Well, it is a very small room.  He
10  was -- Pysell is one of the bigger guys on the
11  force.
12       I think as we were both reaching for
13  him -- as I was straddling over Greenwood to pull
14  him off the floor, I think in Pysell's attempt to
15  help, he bumped into me and instead of stepping on
16  Greenwood I stepped over him.
17       Kehoe again is a very large man.  He and
18  Pysell picked Greenwood up.
19    Q.   I'm sorry, did you say that Kehoe
20  grabbed Greenwood?
21    A.   Kehoe and Pysell.
22    Q.   You said you took Gevry in the hallway?
23    A.   Right; I told Pysell and Kehoe to chain
24  Greenwood to the pipe which is -- there's a -- it

VOLUME I - 166

1  is a pipe in the wall made for handcuffs so if you
2  had someone that you would handcuff, one cuff on
3  them and one handcuff back so he couldn't reach
4  the officer doing the booking.
5    Q.   Okay.
6    A.   And I went into the hallway with Gevry.
7    Q.   You're saying at that point the booking
8  process was completed with Mr. Greenwood?
9    A.   No; Gevry was only part way through the
10  booking process when this got out of hand a couple
11  of times.
12       After all of that was stopped, Greenwood
13  was photographed, the booking process went on and
14  then Gevry wrote his report.  This was part way
15  through the booking process.
16    Q.   You stated that you punched
17  Mr. Greenwood in the chin?
18    A.   Mmm-hmm.
19    Q.   At what point on his chin -- meaning the
20  center, right, left?
21    A.   The center of his chin.
22    Q.   Did you hit him any other time?
23    A.   No.
24    Q.   You only hit him once?

VOLUME I - 167

1    A.   Right; right.
2    Q.   Did you ever kick him?
3    A.   No.
4    Q.   Did you ever step on him?
5    A.   No.
6    Q.   When this was occurring who else was in
7  the room besides Gevry, Greenwood, you, and
8  Pysell, if anyone?
9    A.   No one; that's it.
10    Q.   Do you know if anyone else could observe
11  what was going on in the room?
12    A.   No.
13    Q.   In other words Gould and O'Leary weren't
14  in the vicinity, is that correct?
15    A.   Correct.
16    Q.   Do you know whether or not Greenwood
17  injured Gevry?
18    A.   Gevry claimed that he didn't have any
19  injuries.
20    Q.   Did you notice any injuries on him?
21    A.   No; just from the side, from the obvious
22  red marks, that sort of thing.
23    Q.   Where were the red marks?
24    A.   In the front of his neck.

VOLUME I - 168

1    Q.   When you say panic tones what do you
2  mean?
3    A.   There are, with the radio, the
4  dispatcher has the ability to -- when a dispatcher
5  would call a cruiser or call a portable radio
6  there's a couple of quick beeps to let you know
7  that there's an open mic, somebody is talking,
8  that sort of thing but the dispatcher has the
9  ability to send out what we call a panic tone.
10  It's a series of quick beeps that as an officer
11  when you hear that, you stop what you're doing,
12  something really wrong is about -- you're going to
13  be dispatched to something that is far above and
14  beyond the ordinary.  The tone is not used very
15  often.
16       As soon as we heard the panic tones on
17  the radio and then immediately Bonnie O'Leary
18  calling for officers to the station, I need
19  officers in here now, we knew that that was
20  urgent.
21    Q.   Do you know why Gould didn't go to
22  assist Gevry prior to your getting there, given
23  that he was right in the station at the time?
24    A.   He was on his way.  Pysell and I beat

## VOLUME I - 177

1  had asked him to make any other changes or
2  additions to this statement?
3      A.   No; he didn't say anything.
4      Q.   For instance, the last line, it says
5  "Sergeant Bolduc had done nothing wrong in this
6  matter."  Did he indicate whether --
7      A.   (Interposing) That's part of his
8  original.
9      Q.   And that remained, obviously, is that
10 correct, in terms of what was introduced at the
11 hearing?
12     A.   Correct.
13     Q.   You ended up writing a report on this
14 incident, is that correct?
15     A.   Yes.
16              (Defendant's Deposition Exhibit
                No. 11 offered and marked.)
17
18     Q.   (BY MS. LYNCH)  Showing you what's been
19 marked as Exhibit 11, can you identify that?
20 (Indicating.)
21     A.   (Witness examining document.)  A
22 redacted copy of my report narrative with the
23 crossover information from PAMET to IMC.
24     Q.   Is it fair to say that you did not

## VOLUME I - 178

1  include anything in there about Greenwood
2  assaulting or battering Gevry?
3      A.   The last paragraph of the last page,
4  picking it up at the full sentence, "All officers
5  arrived to assist Officer Gevry" -- whatever
6  redaction -- "became unruly and combative.  I
7  arrived into the booking room first and exhibited
8  enough force to quell" redacted -- combative
9  outburst.  The level of force used escalated to
10 hand-to-hand tactics only.  No weapons or pepper
11 spray was needed."  I imagine Greenwood "was not
12 charged over the incident."
13     Q.   Why didn't you charge him?
14     A.   To have charged Greenwood would have put
15 Gevry right back at the center of attention where
16 he didn't need to be at that point in his career.
17             Gevry was having a steady run of
18 discipline.  He spent five days in a detox
19 facility for being impaired on duty.
20     Q.   I'm sorry, who are you talking about?
21     A.   Gevry.
22     Q.   I thought I asked you about Greenwood.
23     A.   You asked me why Greenwood wasn't
24 charged.

## VOLUME I - 179

1              MS. LYNCH:  Can I just read that
2  back?
3              (Scrolling on computer screen.)
4      Q.   (BY MS. LYNCH)  In any event you said
5  that that would have put Gevry back at the
6  center --
7      A.   (Interposing) Right; the center of
8  attention.
9      Q.   What are you referring to there?
10     A.   That Gevry was having a tough time with
11 Chief Bergeron and Deputy Chief Ralph on his
12 personal life and Gevry was not having an easy
13 time career-wise.
14             To charge Greenwood would have brought
15 out all of the things that Gevry shouldn't have
16 done in handling Greenwood.
17     Q.   But can you give us some examples as to
18 what problems you believe he was having that would
19 have caused him a problem if you had charged
20 Greenwood?
21     A.   Gevry was being reprimanded by other
22 sergeants, by the Chief or by Ralph in the
23 Department for failing to do some of the
24 assignments that he was supposed to be doing such

## VOLUME I - 180

1  as his crime scene work, his crime scene
2  preservation, evidence collection, that sort of
3  thing.
4              Gevry's mind was often elsewhere so this
5  would have been another problem for him.
6      Q.   How would you describe your relationship
7  with Gevry prior to this Greenwood incident?
8      A.   Officer Gevry and I don't like each
9  other.
10     Q.   At that time you didn't, either?
11     A.   Correct.
12     Q.   Why were you looking out for him so to
13 speak?
14     A.   So he would not lose his job.
15     Q.   Why didn't you like him at that point?
16     A.   Because of all the things that had
17 transpired by him to me when I was a patrolman and
18 he was my supervisor -- my officer in charge on
19 the shift oftentimes.
20     Q.   Was he a sergeant?
21     A.   He was a senior patrolman so oftentimes
22 he would be the OIC or the officer in charge.
23     Q.   Anything in particular that caused you
24 not to like him from back at that time?

VOLUME I - 201

1  that he investigated that incident?
2      A.   Yes.
3      Q.   When do you believe he did an
4  investigation?
5      A.   I believe at the time that he spoke to
6  Bent, at the time that he had Hoover and I in his
7  office.
8           (Defendant's Deposition Exhibit
             No. 12 offered and marked.)
9
10     Q.   (BY MS. LYNCH)  Showing you what's been
11 marked as Exhibit Number 12, have you seen that
12 before? (Indicating.)
13     A.   Yes.
14     Q.   Do you recall when it was that you first
15 saw it?
16     A.   With Chris Browne but this wasn't --
17 this third page, last page -- wasn't attached when
18 Chris had this.
19          We have this but it wasn't attached.  It
20 wasn't like it is now.
21     Q.   When Officer Ralph was reportedly doing
22 his investigation, did he tell you about it?
23     A.   About the investigation?  It was Jim
24 Hoover first who said to me that the Greenwood

VOLUME I - 202

1  thing was nothing; that the Chief didn't have a
2  problem with it at all.
3           Then sometime after Hoover said that to
4  me I had asked Ralph.  I said -- Jimmy Hoover --
5  Jimmy said we're all set, he says yeah, the Chief
6  said there was no problem.  He was all right with
7  everything.
8      Q.   Are you talking about this meeting that
9  occurred in Ralph's office following that?
10     A.   No; this is sometime after that.  Hoover
11 was stating to me that this Greenwood thing was
12 nothing at all, that everything was fine.
13          After Hoover had said that, this is, I
14 don't know, a couple of months after Hoover and I
15 were in Ralph's office.
16     Q.   Did he indicate to you what information
17 Chief Bergeron had been given about the Greenwood
18 incident?
19     A.   No.  Later on Pysell -- at one point
20 Pysell told me that Tom Ralph had talked to him
21 and another time Kehoe told me that Tom Ralph had
22 talked to him but...
23     Q.   I'm sorry, are you finished?
24     A.   I am.

VOLUME I - 203

1      Q.   Do you recall discussing this incident
2  with the Chief while you and Ralph were driving
3  with him to some sort of seminar or other
4  police-related event?
5      A.   I don't remember attending any seminars
6  or events with --
7      Q.   (Interposing) Or training?
8      A.   I don't recall any type of conversation
9  like that at all.
10     Q.   But going back to Ralph's reported
11 investigation, did he ever discuss that with you,
12 why he was investigating, how he conducted his
13 investigation, anything like that?
14     A.   No; only that when we were in the
15 office -- Hoover and I were in Tom Ralph's
16 office -- that Gevry had gone to Bent; Bent had
17 talked with Ralph; and Ralph said that he'd look
18 into it and this is why Hoover and I were there.
19     Q.   Do you believe that Ralph conducted an
20 investigation following that meeting?
21     A.   Yes.
22     Q.   Did he discuss with you how he was going
23 to do it or afterwards what he did do?
24     A.   No.

VOLUME I - 204

1      Q.   Do you know whether Chief Bergeron knew
2  that he was going to be conducting an
3  investigation?
4      A.   I don't know.  I assume he did.
5      Q.   Did you ever discuss this Greenwood
6  incident with Chief Bergeron?
7      A.   No.
8      Q.   And incidentally, did you ever discuss
9  the Jonah Mayotte incident with Chief Bergeron?
10     A.   Yes.
11     Q.   When was that?
12     A.   A short time after that took place.
13     Q.   What do you recall about that
14 discussion?
15     A.   Explaining to him what took place,
16 basically where I was coming from with that whole
17 idea and thought pattern.
18          I remember him saying to me, "Well, it's
19 unconventional but effective" -- and that's how we
20 left it.
21     Q.   Is that an exact quote?
22     A.   "Unconventional but effective"; yes.
23     Q.   Why was it that you discussed that with
24 him?

**EXHIBIT 5**



TO:  Chief Richard Bergeron
FROM:  Brian J. Barnes, Patrolman
DATE:  April 17, 2003
RE:  Investigation


Sir:


About two months ago, I went to Sgt. John Bolduc on a midnight shift and asked if I
could speak to him in private.    We met in his office in the basement of the station.  I
told him that I thought he performed very well as an officer and that during our time
working together we have never had a disagreement and have worked fairly well
together.    I told him that there was however something bothering me that I had to get off
my chest.  I told him that I was aware of the fact that he received the questions that were
to be used in the oral interview for the promotional exam by which he made sergeant.  I
told him that I was in the room when Deputy Chief Thomas Ralph read him the questions
on the exam.  I told him that Ralph told me not to "fucking say anything to anybody"
about this conversation.   The call took place in Deputy Chief Ralph's office very late in
the 3-11 shift the night before the oral boards.    I relayed one of the questions that was
read over the phone to him by Ralph.  I remember the question vividly.   The question
dealt with where a search warrant that was issued by the superior court was supposed to
be returned to and in how many days.   I remember from my academy training that it is
seven days on the return of the warrant from the district court but we never talked about
the superior court.  Ralph was explaining it to me but was interrupted.  I remembered the
question because I did not think anyone who did not know the question ahead of time
would have gotten the right answer if asked.


The interview took place and the appointment was made.  Sgt. Bolduc was appointed to
the position.   I remember Ralph showing me the appeal from civil service that the losing
candidate, Officer Michaela Kelley, sent in.   He laughed at it and said "that bitch is so
dumb, look at what she put down as a reason: " I purportedly did not do well on the oral
interview."  It was handwritten and I remember him saying "the least she could have
done was typed it."  He said she would never win the case based upon that reasoning.
He further indicated that the Chief still felt Michaela was very competent and should be
promoted next and that he disagreed.  He said that the chief even wanted to make her a
detective and have her handle sexual assault cases and Ralph said it would look like we
were trying to give her a consolation prize and that it should be avoided so that she didn't
have any ammunition to use against them for not promoting her.


Officer Kelley and I have never been close at work or ever spoken to each other outside
of the work setting before last week.   We have always been cordial to each other but
have never been friends by any stretch of the imagination.   I did feel bad for her
however.   I felt bad after hearing the questions read, but worse when Ralph showed me

her statement for the appeal. She knew that the interview was tainted and appealed it to civil service for that reason alone.

I approached Detective Mike Shaw about two months ago and told him that I was a witness to the cheating. Detective Shaw was visibly upset that this could have possibly taken place. I told him that I had told nobody until that point. I told him that I was told by Ralph not to say anything and that getting on the wrong side of Ralph was a bad thing for anybody to do. I further explained that I had no personal gain in the whole matter. I have never taken an exam and it would be obvious to anyone in the station that Michaela Kelley and I were not friends so I was not doing a favor for a friend by coming forward.

Shaw and I were meeting at the time over negative emails and directives that Ralph sent out to me which were somehow questioning my work ethics. It was at that time that I told Shaw "who is this guy to question anybody's ethics." That is when I told him about the exam scam.

Detective Shaw said, " I can't work in a place that would ever do something like that." I told him I had no reason to lie. I then went to the Chief and relayed the same story. I told the chief that yes I had not said anything because I was told not to by Ralph. I knew the Chief was floored by the accusation but he listened to what I had to say. I told the chief I was so sure of it that I would submit to a lie detector test and even submit my resignation prior to the test. Based upon a negative result I would then not appeal my resignation.

The Chief told me that I needed to speak with Ralph and to talk about this with him. I was working a detail at the PACC lounge when the union representatives, detectives Hoover and Shaw came by and asked me if I would be willing to talk to Ralph who was in the truck waiting. I was relieved by another officer and did so. We drove around town and Ralph refused to acknowledge his cheating. I told him he did not have to tell any of us but that he should tell the chief what he did behind his back. He refused to do it. He asked me what my gain was in this whole thing and I told him that it was out of principle. I told him that when people take an exam it should be given on an equal playing field and that is what civil service was supposed to be about. I told him that it would hurt the department if this shit became public and that it would be better if he went to the chief and to Officer Kelley and perhaps worked something out to make a wrong right. He asked, "What kind of proof do you have?" I said I have my word and could subpoena the phone records for the time of day and the calls made if he really wanted to make an issue of it. Ralph said I talk to Bolduc all the time and a phone record is not going to do anything to prove it. I further told him that if he had that much hate for her he should have excluded himself from the oral interview process. He then told me that I am a person of no morals. I then responded by saying that he should forget about going to church with his kids and that he was a hypocrite for doing so. I told him that he does not see people as people but rather employees. I told him that I did not put anything in writing because I thought he would lose his job and that I was thinking about his wife and small children and that perhaps he should do the same.

The meeting with Ralph ended with him getting out of the car and saying 'put it in writing." I will call Mr. Stankiewicz, the no former town administrator, and have him put me on paid leave while this goes on.

I continued to sit in the car with Hoover and Shaw and asked them to consider what possible motive I would have for doing it other than to correct an injustice. I told them that it was unfortunate that he did not have enough decency to tell the truth in private to the chief who had given him more opportunities and specialized positions than any other guy in the department. They seemed convinced that I was telling the truth in the matter.

Within days, the town administrator's secretary, with whom I am very good friends, told me that she was approached by another town employee who told her that Ralph came to her and told her that she should talk to her and tell her not to associate with me or that she may lose her job with the town. When I was told of this I told her that these were tactics that had been used before against someone else in town service. I told her to exercise her own mind but not to put her job on the line for a friendship with me. We remained friends. She later got contacted be the same town employee who relayed to her that the now former town administrator told her that the police department had pictures of her talking to me while I was on detail duty at the Price Chopper Supermarket and that she should consider letting this friendship go. He told her that the police have pictures of her talking to Officer Barnes and that Officer Barnes was sitting in her vehicle. This was a true statement. I was sitting in her car for about twenty minutes and we were talking so the administrator did have his facts right.

Since the time I came forward with the facts of the exam scam, Ralph has not spoken to me in or out of the building.

This past week the Chief received a letter from Ralph labeling me as a "racist." He indicated that I was not subject to any discipline in the department. The statements are being digested by union attorneys and Kevin Reddington, attorney at law for a legal review at this time.

The only comments I will make relative to such statements are as follows: I am not a racist nor have I ever been called such by anyone in or out of this department prior to presenting the facts of this exam scam. I further have been disciplined verbally in this department. Sgt. Keefe has never been shy with me. We have disagreed with each other but never did I feel he was backing down from me because the Chief had an order indicating such. Sgt. Edgar Latour, now retired, was my supervisor on days for several years. Though not at all the power-hungry person Ralph is, never treated me any differently than any other employee when it came to correcting me or offering a different approach to doing things. At no time during my career here or in any other job that I have held have such accusations been made. I worked for a police department for seven years in Quincy and no such accusations were ever made. Prior to that I was a religious brother in the Bronx. I speak Spanish because every assignment I worked in while in Religious Life was a poor urban parish. This was at my request. I further studied

Cantonese while I was working for the Quincy Police so that I could communicate with the large Chinese population. ( I was never able to grasp the language.)

Mr. Ralph's statements were apparently fired out because I took the huge step of talking to Officer Michaela Kelley about the exam scam. Ralph knew that this escapade he orchestrated was coming to an end. I called Officer Kelley and requested to meet her. She was shocked to say the least that I wanted to meet her. I was nervous and apologetic that I was intimidated by Ralph and did not come out with the information sooner. She told me that while she wished I had said something sooner she could understand my point of view. She further told me that she did not expect me to put anything in writing because of retribution that would take place. I told her that I was going to talk to the Chief and let him know that I had spoken to her. Officer Kelley did not act surprised to the news I had given her like the shock the chief had expressed. She told me that she was surprised to hear it from me but that it was not any big revelation to her. She knew from another source much earlier in the process that the questions were given out I left the meeting and I felt better that I had told her everything. I went home thinking how tough it must have been for her to hear this news but worse how much of a victim she must have felt like by this scam. It is sad that status for Ralph is so important that he could not tell the truth and had to resort to making unsubstantiated accusations in light of my presenting the facts of this scam.

Ralph wrote that I should not be an officer for being a racist. No officer should be. I challenge him to prove those accusations. I have presented facts, not unsubstantiated accusations against Ralph. I believe he has acted in direct violation of the code of ethics. I do not believe he should be an officer of this department and that he should be formally disbarred, as a lawyer and I will seek to have this accomplished. No department should allow such prejudice to exist against any officer who takes an exam. At no time should it have become a personality test. Nor should any court allow any attorney to practice law who has committed such a horrible act and testified to it at a civil service hearing.

In closing, I hope that not only Officer Kelley receives a fair interview, but that this coming forward would further dissuade anyone in this department or any other department from cheating to get ahead. There are many victims to Deputy Ralph's actions in this scam if this promotion stands. It affects everyone even if you are not on the list or if you have a friend who stands to get promoted. It is about principles and integrity.

**Brian J. Barnes, Patrolman 1157**
**Webster Police Department**

**EXHIBIT 6**

Thomas V. Ralph
11 Chestnut Hill Drive
Webster, MA 01570

April 15, 2003

Richard E. Bergeron, Jr.
Chief of Police
Webster Police Department
57 Thompson Road
Webster, MA 01570

Dear Chief Bergeron:

This letter is written as a formal compliant against Officer Brian Barnes. Officer Barnes has acted in a manner that is racist, slanderous and libelous. In my opinion Officer Barnes is not worthy to wear the uniform of a police officer. It is unfair to the residents of this community and the other Webster Officers to allow him to continue on in this manner.

Officer Barnes has, while in uniform and on duty, made racist statements in public by referring to blacks as "niggers", Hispanics as "spics" and Asians as "chinks". All of these statements have gone without repercussion despite the fact that they are illegal, conduct unbecoming and in violation of department rules and regulations, as you believe that they are acceptable because Officer Barnes gives the department "110%".

In the beginning of this year the Webster Police Department received negative publicity throughout New England in various newspapers and on television stations such as New England Cable News regarding Officer Barnes being the number one Officer in the state failing to comply with the state mandated racial profiling law. While even at this meeting Officer Barnes informed many persons at the Webster Police Department that Senator Diane Wilkenson was nothing more than a "dumb nigger".

These type of remarks bring the police department into a negative light. I have remained obedient to your requests to leave him alone during this time. However, I can no longer follow your directives with regards to Officer Barnes.

My attempt to exercise managerial control over Officer Barnes has resulted in numerous and widespread libelous and slanderous remarks by him towards me personally and professionally. Officer Barnes has publicly disseminated department wide emails commenting on everything from my attire to my managerial ability and gone so far as to accuse me of providing oral board questions to Sgt. Bolduc prior to the sergeant's oral boards.

When Officer Barnes first made the unfounded accusations against me you informed me to deal with it "before we both lose our jobs". I attempted to inform the Town Administrator to request a hearing, but was told by you not to speak to anyone about this. You also told me to meet with Officer Barnes and attempt to pacify him. As a result, Officers Barnes, Hoover and Shaw along with myself met in cruiser 536 that Saturday night. This meeting failed to produce any positive results. At the meeting I listened to Officer Barnes and answered all of his accusations. He concluded by informing the persons in that vehicle that he would no longer respect me and would do anything in his power to prevent me form advancing within the department. However, he refused to make a formal complaint allowing the issue to be investigated and a hearing held.

Despite your statements that I need to settle these issues with Officers Barnes, I cannot. Officer Barnes' racial remarks to personnel at the town hall, the school and the police department are unprofessional and illegal. His libelous and slanderous statements against me can no longer go unanswered.

A formal response from you is expected within the next fourteen days. Failure to have an adequate response will force me to pursue just and proper intercession from outside agencies.

Respectfully,

Thomas V. Ralph
Deputy Chief of Police

**EXHIBIT 7**



# Webster Police Department

### *Office of the Chief of Police*

Webster, Massachusetts 01570

### (508) 943-1212
### FAX (508) 949-3898

Richard E. Bergeron, Jr.
*Chief of Police*

Date: April 17, 2003

To: Deputy Chief Thomas Ralph

From: Chief Richard E. Bergeron, Jr.

Re: Your Apparent Insubordination.

You are herby ordered to complete a detailed report concerning the above. Your report is to be completed by the end of your next working shift and shall include the following:

- Where you went when you left my office Tuesday morning April 15, 2003.

- Why you did not answer your radio or nextel after repeated requests for a response.

- Why you left the Police station without speaking to me Tuesday afternoon April 15, 2003.



*On the Shores of*
# LAKE CHARGOGGAGOGGMANCHAUGGAGOGGCHAUBUNAGUNGAMAUGG

**EXHIBIT 8**

To: Chief Richard Bergeron

From: Detective Michael Shaw

Date: April 25, 2003

Re: Requested report regarding Sergeant's oral board.

Chief Bergeron,

I am writing this report in response to your request for any information I have regarding any knowledge that I have involving the fact that a candidate for the promotion to the position of Sergeant for the Webster Police Department. I must tell you that I have no direct knowledge of the incident firsthand, and that all of my information comes via a member of the union body. It is also my understanding that I am not able to disclose the contents of these conversations, as they were told to me as a union representative, and that I may be held liable under Chapter 150E Section 2. I in no way mean this as a form of insubordination or disrespect to yourself or your office, but I have a responsibility to protect Officer Barnes as a member of the Union. I am told that if Officer Barnes wishes to inform you as to our conversation, he may do that.

I can tell you that on March 6th, I was informed that Officer Barnes had been a party to hearing Deputy Chief Ralph give questions to Officer John Bolduc that were to be used in the upcoming oral board interview for the promotion to Sergeant. I then called President James Hoover and informed him of what I had been told. Later on that evening I saw yourself and spoke with you briefly upstairs. I think we were both under the impression that this was a misunderstanding and could hopefully be nipped in the bud, before it spiraled out of control.

The next day, President James Hoover, Officer Barnes, and myself met to discuss what had transpired the previous night. Without getting into specifics, Officer Barnes stood by his statements, but would not file a written formal complaint at the time.

On Saturday March 8th, Officer Barnes was working a paid detail at a local establishment in town. Deputy Chief Thomas Ralph had been made aware of the allegations and wanted to discuss them with Officer Barnes. Deputy Chief Ralph, James Hoover, and myself then went to where Officer Barnes was working. I asked him if he would be interested with meeting with Deputy Chief Ralph and he agreed to. It should be noted that there were several other issues lingering at the time that were also discussed during this meeting. One of which was the punishment of an officer for making threatening remarks against the Officer Barnes, and several new stipulations regarding Officer Barnes assignment as School Resource Officer.

Officer Barnes and Deputy Chief Ralph discussed the allegations and both stood by their positions. At the conclusion of this meeting, Officer Barnes still declined to "go to paper" and no formal complaint was filed.

President Hoover had been in contact with the attorney for the union and had received guidance, which I believe he has explained in his report.

Sometime during the week of April 12th, Officer Barnes informed me that he had informed Officer Michaela Kelley of the allegations we had discussed on March 6,7, and 8th. He informed me that also at this time that he was willing to reduce his allegation to writing and file a formal complaint. Shortly thereafter, I was informed that Officer Barnes also had informed Sergeant William Keefe of these same allegations.

I hope this letter has satisfied your request for the information you wanted. If you have any questions please feel free to contact me at any time.

Respectfully submitted,

Michael D. Shaw

# EXHIBIT 9

To:     Chief Bergeron

From:   Sgt. Bolduc

Date:   05/02/03

Re:     Officer Barnes


Sir:

During our last conversation (your office, afternoon of 05/01/03) you asked me if I had ever heard Officer Barnes make any inappropriate racial comments. When I answered that I had, you ordered me to write a statement.

On or about February 22, 2003 I attended a birthday lunch at the Colonial Club Restaurant for Town Administrator Secretary Heidi Courtnay. Present at that lunch were Lee Ellen Olmstead, Pamela Leduc, Deputy Chief Ralph, Officer Barnes, Heidi, and I.

At one point during the meal, Officer Barnes told us about an unpleasant airplane flight he had recently taken. He first began talking about an overweight woman who was seated in front of him and then repeated the sarcastic remarks he claimed he made to the flight attendant when she asked whether or not the woman "cared for a snack." He went on about the size of the woman and the amount of snacks she would require. The aforementioned people smiled sheepishly at best.

Officer Barnes then elaborated as to why he did not find the flight pleasant, at one point stating, "I had to sit in the middle seat between two niggers. I felt like a fuckin' oreo cookie." At that point, he became aware of the awkwardness he was creating as no one was laughing or smiling, but instead looking at each other. Officer Barnes paused briefly, and then changed the subject.

Respectfully,
Sgt. John Bolduc, Jr.


END

# EXHIBIT 10

**IN THE MATTER OF:**

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

**DEPOSITION OF:**

WILLIAM KEEFE
DATE:  AUGUST 17, 2006

---

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

17

1  Q. Were you one of the sergeants in charge
2  of a shift?
3  A. Yes, sir.
4  Q. What shift was it that you were in
5  charge of?
6  A. I believe I was the fill-in. I used to
7  switch from second shift to the fill-in shift
8  because we rotate -- we sign for shifts every
9  three months.
10  Q. There was no specific shift that a
11  sergeant would be dedicated to on a regular basis?
12  A. If the Chief wanted to appoint -- like
13  Sergeant Latour, when he was there, he was the
14  day-shift sergeant. He was basically the
15  administrative sergeant but in 2003 there was --
16  it went the Chief and deputy chief and then the
17  sergeants.
18  Q. The deputy chief was Thomas Ralph?
19  A. Correct.
20  Q. In what manner did the deputy chief
21  interact with the sergeants at that point?
22  A. He would basically do the scheduling.
23  If anything that had to be passed down, he would
24  pass down the information to us.

18

1  Q. Did he actually actively oversee the
2  operational performance of the officers while on
3  shift?
4  A. I don't know what he did, to be honest
5  with you.
6  Q. Would he be present at various shifts or
7  what were his duty hours?
8  A. Whenever he wanted.
9  Q. What were the Chief's hours at that
10  point in say January of '03? Were you
11  accustomed -- let me strike that.
12  Were you accustomed to seeing the Chief
13  in the station during your duty shifts?
14  A. Chief Bergeron was -- he was -- he'd
15  come in in mid-morning and stay late at night so
16  his hours varied.
17  He could be there ten hours, he could be
18  there -- he varied on his hours.
19  Q. Do you recall -- I think you just
20  testified that the Deputy Chief's hours were not
21  specified?
22  A. I wouldn't know.
23  Q. Do you have any recollection as to what
24  hours Sergeant Bolduc was working in January of

19

1  2003?
2  A. Sergeant Bolduc was assigned for the
3  midnight shift but he was bouncing back and forth
4  on a special investigation.
5  Q. What special investigation was that?
6  A. The kidnapping of the Andy Amato case.
7  It's a cold case basically, probably about thirty
8  years old.
9  Q. Who assigned him to that task?
10  A. I would imagine Chief Bergeron did.
11  Q. In his capacity of being assigned to the
12  Amato case, in the course of doing that did he
13  have occasion to operate as a sergeant for any of
14  the shifts?
15  A. I don't understand. What do you mean
16  operate?
17  Q. In addition to the tasks he was
18  performing as part of the Amato murder
19  investigation, did he have occasion to operate as
20  a shift supervisor?
21  A. He was assigned the midnight shifts so
22  if he wasn't working the Amato case, he was
23  supposed to be working his midnight shift.
24  Q. To the best of your knowledge he worked

20

1  the midnight shift?
2  A. I think on occasions; yes.
3  Q. You stated earlier that the sergeants
4  would sign up for shifts. Could you explain that
5  to me?
6  A. We -- all the officers and sergeants bid
7  for shifts every -- I think it's three months --
8  three-month period.
9  A piece of paper like an eight-by-eleven
10  would go up with all the officers' names as well
11  as all the assignments. Each shift basically
12  would have a sergeant spot where, seeing I'm the
13  senior sergeant, if I wanted to work second shift,
14  unless I'm assigned by the Chief to a certain
15  shift, I would have the ability to sign any shift
16  I want so if I was working days this rotation,
17  next rotation I could sign for second shift and
18  then the other less senior sergeants -- it went on
19  a seniority basis, they would sign wherever they
20  wanted.
21  Q. Was it for sergeants to vary their --
22  the shifts that they worked?
23  A. Not really; no.
24  Q. Are you aware of what the -- strike

41

1  by the Chief.  It came to me and I -- he drafted
2  this letter up and I had to give it to Sergeant
3  Bolduc.
4      Q.   Aside from transmitting the memorandum
5  from the Chief to Sergeant Bolduc, did you have
6  any further involvement with the resolution of
7  that issue?
8      A.   I believe I did.
9      Q.   What was that?
10     A.   I had Sergeant Bolduc come in in the
11  morning for a meeting with the Chief and myself on
12  this issue.
13         We were in the booking room two.  The
14  Chief was upset because Sergeant Bolduc failed to
15  present any information on a serious incident the
16  night before -- or during this date.  The Chief
17  was very upset.
18     Q.   As a result of that interaction, did a
19  letter of reprimand in fact issue?
20     A.   I don't believe a letter of reprimand
21  was issued.  I think it was more of a verbal
22  warning, don't do it again.
23     Q.   With respect to the don't do it again,
24  was it because Bolduc's report was considered

42

1  incomplete by the Chief?
2      A.   There was not report at the time.
3      Q.   When you say at the time, you mean as of
4  the time that you had the meeting?
5      A.   No; I can't recall the exact date of the
6  meeting but on this date, May 14th, 2003, the next
7  morning if I recall correctly the Chief comes in
8  and he got a phone call from the family member of
9  the individual who lost an eye and he went to look
10  for some information on the call and there wasn't
11  any.
12         That's when he was upset because nothing
13  was -- he had nothing to tell these individuals
14  about the incident.
15     Q.   Was Sergeant Bolduc a shift sergeant at
16  that point?  Was he responsible for a shift?
17     A.   Yes, sir.
18     Q.   Do you recall what that shift was?
19     A.   Eleven to seven.
20     Q.   Do you recall if there was an arrest
21  made with respect to that incident?
22     A.   During this time?
23     Q.   Yes.
24     A.   No; I don't believe there was.

43

1      Q.   I believe you testified that Sergeant
2  Bolduc was warned about failing to report.  Was
3  that the issue with respect to the Chief at that
4  point?
5      A.   Not to report it; it was recorded on the
6  log -- on the police log.  What he failed to do I
7  believe was that he failed to enter a summary or a
8  gist of what happened that night.
9          The Chief had nothing to go by.  He had
10  no knowledge of any of the events occurring that
11  night on this case.
12     Q.   Aside from the log entry, the Chief
13  considered the information that was entered
14  inadequate?
15     A.   Correct.
16         MS. LYNCH:  Can I just have one
17  second?
18         MR. GREEN:  Sure.
19         (Pause in proceedings.)
20     Q.   (BY MR. GREEN)  Do you know Aaron Suss?
21     A.   Yes, sir.
22     Q.   Who is he?
23     A.   He's a patrolman in the Webster Police
24  Department.

44

1      Q.   Is he still with the Webster Police
2  Department?
3      A.   Yes, sir.
4      Q.   How long has he been with the Webster
5  Police Department?
6      A.   I can't say.  Again, he was an
7  auxiliary, went to an intermittent stage, and then
8  he became a full-timer so he's been there for
9  several years.
10     Q.   He's been a patrolman for his entire
11  tenure with the police department in Webster?
12     A.   Yes; that's correct.
13     Q.   At some point in 2003 you were --
14  assumed the position as chief -- acting chief,
15  would that be a fair statement?
16     A.   Yes, sir.
17     Q.   When did that occur?
18     A.   I believe it was in July of 2003.
19     Q.   What were the circumstances that led to
20  your appointment as acting chief?
21     A.   The town administrator put Chief
22  Bergeron on paid administrative leave.
23     Q.   Did the town administrator offer you any
24  explanation as to why he did that -- strike that.

JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
WILLIAM KEEFE          AUGUST 17, 2006

45

1  That was Stephen Boudreau, was it not?
2     A.   Yes.
3     Q.   Did he offer any explanation as to why
4  he did that?
5     A.   He didn't -- I don't believe he offered
6  me an explanation.  He just appointed me.
7          It was common knowledge again in the
8  Department why he was on paid administrative
9  leave.
10    Q.   What was the common knowledge?
11    A.   Well, they put him on leave pending an
12 investigation through Judge Barton.
13         They hired a retired judge I believe to
14 do a mismanagement study on the Webster Police
15 Department.
16    Q.   Do you have any personal knowledge under
17 what circumstances it was that led to the
18 appointment of Judge Barton?
19    A.   Why they hired Judge Barton?
20    Q.   Yes.
21    A.   Again they claimed it was mismanagement.
22 There was problems within the police department.
23    Q.   When you say "they," who are the "they"?
24    A.   The selectmen are the ones who came up

46

1  with the idea of having a study done of the police
2  department.
3     Q.   Some time in July Stephen Boudreau
4  appoints you as the acting chief and at that point
5  was Chief Bergeron completely out of the picture?
6  Was he out of -- he completely relieved of all
7  of his operational duties?
8     A.   Correct.
9     Q.   Did Mr. Boudreau give you any specific
10 instructions as to what you were to do with
11 respect to the Department during the conduct of
12 this study by Barton?
13    A.   He told me I was in charge of the police
14 department and I had full authority over the
15 police officers.
16    Q.   Did he have any specific areas that he
17 wanted you to pay particular attention to as a
18 result of -- during the period that you would be
19 acting as chief?
20         MS. LYNCH:  Objection; you can
21 answer.
22         THE WITNESS:  No.
23    Q.   (BY MR. GREEN) Did he give you any
24 written instructions as to how to begin to conduct

47

1  your duties as chief?
2     A.   No; I don't recall.
3     Q.   Do you recall having any discussions
4  with Mr. Boudreau with respect to changes that you
5  wanted to make in the Department?
6     A.   As far as changes -- what kind of
7  changes?
8     Q.   Personnel changes.
9     A.   I had no -- my line of thinking was to
10 get back the police department in a stable manner,
11 basically.
12    Q.   Was it your opinion at the time you were
13 appointed as acting chief that the Department was
14 unstable?
15    A.   We had a lot of disgruntled police
16 officers; yes.
17    Q.   Did you have any particular ideas as to
18 how to put the Department on a stable basis?
19    A.   I had my own ideas; yes.
20    Q.   What were those?
21    A.   Treat everybody fairly and equally.
22    Q.   Who was it that you felt was responsible
23 for unequal treatment within the Department?
24    A.   I didn't feel it was one specific person

48

1  that was unfairly treating the Department but
2  there was -- Chief Bergeron overlooked a lot of
3  things and his deputy was going against a lot of
4  the people that didn't do things their way.
5     Q.   When you say their way, you mean --
6  you're referring to Ralph?
7     A.   Correct.
8     Q.   At the time you became acting chief,
9  what was Ralph's situation?
10    A.   I believe he was on paid administrative
11 leave also.
12    Q.   Did you appoint -- in your capacity as
13 acting chief, did you appoint any other officers
14 to act as a deputy or an administrative officer?
15    A.   I think after awhile I had Sergeant Bent
16 come to days and be the day shift supervisor
17 because I was -- I had my hands full.
18         I couldn't run the day shift operation
19 and do the assignment of the chief of police; and
20 also the secretary had resigned so I was doing
21 both jobs.
22    Q.   What particular tasks -- what were the
23 tasks that the Chief was performing that made it
24 difficult for him to perform without an assistant?

PERLIK and COYLE REPORTING

73

1    A.    Correct.
2    Q.    When did Officer Pysell leave the
3    Department?
4    A.    I think it was towards the end of 2005.
5          MR. GREEN:  Want to take a half hour
6    now?
7          MR. McCULLOUGH:  Sure.
8          MR. GREEN:  Why don't we take a half
9    hour.
10         (A luncheon recess was taken.)
11         (Plaintiff's Deposition Exhibit
          No. 8 offered and marked.)
12
13   Q.    (BY MR. GREEN)  Sergeant, I'm going to
14   give you a document which has been marked as
15   Exhibit 8 for the purposes of today's deposition.
16   It's a letter to Sergeant Bolduc dated
17   December 12, 2003 to Ms. Leal in which you are
18   cc'd.
19         She notes in paragraph one of Exhibit 8,
20   quote, "I've become aware of several incidences of
21   excessive and/or unnecessary force that you have
22   used during bookings and, calls and interviews,"
23   unquote.
24         Was it from you that she became aware of

74

1    these incidents? (Indicating.)
2          MS. LYNCH:  Objection; you can
3    answer.
4          THE WITNESS:  (Witness examining
5    document.)
6          I believe we had spoke about the other
7    incidents; yes.
8    Q.    (BY MR. GREEN)  When you say the other
9    incidents, you mean --
10   A.    (Interposing) That I was aware of
11   Sergeant Bolduc in abuse of other prisoners.
12   Q.    Specifically with the Abbe case which
13   was one that occurred in November of 2003, did it
14   not or do you recall?
15   A.    I believe it was in November, 2003.
16   Q.    How did you learn of a problem involving
17   Abbe?
18         MS. LYNCH:  Did you say Abbe?
19         MR. GREEN:  Abbe; right.
20         THE WITNESS:  It was brought to my
21   attention by an officer in the Department.  I
22   don't know which one informed me.
23   Q.    (BY MR. GREEN)  Was it Difusco?
24   A.    No.

75

1    Q.    It was not Difusco?
2    A.    No.
3    Q.    As a result of becoming aware that
4    something had occurred involving Abbe, what did
5    you do next?
6    A.    When I was aware of the incident with
7    Abbe I had a meeting in Holden with Officer
8    Difusco.
9          We were going to a grant seminar
10   meeting.  He was driving and at that point I
11   brought up to him that I was aware of an incident
12   that took place with a female and Sergeant Bolduc
13   to Officer Difusco.
14   Q.    Do you recall who the officer was that
15   brought it to your attention?
16   A.    I don't recall who told me.
17   Q.    Did you keep any written memorandum of
18   that?
19   A.    No.
20   Q.    As a result of your discussions with
21   Officer Difusco, what happened?
22   A.    When I mentioned that to Officer
23   Difusco.  I caught him off guard and he was
24   surprised that I had found out.

76

1    Q.    Did you instruct him to do anything as a
2    result of your interaction with him at that point?
3    A.    No; I asked him exactly what happened.
4    At that point he told me that he had brought in an
5    unruly female.  They were in the booking room, him
6    and Officer Young.  She wasn't cooperating taking
7    a mug shot.
8          Sergeant Bolduc came in and squeezed her
9    face, pried her eyes open with his other hand
10   after he squeezed her jaw and Sergeant Bolduc told
11   Officer Difusco to snap the photo.
12   Q.    After Difusco told you that what
13   happened?
14   A.    During that same conversation Difusco
15   also told me that after the whole incident was
16   over and Abbe was placed in the cell, he had
17   deleted the pictures from the camera.
18   Q.    What did you do then?
19   A.    I went on to the meeting we were
20   supposed to go to and came back.
21   Q.    At any point did you direct Difusco to
22   do anything further?
23   A.    No.
24   Q.    I believe you testified earlier that he

65

1    Q.   Did you make any inquiry with Boudreau
2  as to when or how Ralph's status was going to be
3  resolved?
4    A.   I don't think we have ever had that
5  conversation.
6    Q.   Referring you back to this exhibit, were
7  Kelley and Bolduc's personnel files ever found?
8    A.   No, sir.
9    Q.   Did you inquire of -- did you have any
10 communications with Chief Bergeron after he
11 departed the Department?
12   A.   Very little communications.
13   Q.   Did you have any communication with him
14 about these personnel files?
15   A.   I asked him if he had any idea where
16 they might be.
17   Q.   What did he say?
18   A.   I don't recall.
19   Q.   Did you have any discussions with
20 Attorney Novick about these files?
21   A.   Yes; I did.
22       MS. LYNCH:  Attorney Novick?
23   Q.   (BY MR. GREEN)  I'm sorry, strike
24 that -- Officer Novick?

66

1    A.   Yes; I did.
2    Q.   Did he give you any indication as to
3  what happened with these personnel files?
4    A.   No; he did not.
5    Q.   Did he make any statement whatsoever
6  with respect to these files?
7    A.   I remember speaking to him in -- after
8  reading Ralph's letter here about the big large
9  envelope.
10       I mentioned that to, I believe, Officer
11 Novick and he didn't recall anything like that.
12   Q.   He didn't recall having received these
13 files from Ralph?
14   A.   That's his statement to me, to the best
15 of my recollection, sir.
16   Q.   Did the Chief give any indication of
17 having received the files?
18   A.   Not that I can recall at this point.
19       MR. GREEN:  If you can mark this,
20 please?
21       (Plaintiff's Deposition Exhibit
         No. 7 offered and marked.)
22
23   Q.   (BY MR. GREEN)  Sergeant, if you could
24 take a look at this document.

67

1        I'm going to ask you if you recognize
2  it? (Indicating.)
3    A.   (Witness examining document.)  I do.
4    Q.   This is dated November 19th, 2003 by
5  Thomas E. Pysell.  Who is Mr. Pysell?
6    A.   He was a police officer for the Town of
7  Webster.
8    Q.   Was this a statement that was solicited
9  by you from Officer Pysell?
10   A.   The original contents -- this was an
11 affidavit.
12       I asked -- I was doing an investigation
13 on an incident of abuse of Mr. Greenwood and asked
14 Pysell if he had any recollection of what went on
15 during that incident.
16   Q.   What prompted your investigation into
17 the incident involving Greenwood?
18   A.   A incident occurred with Sergeant Bolduc
19 abusing a -- or I should say I had received
20 pictures of Sergeant Bolduc squeezing a female
21 prisoner's face to get a mug shot.
22   Q.   From whom did you receive those
23 pictures?
24   A.   Officer Daniel Difusco.

68

1    Q.   As a result of seeing those pictures,
2  what did you do?
3    A.   I notified the town administrator.
4    Q.   Who was the town administrator at that
5  time?
6    A.   Ms. Leal.
7    Q.   When did you notify the town
8  administrator?
9    A.   I notified her the day I received --
10 well, back up.
11       I had knowledge of the incident maybe a
12 day or so earlier than I received the disk of
13 pictures.
14       I made Ms. Leal aware of it and then a
15 couple of days went by.  Then I received the disk
16 with the pictures on it and that afternoon I
17 showed Ms. Leal.
18   Q.   This was Abbe, do you recall?
19   A.   Catherine Abbe; yes.
20   Q.   Had Catherine Abbe filed a complaint?
21   A.   No.
22   Q.   Had you had any discussions prior to the
23 pictures of Catherine Abbe with Ms. Leal prior to
24 Sergeant Bolduc?

Case 4:04-cv-40246-FDS Document 24-4 Filed 08/17/2006 Page 8 of 14

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
WILLIAM KEEFE                          AUGUST 17, 2006

69

1    A.   I just told you I informed her a couple
2  of days earlier that there was a possible abuse of
3  a prisoner.
4    Q.   When you say a prisoner, you're
5  referring to?
6    A.   Ms. Abbe.
7    Q.   Had you had any discussions with
8  Ms. Leal about Officer Bolduc prior to that,
9  informing her about the Abbe situation, about
10 Bolduc?
11   A.   About the Abbe situation?
12   Q.   No; had you had any conversations with
13 Ms. Leal about Sergeant Bolduc prior to the Abbe
14 situation?
15   A.   I don't know if I had any conversations
16 with -- specifically about John Bolduc.
17   Q.   You don't know?
18   A.   Well, what kind of conversation are you
19 looking for?
20   Q.   I'm just asking if --
21   A.   (Interposing) We might have.  She was my
22 boss and we talked about the police department.
23        Again, she was new.  I was filling her
24 in on the police department.  Sergeant Bolduc's

70

1  name could have popped up.
2    Q.   What is it about the Abbe situation that
3  prompted you to ask Pysell for an affidavit about
4  Greenwood?
5    A.   Because I had knowledge of other abuse
6  cases that Sergeant Bolduc was involved with.
7    Q.   Did Greenwood ever file a complaint?
8    A.   No.
9    Q.   As of November 19th, 2003 Greenwood had
10 not filed a complaint?
11   A.   Correct.
12   Q.   Is Officer Pysell still an officer with
13 the Webster police force?
14   A.   No.
15   Q.   On the fifth paragraph down of the first
16 page of this exhibit there are some notes --
17 handwritten notes.  Do you see those?
18   A.   Yes, sir.
19   Q.   Who placed that handwritten note down
20 there?
21   A.   That was my writing.
22   Q.   It's dated I believe by your signature
23 February 8th, '04, is that correct?
24   A.   I think it's the third, sir.  2/3/04.

71

1    Q.   2/3/04?
2    A.   Yes, sir.
3    Q.   How did that note happen to end up on
4  this affidavit of November 19th, 2003?
5    A.   During my investigation into the -- of
6  the alleged abuse cases I asked Mr. Pysell --
7  Officer Pysell if he had any knowledge of any
8  occurrence of the Greenwood case on I believe it
9  was -- during that time frame I asked him.
10        He produced this document and said to me
11 that this document was an affidavit he had made
12 and he gave to the Judge Barton's investigation.
13   Q.   This was an affidavit that Pysell
14 provided to Judge Barton?
15   A.   Yes.
16   Q.   When did you first see this affidavit?
17   A.   I believe it was a couple of days --
18 Officer Pysell dropped this off, said he completed
19 an affidavit, he gave it to me.
20        I reviewed it.  I called him back into
21 my office and I asked him after going over the
22 affidavit if, when he stated here that -- if I
23 might take a minute? (Witness examining document.)
24        When it says right above the writing,

72

1  "Sergeant Bolduc then struck Greenwood to make him
2  release his grip of Officer Gevry," I asked him
3  the question did he hit him once or did he hit him
4  more than once.
5         Officer Pysell stated to me he could
6  have hit him two or three times.  I said okay, is
7  that your recollection.  He said yes.  I said then
8  you only put that he struck Greenwood.  I said
9  would you write that he struck him two or three
10 times.  That's his writing, two or three times.
11 Those are his initials and that's his signature
12 with a date.
13   Q.   Again if you've already answered this,
14 when was it -- was the first time you saw this
15 affidavit in February of '04 or was it in November
16 of '03?
17   A.   No; February of '04.
18   Q.   So prior to February of '04 you had not
19 seen this affidavit?
20   A.   That is correct.
21   Q.   In the course of your discussions with
22 Pysell you arranged for him to effectively
23 supplement his answer on this affidavit that he
24 gave Judge Barton?

73

1    A.   Correct.
2    Q.   When did Officer Pysell leave the
3 Department?
4    A.   I think it was towards the end of 2005.
5         MR. GREEN:  Want to take a half hour
6 now?
7         MR. McCULLOUGH:  Sure.
8         MR. GREEN:  Why don't we take a half
9 hour.
10        (A luncheon recess was taken.)
11        (Plaintiff's Deposition Exhibit
           No. 8 offered and marked.)
12
13   Q.   (BY MR. GREEN)  Sergeant, I'm going to
14 give you a document which has been marked as
15 Exhibit 8 for the purposes of today's deposition.
16 It's a letter to Sergeant Bolduc dated
17 December 12, 2003 to Ms. Leal in which you are
18 cc'd.
19        She notes in paragraph one of Exhibit 8,
20 quote, "I've become aware of several incidences of
21 excessive and/or unnecessary force that you have
22 used during bookings and, calls and interviews,"
23 unquote.
24        Was it from you that she became aware of

74

1 these incidents? (Indicating.)
2         MS. LYNCH:  Objection; you can
3 answer.
4         THE WITNESS:  (Witness examining
5 document.)
6         I believe we had spoke about the other
7 incidents; yes.
8    Q.   (BY MR. GREEN)  When you say the other
9 incidents, you mean --
10   A.   (Interposing)  That I was aware of
11 Sergeant Bolduc in abuse of other prisoners.
12   Q.   Specifically with the Abbe case which
13 was one that occurred in November of 2003, did it
14 not or do you recall?
15   A.   I believe it was in November, 2003.
16   Q.   How did you learn of a problem involving
17 Abbe?
18        MS. LYNCH:  Did you say Abbe?
19        MR. GREEN:  Abbe; right.
20        THE WITNESS:  It was brought to my
21 attention by an officer in the Department.  I
22 don't know which one informed me.
23   Q.   (BY MR. GREEN)  Was it Difusco?
24   A.   No.

75

1    Q.   It was not Difusco?
2    A.   No.
3    Q.   As a result of becoming aware that
4 something had occurred involving Abbe, what did
5 you do next?
6    A.   When I was aware of the incident with
7 Abbe I had a meeting in Holden with Officer
8 Difusco.
9         We were going to a grant seminar
10 meeting.  He was driving and at that point I
11 brought up to him that I was aware of an incident
12 that took place with a female and Sergeant Bolduc
13 to Officer Difusco.
14   Q.   Do you recall who the officer was that
15 brought it to your attention?
16   A.   I don't recall who told me.
17   Q.   Did you keep any written memorandum of
18 that?
19   A.   No.
20   Q.   As a result of your discussions with
21 Officer Difusco, what happened?
22   A.   When I mentioned that to Officer
23 Difusco.  I caught him off guard and he was
24 surprised that I had found out.

76

1    Q.   Did you instruct him to do anything as a
2 result of your interaction with him at that point?
3    A.   No; I asked him exactly what happened.
4 At that point he told me that he had brought in an
5 unruly female.  They were in the booking room, him
6 and Officer Young.  She wasn't cooperating taking
7 a mug shot.
8         Sergeant Bolduc came in and squeezed her
9 face, pried her eyes open with his other hand
10 after he squeezed her jaw and Sergeant Bolduc told
11 Officer Difusco to snap the photo.
12   Q.   After Difusco told you that what
13 happened?
14   A.   During that same conversation Difusco
15 also told me that after the whole incident was
16 over and Abbe was placed in the cell, he had
17 deleted the pictures from the camera.
18   Q.   What did you do then?
19   A.   I went on to the meeting we were
20 supposed to go to and came back.
21   Q.   At any point did you direct Difusco to
22 do anything further?
23   A.   No.
24   Q.   I believe you testified earlier that he

77

1  provided you with some pictures?
2      A.  At a later point.
3      Q.  You were at this point the superior
4  officer of the Department, were you not?
5      A.  Yes, sir.
6      Q.  Did you confront Sergeant Bolduc with
7  respect to the Abbe incident?
8      A.  Initially, no.
9      Q.  Did you inform Ms. Leal of the situation
10  prior to addressing it with Sergeant Bolduc?
11      A.  Yes.
12      Q.  Would it be a fair statement to say as
13  of the date that this letter was received by
14  Bolduc, you had not talked to him about the Abbe
15  incident?
16      A.  I spoke to him this day.  He came in at
17  three o'clock.
18      Q.  Was it for the purposes of getting this
19  letter?
20      A.  No; that's the day I received the
21  pictures.
22      Q.  You received the pictures on
23  December 12th?
24      A.  It's either the twelfth or the eleventh,

78

1  one of those days.  I can't recall exactly what
2  day right now but it was either that morning or
3  the day before but I think it was -- I can't
4  exactly.
5          It's either the day before, the eleventh
6  or the twelfth.
7      Q.  I believe you just testified that you
8  informed Ms. Leal about the situation prior to
9  addressing it with Sergeant Bolduc?
10      A.  Yes; when I first found out about it.
11      Q.  Was there any point at which you
12  addressed this issue with Sergeant Bolduc prior to
13  the issuance of this letter?
14      A.  We -- myself and Sergeant Bolduc
15  discussed this letter that afternoon prior to him
16  getting this, about the pictures.  I had told him
17  I received pictures.
18      Q.  But this letter was already in the
19  process of being produced, was it not?
20      A.  After I showed the pictures to Ms. Leal
21  we decided to -- or she decided to tell him that
22  we're going to put him on paid administrative
23  leave pending investigation.
24      Q.  Was it at the same time you related the

79

1  circumstances of the Abbe situation that you
2  informed Ms. Leal of the other incidences that are
3  referred to in paragraph one or had you done that
4  prior to discussing the Abbe incident?
5      A.  I think when I informed Ms. Leal of the
6  Abbe incident -- the original notification that I
7  had received prior to the pictures -- I informed
8  her of an abuse case before she heard it from
9  somebody else.
10          At that point we discussed other -- I
11  told her about the other incidences that I was
12  aware of.
13      Q.  You're referring to Greenwood I'd
14  imagine is one?
15      A.  Correct.
16      Q.  What was the other one?  Mayotte, is it
17  not?
18      A.  Correct.
19      Q.  Were you aware of -- did Mayotte ever
20  file a complaint?
21      A.  No, sir.
22      Q.  How did you learn of Mayotte?
23      A.  By Officer Kelley right after the
24  incident occurred.

80

1      Q.  Which was over a year earlier, right?
2      A.  I believe it was.
3      Q.  How did Officer Kelley happen to inform
4  you?
5      A.  She was present when it took place.
6      Q.  In fact she was the arresting officer,
7  was she not?
8      A.  I believe so; yes.
9      Q.  She left the station before the booking
10  process was complete, did she not?
11      A.  She left the room after the bolt cutters
12  incident; yes.
13      Q.  Were you aware of the incident involving
14  Greenwood having been investigated previously?
15      A.  No.
16      Q.  What did you do with the information you
17  received from Officer Kelley about the Mayotte
18  incident?
19      A.  I went to -- I believe it was either the
20  next day or the next time I saw Deputy Chief Ralph
21  at the station and I asked him if it was true and
22  if he saw what happened.
23      Q.  What did Ralph relay to you?
24      A.  He made the comment that he was there,

**81**

1  he left the room, he went to get his keys and he
2  left the station and went home.
3      Q.  Did you file a complaint?
4      A.  Did I file a complaint?
5      Q.  Yes.
6      A.  No.
7      Q.  Did you recommend that Officer Kelley
8  file a complaint?
9      A.  No.
10     Q.  Did you ever interview Mayotte?
11     A.  He died.  He was deceased.
12     Q.  As of when?
13     A.  Shortly after he got arrested.
14          MR. GREEN:  This is 9.
15          (Plaintiff's Deposition Exhibit
             No. 9 offered and marked.)
16
17     Q.  (BY MR. GREEN)  Sergeant, if you could
18  look at this document which has been marked as
19  Exhibit 9 for the purposes of this deposition.
20          I'll ask if you recall this memo?
21  (Indicating.)
22     A.  (Witness examining document.)  Yes, sir;
23  that's from me.
24     Q.  That was issued at, it looks like

**82**

1  six-thirty p.m. December 12th, the same date as
2  Exhibit 8.
3          I believe you said that you talked to
4  Bolduc on that afternoon?
5      A.  I talked to him when he came in on his
6  shift at three o'clock.
7      Q.  Did you deliver him the letter that day?
8      A.  This letter?
9      Q.  Yes.
10     A.  Exhibit 8?
11     Q.  Yes.
12     A.  Ms. Leal brought it to the station.
13     Q.  Did she deliver it to John Bolduc?
14     A.  Yes.
15     Q.  In hand?
16     A.  Yes.
17     Q.  Was that before or after you issued this
18  memorandum?
19     A.  This was given to him before I sent out
20  the memorandum.
21     Q.  Were you aware at the time you talked to
22  Bolduc that Ms. Leal was going to issue an
23  administrative leave?
24     A.  Was I aware of it?

**83**

1      Q.  Were you aware before talking to Bolduc
2  that he was going to be placed on administrative
3  leave?
4      A.  Yes.
5      Q.  Did you inform him of that?
6      A.  I believe I might have because I had to
7  keep him in my office until Ms. Leal arrived at
8  the police station.
9      Q.  Did you have authority as the Chief to
10  have placed him on any type of suspension or paid
11  administrative leave?
12     A.  I believe as the Chief of Police you do;
13  yes.
14     Q.  Why didn't you do that on your own?
15     A.  Well, I'd been the acting chief probably
16  about five months.  I'm not -- wasn't sure of all
17  the things that the Chief of Police could and
18  could not do.
19          That's why I looked at the town
20  administrator for advice most of the time.
21     Q.  Prior to December 12th -- strike that.
22  Did you have the conversation with Ms. Leal that
23  led to the letter of December 12th on the twelfth
24  or on the eleventh?

**84**

1      A.  I'm not sure exactly how the dates fell.
2  When I received the disk with the pictures on it
3  is when I showed Ms. Leal.
4      Q.  Did you have any communications with
5  Ms. Leal about Bolduc and this situation that were
6  communicated by e-mail?
7      A.  I don't believe so.
8      Q.  Did you use e-mail?
9      A.  Yes; I used e-mail.
10     Q.  Did you ever communicate with the town
11  administrator using e-mail?
12     A.  Probably.
13     Q.  How did you first inform her of the Abbe
14  incident or situation?
15     A.  I either called her up or I was down at
16  her office.
17          Like I said, there was a lot of things
18  going on and I had to get advice from the town
19  administrator.
20     Q.  Would it be a fair statement to say that
21  at no time prior to the letter of December 12th,
22  2003 was Bolduc counseled by you regarding the use
23  of force during the booking procedure?
24     A.  Against Abbe?

93

1    Q.   The upper left-hand corner of the first
2  page indicates a name.  Who is that?
3    A.   That's Gary Wrubaleski.
4    Q.   Is this report written by Gary
5  Wrubaleski?
6    A.   It's written by myself.
7    Q.   On the second page there's a signature.
8  Whose signature is that?
9    A.   That's Gary Wrubaleski.
10    Q.   Where did he actually sign this
11  statement that you wrote?
12    A.   In my office at the police station.
13    Q.   Was he solicited to come down there by
14  yourself?
15    A.   Yes; he was.
16    Q.   I take it that you and Wrubaleski had a
17  conversation and that as a result of your
18  conversation you drafted this statement for him to
19  sign?
20    A.   He was sitting right there.  I was
21  questioning him and as he was giving me his
22  answers I was writing them down.  He signed it
23  after I had him read it.
24    Q.   Had you previously asked him to provide

94

1  a statement?
2    A.   No.
3    Q.   Did you draft this on the basis of the
4  notes you took from that meeting or is this -- are
5  these in fact the notes you took?
6    A.   These are verbatim what he told me.
7    Q.   Would your meeting with Wrubaleski on
8  the fourth of February be something that would be
9  reflected on your calendar at your office?
10    A.   I'm not a hundred percent sure.  He
11  works for the Webster EMS.
12         MR. GREEN:  Can you mark this as 15.
13         (Plaintiff's Deposition Exhibit
              No. 15 offered and marked.)
14
15    Q.   (BY MR. GREEN)  Sergeant, this is what's
16  been marked as 15.  In the upper left-hand corner
17  indicates Gary Milliard.  Do you recognize this
18  document?  (Indicating.)
19    A.   Yes, sir.
20    Q.   Did you take Milliard's statement the
21  same day that you took Wrubaleski's?
22    A.   Yes; I took this statement first.
23    Q.   Did they come in together?
24    A.   They might have; I'm not a hundred

95

1  percent sure.
2    Q.   Is this also a statement where you
3  transcribed the statements or comments made to you
4  by Milliard into a written document for him to
5  sign?
6    A.   Yes, sir.
7    Q.   He didn't come in with a statement?
8    A.   No, sir.
9    Q.   You crafted the statement and he signed
10  it in your office?
11         MS. LYNCH:  Objection; you can
12  answer.
13         THE WITNESS:  I didn't craft it.  He
14  told me this.  These are his words.
15    Q.   (BY MR. GREEN)  But you're the one that
16  took his statements and converted them into a
17  writing and put them on the paper, right?
18    A.   Yes.
19    Q.   And then he signed it on the second
20  page?
21    A.   After he read it; yes.
22         MR. GREEN:  16.
23         (Plaintiff's Deposition Exhibit
              No. 16 offered and marked.)
24

96

1    Q.   (BY MR. GREEN)  If you could look at
2  what's been marked as Exhibit 16.  Do you
3  recognize that document? (Indicating.)
4    A.   I do.
5    Q.   With respect to which event does that --
6  is that your writing?
7    A.   It is.
8    Q.   It has the name of Tom Ralph on it.
9  Does it reflect a meeting between yourself and Tom
10  Ralph?
11    A.   Yes, sir.
12    Q.   To which of the three incidents does
13  this one refer?
14    A.   The first -- under his name, the first
15  statement or line, it refers to the Greenwood
16  case.
17    Q.   Okay.
18    A.   The second one refers to the Mayotte
19  case.
20    Q.   This is referring to two distinct
21  incidents?
22    A.   Yes.
23    Q.   The top line, what did you take that to
24  mean?

**109**

1    A.   I don't recall Ms. Leal being at the
2    Courthouse.
3    Q.   Would it have been -- were you aware
4    that Greenwood's attorney had requested the
5    personnel records of Sergeant Bolduc for
6    consideration by the District Court in resolution
7    of his case?
8    A.   No.
9    Q.   Was it in your capacity as chief,
10   because in November of 2004 you were the interim
11   chief or provisional chief at that point, were you
12   not?
13   A.   Yes, sir.
14   Q.   Was it common practice for you to attend
15   District Court sessions as the Court officer for
16   the Department?
17   A.   I did it on occasion; yes.
18   Q.   How often would you do it?
19   A.   It wouldn't be that often.  Just when
20   the Court officer wasn't there.
21   Q.   Were you consulted -- do you recall
22   being there in November of 2004 for the
23   disposition of Greenwood's case before the East
24   Brookfield District Court?

**110**

1    A.   Yes, sir; I was.
2    Q.   Were you consulted as to the disposition
3    that Greenwood would receive by the district
4    attorney?
5    A.   I spoke with the district attorney.
6    Q.   As a result of the appearance that day,
7    are you aware of what the disposition was for
8    Greenwood?
9    A.   No; I don't.  I can't say.  I know there
10   was some charges dismissed but I don't know the
11   disposition.
12   Q.   At a later point in time, in fact
13   specifically at the civil service hearings that
14   were conducted in Boston involving Sergeant
15   Bolduc's appeal to the Civil Service Commission,
16   did you obtain the testimony of Greenwood to be
17   entered as evidence against Sergeant Bolduc?
18   A.   Yes.
19   Q.   Did you in fact solicit that testimony
20   from him at the Worcester County House of
21   Correction?
22   A.   I did.
23   Q.   Do you have a recollection of Sergeant
24   Bolduc being referred for assessment by Leo

**111**

1    Polizoti?
2    A.   Yes, sir.
3    Q.   At whose initiative was that reference
4    done?  Was that by you?
5    A.   I don't believe so.
6    Q.   How did that happen to take place?
7    A.   I believe myself and Ms. Leal had a
8    conversation and we -- it was brought up to send
9    him for a fit-for-duty screening.
10   Q.   Was it a common practice -- was it a
11   standard practice of the Webster Police Department
12   to refer officers for a fit-for-duty screening?
13   A.   I guess it's not a practice but it has
14   happened.
15   Q.   Can you recollect any other officers
16   aside from Sergeant Bolduc that had been referred
17   to a fit-for-duty screening by the Webster Police
18   Department?
19   A.   I can.
20   Q.   Whom might they be?
21   A.   Can I say?
22        MS. LYNCH:  Do you need to talk to
23   me?  Can I just have a moment with him?
24        MR. GREEN:  Sure.

**112**

1        (A recess was taken.)
2    Q.   (BY MR. GREEN)  Do you want me to
3    restate that question?
4    A.   Please.
5        MR. GREEN:  Could you read that
6    back?
7            (Reporter read back as
            requested.)
8
9        THE WITNESS:  Can we go back further
10   than that?
11           (Reporter read back as
            requested.)
12
13       THE WITNESS:  I believe I answered
14   yes.
15       At this time I don't feel comfortable
16   under the HIPA rule that I should refer to any
17   other officer by name and for where they went or
18   what they went for.
19   Q.   (BY MR. GREEN)  Well, without reference
20   to -- were any other additional officers referred
21   for that purpose during your tenure as acting
22   chief?
23   A.   For what purpose?
24   Q.   A fit-for-duty evaluation?

113

1    A.  No.
2    Q.  Sergeant Bolduc -- was the decision to
3 refer Sergeant Bolduc for a fit-for-duty
4 evaluation one made by you?
5    A.  It probably came up from me to the town
6 administrator.  I'm not a hundred percent sure.
7    Q.  Do you recall having any conversations
8 with Leo Polizoti regarding Sergeant Bolduc?
9    A.  I had contacted him on the phone to
10 probably schedule the appointment; yes.
11    Q.  Did you provide -- did you have any
12 other contact with him aside from establishing the
13 time and place of the appointment for Bolduc?
14    A.  Verbal contact?
15    Q.  Any form of contact.
16    A.  I had submitted a letter giving why I
17 was sending Sergeant Bolduc to be evaluated.
18        MR. GREEN:  If we could mark this
19 as 21.
20        (Plaintiff's Deposition Exhibit
          No. 21 offered and marked.)
21
22    Q.  (BY MR. GREEN)  Sergeant, I'm going to
23 show you what has been marked as Exhibit 21 which
24 consists of five pieces of paper and ask if you

114

1 recognize the cover letter as being the letter
2 that you sent to Doctor Polizoti? (Indicating.)
3    A.  With all this writing on it?
4    Q.  No; just the typed context and the
5 signature, is that the letter you sent?
6    A.  (Witness examining document.)  Yes.
7    Q.  Look at the second page.  Is that a
8 continuation of what you attached to that letter,
9 again without reference to the marginal notations?
10    A.  Yes.
11        MS. LYNCH:  Or any of the
12 underlining and so forth.
13    Q.  (BY MR. GREEN)  Or any of the
14 underlinings and anything of that sort?
15    A.  Yes.
16    Q.  Going to the next page, I'm assuming
17 that is not something you attached to that letter?
18    A.  Never saw it.
19    Q.  Looking at the final two pages, are
20 those attachments that you provided Doctor
21 Polizoti?
22    A.  I don't know if these were the
23 originals.  I can't say.
24    Q.  Did you attach some pictures?

115

1    A.  I attached pictures, yes, of Abbe and
2 Greenwood and probably Mayotte.
3    Q.  But you can't say with any certainty
4 that those are the pictures that you attached?
5    A.  No.
6    Q.  Looking at the text of your -- I'm just
7 going to -- I'd like you to just read the first
8 sentence of the second paragraph and ask what it
9 is that -- just read it out loud and then explain
10 what it is that you were trying to convey to
11 Doctor Polizoti by that statement?
12    A.  The first sentence?
13    Q.  The first sentence of the second
14 paragraph?
15    A.  I put in there, "Sergeant Bolduc is very
16 educated and knowledgeable individual who can say
17 the right things when needed."
18    Q.  What was -- what do you mean by -- what
19 was your suggestion to Doctor Polizoti about
20 saying the right things when needed?
21        MS. LYNCH:  Objection; you can
22 answer.
23        THE WITNESS:  Well, John, like I
24 said in the beginning, he's very educated, he's a

116

1 very knowledgeable person.  He's a smooth talker.
2 I think he can sit here and talk to you and he's
3 very -- to listen to him, you can tell he's smart
4 and I think if you ask him a question, he can tell
5 you the answer in a round-about way of what you
6 want to hear.
7        I know he goes on forever but basically
8 he'll tell you what you want to know.
9    Q.  (BY MR. GREEN)  Did you ever have any
10 verbal conversations with Doctor Polizoti after
11 sending him in letter?
12    A.  I think we might have had one
13 conversation; I'm not a hundred percent sure.  I
14 think there was one conversation and Doctor
15 Polizoti said to me if it is in fact true of what
16 he was charged with then he should not come back
17 to duty.
18        I believe that's what it was in his
19 medical evaluation also.
20    Q.  Do you recall when that conversation
21 would have taken place?
22    A.  I don't.
23    Q.  But it would have been after January 4,
24 2004 obviously?

# EXHIBIT 11

TO:       Steven Boudreau, Webster Town Administrator

FROM:   Webster Police Sergeant John Bolduc, Jr.

DATE:    May 15, 2003

Re:        Intimidation complaint


Sir:

This is to inform you that I have filed an intimidation complaint with the Massachusetts
Commission Against Discrimination (MCAD). I believe that I have been and continue to
be the target of retaliation by Webster Police Chief Richard Bergeron, Jr., as I have been
identified as a witness in a pending MCAD Investigation.

I am also appealing to you for relief as I anticipate further negative actions on the part of
Chief Bergeron. Please consider the attached three-page narrative as evidence of said
retaliation.

I will make myself available to you should you want to speak with me or if you require
more information. You can reach me at 508-943-9907 (home) or ~~508-326-1078~~ (cell).

### Complaint Narrative

On Tuesday 04/15/03 at approximately 15:35 hours I stopped at Chief Bergeron's office. His office door was open. He was seated at his desk. I lightly knocked on his door as I entered his office. As I entered I asked, "Chief, can I have a couple of minutes?"

He immediately stood up and removed his eyeglasses. It was obvious to me by his appearance and demeanor that he was very angry. As I stood across the desk from him, he snapped, "You got no fuckin' loyalty. You walk around with your tongue stuck up the Deputy Chief's ass because you think he's going to be the fuckin' Chief and you're going to end up with a good job. Let me tell you something, he's not going to be the Chief here. He's got no balls. He sends out emails, memos, and policies then he runs away and fuckin' hides. And you, you'll never be a Chief. You got more balls than you got brains. I got one guy with no balls and I got one guy with too much balls. Your friendship, support, and loyalty of the Deputy Chief is going to cost you."

I did not respond right away as I was taken by surprise. Chief Bergeron then picked up a letter from his desk. He held it in front of me. He asked, "Did you know about this? You must have collaborated on this. He didn't do this on his own. He must have told you about this."

I responded with, "Chief, what is it?"

He then handed me the letter and instructed me to read it. As I read it I learned that it was a letter from Deputy Chief Thomas Ralph to Chief Bergeron regarding Officer Brian Barnes. The nature of the letter was a complaint against Officer Barnes outlining incidents of racial bigotry. I informed Chief Bergeron that this was the first I knew of the letter. Chief Bergeron then informed me that the language used in the letter was "downtown." He took exception with a section in the letter, which requested a response within fourteen (14) days of receipt. He then informed me, "That's a Stankiewicz trick."

My only response was, "Chief, I don't know."

He was also angry because he stated that he could not contact Deputy Chief Ralph after he (Ralph) gave him (Bergeron) the letter. I then tried to explain that Deputy Chief Ralph, Officer Derrick Stokes, and I had met with John Bish at his (Bish) office in the East Brookfield Courthouse, then the four of us went to lunch together, and that East Brookfield and Spencer are out of portable radio range and provides an incredibly poor Nextel signal. Chief Bergeron then called me a liar and told me to not try to cover for him (Ralph).

It was at that point that the conversation became unpleasant from both of us. The conversation, heated at times, lasted until approximately 18:05 hours. After exiting the Chief's office, I left the station.

On or about Thursday 04/17/03 Deputy Chief Thomas Ralph informed me that he was ordered to supply Chief Bergeron the names of all witnesses, in writing, in the complaint against Officer Barnes. He further informed me that my name would appear on the list as a witness.

On Thursday 05/01/03 at approximately 16:30 hours I stopped at Chief Bergeron's office to brief him on an investigation that Officer Stokes and I were working. I knocked on his door, which was open, however this time I asked permission to enter before doing so. He told me to enter. Once inside he said, "So I guess you feel threatened huh? I understand that I threatened you? How did I threaten you?"

I reminded him that he informed me that my friendship, support, and loyalty to Deputy Chief Ralph were going to cost me. He then said, "Oh yeah? Cost you how?"

I replied, "I don't know Sir. Those are your words, not mine."

He then said, "So you think Brian Barnes is a racist. Have you ever heard him say anything racist? Labeling someone a racist is a big problem. Going to paper and calling someone a racist is a big problem. If I asked you if you ever heard Brian Barnes make any racial comments, what would you say?"

I answered, "Yes. I have."

He snapped, "Then you're the only one. You're the only person I have talked to that has said yes. I've talked to people at the school, business people, everyone. You're the only person. I want a written statement. I want names, I want dates, I want times. I want it in writing."

I then said, "Chief, there are other people, but they're not going to tell you. People are afraid of you. People are afraid that if they say yes, you'll jump all over them."

The Chief replied, "Oh yeah? Who? Give me some names. Like who?"

I said, "Your secretary (Lee Olmstead), Pam Leduc (Town Accountant), Heidi, though she'd never admit it (Town Administrator's Secretary), Phil Charbonneau (Junior High School Principle)."

He then ordered me to put it in writing.

On Monday 05/12/03 at approximately 14:30 hours Chief Bergeron came to my office located in the lower level of the station. As I was conversing with Officer Stokes, Chief Bergeron entered and said, "John, I told you to write a narrative regarding the complaint against Brian Barnes. Did you do it?"

I informed him that I had, I took it from a folder, and handed it to him.

2

He read it and then said, "Billy (Sgt William Keefe) complained to me that he is having scheduling problems. I'm pulling both of you back into the rotation (meaning that Stokes and I are to report to our uniformed patrol duties).

I responded, "Okay. Effective when Sir?"

He replied, "Immediately." He then left my office.

Officer Stokes then said, "It's a good thing you did it. He didn't look happy."

*It should be noted that I had a conversation with Sgt. Keefe on Thursday 05/08/03 about the rotation schedule. At that time we agreed that if there were a day that the 11:00pm to 7:00am shift was short personnel, Stokes and I would report for duty on said shift and then resume our investigation when able.*

*It should be further noted that the aforementioned investigation is the Andrew Amato case. It is a 25 year-old missing child cold case. I have been the lead investigator on this case since 1997. It has been past practice that as new leads develop; I work the case until said leads are exhausted. It is at this time that Officer Stokes and I have a series of confessions and a general burial site. This is the most advanced this case has ever been to date.*

After I had left the station, I telephoned Chief Bergeron and asked him if Officer Stokes could finish out the week on the Amato case and that I would return to uniform patrol duties. He agreed.

On Wednesday 05/14/03 I learned that Chief Bergeron and Webster Reserve Police Officer Alfred Beland met with John Stevens. Stevens is a former Webster Reserve Police Officer Stevens is currently employed as a Massachusetts State Police Dispatcher and is a Southbridge (MA) Reserve Police Officer. Stevens will testify that Chief Bergeron and Beland offered to reinstate Stevens as a Webster Reserve Officer if he was able to provide them with any negative information concerning Deputy Chief Ralph or myself.

I am convinced that the actions of Police Chief Richard Bergeron are strictly retaliatory against me for bearing witness against Officer Brian Barnes, for supporting Deputy Chief Thomas Ralph, and further, that the information contained in the aforementioned narrative clearly support such claim.

Respectfully submitted,


Sgt. John Bolduc, Jr.

# EXHIBIT 12



EXHIBIT

Ralph 1
CSO 98.06

## The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone: (617) 994-6000 Fax: (617) 994-6024

---

MCAD DOCKET NUMBER: 03BEM01122        EEOC/HUD CHARGE NUMBER: 16CA301562
FILING DATE: 05/01/03                VIOLATION DATE: 05/01/03

---

Name of Aggrieved Person or Organization:
Thomas V. Ralph
11 Chestnut Hill Dr.
Webster, MA 01570
Primary Phone: (508)949-7976 ext. ____

---

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Town of Webster Police Department
C/O Town Administrator
Town Hall
Main Street
Webster, MA 01570
Primary Phone: (508)949-3800 ext. ____

Richard Bergeron, Jr.
Town of Webster Police Department
57 Thompson Road
Webster, MA 01570
Primary Phone: (508)943-1212 ext. ____

No. of Employees:        25+

Work Location: Webster

---

Cause of Discrimination based on:
Other, Paragraph 4, Retaliation.

---

**The particulars are:**
I, Thomas V. Ralph, the Complainant believe that I was discriminated against by Town of Webster Police
Department, Richard Bergeron, Jr., on the basis of Other. This is in violation of M.G.L. 151B Section 4
Paragraph 4 and Title VII.

I have been employed by Respondent for seven years, most recently as Deputy Chief of Police.  I have
always performed my job well and have never had any previous disciplinary problems.  On or about April
15, 2003 I filed a formal complaint with the Chief of Police against Officer Brian Barnes after other
officers had complained to me about his use of racially derogatory statements.  The basis for the complaint
was that on numerous occasions, Officer Barnes has referred to African Americans as 'niggers', Asian
Americans as "chinks", and Hispanic people as 'spics'.  I also stated that Officer Barnes is non-compliant
with the Racial Profiling law, which requires Officers to state the race of the operator when they stop a
vehicle.  Immediately upon handing Chief Bergeron the formal complaint, I was told to leave the station.
Upon information and belief, Bergeron and Barnes are close friends.  Chief Bergeron brought Officer
Barnes with him when he transferred from the Quincy Police Department.  After I was told to leave the
station, I went to the Town Administrator, Mark Stankiewicz, but it was his last day.  He told me that there
was nothing he could do for me at that point.  I then went to Worcester to find Sergeant Budrow (next in

---

MCAD Docket Number 03BEM01122, Complaint

line to me) to inform him of the situation. I was unable to find him and returned to the station after attending an unrelated meeting. When I got to the station, Chief Bergeron ordered me to turn in my vehicle (which I have had for over 6 years). In fact, the board of selectman has required that the Deputy Chief of Police be issued a vehicle. I went home an hour and a half early that day because the situation made me feel sick. I also took two personal days and one owed day (time off for previously worked time) off. For the first time in my career, Chief Barnes questioned me about who authorized this time off. On or about April 16, 2003, I faxed a letter to Chief Bergeron inquiring about my status. I received a letter the next day from Bergeron stating that my status was undecided and under investigation. Chief Bergeron left on vacation and I returned to work. I was told from several officers that Bergeron had told Barnes to inform the Department that one of my subordinates, Sergeant Keefe had been left in charge. The investigation that I am under stems from a two month old allegation. Officer Barnes has alleged that I gave the answers of a placement test to a candidate for Sergeant the night before he was to take the test. The test was in or about June 2002, and the allegations came up in or about March 2003. Officer Barnes made these allegations after I had reprimanded him on an unrelated matter. Nothing was done, and Chief Bergeron told me that he wanted nothing to do with the allegations. However, after I lodged a formal complaint against Officer Barnes, the allegations conveniently became important to Chief Bergeron. Further, there is no formal complaint lodged against me to this day, yet I am being investigated while Barnes is not. I have been told from people within the Police Department and a member of the Board of Selectmen that Chief Bergeron is looking for ways to have me demoted and possibly terminated. I believe that this adverse action is in retaliation to the formal complaint I lodged about Officer Barnes' inappropriate and racially derogatory statements

-----------------------------------------------------------------------

(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 5/1/2003.

NOTARY PUBLIC: Jeannine K Rice

SIGNATURE NOTARY PUBLIC:

MY COMMISSION EXPIRES: 05/09

# EXHIBIT 13

The Commonwealth of Massachusetts
Commission Against Discrimination
436 Dwight Street, Rm. 220 , Springfield, MA 01103
Phone: (413) 739-2145 Fax:

**RECEIVED**

8/11/2003

Webster Police Department
Richard Bergeron, Jr., Police Chief
57 Thompson Road
Webster, MA 01570

**AUG 19 2003**

TOWN OF WEBSTER
ADMINISTRATOR

RE: John Bolduc  vs. Webster Police Department
MCAD Docket Number: 03SEM01779
EEOC/HUD Number: 16CA302081

Dear Respondent Party:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD) has received the above referenced complaint of discrimination which alleges that you have committed an act of discrimination. A copy of that complaint is enclosed.

State law requires the Commission to impartially review the allegations in that complaint. The Commission has assigned one of its staff, Karen Dome, to investigate the complaint. This MCAD investigator will keep the parties informed of developments arising from that investigation.

State law requires that you submit a formal written answer to the complaint in the form of an affirmed Position Statement. This written answer should be submitted to MCAD Investigator within twenty-one (21) days of receipt of this notification. In addition, the Position Statement must be notarized. A copy must also be forwarded to the Complainant at the address listed on the enclosed complaint.

Please note that you must include in the Position Statement one of the following statements:

I am (or Respondent is) represented by an attorney in this matter.
          -OR-
I am (or Respondent is) not represented by an attorney in this matter.

Failure to submit an accurate statement may result in adverse action being taken against you as the Respondent. Please note that if your representational situation changes, you must notify the Commission immediately.

It is our policy to determine whether the parties are willing to consider a rapid, informal and voluntary resolution of this dispute. The Commission encourages such resolutions as an alternative to the often lengthy and expensive litigation process. To discuss the possibility of settlement, please contact the Investigator named below.

If you have any questions pertaining to the Investigation, please contact Karen Dome at (413) 739-2145 x 106.

Sincerely,

Karen Dome
Investigator

MCAD Docket Number 03SEM01779, Serve Respondent – Without Investigative Conference

# EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Webster Police Department
Richard Bergeron, Jr., Police Chief
57 Thompson Road
Webster, MA 01570

Person Filing Charge:
This Person (Check One):

Date of Alleged Violation:
Place of Alleged Violation:
EEOC Charge Number:
MCAD Docket Number:

John Bolduc
(x) Claims to be aggrieved
( ) Is filing on behalf of

05/12/03
Webster,
16CA302081
03SEM01779

## NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY PROCESS (See Attached Information Sheet For Additional Information)

You are hereby notified that a charge of employment discrimination under
[X] Title VII of the Civil Rights Act of 1964
[ ] The Age Discrimination in Employment Act of 1967 (ADEA)
[ ] The Americans Disabilities Act (ADA)
Has been received by
[ ]     The EEOC and sent for initial processing to     MCAD
                                                        (FEP Agency)
[X]     The Mass. Commission Against Discrimination
        (FEP) Agency and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon the expiration of any deferral requirements if this is a Title VII or ADA Charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

[X]     As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's issuing a final finding and order. If the agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained on the second page of this form apply.

For further correspondence on this matter, please use the charge number(s) shown.

[ ]     An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the Commission concurrently with the Agency's investigation of the charge.
[X]     Enclosure: Copy of the Charge

Basis of Discrimination
( ) Race              ( ) Color          ( ) Sex          ( ) Religion
( ) Age               ( ) Disability     (x) Retaliation  ( ) Other          ( ) National Origin

Circumstances of alleged violation:
        SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

EEOC Charge Number 16CA302081, EEOC Transmittal Letter to Respondent

| Date | Type Name/Title of Authorized EEOC Official | Signature |
|---|---|---|
| 7/11/2003 | Robert L. Sanders, Director | |

EEOC Charge Number 16CA302081, EEOC Transmittal Letter to Respondent

**Discrimination Complaint**
Massachusetts Commission Against Discrimination And EEOC

FEPA No.: 03-23-01779    Filing Date: 6/14/03
EEOC No.: 16CA302081    Violation Date: April 15, 2003

RECEIVED

JUN    2003

COMMISSION AGAINST
DISCRIMINATION/SPRINGFIELD

**Name of Aggrieved Person Or Organization:**
John Bolduc
P.O. Box 326
Webster, MA 01570

Telephone Number: (508) 943-9907
Home:
Business: (508) 326-1078

**Named is the Employer, Labor Organization, Employment Agency, or State/Local Government Agency Who Discriminated Against Me:**
Webster Police Department
57 Thompson Road
Webster, MA 01570

Number of Employees: 25+
Telephone Number: 508-943-1212

Webster Police Chief
Richard Bergeron Jr.
57 Thompson Rd.
Webster MA 01570

**Cause of Discrimination Based On:** Retaliation
**The Particulars Are:**

On May 12, 2003, the Webster Police department has subjected me to unequal terms and conditions in my employment in retaliation for being a witness in a discrimination case against the Webster Police Department. Police Chief Bergeron, has interfered with my civil rights, granted and protected by law, by changing my rotation schedule from days to nights in the middle of an investigation. Chief Bergeron has created a hostile environment with intimidation and unequal treatment. I believe the respondent's conduct violates M.G.L.C. 151B s4(4), (4a) and Title VII of the 1964 Civil Rights Act, as amended.

1.) I have been a police officer with the Webster Police Department since March 1995. I have held the rank of Sergeant since October 2001.
2.) On April 15, 2003, I went to see Chief Bergeron and he immediately started to raise his voice, use profanity directed against me, and threaten me.
3.) On April 17, 2003, Deputy Chief Thomas Ralph, informed me that my name would appear on the list as a witness in his discrimination suit against the Webster Police Department.
4.) On May 1, 2003, Webster Deputy Police Chief, Thomas V. Ralph, filed a discrimination claim against the Webster Police Department alleging race discrimination.
5.) On May 12, 2003, I was informed that my scheduled duty of working days was changed to nights, effective immediately. Being pulled back into rotation to uniformed patrol duties during an ongoing investigation is not common practice.
6.) On May 14, 2003, I learned that John Stevens, a former Webster Reserve Police Officer, was told by Chief Bergeron that he would be reinstated if he was able to provide the chief with any negative information concerning myself or deputy chief Ralph.
7.) On or about May 15 2003, officer Brooks and officer Kehoe of the Webster Police Department, informed me that Chief Bergeron had questioned them as to whether I was involved at any time in any mistreatment of prisoners that they knew of.

8.) On May 19, 2003, I was informed via e-mail by Chief Bergeron that I was to exit the office I have had for the last three years, and relinquish all keys to him by end of business day. I am a patrol supervisor and have investigative duties. I am also the Domestic Violence Coordinator, Liaison Sergeant to the Reserve Police Unit, and the Department Training officer. Since losing my office, I have been forced to continue performing my duties from my home. Patrolmen lower in rank have an office to work out of. Being home for too long a period of time on duty is against regulations. I am concerned that I will lose my job as a result of this.

9.) I believe the reason these actions are being taken against me are in retaliation for participation and assisting in proceedings of opposing discriminatory practices.

I ALSO WANT THIS CHARGE FILED WITH EEOC: xx
I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.
I SWEAR OF AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Sgt. John Bolduc, Jr.

SWORN TO AND SUBSCRIBED BEFORE ME THIS _1st_ DAY OF _June_ 2003

NOTARY PUBLIC

My Commission Expires: / /

SHERRIE L. CONDOS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 26, 2009

# EXHIBIT 14

# IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

# DEPOSITION OF:

JOHN BOLDUC
DATE:  SEPTEMBER 13, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

JOHN BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC                    SEPTEMBER 13, 2006

VOLUME II - 215

1    JOHN BOLDUC, the Deponent, having been
2  previously satisfactorily identified by the
3  production of his driver's license and having been
4  first duly sworn by the Notary Public, deposes and
5  says as follows:
6                    *****
7    DIRECT EXAMINATION BY MS. LYNCH (CONT'D)
8    Q.   Mr. Bolduc, since our last deposition,
9  have you done anything to further prepare for
10  today's deposition?
11    A.   Just speak with my attorney.
12    Q.   Other than your attorney?
13    A.   No.
14    Q.   Have you reviewed any documents?
15    A.   No.
16    Q.   Have you spoken to Thomas Ralph about
17  his deposition?
18    A.   Only to ask how things went.  He said he
19  felt good; he thought it was positive.
20    Q.   Other than just telling someone that you
21  were coming here, did you speak with anyone else
22  substantively about your deposition?
23    A.   No.
24    Q.   I want to draw your attention to the

VOLUME II - 216

1  Catherine Abbe incident that occurred on
2  November 30th, 2003.
3       First of all, can you tell me how you
4  ended up being involved with her in terms of the
5  photographing?
6    A.   I was the shift sergeant and as the
7  booking process was taking place I entered the
8  booking room.
9    Q.   Why did you get involved, though, with
10  regard to the photographing?
11    A.   There were four officers -- Difusco,
12  Young, Melendez, and myself -- that were involved
13  at the scene and then from the scene to the
14  station so from the call of service to the booking
15  all of us were involved.
16    Q.   But in other words why did you place
17  your hands on her face or her head as part of the
18  photographing?
19    A.   To still her head for the picture -- for
20  the booking photo.
21    Q.   What was she doing, though, that you
22  felt that you should do that?
23    A.   She has long hair -- had long hair.  She
24  would look toward the floor away from the camera

VOLUME II - 217

1  with her hair in front of her face.
2    Q.   Did she appear to be embarrassed?
3    A.   No; she appeared angry.
4    Q.   Did you or anyone else as far as you
5  know instruct her to keep her head still and face
6  forward or something of that nature before you put
7  your hands on her?
8    A.   Yes.
9    Q.   What exactly was said?
10    A.   Officer Difusco was directing her to
11  look at the camera.  She wasn't -- either Officer
12  Young or Officer Melendez also directed her.  I
13  told her that we had to take a picture.  I
14  directed her to look at the camera and cooperate
15  with the officer.
16    Q.   How much time was actually spent
17  directing her to look at the camera on her own
18  before you interceded?
19    A.   Approximately five or six minutes.
20    Q.   When you did become involved what
21  exactly did you do?
22    A.   I put on my duty gloves, informed her
23  that we had to take a booking photo, to look at
24  the camera or I would hold her head so we could

VOLUME II - 218

1  take the picture.
2    Q.   Did she respond at all?
3    A.   I think she swore at us.
4    Q.   And then what did you do?
5    A.   I stepped forward, steadied her head,
6  Officer Difusco took a picture.  I stepped back,
7  Officer Difusco said that her eyes were closed so
8  I told her that to again cooperate or we would be
9  here all night doing that.
10    Q.   What was her response?
11    A.   Again yelling, swearing, uncooperative.
12    Q.   Then what did you do next?
13    A.   Same thing -- stepped forward, steadied
14  her head.
15       Officer Difusco said that her eyes were
16  closed so I put two fingers on her eyebrows and
17  raised the eyelids.
18    Q.   Then what happened?
19    A.   I stepped back.  Officer Difusco said
20  that he needed a picture.  Again I instructed her
21  to do that.  She said fine, take your picture or
22  take your f'ing picture and that was the end of
23  it.
24    Q.   Are you saying that another picture was

VOLUME II - 219

1  taken without your hands on her?
2      A.  Yes.
3      Q.  Is that the one that actually was used
4  for her mugshot or her booking photo?
5      A.  Her booking photo I believe, yes.
6      Q.  Do you use the term mugshot?
7      A.  You can.  We don't but you can.
8      Q.  As far as you know there were three
9  photographs taken and the third one was the one
10 that was used for the booking photo?
11     A.  Yes.
12          (Defendant's Deposition Exhibit
            No. 13-14 offered and marked.)
13
14     Q.  (BY MS. LYNCH)  I'm going to show you
15 what's been marked as Exhibit 13 and Exhibit 14.
16 If you could take a look at those, please?
17 (Indicating.)
18     A.  (Witness examining document.)
19     Q.  Are those the two photographs that were
20 taken when you had your hands on her?
21     A.  Yes.
22     Q.  As far as you know there are no other
23 photographs taken of her with your hands on her?
24     A.  I don't believe so; no.

VOLUME II - 220

1      Q.  Was she crying at all or showing any
2  type of -- well, strike that.
3          Was she crying at all when you had your
4  hands on her?
5      A.  The entire time.
6      Q.  She was crying?
7      A.  The entire time since her arrest at the
8  scene.
9      Q.  Do you know if she had any prior record?
10     A.  I believe there were domestic charges,
11 drunk and disorderly type charges in the past.
12     Q.  Against her?
13     A.  Yes.
14     Q.  What was she arrested for this
15 particular evening of November 30th, 2003?
16     A.  I believe it was disorderly person,
17 assault and battery on a police officer, resisting
18 arrest.
19     Q.  Who was the police officer that was the
20 subject of the A & B charge?
21     A.  Officer Difusco.
22     Q.  Was she arrested at her own house?
23     A.  Yes.
24     Q.  What exactly did she do to Officer

VOLUME II - 221

1  Difusco?
2      A.  I believe she struck him.
3      Q.  Do you know where?
4      A.  No.
5      Q.  And with what?
6      A.  No.
7      Q.  Do you know what the outcome of those
8  criminal charges were?
9      A.  No.
10     Q.  The duty gloves, those are what's on
11 your hands in Exhibit 13 and 14?
12     A.  Yes.
13     Q.  When do you wear those?
14     A.  Typically when I was going to search
15 something or somebody.  If I was to have physical
16 contact with someone, wintertime more often as far
17 as weather protection as well.
18     Q.  Why did you decide to put your hands on
19 her as opposed to putting her in the cell until
20 she was cooperative with the photographing
21 process?
22     A.  By instructing her to do that for police
23 to be effective we've got to be able to maintain
24 control to show that we would maintain control

VOLUME II - 222

1  that the photograph would be taken.
2      Q.  Were you definitely present when that
3  third photograph was taken or when other
4  photographs were taken that were used as the
5  booking photograph?
6      A.  Yes.
7      Q.  Before that third photograph was taken
8  did you believe that Exhibit 13 and 14 were going
9  to be the booking photographs?
10     A.  Yes.
11     Q.  Had you ever seen a booking photograph
12 like these before with someone's hands on the
13 face?
14     A.  Someone's hand on a neck; yes.
15     Q.  Is that common in doing booking
16 photographs, for an officer's hands to be placed
17 on the detainee for purposes of taking the booking
18 photograph?
19     A.  Yes.
20     Q.  How often does that happen?
21     A.  Depending upon the Department and the
22 situation, I can't begin to guess; I don't know.
23     Q.  When you were at the Webster Police
24 Department can you think of any other time when

VOLUME II - 231

1  you think you could have done?
2      A.  Yes.
3      Q.  What is that?
4      A.  In all of my hearings I've testified
5  that the idea of not allowing her to be bailed by
6  placing her in the cell and not allowing her to be
7  bailed until she took a photograph I thought was a
8  good idea.
9      Q.  Was anyone else present in the room
10 besides you, Ms. Abbe, and Officer Difusco when
11 the photographs were taken with your hands on her?
12     A.  Officer Melendez.
13     Q.  He was present?
14     A.  Yes.
15     Q.  Anyone else?
16     A.  Officer Young was standing in the
17 doorway.
18     Q.  Did any of them say anything in an
19 effort to deter you from placing your hand on her?
20 In other words, did any of them say they didn't
21 think it was a good idea to place your hands on
22 her?
23     A.  No.
24     Q.  Or anything of that nature?

VOLUME II - 232

1      A.  No.
2      Q.  At the hearing that you had before
3  Ms. Leal and the Civil Service hearing, did any of
4  those officers testify in your behalf?
5      A.  Officer Melendez.
6      Q.  Did either Officer Young or Difusco
7  testify at the hearings?
8      A.  They did.
9      Q.  Did they testify for the Town?
10     A.  For the Town; yes.
11     Q.  What is your understanding as to how
12 these photographs Exhibit 13 and 14 surfaced
13 within the Department?
14         In other words did you become aware that
15 Acting Chief Keefe received the photographs?
16     A.  Yes.
17     Q.  What is your understanding as to how he
18 got them?
19     A.  From Officer Difusco.
20     Q.  What do you know about that?
21     A.  As far as?
22     Q.  How he got those?
23     A.  Officer Difusco had them on a disk and
24 he either gave them to or left them for Acting

VOLUME II - 233

1  Chief Keefe.
2      Q.  Did you ever have any discussion with
3  Officer Difusco about that -- his giving the
4  photographs to Acting Chief Keefe?
5      A.  Briefly.
6      Q.  What was that discussion?
7      A.  Officer Difusco came to me after Tom
8  Ralph's hearing in December of '03, said that he
9  was being teased by officers so he gave Acting
10 Chief Keefe the photographs.
11     Q.  Did he tell you anything else about the
12 teasing and who was doing it?
13     A.  No.
14     Q.  In other words exactly what was said?
15     A.  He had said to me that officers were --
16 at the shift break -- were laughing at him and
17 asking about a new booking procedure or something
18 that they didn't hear about or something to that
19 effect.
20     Q.  Did you ever tell Acting Chief Keefe
21 that the photographs were no big deal because you
22 spoke to Ms. Abbe's family or anything similar to
23 that?
24     A.  Yes.

VOLUME II - 234

1      Q.  What exactly -- what was that
2  discussion?
3      A.  Acting Chief Keefe showed me the
4  photographs that Officer Difusco had left for him
5  or the disk and he brought it up on the -- on his
6  computer in his office.
7          We looked at them and I had said to him
8  I didn't think it was any big deal at all, that
9  she was not hurt or being hurt.
10         At Hubbard Hospital her brother-in-law,
11 who is a retired Webster police sergeant, pulled
12 up alongside me in a pickup truck as I was walking
13 in the parking lot.  He was laughing.  He said, "I
14 see you met my sister-in-law," said something
15 along the lines of "she's a firecracker or a
16 spitfire," something to that effect and told me
17 that now I understood why, when there was a call
18 over there, he would have officers go in and he
19 would stay back and not get involved or not engage
20 her at all.
21     Q.  You mean when he was a police officer?
22     A.  When he was an officer and then a
23 sergeant.
24     Q.  What is his name?

VOLUME II - 235

1     A.   Roger Lebeau.
2     Q.   Did you specifically discuss the
3  photographs with him?
4     A.   No.
5     Q.   When you said that it was no big deal,
6  that you had spoken to the family, what were you
7  referring to?
8     A.   Roger --
9     Q.   (Interposing) The conversation that you
10  just mentioned?
11     A.   Yes.
12     Q.   When Acting Chief Keefe spoke to you
13  about these photographs did you bring up the
14  subject of your rights under the union -- anything
15  about Weingarten rights or anything like that?
16     A.   Yes.
17     Q.   What exactly was said?
18     A.   When I realized that Acting Chief Keefe
19  wanted to pursue this and some sort of wrongdoing,
20  I told him at that point that I was respectfully
21  enacting my rights under Weingarten.
22     Q.   Anything else that was said?
23     A.   No.
24     Q.   When you had your hands on her as shown

VOLUME II - 236

1  on Exhibit 13 and 14 were you putting pressure on
2  her face with your hands?
3     A.   I was holding her face.
4          (Defendant's Deposition Exhibit
5           No. 15 offered and marked.)

6     Q.   (BY MS. LYNCH)  Showing you what has
7  been marked as Exhibit 15, is that something that
8  you received prior to the hearing? (Indicating.)
9     A.   Yes.
10     Q.   You received that prior to the hearing
11  that Ms. Leal conducted, is that correct?
12     A.   I believe so.
13          (Defendant's Deposition Exhibit
            No. 16 offered and marked.)
14
15     Q.   (BY MS. LYNCH)  Showing you Exhibit 16,
16  is that something you received prior to the
17  hearing that Ms. Leal conducted? (Indicating.)
18     A.   I believe so.
19     Q.   With respect to the hearing that
20  Ms. Leal conducted with respect to the Jonah
21  Mayotte incident, the Heath Greenwood incident,
22  and the Catherine Abbe incident, when did you
23  first hear about that -- that there would be
24  charges brought?

VOLUME II - 237

1     A.   Those three incidents specifically by
2  name or just that something was being looked into?
3     Q.   Why don't we start from the first
4  information that you had?
5          Was it that something was being looked
6  into?
7     A.   Correct.
8     Q.   What were you told and who told you?
9     A.   I received a letter placing me on paid
10  administrative leave on December 12th, 2003 by
11  Town Administrator Leal and Acting Chief Keefe.
12     Q.   Did that letter state the reasons?
13     A.   For I believe it was looking into
14  excessive force but there were no specific
15  incidents outlined, just a vague possibly
16  two-paragraph letter or something to that effect.
17          (Defendant's Deposition Exhibit
            No. 17 offered and marked.)
18
19     Q.   (BY MS. LYNCH)  Showing you what's been
20  marked as Exhibit Number 17, is that the letter
21  that you received? (Indicating.)
22     A.   Yes.
23     Q.   Then what was the next thing that
24  happened?

VOLUME II - 238

1     A.   The next thing I believe was I was sent
2  for a psychological evaluation.
3     Q.   Had you ever been sent to any
4  psychological evaluations prior to that?
5     A.   Only when I was first hired.
6     Q.   Were you sent to Leo Polizoti?
7     A.   Yes.
8     Q.   Did you receive a copy of what was sent
9  to him prior to the examination?
10     A.   Yes; the letter.
11     Q.   Did you receive it before you went to
12  the examination?
13     A.   At the examination.
14     Q.   Was it Doctor Polizoti that gave it to
15  you?
16     A.   Yes.
17     Q.   First of all, can you describe what it
18  was that Doctor Polizoti gave you?
19     A.   It was a letter forewarning him of my
20  being very intelligent, knowing what to say to him
21  or having right answers or something to that
22  effect.
23     Q.   Was it a single page letter or was it
24  accompanied by other documents?

Case 4:04-cv-40170-FDS Document ... Filed ... Page 7 of 17

## VOLUME II - 243

1      MR. GREEN:  The next thing during
2 the examination?
3      MS. LYNCH:  Yes.
4      THE WITNESS:  After I was done
5 taking the written exams I had to go back and I
6 guess have more of an interview type of atmosphere
7 and go over the information that was in the tests
8 or what the tests meant and that sort of thing.
9      Q.  (BY MS. LYNCH)  Was that with Doctor
10 Polizoti?
11      A.  Yes.
12      Q.  In other words, when you had this exam
13 did you deal with any of his other staff members
14 at all or was it always with him?
15      A.  Always with him.
16      Q.  You had an interview with him after the
17 written exams.  Did the exam consist of anything
18 else?
19      A.  He said that he had the pictures of
20 Ms. Abbe, the 13 and 14.
21      Q.  You're referring to Exhibit 13 and 14?
22      A.  Yes; the exhibits that you showed me
23 today, 13 and 14, the pictures of Catherine Abbe;
24 that he conferred with I guess other psychologists

## VOLUME II - 244

1 or psychiatrists or someone involved with the
2 Worcester Police Department, said that he wasn't
3 concerned, that there were things in there that
4 indicated to him that he wasn't concerned with
5 them.
6      Q.  Do you recall anything else about the
7 examination?
8      A.  Only that he gave me this letter.
9      Q.  Which is Exhibit --
10      A.  (Interposing) I'm sorry, Exhibit 18 --
11 today's Exhibit 18; told me that it was his
12 opinion that it looked like the Town was trying to
13 set me up, take this letter that he gave me, asked
14 me if I had an attorney, told me to call him as
15 soon as I left his office, which I did.
16      Q.  Were those his exact words, that he
17 thought that the Town was trying to set you up?
18      A.  Yes.
19      Q.  At what point did he say that?
20      A.  At the end of the second day, at the end
21 of all of this.
22      Q.  Did he say why he was saying that to
23 you -- what that opinion was based upon?
24      A.  The letter from Acting Chief Keefe, the

## VOLUME II - 245

1 telephone call from Town Administrator Leal, his
2 interviewing and evaluating me.
3      Q.  And the letter is from Acting Chief
4 Keefe is what you're referring to?
5      A.  Yes.
6      Q.  What do you disagree with in that
7 letter?
8      A.  I don't believe that I have a temper
9 that ignites very fast.  I think that the overall
10 connotation to the letter is negative.
11      Q.  Anything else that you specifically
12 disagree with?
13      A.  I do.  The fact that the -- again the
14 letter in its entirety, the warning that he has to
15 be careful that I've got the -- some greater
16 hidden ability for deceit, that sort of thing.
17      I think that this is a very negative
18 letter.
19      Q.  Do you agree, though, with the statement
20 that you are very educated and a knowledgeable
21 individual?
22      A.  I believe so.
23      Q.  Do you agree that you were a good police
24 officer?

## VOLUME II - 246

1      A.  Yes.
2      Q.  Do you know who the other two sergeants
3 are that are referenced there?
4      A.  At this time there would only be two
5 sergeants left so through process of elimination
6 it would be Sergeant Bent, Sergeant Budrow.
7      Q.  Did you ever speak with them about the
8 reference to them in Exhibit 18?
9      A.  No.
10      Q.  Given that this Exhibit 18 states that
11 it was for Doctor Polizoti's eyes only do you know
12 why he gave it to you?
13      A.  He made some reference -- Doctor
14 Polizoti made some reference to James Bond and
15 that's when he said that he felt that the Town was
16 trying to set me up.
17      Q.  Before the examination was concluded did
18 he provide you with any information that he had
19 been given by the Town?
20      In other words, did you receive
21 everything at the end of the examination?
22      A.  Right; at the end of the examination is
23 when I received the letter, when he told me that
24 he received a telephone call from Town

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC                    SEPTEMBER 13, 2006

VOLUME II - 247

1  Administrator Leal warning him of a -- that I had
2  a temper problem or an anger issue or something to
3  that effect and then he referenced this letter.
4      Q.  Did he tell you anything else about his
5  conversation with Ms. Leal?
6      A.  No.
7      Q.  Did he ever say that he had a
8  conversation with Acting Chief Keefe?
9      A.  Only after my -- when Attorney Browne
10 had received this letter he had a conversation.
11     At one point Doctor Polizoti left a
12 message on my home answering machine telling me
13 that he didn't understand why my attorney was
14 upset; that he thought he told me that I thought
15 you were all right, the Town called me and said
16 that witnesses had recanted statements.
17     He told me to read the last page of the
18 report, that if what they were saying was true,
19 then he would be concerned.  That was it.
20     Q.  Did he say who the witnesses were that
21 recanted their statements?
22     A.  He did not.
23     Q.  Do you know who they are?
24     A.  I don't believe there are any that

VOLUME II - 248

1  exist.  I don't know.
2      Q.  With respect to the witnesses that
3  recanted their statements, do you know if they had
4  been witnesses for you or witnesses for the Town?
5      A.  I don't know.  He didn't say.
6      Q.  It is your understanding that Acting
7  Chief Keefe had a discussion with Doctor Polizoti
8  based on the phone message that he left you?
9      A.  Either Acting Chief Keefe or Town
10 Administrator Leal.  He just said the Town of
11 Webster had called him.
12     Q.  And that was a different conversation
13 than the one you mentioned by Ms. Leal?
14     A.  Yes.
15     Q.  These notes that are on Exhibit 18, it
16 appears to say "call O'Keefe, get info from Judge
17 Barton."
18     First of all, with regard to those, do
19 you know what those are referring to?
20     A.  I don't.
21     Q.  Do you know what the rest of it says?
22     A.  I don't.  Again, this was all Doctor
23 Polizoti's writing and marks in all of this.
24     Q.  It looks like it might say "comment

VOLUME II - 249

1  about knock him Chevry out," is that the way you
2  read it?
3      A.  Right; I would imagine that's Gevry --
4  Officer Gevry.
5      Q.  Do you know what that's in reference to?
6      A.  Most likely a reference to what we had
7  discussed earlier in the deposition.
8      Q.  Do you recall any incidents where you
9  showed aggressive behavior when you were
10 affiliated with the Webster Police Department?
11     A.  Only in performance of duty with -- if
12 there were -- in response to aggressive behavior.
13     Q.  Do you recall any instances where you
14 have shown a temper while working at the Webster
15 Police Department?
16     A.  I would say in performance of duty.  I
17 would say that temper or aggressive -- same sort
18 of response, same sort of emotion again when
19 needed to perform.
20     Q.  Have you now told us with respect to the
21 two-day examination that you had with Doctor
22 Polizoti everything that he told you regarding the
23 Town of Webster or why he thought you were being
24 set up?

VOLUME II - 250

1      A.  As best as I can recollect today.
2      Q.  Did you take any kind of notes of that
3  conversation, make any documentation with regard
4  to what he stated to you that day?
5      A.  No.
6      Q.  You have turned over a tape recording of
7  a telephone message that was left for you by
8  Doctor Polizoti to your attorney, is that correct?
9      A.  Yes.
10     Q.  Is that the only telephone call that he
11 made to you -- Doctor Polizoti?
12     A.  The only telephone tape that he had --
13 the only telephone message that he had left for
14 me; yes.
15     Q.  In other words did you have any other
16 telephone calls with him with regard to your
17 examination?
18     A.  I believe he was being asked to testify
19 at one of the hearings but was not available.
20     Q.  By your attorney?
21     A.  Mmm-hmm -- yes.
22     Q.  Has he ever testified on your behalf?
23     A.  No.
24     Q.  Do you know what reason he gave other

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 251

1 than being unavailable?
2     A.   I don't.
3     Q.   Other than that, you've had no other
4 phone conversations with him, is that correct?
5     A.   Correct.
6     Q.   Do you know why he left the message on
7 your phone as opposed to, say, contacting your
8 attorney?
9     A.   I don't.
10    Q.   You hadn't called him, had you?
11    A.   No.
12    Q.   Did you communicate with him at any
13 other time other than at the two-day examination
14 either by phone, in person, e-mail, writing -- any
15 other way?
16    A.   No.  The examination, the phone message,
17 and him saying that he wasn't available for the
18 hearing that I believe it was Attorney Clancy
19 wanted him for.
20    Q.   Did he give you the impression at all
21 based on what he said that he was going to support
22 you in your efforts to keep your position with the
23 Webster Police Department?
24    A.   Yes.

VOLUME II - 252

1     Q.   Is there anything that that's based upon
2 besides what you've already testified to?
3     A.   No.
4          MS. LYNCH:
5               (Defendant's Deposition Exhibit
6               No. 20 offered and marked.)
7     Q.   (BY MS. LYNCH)  Showing you what's been
8 marked as Exhibit Number 20, can you identify
9 that? (Indicating.)
10    A.   (Witness examining document.)  This is
11 part of Doctor Polizoti's report.
12    Q.   Had you received that before the hearing
13 before Ms. Leal?
14    A.   I'm not sure when Attorney Browne
15 received it but he had a report that was much
16 larger than what I'm looking at here.
17    Q.   From Doctor Polizoti?
18    A.   Yes.
19    Q.   Do you recall what else it consisted of?
20    A.   There were other pages relating to some
21 of the different tests.  There were -- I think all
22 total there are eight or nine pages, I think.  I'd
23 have to look.
24    Q.   You'll notice there it says, "Date of

VOLUME II - 253

1 assessment, January 14, 2004" meaning -- implying
2 just one day.
3          Are you saying that's not correct, that
4 you did have this exam for more than one day?
5     A.   Right; there was a second day that I
6 went back, yes.
7     Q.   In light of the phone message that was
8 left on your machine by Doctor Polizoti with
9 regard to apparent statements made by your
10 attorney, does that refresh your memory as to
11 whether you received Exhibit 20 prior to the
12 hearing before Ms. Leal?
13    A.   No.
14    Q.   Or whether your attorney received it
15 prior to the hearing before Ms. Leal?
16    A.   As best as I remember this was -- all of
17 this documentation was part of the appeal.  Again,
18 maybe it was in that packet the night before; I
19 don't know what was in there.  I know that
20 Attorney Browne wasn't able to go through that.  I
21 handed it to him that morning and we went on with
22 the hearing.
23          As the appeal process went on, that's
24 when I've seen a lot of the documentation so I

VOLUME II - 254

1 can't say.
2     Q.   Your hearing before Ms. Leal was on
3 March 10, 2004, is that correct?
4     A.   Correct; March 10th and 11th, yes.
5     Q.   Do you believe that any information was
6 withheld from Doctor Polizoti prior to his
7 examination?
8     A.   Yes.
9     Q.   What specifically do you believe was
10 withheld?
11    A.   Anything positive for me.
12    Q.   Do you have anything specific in mind?
13    A.   No.
14    Q.   Do you consider the statement made by
15 Acting Chief Keefe that you were -- I think he
16 said you can be a good police officer.  Would you
17 consider that to be positive?
18    A.   By itself, yes.
19    Q.   Would you consider the statement that
20 you're well educated and knowledgeable to be
21 positive?
22    A.   By itself I would; yes.
23    Q.   When was the last time you had contact
24 with Doctor Polizoti?

**PERLIK and COYLE REPORTING**

VOLUME II - 267

1    A.   Right; and again I'd have to look at
2  that packet or the same type of summary is what
3  I'm saying.  Not an identical copy of this here
4  but I'd have to take a look.
5        What I'm saying is I'd have to compare
6  the two but there was something from Acting Chief
7  Keefe to Town Administrator Leal.
8    Q.   Did you ever question the issue of your
9  belief that you did not receive Exhibit 22 before
10  the hearing?
11        In other words did you bring that to
12  anyone's attention given that it was mailed to you
13  on first class mail on or before March 1, 2004?
14    A.   Yes; Attorney Clancy brought that up at
15  Civil Service.
16        I'd have to take a look because I
17  thought Attorney Browne raised that issue at the
18  March 10th hearing too, but yes, it's been brought
19  up at other hearings; yes.
20    Q.   So you think that the issue of your not
21  receiving Exhibit Number 22 on or about March 1,
22  2004 was also brought up at the hearing before
23  Ms. Leal?
24    A.   I thought so.  Again I'd have to look at

VOLUME II - 268

1  the transcripts but it was absolutely brought up
2  at the Civil Service hearing; yes.
3    Q.   Assuming you didn't get Exhibit 22
4  before the hearing before Ms. Leal, what is your
5  understanding as to why you didn't get it?
6    A.   I don't know.
7    Q.   Were you residing at the same address in
8  Webster the entire time that you were working for
9  the Webster Police Department up until the date of
10  the hearing?
11    A.   Yes.
12    Q.   Other than the documentation that you
13  received either from Acting Chief Keefe or
14  Ms. Leal prior to the hearing, did you have any
15  discussion with either of them about the topics of
16  the termination hearing prior to the hearing?
17    A.   No.
18    Q.   Did you have any discussion with any
19  other supervisory personnel either at the Webster
20  Police Department or within the Town of Webster
21  prior to the hearing --
22    A.   (Interposing) No.
23    Q.   -- about the topics of the hearing?
24    A.   No.

VOLUME II - 269

1    Q.   Is it your understanding that Richard
2  Bergeron had been on paid administrative leave
3  since July 14, 2003 until he retired?
4        In other words, he didn't come back to
5  work after he was placed on paid administrative
6  leave?
7    A.   Correct; that's my understanding, yes.
8    Q.   So you didn't have an opportunity to
9  work with him after he was placed on paid
10  administrative leave?
11    A.   No.
12    Q.   Do you know which date he retired on?
13    A.   I don't.
14    Q.   Did you have any communication with him
15  at all between the time that he was placed on paid
16  administrative leave and the date of your
17  termination?
18    A.   No.
19    Q.   With respect to that communication at
20  the funeral home where Selectman Regis, Selectman
21  Miller, yourself, and Ralph were there, was anyone
22  else there?
23    A.   No.
24    Q.   You apparently received a commendation

VOLUME II - 270

1  regarding the Amato investigation on or about
2  February 23, 2004, do you recall that?
3    A.   Yes.
4    Q.   Do you know how that came about, given
5  that you were already on paid administrative leave
6  at that time?
7    A.   Do I know how that came about?
8    Q.   Right; what is your understanding as to
9  why you were being considered for a commendation
10  at that time given that you were already on paid
11  administrative leave?
12    A.   I don't know.
13    Q.   In other words do you know whose idea it
14  was?
15    A.   No.
16    Q.   Did anyone discuss it with you before
17  you were given the commendation?
18    A.   No.
19    Q.   How were you notified of the
20  commendation?
21    A.   It was never given to me.  I learned of
22  that watching the Selectmen's meeting on the cable
23  access channel, government access channel.  That's
24  the first I ever heard of it.

VOLUME II - 271

1    Q.   So you didn't receive it for a period
2    and then it was rescinded?
3        A.   Correct; the Board of Selectmen brought
4    it up and voted to do that and then the next week
5    two members voted to rescind it and the other two
6    members did not.  There was a vacancy at that
7    time -- so I never received it.
8        Q.   Are you saying that the first time you
9    learned that you were going to be getting a
10   commendation was when you were watching on TV and
11   seeing the Select Board voting in favor of it?
12       A.   Yes.
13       Q.   No one had mentioned it to you at all
14   prior to that?
15       A.   No.
16       Q.   Who introduced the proposal to give you
17   the commendation from the Select Board?
18       A.   Selectman Miller I believe.
19       Q.   Do you know who else voted in favor of
20   it?
21       A.   Selectman Regis, Selectman Dowgiewicz,
22   and Selectwoman Martel.
23       Q.   Have you ever spoken to Selectman Miller
24   about that commendation?

VOLUME II - 272

1        A.   No.
2        Q.   Not to this day?
3        A.   Correct.
4        Q.   How about Selectman Regis?
5        A.   No.
6        Q.   What is your understanding as to why it
7    was rescinded?
8        A.   It would have a negative impact on the
9    Town's position at both MCAD and at my hearing.
10       Q.   Who told you that?
11       A.   That's my assumption based on the --
12   Selectman Miller left Tom Ralph an answering
13   machine message directing him to get in touch with
14   me and tell me that Town Administrator Leal was
15   asking the Select Board members to rescind their
16   commendation.
17       Q.   And Tom Ralph passed that information on
18   to you?
19       A.   Yes.
20       Q.   Do you know why that message was left
21   for him instead of for you directly?
22       A.   I don't.
23       Q.   He was also on paid administrative leave
24   at the time, is that correct?

VOLUME II - 273

1        A.   Yes.
2        Q.   Did he ever give you any information
3    prior to your receiving the commendation in the
4    first place that you were being considered for it?
5        A.   No.
6        Q.   What is your understanding as to why you
7    were given that commendation originally?
8        A.   My thought was the great strides we were
9    making with Amato.
10           The Amato case has always been something
11   that is talked about in and around town.
12       Q.   Can you point to anything in particular
13   that you thought was worthy of that commendation
14   that you had done with respect to the Amato
15   investigation?
16       A.   Having a general area where Andy Amato's
17   remains are buried; the fact that the information
18   gathered in that investigation was enough to have
19   the state of Rhode Island, the FBI, the National
20   Grid all devote resources to this area that we
21   were looking at.
22           It's the most advanced that the Amato
23   case has ever been.
24       Q.   Do you recall when it was that you got

VOLUME II - 274

1    that general idea?
2        A.   That was ongoing from information
3    beginning in March -- it would have been March,
4    2003 through right up until I was placed on paid
5    administrative leave.
6        Q.   Do you know if any other selectmen
7    provided any other information about the issue of
8    the commendation to Ralph -- to Thomas Ralph
9    besides Miller?
10       A.   I don't know.
11       Q.   Other than what you've already testified
12   to, do you recall any other information that
13   Thomas Ralph has given to you to this date to
14   assist you with regard to your claims and to
15   prevent your termination?
16       A.   That's a couple of part question.  Do
17   you want to take that one at a time so I
18   understand?
19           MR. GREEN:  Can we read the question
20   back?
21           (Reporter read back as
22            requested.)
23           MR. GREEN:  Can we take a minute?
24           MS. LYNCH:  Go ahead.

VOLUME II - 291

1 Bergeron when this conversation took place,
2 according to Brian Barnes.
3      Q.   When did he tell you that?
4      A.   At the time that the personnel file
5 requests and whatnot were going back and forth,
6 that they couldn't be found and where a part was
7 found or something to that effect.  As that was
8 ongoing, around that time.
9      Q.   Before your hearing he told you that?
10     A.   No; it was after the hearing because
11 Michael Clancy was my attorney then so it was
12 after Chris Browne so the hearing had been -- it
13 had to be in preparation for the appeal.
14          It was after the hearing -- in between
15 the hearing for the Town and Civil Service appeals
16 hearing.
17     Q.   You're saying it was between the hearing
18 that Ms. Leal conducted and the Civil Service
19 hearing?
20     A.   After the hearing that Ms. Leal
21 conducted and prior to the Civil Service hearing.
22     Q.   Now is it your position that Brian
23 Barnes was very friendly with Chief Bergeron?
24     A.   Yes.

VOLUME II - 292

1      Q.   And yet you're testifying that he told
2 you that Chief Bergeron ordered that your
3 personnel file be destroyed?
4      A.   Yes.
5      Q.   Why do you believe that he would tell
6 you something like that?
7      A.   I don't know.  I don't begin to guess
8 why Brian Barnes does anything Brian Barnes does.
9 I don't know.
10     Q.   Actually Chief Bergeron hadn't even been
11 working at the station at the time that your
12 hearing was being conducted, isn't that correct?
13     A.   Correct; but my personnel file was lost
14 long before the hearing for the Town in '04.
15     Q.   When do you believe your personnel file
16 was lost?
17     A.   Sometime in 2003.
18     Q.   You did introduce documents at the
19 hearing that were also contained in your personnel
20 file of a positive nature, is that correct, such
21 as letters from citizens and so forth?
22     A.   Correct.
23     Q.   How did you get those?
24     A.   At the time that those were given or

VOLUME II - 293

1 sent or presented, I made a copy and I have a book
2 called a brag book, copies of citations or awards
3 or training certificates, that sort of thing.
4      Q.   Do you believe that there were documents
5 contained in your personnel file that you did not
6 already have a copy of that would have been
7 helpful to you at your hearing if you had had the
8 complete personnel file?
9      A.   Yes.
10     Q.   What do you believe you didn't have that
11 would have been helpful?
12     A.   I'm not certain how to answer that.  I
13 don't know how to articulate what would be there
14 if I don't know what was in there.  Do you
15 understand?
16     Q.   Had you ever reviewed your personnel
17 file before it was missing?
18     A.   I may have.  I don't remember
19 specifically doing that.  I remember asking
20 whether it was the Chief or Sergeant Latour or
21 whoever was overseeing them.
22          As I received different things if they
23 were in there or I'd make a copy of what I
24 received and leave it for them to put it in there.

VOLUME II - 294

1 Possibly documents or items that I wouldn't know
2 about necessarily.  I don't know what's in there.
3      Q.   In terms of -- what's in your brag book?
4 You said letters?
5      A.   Right; any type of training certificate
6 that I received, letters of recognition from
7 either inside or outside of the Department.
8      Q.   How did you get those -- copies of those
9 for your own brag book?
10     A.   They were given to me.
11     Q.   By whom?
12     A.   Either the Chief or one of my
13 supervisors.
14     Q.   In other words is it your understanding
15 that when such a letter came into the station you
16 were given a copy of it?
17     A.   Yes.
18     Q.   At your hearing there was no testimony
19 that you had had prior discipline, is that
20 correct?
21     A.   I never have.
22     Q.   So why do you think that the personnel
23 file would have been helpful to you given that
24 there wasn't any testimony that you had ever had

VOLUME II - 295

1  discipline prior to that hearing?
2      A.   Exactly that.
3      Q.   I'm not following you.  There was no
4  testimony at the hearing that you had had prior
5  discipline, is that correct?
6      A.   Right, by me.
7      Q.   Did any witness come forward at the
8  hearing before Ms. Leal and state that there was
9  prior discipline taken against you before that
10  hearing?
11      A.   No; but I've never had any discipline,
12  I've never had any counselling by a supervisor or
13  anybody.  It was an exemplary personnel record.
14  That -- as I say, that in and of itself because
15  it's exemplary is positive for me.
16      Q.   But was there any testimony at that
17  hearing that you had had counselling or that there
18  was anything negative about you before that
19  hearing?
20      A.   No.
21      Q.   So you just think that the personnel
22  file would have just been confirmation of the fact
23  that there wasn't anything negative stated about
24  you?

VOLUME II - 296

1      A.   Correct.
2      Q.   Any other reason it would be
3  important -- it would have been important to you
4  at the hearing?
5      A.   To show that of all of the personnel
6  within the Webster Police Department --
7  everybody's file can be located except for mine
8  and Sergeant Kelley's.
9      Q.   Do you know if yours had been
10  segregated -- yours and Ms. Kelley's had been
11  segregated because there was an investigation with
12  regard to the cheating allegations?
13      A.   I don't believe so.
14      Q.   Did you ever discuss Brian Barnes'
15  allegation that Chief Bergeron ordered the
16  personnel files destroyed with Chief Bergeron?
17      A.   No.
18      Q.   Did you ever discuss it with Officer
19  Novick?
20      A.   No.
21      Q.   Why not?
22      A.   I would assume that any conversation
23  with either Bergeron or Novick, I would assume
24  that it would be an adversarial environment.  I

VOLUME II - 297

1  wouldn't contact either one of them.
2      Q.   Did you essentially introduce the
3  contents of the brag book at your hearing before
4  Ms. Leal?
5      A.   Some of it; yes.
6      Q.   To this day other than what Mr. Barnes
7  told you, do you have any other information as to
8  what happened to your personnel file?
9      A.   No.
10      Q.   I'm sorry, I'm not sure I asked you this
11  or not.
12          Do you know at what point in time Chief
13  Bergeron allegedly ordered your personnel file
14  destroyed?
15      A.   I don't.
16          (Defendant's Deposition Exhibit
17          No. 24 offered and marked.)
18      Q.   (BY MS. LYNCH)  I show you what's been
19  marked as Exhibit Number 24.
20          Have you seen that before today?
21  (Indicating.)
22      A.   Yes.
23      Q.   You'll notice that the subject matter
24  there says "Potential Letter of Reprimand"?

VOLUME II - 298

1      A.   Yes.
2      Q.   Did you ever get a letter of reprimand
3  with regard to the incident that occurred on
4  May 14, 2003?
5      A.   No.
6      Q.   Just briefly, what was the subject of
7  that, quote, "Potential Letter of Reprimand"?
8      A.   Chief Bergeron was angry that he was not
9  informed by either myself or the officer on the
10  shift as to a major incident with an injury.
11          He decided not to issue any type of
12  reprimand when he found out that morning
13  everything was turned over to William Keefe and it
14  was in fact William Keefe that didn't inform him.
15      Q.   Was there a discussion then after
16  May 21, 2003 where he stated that he did not think
17  you deserved a letter of reprimand?
18      A.   He said I wouldn't receive the letter;
19  that he took care of it with William Keefe.
20      Q.   Was that the end of this issue?
21      A.   That was the end of it.
22      Q.   In terms of the incidents involving
23  Catherine Abbe, Jonah Mayotte, and Heath
24  Greenwood, do you know whether or not Thomas Ralph

JOHN BOLDUC v. TOWN OF WEBSTER ET AL
JOHN BOLDUC                    SEPTEMBER 13, 2006

VOLUME II - 307

1  Q.  That was something different?
2  A.  Correct.
3  Q.  Were you there as well?
4  A.  No.
5  Q.  That was Tom Ralph?
6  A.  Correct.
7  Q.  What was your understanding of that
8  meeting?
9  A.  That Regis had informed O'Donnell that
10 Ms. Leal intended to fire me but that she needed
11 to have a hearing to make things look good and
12 didn't know if O'Donnell could use that for his
13 newspaper or something.
14 Q.  Who wanted to know if it could be used
15 for the newspaper?
16 A.  My understanding is Regis didn't know if
17 O'Donnell could use it for his newspaper.
18 O'Donnell is a publisher of a once-a-week
19 newspaper.
20 Q.  So you believe that Regis who was a
21 selectman at the time was offering it as a
22 possible story to the publisher of a newspaper?
23 A.  I don't know for certain.
24 Q.  That's your understanding?

VOLUME II - 308

1  A.  But they're in that office.
2  Q.  What is your understanding of the
3  relationship between Mr. O'Donnell and Mr. Regis?
4  A.  I would assume it's friendly.  I don't
5  know for sure.
6      Paul O'Donnell is somebody basically who
7  everybody knows who he is.
8  Q.  Was anything ever published as far as
9  you know?
10 A.  Not as far as I know.
11 Q.  Do you know why not?
12 A.  I don't.
13 Q.  I can't recall if I asked you this or
14 not before.
15     What is your understanding of Regis'
16 relationship with Ms. Leal?
17 A.  I don't know.  That as selectman and
18 town administrator that they have to work
19 together.
20 Q.  Do you believe that they were
21 adversaries?
22 A.  I'm under the impression that at times
23 it was a strained relationship.
24 Q.  Do you -- I'm sorry; go ahead?

VOLUME II - 309

1  A.  No.
2  Q.  Do you have any information to believe
3  that Mr. Regis did not agree with the way that
4  Ms. Leal was conducting the hearing pertaining to
5  you?
6  A.  I don't think he agreed with all of
7  that; no.
8  Q.  What do you base that upon?
9  A.  His willingness to tell people of his
10 conversation with Ms. Leal about me being
11 terminated before a hearing and having a hearing
12 to keep up appearances as it was put.
13 Q.  Do you know whether or not he ever
14 informed Ms. Leal that he didn't agree with what
15 she was doing with regard to your termination
16 hearing or that he tried to prevent her from going
17 forward with the hearing, anything like that?
18 A.  I don't know.
19 Q.  The Select Board were Ms. Leal's boss
20 though, right?
21 A.  As far as I know; yes.
22 Q.  Did you testify last time with regard to
23 information about alleged statements by Ms. Leal
24 involving Paul Adams?  Was that the incident at

VOLUME II - 310

1  the store?
2  A.  I testified to Regis being in Paul
3  Adams' store, the store he owns; yes.
4  Q.  Was there a Charles Tomasso there as
5  well?
6  A.  Yes.
7  Q.  It was just the one incident in the
8  store, is that correct?
9  A.  Correct.
10 Q.  At your hearings, either the Civil
11 Service hearing or the hearing before Ms. Leal,
12 did either Mr. Miller or Mr. Regis testify in your
13 behalf?
14 A.  Mr. Miller at both hearings; Mr. Regis
15 at Civil Service I believe -- or just Civil
16 Service.
17 Q.  Mr. Regis?
18 A.  Yes.
19 Q.  Is it fair to say that at the hearing
20 before Ms. Leal that -- strike that.
21     Are you asserting that the hearing that
22 was conducted by Ms. Leal was unfair?
23 A.  Yes.
24 Q.  What are you basing that upon?

## VOLUME II - 315

1    Q.   That was all on the same day?
2    A.   All within the same hour; yes.
3    Q.   Anything else you think he could have
4  been helpful to you with regard to the hearing?
5    A.   No.
6    Q.   You mentioned Mayotte.  Anything in
7  particular with regard to that or did you think
8  that he should have been available for
9  cross-examination?
10    A.   Exactly; right.
11    Q.   Do you know why he didn't attend the
12  hearing?
13    A.   I don't know.
14    Q.   Did you or as far as you know your
15  attorney or anyone on your behalf try to get him
16  to testify at the hearing?
17    A.   No.
18    Q.   Was he still employed at the Webster
19  Police Department when the hearing occurred?
20    A.   I'm not sure.
21    Q.   Officer Langevin, how do you believe he
22  would have been helpful to you at the hearing?
23    A.   For Mayotte.
24    Q.   Was it that you thought he could add

## VOLUME II - 316

1  information or did you want him to be
2  cross-examined?
3    A.   Both.
4    Q.   What information do you think that he
5  might have added that would have been helpful to
6  you?
7    A.   He observed the incident.  It was
8  Officer Langevin who retrieved the bolt cutters.
9  He was the person who supplied them.
10    Q.   Do you know why he didn't testify?
11    A.   I don't know.
12    Q.   Did you, your attorney or anyone on your
13  behalf contact him to try to get him there?
14    A.   No; again according to Chris Browne we
15  weren't allowed to call or subpoena witnesses.
16    Q.   How about Officer Becker?  What
17  information do you believe that he would have had
18  that would have been helpful to you?
19    A.   EMT.  He was the second EMT there.
20    Q.   At which incident?
21    A.   Mayotte, I'm sorry.
22    Q.   What information do you believe that he
23  would have had that would have been helpful to
24  you?

## VOLUME II - 317

1    A.   His observations from an EMT medic
2  standpoint that precautions were taken not to
3  injure Mayotte.
4    Q.   Anything else?
5    A.   Detective Hoover I think should have
6  been called.
7    Q.   With regard to Becker, though?
8    A.   No.
9    Q.   What precautions do you believe were
10  taken not to injure Mayotte?
11    A.   The fact that when I removed the jewelry
12  it was done in such a manner that it was a safe,
13  controlled environment that he was not in danger
14  of being injured and he wasn't injured.
15    Q.   Did you, your attorney or anyone on your
16  behalf try to contact him to get him to the
17  hearing?
18    A.   No.
19    Q.   Do you know why he didn't attend the
20  hearing?
21    A.   I don't know.
22    Q.   You mentioned Hoover as well.  What
23  information do you believe that he would have
24  provided that would have been helpful to you at

## VOLUME II - 318

1  the hearing?
2    A.   I think that James Hoover has a lot of
3  information.
4         Hoover -- in all of my testimony Hoover
5  is a large part of a lot of things so for both the
6  ability for Chris Browne to question him.
7    Q.   Do you mean cross-examine or provide
8  information?
9    A.   Both.  If he was brought in by the Town,
10  then cross-examined and if not, then called by us
11  or called by me but I think that James Hoover is
12  somebody that has a lot of information.
13    Q.   But the three subjects of the hearing
14  were the Mayotte, Greenwood, and Abbe incidents,
15  right?
16    A.   Right.
17    Q.   What information do you think he had
18  about any of those?
19    A.   He was present for the telephone call
20  for Heath Greenwood in William Keefe's office that
21  day.
22         With Greenwood he was with me as my
23  union representative for Ralph's questioning of
24  me.  He was present for that.

JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 323

1      A.   Bergeron told me that my friendship,
2   support, and loyalty to Thomas Ralph would cost
3   me.
4      Q.   Anything else that you base that upon?
5      A.   I'd have to speak with my attorney.
6      Q.   You want to speak to your attorney right
7   now, is that what you're saying?
8      A.   I would have to, to elaborate more on
9   your question; yes.
10     Q.   If you want to speak to your attorney,
11  you can do so?
12     A.   Okay.
13          (A recess was taken.)
14     Q.   (BY MS. LYNCH)  Now that you've spoken
15  to your attorney, do you want to add anything to
16  your answer?
17     A.   No.
18     Q.   You are alleging that the Defendants
19  have retaliated against you.
20          How do you believe you've been
21  retaliated against?
22     A.   By having my duty assignment changed; by
23  being essentially evicted from my office; by being
24  pulled from the Amato investigation; by

VOLUME II - 324

1   reexamining or reopening issues that were taken
2   care of at the time going back over -- or looking
3   back over just an unspecified amount of time and
4   reexamining these things; to be soliciting
5   negative information from people who are thought
6   to have maybe know of anything; to have been
7   terminated without ever being disciplined or
8   reprimanded or counseled.
9           Once William Keefe was installed as the
10  acting chief of police, never once did he mention
11  to me that he would want anything done differently
12  by me or anybody else; that any type of behavior
13  alleged by him were to be altered, stopped,
14  changed, unacceptable, anything to that effect;
15  never said anything about the performance of my
16  duties or how I went about them.
17     Q.   You're talking about prior to the actual
18  hearing he never said anything to you -- meaning
19  prior to the charges being made?
20     A.   Ever -- exactly.  From the time that he
21  was the acting chief of police and the number one
22  cop in the Department, when it was essentially his
23  administration there was never any mention of him
24  wanting me personally to do anything different

VOLUME II - 325

1   than I had ever done.
2      Q.   Any other reasons you believe you were
3   retaliated by the Defendants?
4      A.   All of those.  Everything that we're
5   here for.
6      Q.   When you said that your duty assignment
7   was changed, are you referring to being taken off
8   of the Amato investigation?
9      A.   Yes.
10     Q.   When you said you were evicted from your
11  office, was there any reason why you couldn't use
12  any of the offices that had been occupied by
13  officers or sergeants on other shifts -- when you
14  were on a different shift than them?
15     A.   I don't know.
16     Q.   You also said that you feel you were
17  retaliated over old issues that had been
18  reexamined.
19          Is it fair to say that reportedly only
20  the Greenwood incident had been examined prior to
21  the charges brought against you in the hearing?
22     A.   No; Bergeron was aware of Mayotte and
23  had no issue with the Mayotte incident at that
24  time.

VOLUME II - 326

1      Q.   But there was no investigation of that
2   incident, was there?
3      A.   Not that I'm aware of; no.
4      Q.   There was no investigation of the Abbe
5   incident until the hearing, is that correct -- or
6   the events leading up to the hearing?
7      A.   Until Ralph's hearing; correct.
8      Q.   Other than the town administrators that
9   you've already mentioned, did you discussed the
10  charges brought against you with any other Webster
11  town administrator?
12     A.   No.
13     Q.   Or your employment in general?
14     A.   No.
15     Q.   Is it fair to say that you had a
16  satisfactory relationship with Acting Chief Keefe
17  up until the point that those charges were brought
18  against you?
19     A.   Yes.
20     Q.   You have alleged that the Defendants
21  have conspired essentially to bring about damage
22  to you.  I believe you stated in your complaint
23  that they have corroborated to punish you for
24  expressing your opinions.

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL

## JOHN BOLDUC                    SEPTEMBER 13, 2006

### VOLUME II - 327

1 How do you believe that they have
2 conspired?
3 A. I believe that all of this is
4 retaliatory against me; that through their --
5 basically a group effort with them.
6 Q. Do you have any information that they
7 got together or somehow communicated with each
8 other to support the termination of your
9 employment -- and I'm referring to all of the
10 Defendants?
11 A. My belief that they all agreed and acted
12 together to further my termination.
13 Q. For instance Richard Bergeron, he wasn't
14 even employed by the Webster Police Department at
15 the time of your termination hearing, is that
16 correct?
17 A. Correct -- well, right, he retired I
18 believe at the time of my termination.
19 Q. So do you believe that he was involved
20 in any conspiracy to have you terminated?
21 A. In the beginning; yes.
22 Q. What are you referring to?
23 A. At the times when he was soliciting
24 officers and civilians for negative information.

### VOLUME II - 328

1 Q. But he never took any disciplinary
2 action against you before he left, did he?
3 A. No.
4 Q. How do you believe that William Keefe
5 has conspired against you?
6 A. My belief is that where Bergeron --
7 where they started this and Keefe furthered this
8 to -- in part my belief is to clear the way for
9 him to the Chief's office; that I would have been
10 seen as either standing in his way or competition
11 for him in testing.
12 I think that his attempt to influence
13 Polizoti, along with Robin Leal's telephone calls
14 to Polizoti ahead of time, I think that was to
15 influence the outcome in favor of their position.
16 Q. Do you believe that any other official
17 of the Town of Webster did anything to conspire
18 against you to bring about your termination?
19 A. No; I believe that the e-mail from Bob
20 Stawiecki to Robin Leal where he was aware that
21 myself and Ralph were targeted.
22 Q. Do you believe that Mr. Stawiecki was
23 somehow conspiring against you?
24 A. I don't know if he was conspiring or if

### VOLUME II - 329

1 he -- or if he knew what was going on or if he
2 could see what was happening or if he wanted some
3 sort of action taken; I don't know.
4 Q. You identified -- or your attorney
5 identified in initial disclosure on
6 October 19, 2005, several witnesses. One was
7 Heidi Courtenay.
8 Other than what you testified today
9 related to her, what information do you believe
10 that she has that is significant with respect to
11 your claim?
12 A. I think Heidi Courtenay has a lot of
13 information, some that I don't know of but would
14 have to be subpoenaed and asked under oath so as
15 to protect her job type of thing.
16 I think that she was present also at the
17 Colonial Club for -- where Barnes made the
18 statements that I heard and gave the written
19 report about but I think that there's more
20 information that Heidi Courtenay would have.
21 Q. Incidentally, do you have any
22 understanding of what her relationship is to Brian
23 Barnes?
24 A. I don't know.

### VOLUME II - 330

1 Q. Who is Karen Dean Smith, Esquire?
2 A. She was the assistant to Judge Barton.
3 Q. Mark Dowgiewicz, does he have any
4 knowledge other than what you've already testified
5 to?
6 A. I don't know.
7 Q. You've identified Paula Laduc. What
8 information does she have?
9 A. That would be Pamela. It might be a
10 typo.
11 Q. Here it's written P-A-U-L-A.
12 A. It's the Town accountant, Pamela Laduc.
13 Q. What information do you believe that she
14 has that would be relevant to your claim?
15 A. Other than what we had discussed about
16 my conversation with Ralph on Monday, along the
17 same lines as Heidi Courtenay.
18 I think that she has information that
19 she'd be able to give freely under oath when she
20 was subpoenaed to do so, again in preservation for
21 her job and all of that.
22 Q. Do you have any knowledge as to what you
23 think she knows that would be helpful to your
24 claim?

# EXHIBIT 15

COMMONWEALTH OF MASSACHUSETTS
HUMAN RESOURCES DIVISION
INVESTIGATION

RECOMMENDATION OF THE HEARING OFFICER

IN THE MATTER OF:

BRIAN BARNES and THE TOWN OF WEBSTER POLICE DEPARTMENT

INTRODUCTION

I, Elizabeth Sullivan Khan, duly appointed designee for the Personnel Administrator of

the Human Resources Division, held an investigatory hearing on July 29, 2003, and August 1,

2003, pursuant to the Personnel Administrator's Rule (PAR) .03. The hearing was held at the

Human Resources Division's Legal Department at One Ashburton Place, Boston, Massachusetts.

The investigation concerned allegations of impropriety during the promotional interviews for the

position of police Sergeant for the Town of Webster. Specifically, whether acting Sergeant John

Bolduc was provided with the questions and answers to the oral interview held on June 13, 2002,

for the position of Sergeant. These allegations were brought by Officer Brian Barnes of the

Webster Police Department.

Deputy General Counsel Omar Hernandez served as the investigator for the Human

Resources Division. He called six witnesses to testify before the hearing officer. The witnesses

were Chief Richard Bergeron, Deputy Chief Thomas Ralph, Officer Brain Barnes, Officer

Michaela Kelley, Sergeant John Bolduc, and Mr. Alfred Beland. This was a closed hearing and

the witnesses were sequestered. Counsel for the witnesses were present and allowed limited

cross examination of each witness. Counsel were also allowed to admit relevant documents into

evidence. The rules of evidence were suspended to allow the Personnel Administrator full

access to all of the relevant factors. A transcript was made of the hearing.

The scope of the Personnel Administrator's review is limited to whether acting Sergeant John Bolduc received the questions and answers to the oral interview for the promotional position of permanent police Sergeant for the Town of Webster. If the Personnel Administrator determines that such impropriety did occur, the promotion of Sergeant John Bolduc may be invalidated and his name may be removed from the eligibility list for the position of Sergeant for the Town of Webster's Police force pursuant to M.G.L. c. 31, § 73 and PAR .03.

## RELEVANT STATUTE & RULES

<u>M.G. L. c. 31, § 73</u>:

If, in the opinion of the administrator, a person is appointed or employed in a civil service position in violation of the civil service law and rules, the commission or the administrator shall mail a written notice of such violation to such person and to the appointing authority. The commission or the administrator shall then file a written notice of such violation with the treasurer, auditor or other officer whose duty it is to pay the salary or compensation of such person or to authorize the drawing, signing or issuing of any warrant for such payment.

The payment of any salary or compensation to such person shall cease at the expiration of one week after the filing of such written notice with such treasurer, auditor or other officer. No such treasurer, auditor or other officer shall pay any salary or compensation to such person, or draw, sign or issue, or authorize the drawing, signing or issuing of any warrant for such payment, until the legality of the appointment or employment is duly established.

Any person found by the administrator to be illegally appointed or employed may file a petition for a writ of mandamus in the supreme judicial court to compel the administrator to authorize such appointment or employment and the payment of compensation or salary.

At any time after the filing of such petition, the court may order that the compensation accruing to such person for services actually rendered shall be paid to him until further order of the court, if the court is of the opinion that there is a reasonable doubt whether the appointment or employment of such person is in violation of the civil service law and rules.

PAR .03 (4):

The administrator may cancel an application, suspend the same pending investigation, exclude an applicant from examination, refuse to certify an otherwise eligible candidate, remove a candidate's name from any eligible list, or declare a candidate's appointment invalid upon proof of any of the following conditions after a hearing held by the administrator…

c.) The knowingly making of a material false statement by any person in his application or in his examination and any connivance by him at any material false statement made in any accompanying certificates, or the commission of or attempt to commit any fraud against civil service law or rules, or any complicity by or benefit to him in any such fraud, before, during or after any examination.

…

## FINDINGS OF FACT

I find the following facts in this matter:

1. The Town of Webster's Town Administrator, Mark Stankiewicz, requested a certification from the Human Resources Division, Civil Service Unit to fill one permanent vacancy for the promotional position of police Sergeant on May 28, 2002. Exhibit 1.

2. The Human Resources Division, Civil Service Unit issued the promotional certification for Sergeant to the Town of Webster on May 28, 2002. Exhibit 2.

3. Three names appeared on the certification. They were in descending order: Michaela N. Kelley; John A. Bolduc, Jr.; and, Aaron A. Suss. All signed willing to accept the appointment. Exhibit 2.

4. John Bolduc had been acting provisionally as a Sergeant since October 22, 2001.

5. Chief Bergeron wanted to appoint John Bolduc to the position of permanent Sergeant without an interview.

6. Deputy Chief Ralph organized the interviews at the direction of the Chief and the Town Administrator.

7. Before and after June 13, 2002, Deputy Chief Ralph and Sergeant Bolduc have been close friends, socializing regularly outside of work hours.

8. Brian Barnes worked the three to eleven shift on June 12, 2002.

9. The Town held oral interviews for the position of Sergeant on the afternoon of June 13, 2002.

10. The three candidates were given notice and appeared at the interviews which took place at the Town Hall.

11. Deputy Chief Ralph drafted five questions to ask the candidates sometime before June 13th. Exhibit 4.

12. Chief Bergeron did not review the interview questions drafted by Deputy Chief Ralph until shortly before the start of the interviews on June 13, 2002.

13. Police Chief Bergeron, Deputy Chief Ralph, and Town Administrator Stankiewicz acted as the interview panel. Each member asked the candidates several questions.

14. Neither Chief Bergeron nor Town Administrator Stankiewicz brought prepared questions to the interview.

15. The four permanent Sergeants were not invited and did not attend the interview. This was contrary to the usual procedure of the Department when conducting interviews.

16. Officer Kelley was interviewed first, acting Sergeant Bolduc second, and Officer Suss third.

17. Chief Bergeron asked each candidate a question pertaining to community policing. This question was not prepared in advance of the interview, nor was it written down.

18. Town Administrator Stankiewicz asked the first and last questions of the interview. These questions were not prepared in advance of the interview, nor were they written down. The last question gave the candidate an opportunity to elaborate on why they were the best candidate for the position.

19. Officer Kelley's interview lasted approximately a half an hour.

20. Acting Sergeant Bolduc's interview lasted over an hour.

21. Officer Suss' interview lasted less than half an hour.

22. Officer Brian Barnes was not a candidate for the promotion, nor was he present for the interviews.

23. Immediately after the conclusion of the interviews, the panel unanimously chose acting Sergeant Bolduc for the promotion to permanent Sergeant.

24. The Town reported its selection of acting Sergeant Bolduc for the promotion to permanent Sergeant to the Human Resources Division on June 25, 2002. The Town provided positive reasons for the selection of acting Sergeant Bolduc and by-pass of Officer Kelley. One of the reasons provided for his selection was acting Sergeant Bolduc's performance on the oral interview. Officer Suss was not by-passed as he was third on the certification. Exhibit 3.

4

25. The Human Resources Division approved acting Sergeant Bolduc's permanent appointment to Sergeant.

26. Sometime in February, 2003, Officer Barnes and Deputy Chief Ralph's working relationship had begun to deteriorate. At that time they were discussing Mr. Barnes continued assignment at Bartlett High School.

27. On March 6, 2003, Officer Barnes came forward with the allegation that Deputy Chief Ralph had given Sergeant Bolduc the interview questions and answers. Exhibit 9.

28. The Town did not conduct an investigation into Officer Barnes' accusation.

29. Town Administrator Stankiewicz's last day in office was April 15, 2003.

30. Officer Barnes put his allegations into writing on April 17, 2003, after Chief Bergeron requested that he do so. Exhibit 9.

## CONCLUSION

The Hearing Officer's review of the promotional selection process for the position of Sergeant for the Town of Webster was limited to whether acting Sergeant Bolduc was provided with the questions and answers in advance of the oral interview given on June 13, 2002, for the position of permanent Sergeant. After review of the testimony and evidence presented to the Personnel Administrator, I am not persuaded by the preponderance of the evidence that acting Sergeant Bolduc received the interview questions and answers in advance of his official interview.

I do not credit Officer Barnes' testimony that he overheard Deputy Chief Ralph speaking to then acting Sergeant Bolduc on the night of June 12th on his Nextel Direct Connect cell phone. I do not find it creditable that Deputy Chief Ralph would have identified whom he was speaking to and what he was doing in the manner described by Officer Barnes. Officer Barnes' testimony is further diminished by the fact that he waited almost nine months to reveal this crucial information. He consistently claimed during his testimony that he had nothing to gain by coming

5

forward, yet he remained silent about this serious allegation which concerned the integrity of the Webster Police Department and the careers of his fellow officers until he was experiencing professional difficulties with Deputy Chief Ralph's supervision.[1]

While I am recommending that Sergeant Bolduc's appointment be allowed to stand, I am greatly troubled by the testimony concerning the selection process. I believe that the process was skewed in favor of acting Sergeant Bolduc from the beginning and that the Town utilized the interview to lend the promotion a semblance of objectivity. Testimony from the Chief, the Deputy Chief, Officer Kelley, and Mr. Beland all indicated that the interview panel had made their selection long before the actual interview took place.

I find it likely that Deputy Chief Ralph tailored his interview questions to complement acting Sergeant Bolduc's knowledge and work history. However, I cannot conclude based upon the record before me that Sergeant Bolduc was a knowing participant in this action. A finding that the individual was knowingly involved in the fraudulent activity is a requirement under PAR .03 (4) before the Personnel Administrator may take any adverse action. As such, based upon the evidence presented and the extremely narrow scope of the Personnel Administrator's review, I cannot recommend Sergeant Bolduc's removal from the position of permanent Sergeant.

I make this recommendation of fact to the Personnel Administrator on November 7, 2003.

Elizabeth Sullivan Khan. Esq.

---

[1] See Exhibit 9, p. 2, ¶ 2, Memorandum dated April 17, 2003, To: Chief Richard Bergeron, From: Brian J. Barnes, Patrolman, "Shaw and I were meeting at the time over negative emails and directives that Ralph sent out to me which were somehow questioning my work ethics. It was at that time that I told Shaw 'who is this guy to question anybody's ethics.' That is when I told him about the exam scam."

**EXHIBIT 16**

CIVIL SERVICE COMMISSION

JOHN BOLDUC,                    )
         Appellant             )
                               )
vs.                            )
                               )
TOWN OF WEBSTER                )
         Respondent            )


HEARING:   BEFORE HEARING OFFICER, ROBIN
LEAL, TOWN ADMINISTRATOR OF THE TOWN OF WEBSTER at
the Webster Town Hall, Webster, Massachusetts on
March 10, 2004 regarding an Investigation of
Excessive and Unnecessary Use of Force by Sgt. John
Bolduc.

HEARING OFFICER:

Robin Leal, Town Administrator


APPELLANT:

John Bolduc

COUNSEL:

Christopher M. Browne, Esq.
International Brotherhood of Police Officers
1299 Page Boulevard
Springfield, MA 01104
(413) 732-6191


RESPONDENT:

Town of Webster

COUNSEL:

Marcelino LaBella, Esq.
Kopelman and Paige, P.C.
31 Saint James Avenue
Boston, MA 02216
(617) 556-0007


STENOGRAPHER:

Danita Boutiette
Real-Time Court Reporting
343 Trafton Road
Springfield, MA 01108
(413) 732-1157

INDEX:

WITNESS:  OFFICER DANIEL JAMES DEFUSCO
Direct Examination by Mr. LaBella . . . . . . . .16
Cross-Examination by Mr. Browne . . . . . . . .28

WITNESS:  OFFICER SCOTT NELSON
Direct Examination by Mr. LaBella . . . . . . . .38
Cross-Examination by Mr. Browne . . . . . . . .42

WITNESS:  ACTING CHIEF WILLIAM KEEFE
Direct Examination by Mr. LaBella . . . . . . . .53
Cross-Examination by Mr. Browne . . . . . . . .83
Redirect Examination by Mr. LaBella . . . . . . 165
Recross-Examination by Mr. Browne . . . . . . 166

WITNESS:  EVA O'CONNELL
Direct Examination by Mr. Browne  . . . . . . . 188

WITNESS:  OFFICER THOMAS PIESEL
Direct Examination by Mr. Browne . . . . . . . 209
Cross-Examination by Mr. LaBella . . . . . . . 226

WITNESS:  STEVEN BOUDREAU
Direct Examination by Mr. Browne  . . . . . . . 234

WITNESS:  GARY WRUBLESKI
Direct Examination by Mr. Browne  . . . . . . . 239
Cross-Examination by Mr. LaBella  . . . . . . . 245
Redirect Examination by Mr. Browne  . . . . . . 249

WITNESS:  GARY MILLIARD
Direct Examination by Mr. Browne  . . . . . . . 250
Cross-Examination by Mr. LaBella  . . . . . . . 253

WITNESS:  ACTING CHIEF WILLIAM KEEFE
Direct Examination by Mr. Browne  . . . . . . . 261
Cross-Examination by Mr. LaBella  . . . . . . . 262

WITNESS:  OFFICER LUIS MELENDEZ
Direct Examination by Mr. Browne  . . . . . . . 263
Cross-Examination by Mr. LaBella  . . . . . . . 268

TOWN'S EXHIBITS:

1   Robin Leal's Letter of December 12, 2003 . .  10
2   Acting Chief Keefe's Letter of March 1, 2004  10
3   Officer Defusco's Report . . . . . . . . . .  23
4   Photograph of Detainee Number 1  . . . . . .  23
5   Photograph of Detainee Number 1  . . . . . .  24
6   Photograph of Detainee Number 2  . . . . . .  53
7   Acting Chief Keefe's Report  . . . . . . . .  63
8   Photograph of Detainee Number 3  . . . . . .  67
9   Photograph of Detainee Number 3  . . . . . .  68
10  Acting Chief Keefe's Investigation Report  .  69
11  Deputy Chief Ralph's Report of 2-26-03 . . .  73
12  Integrated Force Management Reference Guide   78
13  Department Policies  . . . . . . . . . . . .  79
14  Fitness for Duty Evaluation  . . . . . . . .  81
15  Result of Fitness for Duty Evaluation  . . .  81

EMPLOYEE'S EXHIBITS:

1   Acting Chief Keefe's Letter to
    Dr. Pallozotti of January 5, 2004  . . . . .  88
2   Officer Piesel's Report to Judge Barton  . .105
3   Acting Chief William Keefe's Email . . . . .116
4   Policy of Prior Chief of Policy  . . . . . .119

1          MR. BROWNE:  And, not only that, okay,

2     Mr. Bolduc was home until two o'clock at which

3     time he had a meeting in my office in

4     Springfield, so no attempt was made to serve

5     any of these documents until well after two

6     o'clock.

7          HEARING OFFICER:  Did your client

8     inform the acting chief that he would be out of

9     his house and not available.

10          MR. BROWNE:  I'm not sure if he did or

11     not.

12          MR. LABELLA:  In response to a couple

13     of the statements.  I'm not going to respond to

14     the terms such as mean-spirited and

15     back-slanted, which I'm not sure what that

16     means, and cheap shot because I don't think

17     it's necessary.  What I would like to do is

18     move forward with this hearing.  We've followed

19     everything required of us under the law.  We

20     gave notice and provided an opportunity to be

21     heard, and with that being said, I request that

22     we move forward with the hearing.

23          HEARING OFFICER:  Do you have any

1    requests of delaying this while you take a look

2    at the information.

3         MR. BROWNE:  No, we'll go forward.

4         HEARING OFFICER:  So for the record,

5    counsel agrees to go forward and you had an

6    opportunity to review the information.

7         MR. BROWNE:  No, I have not had an

8    opportunity, but I don't want to delay the

9    hearing any further.

10        HEARING OFFICER:  We'll go forward.

11        MR. LABELLA:  With regard to jumping

12   right in as opposed to giving a lengthy opening

13   statement, you've read aloud the notice and

14   specification of charges served on Sgt. Bolduc.

15   And at this time I call to the stand an officer

16   by the name of Defusco.

17        (Witness sworn.)

18        HEARING OFFICER:  State your name for

19   the record.

20

21   WITNESS:  DANIEL JAMES DEFUSCO.

22   DIRECT EXAMINATION BY MR. LABELLA:

23   Q.  Officer Defusco, my name is Mark LaBella

# EXHIBIT 17



**TOWN OF WEBSTER**
**TOWN ADMINISTRATOR'S OFFICE**
**PO BOX 339**
**WEBSTER, MA 01570**
Phone: (508) 949-3800, Fax: (508) 949-3888



December 12, 2003

Sergeant John Bolduc
P.O. Box 326
Webster, MA 01570

RE:     Investigation of Excessive and/or Unnecessary Use of Force

Dear Sergeant,

Please be advised that I have become aware of several incidences of excessive and /or unnecessary force that you have used during bookings, calls and interviews. As you know, the Town of Webster has regulations that prohibit the use of force except to overcome resistance directed against you or to assist another person who is in danger of bodily injury.

The incidents that have come to my attention did not warrant such force including the booking (picture taking) of a woman, rough handling of another woman while putting her in a car, and cutting head jewelry off a man while in the station with bolt cutters while he was handcuffed.

I have asked the Interim Police Chief to investigate this matter and until you have been either cleared or otherwise, you will be placed on paid administrative leave. You shall be assigned to your house between the hours of 9:00 AM to 5:00 PM and will notify the Acting Chief if you need to leave for an emergency.

I will inform you when the investigation is complete. If you have any questions, please contact me.

Sincerely,

Robin J. Leal
Town Administrator

Cc:     Board of Selectmen
        Acting Chief Keefe

RECEIVED ON 12·12·03 @ 18:09 HRS.

# EXHIBIT 18

December 30th, 2003

To: Acting Chief William Keefe

From: Patrolman Leonard S. Gevry
      Badge #1010

Re: Sergeant John Bolduc

Sir,

This statement is at your request. This is regarding the recent statement by Sergeant Bolduc to Judge Barton where he admitted he made a threat to cause me physical harm. I do remember him speaking to me. I remember I was in uniform and on duty. I don't remember the day or exactly what was said. It was one of a few times he approached me in such a confrontational way. I have no intentions, at this time, to pursue any criminal complaint against him for it. The action speaks for itself.

Shortly after he was promoted to Provisional Sergeant he took me into the garage. I did not know why he wanted to speak with me. For some reason he felt I was trying to undermine his authority and he needed to make a point. At that time I told him it was his decision to pursue a Sergeant's position. I gave him credit for that as well. I also told him that he would have my respect as the rank of Sergeant. I asked that he respect me in turn for my position. His demeanor got stronger with me and I began to feel uncomfortable. I told him I was done talking to him if he was going to continue to speak to me in the manner he was doing. When I turned to leave he prevented me from opening the garage door to enter the hallway by jamming his foot against the door. At that point he said, "If you think you can challenge my authority, you got a big surprise coming to you". Again, I told him I was done speaking to him under the current conditions and did not want to say anything else.

In 2002 I signed for a 3rd shift position for that rotation. I did it for my own reasons. I did not expect the differences between Sergeant Bolduc and me to decay even more than they were. I hoped that matters would improve because I would in turn be the senior patrol officer beneath him. This was not the case. As time went on into the rotation I found it harder and more difficult to work because of the stress brought on by him. I disregarded the remarks made to me by other officers that he was out to get me and another officer on his shift.

On 8-19-02 (I0213638), I was requested to report at Moore Lumber on Cudworth Road to assist Officer Timothy Moran and Officer Michael Kehoe. The main reason for my involvement was to document the scene of a break and entering there. Up until this incident I was the primary crime scene technician for this department. My duty was to record photographically the crime scene itself. I was also expected to make an attempt to recover any latent print evidence that may have been left by the perpetrator(s). It was obvious that the break was well planned out by the person(s) who did the crime. There was strong evidence that showed whoever was responsible took the time to do the crime

without leaving the evidence behind that could lead to their identities. The other problem that made it difficult for the three of us at the time was the fact that the employees themselves had contaminated the scene prior, during, and even after the incident was reported. We did what we could to photograph, search, and collect as much evidence as we could. I collected approximately six bags of evidence. I decided, given the amount of property stolen, to submit what I collected to the Massachusetts State Police. After checking out that morning I had the intention of returning to the station to speak with the detective about the break. I knew Officer Kehoe was going to stay to put out a BOLO message about it for other agencies.

Within two hours I was called in by the dispatcher and was informed that a vehicle was found several towns from Webster with evidence it was used in the break. The vehicle was stolen from the Industrial Park on Town Forest Road near Moore Lumber.

An investigation against Officer Moran and I was started by Deputy Thomas Ralph. I was told it was for not following departmental procedures. I did not know of any procedures at the time. I had done my duty the same as I had done in the past, under similar circumstances. At one point I was asked to give a statement regarding my actions. Without notice, Officer Moran and myself, were approached by Sergeant Bolduc a short time after the incident when we reported in for our shift. Sergeant Bolduc's manner of speech was precise. He told us we were not to do anything else until our reports were final. It was to include what we were doing prior to the call, during the call, and after the call. What I wasn't clear with was when he told us we were not to be together. We were told we could not speak to each other to combine our reports. I sat in booking 2 with my back pointing to Moran. We proceeded to our do our own statements.

At one point Sergeant Bolduc walked by the room. When he saw that we were together he got highly emotional with us. Shouting, he ordered me into booking room 1. He added that because I could not follow orders he told me I now needed to report to the Chief of Police the following day. I tried explaining to him that I never heard him say we were to be in separate rooms. The stress over this incident was intense following the next few days. As I went through each day I began to question Deputy Ralph about what he was doing to me. It was becoming obvious to me that he wasn't attacking Officer Moran but needed to go through me to get him. Deputy Ralph was persistent with asking my why Moran left that morning. I told him he needed to clear Moran's matter with Moran himself and not me.

Another issue I brought up regarding the accusation that I did not follow departmental procedure was the Nautilus Body Works break that Ralph was called to investigate on July 2nd, 2002 (I0210515). There he was accusing me when in fact he himself did even less investigating this break. To this day he had never even filed a report. He walked out of the scene when Officer Joseph Brooks and I walked in to do the crime scene search. Before leaving he told me he had something personal to do himself and had to leave by 7:00 am. Deputy Ralph, Sergeant Bolduc, and myself, attended a specialized class in fingerprinting identification and recovery. The three of us received certificates for the class after completing eighty hours of training. They are just as capable as I am in crime scene search and recovery, although I have done it since I became an officer. Officer Suss stayed over his shift to explain to us what was known to our arrival. As a result of our involvement we obtained three written confessions from

three juveniles naming them responsible for the break into the Nautilus, the break and destruction of Serenity Hall, and damage over $2000.00 to two park vehicles behind 275 Main Street. It took our entire shift that day to achieve this. Deputy Ralph couldn't compare his actions to ours. He passed it off saying the monetary value alone was greater in the Moore case than that to the Nautilus case. I told him that I was confused with that. I added a felony is a felony.

As a result of his investigation I understand Officer Moran was suspended for sometime. I received a one-day suspension that was suspended for six months. I was told barring no other incidents it would be removed from my file after the time period. In addition to my suspension Deputy Ralph reasoned with me that I had a lot of responsibility. Besides my patrolman duties I was also responsible for maintaining the fingerprinting the department done, crime scene searching and documentation, immigration identification, our department photo logs, and our departments sex offender registry. He used the term, "I had a full plate". He also spoke of my personal life and my problems I went through with my wife's cancer battle.

He asked me what could he do to help relieve some pressure because of my load. I asked that I be taken off the road so I could dedicate more time to the in house matters and crime scene investigations. He laughed and said he wish he could but it was out of the question. He said I could chose to give up one of my responsibilities, one that he would assign another officer to perform instead. I told him I enjoyed doing all the extra duties I do and that I did not want to loose any of them. I had to choose, so I picked the sex offender registry. Deputy Ralph told me it would be too difficult at the time to train someone to move into the position at the time. So he said the crime scene technician duties would go. I tried to differ with him because of my experience and long performance of this duty. He made up my mind. He then added that all though I was giving it up it would be written as a punishment for not following procedures in the Moore case. I received my letter, which stated the reasons and remedy he made regarding his investigation. He told me he wanted it to look like I was punished by loosing the crime scene technician position and not that it was something I wanted to give up.

On 8-24-02, I responded to the Town of Dudley for a mutual aid call with Sergeant Bolduc and Officer Arron Suss (I0213958). Sergeant Bolduc had a civilian riding with him that night. He responded to the call with him. When we arrived at the scene I immediately identified the person involved to b█████████████████ was a disturbance call. I could tell she had been drinking. She asked why we were there? I told her and added we need to enter because of the disturbance to make sure things were in order. She hesitated a little too long for Sergeant Bolduc. He step up and ordered her to open the door or he'd rip it of the fucking hinges.█████████ked at me and laughed. She said what's up with him. This made Sergeant Bolduc even worse. She finally opened the door. Inside the apartment we discovered█████████████████████ ██████████too█████████████ the living room. Sergeant Bolduc arguing with █████████████the kitchen. Knowing her I would have spoken to her differently. Sergeant Bolduc in my opinion went the other way escalating her emotions instead of trying to calm her. Ev████████████████████nted to help her. They couldn't understand why I wasn't saying something to Sergeant Bolduc to stop him. I did everything I could to keep them in the living room out of sight of what was taking place.

I heard Sergeant Bolduc te̶̶̶̶̶̶̶̶̶̶now she was under arrest. He and Officer Suss dropped her to the floor and handcuffed her. She was then brought outside and loaded into the sergeant's cruiser. After sometime went by I realized we were all in the kitchen and nobody was watchin̶̶̶̶̶̶utside. I told Sergeant Bolduc I was going out to watch her.

    When I walked up to the cruiser I immediately noticed a small straw and a baggie on the ground directly under her open window. Inside the baggie I saw a small amount of white powder collected in a corner of the bag. I figured it was most likely Cocaine and that ̶̶̶̶̶̶̶d dropped it out the window̶̶̶̶̶̶̶̶ied it was hers and denied she dropped it out the window. Because I believed it to be Cocaine I brought it to the attention of Sergeant Bolduc and handed him the bag and straw. Sergeant Bolduc's report about this incident is very well written but did not mention anything about the Cocaine or what he did to dispose of it. He told me a few days later that it was only residue in the bag, not even enough to test.

    On 11-09-03, I responded to a call with Sergeant Bolduc, Officer Thomas Pysell, and Officer Michael Kehoe (I0218892). It was reported as a break into a home. When we arrived the homeowner had a suspect detained. Several items were found on the suspect that belonged to people in the house, the suspect, later identified̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶ was handcuffed behind his back and was placed in my unit under arrest. Sergeant Bolduc, Officer Kehoe, and Officer Pysell were speaking to the parties and obtaining statements. I told Sergeant Bolduc I'd transp̶̶̶̶̶̶̶̶ the station and begin the booking.

    The odor of an alcoholic beverage was really strong coming fr̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶ While returning wit̶̶̶̶̶̶̶o the station he began asking me what his charges were. I told him repeatedly he was charged with breaking and entering to start and that I had to wait to hear from my supervisor regarding any other charge̶̶̶̶̶̶̶̶̶̶ was brought into Booking Room 1. I sat him down and started to book him̶̶̶̶̶ again asked what his charges were? Again I tried to explain it to him. All of a sudden he came out with a remark, "just put me in a cell because I'm going to flip out". I tried to tell him calmly not to act out. His voice got louder; he was now demanding to know the charges! Then, he said, "Just because I'm handcuffed, don't think I can kick you". He then leaped to his feet. I raised my voice quite loudly to tell him to sit. He pushed back at me with his chest. He got up several more times lunging more at me each time. It became physical to the point he was fighting back with me.

    The dispatcher at the time called out for all units to respond to the station after hearing us. At one point Travis Gould, who was working on becoming a reservist, came into the room to help me. It was now the two of us trying to ho̶̶̶̶̶̶̶̶own. Shortly after Gould began to help Sergeant Bolduc rushed in out of nowhere yelling, "You want to fuck with my guys, huh? Then you are fucking with me too!" He pushed me away, grabbed̶̶̶̶̶̶̶d spun him around̶̶̶̶̶̶̶̶t his balance and began falling backwards to the floor. Sergeant Bolduc then pulled back and punched ̶̶̶̶̶̶̶̶̶̶̶w his left eye. He gave two more shots to the same area before I was able to hook elbows with him to stop the punching. I felt Sergeant Bolduc tug when he tried to deliver a forth punch. When he realized he couldn't punch again he kicked ̶̶̶̶̶̶̶̶̶vice on the right side of his chest. Because I was pulling Sergeant Bolduc away now he couldn't kick, but he was able to stomp him once. After the stomp Officer

Pysell jumped in between Sergeant Bolduc and ▇▇▇▇▇▇▇▇ He grabbed Sergeant Bolduc. He handed him to Officer Kehoe and said, "Put a leash on him, and get him out of here." Once Sergeant Bolduc was out of the room ▇▇▇▇▇▇ was photographed quickly and was placed in a cell.

I had a difficult time accepting what I just witnessed. I think everyone did. Later they joked with me that I should have stayed longer because one of the girls exposed her breast to them at the house. Sergeant Bolduc then asked if I was going to do the report. I just looked at him and said, "No, not on this one." He then said he would. By the end of our shift he handed me the report. I was upset with him and how he wrote it. He asked me if it was okay with me? All I replied was, Yeah. But I wasn't okay with it. In fact it really bothered me. I spoke with Officer Kehoe about it. What could be done? Officer Kehoe said he wasn't doing anything but added this by telling me, "Your senior to me, if you don't say something and it comes out later on that you knew, you know your going to get in trouble as well".

The next day I made my report to Sergeant Timothy Bent. Sergeant Bent said he'd report to Deputy Ralph. Deputy Ralph never spoke to me about the matter. No one as far as I know had been ordered to give any account of what they knew. Several days after my report Sergeant Bent asked to meet with me at Sandy's Restaurant. He felt it would be easier to talk there instead of in the station. When I met him I did not know Detective Hoover was going to meet with us as well. Hoover brought up the handcuffs and for the first time I heard the report tha▇▇▇▇▇▇▇▇ cuffed in the front and was choking me.

If this incident had taken place like Sergeant Bolduc said it did I would have been the first officer to add an additional charge of assault and battery upon a police officer, with a dangerous weapon (handcuffs).

By the end of our discussion my personal problems were address, my medical problems were addressed, and I was being asked by Hoover if I felt some time off would help me deal with the stress. He mentioned my spouse and her battle with cancer. I was shocked. I told him, "You mean to tell me that Bolduc can run around acting and treating people like he does, and I'm the one who needs time off?" He then brought up the question of me being drug tested and getting evaluated under orders by the Chief, Deputy Ralph, and the Town Administrator, Mark Stankiewicz. After these statements I didn't feel like speaking to them any longer. I agreed to do anything they wished at this point. I guess Hoover could tell how upset I was. He told me he had to assure Ralph that I was okay and whether or not he felt I was okay to continue to work. A short time went by then Sergeant Bent that everything was okay.

On 12-6-02, I got involved in a rape report with the Burriville Rhode Island Police Department (I0220589). The victim in this case claimed she was raped in Webster at the suspects home. Also that over twenty-four hours had gone by before she made her report. The victim also performed her own vaginal swabs and had them stored in her freezer. It turned out I knew the suspect from a single call to his home in the past on other matters not of a sexual nature. It was agreed that the victim be seen by a physician. I thought she would go the nearest Rhode Island Hospital but instead was transported to Hubbard Regional instead. I did not know that Officer Moran was sent to Hubbard to speak with the victim. After he arrived I did as well. The victim was being examined at the time we arrived. We were told it would be some time as well before we could speak

to her. Officer Moran and I, after all that had happened in the recent month or so with Sergeant Bolduc, looked at each other and agreed that no matter what we did, we'd be wrong. But we decided to get an officer trained in investigating rapes to respond. One officer did not want to come out. We tried again and were able to have Officer Caccipouti respond. The victim that evening told the nurses she did not want to pursue charges. Officer Caccipouti was told the same. I became even more uncomfortable that evening after the victim claimed that the suspect was a friend with all the Webster Police, that he had us all in his back pocket.

Again, as expected by Officer Moran and myself, our actions again were being look at. As far as I could tell another investigation was taking place. Even after the fact that the victim had no intention of pursuing a complaint against the suspect. However my feelings were that the investigation was geared more toward the refusal of the first officer we called that would not come to Hubbard. Again, Sergeant Bolduc met us at the start of our shift. Again we (Moran and me) had to be separate when we wrote our explanations of our actions before, during, and after the incident. Sergeant Bolduc made it very clear to me this time that we were to be apart. He mentioned the evening we made our reports for Moore Lumber. He said I seemed to have a habit of not hearing him.

After I gave my statement Sergeant Bolduc told me it wasn't complete because I did not mention the first officer. I told him I did not want to implicate the officer. I added that I couldn't justify the relevance of it. At this point he said, do it or else. I entered it. When I was done I was told to go home. The Chief would be notified and that I would be paid. I left the station but knowing I had to face my spouse that I came home I decided to go back and speak with Sergeant Bolduc. I tried speaking to him one-on-one in his office. I more or less beg him to allow me to complete my shift. I couldn't understand why he was treating me this way. He finally looked at me and sternly said, "Officer, get out of my office now!" He added if I were not out of his sight in ten seconds he would bring additional charges up against me for insubordination. I walked out saying I wasn't trying to be insubordinate; I was trying to be human. I met Officer Moran before I went home. He couldn't understand why I left.

Once other incident that Sergeant Bolduc yelled and swore at me involved Officer Yurkevicius. I don't recall the date but I reported to work after my two days off. I stopped at the mail slots in the hall after I noticed I had some. I heard Sergeant Bolduc in Booking Room 2 speaking with someone regarding, I assumed, a missing kid. I was involved with reading several notices from the Sex Offender Registry. I did not know he was speaking to me. When I began to focus on exactly what he was saying I discovered it was something I needed to record on paper because he was telling me several names. Once I finally had a slip of paper and pen ready he had to mention the names at least three times to me. He stormed out of the room, saying you stay here; I'll get someone else to go. I told him I'd go. Officer Yurkevicius was the first officer in his sight. He started yelling, GO! GO! GO! NOW Mister! Officer Yurkevicius ran past me and continued running out of the station. I walked into the hall to go look as well. He called me back and took me into Booking Room 1. He slammed the door and proceeded to talk sternly with me. I told him he did not have to speak or treat me this way. I explained to him that he caught me off guard after I had just walked in the station. My attention was focused on what I was reading regarding the sex offender registry notices and not what he was saying to me. After discussing this with him he apologized and we shook hands

over it. When I left I went out looking for the missing girl. I spoke to one person that evening that led me to ███████████t. I found the missing girl and brought her in. I was then asked to go to Hubbard Regional Hospital. Officer Kehoe was complained of chest pains this evening after Sergeant Bolduc acted out over the missing child.

Lastly,

I worked an extra detail at LKQ recently on Route 16 between 11:00 pm to 4:00 am. Officer Moran met me a day later. He told me when I called in someone commented to Sergeant Bolduc that his buddy (meaning me) was working the detail at LKQ. Officer Moran told me he was really surprised to hear Sergeant Bolduc's reply, " He's not my buddy, I'll punch him right in the fucking face!" Since he openly admitted making the threat and this latest statement by Officer Moran I'm even uneasier working when Sergeant Bolduc is around. I have tried to avoid him. I don't speak to him any longer and if needed I still respect his position only. My spouse has expressed concerns for her safety since reading the report from Judge Barton.

This statement was not easy for me to compile. But it is a true and accurate account of the incidents I had involving Sergeant Bolduc. I spoke with ██████████████ this report. She would be willing to speak with the Town Administrator or yourself, Sergeant Keefe regarding I0215938.

Respectfully submitted,

Patrolman Leonard S. Gevry
Badge #1010
Webster Police Department

# EXHIBIT 19

# DIRECT DECISION INSTITUTE

*Leo F. Polizoti, Ph.D.*
*Licensed Psychologist/Health Service Provider*
*Director, Police Consultation Program*
*e-mail:drdecision@aol.com*

Date of report: January 27, 2004

Date of assessment: January 14, 2004

Officer: Sergeant John Bolduc

Department: Webster Police Department



DEFENDANT'S DEPOSITION EXHIBIT
PENGAD 800-631-6989
20 Bolduc
9/13/06

## FITNESS FOR DUTY EVALUATION

The above-named law enforcement officer was referred for a psychological fitness-for-duty evaluation (FFDE) because this officer's emotional stability has come into question. This evaluation is designed to conform to the FFDE guidelines adopted by the International Association of Chiefs of Police, Police Psychological Services Section. It also conforms to the ethical guidelines of the American Psychological Association and the Massachusetts Psychological Association in addition to the legal requirements of the Americans with Disabilities Act.

**Disclaimer:**
The evaluation opinions would need to be reconsidered if it is determined that the information provided is found to be misleading, deceptive, incomplete, distorted or untrue.

**Referral question:**
The specific question to be addressed was to determine the status of this officer's psychological functioning as it relates to performing the duties required of a Sergeant for the Webster Police Department.

**Evaluation procedures/tests used:**
Minnesota Multiphasic Personality Inventory-2 (MMPI-2); clinical interpretive report.
Millon Clinical Multiaxial Inventory-III (MCMI III), clinical interpretive report.

---

*Telephone & Fax (508) 798-2399, Toll-free (800) 842-7778*
*338 Highland Street, Worcester, MA. 01602*

1/28/2004 4:33 PM  FROM: 508-798-2399    CC Direct Decision Institute  TO:   1 508 9493888    PAGE: 003 OF 004

Personality Assessment Inventory, Law Enforcement (PAI)
Extended clinical interviews (3).
Information supplied by the Acting Chief of Police, Sergeant William Keefe.

**History:**
Sergeant Bolduc was referred for a psychological fitness for duty evaluation because of concerns regarding anger and physically aggressive behaviors. These include angry outbursts; grabbing a prisoner's face to have her picture taken; punching a prisoner in the face several times and cutting off several pieces of another prisoner's jewelry with bolt cutters. Additional aggressive behavior has been alleged by others he has worked with and been supervised by. These behaviors are still under investigation.

**Mental status:**
During the assessment process Officer Bolduc was quite open and cooperative. His emotional functioning was essentially within normal limits and he manifested an absence of psychological symptoms. His level of anxiety of was low considering the circumstances surrounding the assessment.

**Testing results:**
The results of the MMPI-2 were not very useful since he omitted responses to 33 items. Although this is not enough to invalidate the test results, many of the scaled scores were lower than expected. I reviewed the omitted items with him and determined that certain aspects of his personality e.g., compulsiveness, accounted for many of the omissions as did a degree of defensiveness when responding to the test items.

The MCMI-III results also were somewhat compromised due to his tendency to not reveal himself. Therefore, the results were distorted in a positive direction. Problematic personality traits were indicated but their severity is difficult to determine because of the issues stated above.

The results of the PAI indicate that the overall probability of him being found "poorly suited" for law enforcement work is "low" in a pre-employment screening situation. But, the likelihood of a negative behavioral history in job-relevant domains is at the "high-risk level" for anger management problems.

**Summary:**
This officer has reportedly been described as being able to function as a "good police officer" but is somewhat explosive at times and becomes aggressive. He is an outgoing and intelligent person. His personality makeup includes compulsiveness, a strong sense of right or wrong and a measure of grandiosity.

2

He feels paternal toward those who work under his supervision and is dedicated to their well-being. His verbally aggressive style has created problems for him in interpersonal relations and he states that he is an individual who tells it like it is. His strong sense of dominance and desire to get the job done come across as overly aggressive. He has generally been able to manage these feelings while performing policing duties and interacting with the public.

The issues mentioned in the history are indicative of physical aggression. It appears that if he is in charge of a situation and things are going the way he thinks they should go, he probably can function appropriately. If the issues mentioned previously are found to be true, it would be my opinion that he has a serious problem with hostility that manifests itself in situations that do not conform to his idea of what needs to be done and in what way.

The incident that included his allegedly punching a prisoner multiple times is critical for the purpose of this evaluation since Sgt. Buldoc insisted that he hit the prisoner only once in a deliberate attempt to prevent his partner from being hurt. The other incidents, though problematic, would have less impact on my conclusions although they still would indicate problematic behaviors that would need to be addressed. If they are found to be true and having occurred as described above, my evaluation results would indicate that he is a person with personality issues that are detrimental to functioning appropriately as a police officer. Unfortunately, personality problems are difficult, if at all possible, to detect in pre-employment interviews and psychological screening unless they are relatively blatant. They come to the forefront after incidents occur as described above.

**Recommendations:**

1. If the incident mentioned in the history section that involved punching the prisoner multiple times is found to be true, it would be my opinion that this officer is unfit for law enforcement duty and I would recommend that he not return to full-duty status. He did admit to the bolt cutter and picture taking incidents and depending what other information is gleaned from the ongoing investigations, I would have additional recommendations to make.

Leo F. Polizoti, Ph.D.

Licensed Psychologist Provider
Police, Consulting Psychologist

3

# EXHIBIT 20



**TOWN OF WEBSTER**
**TOWN ADMINISTRATOR'S OFFICE**
**PO BOX 339**
**WEBSTER, MA  01570**
Phone: (508) 949-3800, Fax: (508) 949-3888

March 19, 2004

Mr. John Bolduc, Jr.
P.O. Box 326
Webster, MA 01570

Re:    Town of Webster and John Bolduc

Dear Mr. Bolduc:

        Please be advised that this letter constitutes my decision regarding the hearing conducted, pursuant to M.G.L. c. 31, on March 10, 2004.  Effective immediately your employment with the Town of Webster is terminated.  Attached please find the specification of charges letter dated February 26, 2004 from Acting Chief of Police William Keefe which outlines the charges that were substantiated at the March 10, 2004 hearing.  Further it is my position that the charges individually or collectively would justify your termination.

        All of the Town's property which is in your possession is to be returned to Acting Chief of Police William Keefe immediately.

        I have enclosed a copy of M.G.L. c. 31, §§41-45 for your review.

Sincerely,

Robin J. Leal

Enc.

DEFENDANT'S DEPOSITION
EXHIBIT
25 Bolduc
9/13/06
PENGAD 800-631-6989

cc:    Board of Selectmen
       Acting Police Chief
       Town Counsel



**WEBSTER POLICE DEPARTMENT**
Office of the Chief of Police
Webster Massachusetts 01570
**(508) 943-1212**
FAX (508) 949-3898

BY HAND AND FIRST CLASS MAIL

March 1, 2004

Mr. John Bolduc, Jr.          **CONFIDENTIAL-NOT A PUBLIC DOCUMENT**
P.O. Box 326
Webster, MA  01570

Re:    SPECIFICATION OF CHARGES AND RECOMMENDATION
       OF DISCIPLINARY ACTION

Dear Mr. Bolduc:

Please be advised that I have requested a hearing before the Town Administrator based on your
conduct on or about February 19, 2002, November 9, 2003 and November 30, 2003.

As you are aware, an investigation was conducted into your conduct as a Sergeant of the Police
Department for the Town of Webster regarding your actions during the above dates.  Internal
investigations into your conduct illustrate that you have violated several department rules and
regulations.  This conduct included use of excessive force, conduct unbecoming, failure to file a
report and failure to follow appropriate departmental procedures.  If the Town Administrator
chooses to subsequently suspend you for a period of more than five days, reinstatement shall be
subject to the approval of the Personnel Administrator of the Massachusetts Human Resources
Division as provided in M.G.L. c.31, §41.

The specifics of these allegations are summarized as follows:

First, on or about February 19, 2002 you failed to follow the police department practice
involving booking procedure.  Specifically, you requested a prisoner, referenced herein as
Detainee 1, to remove all of his jewelry while you were processing him through the booking
procedure.  You contacted Webster EMS and requested a ring cutter and a bolt cutter.  You
proceeded to cut the facial piercings off of Detainee 1 with bolt cutters.  This is a violation of the
departmental practice for booking procedures as well as constitutes conduct unbecoming.

Second, on or about November 9, 2003, you used excessive force when dealing with a prisoner,
referenced herein as Detainee 2.  Specifically, while Detainee 2 was being processed through the
booking procedure he became unruly.  At this time you arrived at the scene and said words to the
effect of: "You want to fuck with my guy, huh?  Then you are fucking with me."  You then
forcefully turned Detainee 2 around and punched him several times below his left eye.  Further,
you proceeded to kick and stomp Detainee 2 in the chest.  You then stated words to the effect of
"Put a leash on him, and get him out of here."  These actions violate the department's use of

Mr. John Bolduc, Jr.
March 1, 2004
Page 2

force policy, integrated force management procedure and constitutes conduct unbecoming a police officer.

Third, on or about November 30, 2003 you were involved in an altercation with a female prisoner, referenced herein as Detainee 3, while she was being processed through the booking procedure. During the booking and processing procedure Detainee 3 refused to follow the directions of a fellow officer and allow herself to be photographed. You began to yell at Detainee 3 to follow the directions that she had been given. Once Detainee 3 continued to refuse to be photographed you held her face toward the camera so that a picture could be taken. You then held her head and eyes open for a second photograph. This conduct constitutes a violation of the department's use of force policy, the integrated force management procedure, and constitutes conduct unbecoming.

Each of these violations on or about February 19, 2002, November 9, 2003 and November 30, 2003 independently, as well as collectively, provides just cause for serious discipline. After a compete review of these matters, I am compelled for the good order and discipline of the Webster Police Department to request the appointing authority, the Town Administrator, to terminate your employment with the Town.

I have enclosed copies of Massachusetts General Laws Chapter 31, §41-45 for your review.

Respectfully,

William Keefe
Acting Chief of Police

/hc
Encl:
cc:      Robin Leai, Town Administrator
         Board of Selectmen

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 41 Discharge; removal; suspension; transfer; abolition of office; reduction of rank or pay; hearings; review**

Section 41. Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his written consent if he has served as a tenured employee since prior to October fourteen, nineteen hundred and sixty-eight, lowered in rank or compensation without his written consent, nor his position be abolished. Before such action is taken, such employee shall be given a written notice by the appointing authority, which shall include the action contemplated, the specific reason or reasons for such action and a copy of sections forty-one through forty-five, and shall be given a full hearing concerning such reason or reasons before the appointing authority or a hearing officer designated by the appointing authority. The appointing authority shall provide such employee a written notice of the time and place of such hearing at least three days prior to the holding thereof, except that if the action contemplated is the separation of such employee from employment because of lack of work, lack of money, or abolition of position the appointing authority shall provide such employee with notice at least seven days prior to the holding of the hearing and shall also include with such notice a copy of sections thirty-nine and forty. If such hearing is conducted by a hearing officer, his findings shall be reported forthwith to the appointing authority for action. Within seven days after the filing of the report of the hearing officer, or within two days after the completion of the hearing if the appointing authority presided, the appointing authority shall give to such employee a written notice of his decision, which shall state fully and specifically the reasons therefor. Any employee suspended pursuant to this paragraph shall automatically be reinstated at the end of the first period for which he was suspended. In the case of a second or subsequent suspension of such employee for a period of more than five days, reinstatement shall be subject to the approval of the administrator, and the notice of contemplated action given to such employee shall so state. If such approval is withheld or denied, such employee may appeal to the commission as provided in paragraph (b) of section two.

A civil service employee may be suspended for just cause for a period of five days or less without a hearing prior to such suspension. Such suspension may be imposed only by the appointing authority or by a subordinate to whom the appointing authority has delegated authority to impose such suspensions, or by a chief of police or officer performing similar duties regardless of title, or by a subordinate to whom such chief or officer has delegated such authority. Within twenty-four hours after imposing a suspension under this paragraph, the person authorized to impose the suspension shall provide the person suspended with a copy of sections forty-one through forty-five and with a written notice stating the specific reason or reasons for the suspension and informing him that he may, within forty-eight hours after the receipt of such notice, file a written request for a hearing before the appointing authority on the question of whether there was just cause for the

suspension. If such request is filed, he shall be given a hearing before the appointing authority or a hearing officer designated by the appointing authority within five days after receipt by the appointing authority of such request. Whenever such hearing is given, the appointing authority shall give the person suspended a written notice of his decision within seven days after the hearing. A person whose suspension under this paragraph is decided, after hearing, to have been without just cause shall be deemed not to have been suspended, and he shall be entitled to compensation for the period for which he was suspended. A person suspended under this paragraph shall automatically be reinstated at the end of such suspension. An appointing authority shall not be barred from taking action pursuant to the first paragraph of this section for the same specific reason or reasons for which a suspension was made under this paragraph.

If a person employed under a provisional appointment for not less than nine months is discharged as a result of allegations relative to his personal character or work performance and if the reason for such discharge is to become part of his employment record, he shall be entitled, upon his request in writing, to an informal hearing before his appointing authority or a designee thereof within ten days of such request. If the appointing authority, after hearing, finds that the discharge was justified, the discharge shall be affirmed, and the appointing authority may direct that the reasons for such discharge become part of such person's employment record. Otherwise, the appointing authority shall reverse such discharge, and the allegations against such person shall be stricken from such record. The decision of the appointing authority shall be final, and notification thereof shall be made in writing to such person and other parties concerned within ten days following such hearing.

Any hearing pursuant to this section shall be public if either party to the hearing files a written request that it be public. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

If it is the decision of the appointing authority, after hearing, that there was just cause for an action taken against a person pursuant to the first or second paragraphs of this section, such person may appeal to the commission as provided in section forty-three.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section.

Notice of any action taken under this section shall be forwarded forthwith by the appointing authority to the personnel administrator.

---

Return to:

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 41A Discharge, removal or suspension; hearing before disinterested hearing officer; review**

Section 41A. Upon the request of the appointing authority and a tenured employee, who is entitled to a hearing pursuant to the first paragraph of section forty-one, a hearing before a disinterested hearing officer, designated by the chairman of the commission, may be held in lieu of a hearing before the appointing authority. Such hearing officer shall make findings of facts and may make recommendations for decision to the commission. Following the decision of the commission, there shall be no appeal pursuant to the provisions of section forty-three; provided, however, that a petition to review may be filed pursuant to the provisions of section forty-four. All requirements relative to written notice and the holding of hearings pursuant to this section shall be governed by those set forth in section forty-one.

---

Return to:

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

Case 4:05-cv-40030-FDS     Document 24-12     Filed 11/17/2006     Page 12 of 17

# GENERAL LAWS OF MASSACHUSETTS

### PART I.
### ADMINISTRATION OF THE GOVERNMENT

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 42 Complaints; hearings; jurisdiction; filing of civil action**

Section 42. Any person who alleges that an appointing authority has failed to follow the requirements of section forty-one in taking action which has affected his employment or compensation may file a complaint with the commission. Such complaint must be filed within ten days, exclusive of Saturdays, Sundays, and legal holidays, after said action has been taken, or after such person first knew or had reason to know of said action, and shall set forth specifically in what manner the appointing authority has failed to follow such requirements. If the commission finds that the appointing authority has failed to follow said requirements and that the rights of said person have been prejudiced thereby, the commission shall order the appointing authority to restore said person to his employment immediately without loss of compensation or other rights.

A person who files a complaint under this section may at the same time request a hearing as to whether there was just cause for the action of the appointing authority in the same manner as if he were a person aggrieved by a decision of an appointing authority made pursuant to all the requirements of section forty-one. In the event the commission determines that the subject matter of such complaint has been previously resolved or litigated with respect to such employee, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with said section eight, the commission shall forthwith dismiss such complaint. If said complaint is denied, such hearing shall be conducted and a decision rendered as provided by section forty-three.

The supreme judicial court or the superior court shall have jurisdiction over any civil action for the reinstatement of any person alleged to have been illegally discharged, removed, suspended, laid off, transferred, lowered in rank or compensation, or whose civil service position is alleged to have been illegally abolished. Such civil action shall be filed within six months next following such alleged illegal act, unless the court upon a showing of cause extends such filing time.

---

Return to:

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
## ADMINISTRATION OF THE GOVERNMENT

## TITLE IV.
## CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 43 Hearings before commission**

Section 43. If a person aggrieved by a decision of an appointing authority made pursuant to section forty-one shall, within ten days after receiving written notice of such decision, appeal in writing to the commission, he shall be given a hearing before a member of the commission or some disinterested person designated by the chairman of the commission. Said hearing shall be commenced in not less than three nor more than ten days after filing of such appeal and shall be completed within thirty days after such filing unless, in either case, both parties shall otherwise agree in a writing filed with the commission, or unless the member or hearing officer determines, in his discretion, that a continuance is necessary or advisable. If the commission determines that such appeal has been previously resolved or litigated with respect to such person, in accordance with the provisions of section eight of chapter one hundred and fifty E, or is presently being resolved in accordance with such section, the commission shall forthwith dismiss such appeal. If the decision of the appointing authority is based on a performance evaluation conducted in accordance with the provisions of section six A and all rights to appeal such evaluation pursuant to section six C have been exhausted or have expired, the substantive matter involved in the evaluation shall not be open to redetermination by the commission. Upon completion of the hearing, the member or hearing officer shall file forthwith a report of his findings with the commission. Within thirty days after the filing of such report, the commission shall render a written decision and send notice thereof to all parties concerned.

If the commission by a preponderance of the evidence determines that there was just cause for an action taken against such person it shall affirm the action of the appointing authority, otherwise it shall reverse such action and the person concerned shall be returned to his position without loss of compensation or other rights; provided, however, if the employee, by a preponderance of evidence, establishes that said action was based upon harmful error in the application of the appointing authority's procedure, an error of law, or upon any factor or conduct on the part of the employee not reasonably related to the fitness of the employee to perform in his position, said action shall not be sustained and the person shall be returned to his position without loss of compensation or other rights. The commission may also modify any penalty imposed by the appointing authority.

Any hearing pursuant to this section shall be public if either party so requests in writing. The person who requested the hearing shall be allowed to answer, personally or by counsel, any of the charges which have been made against him.

The decision of the commission made pursuant to this section shall be subject to judicial review as provided in section forty-four.

Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of

Case 4:05-cv-40030-FDS    Document 24-12    Filed 11/17/2006    Page 14 of 17

# GENERAL LAWS OF MASSACHUSETTS

### PART I.
### ADMINISTRATION OF THE GOVERNMENT

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 44 Judicial review**

Section 44. The commission may institute appropriate proceedings in the superior court for enforcement of its final orders or decisions. Any party aggrieved by a final order or decision of the commission following a hearing pursuant to any section of this chapter or chapter thirty-one A may institute proceedings for judicial review in the superior court within thirty days after receipt of such order or decision. Any proceedings in the superior court shall, insofar as applicable, be governed by the provisions of section fourteen of chapter thirty A, and may be instituted in the superior court for the county (a) where the parties or any of them reside or have their principal place of business within the commonwealth, or (b) where the commission has its principal place of business, or (c) of Suffolk. The commencement of such proceedings shall not, unless specifically ordered by the court, operate as a stay of the commission's order or decision.

---

**Return to:**

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

# GENERAL LAWS OF MASSACHUSETTS

## PART I.
### ADMINISTRATION OF THE GOVERNMENT

### TITLE IV.
### CIVIL SERVICE, RETIREMENTS AND PENSIONS

**CHAPTER 31.** CIVIL SERVICE

**Chapter 31: Section 45 Reimbursement for defense expenses**

Section 45. A tenured employee who has incurred expense in defending himself against an unwarranted discharge, removal, suspension, laying off, transfer, lowering in rank or compensation, or abolition of his position and who has engaged an attorney for such defense shall be reimbursed for such expense, but not to exceed two hundred dollars for attorney fees for each of the following: (1) a hearing by the appointing authority; (2) a hearing pursuant to section forty-two or forty-three; (3) a judicial review pursuant to section forty-four; and not to exceed one hundred dollars for each of the following: (1) summons of witnesses; (2) cost of stenographic transcript; (3) any other necessary expense incurred in such defense.

Any person seeking such reimbursement shall file with his appointing authority a written application therefor within thirty days after final disposition of his case. The appointing authority shall, within thirty days after receipt of such application, pay such reimbursement from the same source as that from which the salary of the person seeking the reimbursement is paid, but only upon receipt of satisfactory proof that such expenses were actually incurred for the purposes set forth in this section.

Saturdays, Sundays, and legal holidays shall not be counted in the computation of any time period specified in this section.

---

Return to:

** Next Section ** Previous Section ** Chapter Table of Contents ** Legislative Home Page

# EXHIBIT 21

COMMONWEALTH OF MASSACHUSETTS
CIVIL SERVICE COMMISSION

APPEAL PURSUANT TO
M.G.L. c. 31, Secs. 42 & 43

1 Ashburton Place, Room 503
Boston, MA. 02108
(617) 727-2293

Petitioner Information

Sergeant John Bolduc
Name

33 High Crest Park
Street Address

Webster, MA 01570
City, State, Zip Code

508-943-9907
Telephone Number

Sergeant in Police Department
Title/ Position

Town of Webster
Appointing Authority (Employer)

350 Main St., P.O. Box 193
Street Address

Webster, MA 01570
City, State, Zip Code

413-949-3800
Telephone Number

5/5/96
Civil Service Seniority Date

## I. APPEAL OF JUST CAUSE DETERMINATION

Pursuant to the provisions of M.G.L. c.31, sec. 43, I hereby appeal the decision of my appointing authority finding just cause to:

xx Discharge
o Suspend for ___ days/months
o Transfer (c. 31, sec. 35)
o Layoff
o Abolish my position
o Other ___

I received the decision on  3 / 19 / 04  (mm/dd/year). (**Attach** the Decision)

## II. APPEAL OF PROCEDURE IN DETERMINING JUST CAUSE

Pursuant to the provisions of M.G.L. c. 31, sec. 42, I hereby allege that my appointing authority has failed to follow the requirements of M.G.L. c. 31, sec. 41 that has affected my employment or compensation. Specifically, the appointing authority did not:

xx Hold a timely hearing
o Provide a copy of c. 31, secs. 41-45
o (and sec. 39 in layoff)
xxxx Issue a timely decision
xxx Provide proper notice
o Other (Specify):

John Bolduc was placed on administrative leave on 12/12/03. From that time
until his discharge on 3/19/04 the Town engaged in an unprecedented investigation that was
This action has prejudiced my rights by _____ unlimited in scope, time and subject
matter.

see over →

# EXHIBIT 22

## The Commonwealth of Massachusetts
### Commission Against Discrimination
**436 Dwight Street, Rm. 220, Springfield, MA 01103**
**Phone: (413) 739-2145  Fax: (413) 784-1056**

## DISMISSAL and NOTIFICATION of RIGHTS

| | |
|---|---|
| To:   John Bolduc<br>P.O. Box 326<br>Webster, MA 01570 | Case: Bolduc vs. Webster Police Department<br>MCAD Docket Number: 032301779<br>EEOC Number: 16CA302081<br>Investigator: Karen Dome |

Your complaint has been dismissed for the following reasons:

[ ]   The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]   Respondent employs less than the required number of employees.

[ ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[X]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ]   Other (briefly state)

### - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. **Attention: Migdalia Rivera.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

| | |
|---|---|
| _Cynthia Tucker_<br>Cynthia Tucker<br>Investigating Commissioner | Date   5/11/04 |

Cc:   Elizabeth Corbo
Kapelman and Paige
31 St. James Avenue
Boston, MA 02116

John J. Davis
Pierce, Davis and Perritano
10 Winthrop Square
Boston, MA 02116

# MEMORANDUM

CASE NAME: Bolduc vs. Webster Police Department.
DOCKET NO: 032301779
EEOC NO: 16CA302081
NUMBER OF EMPLOYEES: 25+
INVESTIGATOR: Karen Dome

RE:   RECOMMENDATION FOR DISMISSAL OF COMPLAINT
DATE:  May 7, 2004

## ISSUE(S) INVESTIGATED:

On June 16, 2003, Complainant filed a charge alleging that Respondent discriminated against him by subjecting him to unequal terms and conditions of employment in retaliation for being a witness in a discrimination case against the Webster Police Department. Police Chief Bergeron has interfered with his civil rights, by changing his rotation schedule from days to nights in the middle of an investigation. Chief Bergeron has created a hostile environment with intimidation and unequal treatment. He believe the respondent's conduct violates M.G. L.C. 151B s4 (4) (4a) and Title VII of the 1964 Civil Rights Act as amended.

## SUMMARY OF FINDINGS:

Respondent denies all allegations.  The evidence presented supported Respondent's position that Complainant was not subject to unequal terms and conditions or retaliated against. Chief Bergeron did not created a hostile work environment or interfere with his civil rights.  Complainant has failed to produce sufficient evidence of pretext.  Therefore, there is insufficient evidence upon which a fact-finder could form a reasonable belief that the Respondent committed an unlawful practice.

Agustin Cruz
Investigative Intern

Karen Dome
Investigator

Migdalia Rivera
Supervisor

# EXHIBIT 23

# GREEN, MILES, LIPTON & FITZ-GIBBON

### ATTORNEYS AT LAW
### 77 PLEASANT STREET
### POST OFFICE BOX 210
### NORTHAMPTON, MASSACHUSETTS 01061-0210
### (413) 586-8218
### FAX (413) 584-6278

JOHN J. GREEN, JR.
HARRY L. MILES
ROGER P. LIPTON
JOHN H. FITZ-GIBBON

SUSAN L. MILES
BRIAN L. BLACKBURN
JON HEYMAN
(GEOFFREY B. WHITE - Retired)

August 5, 2004

**FIRST CLASS AND RETURN
RECEIPT REQUESTED**

Town of Webster
Board of Selectmen
P.O. Box 339
Webster, MA  01570

RE:     John Bolduc: Notice pursuant to M.G.L. c. 149, § 185 (c)(1)

To the Select Board:

John Bolduc, formerly an officer of the Webster Police Department, has retained this

office to represent him with respect to the claims he has against the Town of Webster, as

enumerated below.  This notice is provided to the Town of Webster pursuant to Massachusetts

General Laws Chapter 149, § 185 (c)(1).  The purpose of this underline notice is to bring to the attention of

the Board activities, policies and practices of the Webster Police Department and the Town

Administrator which constitute violations of law.  It is our intent to provide the Town an

opportunity to rectify those unlawful practices, prior to undertaking litigation before

Massachusetts and United States Courts.  Unless resolution is achieved, we will initiate litigation

for the purposes of correcting the unlawful policies and practices and to obtain relief for John

Bolduc.  We contend employees of Webster retaliated against John Bolduc because he

substantiated racist public behavior by a uniformed officer of the Webster Police Department. This notice constitutes an opportunity for the Town to reverse its unlawful adverse employment actions against John Bolduc; those actions, enumerated below, include his termination from the Webster Police Department by the Town of Webster, acting by and through its Town Administrator.

Bolduc alleges that the following actions and activities of the Webster Police Department and its agents constituted violations of Massachusetts and Federal law, both in practice generally and specifically as applied to him:

1) The failure of the Police Department to comply with the administrative requirement of recording the race of individuals detained by the police for traffic violations, which is intended to deter racial profiling;

2) The failure of the Police Department to discipline officers for conduct unbecoming an officer, i.e. making overly racist remarks while in uniform, on duty, and in a public place;

3) The taking of adverse retaliatory employment actions against officers who either directly reported or substantiated racist behavior on the part of members of the Webster Police Department.  Specifically as to Sergeant John Bolduc:  On May 12, 2003, he complied with Chief Bergeron's direct order and provided written substantiation and confirmation of Officer Brian Barnes' overtly racist conduct and conduct unbecoming an officer. As a result, Chief Bergeron, Acting Chief Keefe, and Town Administrator Leal unlawfully retaliated against him as follows:

a) His duty status was changed from day shift to night shift;

b)      His assignments were changed, e.g., he was taken off an ongoing murder investigation and instead assigned to uniformed patrol;

c)      He was ordered to vacate his assigned office space and relinquish all keys (he was the only sergeant on the force without assigned office space);

d)      Two closed investigations regarding prisoner handling by Bolduc were re-opened by Town officials with the intent of effecting a retaliatory discharge;

e)      Town officials solicited unfavorable information about Bolduc with the intent of effecting a retaliatory discharge;

f)      He was denied a commendation regarding a highly successful murder investigation;

g)      He was targeted for discharge from the Webster Police Department prior to the conduct of a fair and impartial hearing; and

h)      He was wrongfully discharged from the Webster Police Department on March 19, 2004.

It is Bolduc's intention to assert claims for relief before the Massachusetts and Federal Courts pursuant to MGL c. 149, §185, 42 U.S.C. § 1983, and such other state and federal statutes and regulations as may be applicable to the facts of this case. The Town of Webster may avoid litigation against it, its officers, agents and employees by: (1) ensuring that the officers of the Town of Webster comply with the requirements of the Commonwealth to monitor and prevent

racial profiling; (2) disciplining officers who display overtly racist conduct while on duty and in uniform; and (3) by the immediate reinstatement of John Bolduc to his position as a Sergeant with the Webster Police Department, with retroactive pay and benefits from March 19, 2004 to the present and the payment of his Attorney's fees as incurred to date.

In addition to providing <u>notice</u> pursuant to M.G.L. c. 149, § 185, this letter proposes a settlement of disputed claims.  This letter is not intended to waive any cause of action or claim for relief which the law allows.

Very truly yours,

John J. Green, Jr.

JJG/khr

cc:    John Bolduc

# EXHIBIT 24

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

ROBIN LEAL
DATE:  SEPTEMBER 15, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

113

1  something, we would put together a policy. It
2  could be in the form of a memo but the basis of my
3  answer is that we were revising as needed and as
4  we were going along.
5      Q.   Do you recall any specific policies and
6  procedures that were revised that were revised as
7  a result of the Barton report?
8      A.   Any specific ones?  No.
9      Q.   If the departments were reviewing and
10 amending policies and procedures, would those
11 amendments or revisions be forwarded to you for
12 approval prior to implementation?
13     A.   Sometimes.
14     Q.   Did that include all departments?
15     A.   Yes.
16     Q.   Would they be submitted to you in the
17 form of a draft document?
18     A.   Yes.
19     Q.   Do you recall any specific policies and
20 procedures that were revised between your assuming
21 your duties as town administrator and May 4th,
22 2004 with regard to the Police Department?
23     A.   Specific policies regarding the Police
24 Department?  No.

114

1          There may have been some; I don't
2  remember what they would have been.
3          MR. GREEN:  Would you mark this?
4          (Plaintiff's Deposition Exhibit
           No. 13 offered and marked.)
5
6      Q.   (BY MR. GREEN)  I'm going to show you
7  what's been marked as 13 for the purposes of
8  today's deposition and ask if you recognize this
9  document? (Indicating.)
10     A.   (Witness examining document.)  Yes; I
11 do.
12     Q.   As you look at this document can you
13 tell when it was that you received this document?
14 First of all, was this document -- was it a
15 document that was referred to you?
16     A.   Yes; I believe so.
17     Q.   Do you have any recollection as to when
18 this recommendation was given to you?
19     A.   For a date?
20     Q.   Yes.
21     A.   No.
22     Q.   Well, was it before or after you
23 referred Bolduc to Polizoti?
24     A.   I believe it was probably about the same

115

1  time.  This may have even been what was sent to
2  Polizoti.  I don't actually remember.
3      Q.   So if it was about the same time, that
4  would be January of 2004?
5      A.   I think so.
6      Q.   Upon receiving this from Acting Chief
7  Keefe what did you do?
8      A.   I don't remember the order that it was
9  given to me in so I'm not sure if this was in
10 response -- I don't know if this is the actual
11 response to the investigation or if there was a
12 different document that was that.
13     Q.   Well if you recall, does this document
14 as you look at it here constitute the completion
15 of the investigation?
16     A.   It appears to be.  It appears to be his
17 report to me from my request that he investigate
18 whether or not there was a history of excessive
19 use of force by Sergeant Bolduc.
20     Q.   Going to the last page of the document,
21 looking at the first sentence, can you explain why
22 Chief Keefe would have referred to himself as
23 Acting Chief Keefe?
24          Did you have anything to do with the

116

1  preparation of the writing of this document?
2      A.   I don't remember.  I was working with
3  Chief Keefe.  We had town counsel working with
4  Chief Keefe.  Chief Keefe was also working with
5  sergeants.
6          I do not remember whether or not I had
7  seen this document.  It was quite often that I
8  would review his drafts.  This one -- looking at
9  the way it was written, I wouldn't think that I
10 reviewed this one and revised it.
11     Q.   But I think you're saying that you had
12 in the past.
13          Can you recall any specific documents
14 that you had reviewed drafts of and revised?
15     A.   Absolutely most of the time, personnel,
16 to check to make sure that we were within our
17 legal rights; procurement drafts, that things were
18 worded that for sure you had in your dates and
19 your vendors.
20          Mostly around procurement or personnel
21 or press releases.  Anything going out to the
22 newspapers I usually asked to take a look at --
23 and that was for all departments.
24     Q.   Going back to what has been marked as

# EXHIBIT 25





PENGAD 800-631-6989

DEFENDANT'S DEPOSITION
EXHIBIT

4 Bdu
8/3/06

# EXHIBIT 26

