UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-40030FDS

_____
                                )
JOHN A. BOLDUC, JR.             )
            Plaintiff,          )       **PLAINTIFF JOHN A. BOLDUC,**
                                )       **JR.'S MEMORANDUM IN**
                                )       **OPPOSITION TO THE**
v.                              )       **MOTION FOR SUMMARY**
                                )       **JUDGMENT OF DEFENDANTS**
TOWN OF WEBSTER, ROBIN          )       **TOWN OF WEBSTER,**
LEAL, RICHARD BERGERON,         )       **RICHARD BERGERON AND**
and WILLIAM KEEFE,              )       **WILLIAM KEEFE**
            Defendants.         )
_____)

## Introduction

This action was precipitated by two events that occurred on April 15, 2003. The first was the filing of a formal written complaint by Town of Webster Deputy Chief Thomas Ralph (hereafter Ralph) with Webster Police Chief Richard Bergeron (hereafter Bergeron) alleging racist behavior on the part of Webster Police Officer Brian Barnes (hereafter Barnes). The second was a meeting wherein Chief Bergeron angrily accused the Plaintiff in this matter, John Bolduc (hereafter Bolduc), with having cooperated with Ralph in the preparation of the complaint. From that point on, there emerged a continuing pattern of retaliatory actions directed at Bolduc by Bergeron and the Town of Webster and its agents, which culminated in Bolduc's termination from the Webster Police Department.

**CONCISE STATEMENT OF THE MATERIAL FACTS OF RECORD AS TO WHICH IT IS CONTENDED THAT THERE EXISTS A GENUINE ISSUE**

**Response to Defendants' Statement of Undisputed Material Facts**

1

1.    The Plaintiff accepts as undisputed for the purpose of the determination of this motion the following facts as alleged in Defendants' Town of Webster (hereafter "Town"), Richard Bergeron (hereafter "Bergeron") and William Keefe's (hereafter "Keefe") Concise Statement of Undisputed Facts, by the following paragraph numbers:  1 – 10, 13, 15 – 18, 21 – 23, 27, 32, 36 – 39, 43, 51, 53 – 55, 58 – 59, 61 – 68, 72, 74, 77 – 79, 83, 87, 93, 97, 102 – 104, 107, 109, 111 – 113, 115, 118, 120 – 122, 124, 126 – 127.

2.    The Plaintiff responds to Defendants' Town, Bergeron and Keefe's additional assertions, referencing the following paragraphs of Defendants' Concise Statement of Undisputed Facts and asserts those facts are disputed:

a.    Re Paragraph 14:    The selecting officials in the process to determine the appointment to permanent Sergeant could pick from any one of the three top scoring applicants on the Civil Service Examination. Exhibit 1; Exhibit 2, Deposition of Richard Bergeron at pages 42 – 44; Certification of Bolduc Appointment.

b.    Re Paragraph 15:    See Paragraph 5 of Affidavit of Bolduc, Exhibit 3.  See also Deposition of Ralph, page 104, line 10 and page 106, line 15; Exhibit 4, Deposition of Bolduc, pages 54 – 57.

c.    Re Paragraphs 19 and 20:    Barnes' allegation regarding Bolduc and the oral exams were found to be not credible by the Human Resources Division Hearing Officer (HRD), and to have been made after

encountering supervision difficulties with Ralph.  Exhibit 5, HRD

Findings, page 5; Exhibit 6, Deposition of Ralph, pages 79 – 80, 83.

d.      Re Paragraphs 23 – 24:      Exhibit 6, Deposition of Ralph,

Pages 34 – 37 and pages 139 – 140.

e.      Re Paragraph 25:      Ralph was at the East Brookfield Court

attending a scheduled meeting with Bolduc and John Bish.  Exhibit 6,

Ralph Deposition at pages 139 – 141; Exhibit 4, Bolduc Deposition at

pages 71 – 72.

f.      Re Paragraph 26:      Barnes was well known in the Webster

Police Department (WPD) for making racially insensitive remarks and

Bergeron had been informed about it.  Bergeron's statements to the

contrary are not credible.  Exhibit 6, Deposition of Ralph, page 23, pages

34 – 36, pages 77 – 78, pages 104 – 106, pages 107 – 109, pages 110 –

113, pages 114 – 116, pages 133 – 134, pages 136 – 138, pages 145 – 146.

Barnes' racist statements were reported to Town officials by Ralph,

Exhibit 6, Ralph Deposition, pages 123 – 125, pages 129 – 130.  Barnes

admits he was not complying with the racial profiling law.  Exhibit 7,

Deposition of Barnes, pages 82 – 100; see also Exhibit 4, Deposition of

Bolduc, pages 54 – 62.

g.      Re Paragraph 28:      Bolduc contends Bergeron made no such

statement on April 15, 2003 during their encounter in his office.  Exhibit

4, Deposition of Bolduc, pages 69 – 70; Exhibit 3, Affidavit of Bolduc,

paragraphs 6 and 7.

h.      Re Paragraph 33:      This assertion is factually incorrect.

Bergeron did not request Bolduc put anything in writing until May 8,

2003.  Exhibit 3, Affidavit of Bolduc, paragraph 8.

i.      Re Paragraphs 40 – 41:      See Exhibit 3, Affidavit of Bolduc,

paragraphs 10 and 11.

j.      Re Paragraph 42:      See Affidavit of Robert Miller (hereafter

Miller), attached hereto as Exhibit 8.

k.      Re Paragraph 45:      See Affidavit of Bolduc, Exhibit 3,

paragraph 13.

l.      Re Paragraph 48:      See Affidavit of Bolduc, Exhibit 3,

paragraph 14.  The writing sent to Acting Town Administrator Steven

Boudreau on that date is attached as Exhibit 11.

m.      Re Paragraph 49:      Ralph's MCAD Complaint was filed on

May 1, 2003.  Exhibit 12.

n.      Re Paragraph 50:      See Affidavit of Earl Burgess (hereafter
Burgess), Exhibit 13.

o.      Re Paragraph 52:      See Exhibit 3, Affidavit of Bolduc,

paragraph 17.

p.      Re Paragraph 56:      Bolduc asserts that Bergeron undertook a

series of retaliatory, adverse employment actions against him prior to

departing office, to include initiating reinvestigation of prisoner handling

events that was continued by Keefe and Leal and lead to his discharge.

Exhibit 3, Affidavit of Bolduc, paragraphs 14 and 18; Exhibit 4, Deposition of Bolduc, pages 323 and 328.

q.    Re Paragraph 57:    See testimony of Steven Boudreau, Exhibit 14, pages 234 – 238.

r.    Re Paragraph 60:    The Hearing Officer concluded that Barnes' testimony was not credible.  See Exhibit 5, HRD Decision, pages 5 – 6.

s.    Re Paragraph 73:    This meeting took place after Bolduc was placed on administrative leave.  See Exhibit 3, Affidavit of Bolduc, paragraph 24; see also Exhibit 15, Affidavit of Miller and Exhibit 16, Affidavit of Raymond Regis.

t.    Re Paragraph 80:    Bolduc responded.  Ralph was present, but did not participate.  Exhibit 3, Affidavit of Bolduc, paragraph 23; Exhibit 4, Deposition of Bolduc, pages 120 – 130; Exhibit 6, Deposition of Ralph, pages 160 – 166.

u.    Re Paragraph 81:    See Exhibit 3, Affidavit of Bolduc, paragraph 23.

v.    Re Paragraph 84:    This assertion is false.  At the point Bolduc inquired about the lacerations on a prisoner, the Town had not identified what incidents, other than Abbe, they were investigating.  Exhibit 4, Deposition of Bolduc, pages 131 – 135; Deposition of Ralph, pages 163 – 166; see also Exhibit 14, pages 239 – 260.

w.    Re Paragraphs 88 – 91:    Plaintiff contends the Gevry report of the incident is untrue.  See Exhibit 3, Affidavit of Bolduc, paragraph

23; Exhibit 17, Affidavit of Thomas Pysell (hereafter Pysell); Exhibit 14, pages 209 – 225, Testimony of Pysell; Exhibit 4, Deposition of Bolduc, pages 152 – 171.

x.      Re Paragraph 92:      See Exhibit 4, Deposition of Bolduc, pages 184 – 188.

y.      Re Paragraphs 95 – 96:      Upon learning of the Greenwood incident, Ralph, in his capacity as Deputy Chief, investigated the circumstances and issued a report.  Exhibit 6, Deposition of Ralph, pages 172 – 188; Exhibit 18, Ralph letter to Bergeron.

z.      Re Paragraph 98:      See Exhibit 14, Testimony of Pysell, pages 209 – 225.

aa.      Re Paragraph 99:      The Disciplinary Hearing for Ralph was conducted on December 9, 2003.  Exhibit 6, Deposition of Ralph, page 39; Exhibit 3, Affidavit of Bolduc, paragraph 22.

bb.      Re Paragraph 100:      Bolduc admits he was placed on administrative leave.  He was not made aware of the names of the prisoners involved at that time.  See Exhibit 19.

cc.      Re Paragraph 101:      That letter did not advise Bolduc of his civil service rights.  See Exhibit 19.

dd.      Re Paragraph 105:      Bolduc only received the single page cover letter that was sent to Polizotti.  Exhibit 4, Deposition of Bolduc, page 238.

ee.     Re Paragraph 110:     Dr. Polizotti's report (Town's Exhibit 17) actually says "if the incident involving punching the prisoner multiple times is found to be true."  He made no comments regarding Mayotte and Abbe based on the information he was provided.

ff.     Re Paragraph 114:     See Affidavits of Miller and Regis, Exhibits 15 and 16.

## STANDARD OF REVIEW

Federal Rules of Civil Procedure 56 provides for the entry of Summary Judgment in a case where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Under Summary Judgment procedure, the essential inquiry is whether material facts are disputed.  The threshold inquiry in a Summary Judgment proceeding is whether there is a need for a trial or, in other words, whether there are genuine issues of material fact that properly can be resolved only by a finder of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The Supreme Court has stated that a Court considering a Summary Judgment motion must look at the record in a light most favorable to the party opposing the Motion, and that Summary Judgment is appropriate only where it is quite clear what the truth is.  Poller v.  Columbia Broadcasting System, Inc., 368 U. S. 464 (1962) and that the issue of material fact which must be present to entitle a party to proceed to trial does not have to be resolved conclusively in the non-moving party's favor.  Rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.  The

requirement that there be no genuine dispute as to any material fact is to be strictly construed so as to ensure that the factual issues will not be determined without the benefit of the truth seeking procedures of trial.  <u>Corley v. Life and Casualty Assurance Co</u>., (1961) 11 App. D.C. 327; 296 F.2d. 449.  It is recognized in determining whether there is an issue of material fact Courts must resolve any doubts[1] or reasonable doubts[2] and draw all inferences[3] or reasonable inferences[4] in favor of the non-moving party.  Under Fed.R.Civ.P. 56 (C), the Judge's function at the Summary Judgment stage is only to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242 (1986).  It is a fundamental maxim that on a Motion for Summary Judgment under Fed.R.Civ.P. 56, the Court cannot try issues of fact, but can only determine whether there are issues to be tried.  <u>Cronin v. Aetna Life Insurance Co</u>. (1995) CA 2 (Connecticut) (46 F.3d. 196).  Thus, any credible evidence contrary to the moving party's version of events will defeat summary judgment motion.  <u>Losch v. Parkesburg</u> (1984) CA 3 (Pennsylvania) (736 F.2d 903).  Furthermore, for purposes of deciding a summary judgment motion, the non-moving party's version of any disputed issue is presumed correct.  <u>Eastman Kodak Company v. Image Technical Services</u> (1992) 504 U.S. 541.

## CONTINUING VIOLATION

Bolduc's contention is that the unlawful conduct of he complains of consists of a series of discreet related acts of a continuing nature, caused by his corroboration of Ralph's claims of racist behaviors.  The notion of continuing violations recognizes that some discrimination and arguably retaliation claims involve a series of related acts that

---

[1] <u>Desvi, Inc. v. Continental Insurance Co</u>. (1992) C.A. 3 (VI); 968 F.2d 307.
[2] <u>Resolution Trust Corp. v. North Park Junior Venture</u> (1992) C.A. 5 (Texas); 958 F2d 11313
[3] <u>John v. Louisiana (Board of Trustees)</u> (1985) C.A. 5 (LA) 757 F.2d 698
[4] <u>Allensworth v. General Motors Corp.</u> (1991) C.A. 7 (Indiana) 945 F.2d 174

must be viewed in their totality to adequately assess their discriminatory nature and impact.  Cuddyer v. The Stop and Shop Supermarket Co., 434 Mass. 521, 531 (2001).

Bolduc contends that the acts engaged in by Bergeron in May 2003 constitute the initial retaliatory adverse employment acts, followed by pursuit of adverse information about Bolduc by Bergeron and, continued by Keefe.  This assertion is supported by Keefe's attempts to get Acting Town Administrator Steven Boudreau to terminate Bolduc in the summer of 2003 (Exhibit 14, p 234-239) Later, Leal took steps to ensure that the Town's position with respect to Bolduc's MCAD action and disciplinary hearing was not compromised by the Town's awarding Bolduc a commendation in March 2004. Exhibits 15 and 16.

### RETALIATION

M.G.L. c. 151B, s. 4 (4) prohibits retaliation against persons who have opposed practices forbidden under Chapter 151B or who have filed a Complaint of discrimination. It protects individuals who have acted to aid or corroborate allegations of unlawful behavior made by others.  To prove a prima facie case of retaliation, Complainant must demonstrate (1) that he engaged in a protected activity; (2) that the Defendant was aware that he had engaged in a protected activity; (3) that Defendant had subjected him to an adverse employment action; and (4) that a causal connection existed between the protected activity and the adverse employment action.  Magill v. Massachusetts State Police, 24 MDLR 355 (2002); Morris v. Boston Edison Company, 924 F.Supp. 65, 68-69 (D.Mass. 1996); Kelley v. Playmouth County Sheriff's Department, 22 MDLR 208, 215 (2000).  Retaliation may take the form of harsh performance evaluations, punitive transfers, or outright discharge.  Under the provisions of 42 U.S.C. §2000(e)-3(a), it shall

be an unlawful employment practice for an employer to discriminate against any of his

employees

> "…because he has opposed any practice made an unlawful employment
> practice by this subchapter or because he has made a charge, testified,
> assisted or participated in any manner in an investigation, proceeding or
> hearing under this subchapter."

The participation clause has been explicitly applied to the announcement of the

intention to file a charge before filing it.  Croushorn v. University of Tennessee, 518 F.

Supp. 9.  It has also been applied to protect those who are witnesses.  Glover v. S.C. Law

Enforcement Div., 79 FEP 276 (4th Cir. 1999).  All aspects of the process should be

protected.  A deputy who gave a statement in an internal investigation of sexual

harassment and was discharged was vindicated by a jury verdict.  Scott v. Ramsey

County, 180 F.3d 913.  An employer can be held strictly liable for the retaliatory actions

of a chief of police.  See Cross v. Cleaver, 142 F.3d. 1059, (8th Cir. 1998).  Courts have

held that downgrading of job duties and exclusion from some activities constituted

actionable retaliation even if the change had no adverse pecuniary consequences.  Preda

v. Nissho Iwai Am. Corp., 128 F.3d 789 (2nd  Cir. 1997).  In Harrison v. Metro

Government of Nashville  (80 F.3d 107, 119), the 6th Circuit affirmed a finding that the

Plaintiff's activities were scrutinized more carefully than those of comparably situated

individuals and that such could constitute retaliation.  In another case, surveillance was

an element of retaliatory behavior.  Collins v. Mallinckrodt, Inc., No. 4:95 CV 00669

JCA (Ed. Missouri, September 25, 1996).  It has been noted that surveillance is important

"because its presence strongly suggests the possibility of a search for pretextual basis for

discipline which in turn suggests that subsequent discipline was for the purposes of

retaliation. (B. Schlei & P. Grossman, Employment Discrimination Law 559 (2nd

Edition, 1983). The 1st Circuit has held that an employee need only suffer an "adverse employment action" in order to establish a prima facie case for retaliation. White v. New Hampshire Department of Corrections, 221 F.3d 254, 262 (1st Cir. 2000).

To prove a 1983 cause of action for retaliation, a state employee needs to demonstrate that his engagement in protected conduct was at least a substantial or motivating factor in the adverse employment action. Gierlinger v. Gleason, 160 F.3d. 858 (2nd Cir. 1998). If the Defendant is acting under the color of state law, activities that constitute opposition and participation may raise free speech and association issues. Walker v. Schwalbe, 112 F.3d 1127 (11th Cir. 1997).

M.G.L. c. 151B, s. 4 (5) makes it unlawful for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so. Bolduc contends that Bergeron and Keefe, are aiders, abettors, and perpetrator's of unlawful acts. There is evidence that Bergeron undertook adverse employment actions against Bolduc as a result of and close in time to his having corroborated Ralph's assertions of racist behavior by Barnes. Where it is clear that the Defendant encouraged an environment hostile to an individual who has supported allegations of racist behaviors by another, that individual may be found liable for aiding and abetting the employer, which is considered a viable and legal person, separate and distinct from its employees. Beaupre v. Smith & Associates, et al., 50 Mass. App. Ct. 480 (2000). Thus on the facts of record, Bergeron, Keefe may be liable on a theory of aiding and abetting discriminatory and/or retaliatory conduct engaged in by their employer, the Town of Webster, pursuant to G.L. c. 151B, s. 4 (5) by their actions including unwarranted investigation of Bolduc.

M.G.L.c. 151B, §4(4A) makes it unlawful for any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected by this Chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this Chapter. The Town has asserted that Bolduc's claims against Bergeron must fail because there is no evidence in the record that Bergeron used threats, intimidation or coercion to interfere with or attempt to interfere with Bolduc's civil rights. Bolduc was confronted initially by Bergeron on April 15, 2003 with respect to the allegations presented to Bergeron by Ralph. See Exhibit 3, paragraph 6. During that confrontation, overheard by Officer Michael Kehoe (see Exhibit 10), Bergeron told Bolduc, "Your friendship, support and loyalty to the Deputy Chief is going to cost you." It is the Plaintiff's contention that this encounter, coupled with a demand by Chief Bergeron to Bolduc on May 1, 2003 (Exhibit 3, paragraph 8), constituted sufficient coercion accompanied by a threat to allow the Plaintiff to prevail on his civil rights claim. LaManqe v. Massachusetts Department of Employment and Training, 3 F.Supp.2d 83, 93 (D. Mass. 1993).

Liability has been imposed under General Laws Chapter 151B, Section 4, Paragraph 4A, in cases where the individual charged with employment discrimination is not the employer. Kelley v. Plymouth County Sheriffs Department, et al., 22 MDLR 208 (2000) (the four named Respondents either participated in or were aware of or could have prevented retaliatory conduct against the Complainant).

Bolduc has raised an issue (Exhibit 3, paragraphs 9, 10, 11,12) that Bergeron was the perpetrator of unlawful retaliation. After confronting Bolduc with a copy of Ralph's

letter, Bergeron ordered Bolduc to report instances of racist behavior by Barnes of which he was aware. Bolduc complied with that request. (Exhibit 3) Bergeron, close to the time that Bolduc corroborates Ralph's allegations of racist behavior by Barnes, terminates Bolduc's involvement with a murder investigation in which he had been engaged for several years, compels him to vacate his office and, orders him returned to uniform patrol duty on the night shift. Wyatt v. City of Boston, 35 F. 3d 13. Each of these acts, close in time to his having corroborated Ralph's allegations of racist behavior by Barnes, constitutes arguable retaliatory behavior within the meaning of 42 U.S.C. 2000(e) and M.G.L.c. 151B, Section 4(4A). Bergeron initiates an investigatory process in which he attempts to develop information sufficient to terminate Bolduc. (Exhibits 8, 13, 23) Bergeron began the inquiry into Bolduc's handling of prisoners, as an adverse employment action. Although Bergeron has asserted other reasons for taking each of the actions related to Bolduc's job, Plaintiff contends that the reasons put forth by Bergeron are not credible, and his intent is a material question of fact.

Plaintiff alleges he was denied substantive and procedural due process when his employment was terminated in violation of 42 U.S.C. § 1983. He asserts that Keefe and Bergeron are liable because their actions did violate a "clearly established statutory or constitutional right of which a reasonable person should've known." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002). That right, without considering Bolduc's rights under the First Amendment to the United States Constitution would have included his right to be free from adverse employment actions pursuant to 42 U.S.C. 2000e 3 (a) as one who was participating in the assertion of rights pursuant to 42 U.S.C. 2000e. (Ralph complaints of racist behavior by Barnes, Exhibit 18, Bolduc's corroboration of the same by memo dated

May 2, 2003, Exhibit 21.  Bergeron took adverse employment action against Bolduc in May 12, 2003.  Exhibit 3, paragraphs 9, 10, 11, 12.  Based on the facts and exhibits produced by Bolduc in response to the Defendant's Motion, a fact finder could find that the retaliatory process leading to Bolduc's termination began with the initiation of investigatory procedures by Bergeron in the spring of 2003.  Bergeron was involved in the loss of Bolduc's personnel file, see Exhibit 30.  Bolduc denies that he was provided a letter outlining the specific charges against him on March 1, 2004.  Exhibit 3, paragraph 30.  Failure of the Town and Keefe to have provided Bolduc with the specification of charges before the conduct of the hearing in and of itself raises suspicions that the process was tainted and "unfair."  The Town, through its officials Keefe and Leal, determined well prior to the conduct of the hearing on March 10th and 11th, 2003 that termination of Bolduc would occur.  Exhibits 15 and 16.  Note the statements of Leal of December 2003 and February 2004 reported at Exhibits 15 and 16 to Select Board members prior to the completion of the investigative process by Keefe.  Keefe's investigation report was presented to Leal on March 1, 2003.  See Exhibit 29.  It was not provided to Bolduc until he received his termination notice on March 19, 2004.  See Exhibit 3, paragraph 30.  There was evidence that statements gathered by Keefe in the process of his "investigation" were tampered with and did not comport to the original statements made by the individuals.  Exhibit 14, Testimony of Pysell, Wrubleski and Milliard.  It is the Plaintiff's contention that the process leading to charges against him for events about which no complaints were filed by the prisoners involved was arbitrary, capricious and intended to retaliate against him for his substantiation of charges of racism raised by Ralph and for his filing of a MCAD complaint in June 2003 (Exhibit 25).

Bolduc contends that there can be no fair argument that the allegations of racism raised by Ralph in his formal Complaint of April 15, 2003 to Bergeron do not involve and raise matters of "public concern" as that term is appreciated and interpreted by the courts of this circuit.  Wagner v. City of Holyoke, 241 F.Supp.2d 78.  There is a strong inference that Bolduc's Memorandum of May 2, 2003 (Exhibit 21) was the substantial or motivating factor in initiation of a series of adverse employment actions.  Each of the adverse employment actions were done by Bergeron within days of his receiving Bolduc's May 2, 2003 memorandum (Exhibit 21).  Bolduc alerted Town Administrator Steven Boudreau of his concerns about Bergeron's behaviors. (Exhibits 11 and 24).

The Defendants' assertion that Bergeron was not involved in any adverse employment decision against Bolduc, and did not participate in the disciplining of Bolduc, flies in the face of the undisputed fact of Bergeron's investigations in the spring of 2003 and the focus on prisoner handling (Exhibits 8 and 23) which set in motion a continuing set of events, to include the investigatory process by Keefe and Leal after December 12, 2003 that resulted in the termination of Bolduc in March 2004.

Inquiries were started with regard to the Greenwood incident, which had been fully investigated (see Exhibit 18).  There was heightened scrutiny of Bolduc in the aftermath of his having filed his Massachusetts Commission Against Discrimination Complaint in June 2003 (Exhibit 25).

The Town, through its officials, to include the Select Board and the chief of police had adopted a policy of refraining from inquiry into the racist behaviors of officers of the Town of Webster Police Department.  Bergeron consistently ignored suggestions on the part of Ralph that Barnes was engaged in racist behaviors.  See Exhibit 6 Deposition of

Ralph 116-117.  When Ralph raised the issue of Barnes' racist behaviors with members

of the Select Board, they took no action.  Exhibit 6, pages 129-130.  The failure of the

Chief to act, and of other Town officials to act, when being informed of the allegedly

racist behaviors of Barnes, constitute "deliberate indifference to the rights of its citizens."

City of Canton v. Harris, 49 U.S. 378, 388 (1989).

Bolduc contends the Town, Bergeron and Keefe have in cooperation caused "an

abridgment of some actually federally secured right."  Torres-Rosado v. Rotger-Sabat,

335 F.3d 114 (1st Cir. 2003).  The actions taken by the Town against Bolduc were

precipitated by his corroboration of Ralph's allegations of racist behavior on the part of

Barnes.  As Ralph reports in his letter of April 15, 2003 (Exhibit 9), there existed

considerable concern within the Department about the racist activities of that officer.  See

also Deposition of Barnes, Exhibit 7, pages 81-100.  The fact that Barnes made racial

comments in Bolduc's presence on only one occasion, does not minimize the impact

Barnes was having on other officers in the department.  It is not necessary for Bolduc to

be a member of a protected class to claim the protections offered by 42 U.S.C. 2000e 3

(a) or as a whistleblower under M.G.L. c. 149.

With regard to M.G.L. c. 151B, § 4 (4), § (4A) and § (5) the undisputed facts

show that Bolduc engaged in protected conduct, and suffered adverse personnel actions

within the meaning of those statutes.  See Exhibit 3, paragraph 6 – 13, paragraphs 22, 24,

29, 35; see also Exhibits 15 and 16.  Bolduc filed his memo (Exhibit 21) with Bergeron,

and the actions taken by Bergeron against Bolduc, were adverse.  A permissible inference

exists that there is a causal connection between the protected conduct, and the adverse

employment actions.  There is a strong permissible inference that the continued actions

by the Town and Keefe to terminate Bolduc subsequent to his filing of a Massachusetts

Commission Against Discrimination Complaint on June 15, 2003 was in the minds of

Keefe and Leal as they initiated investigation of Bolduc, Exhibit 15 and 16.  The

determination to broadly investigate Bolduc after the Abbe arrest occurred after Bolduc

testified on behalf of Ralph at a December 9, 2003.  That disciplinary hearing, that was a

direct outcome of the racist allegations that Ralph had filed against Barnes with Bergeron

on April 15, 2003.  See Exhibit 3, paragraph 22.  Bolduc was suspended within 48 hours

of having testified on behalf of Ralph at his disciplinary hearing.  Exhibit 3, paragraph

23.  The Defendants' contention that they were not aware of Bolduc's engagement of

protected activity is not credible.  Investigation of Bolduc after June 15, 2003 was done

with the knowledge on the part of Keefe and Leal that Bolduc had filed a Massachusetts

Commission Against Discrimination claim.  Exhibit 25. The Defendants' assertion that

Bolduc's initial protected activity occurred in June 2003 is incorrect.  Bolduc's initial

participation in the investigatory process, occurred on May 2, 2003 (Exhibit 21).  The

fact that the Defendants have articulated a legitimate, nondiscriminatory reason for

terminating Bolduc is not dispositive of the question of the issue as to whether or not

there has been a retaliatory adverse employment action if the decision to terminate was in

any part substantially motivated by a protected action on the part of Bolduc.  "Title VII

prohibits employers from discriminating against any employee because he has opposed

any practice made unlawful by the subchapter or because he has made a charge, testified,

assisted or participated in any manner in an investigation, proceeding, or hearing under

the subchapter."  Ianetta v. Putnam Investments, Inc., 2002 U.S. District Lexis 3277 (D.

Mass.) (quoting 42 U.S.C. 2000e 3).

Bolduc asserts that he provided notice adequate for the purposes of notice under M.G.L. c. 149, § 185 by virtue of his memoranda to the Acting Town Administrator, Steven Boudreau, attached as Exhibit 11 and Exhibit 24.  The Defendants' assertion that Bolduc cannot prevail because his termination related solely to the three incidents of excessive force is a question of fact, in that he has provided sufficient evidence that the investigation was precipitated by the fact that he had support Ralph's allegation and filed a MCAD Complaint about which Leal had expressed concern (See Exhibit 16).  In his memoranda to Boudreau (Exhibits 11 and 24), he was reporting activity policies and practices of his employer, to wit Bergeron, who was retaliating against him for his memo of May 2, 2003.

There is sufficient evidence of record to raise a question as to whether Bergeron attempted to interfere with or did interfere with Bolduc's civil rights.  Bergeron's statement on April 15, 2003 (Exhibits 3 paragraph 6) that his support of Ralph would "cost him" followed by adverse employment actions are sufficient to raise a reasonable inference that those acts were related to Bolduc's exercise of his right to substantiate Ralph's assertions of racist behaviors on the part of Barnes.

### SUBSTANTIAL OR MOTIVATING FACTOR

a.        <u>Substantial or Motivating Factor</u>

The First Circuit has made it clear that a complaining parties' lawsuit need only constitute <u>a</u> substantial or motivating factor for his delayed reinstatement, not the <u>only</u> substantial or motivating factor.  <u>Padilla-Garcia</u>, 212 F.3d at 73; <u>Nethersole v. Bulger</u>, 287 F.3d 15, 19 (1st Cir. 2002) (stressing that Plaintiff need only show that employer retaliated "at least in part" in response to First Amendment activity).

The Second Circuit has suggested that when reviewing a retaliation claim, the factfinder should first "determine whether the impermissible reason was at least part of the Defendant's basis of its action, and if so, then answer the hypothetical question, 'Would the Defendant have taken the same adverse action even if the impermissible reason had not existed?'" Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency, 77 F.3d 26, 32 (2d. Cir. 1996). "[A] retaliatory state of mind typically is not susceptible to proof by direct evidence…" Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980).

A federal court evaluating a "retaliatory state of mind" question may borrow from Title VII jurisprudence because "the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim." Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 482 (7th Cir. 1995).

Put differently, "[t]he factfinder's disbelief of the reasons put forward by the Defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Center v. Hicks, 509 U.S. 502 at 511 (1993). See also Dominquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000) (reversing district court's decision to allow summary judgment motion when evidence was sufficient for jury to infer that employer's claimed reasons were pretextual and decision was result of discriminatory animus).

On the basis of this record a fact finder could find the Defendants Town, Bergeron and Keefe subjected Bolduc to a relentless, pervasive and unwarranted retaliatory investigation for the purposes of terminating his employment, all of which

arose from and was precipitated by his having corroborated Ralph's allegations of racist behavior on the part of Barnes.

For all of the above reasons the Court should deny the Motion for Summary Judgment of the Town, Bergeron and Keefe.

Date: December 15, 2006          Respectfully submitted,
                                 The Plaintiff,
                                 By his attorney,


                                 /s/ John J. Green, Jr.
                                 John J. Green, Jr.
                                 Green, Miles, Lipton & Fitz-Gibbon, LLP
                                 77 Pleasant Street, P.O. Box 210
                                 Northampton, MA  01061-0210
                                 Telephone: 413-586-8218
                                 Fax: 413-584-6278
                                 BBO# 209020

CERTIFICATION

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the notice of electronic filing, and paper copies will be sent to those indicated as non-registered participants on December 15, 2006.

Date:   December 15, 2006              /s/ John J. Green, Jr.
                                       John J. Green, Jr.

## BOLDUC EXHIBIT INDEX

1.    Letter from Mark Stankiewicz to Thomas Ralph, dated June 14, 2002, regarding Sergeant's Appointment.
2.    Deposition of Richard Bergeron.
3.    Affidavit of John Bolduc.
4.    Deposition of John Bolduc.
4A.   Continued deposition of John Bolduc.
5.    Letter from Ruth Bramson to John Bolduc, dated November 10, 2003, regarding Investigation – Determination.
6.    Deposition of Thomas Ralph.
6A.   Continued deposition of Thomas Ralph.
6B.   Continued deposition of Thomas Ralph.
7.    Deposition of Brian Barnes.
8.    Affidavit of Robert Miller.
9.    Letter from Thomas Ralph to Richard Bergeron, dated April 15, 2003, written as formal complaint against Brian Barnes.
10.   Affidavit of Michael Kehoe.
11.   Memo from John Bolduc to Steven Boudreau, dated May 15, 2003, regarding Intimidation Complaint.
12.   MCAD Complaint filed by Thomas Ralph.
13.   Affidavit of Earl Burgess.
14.   Transcript of Hearing regarding Investigation of Excessive and Unnecessary Use of Force by John Bolduc.
14A.  Continued Transcript of Hearing regarding Investigation of Excessive and Unnecessary Use of Force by John Bolduc
15.   Affidavit of Robert Miller.
16.   Affidavit of Raymond Regis.
17.   Affidavits of Thomas Pysell.
18.   Letter from Thomas Ralph to Richard Bergeron, dated February 26, 2003, regarding Greenwood Incident.
19.   Letter from Robin Leal to John Bolduc, dated December 12, 2003, regarding Investigation of Excessive and/or Unnecessary Use of Force.
20.   Memo from Richard Bergeron to Thomas Ralph, dated April 17, 2003, regarding allegations that Barnes is a racist.
21.   Memo from John Bolduc to Richard Bergeron, dated May 2, 2003, regarding Officer Barnes.
22.   E-Mail from Richard Bergeron to John Bolduc and Aaron Suss, dated May 15, 2003, regarding vacation of office.
23.   Affidavit of Michael Kehoe.
24.   Memo from John Bolduc to Steven Boudreau, dated May 19, 2003, regarding Intimidation Complaint.
25.   MCAD Complaint filed by John Bolduc.
26.   Webster Police Department Policy and Procedure.
27.   Letter from William Keefe to Dr. Polizoti, dated January 5, 2004, regarding John Bolduc.

28.     Letter from Robin Leal to John Bolduc, dated March 19, 2004, regarding hearing decision, with letter from William Keefe to John Bolduc, dated March 1, 2004, regarding specification of charges and recommendation of disciplinary action.

29.     Letter from Robin Leal to John Bolduc, dated March 1, 2004, regarding Notice of Hearing.

30.     Letter from William Keefe to Attorney Christopher Browne, dated March 9, 2004, regarding document request and Letter from Thomas Ralph to William Keefe, dated September 30, 2003, regarding personnel files.

31.     Deposition of Robin Leal.

32.     Deposition of William Keefe.

# EXHIBIT 1



# TOWN OF WEBSTER

**TOWN ADMINISTRATOR'S OFFICE**
P.O. Box 339                                           Phone:  (508) 949-3800
Webster, MA  01570                                       Fax:  (508) 949-3888


June 25, 2002

Ms. Luz Henriquez
Commonwealth of Mass                    *COPY*
Human Resources Division
One Ashburton Place
Boston, MA  02108

Re:     Certification #220532
        One Permanent Full Time Sergeant

Dear Ms. Henriquez:

Enclosed please find the above referenced Certification 220532, Form 14, the Certification and
Report Supplement and supporting documentation for the Sergeant appointment.

Should you require any additional information, please feel free to call me at 508-949-3800.

Thank you.

Sincerely,

Heidi Courtenay
Executive Secretary

/hc
encl:

---

*On the shores of . . . Lake Chargoggagoggmanchauggagoggchaubunagungamaugg*

CONFIDENTIAL



# Webster Police Department

*Office of the Chief of Police*

Webster, Massachusetts 01570

**(508) 943-1212**
**FAX (508) 949-3898**

Richard E. Bergeron, Jr.
*Chief of Police*

RECEIVED

TOWN OF WEBSTER
ADMINISTRATOR

To:      Mark Stankiewicz
         Town Administrator

From:    Thomas Ralph
         Deputy Chief

Date:    June 14, 2002

Re:      Sergeant's Appointment

The sergeant's interview committee unanimously agreed that Officer John Bolduc should be appointed Sergeant. The reasons for selecting Officer Bolduc appear below.

During the interview Officer Bolduc clearly and in a very detailed manner answered all of the interview questions. John's answers to a majority of the questions were more in depth than the other candidates, demonstrating his ability to think quickly and adapt to various situations. He also demonstrated his understanding of the law and his ability to properly apply it in various scenarios presented to the candidates. John's answers to the committee were more attuned to that of a supervisor than a patrol officer.

Since his appointment in 1996, John has been an exceptional employee. John's personnel file contains letters of recognition from the town and department. His file also contains numerous letters from members of the community and town business owners commending his job performance. This demonstrates his ability to interact with the community, the backbone of community policing. Community policing is a major objective of this department and a desired quality in its supervisors.

John also developed and taught formal training classes in Domestic Violence, Report Writing, Motor Vehicle Law and Criminal Law to this department's part-time officers, without compensation. This type of volunteer service to the town shows John Bolduc's commitment to the department and his extensive knowledge of these areas. His ability to clearly present this material to others, make John an asset to have as a Sergeant.

As the police department has no formal detective unit, officers routinely conduct investigations. A sergeant in this department is required to have knowledge about patrol procedures as well as investigative procedures. During the interview, John demonstrated his understanding and knowledge of these areas better than the other candidates.

For all of the above reasons, the committee unanimously recommends John Bolduc for appointment as Sergeant within the Police Department.

*On the Shores of*
## LAKE CHARGOGGAGOGGMANCHAUGGAGOGGCHAUBUNAGUNGAMAUGG

TITLE CODE:    0083B
CERTIFICATION NUMBER:    220532
WEBSTER POLICE DEPARTMENT

DATE: 05/28/2002    PAGE: 1

MARK STANKIEWICZ, TOWN ADMINIS
WEBSTER POLICE DEPARTMENT
350 MAIN STREET
WEBSTER MA  01570

*Return to*
*Human Resources Division*

LOCATION:    WEBSTER
ONE PERMANENT FULL TIME POLICE SERGEANT
SELECTION MUST BE OF    1 OF THE FIRST    3 HIGHEST WHO WILL ACCEPT

| Name and address of Applicant Notified to Report for Interview | Eligibility Expires | Score | FAILED TO RESPOND | DECLINED APPOINTMENT | OTHER REPORT (STATE BELOW) | WILLING TO ACCEPT | SELECTED FOR APPOINTMENT |
|---|---|---|---|---|---|---|---|
| PROM   KELLEY, MICHAELA N   5 CHARRON ST SPENCER 01562   [X] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | 82.00 | | | | | |
| PROM   BOLDUCJR, JOHN A   POST OFFICE BOX #326 WEBSTER 01570   [X] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | 79.00 | | | | | |
| PROM   SUSS, AARON A   195 NORTH MAIN ST #2 WEBSTER 01570   [X] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | 74.00 | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |
| [ ] I WILL accept the appointment   [ ] I WILL NOT accept the appointment   Applicant's Signature:- | | | | | | | |

Applicant Status

06/18/2002

SEE REVERSE SIDE FOR FURTHER INSTRUCTIONS AND LEGEND AND APPOINTING AUTHORITY'S SIGNATURE

| City or Town | Town of Webster | Date | June 24, 2002 |
| Department | Webster Police Department | Division | |
| | | Requisition/Certification Number | 220532 |

## TO THE APPOINTING OFFICER:

Authority is hereby given to fill the vacancy(ies) identified on the above referenced requisition by selecting from among the applicants listed on the attached certification in accordance with the instructions which appear thereon.

### DESCRIPTION OF POSITION TO BE FILLED

Position Title: Police Sergeant    Number of Vacancies: One    Salary Rate:

Permanent [X]    Temporary [ ]    Military Substitute [ ]    Full Time [X]    Part Time [ ]
Intermittent [ ]    Reserve [ ]

_Patricia Wade_
Personnel Administrator

## NOTIFICATION OF EMPLOYMENT UNDER THE ABOVE AUTHORIZATION

To the Personnel Administrator:

As the legal Appointing Authority I have selected the undersigned individuals for appointment (or promotion) in accordance with the law and the above authorization as follows:*

I, the signed appointee, hereby certify, under the penalties of perjury, that I have not paid and have agreed not to pay, and to the best of my knowledge, no other person has paid nor agreed to pay any money or other thing of value to any person in anticipation or as a result of my appointment. I hereby accept the appointment with the understanding that, under the Civil Service Law and Rules, appointments are governed as follows:

- Permanent appointments are subject to a probationary period of six months (twelve months for police and fire forces).
- Temporary appointments are for the duration of the vacancy.
- Military substitute appointments are temporary subject to the provisions of Chapter 708, Acts of 1941, as amended

| Date Of Birth | Name Home Address S.S. # of Appointee | Employment Date | Appointee's Signature |
|---|---|---|---|
| 6/24/63 | John A. Bolduc    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<br>33 Highcrest Park<br>Webster, MA  01570 | 6/30/02 | _John A. Bolduc_ |
| | | | |
| | | | |
| | | | |
| | | | |

*See reverse of this form

Signed: _Mark Stankiewicz_

(Officer authorized by law to make appointments)
Mark Stankiewicz, Town Administrator

Name    (please print or type)    Title

| If appointee is in military service, statement to that effect should be made. |

This form must be properly completed, returned to the Human Resources Division and approved before the Auditor will authorize payment of salary. Please file reports early enough to eliminate the necessity of withholding pay.

Webster

HUMAN RESOURCES DIVISION

220532

**MUNICIPALITY**

**CERTIFICATION NUMBER**

CERTIFICATION AND REPORT SUPPLEMENT

Police

5/28/2002

**DEPARTMENT**

PROMOTIONAL APPOINTMENT

**CERTIFICATION DATE**

**THIS FORM MUST BE COMPLETED AND RETURNED WITH THE CERTIFICATION.**
**Please enter on this form the name(s) of <u>all</u> individuals on the certification who indicated <u>willingness to accept</u> the appointment, regardless of your intention to appoint or not to appoint.  The name(s) must be listed in the <u>exact order</u> in which they appear on the certification.  This form should be returned with the original signed certification and all required accompanying documentation to: Human Resources Division, One Ashburton Place, Boston, MA  02108.**

| NAME OF CANDIDATE | SELECTED | NOT SELECTED |
|---|---|---|
| 1. Michaela Kelley | | ✓ |
| 2. John Bolduc | ✓ | |
| 3. Aaron Suss | | ✓ |

Your first appointment must be made from among the above names.
(1-3 inclusive)

4.
5.

Your second appointment must be made from among the above names.
(1-5 inclusive)

6.
7.

Your third appointment must be made from among the above names.
(1-7 inclusive)

8.
9.

Your fourth appointment must be made from among the above names.
(1-9 inclusive)

10.
11.

Your fifth appointment must be made from among the above names.
(1-11 inclusive)

12.
13.

Your sixth appointment must be made from among the above names .
(1-13 inclusive)

14.
15.

Your seventh appointment must be made from among the above names.
(1-15 inclusive)

16.
17.

Your eighth appointment must be made from among the above names.
(1-17 inclusive)

18.
19.

Your ninth appointment must be made from among the above names.
1-19 inclusive)

20.
21.

Your tenth appointment must be made from among the above names.
(1-21 inclusive)

**Signature of Appointing Authority**

24 JUNE 02
**Date**

# EXHIBIT 2

**Richard Bergeron**
**August 18, 2006**

1

Volume I, Pages 1-128

Exhibits 1-15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOHN A. BOLDUC, JR.,

        Plaintiff

vs.                                            No. 05-40030FD5

TOWN OF WEBSTER, ROBIN LEAL,

RICHARD BERGERON, and WILLIAM KEEFE,

        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF: RICHARD BERGERON

10:15 a.m. - 2:04 p.m.

Friday, August 18, 2006

MORRISON MAHONEY LLP

One Chestnut Place, Suite 470

Worcester, Massachusetts


-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

PERLIK AND COYLE REPORTING

1331 Main Street

Springfield, Massachusetts  01103

413.731.7931    Fax 413.526.2316

**Richard Bergeron**
**August 18, 2006**

(Pages 42 to 45)

|  | 42 |
|---|---|
| 1 | And I think, my opinion he would have beaten anybody |
| 2 | that he was up against in the presentation part. |
| 3 | That's why he was my choice. He basically, on the |
| 4 | civil service you have a right to pick from the top |
| 5 | three, and I was willing to say he was my choice. |
| 6 | Q. So from your standpoint given the fact you |
| 7 | could make a selection from within the top three, |
| 8 | the interview process was really kind of |
| 9 | unnecessary; would that be a fair statement? |
| 10 | A. In my opinion, yeah. Other people might |
| 11 | have a different perspective on it. |
| 12 | Q. Is the interview process a mandated part of |
| 13 | the civil service selection process? |
| 14 | A. No. |
| 15 | Q. So -- |
| 16 | A. They were all good candidates. I had no |
| 17 | problem with the candidates. They were all good. |
| 18 | One was too young, didn't have enough experience. |
| 19 | Q. Being who? |
| 20 | A. Aaron Suss. I think he had less than -- |
| 21 | something like -- probably was just barely eligible |
| 22 | to take the exam. You had to have a year -- |
| 23 | Q. Based on his seniority or -- |
| 24 | A. Right. |

|  | 44 |
|---|---|
| 1 | Q. Had he been a police officer like a reserve |
| 2 | officer in any other department to your knowledge? |
| 3 | A. No. |
| 4 | Q. Did you know Officer Barnes from any prior |
| 5 | contact before he joined the police department in |
| 6 | the Town of Webster? |
| 7 | A. He was a call taker. I had been |
| 8 | communication sergeant, booking sergeant, street |
| 9 | sergeant, bounced around in Quincy. He had been a |
| 10 | call taker in their dispatch center was basically |
| 11 | what he did. |
| 12 | Q. Just to enlighten those of us not familiar |
| 13 | with the internal mechanisms, so a call taker would |
| 14 | be a person that takes 9-1-1 calls? |
| 15 | A. Yes. |
| 16 | Q. Is this differentiated from a dispatcher? |
| 17 | A. I don't think it is now, but it was at the |
| 18 | time. At the time there could only be a cop to be a |
| 19 | dispatcher. Now I think cops fill in or they have |
| 20 | civilians dispatching, so things have changed. |
| 21 | There was no civilian dispatching at that time. |
| 22 | Q. Did you have, were you familiar, for |
| 23 | example, did you have any social contact with Brian |
| 24 | Barnes or any of his relatives prior to his becoming |

|  | 43 |
|---|---|
| 1 | Q. Now, you are aware, I'm sure, that, but if |
| 2 | you are not, please so indicate, that at some point |
| 3 | in time Officer Brian Barnes suggested that Ralph |
| 4 | engaged in some inappropriate conduct previous to |
| 5 | the interview process? |
| 6 | A. Yes. |
| 7 | Q. Do you recall when it was that Officer |
| 8 | Barnes joined the department? |
| 9 | A. It was a year or so after I got there, I |
| 10 | believe. |
| 11 | Q. Do you recall under what circumstances he |
| 12 | happened to join the department? |
| 13 | A. Took a civil service exam and wanted to |
| 14 | come out to Webster. |
| 15 | Q. As I understand it, correct me if I'm |
| 16 | wrong, he was already a police officer in the Town |
| 17 | of Quincy? |
| 18 | A. No. |
| 19 | Q. He was not? |
| 20 | A. No. |
| 21 | Q. I see. His appointment as a police officer |
| 22 | in the Town of Webster was to your knowledge first |
| 23 | appointment as a police officer? |
| 24 | A. Yes. |

|  | 45 |
|---|---|
| 1 | a member of the Webster Police Department? |
| 2 | A. No. |
| 3 | Q. But I believe you testified you knew him |
| 4 | simply as a call taker who had been associated with |
| 5 | the Quincy Police Department? |
| 6 | A. Correct. |
| 7 | Q. And your contact with him had been in the |
| 8 | context of your duties as a Quincy police officer? |
| 9 | A. My contact? |
| 10 | Q. Your contacts with him prior to him coming |
| 11 | to Webster were in the context of your duties as a |
| 12 | Quincy police officer? |
| 13 | A. Correct. |
| 14 | Q. With respect to his appointment as a patrol |
| 15 | officer in the Town of Webster, how did that |
| 16 | selection process proceed? |
| 17 | A. Just a normal selection process. He |
| 18 | decided he wanted to be a Webster police officer. |
| 19 | He took the civil service exam. He came out for the |
| 20 | interview. He started as a part-time officer like |
| 21 | everybody else does in Webster. |
| 22 | Q. Was it in response to an advertisement for |
| 23 | an opening in the Webster Police Department? |
| 24 | A. Potentially. They advertised statewide for |

12

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-40030FDS

_____
                               )

JOHN A. BOLDUC, JR.          )
           Plaintiff,       )
                               )

v.                               )

TOWN OF WEBSTER, ROBIN   )
LEAL, RICHARD BERGERON,   )
and WILLIAM KEEFE,         )
           Defendants.    )
_____)

## AFFIDAVIT OF JOHN A. BOLDUC, JR.

I, John A. Bolduc, Jr., do hereby depose and say:

1.    I was first employed by the Town of Webster as a police officer in March of 1995.

2.    The Defendant Richard Bergeron (hereinafter "Bergeron") was hired as Town of Webster Chief of Police in June of 1996.

3.    On or about October 19, 2001, I was appointed as a Provisional Sergeant, effective October 22, 2001.

4.    On June 30, 2002, Mark Stankiewicz (hereinafter "Stankiewicz"), in his capacity as Town Administrator, appointed me as a Sergeant with the Webster Police Department.

5.    On February 22, 2003, I was in the company of several other Town employees at the Colonial Club Restaurant in the Town of Webster. Those other employees included Deputy Chief Thomas Ralph (hereinafter "Ralph") of the Webster Police Department, Officer Brian Barnes (hereinafter "Barnes") of the Webster Police

1

Department, and several other Town employees. Barnes was in police uniform. During the course of that luncheon, Barnes made racist remarks directed at African-Americans with whom he had come in contact.

6.    On or about April 15, 2003, I went to confer with Bergeron with respect to a pending murder investigation to which I was assigned (Amato case). Upon my entering Bergeron's office, Bergeron started to raise his voice and directed profanity at me, accusing me of displaying inappropriate loyalty to Ralph. Bergeron specifically said to me, "Your friendship, support and loyalty to the Deputy Chief is going to cost you." At that time, Bergeron showed me a copy of the formal written complaint that had been filed with Chief Bergeron by Deputy Chief Ralph and instructed me to read it. I read the complaint, then informed Bergeron that this was the first I knew of it. A copy of said formal written complaint is provided herewith as Exhibit 9 and is incorporated herein. Bergeron accused me of having collaborated with Ralph with respect to the formal complaint that had been filed, which I denied. After concluding the conversation with Bergeron, I left the station. At no time did I collaborate with Deputy Chief Ralph with regard to the formal complaint he filed on April 15, 2003 with Chief Bergeron alleging racist behaviors by Officer Barnes. The interaction between myself and Bergeron was heard by Officer Michael Kehoe (hereinafter "Kehoe"). See Kehoe Affidavit, attached herewith as Exhibit 10.

7.    On or about April 17, 2003, Ralph informed me that he was ordered by Bergeron to supply Bergeron with the names of all witnesses, in writing, to support his allegations in the complaint against Officer Barnes. Ralph informed me that he would be supplying Bergeron with my name based on my having overheard Barnes' remarks at the

2

February 22, 2003 luncheon meeting at the Colonial Club.  See also Deposition of Ralph, page 146, lines 15-23, attached hereto as Exhibit 6.  See also Exhibit 20.

8.    On May 1, 2003, I stopped by Bergeron's office to brief him further on the Amato investigation.  During that conversation, Bergeron asked me if I had ever heard Officer Barnes say anything racist.  I indicated that I had.  Bergeron responded angrily and ordered me to provide him a written statement with names and dates.

9.    On May 12, 2003, Bergeron came to my office, located in the lower level of the Webster Police Station, and asked if I had produced a written narrative, as ordered, regarding Barnes' racist behavior.  I informed him that I had, and gave it to Bergeron.  A true and exact copy of the narrative is attached hereto, incorporated herein by reference and marked as Exhibit 21.

10.    When Bergeron read my written narrative, he indicated that I was to be returned to uniformed patrol duty, effective immediately.

11.    On May 12, 2003, I was informed by Bergeron that my schedule of duty and working days was to be changed to nights, effective immediately, that I was removed from the Amato murder investigation and that I was to be put back into rotation to uniform patrol duties.

12.    On or about May 14, 2003, I was told by Robert Miller, a Webster Selectman, that John Stevens, a former Webster reserve police officer, was told by Bergeron that he would be reinstated if he was able to provide Bergeron with any negative information concerning me or Ralph.  See Exhibit 8 attached herewith and incorporated herein.

3

13.    On or about May 15, 2003, I was informed via e-mail by Bergeron that I was to surrender the office that I had used for the last three years and relinquish all keys to Bergeron by the end of the business day. See Exhibit 22 attached herewith. After losing my office, I continued to perform duties as assigned, including duties as Department Domestic Violence Officer, Training Coordinator and Reserve Unit Liaison Sergeant, which required me now to maintain records at home.

14.    On or about May 15, 2003, I filed a memorandum with Steven Boudreau (hereinafter "Boudreau"), then Webster Town Administrator, indicating that I intended to file a complaint with the MCAD, and asserting that I had been and continued to be the target of retaliation by Bergeron because I had been identified by Ralph as a witness in a pending MCAD investigation. A copy of that memorandum is attached hereto as Exhibit 11 and is incorporated herewith. The pending MCAD investigation to which I referred was Ralph's complaint filed on or about May 1, 2003.

15.    On or about May 15, 2003, Webster police officers J. Brooks and M. Kehoe informed me that they were questioned by Bergeron, who was seeking information about me mistreating prisoners. See Exhibit 23 attached herewith.

16.    On or about May 19, 2003, I sent a second memorandum to Town Administrator Boudreau concerning retaliatory actions by Bergeron directed at me. A copy of said memorandum is attached hereto as Exhibit 24.

17.    On or about June 15, 2003, I learned that Bergeron and Officer Novik had interviewed Earl Burgess seeking negative information about me, specifically drug use. Bergeron had first mentioned this to me in 2002 and stated he heard it in 1998. I did offer to submit to blood or urine tests. Bergeron said to "forget it." See Exhibit 13.

4

18.    On June 16, 2003, I filed a complaint with the MCAD, alleging that the Webster Police Department and Bergeron had subjected me to unequal terms and conditions of employment, in retaliation for being identified as a witness with respect to discrimination alleged by members of the Webster Police Department as asserted by Ralph. The complaint filed with the MCAD specifically alleged that the Town and Bergeron had subjected me to unequal terms and conditions of employment, retaliation and civil rights violations for being named as a witness and participating in and assisting in proceedings opposing discriminatory practices, and such practices violated Massachusetts General Laws Chapter 151B § 4 (4) and Title VII of the 1964 Civil Rights Act, as amended. A copy of my complaint is attached hereto as Exhibit 25 and is incorporated herewith.

19.    On July 29, 2003 and August 1, 2003, I participated in investigatory hearings at the Human Resources Division of the Commonwealth of Massachusetts (HRD) to review allegations of impropriety during the promotional process by which I was selected as a permanent Sergeant of the Webster Police Force on June 13, 2002. Specifically, the allegations made by Officer Brian Barnes were that Ralph had provided me with questions and answers for the oral interview.

20.    After hearing, the Hearing Officer concluded that I was not provided the interview questions and answers in advance. See page 5 of Exhibit 11, attached hereto.

21.    The Hearing Officer did not find Barnes' allegation credible and noted he waited until he had professional difficulties with Ralph before making the allegations. See Exhibit 5, pages 5-6.

5

22.    On December 9, 2003, I testified on behalf of Ralph at a disciplinary hearing conducted by Leal as Hearing Officer in her capacity as Town Administrator. The disciplinary hearing was generated by charges filed by then retired Webster Police Chief Bergeron against Ralph, as a result of the matters on or about April 15, 2003 in which Ralph had alleged that Barnes was engaging in racist activity.

23.    On December 12, 2003, I was placed on administrative leave pending the outcome of an investigation of my allegedly using "excessive and unnecessary force" in handling prisoners. See Exhibit 19 attached herewith. One incident that occurred on February 19, 2002 involved a prisoner who was not complying with instructions from the booking officer to remove jewelry from his person. It was standard procedure to remove and inventory jewelry on a prisoner. See Exhibit 26 attached herewith. After his continued refusal to comply with my instructions, I removed a necklace by cutting it off. There was no mechanical clasp on the necklace. I removed two pieces of jewelry by using bolt cutters. The prisoner removed the rest by himself. Deputy Chief Ralph observed that situation and did not find the procedures used to be excessive or unnecessary. On November 9, 2002, I was called back to the station by an emergency call from the dispatcher indicating that there was a fight in the station. I arrived with Officer Thomas Pysell to find a prisoner named Heath Greenwood, with his hands handcuffed in front, attacking Officer Leonard Gevry. Officer Gevry was pinned against a wall with the prisoner's hands at this neck. I used my fist to strike Greenwood and separate him from Gevry. With the assistance of Officer Pysell, I then subdued Greenwood. See Affidavit of Pysell, attached hereto as Exhibit 17. Deputy Chief Ralph investigated the incident and prepared a report which was submitted to Chief Bergeron.

A copy of Deputy Chief Ralph's report is attached herewith as Exhibit 18 and is incorporated herein. On November 30, 2003, I held the face of a female prisoner who was not complying with the booking officer's instructions to allow her booking photo to be taken. None of the prisoners involved in these incidents filed a complaint.

24.    In or about December 2003, I was requested by Robert Miller (hereinafter "Miller"), a member of the Town Select Board, to meet with him at his business location. Ralph was also there. Miller said that he was conferring with Ralph and me in his capacity as Chairman of the Select Board on behalf of Town Administrator Robin Leal (hereinafter "Leal") to ask that we resign from the Webster Police Department. Miller stated that Leal promised "glowing" recommendations if we resigned. Both Ralph and I refused to resign. At the conclusion of the meeting of Ralph and me with Miller, Raymond Regis (hereinafter "Regis"), another member of the Select Board, entered and asked if our resignations had been tendered. Both Ralph and I indicated that our resignations had not been tendered. Regis then stated to me that Leal told him she intended to fire me after a hearing. See Exhibit 16 attached hereto.

25.    On or about January 5, 2004, I was ordered to attend a "fit for duty exam" with Leo Polizotti, M.D. (hereinafter "Polizotti"). Before the exam, Keefe, in his capacity as Acting Chief of the Webster Police Department, sent a letter to Polizotti with negative information, and characterizing me as being manipulative. He further warned Polizotti of my high intelligence, ability to deceive, and ability to perform well on tests. A copy of said letter is attached hereto as Exhibit 27.

26.    Leal also telephoned Polizotti to inform him that I had an anger problem about which the Town already was aware.

7

27.     On January 14, 2004, I was informed by Polizotti of Acting Chief Keefe's letter and of Leal's phone call to him. He further indicated that Keefe supplied only negative information for the Polizotti review. Polizotti told me that he believed the Town was setting me up and advised me to seek counsel.

28.     On or about February 23, 2004, the Town Select Board unanimously voted to award me a commendation for my work on the Amato murder investigation. See Exhibit 15 and Exhibit 16.

29.     On or about March 1, 2004, Leal requested that each member of the Webster Select Board individually rescind my commendation related to the Amato case, because it would weaken her position at the disciplinary hearing and in matters pending before the MCAD. Two members of the Webster Select Board, Martell and Dowgiewicz, agreed to change their votes and the award to me was rescinded. See Exhibit 15 and Exhibit 16.

30.     On or about March 1, 2004, Keefe, in his capacity as Webster Police Chief, sent a letter to Leal recommending my termination. Keefe did not interview any witnesses with exculpatory or positive information with respect to my conduct with respect to the specific incidents being investigated, or as a member of the Webster Police Force in general. See Exhibit 28 attached hereto. I did not receive a copy of Keefe's letter of March 1, 2004 until I received my Termination Notice on March 19, 2004, to which it was attached.

31.     On March 2, 2004, I received the letter at Exhibit 29 advising me of a hearing on March 10, 2003. No specific charges from Chief Keefe were attached. Copies of M.G.L. c. 31, §§ 41 – 45 were not enclosed.

8

32.     On March 9, 2004, Webster Police Officer Pysell, at Keefe's direction, hand delivered to my residence a large manila envelope containing information that my attorney, Christopher Browne, had requested on January 15th and 28th, February 19th and 24th, and March 4, 2004 to prepare for the hearing scheduled for March 10, 2004. The envelope arrived at 9:00 p.m., only twelve hours prior to my disciplinary/termination hearing. See Exhibit 30 attached herewith. By the letter contained therein, we were informed that the Town could not locate my personnel file and it had been turned over to Bergeron.

33.     On March 10, 2004, Leal, as Hearing Officer, conducted a disciplinary hearing for me, arising from allegations of prisoner mistreatment. None of the allegations were the result of a prisoner complaint. All of the incidents involved apprehended prisoners not complying with instructions from a police officer during the booking procedure. One of the allegations had previously been investigated, close in time to the incidents, by Deputy Chief Ralph and was found not to have involved the use of excessive force. None of the prisoners who were referred to in the disciplinary hearing allegations filed a complaint with the Webster Police Department or any other agency with respect to my conduct before, during, or after their arrests.

34.     In my nine years with the Webster Police Department, I had never been the subject of department discipline or counseling by any supervisor for inappropriate behavior or performance of duty. In 1998, I received a Meritorious Service Medal. In 1999, I was awarded a Medal of Valor.

35.     On March 19, 2004, Town Administrator Leal terminated me from the Webster Police Department. See Exhibit 18 attached hereto.

9   

Signed under the pains and penalties of perjury this _14TH_ day of

_DECEMBER_____, 2006.

John A. Bolduc, Jr.

# EXHIBIT 4

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

JOHN BOLDUC
DATE:   AUGUST 31, 2006

---

# PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

Case 4:05-cv-40030-FDS     Document 29-6     Filed 12/15/2006     Page 3 of 12

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 53

1 someone of the Select Board.

2      I wanted him to provide the opportunity

3 to completely answer your question.

4           MS. LYNCH:  I would appreciate it if

5 you didn't do that.  I just want your witness' own

6 memory.

7     Q.   (BY MS. LYNCH)  With respect to the note

8 that your attorney wrote to you, what significance

9 does that have?

10     A.   Bob Miller had left a phone message on

11 Tom Ralph's answering machine instructing Tom to

12 get ahold of me because Ms. Leal had asked the

13 Board to rescind a commendation for the Amato case

14 that the board voted to give to me.

15     Q.   We'll get to that later.  I was asking

16 you about Mr. Stawiecki.

17           Did you ever have any discussions with

18 him regarding your employment?

19     A.   No.

20     Q.   Do you have any sort of background in

21 martial arts, anything like that?

22     A.   No formal martial arts training.

23     Q.   I'd like to draw your attention to

24 apparently a luncheon that occurred on

VOLUME I - 54

1 February 22, 2003 at the Colonial Club Restaurant?

2     A.   Yes.

3     Q.   Do you recall being there?

4     A.   Yes.

5     Q.   Who was present?

6     A.   Myself; Tom Ralph; Pamela Laduc who is

7 now Pamela Laduc Regis; Heidi Courtenay; Lee Ellen

8 Olmstead; and Brian Barnes.

9     Q.   You said Pamela Laduc Regis.  Is she

10 related to the Selectmen Regis?

11     A.   Daughter-in-law.

12     Q.   Daughter-in-law?

13     A.   Yes.

14     Q.   What occurred at that luncheon that was

15 significant with respect to Brian Barnes?

16     A.   Brian Barnes repeated a story of an

17 unpleasant airplane flight that he had.

18     Q.   And what was that?

19     A.   That he was seated between two

20 African-Americans.  He also spoke about an obese

21 woman and her snacking habits.

22     Q.   Can you recall what you said?

23     A.   He had said that he took a plane flight

24 to Florida.  He went on to say why the flight was

VOLUME I - 55

1 unpleasant as he felt like an Oreo cookie stuck

2 between two niggers; and then the flight attendant

3 who was asking the woman behind him who should

4 have bought two tickets because she was so large

5 and took up so much room, if she wanted snacks

6 when Brian went on this tirade to the stewardess

7 of course she wants snacks, look at her type of

8 thing.

9     Q.   The woman who was large, was she

10 African-American, do you know?

11     A.   I don't know.

12     Q.   I want to make sure I understand.  There

13 was a large woman behind him and he had two

14 African-Americans next to him, is that correct?

15     A.   That's correct.

16     Q.   Did he say anything else of a racial

17 nature?

18     A.   Not that I recall.

19     Q.   What was your response when he told that

20 story?

21     A.   My response was that -- nobody said

22 anything.  There was silence.  Brian wasn't

23 getting the reaction he was looking for so he went

24 on to something different.

VOLUME I - 56

1     Q.   Did anyone chastise him for making that

2 statement or anything like that?

3     A.   No.

4     Q.   How did you feel about the statement?

5     A.   I felt that the statement was wrong.  He

6 was loud, he had people looking at him at some of

7 the other tables.  It was apparent that more

8 people had heard what he had said than who were

9 seated at the table.

10           Of course Brian was in the full Webster

11 police uniform.  It wasn't very appropriate was my

12 thought.

13     Q.   Why didn't you say something to him?

14     A.   It would have fallen on deaf ears.

15     Q.   Why do you say that?

16     A.   There would be no repercussion for

17 Brian.

18     Q.   What do you mean by that?

19     A.   That again, being outside of the chain

20 of command or not being subject to discipline

21 under Chief Bergeron, to say something to Brian,

22 have him chuckle and nothing come of it, what

23 would be the point.

24     Q.   Had you ever witnessed him make a racial

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 57

1  statement at any other time?
2      A.   No.
3      Q.   Had you ever heard him use the word
4  nigger, chink or spic other than at that occasion?
5      A.   No.
6      Q.   Do you know of anyone else that did --
7  who says they did?
8      A.   Aaron Suss, Jim Hoover, Joseph Brooks,
9  Michael Kehoe, Jim Young, Jim Fersenheim.
10     Q.   What was that name?
11     A.   Jim F-E-R-S-E-N-H-E-I-M.
12     Q.   Is he a police officer?
13     A.   He's a dispatcher.
14     Q.   Okay; anyone else?
15     A.   I don't know.
16     Q.   Did these individuals tell you that they
17 witnessed Mr. Barnes making a racial statement?
18     A.   At different times just stories
19 repeated.
20     Q.   Starting with Officer Suss, what did he
21 tell you and when?
22     A.   I don't remember the date.  Suss drove
23 Barnes and Phillip Charbonneau, the assistant
24 principal of the high school, they were going to

VOLUME I - 58

1  some conference for school resource officers and
2  they were making -- the two of them talking back
3  and forth referring to African-Americans as
4  niggers on the way to the airport, whenever that
5  conference took place.
6          The other officers I mentioned were
7  talking about Brian Barnes' statements when he
8  came back after a New England Cable News panel
9  discussion for racial profiling where Senator
10 Dianne Wilkerson was also part of the panel.  The
11 talk of Brian referring to her in front of those
12 people that I mentioned --
13     Q.   (Interposing) That's Hoover, Brooks,
14 Kehoe, Young, and Fersenheim?
15     A.   There were other officers present as
16 well -- or other Police Department personnel --
17 but referring to Senator Wilkerson as nothing but
18 a dumb nigger and whatnot.
19          I was not -- that's not firsthand
20 knowledge from me.
21     Q.   Did they say that he said that as
22 opposed to he was repeating that another police
23 chief said that about her?
24     A.   No; not that I recall.

VOLUME I - 59

1      Q.   The statement that Suss told you he
2  heard between Barnes and Charbonneau, you said
3  that occurred on the way to the airport?
4      A.   Correct.
5      Q.   Did he say that the statement was about
6  the Oreo cookie?
7      A.   No; Aaron had said to me that there was
8  conversation back and forth between Barnes and
9  Charbonneau, both of them using the word "nigger"
10 quite a lot.  The two of them laughing and joking.
11     Q.   Have you, yourself, ever used the terms
12 nigger, chink or spic to refer to individuals?
13     A.   No.
14     Q.   Have you ever heard Richard Bergeron
15 make racist type comments?
16     A.   No.
17     Q.   How about William Keefe?
18     A.   No.
19     Q.   Have you ever heard any other officers
20 or supervisors at the Police Department make
21 racial type comments besides the time that you
22 said that you heard Officer Barnes at the
23 restaurant?
24     A.   No.

VOLUME I - 60

1      Q.   Do you have any knowledge to believe
2  that Chief Bergeron had ever heard Brian Barnes
3  make these type of racial comments?
4      A.   I don't know.
5      Q.   Do you know if, prior to Thomas Ralph
6  reporting the incident at the restaurant to Chief
7  Bergeron, whether any other police officers or
8  Police Department civilian employees had ever
9  reported to Chief Bergeron or to any other
10 supervisor that Brian Barnes had made racial
11 comments?
12     A.   Jim Hoover -- Detective Hoover.
13     Q.   What do you understand he reported?
14     A.   He reported to Tom Ralph about an
15 incident at the Bartlett High School about Brian
16 Barnes refusing to room with a black man when they
17 were in one of the orders of --
18     Q.   Seminary?
19     A.   Something along that line; yes.  They
20 had to work in a soup kitchen in New York or
21 something to that effect and they would be there
22 for a week.  Space was limited.  Brian refused to
23 sleep in the same room so he slept in his car or
24 something along those lines.  I was not there for

## JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
### JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 61

1  that.
2      Q.   This was repeated to you by who?
3      A.   Hoover and Ralph.
4      Q.   They both told you?
5      A.   Yes.
6      Q.   Did they both say that they heard Brian
7  Barnes say that?
8      A.   Tom Ralph had told me that Hoover was
9  the one who wanted to push the complaint, was --
10 wanted something done.
11         There was some sort of assembly or bomb
12 scare or something where there were a lot of
13 people gathered around.  Hoover thought that that
14 was inappropriate, wanted to put this complaint in
15 writing.
16     Q.   You're saying at that bomb scare that's
17 where Brian Barnes repeated this story reportedly?
18     A.   Right.
19     Q.   Hoover was there at this bomb scare?
20     A.   Yes.  If that's what it was.  It was
21 something at this school.
22     Q.   Other than Hoover telling Ralph that, do
23 you know if either of them or anyone else had ever
24 reported alleged racial statements by Barnes to

VOLUME I - 62

1  either the Chief or any other supervisor?
2      A.   I don't know.
3      Q.   Do you know if Ralph or Hoover ever
4  reported that to the Chief -- this statement that
5  reportedly was made at the bomb scare?
6      A.   I was told that's what -- that's where
7  the letter -- the April 15th letter to Chief
8  Bergeron, that's what spurred that whole thing.
9      Q.   As opposed to the Colonial Restaurant
10 incident?
11     A.   I don't know that that incident was
12 reported to the Chief.
13     Q.   Which one?
14     A.   The Colonial Restaurant.
15     Q.   You think it was just the statement at
16 the bomb scare that was reported?
17     A.   I believe the statement at the bomb
18 scare is what brought all of that forward, was the
19 reason for that letter that Ralph gave to the
20 Chief.
21         After that letter, that's when the Chief
22 questioned people and anybody who witnessed
23 anything was to then put something in writing and
24 turn it into him.

VOLUME I - 63

1      Q.   How would you define the term "racist"?
2      A.   I would define the term that if you were
3  to interact with somebody maliciously.  If you
4  were to act or display negative actions because
5  somebody is different, whether that is the
6  obvious -- whether that's skin or heritage or
7  ethnicity, I think that goes deeper.
8          If you want to -- also anybody that's
9  just different or not what society would deem as
10 average male or female Caucasian.
11     Q.   Are you done?
12     A.   I am.
13     Q.   Do you think that Brian Barnes is a
14 racist, based upon your definition?
15     A.   I think so.
16     Q.   In other words, you think that to the
17 extent he made these types of statements he was
18 doing so with malice as opposed to in his mind
19 thinking it was funny?
20     A.   His demeanor, his speech, his delivery,
21 it didn't appear -- he didn't seem to think that
22 that was a joke or making light of something or
23 trying to be colorful or anything like that.
24         I don't -- at the Colonial Club I did

VOLUME I - 64

1  not perceive that as a joking manner.
2      Q.   Actually with respect to that statement
3  at the Colonial Club, did he say it as the thought
4  came from him as opposed to he was repeating
5  something that this Mr. Charbonneau stated?
6      A.   As the thought came from him, first
7  person.
8      Q.   He never referenced Charbonneau?
9      A.   No.
10     Q.   Have you ever observed him treat someone
11 of a different racial background than him
12 differently?
13     A.   Not firsthand, no.
14     Q.   Did you ever at any time discuss with
15 him the racial statements that you said you heard
16 or that you heard of?
17     A.   No.
18     Q.   Do you know when that statement at the
19 bomb scare was reportedly made?
20     A.   I don't know.
21     Q.   Do you recall when it was in relation to
22 the February 22, 2003 Colonial Club Restaurant
23 statement?
24     A.   I thought it was close proximity but

**JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL**
**JOHN BOLDUC          AUGUST 31, 2006**

VOLUME I - 69

1    A.    Correct -- again if that was a bomb
2    scare but at the event or incident at the school.
3    I'm assuming it was a bomb scare but I don't know
4    that for sure.
5    Q.    Were you present when he gave his
6    complaint to Chief Bergeron?
7    A.    No.
8    Q.    When did you first hear about it?
9    A.    In Chief Bergeron's office when I went
10   in to talk to him about the Amato case.
11   Q.    Can you tell us what was discussed then?
12   A.    Chief Bergeron, when I entered, was very
13   angry. He accused me of collaborating with Ralph
14   on a letter that he had -- a tri-folded piece of
15   white paper that he kept waving back and forth and
16   accused me of -- he kept accusing me of working
17   with Ralph on this, you had a part in this. He
18   didn't do this by himself and I had no idea what
19   he was talking about.
20        I asked him and he just shoved the paper
21   forward to me and told me to read it. I read it.
22   I saw that it was from Ralph to Bergeron outlining
23   racial bigotry or racial behavior from Brian
24   Barnes and that he wanted a response from

VOLUME I - 70

1    Bergeron. Bergeron had fourteen days to respond
2    or Ralph would go to other agencies.
3         The Chief was upset because he was
4    telling me that the fourteen-day paragraph, he
5    called that as "downtown," that's "downtown." He
6    said to me that Ralph had to have someone help him
7    with this; that that was nothing he did on his
8    own; that I made a big mistake; that my
9    friendship, loyalty, and support of Deputy Chief
10   Ralph was going to cost me.
11   Q.    Did he say why he thought that you were
12   involved in it?
13   A.    He didn't. He didn't say.
14   Q.    Did you ever have any discussion with
15   Ralph as to why he decided to make that complaint
16   at that time?
17   A.    No.
18   Q.    When you went into the Chief's office
19   that day and he showed you the letter, do you know
20   if that was the same day that Ralph turned in the
21   letter?
22   A.    I believe so.
23   Q.    Do you happen to know what Ralph did
24   after he turned in the letter?

VOLUME I - 71

1         Do you have any knowledge of that --
2    where he went, what he did?
3    A.    No.
4    Q.    When is the first time you did discuss
5    that letter with Ralph?
6    A.    Actually I need to clarify. The Chief
7    had also, when we were in the office -- it had to
8    be that day because earlier that day Derrick
9    Stokes and I had met with John Bish and the Chief
10   accused me of lying to cover Tom Ralph.
11        He was at -- when Derrick and I were at
12   the East Brookfield Courthouse Ralph had showed
13   up. Derrick, John, and I were getting ready to go
14   to lunch so we invited Tom to come with us.
15   Q.    Just for a second. Do you know if that
16   was after he turned in the letter?
17   A.    Right; it had to be.
18   Q.    Okay. Did he go to lunch with you?
19   A.    He did.
20   Q.    Did he discuss the fact that he turned
21   in the letter?
22   A.    No; we were -- he was very quiet but the
23   reason Derrick and I were there was to share with
24   John timetables of people that we were looking at

VOLUME I - 72

1    or suggested to us by other agencies of possible
2    suspects -- today they are people of interest --
3    but suspects in the Amato case so the timetable
4    in the area -- those people that give or have John
5    give those to the investigators for the Molly Bish
6    case so it was all involved in that and the Center
7    For Missing and Exploited Children so Ralph had
8    very little to say during that whole time.
9         As we were finishing lunch he said to
10   Derrick and I that he had to get back to the
11   station and he left.
12   Q.    Do you have any knowledge of him
13   ignoring requests by Chief Bergeron to return to
14   the station?
15   A.    I don't know.
16   Q.    Incidentally, is there an officer
17   Bates -- B-A-T-E-S?
18   A.    Brian Bates; yes.
19   Q.    Did he ever make any statement or
20   statements to you about Brian Barnes and alleged
21   racial statements?
22   A.    Not that I remember.
23   Q.    How about Officer Shaw?
24   A.    Not that I remember. I don't remember

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 113

1  Barnes but Chief Bergeron would not permit it?
2      A.   I heard that indirectly a number of
3  times.
4      Q.   Do you recall who you heard it from?
5      A.   Jim Hoover -- of course Hoover was the
6  union president then.  At various times Tim Bent,
7  Rod Budrow, different officers at different times,
8  the officers making jokes that, well, Barnes did
9  it, he'll get away with it, those types of things;
10  all secondhand hearsay type thing.
11      Q.   Do you have any reason to believe that
12  Barnes did have a close relationship with regard
13  to Chief Bergeron with respect to his prior work
14  experience at Quincy or in Webster that expanded
15  outside of the workplace?
16      A.   I don't think I'm clear.
17      Q.   Do you have any personal information to
18  confirm whether or not Chief Bergeron and Brian
19  Barnes had a relationship outside of work either
20  in Quincy or in Webster?
21      A.   When Chief Bergeron bought his house in
22  New Hampshire there was one day in the dispatch
23  room that Brian was telling us about his -- the
24  indoor pool.

VOLUME I - 114

1          According to Brian he had been up there
2  to the New Hampshire property.  He was telling us
3  all about pools and fruit trees.
4      Q.   Was that when Chief Bergeron was still
5  actively employed?
6      A.   Yes.
7      Q.   Before he was put on administrative
8  leave?
9      A.   Yes.
10      Q.   Any other information that you have
11  about their relationship?
12      A.   Just stories of the days in Quincy,
13  different names of officers and some of the things
14  that they did, some of the war stories type of
15  things that Brian would repeat to us and tell us
16  about.
17      Q.   Did you ever have any discussions with
18  Michaela Kelley about the cheating allegations?
19      A.   No.
20      Q.   Any particular reason why not?
21      A.   I never gave the cheating allegations
22  any credence.
23      Q.   Did you ever discuss that topic with
24  William Keefe?

VOLUME I - 115

1      A.   No.
2      Q.   With respect to Brian Barnes and his
3  assignment at the school, did you disagree with
4  that?
5          In other words, did you think he should
6  just be doing patrol as opposed to working at the
7  school?
8      A.   No.
9      Q.   Do you know whether Thomas Ralph
10  disagreed with that assignment?
11      A.   That, I don't know.
12      Q.   I want to refer you now to the first of
13  the three incidents that have been discussed
14  involving Jonah Mayotte on February 19, 2002.
15          Did you first become involved with him
16  within the police station?
17      A.   Yes.
18      Q.   Can you tell us why it is that you got
19  involved with removing the jewelry?
20      A.   I was called in off the road.  I was on
21  patrol.
22          I was called in and briefed by Steven
23  Novick that they were trying to remove jewelry,
24  couldn't, that they've been trying for a half

VOLUME I - 116

1  hour, forty-five minutes, it's not working so they
2  needed help.
3      Q.   You said Novick actually called you and
4  asked you to come in and help?
5      A.   Yes.
6      Q.   And then what did you do?
7      A.   I went into the booking room, observed
8  Mayotte on the floor.  I removed his necklace,
9  instructed Novick and Pysell to sit him in a
10  chair -- pick him up off the floor, sit him in a
11  chair.
12      Q.   With respect to the necklace, can you
13  describe the necklace?
14      A.   He had a couple of necklaces on.  The
15  necklace that I removed was -- I was able to pull
16  away from his neck.
17          It was a long gold chain and a small
18  medallion or something on it.
19      Q.   How long was it, do you know,
20  approximately?
21      A.   I don't know.
22      Q.   But it wasn't flush against his neck?
23      A.   No.
24      Q.   Do you know how much space there was

PERLIK and COYLE REPORTING

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          AUGUST 31, 2006

### VOLUME I - 117

1  between his skin and the necklace?
2      A.   Six inches, ten inches.
3      Q.   Did you ever testify at any proceeding
4  that it was flush up against his neck?
5      A.   He was wearing one that was flush.  He
6  had an eagle or a bird or something -- something
7  long that sat much like my tie is here.
8      Q.   Did you remove that one?
9      A.   He removed that one later on.
10     Q.   How did you remove the necklace that you
11  removed?
12     A.   My utility knife -- my duty knife.
13     Q.   Why did you remove it with a knife as
14  opposed to just unclasping it?
15     A.   I had duty gloves on.
16     Q.   What are duty gloves?
17     A.   Duty gloves are a -- the outside is
18  black leather.  There is a Kevlar mesh inside so
19  they are cut resistant, puncture resistant but it
20  diminishes fine finger dexterity.  You have to
21  take them off to write with a pen or to unclasp
22  jewelry, which I didn't do.
23     Q.   He was on the ground though facing the
24  floor, is that correct, at that point?

### VOLUME I - 118

1      A.   He was on the floor.
2           He was almost on his belly, not quite.
3  He wasn't -- he was more on his belly than he was
4  on his side but he wasn't laying flat, face down
5  on the floor.
6      Q.   Was there a reason, though, as to why
7  either you -- if you didn't have your gloves on or
8  someone else couldn't remove the necklace by just
9  unclasping it?
10          In other words is there a reason why you
11  didn't just unclasp it?
12     A.   My understanding was he would try and
13  grab it and pull to make it difficult.  According
14  to Novick for some thirty or forty-five minutes
15  they had been trying to do that unsuccessfully.
16          In Sergeant Kelley's report she states
17  that they were unsuccessful in attempting to
18  forcefully remove his jewelry.
19     Q.   What did you do after you got the
20  necklace cut off?
21     A.   I dropped his necklace in a property
22  bag.
23          I had instructed Officers Novick and
24  Pysell to pick him up off the floor and sit him in

### VOLUME I - 119

1  a chair in the booking room.
2      Q.   And then what happened next?
3      A.   I told Mayotte who I was and told him
4  that his jewelry had to come out; that if he
5  didn't take it out himself then we would take it
6  out for him.
7      Q.   Prior to cutting off his necklace, did
8  you say anything to him?
9      A.   No.
10     Q.   Why not?
11     A.   I had three of my officers in there for,
12  as Novick put it, thirty to forty-five minutes,
13  the three of them attempting to remove jewelry.
14  They were unsuccessful in their attempts so for
15  the thirty or forty-five minutes they are allowing
16  Mayotte to have control over what they're doing in
17  that room.
18          By removing his necklace with him having
19  no say whatsoever and then sitting up in the
20  chair, it was apparent to him that jewelry could
21  be removed.  It was demonstrated for that.  That
22  was for the purpose and assuming control of that
23  situation.
24

### VOLUME I - 120

1          (Defendant's Deposition Exhibit
           No. 1 offered and marked.)
2
3      Q.   (BY MS. LYNCH)  I'm going to show you
4  what's been marked Exhibit Number 1.  Is that
5  Mr. Mayotte?  (Indicating.)
6      A.   Yes.
7      Q.   Which necklace was it that you cut off?
8      A.   The longer one that's not in full view
9  of this picture, the one that would go longer.
10  There's one necklace here and there's one there.
11     Q.   Why did you believe that necklace had to
12  come off?
13     A.   Why did I believe the longer --
14     Q.   (Interposing) Why did you want it to
15  come off?
16     A.   Mr. Mayotte is someone who fits the
17  classic model for a suicide risk.  Jewelry that
18  could be either used to commit suicide or to
19  injure himself or to be fashioned into weapons to
20  be used against an officer, all of that had to be
21  removed for those purposes.
22     Q.   Let me ask you first:  What
23  characteristics did he display that you thought
24  fit the classic model for suicide?

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 121

1    A.   The intoxication, alcohol and/or drugs,
2  the white male between the ages of twenty-four and
3  forty, the lack of a previous record as I
4  understood it, the being going from a booking room
5  or a booking facility to a cell where he'd be
6  isolated.
7       All those are within a classic model --
8  the fact that he is a white male which is a higher
9  risk.
10    Q.   Did you have information that he had
11 consumed alcohol or drugs prior to coming to the
12 police station?
13    A.   The arrest occurred in the Maple Leaf
14 Lounge; yes, due to a bar fight.
15    Q.   Did anyone tell you that he was
16 intoxicated?
17    A.   Novick didn't use the words
18 "intoxicated." As best I remember when I got in
19 there Novick said along the lines that, "Look,
20 Sarge, we've got this asshole who was in the Maple
21 Leaf. He's all fucked up, he's giving us a hard
22 time. We've been here for thirty, forty-five
23 minutes," so I'm assuming the bar fight at the
24 bar.

VOLUME I - 122

1    Q.   How do you think that the necklace that
2  you removed could have been used to either harm an
3  officer or harm Mr. Mayotte, himself?
4    A.   Strangulation.
5    Q.   I'm sorry, do you recall how long it
6  was?
7    A.   No.
8    Q.   How thick was it?
9    A.   I don't know. I don't remember.
10    Q.   Looking at that picture, does that
11 refresh your memory as to how thick it was?
12    A.   It appears to me to be a rope chain or
13 rope type necklace. I don't know; a quarter of an
14 inch? I don't know.
15    Q.   What was the next thing that happened
16 after he was sat down in the chair and you told
17 him who you were?
18    A.   I asked him to remove his jewelry.
19    Q.   What was his response?
20    A.   There was none.
21    Q.   What was the next thing that happened?
22    A.   I looked at his jewelry to see if I
23 could tell how it would come out.
24       At that point I wasn't going to be able

VOLUME I - 123

1  to take it off manually so I asked the dispatcher
2  call EMS to bring a ring cutter.
3    Q.   What was the next thing that happened?
4    A.   I told Mr. Mayotte that the EMTs were
5  going to bring a ring cutter and if necessary we
6  would cut the jewelry off of him. I told him
7  again to remove his jewelry.
8    Q.   What was his response?
9    A.   I think he swore at us.
10    Q.   And then what was the next thing that
11 happened?
12    A.   The EMTs arrived. They gave me the ring
13 cutter. I showed them to Mayotte.
14    Q.   Who were the EMTs that arrived?
15    A.   Gary Wrubaleski and Jeff Becker.
16    Q.   Not Gary Milliard?
17    A.   No.
18    Q.   Jeff Becker you said?
19    A.   Yes.
20    Q.   What was the next thing that happened?
21    A.   I attempted to cut a piece of jewelry
22 off Mayotte with the ring cutter.
23    Q.   Which piece?
24    A.   The -- one of the earrings -- one of the

VOLUME I - 124

1  loops.
2    Q.   On his right ear?
3    A.   I believe it was this top earring, this
4  one here. (Indicating.)
5    Q.   The earring on the top of his right ear?
6    A.   Top of his left.
7    Q.   His left; okay. Why did you want to
8  remove that?
9    A.   Because it was easy. It was hanging out
10 there. It was easy to get the foot of the ring
11 cutter through that loop. It was just an easy
12 piece of jewelry.
13    Q.   How would you describe the ring cutter?
14    A.   Much like an imp cutter for a copper
15 pipe.
16    Q.   Did you say imp cutter?
17    A.   It's small; it's got a twisted wheel.
18 There's a cutter wheel, a pressure screw and by
19 bringing the wheel back and forth it should cut a
20 ring.
21    Q.   How big were the cutters, about? How
22 many inches?
23    A.   Probably the size of a very small
24 stapler. It had that type of basis or foot.

**PERLIK and COYLE REPORTING**

## JOHN A. BOLDUC vs.  TOWN OF WEBSTER ET AL
### JOHN BOLDUC        AUGUST 31, 2006

VOLUME I - 125

1    Q.  About six inches or so?
2    A.  Yes; it's very small.
3    Q.  With respect to that earring though on
4  the top of his left ear, why did you think that
5  should come off?
6        Why did you think that posed a danger to
7  anyone?
8    A.  It could be fashioned into weapons; yes.
9    Q.  How so?
10    A.  Any type of jewelry used to cut his own
11  skin; any type of jewelry that could be rubbed on
12  concrete in a cell and used to make some sort of
13  incision if he wanted to hurt himself; anything
14  that could be pinched between fingers and struck
15  or scraped or punched at an officer.
16    Q.  Were you successful in removing that
17  earring?
18    A.  No.
19    Q.  What was the next thing that happened?
20    A.  Matt Langevin who was a part-time
21  officer, full-time dispatcher who was working as a
22  uniform patrol officer suggested that the bolt
23  cutters from the rescue truck from the fire
24  department next door to the police station.

VOLUME I - 126

1    Q.  Where was Matt Langevin when this was
2  all happening?
3    A.  Standing in the room.
4    Q.  Where was Jeff Becker when this was
5  happening?
6    A.  Standing in the room.
7    Q.  Do you know where Jeff Becker is at this
8  time?
9    A.  He's a full-time firefighter paramedic
10  somewhere in Massachusetts.
11    Q.  How about Matt Langevin?
12    A.  Still works for the Webster PD,
13  full-time dispatcher.
14    Q.  What happened after Mr. Langevin
15  suggested the bolt cutters?
16    A.  I shook my head, I told him go ahead, go
17  get them, let's see them.
18    Q.  Did he get them for you?
19    A.  He did.
20    Q.  How would you describe the bolt cutters?
21    A.  Bolt cutters look like -- they were much
22  like a common hedge trimmer would, two handles.
23  There are two pin points and then a -- what's
24  referred to as either a bull nose or a snub nose

VOLUME I - 127

1  and cutters like scissors.
2    Q.  How big were they?
3    A.  Probably two feet.
4    Q.  What happened after he got those for
5  you?
6    A.  I showed them to Mayotte, told him that
7  if he didn't take his jewelry out we would use
8  these to remove his jewelry.
9    Q.  What was his response?
10    A.  I think he swore at us again.
11    Q.  What position was he in at that point?
12    A.  Sitting in a chair facing me.
13    Q.  Who else was in the room?
14    A.  Steven Novick, Thomas Pysell, Michaela
15  Kelley, Scott Nelson, Jeff Becker, Gary
16  Wrubaleski, Matt Langevin, Yvette Roseland, and
17  Tom Ralph was in the hallway watching into the
18  room.
19    Q.  I'm sorry, who is Roseland again?
20    A.  She was a dispatcher.
21    Q.  Did you eventually use those bolt
22  cutters on Mr. Mayotte?
23    A.  Yes.
24    Q.  Before you did so, did anyone say that

VOLUME I - 128

1  they didn't think you should?
2    A.  No.
3    Q.  Did anyone say they didn't think you
4  should use the ring cutter?
5    A.  No.
6    Q.  Which piece of jewelry did you use the
7  bolt cutters on?
8    A.  That same piece.
9    Q.  The ring above his ear?
10    A.  Top of the left ear; yes.
11    Q.  Did you get it off?
12    A.  Yes.
13    Q.  And then what happened?
14    A.  Prior to cutting that I asked Wrubaleski
15  and Becker to stay in the room.  I told Novick and
16  Pysell to stand on each side of Mayotte and hold
17  him still.
18        They did and I cut the ring, took it
19  off, had Novick and Pysell release him, told him
20  to remove the rest of his jewelry.
21    Q.  What did you do with the ring that you
22  took off?
23    A.  Dropped it in the property bag.
24    Q.  Do you know if that jewelry was ever

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC        AUGUST 31, 2006

VOLUME I - 129

1  inventoried?
2      A.   I would assume so.
3      Q.   Is it supposed to be?
4      A.   It's supposed to be; yes.
5      Q.   So after you removed that ring what
6  happened?
7      A.   He said something along the lines of you
8  guys are crazy, he was not going to take his
9  jewelry off.
10     Q.   So then what happened?
11     A.   I instructed Pysell and Novick again to
12  steady Mayotte and I cut a second piece of
13  jewelry.
14     Q.   Which one did you cut off?
15     A.   I believe that it's the piece on the --
16  I believe it is the piece above the left eye.
17     Q.   Is that a ring also?
18     A.   Yeah, not quite a ring.  There's a
19  break -- this is the one I'm looking at.  It's the
20  ring with two large balls on each end.
21  (Indicating.)
22     Q.   I'm sorry, did you say that you did cut
23  that off?
24     A.   Yes.

VOLUME I - 130

1      Q.   The reason for cutting that one off was?
2      A.   Same reason.
3      Q.   You thought it could be used as a
4  weapon?
5      A.   Right; and those two pieces were the
6  safest.
7           When the rings were brought up, they
8  were the two that protruded the most from him and
9  could be cut the safest.
10     Q.   What happened after you cut that one
11  off?
12     A.   He took all the rest of his jewelry off.
13     Q.   Can I see that picture?
14     A.   Sure.
15     Q.   Did you ever give as a reason for
16  cutting off the jewelry that he had an injury to
17  his face -- a laceration or anything like that?
18     A.   Only when we were -- in my conversation
19  with Christopher Browne.
20     Q.   Your attorney?
21     A.   At that time he was the IBPO attorney;
22  yes.  I had no information as to Mayotte as far as
23  a name.  It was Hoover -- Jim Hoover who mentioned
24  something about a guy from a bar fight.

VOLUME I - 131

1           Chris Browne and I met with William
2  Keefe at one point.  It was only then that he had
3  a picture of Mayotte.  He didn't identify Mayotte
4  but in all of my questioning and talking to people
5  and trying to figure out who and when and all of
6  this, I had questioned or thought that Mayotte was
7  one of these guys.  The Maple Leaf was a common
8  place to be called to.
9           MS. LYNCH:  Can you go back on that,
10  please?
11           (Scrolling on computer screen.)
12     Q.   (BY MS. LYNCH)  So with regard to the
13  issue of the laceration, what did you say about
14  that with respect to your reason for cutting off
15  the jewelry?
16     A.   My thought was to have it removed at the
17  request of the EMTs, under the direction of the
18  EMTs.
19     Q.   Are you saying that the EMTs thought the
20  jewelry should come off?
21     A.   No.
22     Q.   I'm not following you, then.  Can you
23  explain what you mean when you say that it was to
24  be removed at the direction of the EMTs?

VOLUME I - 132

1      A.   Before Mayotte was identified to me,
2  before I knew that this is what we were looking
3  at, that I had asked, after finding out that they
4  were talking about someone from a bar fight and we
5  removed jewelry, I was questioning as to
6  lacerations or was it something the EMTs wanted.
7  I had no idea what anybody was talking about.
8      Q.   You're saying that you were thinking
9  these things before you arrived at the station
10  after you had been asked to intercede?
11     A.   No.  What I'm saying is this had taken
12  place in February of 2002 so then all of a sudden
13  in 2004 I had -- I didn't remember Mayotte.
14           It wasn't until all of this started to
15  come about and we were talking about all of this
16  and the jewelry.  I had a list of names of people
17  who were -- that I could remember who were in bar
18  fights.  I had no idea who anybody was talking
19  about.
20     Q.   You're saying that in 2004 when you were
21  questioned about it you were thinking that it was
22  removed because he had a laceration?
23     A.   Correct.
24     Q.   But in fact it wasn't removed because he

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
### JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 133

1  had a laceration?
2      A.   Correct.
3      Q.   He didn't have any lacerations on his
4  face?
5      A.   No.
6      Q.   Did you ever have any discussions with
7  either Mr. Wrubaleski, Mr. Becker or Mr. Milliard
8  about the issue of him having a laceration on his
9  face?
10     A.   With Gary Milliard I did.
11     Q.   What was that discussion?
12     A.   That was -- I asked Milliard if he had
13  had any run reports -- ambulance reports from
14  anybody -- a bar fight at the Maple Leaf Lounge.
15  I was trying to ascertain Mayotte's
16  identity.
17     Q.   This is in 2004 you're saying?
18     A.   This was January, 2004.
19     Q.   What information did Mr. Milliard give
20  you?
21     A.   He said he'd get back to me.
22     Q.   Any other discussion with him or any
23  other EMT about the issue of a laceration?
24     A.   At one point Gary had said to me that he

VOLUME I - 134

1  didn't have any run reports, that he had checked
2  with EMTs, that there was nothing.  There was no
3  information.
4      Q.   Did you ever ask any EMT --
5  Mr. Milliard, Mr. Wrubaleski or Mr. Becker -- to
6  say that the jewelry was removed because he had a
7  laceration?
8      A.   No.
9      Q.   Did you ever hear that they said that --
10  or that one of them at least said that?
11     A.   Not one of them.  William Keefe, in
12  talking with Chris Browne and I had said something
13  about me wanting the EMTs to say something or to
14  say that they told me to do that.  We tried to
15  explain to him what was said in an attempt to
16  identify Jonah Mayotte.
17     Q.   And that's what you testified to before?
18     A.   Mmm-hmm.
19     Q.   That's a yes?
20     A.   Yes; I'm sorry.
21     Q.   What was your relationship with Gary
22  Wrubaleski prior to this incident?
23  In other words, anything outside of just
24  regular work duties?

VOLUME I - 135

1      A.   No.
2      Q.   How about Mr. Milliard?
3      A.   Yes.
4      Q.   Did you have a friendship with him
5  outside of work?
6      A.   Yes.
7      Q.   Are you still friends with him?
8      A.   On occasion I'll see or talk to Gary
9  Milliard.
10     Q.   Why was it that you decided to remove
11  the jewelry as opposed to waiting for him to
12  voluntarily take it off and cooperate, himself?
13     A.   After forty-five minutes of this and the
14  state that he's in, he's not going to cooperate.
15  It's a time factor.
16     Q.   When you say forty-five minutes you're
17  basing it upon what others told you as opposed to
18  what you observed?
19     A.   Yes.
20     Q.   Was there a reason though why he
21  couldn't have been just watched until he
22  cooperated?
23     A.   No.
24     Q.   Why didn't you choose then to just let

VOLUME I - 136

1  him be watched?
2      A.   This was during the overnights,
3  somewhere around two o'clock if I remember
4  correctly.
5  There were two officers leaving at three
6  o'clock.  I would have had the third officer to
7  have to sit with him so I would have been
8  depleting my shift of officers.
9      Q.   Where could he have sat?  In other
10  words, would you put him in a cell or would you
11  leave him outside?
12     A.   No; he would have to be outside of a
13  cell and have to be what we call an
14  eyeball-to-eyeball watch.
15     Q.   Have you ever had a situation where you
16  allowed someone to stay outside of the cell and
17  just watched them when they weren't being
18  cooperative?
19     A.   No.
20     Q.   Have you ever put someone in a cell with
21  their jewelry on when they wouldn't take it off?
22     A.   No.
23     Q.   This eyeball to eyeball that you call
24  it, how often is that used?

# EXHIBIT 4A

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC    AUGUST 31, 2006

### VOLUME I - 149

1    A.  Yes.

2    Q.  With regard to the Jonah Mayotte

3  incident?

4    A.  Yes.

5    Q.  Did your attorney subpoena her as far as

6  you know?

7    A.  No; the Town brought her.

8    Q.  How about Novick? Why didn't you have

9  him testify at either the hearing before Ms. Leal

10  or the Civil Service hearing?

11    A.  He was not available for the hearing

12  before Ms. Leal and he -- the Town wanted to

13  subpoena him but he did not answer the subpoena.

14  They couldn't find him, something to that effect.

15    Q.  With regard to the hearing before

16  Ms. Leal?

17    A.  The hearing before Civil Service.

18    Q.  So he didn't show up at the Civil

19  Service hearing?

20    A.  Right; he didn't show up for either one.

21  For the hearing in front of Ms. Leal, he was

22  unavailable. For Civil Service he didn't answer

23  the subpoena.

24    Q.  How about Officer Nelson? Why didn't

### VOLUME I - 150

1  you have him testify before Ms. Leal?

2    A.  He did.

3    Q.  He did? For who?

4    A.  For the Town.

5    Q.  Did he testify at the Civil Service

6  hearing?

7    A.  For the Town; yes.

8    Q.  How about Mr. Becker? Why didn't you

9  have him testify before Ms. Leal?

10    A.  Supposedly he couldn't be found.

11    Q.  Why didn't you have him testify at the

12  Civil Service hearing?

13    A.  Same reason.

14    Q.  Is he still employed, though?

15    A.  I don't know; not with the Town.

16    Q.  When you said that William Keefe stated

17  that officers were not supposed to be around the

18  Town Hall, was that your testimony?

19    A.  Right; I was told that Keefe told

20  officers that the Town Hall was off limits for --

21  while the hearings were going on.

22    Q.  What did you understand that to mean?

23    A.  To stay away from the Town Hall while

24  the hearing was going on.

### VOLUME I - 151

1    Q.  Did you understand that to mean that if

2  they didn't have any business there they weren't

3  supposed to be there or are you saying that they

4  just weren't supposed to attend the hearing even

5  if they wanted to be a witness?

6    A.  I'm saying that because Chris Browne did

7  not have subpoena power that they were not to be

8  there even if they wanted to be so that they could

9  testify.

10    Q.  Is that your interpretation or were you

11  specifically told that?

12    A.  That's my interpretation.

13    Q.  Calling your attention to the Heath

14  Greenwood incident of November 9, 2002, when did

15  you first have involvement with him?

16    A.  The night of the 911 call.

17    Q.  Did you have involvement before he was

18  brought into the police station?

19    A.  At the scene.

20    Q.  But you didn't go back to the police

21  station with him, is that correct?

22    A.  Correct.

23    Q.  Was he under the influence of alcohol or

24  drugs as far as you know?

### VOLUME I - 152

1    A.  Both.

2    Q.  Was that actually proven in terms of any

3  blood work, anything like that, breathalyzer?

4    A.  I don't know.

5    Q.  How was it that you ended up going back

6  to the Police Department and had contact with him?

7    A.  There was a panic tone and radio call

8  sent out by the dispatcher for a fight in the

9  station. She was calling all units to the

10  station.

11    Q.  Just before we go on to this topic, back

12  with regard to the Jonah Mayotte incident, did you

13  ever see any other statements introduced into

14  evidence at that hearing besides the ones that you

15  had seen the night before?

16    A.  I don't recall. I thought Chris Browne

17  introduced Michaela Kelley's original report

18  written at the time of the incident itself, which

19  is not here.

20    Q.  The actual police report you're talking

21  about?

22    A.  Michaela Kelley's actual report and

23  narrative; yes.

24    Q.  Back with respect to Mr. Greenwood,

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC        AUGUST 31, 2006

### VOLUME I - 153

1  then.

2       You said that you were -- you heard the

3  dispatcher make a call to all units?

4       A.  To come back to the station.

5       Q.  Okay.

6       A.  That there was a fight in the station.

7  You could hear a ruckus going on in the background

8  so myself, Pysell, Kehoe, and a Mass. trooper

9  responded.

10      Q.  Who was the Mass. trooper that

11 responded?

12      A.  Pat Robinson.

13      Q.  Why would -- you're saying a state

14 trooper?

15      A.  Yes, Ma'am.

16      Q.  Why would a state trooper respond as far

17 as you know?

18      A.  Webster is a very active town.  The

19 Sturbridge State Police barrack or C-5, their

20 troopers are -- Webster is part of their patrol

21 area for the state roads, 395 in particular.

22      Oftentimes the state troopers at C-5

23 know or knew that the overnight shift in Webster,

24 they were welcome to come in and train with my

### VOLUME I - 154

1  officers.  Oftentimes in Sturbridge there are a

2  lot of newer troopers so we welcome the help.

3  They were able to do more of the municipal type of

4  policing.

5       They would take our frequency.  They had

6  the ability in their cruisers to scan our radio.

7  They would often show up at major accidents, at

8  house fires, at bar fights, any type of major

9  incident where they thought they could lend a

10 hand, they would come right in.

11      Q.  Did the state trooper stay for the

12 entire incident?

13      A.  It was over when he got there.  He came

14 from 395.

15      Q.  So as far as you know he is not a

16 witness to any relevant fact?

17      A.  As far as I know.

18      Q.  You said it was you, Pysell, Kehoe, and

19 Robinson that did show up?

20      A.  Robinson is the trooper.

21      Q.  Right; anyone else that showed up?

22      A.  Travis Gould was in the station as well

23 as Bonnie O'Leary.  Travis Gould was a reserve

24 officer, part-time police officer.

### VOLUME I - 155

1       Bonnie O'Leary was the dispatcher on

2  duty.

3       Q.  When you arrived at the station, what

4  did you observe with respect to Heath Greenwood?

5       A.  I observed Greenwood with his hands

6  grabbed on the collar of Gevry's uniform.  He was

7  forcing Gevry backward.

8       He had the advantage over Gevry and he

9  caught Gevry in the back over the hamstring.  One

10 leg was in the air.  He was forced back to the

11 wall.  Gevry's head couldn't go back any further

12 because it was pressed against the wall.

13      Gevry had one hand holding onto the edge

14 of the table, of the counter.  He had one hand

15 grasped on Greenwood's forearm.

16      Greenwood was forcing the chain of the

17 handcuff under Gevry's chin and he was choking

18 Gevry.

19      Q.  Was anyone else in the room besides

20 those two?

21      A.  Just those two.

22      Q.  Were there any other police officers in

23 the Department before you arrived besides Gevry?

24      A.  Travis Gould.

### VOLUME I - 156

1       Q.  He was the reserve officer?

2       A.  He interceded on Gevry's behalf the

3  first time.

4       Q.  What do you mean?

5       A.  When the 911 call came in, Officer

6  Pysell had a woman in the other booking room who

7  was in protective custody.  She was intoxicated

8  but cooperative, very still.

9       Travis Gould was actually filling out

10 the booking screens on the computer for the

11 experience to do so.  He wasn't working and was in

12 there on his own time.  The 911 call came in.

13 Pysell secured the woman to the chair and directed

14 Travis Gould to finish the booking process, keep

15 an eye on her and we'll be back.  When we

16 responded, Gevry brought Greenwood back.

17      There was a time where Greenwood and

18 Gevry began arguing.  Gevry slapped Greenwood in

19 the face and Greenwood came out of the chair and

20 attacked Gevry.  Travis Gould either heard the

21 commotion going on or Bonnie O'Leary yelled to

22 Travis Gould.

23      Gould went into the booking room and

24 Gevry and Gould subdued Greenwood.  According to

VOLUME I - 157

1  Travis he waited a few minutes, things seemed
2  okay, went back to the screen where the woman was
3  secured and continued the booking process. After
4  that again there was a problem between Gevry and
5  Gould.
6           MR. GREEN:  Just for the record, you
7  mean Greenwood?
8           THE WITNESS:  Yes; a problem between
9  Gevry and Greenwood again.  That's what set off
10 the panic tones and that's when we came back.
11          Upon entering the station -- when the
12 panic tones had gone off we were on our way back
13 to the station anyway.  We were very close so we
14 were there in a matter of seconds.
15          When Pysell and myself ran into the
16 building Gould was on his way to help Gevry but
17 saw myself and Pysell go into the room at the same
18 time so he decided to stay with his prisoner and
19 finish the booking process.
20 Q.  (BY MS. LYNCH) I'm sorry, where was
21 Pysell prior to coming into the room with
22 Greenwood?  Did you say he was in the next room?
23 A.  No; Pysell was in my cruiser with me.
24 We arrived at the station at the same time.

VOLUME I - 158

1  Q.  I thought you said that Pysell had been
2  in another room with someone in protective
3  custody?
4  A.  I did.  Pysell had a woman who was in
5  protective custody.  He was in another booking
6  room with Travis Gould when this 911 call came in.
7          Pysell and I left from the station but
8  he left Gould to oversee the witness and continue
9  the booking process.
10 Q.  All right; that clarifies that.  As far
11 as you know, then, when Gevry and Greenwood were
12 in the room together the only other officer in the
13 Department was Gould?
14 A.  Correct.
15 Q.  You mentioned that there had been a
16 prior incident that Gould had helped Gevry in
17 where you said Gevry slapped Greenwood in the
18 face?
19 A.  Yes.
20 Q.  How do you know about that?
21 A.  It's in -- it's either in one of the
22 statements or Gevry admitted to that on his own.
23 Q.  At the hearing before Ms. Leal was there
24 any testimony from Officer Gould?

VOLUME I - 159

1  A.  I don't believe so.
2  Q.  How about at the Civil Service hearing
3  recently?  Did Officer Gould testify there?
4  A.  Yes.
5  Q.  Who called him as a witness?
6  A.  I did -- Mike Clancy did.
7  Q.  Do you know why he didn't testify at the
8  hearing before Ms. Leal?
9  A.  No.  Again my understanding is that
10 Chris Browne was not allowed to call witnesses.
11 Q.  But he did call some witnesses, isn't
12 that correct?
13 A.  The ones who showed up anyway.
14 Q.  He introduced documents at the hearing
15 before Ms. Leal, is that correct?
16 A.  He did.
17 Q.  With respect to the slapping in the face
18 of Mr. Greenwood, do you have any idea what
19 prompted that?
20 A.  I don't.
21 Q.  You said that Mr. Greenwood got out of
22 his chair at that point and that Mr. -- Officer
23 Gould had to intercede?
24 A.  Yes.

VOLUME I - 160

1  Q.  How were Mr. Greenwood's hands
2  handcuffed at that point, do you know?
3  A.  They were handcuffed in front.
4  Q.  In front?
5  A.  Mmm-hmm, palms facing each other.
6  Q.  At some point did that change?
7  A.  No -- well, he was changed to being
8  handcuffed in front.
9          When I handcuffed him he was handcuffed
10 behind his back, the tops of the backs of his
11 hands facing one another, palms out, at the scene.
12 Q.  Let's go back over this then because
13 this is important.
14          At the scene you're saying that you
15 handcuffed him?
16 A.  I handcuffed him.
17 Q.  How did you handcuff him at the scene?
18 A.  Behind his back, the backs of his hands
19 facing one another so his palms would have been
20 facing out but this way, only behind his back.
21 (Indicating.)
22 Q.  At some point you believe that was
23 changed?
24 A.  Yes.

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 161

1  Q.  When do you think it was changed and who
2  changed it?
3  A.  It was changed en route to the station
4  by Officer Gevry.
5  Q.  How do you know that?
6  A.  When Greenwood was placed in the cruiser
7  he was handcuffed behind his back and when I got
8  to the station, when he had his -- when he had
9  Gevry's collar and he was forcing the chain up
10  under Gevry's neck.
11  Q.  You're saying his hands were handcuffed
12  in the front at that point?
13  A.  Right.  When I asked Gevry in the
14  hallway how did his handcuffs get changed he had
15  said that Greenwood had a bad shoulder or a bad
16  arm or something and he moved them.
17  Q.  Who was driving the cruiser with
18  Greenwood back to the station?
19  A.  Gevry.
20  Q.  At what point do you think he switched
21  the handcuffs then?
22  A.  At any point.  It could have been when
23  they got to the station.
24  Q.  Is that against Department policy to

VOLUME I - 162

1  handcuff someone in the front?
2  A.  There is no policy for handcuffing
3  somebody.  It's against defensive tactics
4  training.  It's against the rules for officer
5  safety.
6  Q.  When the incident happened where he
7  reportedly got out of his chair and went after
8  Gevry and Officer Gould had to help him, do you
9  know whether or not his handcuffs were handcuffed
10  in front or in back?
11  A.  I would assume they were in the front.
12  Q.  You don't know though?
13  A.  I don't know.
14  Q.  After that incident reportedly happened,
15  do you know if any effort was made to handcuff him
16  in the back?
17  A.  I don't know.
18  Q.  Can you provide any other information
19  about that incident where Greenwood got out of his
20  chair that first time and went after Gevry?
21  A.  No.
22  Q.  Did you ever discuss that with Gevry?
23  A.  No.
24  Q.  Just Gould?

VOLUME I - 163

1  A.  Right.
2  Q.  Do you know how long after that incident
3  occurred that Greenwood reportedly went after
4  Gevry which is what you said you walked into --
5  how much time was there between those two
6  incidents?
7  A.  I don't know exactly.  It was a very
8  short amount of time.
9  Q.  When you say short, a matter of minutes?
10  A.  Matter of minutes; yes.
11  Q.  If I understand you correctly you and
12  Pysell entered the room at the same time because
13  you had been in the cruiser together for the 911
14  call?
15  A.  Right.
16  Q.  Let's just go over this then to the
17  extent there was any overlap.
18  When you both entered the room what did
19  you see again?
20  A.  I saw Heath Greenwood with an advantage
21  over Gevry choking him with his handcuffs.
22  Q.  What did Pysell do?
23  A.  He was right behind me.  We were -- I
24  was a step ahead of him.  The two of us were

VOLUME I - 164

1  rushing in together.
2  Q.  Was Gevry saying anything?
3  A.  Nothing at all.
4  Q.  What did you do when you observed that?
5  A.  I yelled.  Greenwood ignored that.
6  Q.  What did you yell?
7  A.  "Let him go, get off," something to that
8  effect, something to immediately gain Greenwood's
9  attention.
10  Q.  What happened when you yelled?
11  A.  Nothing.  Greenwood completely ignored
12  the fact that Pysell and I were in the room and
13  yelling.
14  Q.  And then what happened?
15  A.  I reached across Greenwood, grabbed his
16  shirt from the far shoulder, spun him toward me
17  and punched him in the chin.
18  Q.  Then what happened?
19  A.  Greenwood fell to the ground -- fell to
20  the floor, began apologizing, saying "I'm sorry,
21  I'm sorry."
22  Q.  Greenwood was?
23  A.  Yes.  Then I stepped over Greenwood.  I
24  was going to reach down and pick him up.  Pysell

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
### JOHN BOLDUC          AUGUST 31, 2006

VOLUME I - 161

1    Q.   When do you think it was changed and who
2    changed it?
3        A.   It was changed en route to the station
4    by Officer Gevry.
5        Q.   How do you know that?
6        A.   When Greenwood was placed in the cruiser
7    he was handcuffed behind his back and when I got
8    to the station, when he had his -- when he had
9    Gevry's collar and he was forcing the chain up
10   under Gevry's neck.
11       Q.   You're saying his hands were handcuffed
12   in the front at that point?
13       A.   Right.  When I asked Gevry in the
14   hallway how did his handcuffs get changed he had
15   said that Greenwood had a bad shoulder or a bad
16   arm or something and he moved them.
17       Q.   Who was driving the cruiser with
18   Greenwood back to the station?
19       A.   Gevry.
20       Q.   At what point do you think he switched
21   the handcuffs then?
22       A.   At any point.  It could have been when
23   they got to the station.
24       Q.   Is that against Department policy to

VOLUME I - 162

1    handcuff someone in the front?
2        A.   There is no policy for handcuffing
3    somebody.  It's against defensive tactics
4    training.  It's against the rules for officer
5    safety.
6        Q.   When the incident happened where he
7    reportedly got out of his chair and went after
8    Gevry and Officer Gould had to help him, do you
9    know whether or not his handcuffs were handcuffed
10   in front or in back?
11       A.   I would assume they were in the front.
12       Q.   You don't know though?
13       A.   I don't know.
14       Q.   After that incident reportedly happened,
15   do you know if any effort was made to handcuff him
16   in the back?
17       A.   I don't know.
18       Q.   Can you provide any other information
19   about that incident where Greenwood got out of his
20   chair that first time and went after Gevry?
21       A.   No.
22       Q.   Did you ever discuss that with Gevry?
23       A.   No.
24       Q.   Just Gould?

VOLUME I - 163

1        A.   Right.
2        Q.   Do you know how long after that incident
3    occurred that Greenwood reportedly went after
4    Gevry which is what you said you walked into --
5    how much time was there between those two
6    incidents?
7        A.   I don't know exactly.  It was a very
8    short amount of time.
9        Q.   When you say short, a matter of minutes?
10       A.   Matter of minutes; yes.
11       Q.   If I understand you correctly you and
12   Pysell entered the room at the same time because
13   you had been in the cruiser together for the 911
14   call?
15       A.   Right.
16       Q.   Let's just go over this then to the
17   extent there was any overlap.
18            When you both entered the room what did
19   you see again?
20       A.   I saw Heath Greenwood with an advantage
21   over Gevry choking him with his handcuffs.
22       Q.   What did Pysell do?
23       A.   He was right behind me.  We were -- I
24   was a step ahead of him.  The two of us were

VOLUME I - 164

1    rushing in together.
2        Q.   Was Gevry saying anything?
3        A.   Nothing at all.
4        Q.   What did you do when you observed that?
5        A.   I yelled.  Greenwood ignored that.
6        Q.   What did you yell?
7        A.   "Let him go, get off," something to that
8    effect, something to immediately gain Greenwood's
9    attention.
10       Q.   What happened when you yelled?
11       A.   Nothing.  Greenwood completely ignored
12   the fact that Pysell and I were in the room and
13   yelling.
14       Q.   And then what happened?
15       A.   I reached across Greenwood, grabbed his
16   shirt from the far shoulder, spun him toward me
17   and punched him in the chin.
18       Q.   Then what happened?
19       A.   Greenwood fell to the ground -- fell to
20   the floor, began apologizing, saying "I'm sorry,
21   I'm sorry."
22       Q.   Greenwood was?
23       A.   Yes.  Then I stepped over Greenwood.  I
24   was going to reach down and pick him up.  Pysell

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC           AUGUST 31, 2006

VOLUME I - 169

1  him into the room.
2      Q.  How long did it take you to get to the
3  station from the time you heard that panic tone?
4      A.  Less than a minute.  We were just about
5  back anyway.
6      Q.  Do you know where Gould was in relation
7  to Gevry?
8      A.  He was at the other end of the building.
9  He had the woman that he wanted to rehandcuff her
10  so she wouldn't have the ability to roam around
11  and then run up the hallway.
12          He almost made it to where Gevry was but
13  Pysell and I entered from the garage which is very
14  close in proximity, fifteen feet to the doorway
15  where Gevry was.
16          When he saw Pysell and I he stopped and
17  thought that the two of us -- that he would be
18  better off to go back to his prisoner and that's
19  what he did.
20      Q.  Did you ever confirm either way whether
21  Greenwood had a bad shoulder?
22      A.  I did not.
23      Q.  You stated that you went into the
24  hallway with Gevry.  What did you discuss?

VOLUME I - 170

1      A.  I wanted to know why Greenwood was
2  handcuffed in the front, why all of the doors to
3  the police station were open -- the garage door,
4  the front door -- why Gevry didn't secure his
5  service weapon that was still in his holster, what
6  he was thinking, what he was doing, why are we
7  doing this, basically.
8      Q.  What did he say in response?
9      A.  He said to me that -- he didn't answer
10  those questions but he wanted to charge Greenwood
11  additionally, maybe ABPO.
12      Q.  Assault?
13      A.  Assault and battery on a police officer;
14  ABDW, to wit handcuffs; other charges --
15  disorderly or disturbing the peace or something
16  like that.
17      Q.  Any other discussion?
18      A.  I told him that I would cut him some
19  slack; if anything like this happens again we'll
20  be in front of the Chief or the Deputy Chief.
21      Q.  Kehoe, when did he arrive?
22      A.  Four or five seconds after Pysell and I.
23  He was in the cruiser right behind us.
24          He pulled into the parking lot at the

VOLUME I - 171

1  same time as we did.  We were closer so we ran in
2  the building and as soon as he pulled up behind
3  us, got out of his car and ran in the building as
4  well.
5      Q.  In other words do you know whether or
6  not he saw the altercation between you and
7  Greenwood?
8      A.  Kehoe said that everything was done when
9  he got into the room.  There was a four- or
10  five-second time lapse.
11          (Defendant's Deposition Exhibit
             No. 8 offered and marked.)
12
13      Q.  (BY MS. LYNCH)  Mr. Bolduc, showing you
14  what's been marked as Exhibit Number 8, can you
15  identify that person? (Indicating.)
16      A.  That is Heath Greenwood.
17      Q.  Do you see any marks from when you
18  struck him on his face?
19      A.  No.
20      Q.  Do you see marks on his face from some
21  sort of altercation or injuries?
22      A.  Yes; there's shadows on his cheeks.
23      Q.  Did you cause those?
24      A.  No.

VOLUME I - 172

1      Q.  How about with respect to inside his
2  mouth?  Do you recall him bleeding inside of his
3  mouth?
4      A.  No.
5      Q.  Do you see what I'm referring to inside
6  of his mouth?
7      A.  It looks like a black tooth; yes.  I see
8  what you're referring to but that's not --
9  Greenwood was not bleeding in the mouth at all.
10      Q.  Do you remember him having a black
11  tooth?
12      A.  No.
13      Q.  The marks on his face, do you know what
14  caused those?
15      A.  I assumed it was the homeowner.
16      Q.  When is the next time you saw Greenwood
17  after this evening?
18      A.  At his court appearances when he was
19  picked up.
20      Q.  How long would that have been after the
21  incident of November 9, 2002?
22      A.  A few months.  He defaulted on his court
23  appearance and it wasn't until Sturbridge PD made
24  the arrest that he was back in the system.

Case 4:05-cv-40030-FDS    Document 29-7    Filed 12/15/2006    Page 8 of 12

JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
JOHN BOLDUC                              AUGUST 31, 2006

VOLUME I - 181

1     A.    Constant exposure to gay Websites,
2  embarrassment of the coprophilia, that whole glass
3  bottom boat nonsense.
4     Q.    What are you referring to?
5     A.    Gevry, when I was a patrolman, myself
6  and Officer Wade Douty had gotten back from the
7  Academy -- had graduated from the Academy and were
8  assigned our shifts.
9         One of the things that Chief Bergeron
10 brought with him were access to the Internet.  At
11 that time Officer Gevry thought it funny to have
12 pictures on the Internet from the Gay Nazi
13 Website, the Gay Arian Brotherhood, various
14 coprophilia or whatever groups.
15        As soon as I would come in the station,
16 he would yell "John" or "Bolduc, come in here."
17 As soon as I walked in the room there was all this
18 stuff for his Internet fetishes.
19    Q.    Did you think he was gay or he just
20 thought it was funny?
21    A.    No; it's well-known throughout the
22 Department Gevry making statements about healthy
23 sexual fantasies involving children.  As long as
24 you didn't act on it, it wouldn't be criminal but

VOLUME I - 182

1  healthy for the psyche, then to go into these long
2  dissertations about pre-pubescent kids.
3         At one time Bergeron himself had to
4  intercede and stop retired Officer Leo Christian.
5  He took huge offense to this pedophilia and
6  interceded before Officer Christian was able to
7  physically attack Officer Gevry.  Gevry would
8  continuously do that sort of thing.
9         Then one of the officers' wives had come
10 to me and said that I might want to have a talk
11 with Gevry; that the time in -- about the time
12 that my wife and I were contemplating separating
13 or divorcing, he was working a detail at the Wind
14 Tiki Lounge and was telling the staff that Bolduc
15 and his wife are divorcing because I was caught up
16 in some sordid extra-marital affair.
17        There has always been this; and this is
18 who I know Gevry to be.
19    Q.    You're saying that he would have these
20 Websites, these gay Websites?
21    A.    Right.
22    Q.    Or pedophilia type?
23    A.    Not pedophilia Websites.  Pedophilia is
24 illegal.  Law enforcement cannot even have

VOLUME I - 183

1  training materials with pedophilia pictures; text
2  only.
3         He would often talk about and not come
4  out and say pedophilia specifically but talk about
5  a healthy sexual psyche involving interacting
6  sexually with pre-pubescent children and go off on
7  these different tangents.
8     Q.    Do you know whether any of his
9  supervisors was aware that he was doing that --
10 either having the Websites or talking about this
11 during work?
12    A.    Chief Bergeron was, William Keefe was,
13 Rodney Budrow was, Tim Bent was.
14    Q.    Do you know whether any of them took any
15 action to stop that or to discipline him?
16    A.    Not that I'm aware of.
17    Q.    As far as you know why do you think
18 Gevry didn't like you?
19    A.    At the time of the Wind Tiki incident
20 sometime in 1998 I explained to Gevry between he
21 and I in the parking lot of the police station out
22 of earshot, away from everybody, that no more did
23 I want him coming up with all of this crazy BS
24 that he does and talks about but that my personal

VOLUME I - 184

1  life and my marriage and my wife are absolutely
2  positively off limits to him.
3         I articulated myself very well.  He
4  understood and that stopped.
5     Q.    Did you threaten him at all?
6     A.    Yes.
7     Q.    What did you say to him?
8     A.    That if he wanted to continue to
9  interject himself into my personal life and into
10 my marriage with Charlene and I that he would have
11 to eat his food through a straw.
12    Q.    Given that he did this and you say he
13 exhibited these gay Websites and spoke about
14 pedophilia in so many words, why were you worried
15 about him losing his job then with regard to this
16 Greenwood incident?
17    A.    It's not about him; it's about his wife.
18 Lenny Gevry is married.  His wife, today, is a
19 breast cancer survivor but at the time she had
20 some twenty or thirty percent chance -- I don't
21 know if she lost one breast or both breasts but I
22 do know that she couldn't work.
23        I know that it would be important for
24 Gevry to have medical insurance; that if he were

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC        AUGUST 31, 2006

VOLUME I - 185

1  to be fired as bizarre as he is, she would -- his
2  wife, she would die. No one is going to pick her
3  up, it's a pre-existing condition. If he lost his
4  job it would not be because of me.
5      As bizarre as he is, his wife has always
6  been -- any time I've ever seen her -- has always
7  been very pleasant, very friendly to me, go out of
8  her way to say hello, whether it's the Post
9  Office, the supermarket, the bank, whatever, it
10  doesn't matter.
11      I have nothing against his wife
12  whatsoever but I would not be the catalyst for her
13  to lose her medical insurance; she would die.
14      Q.  Referring you back to Exhibit Number 11,
15  on the last page where it says "the level of force
16  used escalated to hand-to-hand tactics only," what
17  do you mean by "hand-to-hand tactics only"?
18      A.  That I only punched him. Hand to hand
19  versus --
20      Q.  (Interposing) Are you referring between
21  you and Greenwood?
22      A.  Right.
23      Q.  Did you indicate in this report that
24  Greenwood had actually tried to choke Gevry?

VOLUME I - 186

1      A.  I did not write that he tried to choke
2  him specifically.
3      Q.  And why not?
4      A.  Drawing Gevry into the light, it would
5  be impossible to be choked if someone -- well, it
6  would be very difficult to choke someone if you
7  are handcuffed behind your back.
8      With Gevry being choked the question
9  would have been why was he handcuffed in front.
10      Q.  What do you think would have happened to
11  him?
12      In other words what were you trying to
13  protect him from over the issue of handcuffing in
14  the front?
15      A.  The issue to me was that Gevry gets
16  choked out or choked to the point of losing
17  consciousness, that at that point by not securing
18  his service weapon or sidearm, that at the very
19  least Greenwood runs away, escapes, all the doors
20  are open, there's nothing to confine him so we
21  have a suspect to look for.
22      At worst he arms himself with Gevry's
23  sidearm, his service weapon, maybe shoots Gevry,
24  maybe not. Bonnie O'Leary is unarmed; Travis

VOLUME I - 187

1  Gould is unarmed. There's a whole -- we were
2  lucky that nothing came about.
3      Q.  But given that nothing came about why
4  didn't you just charge him with assault and
5  battery on an officer, given he was just doing
6  that?
7      A.  That whole thing was precipitated by
8  Gevry to charge Greenwood with that and to just
9  have nothing more about it.
10      I mean if it wasn't for the fact that
11  Gevry was lax in what he did, there wouldn't have
12  been any reason for those charges to be brought
13  forward. That was Gevry's doing.
14      Q.  But you also said that Gevry wanted to
15  charge this person so why didn't you?
16      A.  I told him that -- I told him he
17  could -- ultimately he could but think about
18  what's going to happen when all of this comes to
19  light. Think about what happens when the Chief or
20  the Deputy Chief wants to know about everything
21  else.
22      I told Gevry -- I didn't tell Gevry that
23  he could not charge him.
24      Q.  But you chose not to charge him?

VOLUME I - 188

1      A.  Correct.
2      Q.  And your position is you chose not to
3  charge him because you were somehow protecting
4  Gevry?
5      A.  Right.
6      Q.  If in fact Greenwood had a problem with
7  his shoulder, would it be a reasonable
8  accommodation to handcuff him in the front?
9      A.  No.
10      Q.  Why do you say that?
11      A.  If someone had discomfort with a
12  shoulder and in a matter of handcuffing an officer
13  is taught to cuff with the back of the hands
14  facing each other and you put the hands -- it can
15  be uncomfortable.
16      You could take a second set of cuffs and
17  elongate the chain in the back; that way you're
18  not flexing someone's shoulder, you're allowing it
19  to come back in its natural position but they
20  still don't have the use of their hands in front
21  of them for any type of attack, assault or
22  anything like that.
23      You can accommodate with another set of
24  cuffs or two sets of cuffs.

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## JOHN BOLDUC        SEPTEMBER 13, 2006

VOLUME II - 319

1     Q.   Anything else?
2     A.   No.
3     Q.   When you mentioned the telephone call
4  from Greenwood, you're referring to the call that
5  he made when he said he received an anonymous
6  letter stating that you were under investigation,
7  is that correct?
8     A.   Correct.
9     Q.   You did have several witnesses testify
10  on your behalf, is that correct, in the hearing
11  before Ms. Leal?
12     A.   Yes.
13     Q.   What is your understanding as to how
14  they were contacted and brought to the hearing?
15     A.   They came to the hearing to observe.
16     Q.   Did anyone prevent them from staying?
17     A.   No.
18     Q.   Are you saying that neither you, your
19  attorney nor anyone else on your behalf actually
20  called individuals ahead of time and told them to
21  come to the hearing?
22     A.   The only person that I asked, that was
23  asked, was Stephen Boudreau.
24     Q.   That was the only person that was asked?

VOLUME II - 320

1     A.   Right.
2     Q.   By you or your attorney?
3     A.   By me.
4     Q.   Why didn't you ask anyone else?
5     A.   In my conversation with Chris Browne
6  when he had said that we didn't have the ability
7  to call witnesses, he didn't have subpoena power,
8  that's exactly what I took that for.
9     Q.   But did you think that meant that you
10  couldn't call someone and ask them to testify on
11  your behalf even though you couldn't compel them
12  to be there?
13     A.   Yes.
14     Q.   That's how you interpreted it?
15     A.   I did.
16     Q.   Is it your understanding that Ralph
17  didn't testify at your hearing at the advice of
18  his attorney?
19     A.   Yes.
20     Q.   In other words, you asked him to testify
21  and he declined?
22     A.   It was Chris Browne I think talked to
23  Jim Simpson.
24     Q.   Do you have any understanding as to why

VOLUME II - 321

1  his attorney didn't want him to testify?
2     A.   I don't know.
3     Q.   You said that officers were told to stay
4  away from the Town Hall during the hearing.  What
5  do you base that upon?
6     A.   On Pysell and Melendez telling me that
7  officers were told to stay away from the Town
8  Hall.
9     Q.   Isn't it true that it was officers who
10  weren't to be involved in the hearing that were
11  told by Acting Chief Keefe to stay away from the
12  Town Hall?
13     A.   That's not what was repeated to me.
14     Q.   Do you have any personal knowledge as to
15  what Acting Chief Keefe did say to the officers
16  about going to the Town Hall during the hearing?
17     A.   No.
18          THE WITNESS:  Can I ask for a brief
19  break?
20          MS. LYNCH:  Sure; that's fine.
21          (A recess was taken.)
22     Q.   (BY MS. LYNCH)  Mr. Bolduc, while you
23  were employed by the Town of Webster what is your
24  understanding of William Keefe's relationship to

VOLUME II - 322

1  Robin Leal when she was the Town Administrator?
2     A.   Friendly, good relationship.
3     Q.   Were you involved at all in the Judge
4  Barton investigation?
5     A.   Involved?
6     Q.   In other words, did he interview you?
7     A.   Yes.
8     Q.   Did you give him any documents, anything
9  like that?
10     A.   No; I don't believe so.
11     Q.   How long was this interview of you,
12  approximately?
13     A.   An hour.
14     Q.   Do you believe that your First Amendment
15  rights have been violated by any of the
16  Defendants; and if so, how?
17     A.   When I was asked about any knowledge
18  from -- about Brian Barnes and statements and all
19  of that and when I said that I was, I was ordered
20  to put that in writing which I did, and from that
21  point on all of this began.
22     Q.   You have alleged that you had a right to
23  association that was violated.  What do you mean
24  by that?

VOLUME II - 323

1    A.   Bergeron told me that my friendship,
2  support, and loyalty to Thomas Ralph would cost
3  me.
4    Q.   Anything else that you base that upon?
5    A.   I'd have to speak with my attorney.
6    Q.   You want to speak to your attorney right
7  now, is that what you're saying?
8    A.   I would have to, to elaborate more on
9  your question; yes.
10    Q.   If you want to speak to your attorney,
11  you can do so?
12    A.   Okay.
13         (A recess was taken.)
14    Q.   (BY MS. LYNCH)  Now that you've spoken
15  to your attorney, do you want to add anything to
16  your answer?
17    A.   No.
18    Q.   You are alleging that the Defendants
19  have retaliated against you.
20         How do you believe you've been
21  retaliated against?
22    A.   By having my duty assignment changed; by
23  being essentially evicted from my office; by being
24  pulled from the Amato investigation; by

VOLUME II - 324

1  reexamining or reopening issues that were taken
2  care of at the time going back over -- or looking
3  back over just an unspecified amount of time and
4  reexamining these things; to be soliciting
5  negative information from people who are thought
6  to have maybe know of anything; to have been
7  terminated without ever being disciplined or
8  reprimanded or counseled.
9         Once William Keefe was installed as the
10  acting chief of police, never once did he mention
11  to me that he would want anything done differently
12  by me or anybody else; that any type of behavior
13  alleged by him were to be altered, stopped,
14  changed, unacceptable, anything to that effect;
15  never said anything about the performance of my
16  duties or how I went about them.
17    Q.   You're talking about prior to the actual
18  hearing he never said anything to you -- meaning
19  prior to the charges being made?
20    A.   Ever -- exactly.  From the time that he
21  was the acting chief of police and the number one
22  cop in the Department, when it was essentially his
23  administration there was never any mention of him
24  wanting me personally to do anything different

VOLUME II - 325

1  than I had ever done.
2    Q.   Any other reasons you believe you were
3  retaliated by the Defendants?
4    A.   All of those.  Everything that we're
5  here for.
6    Q.   When you said that your duty assignment
7  was changed, are you referring to being taken off
8  of the Amato investigation?
9    A.   Yes.
10    Q.   When you said you were evicted from your
11  office, was there any reason why you couldn't use
12  any of the offices that had been occupied by
13  officers or sergeants on other shifts -- when you
14  were on a different shift than them?
15    A.   I don't know.
16    Q.   You also said that you feel you were
17  retaliated over old issues that had been
18  reexamined.
19         Is it fair to say that reportedly only
20  the Greenwood incident had been examined prior to
21  the charges brought against you in the hearing?
22    A.   No; Bergeron was aware of Mayotte and
23  had no issue with the Mayotte incident at that
24  time.

VOLUME II - 326

1    Q.   But there was no investigation of that
2  incident, was there?
3    A.   Not that I'm aware of; no.
4    Q.   There was no investigation of the Abbe
5  incident until the hearing, is that correct -- or
6  the events leading up to the hearing?
7    A.   Until Ralph's hearing; correct.
8    Q.   Other than the town administrators that
9  you've already mentioned, did you discussed the
10  charges brought against you with any other Webster
11  town administrator?
12    A.   No.
13    Q.   Or your employment in general?
14    A.   No.
15    Q.   Is it fair to say that you had a
16  satisfactory relationship with Acting Chief Keefe
17  up until the point that those charges were brought
18  against you?
19    A.   Yes.
20    Q.   You have alleged that the Defendants
21  have conspired essentially to bring about damage
22  to you.  I believe you stated in your complaint
23  that they have corroborated to punish you for
24  expressing your opinions.

## JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
### JOHN BOLDUC          SEPTEMBER 13, 2006

VOLUME II - 327

1 　　　How do you believe that they have
2 conspired?
3 　　　A.　I believe that all of this is
4 retaliatory against me; that through their --
5 basically a group effort with them.
6 　　　Q.　Do you have any information that they
7 got together or somehow communicated with each
8 other to support the termination of your
9 employment -- and I'm referring to all of the
10 Defendants?
11 　　　A.　My belief that they all agreed and acted
12 together to further my termination.
13 　　　Q.　For instance Richard Bergeron, he wasn't
14 even employed by the Webster Police Department at
15 the time of your termination hearing, is that
16 correct?
17 　　　A.　Correct -- well, right, he retired I
18 believe at the time of my termination.
19 　　　Q.　So do you believe that he was involved
20 in any conspiracy to have you terminated?
21 　　　A.　In the beginning; yes.
22 　　　Q.　What are you referring to?
23 　　　A.　At the times when he was soliciting
24 officers and civilians for negative information.

VOLUME II - 328

1 　　　Q.　But he never took any disciplinary
2 action against you before he left, did he?
3 　　　A.　No.
4 　　　Q.　How do you believe that William Keefe
5 has conspired against you?
6 　　　A.　My belief is that where Bergeron --
7 where they started this and Keefe furthered this
8 to -- in part my belief is to clear the way for
9 him to the Chief's office; that I would have been
10 seen as either standing in his way or competition
11 for him in testing.
12 　　　I think that his attempt to influence
13 Polizoti, along with Robin Leal's telephone calls
14 to Polizoti ahead of time, I think that was to
15 influence the outcome in favor of their position.
16 　　　Q.　Do you believe that any other official
17 of the Town of Webster did anything to conspire
18 against you to bring about your termination?
19 　　　A.　No; I believe that the e-mail from Bob
20 Stawiecki to Robin Leal where he was aware that
21 myself and Ralph were targeted.
22 　　　Q.　Do you believe that Mr. Stawiecki was
23 somehow conspiring against you?
24 　　　A.　I don't know if he was conspiring or if

VOLUME II - 329

1 he -- or if he knew what was going on or if he
2 could see what was happening or if he wanted some
3 sort of action taken; I don't know.
4 　　　Q.　You identified -- or your attorney
5 identified in initial disclosure on
6 October 19, 2005, several witnesses.  One was
7 Heidi Courtenay.
8 　　　Other than what you testified today
9 related to her, what information do you believe
10 that she has that is significant with respect to
11 your claim?
12 　　　A.　I think Heidi Courtenay has a lot of
13 information, some that I don't know of but would
14 have to be subpoenaed and asked under oath so as
15 to protect her job type of thing.
16 　　　I think that she was present also at the
17 Colonial Club for -- where Barnes made the
18 statements that I heard and gave the written
19 report about but I think that there's more
20 information that Heidi Courtenay would have.
21 　　　Q.　Incidentally, do you have any
22 understanding of what her relationship is to Brian
23 Barnes?
24 　　　A.　I don't know.

VOLUME II - 330

1 　　　Q.　Who is Karen Dean Smith, Esquire?
2 　　　A.　She was the assistant to Judge Barton.
3 　　　Q.　Mark Dowgiewicz, does he have any
4 knowledge other than what you've already testified
5 to?
6 　　　A.　I don't know.
7 　　　Q.　You've identified Paula Laduc.  What
8 information does she have?
9 　　　A.　That would be Pamela.  It might be a
10 typo.
11 　　　Q.　Here it's written P-A-U-L-A.
12 　　　A.　It's the Town accountant, Pamela Laduc.
13 　　　Q.　What information do you believe that she
14 has that would be relevant to your claim?
15 　　　A.　Other than what we had discussed about
16 my conversation with Ralph on Monday, along the
17 same lines as Heidi Courtenay.
18 　　　I think that she has information that
19 she'd be able to give freely under oath when she
20 was subpoenaed to do so, again in preservation for
21 her job and all of that.
22 　　　Q.　Do you have any knowledge as to what you
23 think she knows that would be helpful to your
24 claim?

# EXHIBIT 5

THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE FOR ADMINISTRATION AND FINANCE
## HUMAN RESOURCES DIVISION
ONE ASHBURTON PLACE, BOSTON, MA  02108

MITT ROMNEY
Governor

KERRY HEALEY
Lieutenant Governor

ERIC KRISS
Secretary

RUTH N. BRAMSON
Chief Human Resources Officer

November 10, 2003

Mr. John Bolduc, Jr.
33 Highcrest Park
Webster, MA  01570

RE:    PAR .03 Investigation – Determination

Dear Mr. Bolduc:

The Human Resources Division has completed its PAR .03 investigation into the allegation that you received the questions and answers to the interview for the position of permanent Police Sergeant for the Town of Webster which was held on June 13, 2002.  The Hearing Officer has made her Recommendation of Fact to me.  She concluded that this allegation against you has not been supported by the preponderance of the evidence.  Due to the recommendation of the Hearing Officer, the Personnel Administrator will allow your promotion to permanent police Sergeant for the Town of Webster to stand.  Please see enclosed the Hearing Officer's Recommending Finding of Facts.

We understand that Officer Kelley has filed an appeal of her promotional by-pass to the Civil Service Commission.  Please note that HRD's investigation and subsequent finding does not have any bearing on the Civil Service Commission's ultimate decision in that matter.

Yours truly,

Ruth N. Bramson
Personnel Administrator and
Chief Human Resources Officer for the Commonwealth

Enclosure

Cc:    Elizabeth Corbo, Esq.
       John J. Davis, Esq.
       James C. Donnelly, Esq.
       Theresa Dowdy, Esq.
       Laurie Frankl, Esq.
       Richard K. Sullivan, Esq.

COMMONWEALTH OF MASSACHUSETTS
HUMAN RESOURCES DIVISION
INVESTIGATION

RECOMMENDATION OF THE HEARING OFFICER

IN THE MATTER OF:

<u>BRIAN BARNES and THE TOWN OF WEBSTER POLICE DEPARTMENT</u>

INTRODUCTION

I, Elizabeth Sullivan Khan, duly appointed designee for the Personnel Administrator of the Human Resources Division, held an investigatory hearing on July 29, 2003, and August 1, 2003, pursuant to the Personnel Administrator's Rule (PAR) .03. The hearing was held at the Human Resources Division's Legal Department at One Ashburton Place, Boston, Massachusetts. The investigation concerned allegations of impropriety during the promotional interviews for the position of police Sergeant for the Town of Webster. Specifically, whether acting Sergeant John Bolduc was provided with the questions and answers to the oral interview held on June 13, 2002, for the position of Sergeant. These allegations were brought by Officer Brian Barnes of the Webster Police Department.

Deputy General Counsel Omar Hernandez served as the investigator for the Human Resources Division. He called six witnesses to testify before the hearing officer. The witnesses were Chief Richard Bergeron, Deputy Chief Thomas Ralph, Officer Brain Barnes, Officer Michaela Kelley, Sergeant John Bolduc, and Mr. Alfred Beland. This was a closed hearing and the witnesses were sequestered. Counsel for the witnesses were present and allowed limited cross examination of each witness. Counsel were also allowed to admit relevant documents into evidence. The rules of evidence were suspended to allow the Personnel Administrator full access to all of the relevant factors. A transcript was made of the hearing.

1

The scope of the Personnel Administrator's review is limited to whether acting Sergeant

John Bolduc received the questions and answers to the oral interview for the promotional

position of permanent police Sergeant for the Town of Webster. If the Personnel Administrator

determines that such impropriety did occur, the promotion of Sergeant John Bolduc may be

invalidated and his name may be removed from the eligibility list for the position of Sergeant for

the Town of Webster's Police force pursuant to M.G.L. c. 31, § 73 and PAR .03.

## RELEVANT STATUTE & RULES

<u>M.G. L. c. 31, § 73</u>:

> If, in the opinion of the administrator, a person is appointed or employed in a civil service position in violation of the civil service law and rules, the commission or the administrator shall mail a written notice of such violation to such person and to the appointing authority. The commission or the administrator shall then file a written notice of such violation with the treasurer, auditor or other officer whose duty it is to pay the salary or compensation of such person or to authorize the drawing, signing or issuing of any warrant for such payment.

> The payment of any salary or compensation to such person shall cease at the expiration of one week after the filing of such written notice with such treasurer, auditor or other officer. No such treasurer, auditor or other officer shall pay any salary or compensation to such person, or draw, sign or issue, or authorize the drawing, signing or issuing of any warrant for such payment, until the legality of the appointment or employment is duly established.

> Any person found by the administrator to be illegally appointed or employed may file a petition for a writ of mandamus in the supreme judicial court to compel the administrator to authorize such appointment or employment and the payment of compensation or salary.

> At any time after the filing of such petition, the court may order that the compensation accruing to such person for services actually rendered shall be paid to him until further order of the court, if the court is of the opinion that there is a reasonable doubt whether the appointment or employment of such person is in violation of the civil service law and rules.

PAR .03 (4):

The administrator may cancel an application, suspend the same pending investigation, exclude an applicant from examination, refuse to certify an otherwise eligible candidate, remove a candidate's name from any eligible list, or declare a candidate's appointment invalid upon proof of any of the following conditions after a hearing held by the administrator...

c.) The knowingly making of a material false statement by any person in his application or in his examination and any connivance by him at any material false statement made in any accompanying certificates, or the commission of or attempt to commit any fraud against civil service law or rules, or any complicity by or benefit to him in any such fraud, before, during or after any examination.

...

## FINDINGS OF FACT

I find the following facts in this matter:

1. The Town of Webster's Town Administrator, Mark Stankiewicz, requested a certification from the Human Resources Division, Civil Service Unit to fill one permanent vacancy for the promotional position of police Sergeant on May 28, 2002. Exhibit 1.

2. The Human Resources Division, Civil Service Unit issued the promotional certification for Sergeant to the Town of Webster on May 28, 2002. Exhibit 2.

3. Three names appeared on the certification. They were in descending order: Michaela N. Kelley; John A. Bolduc, Jr.; and, Aaron A. Suss. All signed willing to accept the appointment. Exhibit 2.

4. John Bolduc had been acting provisionally as a Sergeant since October 22, 2001.

5. Chief Bergeron wanted to appoint John Bolduc to the position of permanent Sergeant without an interview.

6. Deputy Chief Ralph organized the interviews at the direction of the Chief and the Town Administrator.

7. Before and after June 13, 2002, Deputy Chief Ralph and Sergeant Bolduc have been close friends, socializing regularly outside of work hours.

8. Brian Barnes worked the three to eleven shift on June 12, 2002.

9. The Town held oral interviews for the position of Sergeant on the afternoon of June 13, 2002.

10. The three candidates were given notice and appeared at the interviews which took place at the Town Hall.

11. Deputy Chief Ralph drafted five questions to ask the candidates sometime before June 13th. Exhibit 4.

12. Chief Bergeron did not review the interview questions drafted by Deputy Chief Ralph until shortly before the start of the interviews on June 13, 2002.

13. Police Chief Bergeron, Deputy Chief Ralph, and Town Administrator Stankiewicz acted as the interview panel. Each member asked the candidates several questions.

14. Neither Chief Bergeron nor Town Administrator Stankiewicz brought prepared questions to the interview.

15. The four permanent Sergeants were not invited and did not attend the interview. This was contrary to the usual procedure of the Department when conducting interviews.

16. Officer Kelley was interviewed first, acting Sergeant Bolduc second, and Officer Suss third.

17. Chief Bergeron asked each candidate a question pertaining to community policing. This question was not prepared in advance of the interview, nor was it written down.

18. Town Administrator Stankiewicz asked the first and last questions of the interview. These questions were not prepared in advance of the interview, nor were they written down. The last question gave the candidate an opportunity to elaborate on why they were the best candidate for the position.

19. Officer Kelley's interview lasted approximately a half an hour.

20. Acting Sergeant Bolduc's interview lasted over an hour.

21. Officer Suss' interview lasted less than half an hour.

22. Officer Brian Barnes was not a candidate for the promotion, nor was he present for the interviews.

23. Immediately after the conclusion of the interviews, the panel unanimously chose acting Sergeant Bolduc for the promotion to permanent Sergeant.

24. The Town reported its selection of acting Sergeant Bolduc for the promotion to permanent Sergeant to the Human Resources Division on June 25, 2002. The Town provided positive reasons for the selection of acting Sergeant Bolduc and by-pass of Officer Kelley. One of the reasons provided for his selection was acting Sergeant Bolduc's performance on the oral interview. Officer Suss was not by-passed as he was third on the certification. Exhibit 3.

25. The Human Resources Division approved acting Sergeant Bolduc's permanent appointment to Sergeant.

26. Sometime in February, 2003, Officer Barnes and Deputy Chief Ralph's working relationship had begun to deteriorate. At that time they were discussing Mr. Barnes continued assignment at Bartlett High School.

27. On March 6, 2003, Officer Barnes came forward with the allegation that Deputy Chief Ralph had given Sergeant Bolduc the interview questions and answers. Exhibit 9.

28. The Town did not conduct an investigation into Officer Barnes' accusation.

29. Town Administrator Stankiewicz's last day in office was April 15, 2003.

30. Officer Barnes put his allegations into writing on April 17, 2003, after Chief Bergeron requested that he do so. Exhibit 9.

## CONCLUSION

The Hearing Officer's review of the promotional selection process for the position of Sergeant for the Town of Webster was limited to whether acting Sergeant Bolduc was provided with the questions and answers in advance of the oral interview given on June 13, 2002, for the position of permanent Sergeant. After review of the testimony and evidence presented to the Personnel Administrator, I am not persuaded by the preponderance of the evidence that acting Sergeant Bolduc received the interview questions and answers in advance of his official interview.

I do not credit Officer Barnes' testimony that he overheard Deputy Chief Ralph speaking to then acting Sergeant Bolduc on the night of June 12th on his Nextel Direct Connect cell phone. I do not find it creditable that Deputy Chief Ralph would have identified whom he was speaking to and what he was doing in the manner described by Officer Barnes. Officer Barnes' testimony is further diminished by the fact that he waited almost nine months to reveal this crucial information. He consistently claimed during his testimony that he had nothing to gain by coming

5

forward, yet he remained silent about this serious allegation which concerned the integrity of the Webster Police Department and the careers of his fellow officers until he was experiencing professional difficulties with Deputy Chief Ralph's supervision.[1]

While I am recommending that Sergeant Bolduc's appointment be allowed to stand, I am greatly troubled by the testimony concerning the selection process. I believe that the process was skewed in favor of acting Sergeant Bolduc from the beginning and that the Town utilized the interview to lend the promotion a semblance of objectivity. Testimony from the Chief, the Deputy Chief, Officer Kelley, and Mr. Beland all indicated that the interview panel had made their selection long before the actual interview took place.

I find it likely that Deputy Chief Ralph tailored his interview questions to complement acting Sergeant Bolduc's knowledge and work history. However, I cannot conclude based upon the record before me that Sergeant Bolduc was a knowing participant in this action. A finding that the individual was knowingly involved in the fraudulent activity is a requirement under PAR .03 (4) before the Personnel Administrator may take any adverse action. As such, based upon the evidence presented and the extremely narrow scope of the Personnel Administrator's review, I cannot recommend Sergeant Bolduc's removal from the position of permanent Sergeant.

I make this recommendation of fact to the Personnel Administrator on November 7, 2003.

Elizabeth Sullivan Khan. Esq.

---

[1] See Exhibit 9, p. 2, ¶ 2, Memorandum dated April 17, 2003, To: Chief Richard Bergeron, From: Brian J. Barnes, Patrolman, "Shaw and I were meeting at the time over negative emails and directives that Ralph sent out to me which were somehow questioning my work ethics. It was at that time that I told Shaw 'who is this guy to question anybody's ethics.' That is when I told him about the exam scam."

6

# EXHIBIT 6

Thomas V. Ralph
September 8, 2006

1

1                Volume I, Pages 1-253

2                 Exhibits 1-5

3        UNITED STATES DISTRICT COURT

4      FOR THE DISTRICT OF MASSACHUSETTS

5  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

6  JOHN A. BOLDUC, JR.,

7         Plaintiff

8  vs.                   No. 05-40030FD5

9  TOWN OF WEBSTER, ROBIN LEAL,

10  RICHARD BERGERON, and WILLIAM KEEFE,

11        Defendants

12  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

13      DEPOSITION OF:  THOMAS V. RALPH

14        10:10 a.m. - 4:23 p.m.

15      Friday, September 8, 2006

16       MORRISON MAHONEY LLP

17    One Chestnut Place, Suite 470

18     Worcester, Massachusetts

19

20  -----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

21     PERLIK AND COYLE REPORTING

22       1331 Main Street

23    Springfield, Massachusetts  01103

24    413.731.7931    Fax 413.526.2316

Thomas V. Ralph
September 8, 2006

7 (Pages 22 to 25)

**22**

1  he'd come. But other than that, I've never
2  socialized with him.
3      Q. Was he ever to your house?
4      A. He came up -- I'd said I'd worked for
5  Suffolk University. He said he had a friend that
6  worked for Suffolk. I had some uniforms that I was
7  getting rid of. He said his friend would take them
8  back to Suffolk. He came up to my house when I
9  lived on McGovern Lane and took those items back
10  there.
11      Q. Did he help you move?
12      A. I don't recall him helping me move.
13      Q. Did he come to an event at your house,
14  perhaps a Fourth of July cookout?
15      A. He stopped up and left. My wife doesn't
16  like him. She doesn't want him at the house. She's
17  never liked him since she met him. I believe he
18  stopped up and then left. That was it, when I had a
19  Fourth of July party. But he's never been -- I
20  would say he wasn't there more than five minutes.
21  Never stepped a foot in the house. I don't believe
22  he's ever stepped foot in my house at all.
23      Q. How would you describe your relationship
24  with Brian Barnes prior to March 2003? And as a

**23**

1  point of reference I'm using March 2003 because that
2  was when he made allegations pertaining to cheating
3  with regard to you and John Bolduc.
4      A. Same as everybody else in the department.
5  I tried to treat everybody the same.
6      Q. Did you like him? Did you dislike him?
7      A. Again, as I said, he's made some comments
8  and stuff in the past that I didn't think were
9  right. I had conversations with Bergeron about it.
10  But Bergeron told me to leave him alone, he was a
11  good kid and gave 110 percent. And that's what I
12  did. I left him alone.
13      Q. Briefly what was the general kind of
14  comments he made?
15      A. He'd call black people niggers. Asian
16  people chinks. Hispanic people spics. He'd make
17  fun of fat people. I didn't think it was
18  appropriate language for a police officer.
19      Q. We'll take about that more later. Did you
20  think he was a good police officer?
21      A. Yeah. He went out and met the people. He
22  loved to meet and greet people, loved to get his
23  name in the paper. So as a community policing
24  perspective, he was out there. He was all over

**24**

1  that. Loved to see his name in print. Loved to be
2  the center of attention, so in that respect he did a
3  good job.
4      Q. When did you first meet John Bolduc?
5      A. When I was hired in '95.
6      Q. Did you have any relationship outside of
7  work with him?
8      A. As I said, we'd go to the movies once every
9  couple of months. That wasn't -- it was off and on.
10  Nothing, you know, sometimes a group of us, more of
11  us would get together. I mean, I still now I still
12  go out to lunch with people there. It's the guys
13  try to get together on occasion. It's whoever shows
14  up. Nothing, I don't, you know, I don't know. It's
15  just it's a work relationship. It's not, you know,
16  he's my best friend in the world, come over and hang
17  out with me and play a game and sports with me.
18  Just a general casual work relationship.
19      Q. Now, when you went to movies with him, was
20  it with your wife and his wife or just the two of
21  you alone?
22      A. No, it would just be us. I mean, we'd go
23  out to eat and sometime other people from the police
24  department would be there. It just depends on who

**25**

1  shows up. We'll usually say dinner and movie on
2  Thursday night. Then people would show up.
3  Sometimes nobody shows up. Sometimes everybody
4  backs out. Sometimes it's just two people. We try
5  to go and get together.
6      Q. Did the two of you and your wives socialize
7  for instance?
8      A. No. Not until I got put out of work and we
9  had a civil service hearing and all this other stuff
10  came up. I was confined to my house. He worked
11  nights and he'd come over days and we'd try to
12  figure out what the heck was going on.
13      Q. Again, I'm talking about prior to March
14  2003.
15      A. Then no. Just for work-related stuff.
16  That was about it.
17      Q. And at work did you socialize such as going
18  to lunch?
19      A. Sure. Anybody that was on days, Jim
20  Hoover, I generally went to lunch with Jim Hoover.
21  But if John was working days I'd go to lunch with
22  him. The chief.
23      Q. Did you consider John Bolduc to be your
24  best friend at the department?

Thomas V. Ralph
September 8, 2006

9 (Pages 30 to 33)

---

30

1    Q. Do you know if they had any relationship
2 outside of work when they were both in Quincy?
3    A. I don't know that, ma'am.
4    Q. Do you know if they had any relationship
5 outside of work when they were both at the Webster
6 Police Department?
7    A. Off the top of my head, I don't know. Most
8 of my time focused on the police department. What
9 people did outside on their own time wasn't my
10 concern.
11    Q. When you were the deputy chief, did the
12 chief typically review your work?
13    A. We discussed it. Talked about it. He
14 reviewed what he wanted to review. I would say that
15 he wasn't a hundred percent diligent. If he wanted
16 to review it, he'd review it. If he didn't review
17 it, he didn't care.
18    Q. If you put out memos, that type of thing,
19 would he review them before they would go out?
20    A. They would all speak to him before they
21 ever went out, so he knew before anything ever went
22 out what what's going on.
23    Q. I want to go back with respect to your
24 tenure at the police department. You said that you

---

31

1 became the deputy in October of 2002. At some point
2 did that status change?
3    A. Yes, ma'am.
4    Q. When was that?
5    A. November of 2003 I was demoted for ten days
6 to sergeant. Then I was returned back as a deputy
7 chief, put back out on leave where I remained until
8 April 1 of '04 when I was demoted to patrolman.
9    Q. That's your status at this time?
10    A. Yes, ma'am.
11    Q. Was there a period prior to November 2003
12 when you were on a paid administrative leave?
13    A. Chief Bergeron put me on leave effective
14 May 18 of '03, where I remained until November of
15 '03 for ten days. Then I went back out on leave, as
16 I said, until April 1 of '04. 11 months total house
17 arrest.
18    Q. I understand you have your own appeal going
19 with civil service; is that correct?
20    A. That's correct, ma'am.
21    Q. You have a regular lawsuit in -- is it
22 Worcester Superior Court?
23    A. Yes, ma'am.
24    Q. So just those two cases; is that correct?

---

32

1    A. That's correct.
2    Q. Did you at some point have an MCAD claim as
3 well?
4    A. That's the Superior Court action. It's
5 been removed from MCAD to Superior Court.
6    Q. Did MCAD ever issue any ruling before it
7 was removed?
8    A. I believe they found probable cause, and it
9 was removed.
10    Q. They did find probable cause?
11    A. I believe there was probable cause found,
12 yes, because it was never dismissed. It was never
13 dismissed from MCAD. I believe they issued a
14 probable cause finding and it was transferred to --
15 but I'm not positive on that.
16    Q. Was it at the Springfield or Boston MCAD?
17    A. Boston MCAD. Any chance can I get a water?
18    Q. Sure. Now, with respect to your being
19 placed on administrative leave on May 18, 2003, was
20 that done by Chief Bergeron?
21    A. Correct.
22    Q. What reason were you given?
23    A. I wasn't.
24    Q. You weren't given any reason at all?

---

33

1    A. Letter says you are hereby placed on
2 administrative leave, you are to remain in your
3 residence and available between the hours of 9:00
4 a.m. and 5:00 p.m. Monday through Friday until
5 further notice. You are not allowed to come to the
6 police station without prior authorization.
7    Q. Was that paid administrative leave?
8    A. Yes, ma'am.
9    Q. Was the letter signed by the chief?
10    A. Yes, ma'am.
11    Q. Did you ever have any discussion with him
12 about that?
13    A. Jim Simpson sent him a letter, and I sent a
14 letter requesting what my status was.
15    Q. Who is Jim Simpson?
16    A. He was my attorney through the MPA, Mass.
17 Police Association.
18    Q. You said he contacted him, and you sent a
19 letter as well?
20    A. Yes.
21    Q. Did you get a response?
22    A. It said my status would be determined after
23 investigation. Didn't say what investigation.
24    Q. Did you ever learn why it was that you were

---

Thomas V. Ralph
September 8, 2006

10 (Pages 34 to 37)

---

**34**

1 placed on administrative leave?
2    A. I heard several different versions. Most
3 of them I read in the town's position statements to
4 the MCAD. I don't know if that speaks for the town
5 or not, but it's the only place I ever got anything
6 from.
7    Q. Did you ever speak with Chief Bergeron
8 about the issue of your administrative leave?
9    A. No. We haven't talked since May 18, 2003.
10    Q. To this day?
11    A. To this day.
12    Q. Did any particular event occur on May 18,
13 2003 that you recall that may have led up to this?
14    A. I was in an FBI lead seminar up in Maine
15 for a week. I came back from being in Maine on
16 Saturday. I got a phone message on my machine on
17 Sunday that said there's a package for you at the
18 police department. I went. He was on the phone.
19 He said there it is there. I picked it up. I left.
20 He stayed on his cell phone conversation, and that
21 was the end of it.
22    Q. Now, you reported alleged racism on the
23 part of Barnes to Chief Bergeron on April 15, 2003;
24 is that correct?

---

**35**

1    A. That's correct.
2    Q. So between April 15, 2003 and May 18, 2003,
3 were you both working at the department?
4    A. He was on vacation. I went out sick for a
5 couple of days.
6    Q. After April 15?
7    A. I was thrown out of the station. Told to
8 get out of the station, which I did. Then
9 ultimately I went home sick, was out of work for a
10 couple of days. Bergeron went away on vacation.
11 Then he came back. I believe there was an overlap
12 of a couple of days. Then I left and went to Maine
13 for this seminar that had been scheduled for several
14 months. Then when I came back, I was put on a
15 leave.
16    Q. When you say you were thrown out of the
17 station, what do you mean?
18    A. Yelled at, told to get out.
19    Q. By whom?
20    A. Chief Bergeron. He was yelling and
21 screaming at me.
22    Q. That was with regard to the Brian Barnes --
23    A. Letter that I gave him.
24    Q. -- letter. What specifically did he say to

---

**36**

1 you?
2    A. Get out. Then he told me to leave Barnes
3 alone, that no one ever bothered me when I was at
4 the DA's office or the AG's or the DEA and that
5 Brian does a good job, just to leave him alone. I
6 told him that I had abided by his wishes for this
7 long, and I could no longer in good conscience do
8 that.
9    Q. When you say that you were out sick for a
10 few days, what's your best memory?
11    A. I think it was three or four days, ma'am.
12    Q. Then how long was Chief Bergeron on
13 vacation?
14    A. He was out for a week.
15    Q. One week. Then you said there was an
16 overlap of a few days. What do you mean by a few
17 days?
18    A. I believe, going back a while, pretty sure
19 my daughter's first communion or confirmation was
20 happening on one of those weekends that week he was
21 back. I think I took a couple of personal days get
22 the yard ready and stuff like that. And I think we
23 might have worked like the beginning of the week
24 when he first came back and then I was out for a

---

**37**

1 couple of days, then I went off to the seminar. I
2 think, again, I apologize, without seeing an actual
3 schedule in front of me from back then.
4    Q. When you say an overlap of a few days --
5    A. Two or three days.
6    Q. Did you have communication with him during
7 that time?
8    A. Yeah, he ordered me back to the station to
9 write a report about anything that I knew with
10 regards to any racial statements that Brian Barnes
11 made. To list any, list any and all times I heard
12 him say it. He told me I couldn't leave the office
13 until I did that. So I sat at the office and did
14 that. Al Beland had come in and wanted records.
15 They were at my house. Got permission from Bergeron
16 to leave my desk to take Al Beland to my house.
17 Came back, finished the report, was continuing doing
18 the report. The chief and Steve Novick left. Then
19 they came back and told me to turn over all of the
20 internal affairs files, all the Bolduc files, all
21 the Kelley files to them. Then I turned in my
22 report. It was the end of the day, and I went home.
23    Q. Then you went up to Maine?
24    A. Correct.

---

Thomas V. Ralph
September 8, 2006

20 (Pages 74 to 77)

---

**74**

1  and accused Selectman Miller of being the focus of a
2  criminal investigation.
3      Q. That was March 3?
4      A. March 3. So this, you know, people
5  complained, the union complained, and as a result I
6  was told to rein him in.
7      Q. Did Chief Bergeron use this selectmen's
8  meeting involving Miller as one of the reasons you
9  were to rein him in?
10     A. Only thing I remember from that
11 conversation with regards to that selectmen's
12 meeting, he said there was -- the selectmen couldn't
13 prove that he had Brian go there. We discussed the
14 selectmen's meeting. And he said the selectmen
15 can't prove that I sent Brian there to do that.
16 That's all I remember from that meeting.
17     Q. Can you explain what you were referring to
18 when you say that they couldn't prove that you sent
19 Barnes to a selectmen's meeting?
20     A. No. That the chief sent Barnes. The chief
21 -- we discussed the selectmen's meeting. And all
22 Bergeron kept saying is they can't prove I sent him
23 there.
24     Q. Oh, I thought you were referring to

---

**75**

1  yourself?
2      A. No. That's all he pretty much said about
3  that meeting.
4      Q. Do you recall that Bergeron had anything to
5  do with Brian Barnes going to that selectmen's
6  meeting?
7      A. I do.
8      Q. Why do you believe that?
9      A. Because there was an awful lot of people
10 behind closed doors for three hours that day before
11 that selectmen's meeting.
12     Q. And who was there?
13     A. Brian Barnes, Al Beland, possibly another
14 member of the board of selectmen, but I can't say
15 distinctly.
16     Q. So two or three people?
17     A. Yep. They were behind closed doors for
18 three hours.
19     Q. Or three or four people, I guess it would
20 be?
21     A. Yep. Then as I said, I didn't watch the
22 selectmen's meeting. I found out about it later.
23     Q. So going back to that issue then, did Chief
24 Bergeron indicate that he did not approve of Brian

---

**76**

1  Barnes going to that meeting?
2      A. Oh, no, not at all. He didn't have any
3  problems with it at all.
4      Q. Why do you say that?
5      A. He didn't do anything about it. Selectmen
6  called, ordered him before them, he never came,
7  never went before him.
8      Q. Who are you talking about?
9      A. The chief. The board of selectmen ordered
10 the town administrator to make the chief come before
11 them to explain. This should all be in the board of
12 selectmen's records. The chief never came to
13 explain what was going on. It was the lowest level
14 of politics in the Town of Webster in all of their
15 careers and everything else.
16     Q. Going back to the issue of -- you are
17 saying Chief Bergeron wanted you to rein in Brian
18 Barnes. What was your understanding based on what
19 he said to you as to why you were supposed to be
20 reining him in?
21     A. Everybody was complaining about him. And
22 Bergeron didn't like to hear complaints. So he
23 wanted it to quiet down a little.
24     Q. When you say everybody was complaining, do

---

**77**

1  you mean other officers?
2      A. Yeah, everybody in the defendant.
3      Q. As opposed to officials?
4      A. Officials were complaining. Everybody was
5  complaining after that March 3 meeting. Everybody
6  and their brother was complaining. And chief
7  doesn't -- chief didn't want to be bothered with
8  stuff. So that was, you know, rein him in.
9      Q. Did you understand that the reining in had
10 anything to do, had anything to do with issues other
11 than this Miller selectmen's meeting?
12     A. No. We just wanted the present issue at
13 hand to be quieted down.
14     Q. Which was the Miller selectmen's meeting?
15     A. Yes.
16     Q. How about Brian Barnes' involvement at the
17 high school? Were either you or the chief as far as
18 you know critical of his involvement there?
19     A. No. The only thing I ever said was that a
20 couple of officers came to me with a racial
21 complaint that he made up -- remark he made up at
22 the high school. I forwarded that along.
23     Q. You forwarded it along to who?
24     A. The chief. That's when I put it in

---

78

1  writing. They came to me I believe on April 9. I
2  put it in writing.
3      Q. We'll get to that in a moment. Well, did
4  the chief give you any details as to how he wanted
5  you to rein in Brian Barnes?
6      A. Nope.
7      Q. He just said rein him in?
8      A. That's correct.
9      Q. Your understanding is that had to do with
10  the selectmen's meeting?
11     A. Correct. He was spending a lot of time --
12  there was a complaint that he was spending a lot of
13  time downtown at the town administrator's office.
14  That's the reason for you need to let us -- call
15  off, let us know where you were, what you're doing.
16  My understanding at that time was, and I might be
17  correct, Sergeant Keefe would be a better person to
18  ask this, but I'll tell you what I know is that he
19  was totally defiant to the day supervisor, and
20  always said he reported directly to the chief.
21     Q. Who was the day supervisor?
22     A. Sergeant Keefe. I took him out from
23  underneath the chief's office, put him under the
24  day supervisor. Told him to call off when he left

79

1  the school so we know where he was going, he had to
2  state where he was going and why, he needed to be
3  available 25 percent of the time for calls, and he
4  didn't like that.
5      Q. Okay. What was Brian Barnes' response
6  after you sent him that e-mail?
7      A. He went and said that I gave out the oral
8  board questions. That was his initial response.
9      Q. You didn't have any discussion with him --
10     A. Nope.
11     Q. -- about the e-mail?
12         MR. LICHTEN: Let her finish the
13  question.
14     Q. You didn't have any discussion with him
15  about the e-mail?
16     A. Nope.
17     Q. Was it the same day that he accused you of
18  giving out the questions to the oral interview?
19     A. Yes, ma'am.
20     Q. Do you still have that e-mail that you sent
21  to him?
22     A. Yes, ma'am.
23     Q. You don't have it with you today, do you?
24     A. I do not.

80

1      Q. When you say the same day that Brian Barnes
2  made the allegations, who do you understand he made
3  them to and how?
4      A. He was sitting with Mike Shaw. He
5  immediately told Mike Shaw. They went and saw the
6  chief.
7      Q. The same day?
8      A. Within minutes.
9      Q. What was the next thing that happened as
10  far as you know?
11     A. The chief left for New Hampshire. I tried
12  to call Mark Stankiewicz, the town administrator,
13  and before I could do that Mark Dowgiewicz called me
14  and said what the hell are you doing? I said I'm
15  notifying Stankiewicz of what's going on. He said
16  you want to keep those stripes on your shoulders,
17  you keep your mouth shut, the chief will call you
18  right back.
19     Q. I'm sorry, who said that to you?
20     A. Mark Dowgiewicz, the selectman. Then the
21  chief called me and said don't you speak to anybody
22  outside this department. You straighten this out.
23  I want it resolved by the time I get back from New
24  Hampshire.

81

1      Q. What's your understanding as to how that
2  selectman found out --
3      A. I called the station --
4      Q. -- that you had called the town
5  administrator?
6         THE COURT REPORTER: You have to let her
7  finish. Can you repeat the question?
8         MR. LICHTEN: At some point in time why
9  don't we take a break.
10     Q. What is your understanding as to how the
11  selectmen found out about your call to the town
12  administrator?
13     A. I called the station dispatch to get
14  Stankiewicz's phone number. Brian Barnes was in
15  dispatch and he asked the dispatcher who wanted
16  Dowgiewicz's number. Stankiewicz's number.
17     Q. So did you speak to that selectman?
18     A. He called me. You are talking Stankiewicz
19  or Dowgiewicz? It can get confusing.
20     Q. I think that's where I'm getting confused.
21  You didn't talk to the town administrator, you just
22  heard from the selectman?
23     A. Two days later.
24     Q. You talked to the selectman before that?

**Thomas V. Ralph**
**September 8, 2006**

22 (Pages 82 to 85)

|  | 82 |
|---|---|
| 1 | A. Right. The chief and selectman told me to |
| 2 | keep my mouth shut. When the town administrator |
| 3 | called me, he said what's going on? I said the |
| 4 | powers that be have told me to keep my mouth shut, I |
| 5 | have an order not to say anything, but there's |
| 6 | problems. He said do you see the light at the end |
| 7 | of the tunnel? I said yeah. He said that's a |
| 8 | high-speed train coming right at you. He goes watch |
| 9 | out. That's what he said to me. |
| 10 | MS. LYNCH: Did you want to take a break |
| 11 | now? |
| 12 | MR. LICHTEN: Sure. |
| 13 | (Break taken) |
| 14 | Q. Now, with respect to Chief Bergeron going |
| 15 | to New Hampshire, do you know if that was a planned |
| 16 | trip? |
| 17 | A. He went every weekend. |
| 18 | Q. He went every weekend? |
| 19 | A. Every time he could. So I would say it was |
| 20 | planned. |
| 21 | Q. Did this particular incident then involving |
| 22 | your e-mail to Barnes and his subsequent statement |
| 23 | about the cheating allegations to Shaw occur on a |
| 24 | Friday then? |

|  | 83 |
|---|---|
| 1 | A. I think it was on a Thursday. I think so. |
| 2 | Wednesday or Thursday. |
| 3 | Q. So do you know whether or not the chief had |
| 4 | already planned to go to New Hampshire at that |
| 5 | point? |
| 6 | A. It was a snowstorm. You know what, I don't |
| 7 | know. I know he said he was going and he went. I |
| 8 | can't speculate. |
| 9 | Q. Did he say he was going before these issue |
| 10 | came to light? |
| 11 | A. Not that I recall. |
| 12 | Q. Earlier when you said that the chief said |
| 13 | to rein in Brian Barnes, you said Brian Barnes |
| 14 | flipped out, what did you mean when you said flipped |
| 15 | out? |
| 16 | A. He started saying that, telling Shaw that, |
| 17 | you know, I gave out the oral board questions. |
| 18 | Q. You were referring to those allegations? |
| 19 | A. Yeah. |
| 20 | Q. Then you also mentioned that Chief Bergeron |
| 21 | said to do it gently. At what point did he say |
| 22 | that? |
| 23 | A. Afterwards, after Brian was all upset. He |
| 24 | said you were supposed to rein him in but do it |

|  | 84 |
|---|---|
| 1 | gently. |
| 2 | Q. You also mentioned Hoover? |
| 3 | A. Jim Hoover was the union president. |
| 4 | Q. Hoover was there when Chief Bergeron was |
| 5 | there when he said you were supposed to rein him in |
| 6 | gently? |
| 7 | A. Yes, ma'am. |
| 8 | Q. Now, you also mentioned that Hoover had a |
| 9 | conversation with the chief about needing |
| 10 | corroboration of Brian Barnes' allegations to the |
| 11 | chief. Do you recall that? |
| 12 | A. Yes. |
| 13 | Q. What do you understand about that |
| 14 | conversation? |
| 15 | A. Hoover told me that. That's all I know. |
| 16 | Q. Did he say anything Brian Barnes? |
| 17 | A. No. He just said he thought it was funny |
| 18 | that Beland came forward after he had the |
| 19 | conversation with Bergeron that they needed someone |
| 20 | else to corroborate the story. |
| 21 | Q. Did Hoover tell you that Chief Bergeron was |
| 22 | trying to corroborate Brian Barnes' allegations? |
| 23 | A. No. |
| 24 | Q. Then you said that after Al Beland came |

|  | 85 |
|---|---|
| 1 | forward; do you recall that? |
| 2 | A. Yes. |
| 3 | Q. Are you saying that you believe that Al |
| 4 | Beland was put up to corroborating Brian Barnes' |
| 5 | allegations by someone? |
| 6 | A. Yes. |
| 7 | Q. Who do you believe put him up to that? |
| 8 | A. I don't know. Somebody on that side. |
| 9 | Q. When you say that side, what do you mean? |
| 10 | A. The people that were trying to say that I |
| 11 | did this. |
| 12 | Q. Did you think that Chief Bergeron was |
| 13 | trying to support the allegations of cheating |
| 14 | against you at that point? |
| 15 | A. Once he came forward -- this was, yes, it |
| 16 | was a nonissue from March 6, really was a nonissue. |
| 17 | People were just bickering back and forth until |
| 18 | after April 15. Then it became an issue, then Al |
| 19 | stepped forward and everybody jumped on the |
| 20 | bandwagon to say that this happened. |
| 21 | Q. Do you know why Hoover told the chief that |
| 22 | independent corroboration was needed? |
| 23 | A. He's the detective, and they had a |
| 24 | discussion about it. What they discussed I don't |

Thomas V. Ralph
September 8, 2006

**102**

1  similar?
2      A. No, ma'am.
3      Q. You indicated that the human resources
4  division I believe apparently did not substantiate
5  the allegations but then you said the issue was the
6  topic of your first hearing; is that correct?
7      A. That's correct.
8      Q. Has it ever been the topic of any other
9  type of hearing or complaint as far as you know, the
10  cheating allegations?
11      A. Not that I'm aware of.
12      Q. Did you ever discuss the cheating
13  allegations with William Keefe?
14      A. I don't believe so.
15      Q. Is it correct that John Bolduc provided the
16  best answer to the search warrant question out of
17  the ones that were interviewed?
18      A. Yes.
19      Q. What is your understanding as to how he
20  knew the answer or had the best answer?
21      A. He got the seven-day issue right on the
22  first two questions.
23      Q. What's your understanding as to how he knew
24  the answer?

**103**

1      A. It's in the books. It's on every search
2  warrant. It's a basic principle, whether a Superior
3  Court search or a district court search warrant.
4  It's seven days all the time. It's a basic
5  principle of law enforcement. I believe most know
6  seven days is seven days.
7      Q. Do you know whether he was aware of the
8  issue involving the warrant that apparently Officer
9  Hoover was involved in?
10      A. I don't know.
11      Q. Did he get the portion of the question
12  right that if I recall correctly that it was to be
13  returned to the district court?
14      A. That's one of the places. The actual
15  answer per Edmonds and Heirs is different, so no, he
16  did not.
17      Q. Before you asked that question, did you
18  know that John Bolduc had it, at least the
19  information to answer the question correctly or a
20  portion of the question correctly?
21      A. No.
22      Q. In other words, did you ever have a
23  discussion with him about that topic?
24      A. No, ma'am.

**104**

1      Q. And prior to the decision of the human
2  resources division, were you in your regular status
3  as deputy chief? In other words, were you just
4  carrying out your duties or had any action been
5  taken against you?
6      A. From what date, ma'am?
7      Q. I think I know the answer to that. You
8  were already on administrative leave?
9      A. Yes, ma'am.
10      Q. I want to take you now to the Colonial Club
11  Restaurant on February 22, 2003 that was the subject
12  of your complaint of April 15, 2003; is that
13  correct?
14      A. One of them, yes.
15      Q. What did you hear Brian Barnes state that
16  day?
17      A. Said he felt like an Oreo cookie sitting
18  between two freaking niggers on an airplane flight.
19      Q. Did he attribute that statement to someone
20  else such as I guess the principals that he was on
21  the trip with?
22      A. No, ma'am.
23      Q. Did he say anything else of a racial
24  nature?

**105**

1      A. He was making just comments about the fat
2  people on the flight wanting snacks.
3      Q. Anything else that you recall?
4      A. Not in that conversation, no.
5      Q. Had you ever heard him speak derogatorily
6  toward individuals of different races or ethnic
7  backgrounds than him prior to that day?
8      A. Yes.
9      Q. When was that and what did he say?
10      A. We were down at the Sandy's Restaurant
11  having lunch again, and he was talking about --
12  relaying a story from Quincy about some chinks that
13  was having a problem and he also relayed a story
14  about his father and another guy chasing a black guy
15  and they were calling him a nigger and the guy got
16  so mad he came out of hiding to confront them.
17      Q. That was involving his father?
18      A. Yes.
19      Q. Allegedly?
20      A. Yes.
21      Q. What else did he say about that incident?
22      A. Nothing else. They thought it was funny.
23  That's all.
24      Q. When you say they, they who?

**PERLIK and COYLE REPORTING**
**1.413.731.7931**

Thomas V. Ralph
September 8, 2006

28 (Pages 106 to 109)

---

106

1    A. The people, the two officers, his father
2  and his partner and he was relaying the story.
3    Q. Any other incidents where he made
4  derogatory statements regarding someone's race or
5  national origin?
6    A. To which I was present or to which people
7  reported to me?
8    Q. Let's talk about when you were present
9  first?
10    A. He called Senator Dianne Wilkerson a dumb
11  nigger after he went to his NECN interview.
12    Q. Anything else?
13    A. Not off the top of my head, ma'am.
14    Q. With respect to the statement that was made
15  at the Colonial Club Restaurant, what was your
16  response when he said that?
17    A. I said Brian, you know, I pointed to there
18  was people sitting all around us. I told him keep
19  it down.
20    MR. LICHTEN: Let the record reflect, I
21  guess, the witness had his hands sort of spread like
22  a pastor over the table.
23    MS. LYNCH: Like a what?
24    MR. LICHTEN: Pastor.

---

107

1    MS. LYNCH: I'm not sure I would agree
2  with that. I'll stipulate that the witness had his
3  hands spread out in front of him.
4    Q. Did you tell him he shouldn't make
5  statements like that?
6    A. I spoke to Bergeron about it.
7    Q. When did you speak to Bergeron?
8    A. Immediately thereafter. I believe Bergeron
9  wasn't around that day, but as soon as we met I
10  spoke to him and explained it to him.
11    Q. Did you tell him anything besides what
12  you've stated here?
13    A. We've had conversations many times in the
14  past about Brian's language and the fact of how he
15  refers to different ethnic groups. Bergeron always
16  said people talk like that and that again he gives
17  a hundred percent, just leave him alone.
18    Q. I want to make sure. Are you saying you
19  talked with Richard Bergeron about that issue prior
20  to the time that you spoke to him about the Colonial
21  Club Restaurant?
22    A. Yes, ma'am.
23    Q. When did you speak to him?
24    A. Different occasions beforehand that I don't

---

108

1  have any specific dates off the top of my head.
2    Q. Which issues did you talk to him about?
3    A. About Brian, you know, being in public, you
4  know, the Sandy's incident was one where we were in
5  public before that. Just, you know, little
6  incidents where he would make these comments. I
7  would tell the chief that I didn't think they were
8  appropriate. They weren't right. Somebody should
9  say something to him.
10    Q. The chief's response was?
11    A. Everybody talks that way, leave him alone,
12  he gives 110 percent.
13    Q. Had you ever heard the chief make
14  derogatory statements regarding individuals of a
15  different race or ethnic background?
16    A. Yes, ma'am.
17    Q. When and what did he say?
18    A. Person built a house on Mine Brook Road,
19  and they put a purple door on the house. And when
20  we drove down Mine Brook Road he said that house has
21  got to be owned by a couple of niggers because
22  nobody else would put a purple door on their house.
23    Q. When did that happen?
24    A. Right when they were building those houses.

---

109

1  It would be before all of this. Then when I was
2  building my house, I had problems with carpenter
3  ants. I had called around and got information that
4  carpenter ants look for moist wood. They must have
5  some moist wood around because they're lazy. Then I
6  was talking to the chief about it and he said what
7  do you expect, they should be lazy, they're black.
8    Q. The ants?
9    A. Yes.
10    Q. Any other statements that he made?
11    A. Not off the top of my head at the moment.
12    Q. When he made those two statements, what was
13  your response?
14    A. I just cringed.
15    Q. You didn't say anything?
16    A. No, I didn't say anything to him. It kind
17  of takes me by shock that he would speak that way.
18    Q. Did anyone else ever tell you they heard
19  the chief make derogatory statements of a racial
20  nature?
21    A. I don't think anybody said that they heard
22  the chief make derogatory statements. They didn't
23  tell me, at least.
24    Q. Did you ever report those statements to

---

# EXHIBIT 6A

110

1 anyone that you said the chief made?
2     A. No.
3     Q. Why not?
4     A. Again, as I go back, you were either
5 hundred percent with him or hundred percent against
6 him. He's not a person you wanted on your bad side.
7     Q. The statement at Sandy's Restaurant, do you
8 recall when that happened?
9     A. I believe it was right after Brian got out
10 of the academy.
11     Q. Who else was there?
12     A. I believe Jim Hoover, John Bolduc, and
13 probably Chief Bergeron.
14     Q. Did any of them make any response?
15     A. Everybody kind of just looked at each
16 other.
17     Q. Do you remember John Bolduc saying
18 anything?
19     A. I don't, no.
20     Q. Did Chief Bergeron say anything?
21     A. No.
22     Q. Then who else was present when Brian Barnes
23 made the alleged statement about Dianne Wilkerson?
24     A. Aaron Suss, Chief Bergeron, myself, and I

111

1 believe a dispatcher.
2     Q. Do you know who it was?
3     A. I don't recall the dispatcher.
4     Q. Did Brian Barnes attribute that statement
5 to a police chief from another department?
6     A. Nope, he did not.
7     Q. What did you say when he made that
8 statement about Senator Wilkerson?
9     A. I just looked at Bergeron. Bergeron
10 thought it was funny. He was laughing.
11     Q. Did Chief Bergeron say anything?
12     A. No. Just laughed.
13     Q. Did Officer Suss say anything?
14     A. No.
15     Q. How about the dispatcher?
16     A. Nope. Nobody said anything.
17     Q. Those are all the statements that you
18 yourself witnessed that you stated were derogatory
19 in nature toward a race or national origin?
20     A. Correct.
21     Q. How about any statements that were reported
22 to you?
23     A. Officer Barnes in April of '03 was up the
24 high school as the school resource officer and in

112

1 front of several people up the high school including
2 Officer Hoover, Officer Shue, and I believe Officer
3 Yurkevicius, I can't spell that one, sorry, he made
4 the statement that he was in the friars, the
5 Franciscan friars for a while. And while he was a
6 friar, he went to South Philadelphia to work in a
7 soup kitchen and they put him in a monastery. When
8 he went in his room, there was a black guy there.
9 He said who are you. The black guy said I'm Father
10 so-and-so. I'm your roommate, he said. So he said
11 I don't room with niggers, I'll sleep in my car. He
12 said he went and slept in his car.
13     Q. I'm sorry, who told you that he said that?
14     A. Jim Hoover.
15     Q. When did he tell you that?
16     A. Somewhere around maybe the 10th, 11th,
17 12th, somewhere right after it happened. Because I
18 started working on my letter to the chief at that
19 point in time.
20     Q. That would have been in May of 2003?
21     A. April.
22     Q. April 2003?
23     A. Correct.
24     Q. I'm a little confused about the dates. Did

113

1 Hoover tell you that Barnes had allegedly just made
2 that statement or had it --
3     A. It had been made on April 9.
4     Q. Oh, it was made on April 9?
5     A. Correct.
6     Q. Do you know how soon after he told you?
7     A. Couple of days after. As I said, I wrote
8 the letter on the 15th.
9     Q. Okay. Did he provide you with any other
10 information about that alleged statement such as
11 anything else that Brian Barnes may have stated or
12 what the response was from those in attendance?
13     A. No. He just said people looked
14 uncomfortable. He was uncomfortable. He didn't
15 appreciate that, and he wanted something done about
16 it.
17     Q. Did he say why he was going to you or why
18 he told you?
19     A. Nope. He just brought it to my attention.
20     Q. Do you know whether he discussed that with
21 the chief at all?
22     A. I have no clue.
23     Q. Any other statements that were reported to
24 you about Brian Barnes?

Thomas V. Ralph
September 8, 2006

30 (Pages 114 to 117)

**114**

1    A. He had allegedly asked officers if we get
2 this freaking nigger holiday, Martin Luther coon day
3 off when he was in dispatch one day. He, I know
4 that during an airplane -- trip to the airport with
5 Principal Charbonneau, Officer Suss was driving the
6 car, and Brian made several derogatory statements in
7 the car. And once I sent him the e-mail he was up
8 at the Dudley District Court and told Officer Suss
9 that he felt I was treating him like a nigger.
10    Q. Anything else?
11    A. I had officers tell me at one point in
12 time, right, not sure if it was Officer Suss or not,
13 that a gentleman by the name of Keithon Riviera when
14 these issues started coming to a head, I believe it
15 was the Boston Globe article on the racial
16 profiling. I believe Officer Suss told me I should
17 look at Keithon Riviera's master card, that Brian
18 had cited him quite a few times in a short period of
19 time.
20    Q. What's the name again?
21    A. Keithon, K-e-i-t-h-o-n, Riviera.
22    Q. When you said master card, what are you
23 referring to?
24    A. History on the computer system.

**115**

1    Q. Did he say why he thought he was targeting
2 him?
3    A. I believe he was working with him on the
4 shift and Brian at some period of time, I don't know
5 when it was, but had been in the past had stopped
6 him a whole bunch of times. Like, I don't know, I
7 think it was like eight times in six weeks he
8 stopped and cited this kid for driving violations,
9 something like that. He said I should look into
10 that. He said he was concerned about that.
11    Q. Do you know whether in fact these traffic
12 violations were legitimate?
13    A. I don't.
14    Q. Did Suss say why he was concerned about it?
15    A. As I said, he saw the racial profiling
16 article, that Brian was the number one person in the
17 state not complying with the racial profiling law,
18 so he said that might be connected.
19    Q. Do you know anything about Keithon
20 Riviera's background?
21    A. I do not, ma'am.
22    Q. Any other purported statements made by
23 Brian Barnes of a racial derogatory nature?
24    A. Not that I can recall at this time, I'm

**116**

1 sorry.
2    Q. When did he make the statement about Martin
3 Luther King Day, what year?
4    A. I'm not sure. I'd have to go through and
5 see if I have a date on that for the year. The
6 years kind of blend in now so many years later.
7    Q. Obviously it was made in January as far as
8 you know?
9    A. Right. I think it was January of '03, but
10 I don't want to commit to that.
11    Q. Who informed you of that?
12    A. I think it was Officer Bates or Officer
13 Brooks.
14    Q. Did they tell you what their response was
15 to him, if any?
16    A. Nobody said anything. They just --
17 generally nobody said anything.
18    Q. When did they tell you about that
19 statement?
20    A. I'm not sure. I don't think it was right
21 away. I think it might have been a month or two
22 later.
23    Q. What did you do when they told you?
24    A. Brought it to the chief's attention.

**117**

1    Q. What was the chief's response?
2    A. Don't worry about it.
3    Q. When did you bring it to the chief's
4 attention?
5    A. When it was brought to my attention. I
6 don't have a time frame off the top of my head,
7 ma'am.
8    Q. Did you bring it to him close in time, a
9 day or so?
10    A. As soon as they told me, I went. Which is
11 why I put it myself in writing, because nothing
12 happened when I told him verbally. He just said
13 don't worry about it.
14    Q. Did he say anything else?
15    A. No.
16    Q. Then you said that Officer Suss reported,
17 you said, several derogatory statements. What did
18 he tell you specifically?
19    A. I can't think of what it was at the moment,
20 ma'am, I'm sorry. But he did make, he did tell me
21 that there was some racially derogatory statements
22 made in the back of that car, but I can't remember
23 what they are off the top of my head.
24    Q. Are you referring to --

Thomas V. Ralph
September 8, 2006

32 (Pages 122 to 125)

---

**122**

1  Q. Who are you referring to?
2  A. Brian.
3  Q. Brian?
4  A. Brian. Some heavyset woman, they needed
5  lift assistance because she'd fallen and he'd say to
6  dispatch get a Shaughnessy crane or get Superman
7  down here.
8  Q. In other words, did he respond to a call
9  involving a heavy woman who needed help?
10 A. Yes. They said they were going to send out
11 rescue for lift assist. He said forget rescue, get
12 Shaughnessy Crane or Superman down here.
13 Q. Who's the woman, do you know?
14 A. I don't know.
15 Q. When did that occur?
16 A. When he was part time. I was off at a task
17 force, but I was told about it.
18 Q. Did you ever do anything or respond in any
19 way when you received that information?
20 A. No. I wasn't assigned to the department at
21 the time. I was detached to either the DEA or AG's
22 office.
23 Q. Who told you about this?
24 A. I just heard it from people. I'm going

---

**123**

1  back now ten years.
2  Q. You don't remember who told you?
3  A. No.
4  Q. Other than to Chief Bergeron, did you ever
5  report any of these alleged statements to anyone
6  else with supervisory authority such as a town
7  administrator, selectman, anything like that?
8  A. I went to the town administrator beginning
9  of March, told him that there were a lot of problems
10 in the police department and that I needed to come
11 forward with some information and what were my
12 protections to do that because the chief will
13 retaliate against me.
14 Q. Did you tell them that you wanted to report
15 derogatory racial statements?
16 A. I'm not sure if I said those specific words
17 to Mr. Stankiewicz, but I did say that to Bob
18 Stawiecki because I met with him at the
19 recommendation of Mr. Stankiewicz. And I believe he
20 stated that he'd heard him make those statements as
21 well.
22 Q. You are saying that you went to the town
23 administrator, Mr. Stankiewicz, and you wanted to
24 report problems at the police department, but you

---

**124**

1  never actually did; is that what you are saying?
2  A. I wanted to know what my protections were
3  to do that. He told me that he was leaving and
4  wouldn't be much he could do for me and to go see
5  the chairman of the board, Bob Stawiecki, which I
6  did.
7  Q. What did you discuss with Mr. Stawiecki?
8  A. Brian Barnes and the racial statements.
9  Q. When did you do that?
10 A. April, end of March, end of April, not sure
11 exactly when it was. It was before I got put out.
12 Q. Was it after he had made the cheating
13 allegations against you?
14 A. I'm not sure. It was before he put them in
15 writing. Not sure if it was before he verbally said
16 it.
17 Q. Okay.
18 A. My meeting with Mark Stankiewicz was March
19 4, which would have been before my e-mail.
20 Q. At this point you don't recall discussing
21 specifics with Mr. Stankiewicz?
22 A. I don't remember exactly what the specifics
23 were of that conversation. I know we met privately
24 and I asked him, told him I was concerned about

---

**125**

1  retaliation by coming forward with some issues. I
2  don't remember if I got into the specifics of the
3  issues or not, but I did meet with him about being
4  retaliated against with coming forward, that the
5  chief would not be happy about with regards to Brian
6  Barnes.
7  Q. Why didn't you just discuss those issues
8  with him as opposed to going to speak with Selectman
9  Stawiecki?
10 A. He was leaving. He had already accepted a
11 job for the Town of Stoughton so he was, his days
12 were numbered. He told me he was leaving, there
13 wasn't much he could do with me, et cetera. I met
14 with him again in April before he left. He said the
15 same thing.
16 Q. Did he refuse to speak to you?
17 A. Oh, no. No. He was sympathetic to the
18 cause.
19 Q. What do you mean when you said he was
20 sympathetic to the cause?
21 A. That I feared being retaliated against.
22 That's what he was sympathetic to. He understood my
23 concerns about that.
24 Q. What was the exact discussion with

---

Thomas V. Ralph
September 8, 2006

33 (Pages 126 to 129)

126

1  Selectman Stawiecki?
2     A. We discussed the racial statements that
3  Brian was making, the fact the chief wasn't doing
4  anything about it, and I think that was about it.
5     Q. You said that Mr. Stawiecki stated that he
6  had witnessed statements himself?
7     A. Yeah. I believe his daughter-in-law is
8  Hispanic. He said Brian made statements to him, and
9  he took offense because his daughter-in-law was
10  Hispanic.
11     Q. What was the statement?
12     A. He didn't say.
13     Q. Do you know when it was made?
14     A. I do not.
15     Q. Did he tell you anything else about his
16  witnessing derogatory statements by Brian Barnes?
17     A. No, ma'am.
18     Q. How was that discussion with Selectman
19  Stawiecki left?
20     A. He asked me to go speak with the attorney
21  general's office because the board of selectmen
22  asked the attorney general's office to look into the
23  police department.
24     Q. Did he say why?

127

1     A. I don't believe so, ma'am, I don't recall.
2     Q. Did you ever find out that the attorney
3  general's office --
4     A. I went and spoke with him twice.
5     Q. You did?
6     A. Yes.
7     Q. When was the first time?
8     A. First time was middle to the end of April,
9  the second time, yeah, the second time I believe was
10  May 1.
11     Q. First time was middle to end of April 2003?
12     A. Correct.
13     Q. The second time was May 1?
14     A. Correct.
15     Q. Let's start with the first time. Who did
16  you speak with?
17     A. I believe his name is Christian or
18  Christiansen, I can't remember.
19     Q. Was he an assistant attorney general?
20     A. I believe he is. I think he's a lieutenant
21  with the state police. There was an assistant
22  attorney general there. I don't know who it was.
23     Q. What did you discuss?
24     A. They asked me about police operations, they

128

1  asked me about the chief following people, trying to
2  obtain information on selectmen, wiretapping phones,
3  stuff like that.
4     Q. Did you discuss the issue of Brian Barnes'
5  racial statements?
6     A. They weren't interested in that.
7     Q. Did you discuss that issue with them in
8  either meeting?
9     A. I brought it up. They just basically had
10  their questions that they wanted to ask, and that
11  was it.
12     Q. Briefly what did you discuss during the
13  second meeting?
14     A. The same.
15     Q. About the chief?
16     A. About the chief and the department and LKQ
17  Corporation and what I knew about that stuff. I
18  didn't know anything about that stuff.
19     Q. Do you know whether the attorney general's
20  office or the state police ever brought any charges
21  against Chief Bergeron?
22     A. They found no criminal wrongdoing, just
23  managerial problems.
24     Q. The attorney general's office and the state

129

1  police?
2     A. Correct.
3     Q. Okay. Did you report the alleged racial
4  statements by Brian Barnes to any other individuals
5  with supervisory authority besides what you already
6  testified to?
7     A. Just to the MCAD. I did speak with Irene
8  Martel once.
9     Q. Who was that?
10     A. She was the acting town administrator.
11     Q. When was she acting town administrator?
12     A. Right after Mark Stankiewicz left. I had a
13  meeting with her and Ray Regis about Brian.
14     Q. When was that?
15     A. Not sure of the exact day. It would have
16  been before the end of April.
17     Q. Before the end of April '03?
18     A. Correct.
19     Q. After he had made the cheating allegations
20  against you?
21     A. Correct.
22     Q. What was discussed?
23     A. *We discussed Brian Barnes, his attitude,
24  what he was doing, what he was saying, the chief's

Thomas V. Ralph
September 8, 2006

34 (Pages 130 to 133)

130

1  failure to do anything with him. I had suspended
2  Brian. We had discussed that. She told me that if
3  I didn't like what was going on in the police
4  department to leave.
5        MS. LYNCH: Could you read that answer
6  back.
7        (*Answer read)
8    Q. Did you discuss the alleged racial
9  statements made by Brian Barnes?
10   A. Yes, ma'am.
11   Q. What was her response?
12   A. It was just a general response. If you
13  don't like what's going on here, leave.
14   Q. In response to that or in response to
15  the --
16   A. Just the whole thing. She didn't respond
17  to anything individually.
18   Q. What did Regis -- is that Selectman Regis
19  or former?
20   A. Former Selectman Ray Regis.
21   Q. What was his involvement in that meeting?
22   A. He came with me to the meeting.
23   Q. Why was that?
24   A. Because I had suspended Brian for the day

131

1  and spoken with him. And I wasn't sure who the town
2  administrator -- I don't think I knew who the town
3  administrator was filling in at the time. I spoke
4  to him and he said he would meet me there. He asked
5  me to come up to his office. I went there and he
6  went with me to the meeting with Mrs. Martel.
7    Q. How did you get involved with Selectman
8  Regis to go to that meeting?
9    A. Because --
10   Q. What prompted that relationship?
11   A. I didn't know who was -- I wasn't sure who
12  was actually in charge. Pam LaDuke -- there had
13  been several people in charge as the interim town
14  administrator, so I called him to find out who was
15  in charge as the town administrator.
16   Q. Was he the chairman of the select board?
17   A. I think he was vice-chair, I believe. I
18  think Bob Miller might have been the chairman.
19   Q. Why did you call Regis then?
20   A. I had his number at the station.
21   Q. Did he have any role in that meeting, did
22  he say anything about Brian Barnes' racial
23  statements?
24   A. Nope.

132

1    Q. Why did you suspend Brian Barnes for a day?
2    A. He refused to sign the list as he was
3  required to.
4    Q. Is that what prompted that meeting with
5  Irene Martel, the suspension?
6    A. Correct.
7    Q. Was that suspension overturned?
8    A. Yes.
9    Q. Who overturned it?
10   A. The interim town administrator, Steven
11  Boudreau.
12   Q. Do you know why or what reason was given
13  for overturning it?
14   A. Chief Bergeron said that he told Barnes he
15  didn't need to sign the list and he had told me
16  prior to leaving on the vacation that Brian didn't
17  need to sign the list so, therefore, the whole thing
18  was for naught according to the town administrator.
19   Q. When you say sign the list, what do you
20  mean?
21   A. Shift rotation.
22   Q. With regard to the oral interview of John
23  Bolduc, Aaron Suss, and Michaela Kelley, was that
24  recorded at all?

133

1    A. No, ma'am, not that I'm aware of.
2        MS. LYNCH: It's actually 1:00. Should
3  we take a break now?
4        MR. LICHTEN: Sure.
5        (Lunch break taken)
6        MS. LYNCH: Back on the record.
7    Q. Officer Ralph, with regard to the
8  conversation you had with Irene Martel when you said
9  that she said to leave if you didn't like it, what
10  did you think she was referring to in terms of if
11  you didn't like it?
12   A. If I didn't like the way Chief Bergeron was
13  running the department, leave.
14   Q. Do you know where she is today?
15   A. She's a selectwoman. She just got
16  reelected.
17   Q. Okay. Now, from your testimony you stated
18  that you had heard or had learned of derogatory
19  racial statements made by Officer Barnes prior to
20  April 15, 2003; is that correct?
21   A. That's correct.
22   Q. Why did you wait until then to report them?
23       MR. LICHTEN: Objection. That wasn't
24  his testimony.

Thomas V. Ralph
September 8, 2006

35 (Pages 134 to 137)

134

1    A. What I had stated was that I had spoken
2  with Bergeron. He always said leave him alone, he's
3  a good guy, he gives 110 percent, everyone speaks
4  that way. When Hoover came to me on the 9th and
5  said he wanted something done, I took that as an
6  official complaint and I proceeded forward with it
7  as an official complaint.
8    Q. That's the first time you reported them in
9  writing?
10    A. In writing, correct.
11    Q. You are saying you did report them verbally
12  to the chief prior to that?
13    A. Correct. He always gave me the same answer
14  prior to that which is don't worry about it, he's a
15  good guy, he gives 110 percent, leave him alone.
16    Q. Did Brian Barnes making cheating
17  allegations influence the timing of your written
18  report?
19    A. No, ma'am, just the fact that Detective
20  Hoover on the 9th came and said I want something
21  done about this.
22    Q. Do you know why Hoover didn't go to the
23  chief himself?
24    A. I don't know, ma'am.

135

1    Q. How would you define the term "racist"?
2    A. Any act or statement or any action I guess
3  that reflects negatively upon a certain culture or
4  race, whether it be black people, gay people,
5  Hispanic people, heavyset people. You have a -- you
6  make fun of them, you speak derogatory about them,
7  or single them out for some reason including what I
8  just said. That's a racist act.
9    Q. Do you believe it requires some sort of ill
10  intent or malice as opposed to thinking it's funny
11  on some level?
12    A. I don't think the person saying it has to
13  have malice. I think they just have to offend other
14  people. They are offending other people. If you do
15  it as a police officer, that is obviously going to
16  overflow into your work.
17    Q. Do you believe that Brian Barnes is a
18  racist using your definition?
19    A. Yes.
20    Q. Do you believe he did have any type of
21  malice or ill intent when he made these derogatory
22  statements as opposed to in his mind he thinks it's
23  funny?
24    A. Yeah. I think he was putting those races

136

1  and those types of people down. Bolstering his own
2  self-esteem up.
3    Q. As a police officer, either in the academy
4  or within the department itself, Webster Police
5  Department, do you receive any training with regard
6  to racial issues?
7    A. No, ma'am, I haven't.
8    Q. Now, with regard to the issue of the racial
9  profiling law, which we touched upon briefly, what
10  is your understanding as to when it was when it
11  became mandatory as opposed to voluntary?
12    A. I think it was in the summer of '02, I
13  believe somewhere around there, August, September,
14  October, somewhere around there.
15    Q. Before that newspaper article in the Boston
16  Globe came out that apparently identified Brian
17  Barnes as not complying with it, did you have any
18  understand that he wasn't complying with it?
19    A. No.
20    Q. Were you complying with it before it became
21  mandatory?
22    A. Myself?
23    Q. Yes.
24    A. I always complied. I always fill in the

137

1  blocks.
2    Q. One hundred percent?
3    A. A hundred percent. I don't think there's
4  any ticket that I've ever filled in that doesn't
5  have it.
6    Q. Before it was mandatory, were you aware of
7  any officers that didn't comply with it?
8    A. No.
9    Q. Did you have discussions with Brian Barnes
10  about why he wasn't complying with it?
11    A. Not until after the article came out.
12    Q. Do you know what John Bolduc's practices
13  were with regard to complying with the racial
14  profiling law?
15    A. No, ma'am, I do not.
16    Q. Did you discuss it with Brian Barnes at any
17  time the issue of the racial profiling law?
18    A. I spoke with the chief. I believe Brian
19  was there at one point in time. I said you need to
20  comply. He said if they want me to comply, they
21  should put it on the license. I don't have to guess
22  the sex of the person. I shouldn't have to guess
23  the race of the person.
24    Q. Did he say anything else as to why he

Thomas V. Ralph
September 8, 2006

36 (Pages 138 to 141)

---

**138**

1  wasn't complying?
2      A.  No.
3      Q.  What was the chief's response?
4      A.  There wasn't a response.
5      Q.  Did you ever witness William Keefe make any
6  derogatory racial statement?
7      A.  No, ma'am.
8      Q.  Did you ever witness Robin Leal make any
9  racially derogatory statement?
10     A.  No, ma'am.
11     Q.  Have you yourself ever made any racially
12  derogatory statements?
13     A.  No.
14     Q.  Same question with regard to John Bolduc.
15  Did you ever witness him make any racially
16  derogatory statements?
17     A.  No, ma'am.
18     Q.  I can't recall if I asked you this already.
19  Before you filed the written complaint against Brian
20  Barnes regarding the derogatory racial statements,
21  did you have any discussions with him?
22     A.  With Brian?
23     Q.  Right.
24     A.  Just as I said, when I was present I made

---

**139**

1  the (indicating), Brian, watch it.
2      Q.  Now, I want to go over in a little more
3  detail your discussion with Chief Bergeron after you
4  gave him the letter regarding Brian Barnes on April
5  15, 2003.  What exactly did he say?
6      A.  He yelled at me.  Told me that no one ever
7  bothered me when I was up the DEA and the AG's
8  office and that Brian was a good kid and get out of
9  here.
10     Q.  Anything else?
11     A.  Not that I recall.  Just yelling at me to
12  get out.
13     Q.  Where did you go?
14     A.  I went down to see Mark Stankiewicz.
15     Q.  We talked about that.  At some point during
16  the day did Chief Bergeron ask you to return to the
17  station to talk with him?
18     A.  Yes.
19     Q.  Do you recall when that was?
20     A.  I was in East Brookfield at a meeting with
21  John Bish, Molly Bish's father, John Bolduc and
22  Derrick Stokes.  East Brookfield Court at that time,
23  I don't know what it does now, but at the time it
24  didn't get Nextel reception.  When we broke from our

---

**140**

1  meeting for lunch, we went down the street to Subway
2  and I got a partial message.  I called back the
3  station and was told that the chief wanted to see me
4  and I said okay, I'm in East Brookfield.  I'm
5  finishing up lunch.  I'll be in after that.  I went
6  back in.  I told them I needed to leave.  Threw out
7  my stuff, got in my car, drove back to Webster.
8      Q.  You are saying you did not -- other than
9  finishing your lunch, you didn't delay in returning
10  to the station?
11     A.  That's correct.
12     Q.  Are you aware that the chief stated that
13  you did?
14     A.  Correct.
15     Q.  How soon after you found out that he wanted
16  you to come back did you get back there?
17     A.  However long it took me to drive from East
18  Brookfield to Webster.
19     Q.  How long did you stay at lunch after you
20  found out that he wanted you back?
21     A.  I came right back in and told them I needed
22  to go.  I threw my stuff out.  I don't believe I
23  stayed more than a minute.  Just picking up my stuff
24  and telling them sorry, I couldn't finish the

---

**141**

1  meeting.
2      Q.  Did you also go to see the town
3  administrator that day?
4      A.  Prior to my meeting him in East Brookfield.
5      Q.  Is that when you said Mr. Stankiewicz told
6  you to speak to Mr. Stawiecki?
7      A.  He told me back in March to meet with Mr.
8  Stawiecki.
9      Q.  Did you go to the town administrator,
10  though, prior to returning back to the station?
11     A.  Nope.  Right back to the station.
12     Q.  Did you make any phone calls to the town
13  administrator that day after you left the
14  department?
15     A.  I don't believe so, no, ma'am.
16     Q.  When you got back to the station what
17  happened?
18     A.  Chief was behind closed doors.  I believe
19  Detective Shaw and Detective Hoover were in behind
20  closed doors with him.  I got a phone call from Don
21  Venice, who was the ADA in Dudley.  I spoke with him
22  with regards to a case.  I was still waiting for the
23  chief.  Chief came out in the hallway out of his
24  room, came out in the hallway, saw me and said turn

---

**Thomas V. Ralph**
**September 8, 2006**

37 (Pages 142 to 145)

---

142

1  in your fucking car. I said, excuse me? He said
2  you heard me, turn in the fucking keys to your car.
3  I said yes, sir. He went back in behind his door
4  and slammed the door shut and went back to the
5  meeting.
6      Q. Did he say why?
7      A. No. So I went out, emptied out my car, and
8  actually put everything in Detective Hoover's car
9  because I needed a ride home. I didn't have a car.
10  And waited for Detective Hoover. Detective Hoover
11  came out. I asked him to give me a ride home. I
12  told the dispatcher I was going home sick. I first
13  put the keys in the mail slot of chief Bergeron's
14  door in a metal box. I dropped them in there. He
15  never came out. I waited outside in the dispatch
16  area. Told the dispatcher to put me out sick.
17  Waited for Hoover. Hoover came out, nobody said
18  anything, nobody was looking for me, so I asked
19  Hoover to give me a ride, and he gave me a ride
20  home. I took an hour sick time.
21      Q. Okay. You already testified earlier as to
22  what you did following that day up until being
23  placed on administrative leave?
24      A. Right.

---

143

1      Q. Does Officer Brooks have any knowledge of
2  any racial statements?
3      A. Either Brooks or Bates, I stated earlier,
4  is the one that mentioned the -- pretty sure it's
5  Brooks or Bates mentioned do we get the Martin
6  Luther King holiday off statement.
7      Q. Are you aware of any altercation that
8  occurred between John Bolduc and Brian Barnes in
9  Richard Bergeron's office in April 2003?
10      A. I'm not sure. I know that the chief and
11  John yelled at each other or the chief yelled at
12  John at least.
13      Q. Now I'm talking about John Bolduc and Brian
14  Barnes.
15      A. No.
16      Q. Did you ever hear John Bolduc say that he
17  was going to punch out Brian Barnes?
18      A. No, ma'am.
19      Q. What's your understanding of their
20  relationship before these cheating allegations were
21  made?
22      A. I think they were fine. Everybody, you
23  know, it's a small department. Everybody gets along
24  with everybody even if they don't like them.

---

144

1      Q. Now, did you become aware that John Bolduc
2  had a discussion with Chief Bergeron about the
3  allegations that you had made about Brian Barnes
4  about the racial derogatory statements?
5      A. Only what John told me.
6      Q. What did he tell you?
7      A. He told me that the chief had asked him if
8  in fact he had, if he had collaborated with me on
9  writing the letter. And then he asked him if he had
10  ever heard Brian make any statements. John said he
11  said yes. The chief subsequently told him that his
12  loyalty and friendship to the deputy would cost him.
13      Q. Did you ever witness any conversations
14  between Chief Bergeron and John Bolduc regarding
15  this, the racial allegation issue?
16      A. No, ma'am.
17      Q. Did you ever tell John Bolduc that you had
18  identified him as a witness?
19      A. Yes, ma'am.
20      Q. When did you tell him that?
21      A. As soon as I filed my complaint.
22      Q. Where was that that you filed the
23  complaint?
24      A. MCAD in Boston.

---

145

1      Q. Did you have an attorney to file that
2  complaint?
3      A. No, ma'am.
4      Q. Did you prepare it yourself?
5      A. I went in and spoke with them, and it was
6  prepared while I was sitting there.
7      MR. LICHTEN: Technically, he did have
8  an attorney file the complaint.
9      A. It was just a joke.
10      MR. GREEN: He's an attorney.
11      MS. LYNCH: I thought you meant someone
12  at the MCAD.
13      (Marked, Exhibit 1, Complaint)
14      Q. Showing you what's been marked as Exhibit
15  1. Is that the complaint that you filed?
16      A. Mm-mm. It is, ma'am, yes.
17      Q. Is the information that you indicated
18  there, is that all of the information that you
19  provided to the MCAD?
20      A. It is.
21      Q. Sorry. I thought I had another one. I can
22  make you another if you need it afterward. You'll
23  notice there it makes the statement you filed a
24  formal complaint with the chief of police against

---

Thomas V. Ralph
September 8, 2006

38 (Pages 146 to 149)

---

146

1   Officer Brian Barnes after other officers had
2   complained to you. Have you now identified all of
3   those officers?
4       A. Right. As I said, Jim Hoover was the one
5   that made it, but other officers had made statements
6   to me and I spoke with them in prior times informing
7   the chief and was always told not to worry about it.
8       Q. You said that he referred to -- Brian
9   Barnes had referred to Hispanic people as spics. I
10  don't recall you testifying to that. Was there an
11  occasion when he used that term?
12      A. Yes. Trying to think when it was he called
13  someone a stupid spic. I don't remember when it
14  was.
15      Q. Okay. This Exhibit 1 does not list John
16  Bolduc as a witness; is that correct?
17      A. That's correct. Just says other officers.
18      Q. Did you ever provide his name to the MCAD?
19      A. I'm not sure if I provided it to the MCAD.
20  I provided it to the chief because I was ordered to
21  list any and all statements I had heard and who was
22  present for hearing those. That was that time I was
23  ordered to sit at my desk and complete the report.
24      Q. You also indicated at the end of Exhibit 1

---

147

1   it says "I have been told from people within the
2   police department and members of the board of
3   selectmen that Chief Bergeron is looking for ways to
4   have me demoted and probably terminated." Who are
5   you referring to that you say told you that?
6       A. I believe it would probably be Bob Miller
7   as the member of the board of selectmen, and Jim
8   Hoover.
9       Q. Did either of them ever tell you that they
10  heard similar statements made by Chief Bergeron with
11  regard to John Bolduc?
12      A. No. The chief wrote a couple of letters in
13  July looking to have me removed. I mean, in April,
14  of having me removed.
15      Q. Who did he write to?
16      A. He wrote to the then town administrator
17  asking that I be removed.
18      Q. Richard Bergeron did?
19      A. Yes, ma'am. The town should have those
20  letters.
21      Q. Asking to have you removed altogether as a
22  police officer or just demoted?
23      A. Demoted from deputy chief to sergeant.
24      Q. Was this ever acted upon?

---

148

1       A. No. The town administrator told me that he
2   was going to leave me there pending the outcome from
3   HRD.
4       Q. Which town administrator was that?
5       A. Steve Boudreau.
6       Q. Did John Bolduc tell you about any other
7   conversation that he had with the chief about these
8   racial allegations?
9       A. I don't understand the question, ma'am.
10      Q. Other than the conversation that you
11  relayed a few minutes ago between Chief Bergeron and
12  John Bolduc, did John Bolduc tell you about any
13  other conversations that he had with the chief?
14      A. I don't think so.
15      Q. Did you ever hear either from Mr. Bolduc or
16  anyone else that the chief had made a statement to
17  him that at least he was coming to work, implying
18  that you were refusing to come to work?
19      A. No, ma'am.
20      Q. Did you review the statement that John
21  Bolduc turned in to the chief regarding I guess
22  primarily the events at the Colonial Club Restaurant
23  before he turned it in?
24      A. No, ma'am.

---

149

1       Q. Did you discuss with him that statement
2   before he turned it in?
3       A. No, ma'am.
4       Q. Do you believe that John Bolduc was
5   retaliated against for stating that he heard Brian
6   Barnes allegedly make derogatory statements?
7       A. Yes, ma'am.
8       Q. Why do you believe that?
9       A. Because there was no problem until official
10  complaints were filed. Then all of a sudden
11  everybody was a bad guy and issues were dug up and
12  pressed.
13      Q. How do you believe that he was retaliated
14  against?
15      A. He was ultimately fired.
16      Q. Other than his ultimate termination, do you
17  believe he was retaliated against in any other way?
18      A. He was taken off the Amato case. They took
19  his office away. I believe they were asking
20  officers on his shift for information about him.
21  Then ultimately he was fired.
22      Q. Why do you believe there was a connection
23  between his termination and his reporting of
24  witnessing the racial statements that were allegedly

---

# EXHIBIT 6B

Thomas V. Ralph
September 8, 2006

158

1    Q. Was that at the time Bolduc no longer had
2  his office?
3    A. No. That's as it is now.
4    Q. Back when he no longer had his office, were
5  there officers who had an office, meaning
6  nonsupervisory staff?
7    A. I'm not sure that far back who would have
8  -- the DARE officer would have had an office. I'm
9  not sure if anybody shared it with him. The court
10  officer, computer officer had their office.
11    Q. Since John Bolduc lost his office, has the
12  department been reconfigured at all in terms of
13  creating more offices?
14    A. They took one of the juvenile cells and
15  made that into an office too.
16    Q. Okay. You've also mentioned that
17  reportedly Chief Bergeron was seeking information
18  about John Bolduc. Who told you that?
19    A. John told me that.
20    Q. What did he tell you?
21    A. He told me that he believed the chief had
22  spoken with Officer Kehoe and had said that another
23  officer had said that Bolduc was implicating Kehoe
24  into something and Kehoe said that wasn't true

159

1  because he had seen what the officer wrote or
2  whatever. He was trying to create animosity amongst
3  the troops.
4    Q. Anything else John Bolduc told you about
5  that issue?
6    A. Not that I recall, ma'am.
7    Q. Back when John Bolduc was working on the
8  Amato investigation, what is your best estimate as
9  to the percentage of his time that that
10  investigation took?
11    A. It was a period of time that there were two
12  officers, Officer Kelley and Officer Bolduc, were
13  assigned full time.
14    Q. Michaela Kelley?
15    A. Yes, ma'am, they worked together on it.
16    Q. Why did she get taken off as far as you
17  know?
18    A. I think they just moved it from an active
19  -- it was when -- I'm not sure of the guy's name.
20  Out somewhere out Midwest somebody was arrested and
21  they had the Webster Lake list of names, and so the
22  chief put those two on it full time. When this
23  slowed down, he put them, you know, put them back
24  and they did it, they did work on it on the side.

160

1  But John was always passionate about the Amato case.
2    Q. Do you recall around the time that Chief
3  Bergeron removed John Bolduc from the Amato
4  investigation that William Keefe was reporting that
5  there were issues involving short staffing on the
6  shift that John Bolduc had been assigned to?
7    A. Again, I wasn't around. I was away on
8  vacation and I was put out, so I don't.
9    Q. You don't have any first-hand knowledge?
10    A. No.
11    Q. Now, with regard to the John Mayotte
12  incident of February 19, 2002, were you present when
13  John Bolduc was removing his jewelry?
14    A. For the piercings, yes.
15    Q. Where were you at the time?
16    A. Which time?
17    Q. When he was removing the jewelry from him?
18    A. The piercings I was behind the desk.
19    Q. So you were in the same room?
20    A. Yes, ma'am.
21    Q. What did you observe?
22    A. I observed him ask the detainee to take off
23  the jewelry. The detainee refused. John told him
24  that, listen, if you don't take it off, we're going

161

1  to cut it off. And subsequently the person said go
2  ahead. John cut one off.
3    Q. What did he cut off?
4    A. One piercings stud. Then told him again.
5  You know, you can take them off or it's going to be
6  cut off. Person again told him go ahead, you do it.
7  John cut the second one out. Finally, the person
8  said okay and took them out.
9    Q. What did they cut off first?
10    A. The piercings metal studs.
11    Q. Actually, I'll show you a photograph.
12  Referring you to Exhibit 1 from the Bolduc
13  examination. What did he cut off first?
14    A. It would be these two items here.
15    Q. Above Mr. Mayotte's left eye?
16    A. Correct.
17    Q. What did he use to cut them off?
18    A. Attempted a pair of ring cutters and ended
19  up using a pair of bolt cutters.
20    Q. How would you describe the term "bolt
21  cutters"?
22    A. Medium size, regular size bolt cutters.
23    Q. Which is how big?
24    A. About that big.

**PERLIK and COYLE REPORTING**
**1.413.731.7931**

Thomas V. Ralph
September 8, 2006

42 (Pages 162 to 165)

162

1    Q.  So about two and a half feet?
2    A.  I guess so.  I'm not sure.
3        MR. LICHTEN:  That's not two and a half
4  feet.
5    A.  I don't know.  My recollection -- they
6  showed me a pair at the commission.  I couldn't say
7  whether it was them or not.  It was a pair of bolt
8  cutters.  Bolt cutters are bolt cutters.
9        MS. LYNCH:  Looks like two and a half
10  feet to me.
11       MR. LICHTEN:  Obviously you don't jump
12  horses.
13    A.  Do you have a ruler?  Eight and a half by
14  11, not even a foot and a half.  That's eleven
15  inches that way; right?
16    Q.  You've got about two feet there now.
17    A.  No.  Not even close to two feet.  Want to
18  move that for me?  So less than 22 inches.
19    Q.  Okay.  So close to two feet?
20    A.  About 22 inches, less than two feet; best I
21  can do for you, ma'am, sorry.  Gave it my best shot.
22    Q.  Measuring is not your forte?
23    A.  Not at all.  Reason why I'm a cop.
24    Q.  After he cut off, was it two piercings?

163

1    A.  That's what I call them as far as I
2  remember them to be two piercings.
3    Q.  What else did he cut off?
4    A.  Nothing.  Person took the rest out.
5    Q.  You are saying he only cut off one thing?
6    A.  Two things, two piercings, then the person
7  took them out.
8    Q.  Did you think that that was inappropriate
9  that he used those bolt cutters?
10    A.  No, ma'am.
11    Q.  Have you ever done that?
12    A.  No, ma'am.
13    Q.  Have you ever seen anybody else do that?
14    A.  No, ma'am.
15    Q.  Do you think there was another way that he
16  could have done it that would have been less
17  invasive?
18    A.  Probably could have taken them up to the
19  hospital, but he did call EMS over.
20    Q.  Did Mr. Mayotte have any sort of open wound
21  laceration on his face at all?
22    A.  Not that I recall, no.
23    Q.  Do you recall that coming up as an issue,
24  that Mr. Bolduc stated that the EMTs wanted the

164

1  jewelry removed because he had some sort of an open
2  wound on his face?
3    A.  Yes, ma'am.
4    Q.  How did that issue come up?
5    A.  They were trying to find out exactly who
6  they were talking about.  And nobody was sure.  They
7  just said they were looking into people, rumors from
8  the department that people, the department was
9  looking into bolt cutters being used to take jewelry
10  off a person.  Different people called and said, you
11  know, do you know anything about this.  I didn't
12  recall the incident.  Somebody else, I forget, said
13  I think where the EMT had the jewelry cut off.
14  Sergeant Keefe called me at the time.  He said that
15  wasn't the incident.  Then subsequently I was
16  informed of the incident that was in question.
17    Q.  I'm sorry who is it that came up with the
18  idea that the EMT, it was someone involving the EMTs
19  and the facial laceration?
20    A.  Somebody.  I don't recall who it was,
21  ma'am.
22        (Marked, Exhibit 2, Report)
23    Q.  I'm showing you what's been marked as
24  Exhibit 2.  Have you seen that before?

165

1    A.  Yes, ma'am.
2    Q.  Is that your handwriting?
3    A.  No, ma'am.
4    Q.  Whose handwriting is it?
5    A.  I'm not sure.
6    Q.  Do you recognize that as William Keefe's
7  handwriting?
8    A.  I'm not sure what his handwriting looks
9  like.
10    Q.  Under what circumstances have you seen this
11  before?
12    A.  At the civil service hearing.
13    Q.  Did you at some point, perhaps on February
14  2, 2004, speak with William Keefe about the Mayotte
15  incident?
16    A.  Yes.
17    Q.  What do you recall telling him and what do
18  you recall him asking?
19    A.  Right here.  As I said, I don't know if it
20  was in that conversation or a subsequent
21  conversation that I was informed that that was not
22  the issue that -- the incident they were talking
23  about.
24    Q.  So you are saying that on February 2, 2004,

Thomas V. Ralph
September 8, 2006

**166**

1  you did report that the person had medical needs to
2  William Keefe and later -- then later you found out
3  that it was not the same person?
4      A. That's correct. Different incident.
5      Q. Do you have any idea what that other
6  incident was?
7      A. I don't.
8      Q. Now, it also says verbal statements
9  November 14, 15. Do you know what that pertains to?
10     A. I think it pertains to the Greenwood
11  incident.
12     Q. You don't think that has to do with the
13  Mayotte incident?
14     A. I don't believe so, no.
15     Q. Did you take verbal statements?
16     A. On the Mayotte? Or on the Greenwood?
17     Q. Start with the Mayotte?
18     A. No. I was present so I didn't take verbal
19  statements.
20     Q. You took verbal statements with regard to
21  the Greenwood incident?
22     A. Yes, ma'am.
23     Q. Who did you take them of?
24     A. Mike Kehoe and Tom Pysell and John Bolduc.

**167**

1      Q. Do you recall any other discussion with
2  William Keefe about either the Mayotte incident or
3  the Greenwood incident?
4      A. No, ma'am, just what's there. I don't
5  recall anything else.
6      Q. You weren't there for the Catherine Abbe
7  incident?
8      A. No. I was home on leave for that one.
9      Q. Did anyone that was present for the Jonah
10  Mayotte incident express disapproval of the way that
11  John Bolduc was removing the jewelry from him?
12     A. No, ma'am.
13     Q. That's to this day have you heard anyone --
14     A. Sergeant Keefe came a couple of days later
15  but he wasn't present at the situation. People that
16  were present that night, no one ever said anything
17  about the incident.
18     Q. To this day?
19     A. I don't believe there has ever been a
20  formal complaint issued to this day.
21     Q. How about informal?
22     A. As I said; Sergeant Keefe came to me, asked
23  me if I know what happened that night. I said I was
24  there. Subsequently, I determined that Officer

**168**

1  Kelley had gone to him and he went -- not liking my
2  response to it, went to Bergeron about it.
3      Q. You are referring to Sergeant Keefe?
4      A. Yes.
5      Q. Did Chief Bergeron speak to you as a
6  result?
7      A. No.
8      Q. How did you find out that he went to Chief
9  Bergeron?
10     A. He testified at one of the hearings.
11     Q. Okay.
12     A. That he went there.
13     Q. Did you ever speak with Chief Bergeron
14  regarding the Jonah Mayotte incident?
15     A. The next day.
16     Q. What did you discuss with him?
17     A. Told the chief that the piercings had been
18  cut off. EMS was called over. There were no
19  problems.
20     Q. Why did you speak to him about that
21  incident?
22     A. Just to let him know I was there, just
23  generally discuss anything that was going on in the
24  police department with him when I saw him.

**169**

1      Q. In other words, would you go through each
2  and every incident that generated a police report
3  with the chief?
4      A. No. But if I saw in the log that EMS was
5  called over for a prisoner, I'd tell him that EMS
6  was called over for a prisoner and this is what
7  happened.
8      Q. Anything else you would usually bring to
9  his attention?
10     A. A cruiser accident, you know, somebody was
11  injured, a radio was broken, somebody dropped a
12  radio, somebody dropped a radar gun and smashed it.
13  Somebody broke the cruiser. Somebody smashed a
14  radio, whatever, giving him a little heads up. He
15  would get the logs from the secretary as well.
16     Q. Did you tell him that John Bolduc used bolt
17  cutters to remove jewelry off of Mayotte?
18     A. Yes, ma'am.
19     Q. What was his response?
20     A. There was no response.
21     Q. Did you ever have any discussions with Mr.
22  Wrubaleski regarding the use of the bolt cutters?
23     A. No, ma'am.
24     Q. Or his statement that he gave to Sergeant

Thomas V. Ralph
September 8, 2006

44 (Pages 170 to 173)

|     | 170 |     | 172 |
|-----|-----|-----|-----|
| 1 | Keefe? | 1 | Q. Did you tell William Keefe that when Bolduc |
| 2 | A. I've never spoken to him about it at all. | 2 | was removing the jewelry either with the knife or |
| 3 | Q. Have you ever seen that statement that he | 3 | bolt cutters that you got your keys and left? |
| 4 | gave? | 4 | A. I told him in my statement after it was off |
| 5 | A. I was told about it by my attorney, but I | 5 | I got my keys. I'd come in to get my keys, which is |
| 6 | don't believe I've ever actually officially seen it. | 6 | the reason why I was there at night. So I got my |
| 7 | Q. Do you have any reason to believe that the | 7 | keys and heard a commotion down front. I went down |
| 8 | statement was altered or information was added to it | 8 | front and stood there while it occurred. And then |
| 9 | after Mr. Wrubaleski gave his statement? | 9 | with my keys I left. So it wasn't as though in the |
| 10 | A. My attorney, Jim Simpson, told me in the | 10 | middle of all this I said I'm getting out. Stayed |
| 11 | hearing -- | 11 | and watched it and then I left after it was all |
| 12 | MR. LICHTEN: Hold on. I don't want you | 12 | over. |
| 13 | to testify about anything Mr. Simpson told you. | 13 | Q. Did you ever tell William Keefe or anyone |
| 14 | A. Okay. No. | 14 | else that you did in fact leave, you didn't want to |
| 15 | Q. How about Mr. Milliard, did you ever see | 15 | be a part of it? |
| 16 | the statement he gave? | 16 | A. Oh, no, ma'am. |
| 17 | A. No, ma'am. | 17 | Q. Did you see John Bolduc use a knife to |
| 18 | Q. Have you received any information that his | 18 | remove any of Mr. Mayotte's jewelry? |
| 19 | statement was either altered or information was | 19 | A. No, ma'am. |
| 20 | added to it after he gave it? | 20 | Q. Now with regard to the Heath Greenwood |
| 21 | A. Again, just with the conversation with my | 21 | incident of November 9, 2002, were you present for |
| 22 | attorney back then. | 22 | that? |
| 23 | Q. What happened to the jewelry after it was | 23 | A. No, ma'am. |
| 24 | removed? | 24 | Q. When did you first hear about that? |

|     | 171 |     | 173 |
|-----|-----|-----|-----|
| 1 | A. It was put in a property bag. | 1 | A. Beginning to middle of November, probably |
| 2 | Q. You know for sure that it was inventoried? | 2 | around the 10th of November. |
| 3 | A. I don't know if it was inventoried. It was | 3 | Q. Who did you hear about it from? |
| 4 | put in a property bag. I don't know exactly what | 4 | A. Sergeant Bent. Now Chief Bent. |
| 5 | the inventory sheet said on it. | 5 | Q. What did he tell you? |
| 6 | Q. Should it have been inventoried if it was | 6 | MR. LICHTEN: Sorry, you said November |
| 7 | put in a property bag? | 7 | but not what year. |
| 8 | A. Yes. | 8 | A. About 2002. |
| 9 | Q. Just to be clear, you did not conduct any | 9 | Q. What did he tell you? |
| 10 | kind of an investigation of the Jonah Mayotte | 10 | A. He stated he wanted to let me know that |
| 11 | incident; is that correct? | 11 | Gevry, Officer Gevry had informally told him that |
| 12 | A. That's correct. I was there. | 12 | Bolduc had, you know, hit a prisoner, a handcuffed |
| 13 | Q. Did you stay there the entire time that he | 13 | prisoner. |
| 14 | removed jewelry from Mr. Mayotte? | 14 | Q. Hit a handcuffed prisoner? |
| 15 | A. I was there for piercings removal and then | 15 | A. Correct. The prisoner was handcuffed |
| 16 | the piercings and stuff were taken off and I left. | 16 | behind his back and Bolduc came in and hit him. |
| 17 | Everything was fine. The gentleman was calmed down. | 17 | Q. What did you do in response? |
| 18 | Q. Did you see John Bolduc cut his necklace | 18 | A. I told Chief Bent that I needed to look |
| 19 | off his neck? | 19 | into it. Whether it was informal or not, I needed |
| 20 | A. No, ma'am. | 20 | to look into it and determine what happened. |
| 21 | Q. At some point did you leave before all of | 21 | Q. Did Sergeant Bent tell you why he was |
| 22 | jewelry had been taken off that was removed? | 22 | telling you that? |
| 23 | A. As far as when I recall, all the jewelry | 23 | A. Not that I recall. He just said he was |
| 24 | was off. | 24 | letting me know. |

Thomas V. Ralph
September 8, 2006

45 (Pages 174 to 177)

174

1    Q.  In other words, did he ask you to look into
2  it?
3    A.  No.  He just said for my information.
4    Q.  What did you do in response?
5    A.  I interviewed officers, Officer Kehoe,
6  Officer Pysell when they were working.  I believe it
7  was that date there, the November 14 or 15, spoke
8  with both of them.  Then I spoke, subsequently spoke
9  with Sergeant Bolduc with union representation
10  present.  I spoke with town counsel as to how I
11  should proceed.
12    Q.  Which town counsel?
13    A.  Marc LaBella again.  So as not -- in case
14  there was any type of criminal wrongdoing, that I
15  wouldn't be giving him any type of immunity or
16  anything.  Then in December at some point in time I
17  met with John Bolduc, Jim Hoover, and gave John his
18  Miranda rights.  Asked him if he wanted
19  representation and asked him to speak to me about
20  what happened.
21    Q.  Sorry.  Who was present in that meeting
22  with Bolduc?  Hoover, Bolduc, and who else?
23    A.  Myself.
24    Q.  Just the three of you?

175

1    A.  Yes, ma'am.
2    Q.  How soon after the incident did Sergeant
3  Bent inform you that Gevry had complained about him?
4    A.  I'm not sure of when the incident occurred.
5    Q.  November 9, 2002?
6    A.  I interviewed them on the 14th so within a
7  couple of days of it happening.
8    Q.  Okay.  Why did you wait until December to
9  meet with Bolduc?
10    A.  I wanted to speak with town counsel.  I
11  believe there was some -- I was trying to get in
12  touch with Greenwood.  We just ended up being
13  December that we actually all met.  No specific
14  reason why.
15    Q.  Did you consider that to be serious
16  allegations against Sergeant Bolduc?
17    A.  I told him when we had the meeting with Jim
18  Hoover present that whether he's a friend of mine or
19  not, if in fact he hit a handcuffed prisoner,
20  there's nothing anybody will be able to do for him
21  and he's going to be in a lot of trouble.
22    Q.  You thought it was serious?
23    A.  Yes, ma'am.  You do not hit a prisoner.
24    Q.  In fact, you said you actually gave him his

176

1  Miranda rights; is that correct?
2    A.  That's correct.
3    Q.  What was discussed at that meeting with Mr.
4  Bolduc in December?
5    A.  His version of what happened.
6    Q.  What did he say?
7    A.  He said the dispatcher called over the
8  radio hysterical that there was a fight in the
9  booking room between officer and prisoner.  He came
10  in the room.  The prisoner had Officer Gevry up
11  against the wall and was choking him because he was
12  handcuffed in front.  John hit him and put him to
13  the ground.
14    Q.  And he used the word "hysterical" with
15  regard to the dispatcher?
16    A.  I think so.  He was upset.  It might be my
17  own word, but it's been a long time.
18    Q.  Do you recall who the dispatcher was?
19    A.  I do not, ma'am.  I believe it was a part-
20  time dispatcher, female, not sure of the name.
21    Q.  What did Kehoe tell you when you
22  interviewed him?
23    A.  Everything was over by the time he got in
24  there.

177

1    Q.  How about Pysell?
2    A.  Pysell said he was one step behind John.
3  John hit the prisoner once.
4    Q.  Did you keep any notes of your interviews
5  of Kehoe and Pysell?
6    A.  No, ma'am.  I just spoke with them
7  verbally.
8    Q.  How about Bolduc in December, did you keep
9  any notes of that?
10    A.  I'm not sure.  I'm not sure if I did.
11    Q.  How is it you could recall in February of
12  2004 that you spoke to Kehoe and Pysell on November
13  14 or 15?
14    A.  There was a murder, and I was guarding the
15  murder scene, waiting for the state police to come
16  back with search warrants.  Jim Hoover was there,
17  the union president was there and I was there; and I
18  needed to speak with these people and they were
19  working anywhere.  We called him up to, out in front
20  of the building and I spoke with them there.
21    Q.  Did you go back through your records to
22  find that?
23    A.  No.  I just remember that that is -- when I
24  just testified now?

Thomas V. Ralph
September 8, 2006

46 (Pages 178 to 181)

178

1    Q. Right.
2    A. It's right here. November 14 and 15.
3    Q. That's what I'm asking you. Given that
4  this note is made in February 2, 2004 and this
5  Greenwood incident occurred in November 2002,
6  assuming that you gave that information, that you
7  took statements on November 14 and 15, how is it
8  that you could remember it over a year later?
9    A. I guess I'm not sure. Do you mean right
10  now I'm testifying how do you remember it's the 14th
11  or 15th or how did I remember that I spoke --
12    Q. The latter, when you spoke to Sergeant
13  Keefe, how was it you could remember those dates if
14  you didn't keep any notes?
15    A. I don't believe I gave him specific dates.
16  I believe I said the night of the murder at Cross
17  Court.
18    Q. Is that your memory?
19    A. Yes.
20    Q. Do you remember if anybody else was there
21  when you spoke to them?
22    A. Just Jim Hoover because he was union
23  president.
24    Q. You said that Pysell told you that Bolduc

179

1  hit him once?
2    A. That's correct.
3    Q. Have you since seen his statement where
4  he's indicated that Bolduc hit him two to three
5  times?
6    A. Yes. I was shown it at the civil service
7  hearing.
8    Q. *Do you have any reason to dispute that
9  that's accurate, the two to three times?
10    A. I can only tell you what he told me, ma'am.
11  I'm not in any position --
12        MR. LICHTEN: You changed "who" to "he"
13  and I'm confused as to who. You said he told you it
14  was two or three times, and I don't know if you
15  identified who he was when you made your statement.
16        MS. LYNCH: That's what I was asking.
17        MR. LICHTEN: I'm talking to you -- when
18  you said the statement, you first said are you aware
19  -- can you read back the question she asked?
20        (*Question read)
21        MR. LICHTEN: It's not clear for the
22  record who he was in your question.
23        MS. LYNCH: Pysell.
24    Q. Let me ask you a different question. You

180

1  said you did see the statement, that Pysell
2  statement?
3    A. Yes, ma'am.
4    Q. That stated that Bolduc hit him two or
5  three times; is that correct?
6    A. That's correct.
7    Q. Do you have any reason to dispute that
8  Pysell did in fact give that statement that he hit
9  him two or three times?
10    A. He told me he hit him once. That's the
11  only information I can offer you.
12    Q. Did you make any effort to interview Mr.
13  Greenwood?
14    A. I attempted to locate a working number for
15  him and was unsuccessful.
16    Q. How did you go about locating him?
17    A. Checked the booking sheet, checked the
18  in-house computer. I believe I might have Googled
19  -- not Googled but the then equivalent of trying to
20  locate him and was unsuccessful.
21    Q. Did you check any of the -- to see if he
22  had been arrested or was in prison at all?
23    A. I believe he was out on a default, he was
24  out on default at that time, but it might be at a

181

1  later date in time. He did default. I believe it
2  might have been during that period of time.
3    Q. Other than your own efforts, did you ask
4  anyone else to try to find him?
5    A. No.
6    Q. Did you have a last known address for him?
7    A. Yes, ma'am.
8    Q. Did you go there and try to physically find
9  him?
10    A. No, ma'am.
11    Q. Any particular reason why you didn't?
12    A. It's an informal investigation. He didn't
13  come forward. Trying to figure out whether or not
14  the facts as they are presented by Officer Gevry are
15  true. That's all.
16    Q. Okay. Why didn't you interview Officer
17  Gevry given that he was the one that made the
18  allegations?
19    A. Because in an informal investigation you
20  don't have to interview the complainant, as long as
21  you know what the complainant complained about.
22    Q. When you say you don't have to interview
23  them as long as you know what they complained about,
24  what do you base that upon?

Thomas V. Ralph
September 8, 2006

47 (Pages 182 to 185)

---

182

1    A. The model policy that I followed.
2    Q. What is that?
3    A. I believe it's from the Mass. Chiefs of
4  Police Association. Their model policy.
5    Q. Is that what's it's called?
6    A. Yes. It's just a recommended policy for
7  the state. I believe it was the Mass. Chiefs of
8  Police one.
9    Q. If I wanted to go find it, what would I
10  look at?
11    A. Contact the Mass. Chiefs of Police, get
12  their model policies and get the one for internal
13  affairs.
14    Q. Are you basing that upon anything else that
15  you didn't have to interview them?
16    A. Just that, ma'am.
17    Q. Do you recall if that policy states that it
18  is recommended that you interview the person who was
19  making the complaint?
20    A. No. Just what I said to you. It says the
21  complainant doesn't need to be interviewed if you
22  know what the complainant complained about.
23    Q. Was it your decision not to interview Mr.
24  Gevry?

---

183

1    A. Mm-mm.
2    Q. Yes?
3    A. Yeah. I was doing the investigation.
4    Q. You didn't have any interest in finding out
5  firsthand what his allegations were?
6    A. I trusted Chief Bent's statement to me of
7  what happened.
8    Q. But do you consider somebody's demeanor
9  when you assess their credibility?
10    A. No. I know everybody involved. It's not
11  like I'm trying to assess the credibility because
12  I've never met them before. They are all police
13  officers. They should be all credible.
14    Q. Wouldn't it have been important for you to
15  listen to his version of what happened directly from
16  him?
17    A. I don't think so.
18    Q. Why not?
19    A. Because it's an informal investigation. If
20  it was a formal one, yes, definitely. Interviewed
21  everyone and gotten written statements from them.
22  We're determining whether or not a formal
23  investigation needs to go forward.
24    Q. Do you usually give someone their Miranda

---

184

1  rights when you are investigating them informally?
2    A. It was recommended by town counsel I give
3  him his rights.
4    Q. Who was that?
5    A. Marc LaBella.
6    Q. Did Officer Gevry ever make an attempt to
7  discuss the Greenwood incident with you?
8    A. No, ma'am.
9    Q. If you had wanted to interview Officer
10  Gevry, there was nothing preventing you from doing
11  that; is that correct?
12    A. That's correct.
13    Q. Why is it that you conducted that informal
14  investigation as you put it?
15    A. Chief Keefe was involved with some stuff
16  with SOU out in Charlton, and I had previously sent
17  him an e-mail asking him to spend more time at the
18  department so he wasn't around a lot, Sergeant Keefe
19  I should say.
20    Q. I was going to say because that was
21  November 2002?
22    A. Sergeant Keefe at the time.
23    Q. Sorry. Where was he again?
24    A. Charlton.

---

185

1    Q. In terms of the investigation that was
2  conducted, did you have any discussion about it with
3  Chief Bergeron?
4    A. Discussed what was going on with it and
5  discussed the findings and gave him the report.
6    Q. In other words, let me go back, before you
7  decided to conduct this investigation, did you have
8  any discussion about it with Chief Bergeron?
9    A. I told him I was going to look into it.
10  That was it.
11    Q. You said that, actually I think earlier
12  today, that Sergeant Keefe was in charge of internal
13  investigations?
14    A. Correct.
15    Q. But you decided to do this yourself?
16    A. He was off doing stuff with Charlton is the
17  reason I did it.
18    Q. How long was he off for?
19    A. He was going off quite frequently. As I
20  said, I send him an e-mail telling him he needed to
21  wrap up whatever he was doing in Charlton and spend
22  more time on the day shift, that we needed a day
23  supervisor.
24    Q. Was there anyone else that was involved in

---

Thomas V. Ralph
September 8, 2006

48 (Pages 186 to 189)

---

**186**

1  internal investigations?
2      A. No. Sergeants, various sergeants have done
3  them over the years prior to, but no.
4          (Marked, Exhibit 3, Report)
5      Q. I'm showing you what's been marked as
6  Exhibit 3. Can you identify that, please?
7      A. It's a report that I wrote and gave to
8  Chief Bergeron with regards to the Greenwood
9  incident. This actual copy is the one I gave to
10  Acting Chief Keefe.
11      Q. What do you mean?
12      A. It has his date when I turned it over to
13  him. I'm saying it's not the original one I gave
14  the chief. It's the copy I gave Sergeant Keefe,
15  Acting Chief Keefe.
16      Q. Are you certain that you gave it to Chief
17  Bergeron?
18      A. Yes, ma'am.
19      Q. Are you aware that Chief Bergeron testified
20  at his deposition that you never gave him that?
21      A. No, ma'am, I was not aware of that.
22      Q. It's dated February 26, 2003. Why did you
23  prepare that report so long after the incident of
24  November 9, 2002?

---

**187**

1      A. I had spoken to John Bolduc I believe in
2  the end of December, still was trying to see if we
3  could get in touch, find something with regards to
4  Greenwood. That not being done, I wanted to close
5  it out. And so I made the decision February to do
6  it.
7      Q. You'll notice the last paragraph on that
8  first page. It says "attempts to contact Mr.
9  Greenwood at his home in Worcester have been
10  unsuccessful." Can you state against what you did
11  to try to contact him?
12      A. I tried to find a phone number for him at
13  the residence we had on his booking sheet.
14      Q. Anything else?
15      A. No, ma'am.
16      Q. Any reason why you didn't make more of an
17  effort?
18      A. No. Just other than the fact that I tried
19  to contact him and was unsuccessful in contacting
20  him. He didn't come in on complaints. So I believe
21  he was on a default warrant so he's not going to
22  want to talk to me.
23      Q. In your usual police business, what other
24  avenues did you have available to you to try to find

---

**188**

1  someone?
2      A. The Internet, which, you know, calling
3  them, driver's license, just regular routine. If
4  somebody doesn't want to be found, they can't be
5  found.
6      Q. Did you run his social security number?
7      A. Can't do that.
8      Q. You can't?
9      A. No, ma'am.
10      Q. Why didn't you check the Internet for him?
11      A. I did. I said I Googled or used the
12  equivalent of what it was then. I said that
13  earlier.
14      Q. Try to contact any of his relatives?
15      A. No, ma'am.
16      Q. Any particular reason why not?
17      A. It would end up getting into, what, in my
18  opinion CORI information, information that's
19  privileged that I'm not entitled to release to other
20  people. If I call them up and say this is the
21  Webster Police Department, he was assaulted by a
22  police officer when he was arrested, it creates, in
23  my opinion, a legality issue. I tried to get in
24  touch with him and was unsuccessful.

---

**189**

1      Q. Is there any reason why you couldn't have
2  just called one of his relatives and said you were
3  trying to find him without revealing any information
4  protected by a CORI?
5      A. No, I guess not. Again, he's on default.
6  As far as I know, he's on default. He's not going
7  to come forward voluntarily.
8      Q. Do you know where he in fact was after the
9  incident of February 9, 2002? Have you ever found
10  out where he was?
11      A. No, ma'am. I don't know if he's still on
12  default. Actually, I think they did find him,
13  actually. I correct that.
14          MR. GREEN: For the record, it's
15  November 9.
16          MS. LYNCH: What did I say?
17          MR. GREEN: February 9.
18          MS. LYNCH: Sorry, it's November 9,
19  2002.
20      Q. Did Officer Gevry ever attempt to speak to
21  you about this incident?
22      A. No, ma'am.
23      Q. You indicate here at the bottom of Exhibit
24  3, "Chief, I would also recommend that the use of

---

# EXHIBIT 7

# Miniscript and Word Index

*THOMAS RALPH*

*VS*

*TOWN OF WEBSTER, ET AL*

*AND*

*JOHN A. BOLDUC, JR.*

*VS*

*TOWN OF WEBSTER, ET AL*

*DEPOSITION OF*

*BRIAN J. BARNES*

*AUGUST 24, 2006*

*Leavitt Reporting, Inc.*
*1207 Commercial Street, Rear, Weymouth, MA 02189*
*781-335-6791*

81

1 Commission was not appealed by you in court?

2    **A.** No.

3    **Q.** You also caused to be filed at one point a charge

4 of prohibitive practice at the Labor Relations Commission

5 alleging that things that happened to you were a violation

6 of Chapter 150E. Does that ring a bell with you?

7    **A.** I remember a lot of people were going back and

8 forth, but 150 doesn't ring a bell.

9    **Q.** Now, during the time that you -- strike that.

10          Have you ever used the word "nigger" in

11 reference to any person?

12    **A.** No.

13    **Q.** So that from the beginning of time until this

14 morning you've never used the word "nigger" to refer to any

15 person?

16    **A.** No, I don't use the term.

17    **Q.** Have you ever, at any time ever used the word

18 "chink" or "chinks" to refer to any person?

19    **A.** No.

20    **Q.** And similarly, have you ever used the word "spics"

21 to refer to any person of any type?

22    **A.** No.

23    **Q.** Never, ever?

82

1    **A.** Not to my knowledge.

2    **Q.** Do you deny using the three phrases that I just

3 conveyed to you at any time?

4    **A.** That's it, yea, three.

5    **Q.** You deny ever using those phrases?

6    **A.** Right.

7    **Q.** Do you recall if you ever had a discussion with any

8 officer in the Department regarding Martin Luther King Day?

9    **A.** Nope.

10    **Q.** You don't recall one way or another?

11    **A.** No.

12    **Q.** Do you ever recall referring to Martin Luther King

13 Day as a fake holiday?

14    **A.** No.

15    **Q.** Do you ever recall referring to Martin Luther King

16 Day as a nigger holiday?

17    **A.** No.

18    **Q.** Do you recall on January 21, 2003, ever using the

19 phrase "nigger holiday" with respect to Martin Luther King

20 Day?

21    **A.** Do I recall it? No.

22    **Q.** Do you deny using that phrase in connection with

23 Martin Luther King Day?

83

1    **A.** I deny it, right.

2    **Q.** And similarly, on January 22, 2003, did you use the

3 word "nigger holiday" in reference to the Martin Luther

4 King holiday?

5    **A.** I didn't use it.

6    **Q.** Now, there was a change in the law at some point in

7 time with respect to motor vehicle violations and a

8 requirement of putting racial information in connection

9 with that stop, do I have that right?

10    **A.** Right.

11    **Q.** And I phrased it very inartfully. Could you

12 explain to me what the law is that was changed?

13    **A.** The law is that you have to put on the citation

14 now, if I stopped you, I'd have to put white male, whereas,

15 we didn't have to put that before; it was optional. And so

16 if, but the law is you have to guess. You can't, I

17 couldn't ask you, if your name was David Rodrigues, I

18 couldn't ask you if you were Hispanic or not. I'd just

19 have to guess that you were or you weren't.

20    **Q.** And where is that information put approximately?

21    **A.** On the citation there's race boxes.

22    **Q.** So right on the citation there's a check box for

23 race?

84

1    **A.** Right.

2    **Q.** And is it the requirement that that box be checked

3 only when you give a citation?

4    **A.** Or a warning.

5    **Q.** So either a cite or a warning?

6    **A.** Right.

7    **Q.** Is there similar kind of information that has to be

8 conveyed if there's an arrest involving a motor vehicle?

9    **A.** A similar citation, right, the same citation, yea.

10    **Q.** So, for example, if I had committed a motor vehicle

11 offense that warranted my being arrested, there would be

12 information requested with respect to my race in that

13 circumstance?

14    **A.** Right.

15    **Q.** There would be information requested regarding my

16 race if I was issued a written warning?

17    **A.** Right.

18    **Q.** And similarly, with respect to a non arrestable

19 citation, there would also be a box for race?

20    **A.** Right.

21    **Q.** Now, in non motor vehicle arrest situations, is

22 information regarding race also obtained?

23    **A.** If we book a prisoner?

85

1    **Q.** Right.

2    **A.** We ask are you Hispanic, are you black, are you...

3    **Q.** So in every case where there is an arrest, there is

4 some information gotten about race?

5    **A.** Right, but you can ask in the booking process.

6    **Q.** And the difference being you can't ask in the motor

7 vehicle situation?

8    **A.** Right.

9    **Q.** Do you recall what the citation was to the law that

10 was changed; that is to say, do you know specifically what

11 Massachusetts General Law and what section we're talking

12 about?

13    **A.** No.

14    **Q.** How were you advised that there was a change in the

15 law?

16    **A.** Um, I think it was Sergeant Latour at the time,

17 he's retired now, called me in and said "We just got a call

18 you were top in the state for not filling out the race

19 form, the sex and the race on the tickets," and I said

20 "Well, it's optional," and he said "Yea, but that law

21 changed." And so he said "Make sure you fill this thing

22 out," and it was in front of the Chief at the time. And I

23 said "Okay, I'll fill it out." And at that point they gave

86

1 me the, they had a sticker or something that you could

2 write down codes for what the codes were supposed to be for

3 what race.

4    **Q.** They gave you a sticker?

5    **A.** Yea, it was like a little, like a cheat sheet or

6 something.

7    **Q.** Where did you put that?

8    **A.** In the cruiser.

9    **Q.** So your testimony is that prior to Sergeant Latour

10 telling you that there was a problem you were not aware

11 that there was a change in the law?

12    **A.** Yea, it just never -- I had been writing tickets

13 since 1997 and I never remember the actual law getting

14 changed on it.

15    **Q.** So you didn't receive any handout from the

16 Department?

17    **A.** No, I didn't receive any handout.

18    **Q.** You received no training is what you're saying?

19    **A.** No, we didn't get any training on that.

20    **Q.** So you were completely unaware that the law had

21 been changed until --

22    **A.** I knew it had been talked about but I didn't know

23 that the law had changed.

87

1    **Q.** You've been doing good.

2    **A.** Sorry.

3    **Q.** So your testimony is that you were completely

4 unaware that the law had been changed until Sergeant Latour

5 confronted you with respect to your application of the law?

6    **A.** Right.

7    **Q.** Prior to that day you had no idea at all from any

8 source whatever that the motor vehicle law had been

9 changed?

10    **A.** Right.

11    **Q.** Had that subject ever been covered in the

12 in-service training?

13    **A.** When, well, I never had it in in-service, no.

14    **Q.** Do you recall when approximately it was that

15 Sergeant Latour brought this to your attention?

16    **A.** I'm going to say it was around the end of 2001

17 maybe. Maybe the end of 2001. When I say that, the end of

18 the summer 2001.

19    **Q.** The end of the summer 2001?

20    **A.** Yea.

21    **Q.** Do you keep a diary of any kind?

22    **A.** No.

23    **Q.** Are there any documents that you are aware of that

88

1 exist that would shed light on when this conversation took

2 place with Sergeant Latour?

3    **A.** No.

4    **Q.** So Sergeant Latour brought you in before the Chief?

5    **A.** Right.

6    **Q.** And this would have been Chief Bergeron?

7    **A.** Right.

8    **Q.** And explained to you that you were the top in the

9 state and you needed to be applying the law?

10    **A.** Right.

11    **Q.** And you said you thought that it was optional?

12    **A.** Right.

13    **Q.** He said the law's changed?

14    **A.** Yea.

15    **Q.** And you said you'd follow it?

16    **A.** Right.

17    **Q.** Did he say who he got the telephone call from?

18    **A.** I think it was the Globe.

19    **Q.** The Boston Globe?

20    **A.** Right.

21    **Q.** Were other officers in the Department applying the

22 law as it had been written?

23    **A.** There were others in the Department that hadn't

89

1   filled out the amount of, you know, the check boxes, but I
2   was the highest ticket writer in the Department by a long
3   shot.
4       **Q.** Were others brought in to the Chief?
5       **A.** They didn't share that information with me.
6       **Q.** So you're unaware --
7       **A.** I'm unaware of that.
8       **Q.** -- as to whether that happened?
9       **A.** Right.
10      **Q.** Were there officers who were applying the law?
11      **A.** I would imagine.
12      **Q.** Well, did you ever talk to anyone after this
13  happened as to, to talk about your responsibilities here?
14      **A.** Other than Sergeant Latour, I don't really think
15  so.
16      **Q.** Did an article appear in the Globe?
17      **A.** Yes, it did.
18      **Q.** In relation to your conversation with Sergeant
19  Latour and the Chief, when was it that the article
20  appeared?
21      **A.** Right around the same time.
22      **Q.** Would it have been shortly after?
23      **A.** Right.

90

1       **Q.** Did the Globe interview you?
2       **A.** I think they did. I think they called him on it
3   and wanted to know why I was the highest.
4       **Q.** Do you recall what you said to the reporter?
5       **A.** I don't. I mean I remember talking a little bit to
6   him but I don't remember the exact statements. I remember
7   telling him that, you know, it was for all people; it was
8   not just, you know, minorities or anything else; there were
9   no boxes filled out. It was my error that I didn't fill
10  them out for anybody, male or female.
11      **Q.** Do you recall telling the reporter anything else?
12      **A.** I don't remember that. It's been a while.
13      **Q.** Were you quoted in the article?
14      **A.** I don't remember.
15      **Q.** Did you ever indicate to anyone that any quotations
16  in the article that did appear were inaccurate?
17      **A.** To be honest, I don't remember the article.
18      **Q.** Apart from whether you remember the article, did
19  you ever complain to the Globe that you were not quoted
20  accurately?
21      **A.** I don't remember.
22      **Q.** Did you ever complain to anyone in the Department
23  or tell anyone in the Department that the quotes that were

91

1   in the Globe were inaccurate?
2       **A.** Again, I don't remember.
3       **Q.** At about the same time was there something that
4   happened in New England Cable News?
5       **A.** Right. They called me and asked me to do an
6   interview with them regarding this.
7       **Q.** And was that an interview or actually a show?
8       **A.** I thought it was an interview but it was one of
9   those sit around the table things.
10      **Q.** So did you go down to NECN?
11      **A.** I did.
12      **Q.** And this was over in Needham?
13      **A.** Right.
14      **Q.** And are you saying that when you showed up in
15  Needham it was the first time you realized that this was a
16  show and not an interview?
17      **A.** Right.
18      **Q.** You thought that people that were interviewed by
19  the television station go to the television stations for
20  their interviews?
21      **A.** Like I said, they called up and asked the Chief and
22  Tom Ralph at the time, and they said go ahead, you know, so
23  I went down there.

92

1       **Q.** Do you remember you talked to a producer before you
2   went down there?
3       **A.** I don't remember who it was.
4       **Q.** Was the person you talked to a man or a woman?
5       **A.** I don't remember.
6       **Q.** Do you remember that there was sort of a
7   preinterview during that conversation you had?
8       **A.** I don't.
9       **Q.** You don't remember anything about that?
10      **A.** I don't remember. I remember going to Needham but
11  until you mentioned Needham I wouldn't have even remembered
12  it was in Needham.
13      **Q.** So you showed up in Needham thinking that you were
14  going to be interviewed?
15      **A.** Right.
16      **Q.** And when you got to Needham found out that you
17  were going to be a guest on a talk show?
18      **A.** Right.
19      **Q.** Do you remember who the host was?
20      **A.** I know who he is to look at. You know, I don't
21  remember his name but I know he's got a regular show.
22      **Q.** Could you describe him?
23      **A.** He's got white hair, younger guy but like with

93

1  white hair.

2      **Q.** Do you remember if his name is Jim?

3      **A.** I don't remember, but he's on, he's still on TV; I

4  can hear his voice.

5      **Q.** Did you talk to the person at the station that you

6  had talked to by phone?

7      **A.** I don't remember. I remember I got there, it was

8  kind of closed up at night. There weren't many people in

9  the building.

10     **Q.** You were dressed in a suit and tie?

11     **A.** No, I had my uniform on.

12     **Q.** What was your reaction when you found out that you

13  were going to be on a talk show?

14     **A.** Well, like I said, there was another chief there,

15  and I didn't realize, you know, that they were going to

16  pick me to sit with another chief and a senator that was

17  there.

18     **Q.** And would you tell us who the senator was?

19     **A.** Wilkenson.

20     **Q.** And she's a female?

21     **A.** Right.

22     **Q.** And do you remember her first name?

23     **A.** I don't remember it.

94

1      **Q.** Do you remember where she's a senator from?

2      **A.** She's in Boston.

3      **Q.** And how would you describe her?

4      **A.** She's a black woman. She showed up with her, I

5  think it was her son and her grandson or something.

6      **Q.** Did you have any misgivings when you found out that

7  this was going to be a show rather than an interview?

8      **A.** I don't remember. I just know I was nervous. It

9  was my first time doing any TV thing.

10     **Q.** And you did the show?

11     **A.** I did.

12     **Q.** Do you remember anything you said on the show?

13     **A.** I don't remember but, specifically I remember

14  talking about, you know, that, you know, I think I

15  mentioned something about the license if, you know, if they

16  wanted you to record the information on the ticket why not

17  put it on the license rather than have to make a guess at

18  who somebody is or isn't.

19     **Q.** Do you remember whether or not the subject matter

20  of your not being aware of the law ever came up?

21     **A.** I don't remember.

22     **Q.** Do you remember saying during the interview that

23  this happened because you were not made aware of the change

95

1  in the law?

2      **A.** I don't remember.

3      **Q.** Do you remember saying the opposite, that you were

4  aware of the law but didn't want to apply the law as

5  written?

6      **A.** No, I knew that the law had been talked about, but

7  I didn't know that it actually came down.

8      **Q.** Do you remember saying at the interview anything

9  like you disagreed with the law's requirement that you make

10  a guess as to the race of the person stopped?

11     **A.** Right, I do disagree with that.

12     **Q.** And do you remember saying in substance that you

13  were aware of the change in the law but that you disagreed

14  with the obligation to guess?

15     **A.** I don't, like I said, I never saw anything come

16  down. I remember it being talked about that you were to

17  guess on that...but you couldn't talk...But as far as like

18  seeing anything come down, I never got anything in person

19  and, but I mean I still kind of disagree with guessing on

20  somebody.

21     **Q.** I just want to make sure that I have it right --

22     **A.** Right.

23     **Q.** -- so that I'm not confused.

96

1      **A.** I never watched the interview to be honest with

2  you, so I don't remember it.

3      **Q.** But you were there?

4      **A.** I was there but it was a long time ago. I don't

5  remember it.

6      **Q.** I just want to make sure that I'm not confused.

7      **A.** Okay.

8      **Q.** As I understand your testimony, your testimony here

9  today was that you were not aware that the law had been

10  changed prior to the time that Sergeant Latour brought you

11  into the Chief, do I have that right?

12     **A.** Right.

13     **Q.** Is that your testimony?

14     **A.** Right.

15     **Q.** Now, do you recall whether or not during the

16  interview you said in substance that you were aware that

17  the law had been changed but that you disagreed with the

18  obligation imposed on police officers to guess as to a

19  person's race?

20     **A.** Well, when I went in with Sergeant Latour, I still

21  disagreed with him even though the law was right there; he

22  showed it to me. And when I went to the interview, I still

23  disagree with the way the law is written, and that, you

97

1  know, I should be made to guess, so when I went for the
2  interview, it would have been the same thing, but.
3      **Q.** Well, again, I want to make sure that I'm not
4  confused.
5      **A.** Right.
6      **Q.** Do you recall if you said during the interview that
7  you were aware that the law had been changed all along but
8  that you disagreed with the obligation imposed on police
9  officers to make a guess as to the race of the person
10 stopped?
11     **A.** I don't recall the interview.
12     **Q.** But you do recall expressing the opinion as of the
13 date of the interview that you disagreed with the law as
14 written?
15     **A.** Right.
16     **Q.** Now, would you tell us who the police chief was who
17 was present?
18     **A.** I don't remember his last name, but he was kind of
19 a big-wig with the chiefs I know that.
20     **Q.** He was there on behalf of the Massachusetts Chiefs
21 of Police Association?
22     **A.** That's right.
23     **Q.** And do you remember that his name was Merrick?

98

1      **A.** Merrick, that's it.
2      **Q.** And you agree with that?
3      **A.** That's it, Merrick.
4      **Q.** He was Chief Merrick?
5      **A.** Right.
6      **Q.** And he was an official in the Massachusetts Police
7  Chiefs Association?
8      **A.** That's right.
9      **Q.** Do you know what his role was in the Chiefs
10 Association?
11     **A.** I don't know.
12     **Q.** Do you know where he was chief?
13     **A.** It was either Plainfield or Plainville, one of the
14 two.
15     **Q.** Did you and he talk before the interview or the
16 show?
17     **A.** I did. We were in a conference room like this.
18     **Q.** Was Diane Wilkenson in the conference room with
19 you?
20     **A.** Not at that time. She had been in and out and
21 there was a little kid running around so she was kind of
22 attending to him.
23     **Q.** Did you talk to Chief Merrick --

99

1      **A.** I did.
2      **Q.** -- after the show?
3      **A.** Before the show.
4      **Q.** Did you talk to him after the show?
5      **A.** Not that I remember.
6      **Q.** Did you know Senator Wilkenson before this show?
7      **A.** I had heard, you know, about her in the newspapers.
8      **Q.** What had you heard about her in the newspapers?
9      **A.** She doesn't pay her taxes.
10     **Q.** Did you hear anything else?
11     **A.** No, just...
12     **Q.** How did you feel when you learned that she hadn't
13 paid her taxes?
14     **A.** As an official, you know, I didn't, I couldn't
15 believe it.
16     **Q.** So it would be fair to say you didn't like her
17 before you met her?
18     **A.** Not that I didn't like her but it was kind of odd
19 that a politician wouldn't pay her taxes.
20     **Q.** You thought that she was a law breaker?
21     **A.** No, I wouldn't say that I mean.
22     **Q.** Well, she was sentenced for breaking the law,
23 right?

100

1      **A.** Well, I mean I don't think she was a career
2  criminal or anything.
3      **Q.** But you knew that she didn't pay her taxes?
4      **A.** Right.
5      **Q.** Had she been convicted of that crime at that time
6  or --
7      **A.** I don't --
8      **Q.** -- was that just an accusation?
9      **A.** I just remember seeing it in the paper.
10     **Q.** Did you and Chief Merrick talk about Senator
11 Wilkenson at all?
12     **A.** Um, when I shook his hand, I went in and it was
13 dark in the studio, in the conference room there, and I
14 just said "I'm Brian Barnes, I'm from the Webster police,"
15 and I said "I'm a patrolman there." I said "They called me
16 up and asked me to do this interview." He said "I'm Chief
17 Merrick," and I said "I didn't know it was going to be like
18 this," I said, but I said "I don't know if you're on the
19 same page here or if you're here to chastise me or
20 whatever," and he said, he made a comment about her.
21     **Q.** And what do you say that -- now this is Chief
22 Merrick, right?
23     **A.** Merrick, right.

# EXHIBIT 8

COMMONWEALTH OF MASSACHUSETTS
BEFORE THE MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

I, Robert J. Miller, being duly sworn hereby depose and say as follows:

1.  I reside on Pebble Beach Road and School Street, Webster, Worcester County, Massachusetts, 01570.

2.  I am the Chairman of the Board of Selectmen for the Town of Webster.

3.  Sometime during the end of May 2003 to early June 2003 Mr. John Paul (JP) Stevens came to my place of business on School Street.

4.  Mr. Stevens informed me at this time that both Chief Richard Bergeron and Mr. Alfred Beland stopped by his residence on Hall Road while he was washing his vehicle.

5.  Mr. Stevens stated that the Chief and Mr. Beland asked him if he had any negative information he could give them concerning Deputy Chief Ralph and Sergeant Bolduc.

6.  Mr. Stevens went on to state that he was offered his position back on the reserve police department if he gave a statement against either Ralph or Bolduc.

7.  Mr. Stevens informed me that he told the Chief and Mr. Beland that he did not have any information to provide them.

8.    Mr. Stevens told me at this time that the visit by the Chief and Mr. Beland

lasted approximately fifty-six (56) minutes.

Signed under the penalties of perjury this _22nd_ day of October 2003.

Robert J. Miller

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss

As subscribed and sworn to before me at Webster, Massachusetts on this _22nd_
day of October 2003.

Notary Public
My Comm. Expires:

SHERRIE L. CONDOS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 26, 2009

# EXHIBIT 9

Thomas V. Ralph
11 Chestnut Hill Drive
Webster, MA 01570

April 15, 2003

Richard E. Bergeron, Jr.
Chief of Police
Webster Police Department
57 Thompson Road
Webster, MA 01570

Dear Chief Bergeron:

This letter is written as a formal compliant against Officer Brian Barnes. Officer Barnes has acted in a manner that is racist, slanderous and libelous. In my opinion Officer Barnes is not worthy to wear the uniform of a police officer. It is unfair to the residents of this community and the other Webster Officers to allow him to continue on in this manner.

Officer Barnes has, while in uniform and on duty, made racist statements in public by referring to blacks as "niggers", Hispanics as "spics" and Asians as "chinks". All of these statements have gone without repercussion despite the fact that they are illegal, conduct unbecoming and in violation of department rules and regulations, as you believe that they are acceptable because Officer Barnes gives the department "110%".

In the beginning of this year the Webster Police Department received negative publicity throughout New England in various newspapers and on television stations such as New England Cable News regarding Officer Barnes being the number one Officer in the state failing to comply with the state mandated racial profiling law. While even at this meeting Officer Barnes informed many persons at the Webster Police Department that Senator Diane Wilkenson was nothing more than a "dumb nigger".

These type of remarks bring the police department into a negative light. I have remained obedient to your requests to leave him alone during this time. However, I can no longer follow your directives with regards to Officer Barnes.

My attempt to exercise managerial control over Officer Barnes has resulted in numerous and widespread libelous and slanderous remarks by him towards me personally and professionally. Officer Barnes has publicly disseminated department wide emails commenting on everything from my attire to my managerial ability and gone so far as to accuse me of providing oral board questions to Sgt. Bolduc prior to the sergeant's oral boards.

When Officer Barnes first made the unfounded accusations against me you informed me to deal with it "before we both lose our jobs". I attempted to inform the Town Administrator to request a hearing, but was told by you not to speak to anyone about this. You also told me to meet with Officer Barnes and attempt to pacify him. As a result, Officers Barnes, Hoover and Shaw along with myself met in cruiser 536 that Saturday night. This meeting failed to produce any positive results. At the meeting I listened to Officer Barnes and answered all of his accusations. He concluded by informing the persons in that vehicle that he would no longer respect me and would do anything in his power to prevent me form advancing within the department. However, he refused to make a formal complaint allowing the issue to be investigated and a hearing held.

Despite your statements that I need to settle these issues with Officers Barnes, I cannot. Officer Barnes' racial remarks to personnel at the town hall, the school and the police department are unprofessional and illegal. His libelous and slanderous statements against me can no longer go unanswered.

A formal response from you is expected within the next fourteen days. Failure to have an adequate response will force me to pursue just and proper intercession from outside agencies.

Respectfully,

Thomas V. Ralph
Deputy Chief of Police

**EXHIBIT 10**

# AFFIDAVIT

I, Michael D Kehoe, being duly sworn hereby depose and say, that I am employed as a police officer for the Town of Webster, Massachusetts. This is a position that I have been in since January of 1998. I have been the department's Motor Vehicle Accident Investigator for the past 4 years.

That, in April 2003 around the 15th of the month I was at the Webster Police Department working in my capacity as a patrolman.

That, while I was working at the department's photocopier (which is located outside Chief Bergeron's Office) I heard the Chief yelling and screaming from inside his office.

I could hear the Chief yelling but I was unable to understand what he was saying or who he was yelling at in his office.

The door then opened up and I say Sgt. Bolduc standing at the Chief's door. I was unable to see anyone else was in the office. I do not know if anyone else was in the office besides the Chief and Sgt. Bolduc.

Sgt. Bolduc and I looked at each other when he opened up the door but I did not say anything to him. I did not speak to the Chief either. Sgt. Bolduc then closed the door.

Signed under the penalties of perjury this _____9_____ day of
_OCTOBER_____ 2003.

_____
Michael D Kehoe

Commonwealth of MA

Worcester

Then personally appeared Michael D Kehoe
And acknowledged the foregoing to be his free act
And deed this 9th day of October, 2003

_____, Notary Public

# EXHIBIT 11

TO: Steven Boudreau, Webster Town Administrator

FROM: Webster Police Sergeant John Bolduc, Jr.

DATE: May 15, 2003

Re: Intimidation complaint

Sir:

This is to inform you that I have filed an intimidation complaint with the Massachusetts Commission Against Discrimination (MCAD). I believe that I have been and continue to be the target of retaliation by Webster Police Chief Richard Bergeron, Jr., as I have been identified as a witness in a pending MCAD Investigation.

I am also appealing to you for relief as I anticipate further negative actions on the part of Chief Bergeron. Please consider the attached three-page narrative as evidence of said retaliation.

I will make myself available to you should you want to speak with me or if you require more information. You can reach me at 508-943-9907 (home) or ~~508-326-1045~~ (cell).

## Complaint Narrative

On Tuesday 04/15/03 at approximately 15:35 hours I stopped at Chief Bergeron's office. His office door was open. He was seated at his desk. I lightly knocked on his door as I entered his office. As I entered I asked, "Chief, can I have a couple of minutes?"

He immediately stood up and removed his eyeglasses. It was obvious to me by his appearance and demeanor that he was very angry. As I stood across the desk from him, he snapped, "You got no fuckin' loyalty. You walk around with your tongue stuck up the Deputy Chief's ass because you think he's going to be the fuckin' Chief and you're going to end up with a good job. Let me tell you something, he's not going to be the Chief here. He's got no balls. He sends out emails, memos, and policies then he runs away and fuckin' hides. And you, you'll never be a Chief. You got more balls than you got brains. I got one guy with no balls and I got one guy with too much balls. Your friendship, support, and loyalty of the Deputy Chief is going to cost you."

I did not respond right away as I was taken by surprise. Chief Bergeron then picked up a letter from his desk. He held it in front of me. He asked, "Did you know about this? You must have collaborated on this. He didn't do this on his own. He must have told you about this."

I responded with, "Chief, what is it?"

He then handed me the letter and instructed me to read it. As I read it I learned that it was a letter from Deputy Chief Thomas Ralph to Chief Bergeron regarding Officer Brian Barnes. The nature of the letter was a complaint against Officer Barnes outlining incidents of racial bigotry. I informed Chief Bergeron that this was the first I knew of the letter. Chief Bergeron then informed me that the language used in the letter was "downtown." He took exception with a section in the letter, which requested a response within fourteen (14) days of receipt. He then informed me, "That's a Stankiewicz trick."

My only response was, "Chief, I don't know."

He was also angry because he stated that he could not contact Deputy Chief Ralph after he (Ralph) gave him (Bergeron) the letter. I then tried to explain that Deputy Chief Ralph, Officer Derrick Stokes, and I had met with John Bish at his (Bish) office in the East Brookfield Courthouse, then the four of us went to lunch together, and that East Brookfield and Spencer are out of portable radio range and provides an incredibly poor Nextel signal. Chief Bergeron then called me a liar and told me to not try to cover for him (Ralph).

It was at that point that the conversation became unpleasant from both of us. The conversation, heated at times, lasted until approximately 18:05 hours. After exiting the Chief's office, I left the station.

On or about Thursday 04/17/03 Deputy Chief Thomas Ralph informed me that he was ordered to supply Chief Bergeron the names of all witnesses, in writing, in the complaint against Officer Barnes. He further informed me that my name would appear on the list as a witness.

On Thursday 05/01/03 at approximately 16:30 hours I stopped at Chief Bergeron's office to brief him on an investigation that Officer Stokes and I were working. I knocked on his door, which was open, however this time I asked permission to enter before doing so. He told me to enter. Once inside he said, "So I guess you feel threatened huh? I understand that I threatened you? How did I threaten you?"

I reminded him that he informed me that my friendship, support, and loyalty to Deputy Chief Ralph were going to cost me. He then said, "Oh yeah? Cost you how?"

I replied, "I don't know Sir. Those are your words, not mine."

He then said, "So you think Brian Barnes is a racist. Have you ever heard him say anything racist? Labeling someone a racist is a big problem. Going to paper and calling someone a racist is a big problem. If I asked you if you ever heard Brian Barnes make any racial comments, what would you say?"

I answered, "Yes. I have."

He snapped, "Then you're the only one. You're the only person I have talked to that has said yes. I've talked to people at the school, business people, everyone. You're the only person. I want a written statement. I want names, I want dates, I want times. I want it in writing."

I then said, "Chief, there are other people, but they're not going to tell you. People are afraid of you. People are afraid that if they say yes, you'll jump all over them."

The Chief replied, "Oh yeah? Who? Give me some names. Like who?"

I said, "Your secretary (Lee Olmstead), Pam Leduc (Town Accountant), Heidi, though she'd never admit it (Town Administrator's Secretary), Phil Charbonneau (Junior High School Principle)."

He then ordered me to put it in writing.

On Monday 05/12/03 at approximately 14:30 hours Chief Bergeron came to my office located in the lower level of the station. As I was conversing with Officer Stokes, Chief Bergeron entered and said, "John, I told you to write a narrative regarding the complaint against Brian Barnes. Did you do it?"

I informed him that I had, I took it from a folder, and handed it to him.

He read it and then said, "Billy (Sgt William Keefe) complained to me that he is having scheduling problems. I'm pulling both of you back into the rotation (meaning that Stokes and I are to report to our uniformed patrol duties).

I responded, "Okay. Effective when Sir?"

He replied, "Immediately." He then left my office.

Officer Stokes then said, "It's a good thing you did it. He didn't look happy."

*It should be noted that I had a conversation with Sgt. Keefe on Thursday 05/08/03 about the rotation schedule. At that time we agreed that if there were a day that the 11:00pm to 7:00am shift was short personnel, Stokes and I would report for duty on said shift and then resume our investigation when able.*

*It should be further noted that the aforementioned investigation is the Andrew Amato case. It is a 25 year-old missing child cold case. I have been the lead investigator on this case since 1997. It has been past practice that as new leads develop; I work the case until said leads are exhausted. It is at this time that Officer Stokes and I have a series of confessions and a general burial site. This is the most advanced this case has ever been to date.*

After I had left the station, I telephoned Chief Bergeron and asked him if Officer Stokes could finish out the week on the Amato case and that I would return to uniform patrol duties. He agreed.

On Wednesday 05/14/03 I learned that Chief Bergeron and Webster Reserve Police Officer Alfred Beland met with John Stevens. Stevens is a former Webster Reserve Police Officer  Stevens is currently employed as a Massachusetts State Police Dispatcher and is a Southbridge (MA) Reserve Police Officer. Stevens will testify that Chief Bergeron and Beland offered to reinstate Stevens as a Webster Reserve Officer if he was able to provide them with any negative information concerning Deputy Chief Ralph or myself.

I am convinced that the actions of Police Chief Richard Bergeron are strictly retaliatory against me for bearing witness against Officer Brian Barnes, for supporting Deputy Chief Thomas Ralph, and further, that the information contained in the aforementioned narrative clearly support such claim.

Respectfully submitted,

Sgt. John Bolduc, Jr.

3

# EXHIBIT 12

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place , Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

---

MCAD DOCKET NUMBER: 03BEM01122          EEOC/HUD CHARGE NUMBER: 16CA301562
FILING DATE: 05/01/03                                    VIOLATION DATE: 05/01/03

---

Name of Aggrieved Person or Organization:
Thomas V. Ralph
11 Chestnut Hill Dr.
Webster, MA 01570
Primary Phone: (508)949-7976 ext. _____


---

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Town of Webster Police Department
C/O Town Administrator
Town Hall
Main Street
Webster, MA 01570
Primary Phone: (508)949-3800 ext. _____

Richard  Bergeron, Jr.
Town of Webster Police Department
57 Thompson Road
Webster, MA 01570
Primary Phone: (508)943-1212 ext. _____


No. of Employees:          25+

Work Location: Webster

---

Cause of Discrimination based on:
Other, Paragraph 4, Retaliation.

---

The particulars are:
I, Thomas V. Ralph, the Complainant believe that I  was discriminated against by Town of Webster Police
Department, Richard  Bergeron, Jr., on the basis of Other. This is in violation of M.G.L. 151B Section 4
Paragraph 4 and Title VII.

I have been employed by Respondent for seven years, most recently as Deputy Chief of Police.  I have
always performed my job well and have never had any previous disciplinary problems.  On or about April
15, 2003 I filed a formal complaint with the Chief of Police against Officer Brian Barnes after other
officers had complained to me about his use of racially derogatory statements.  The basis for the complaint
was that on numerous occasions, Officer Barnes has referred to African Americans as 'niggers', Asian
Americans as "chinks", and Hispanic people as 'spics'.  I also stated that Officer Barnes is non-compliant
with the Racial Profiling law, which requires Officers to state the race of the operator when they stop a
vehicle.  Immediately upon handing Chief Bergeron the formal complaint, I was told to leave the station.
Upon information and belief, Bergeron and Barnes are close friends.  Chief Bergeron brought Officer
Barnes with him when he transferred from the Quincy Police Department.  After I was told to leave the
station, I went to the Town Administrator, Mark Stankiewicz, but it was his last day.  He told me that there
was nothing he could do for me at that point.  I then went to Worcester to find Sergeant Budrow (next in

line to me) to inform him of the situation. I was unable to find him and returned to the station after attending an unrelated meeting. When I got to the station, Chief Bergeron ordered me to turn in my vehicle (which I have had for over 6 years). In fact, the board of selectman has required that the Deputy Chief of Police be issued a vehicle. I went home an hour and a half early that day because the situation made me feel sick. I also took two personal days and one owed day (time off for previously worked time) off. For the first time in my career, Chief Barnes questioned me about who authorized this time off. On or about April 16, 2003, I faxed a letter to Chief Bergeron inquiring about my status. I received a letter the next day from Bergeron stating that my status was undecided and under investigation. Chief Bergeron left on vacation and I returned to work. I was told from several officers that Bergeron had told Barnes to inform the Department that one of my subordinates, Sergeant Keefe had been left in charge. The investigation that I am under stems from a two month old allegation. Officer Barnes has alleged that I gave the answers of a placement test to a candidate for Sergeant the night before he was to take the test. The test was in or about June 2002, and the allegations came up in or about March 2003. Officer Barnes made these allegations after I had reprimanded him on an unrelated matter. Nothing was done, and Chief Bergeron told me that he wanted nothing to do with the allegations. However, after I lodged a formal complaint against Officer Barnes, the allegations conveniently became important to Chief Bergeron. Further, there is no formal complaint lodged against me to this day, yet I am being investigated while Barnes is not. I have been told from people within the Police Department and a member of the Board of Selectmen that Chief Bergeron is looking for ways to have me demoted and possibly terminated. I believe that this adverse action is in retaliation to the formal complaint I lodged about Officer Barnes' inappropriate and racially derogatory statements

------------------------------------------------------------

_(Signature of Complainant)_

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 5/1/2003.

NOTARY PUBLIC: _Jeannine Rice_

SIGNATURE NOTARY PUBLIC: _[signature]_
MY COMMISSION EXPIRES: _7/05/09_

# EXHIBIT 13

## AFFIDAVIT OF EARL BURGESS

Now comes Earl Burgess of _Woodstock_ Connecticut and does hereby depose and say:

1. On or about June ____, 2003 I was contacted by the Connecticut State Police and given a telephone number for the Webster Police Department and was asked to call. I was told it was important. I did. The number was Chief Bergeron's personal cell phone number. I spoke with the Chief and offered to come to the station. The Chief said not to come to the station and asked that I meet with him behind the Empire Wok restaurant on Rte 12. I agreed to do so.

2. I did meet with Chief Bergeron and another man I believe was a police officer in the parking lot of the Empire Wok restaurant in Webster, Mass.

3. Chief Bergeron asked if I was aware of any drug use, specifically cocaine, by John Bolduc. I explained that I had only seen him twice when I was working and that he sat at the bar and was fine. He was off duty and not in uniform. I told them I had no knowledge of Bolduc using drugs and had not heard from anyone that he had.

4. I know John Bolduc from seeing him occasionally after being introduced to him by Officer James Hoover of the Webster Police Department. We are not close friends but friendly. We would talk about motorcycles. I would see him occasionally at a bar owned by Bob Zeleski where I worked.

5. After being asked repeatedly I told Chief Bergeron and the man with him that I had no knowledge of any sort of illegal activity on the part of John Bolduc.

Signed under pains and penalties of perjury this _13th_ day of _Dec._ 2006.

_Earl Burgess Jr._

# EXHIBIT 14

CIVIL SERVICE COMMISSION


JOHN BOLDUC,                    )
        Appellant              )
                               )
vs.                            )
                               )
TOWN OF WEBSTER                )
        Respondent             )


HEARING:   BEFORE HEARING OFFICER, ROBIN

LEAL, TOWN ADMINISTRATOR OF THE TOWN OF WEBSTER at

the Webster Town Hall, Webster, Massachusetts on

March 10, 2004 regarding an Investigation of

Excessive and Unnecessary Use of Force by Sgt. John

Bolduc.

1    this hearing and these proceedings and serve

2    only as an attempt to further cloud the issue.

3    Therefore, I move that it be stricken.

4    However, if it is not to be stricken, I want my

5    objection on the record.  And I have no

6    questions or this witness.

7            HEARING OFFICER:  I'll sustain the

8    motion.  Please strike the testimony of this

9    witness from the record.  That would be all.

10           MR. BROWNE:  You're striking the

11   testimony?  Just for the record, I am like zero

12   for twelve now on objections.  I would like to

13   call Tom Piesel.

14           HEARING OFFICER:  Please state your

15   name.

16           THE WITNESS:  Thomas E. Piesel.

17   (Witness sworn.)

18

19           WITNESS:  THOMAS PIESEL

20   DIRECT EXAMINATION BY MR. BROWNE:

21      Q.  Can you please state your name.

22      A.  Thomas E. Piesel.

23      Q.  And what is your position with the Town of

1   Webster?

2       A.   I'm a patrolman for the Town of Webster.

3       Q.   And how long have you been a patrolman for

4   the Town of Webster?

5       A.   Six years.

6       Q.   And with regard to those six years, have

7   you worked with Sgt. Bolduc?

8       A.   Yes, I have.

9       Q.   And during that time, how have you worked

10  with him?

11      A.   We have been patrolmen together, and he has

12  been my supervisor.

13      Q.   And how has he been as your supervisor?

14      A.   Phenomenal.

15      Q.   And with regard to the incident, if I may

16  approach.

17              HEARING OFFICER:  I would remind you,

18      Counselor, to use detainee 1, 2 and 3.

19      Q.   (By Mr. Browne)  With regard to detainee 2,

20  have you seen him before?

21      A.   Yes, I have.

22      Q.   And did you see him on the night of the

23  arrest?

1       A.   Yes, I did.

2       Q.   And with regard to this detainee, can you

3    describe his conduct in the station that evening?

4       A.   Very confrontational.  He was combative,

5    yelling and screaming, using profanity.

6       Q.   And how did he appear as far as sobriety?

7       A.   Intoxicated.

8       Q.   And what told you that he was intoxicated;

9    what did you observe about him?

10       A.   I was actually one of the officers on scene

11    that arrested him at the establishment that we took

12    him out of.

13       Q.   And what establishment did you take him out

14    of?

15       A.   At the time it was called the Maple Leaf.

16    It is now called K-Rae's.

17       Q.   Now, just for the record, did Sgt. Keefe

18    ever interview you with regard to detainee number

19    2?

20       A.   No, he did not.

21       Q.   Did he ever ask you any questions with

22    regard to detainee number 2?

23       A.   No, he did not.

1    Q.  And what was the reason that you arrested

2    detainee number 2 at the Maple Leaf?

3    A.  We got a call.  The original call was a

4    disturbance, possibly a fight.  He ended up having

5    a warrant for his arrest.

6    Q.  So you took him in on a warrant?

7    A.  Yes.

8    Q.  And how was he when you were taking him

9    into custody?

10    A.  At the beginning when myself and Officer

11    Kelly was dealing with him, he was being compliant.

12    Q.  And you took him in the office?

13    A.  Yes, Officer Kelly did, yes.

14    Q.  And at that point did you observe his

15    booking?

16    A.  No, I did not.  I remained out of the room.

17    Q.  And at some point did you come back to the

18    station?

19    A.  Yes, once we got the call for the officers

20    to return.

21    Q.  And who called for the officers to return?

22    A.  The dispatcher.

23    Q.  And why were you called to return?

213

1      A.   Because the defendant or subject was out of
2  control and fighting with everyone.
3      Q.   And did you come back to the station?
4      A.   Yes.
5      Q.   And were they attempting to -- when you
6  first came back, did you observe him?
7      A.   Yes, he was laid on the floor, several
8  officers were around him.
9      Q.   And what officers were around him on the
10 floor?
11     A.   Officers Nelson, Officer Novak and Officer
12 Kelly.
13     Q.   And were they all struggling with him?
14     A.   Yes.
15     Q.   And what were they attempting to do when he
16 was on the ground?
17     A.   I believe they were trying to remove his
18 necklaces and jewelry from his body.
19     Q.   And at some point did Sgt. Bolduc come into
20 the scene?
21     A.   He was there also prior to my arrival.
22     Q.   And after that struggle that occurred to
23 remove his jewelry, what happened?

1     A.  Sgt. Bolduc requested that he get a ring

2  cutter from the paramedics.

3     Q.  And why did you understand that request to

4  get the ring cutter?

5     A.  Because detainee number 2 was refusing to

6  remove any jewelry from his body.

7     Q.  Now, you've been trained as a police

8  officer; is that correct?

9     A.  Yes.

10     Q.  And has it always been a policy to remove

11  all the jewelry from a detainee?

12     A.  Yes.

13     Q.  What are some of reasons for removing all

14  the jewelry from a detainee?

15     A.  To keep them from harming themselves or any

16  of the officers that he would be dealing with him.

17     Q.  And in the case of number 2, did you feel

18  it was necessary to remove his jewelry given the

19  circumstances?

20     A.  Yes.

21     Q.  And did you think it was reasonable to use

22  force to remove his jewelry?

23     A.  Yes.

1      Q.   And were other officers thinking it was

2   reasonable because of their actions in attempting

3   to remove the jewelry?

4      A.   From my point of view, yes.

5      Q.   And at some point did Sgt. Bolduc start

6   removing the jewelry?

7      A.   Yes.

8      Q.   And before he attempted to remove the

9   jewelry, did he have any conversation with detainee

10   number 2?

11      A.   He asked him several times to remove it or

12   we were going to remove it for him.

13      Q.   He gave him the option to remove it?

14      A.   Yes.

15      Q.   Did you show him the instrument you were

16   going to use to remove it?

17      A.   Yes, he did, both of them.

18      Q.   And did the detainee number 2 comply?

19      A.   No.

20      Q.   And now at some point did Sgt. Bolduc cut

21   anything from the detainee number 2?

22      A.   I believe he cut an eyebrow ring off.

23      Q.   And when he did it, did he inflict any pain

1    or any damage on detainee number 2?

2        A.   No, he did not.

3        Q.   After he did that, did he speak to the

4    detainee number 2 again?

5        A.   He told him to remove it, or he was going

6    to continue removing it for him.

7        Q.   What did detainee number 2 say at that

8    time?

9        A.   He wasn't taking anything off.

10       Q.   What did Sgt. Bolduc do then?

11       A.   He cut the next piece of jewelry off.

12       Q.   Did he cut all the pieces of jewelry off?

13       A.   No.

14       Q.   What ended up happening?

15       A.   The gentlemen finally complied and removed

16   the jewelry himself.

17       Q.   Now, at any point after that, are you aware

18   of this detainee making any complaints to anyone?

19       A.   No.

20       Q.   And when you were there, did he hurt the

21   detainee in my manner?

22       A.   No.

23       Q.   And in your opinion as an officer with the

1    Town of Webster and having the training of the Town

2    of Webster, was it wrong for Sgt. Bolduc to remove

3    that jewelry?

4        A.  No.

5        Q.  And you said that at great expense coming

6    here and testifying; is that correct?

7        A.  Yes.

8        Q.  You're aware that there is a history of

9    retaliation in the Town of Webster?

10       A.  Yes.

11       Q.  Depending on what side you're on?

12       A.  Yes.

13       Q.  At one time Sgt. Bolduc was on the right

14   side; is that correct?

15       A.  Yes.

16       Q.  And is it fair to say that he is now on the

17   wrong side?

18       A.  Fair to say, yes.

19       Q.  With regard to the removal of the jewelry,

20   did anyone who was there make any objection?

21       A.  No.

22       Q.  Did anyone say maybe you shouldn't do that?

23       A.  No.

1      Q.   Did anyone say this isn't reasonable at

2    that time?

3      A.   No.

4      Q.   Now, you were also a witness to the

5    detainee number 3 case?

6      A.   Yes.

7      Q.   You have observed detainee 3 before; is

8    that correct?

9      A.   That's correct.

10     Q.   And how did you first become aware of the

11   circumstances involving number 3?

12     A.   We first got a call that it was a possible

13   home invasion within a residence in the town.

14   Myself and Sgt. Bolduc responded in his unit.

15   Officer Keefe responded in his marked unit, and

16   Officer Geevry responded in his.

17     Q.   What happened while you were there,

18   briefly?

19     A.   When we got there the homeowner that we

20   identified later had the detainee laid down in the

21   gravel of the driveway up against the trash cans

22   just pounding on him.

23     Q.   When you say "pounding on him," what do you

219

1    mean?

2        A.    Beating him up.

3        Q.    Can you show us?

4        A.    Just pinned him up the side of the head and

5    the shoulders and ribs.

6        Q.    And you observed this?

7        A.    Yes.

8        Q.    And I take it at some point you took

9    control of the situation?

10        A.    Yes, we did.

11        Q.    And who transported detainee number 3 from

12    the scene?

13        A.    Officer Geevry.

14        Q.    And where did he transport him?

15        A.    He transported him to the station.

16        Q.    And at some point you departed the scene;

17    is that correct?

18        A.    Yes.

19        Q.    And whose cruiser did you depart the scene

20    in?

21        A.    Sgt. Bolduc's.

22        Q.    And he was the supervisor at the time?

23        A.    Yes.

220

1      Q.  And after you departed in that cruiser, at

2  some point did you hear something over the radio?

3      A.  Before we even departed, we got a call

4  first to return to the station.  We heard yelling

5  and screaming.

6      Q.  And could you hear yelling and screaming?

7      A.  Yes.

8      Q.  You could here a disturbance at the

9  station?

10     A.  Yes.

11     Q.  And did you rush to the station?

12     A.  Yes, we did.

13     Q.  And you got there within three or four

14 minutes?

15     A.  Easy, yes.

16     Q.  And when you arrived at the station, did

17 you see the detainee?

18     A.  Yes.

19     Q.  And who was with the detainee?

20     A.  Officer Geevry.

21     Q.  And how were they; if I was the detainee,

22 or if I was Officer Geevry, can you show me how the

23 detainee was with Officer Geevry?

221

1    A.   This about the same height as the booking

2  desk.  The detainee was handcuffed in front pushing

3  Officer Geevry back over the booking desk.

4    Q.   And in your opinion, did Officer Geevry

5  have control of the situation at that point?

6    A.   Absolutely not.

7    Q.   In your opinion, who was getting the better

8  of the tussle at that point?

9    A.   Detainee number 3.

10   Q.   At some point, you guys entered; what did

11 Sgt. Bolduc do?

12   A.   He yelled for him to let go of the officer.

13   Q.   Did he do that immediately?

14   A.   As he was running in, yes.

15   Q.   So he spoke first?

16   A.   Yes.

17   Q.   He attempted to defuse it with words first?

18   A.   Yes.

19   Q.   And that was a verbal command?

20   A.   Yes.

21   Q.   And after receiving that verbal command,

22 did detainee 3 do anything?

23   A.   Just continued going after Officer Geevry.

1    Q.  Did he have the cuffs up around the neck

2   area?

3    A.  Close.  I don't know exactly how close, but

4   they were pretty close.

5    Q.  At that point did Sgt. Bolduc go up there?

6    A.  Yes, he did.

7    Q.  And what did he do?

8    A.  Sgt. Bolduc struck the detainee number 3

9   for him to loosen his grip on Officer Geevry.

10    Q.  And when he struck him, did he loosen the

11   grip?

12    A.  Yes, he did.

13    Q.  And now at some point did Officer Bolduc

14   get him to the ground?

15    A.  Yes.

16    Q.  Did he strike him at any point after he had

17   control of detainee number 3?

18    A.  No, he did not.

19    Q.  Now, you've made a statement on, I believe

20   it's November 19, which is part of the record; is

21   that correct?

22    A.  I believe it's the judge's.

23    Q.  Yes, for Judge Barton?

223

1        A.    Yes.

2        Q.    And with regard to that, you made a

3    statement about what had happened; is that correct?

4        A.    Correct.

5        Q.    And a some point did the chief talk to you

6    about adding things to your statement?

7        A.    He asked me when we were talking about how

8    many times did he strike him, I told him two or

9    three times.  How many times did I recall that

10   Officer Bolduc or Sgt. Bolduc struck the detainee.

11       Q.    Now, I'm going to ask you a question as

12   you're sitting here today.  Do you know exactly how

13   many times he hit him?

14       A.    No.

15       Q.    Did he hit him after he was under control

16   at all?

17       A.    No.

18       Q.    And in your opinion, you were there, there

19   is nobody else there; is that correct?

20       A.    Correct.

21       Q.    You, Geevry and Bolduc, right?

22       A.    Right.

23       Q.    And is it fair to say that Mr. Geevry and

224

1    Mr. Bolduc don't get along?

2        A.   That is correct.

3        Q.   It's well known in the department?

4        A.   Well known.

5        Q.   And do you know anything about it?

6        A.   I know there has always been hostility.

7    Officer Geevry knows that he's terrified of Sgt.

8    Bolduc.

9        Q.   And is that because he thinks Sgt. Bolduc

10   is going to come up and hit him or that because he

11   thinks Sgt. Bolduc had it in with the chief or the

12   former chief?

13       A.   He thinks he had it in with the former

14   chief.

15       Q.   So it was because he thought he was going

16   to walk up and smack him?

17       A.   No.

18       Q.   With regard to the relative heights, how

19   tall is Sgt. Bolduc?

20       A.   Five-eight or five-nine.

21       Q.   And how tall is Sgt. Geevry?

22       A.   Six-one or six-two, maybe even taller.

23       Q.   Now, I'm going to ask you this question and

225

1    you're in front of everyone here.   Did Officer

2    Bolduc use more force than was necessary to get

3    prisoner under control?

4         A.   Absolutely not.

5         Q.   Did he ever say, You got one of my guys,

6    now I'm going to F with you?

7         A.   Not that I recall, no.

8         Q.   Did he ever kick him?

9         A.   No.

10        Q.   And the only thing he did was punch him to

11   get him under control?

12        A.   Yes.

13        Q.   And once he got him under control, how was

14   his behavior?

15        A.   He calmed right down.

16        Q.   And with regard to Sgt. Bolduc, did he seem

17   to have lost his temper or anything at that point?

18        A.   No.

19        Q.   When the Acting Chief Keefe had you in, did

20   you feel pressure to add the two or three times?

21        A.   No.

22        Q.   I have no further questions.

23

234

1          THE WITNESS:  Steven C. Boudreau.

2       (Witness sworn.)

3

4          WITNESS:   STEVEN BOUDREAU

5  DIRECT EXAMINATION BY MR. BROWNE:

6       Q.   Can you state your name?

7       A.   Steven C. Boudreau.

8       Q.   And where were you last employed?

9       A.   In the Town of Webster as the interim town

10  administrator from April of 2003 to October of

11  2003.

12       Q.   And before April 2003, did you have any

13  other employment?

14       A.   Prior to that, no.

15       Q.   And at some point --

16       A.   I take that back.  I had worked at

17  Bridgewater State College.

18       Q.   And from April of 2003 until what date?

19       A.   Approximately October.

20       Q.   October 2003?

21       A.   Yes, end of October.

22       Q.   And at some point you had meetings with

23  Acting Chief Keefe; is that correct?

235

1       A.   Yes, I did.

2       Q.   And did those meetings occur during the

3   summer of 2003?

4       A.   Yes.

5       Q.   And I take it during -- you're familiar

6   with the term "exam scam"?

7       A.   Yes.

8       Q.   And can you explain to the town

9   administrator what that was?

10      A.   There were allegations against Sgt. Bolduc

11  that he had prior knowledge of the oral boards

12  given to him by Deputy Chief Ralph, and it was a

13  matter being investigated by the civil service or

14  department of personnel administration.

15      Q.   And was there a hearing involved in that?

16      A.   Oh, yes.

17      Q.   And after a hearing, was the decision made

18  by the civil service commissioner?

19      A.   Yes.

20      Q.   And what was the decision?

21      A.   I don't know.  I was not in charge in the

22  Town of Webster at that point in time, but I had

23  heard through newspaper accounts that the

236

1  allegations against Sgt. Bolduc and Deputy Chief

2  Ralph weren't sustained, but I didn't have the

3  report in hand.

4       Q.  Now, at some point during the summer of --

5  well, April of 2003 who was the acting chief?

6       A.  Chief Bergeron was still the chief at that

7  point in time.

8       Q.  And how long was Chief Bergeron still

9  chief?

10      A.  He was chief until -- he was actually chief

11  until I suspended him in July of that year.

12      Q.  And after July of that year, who came in

13  charge?

14      A.  Sgt. Keefe was named Acting Deputy Chief.

15      Q.  And at that time did you have conversations

16  with him?

17      A.  Yes.

18      Q.  And did you have a conversation with him

19  relative to Sgt. Bolduc?

20      A.  To all department members, yes.

21      Q.  And who was present during all the

22  conversations that you had with the acting chief

23  about Sgt. Bolduc?

237

A.   Just myself and Bill Keefe.

Q.   It wasn't a group of three or four sergeants, was it?

A.   We did have a meeting with Bill Keefe and the other sergeants at one point in time.

Q.   Were there other meetings?

A.   Regarding?

Q.   With just you and him?

A.   Yes, during my tenure in the interim, yes.

Q.   And during that time, that was before Sgt. Bolduc was under any investigation?

A.   Yes, I believe so.

Q.   And at that time did he express any opinions to you about Sgt. Bolduc.

A.   He expressed an opinion about Sgt. Bolduc and other members of the department that were involved in an ongoing controversy within the department.

Q.   And what opinions did he express to you about Sgt. Bolduc?

A.   He expressed to me that he felt that if Sgt. Bolduc, Deputy Chief Ralph, Chief Bergeron and Officer Barnes were gone, the department would be

# EXHIBIT 14A

238

1    better off.

2        Q.  And since that conversation, Chief Bergeron

3    is now gone; is that correct?

4        A.  That is my understanding.

5        Q.  And you have some knowledge that Deputy

6    Chief Ralph is now -- his termination is

7    contemplated; is that correct?

8        A.  I only understand that he is being brought

9    before a hearing today and that there may be some

10   termination asked for.

11       Q.  And you're aware; you live in the area; is

12   that correct?

13       A.  I live in Barre, Massachusetts, yes.

14       Q.  And you're aware that also Officer Barnes

15   was recently brought here on a disciplinary matter?

16       A.  Yes.

17       Q.  Is it fair to say that what he mentioned in

18   July of 2003, a plan, is now being executed?

19       A.  I don't know if there is a plan, but if all

20   four persons are gone, then what he had said to me

21   is in fact the case.

22           MR. BROWNE:  I have no further

23       questions.

REAL-TIME COURT REPORTING
343 Trafton Road
Springfield, MA 01108                    (413) 732-1157

```
 1            MR. LABELLA:  I have no questions for

 2     this witness.

 3            MR. BROWNE:  Respondent calls  Gary

 4     Wrubleski.

 5            HEARING OFFICER:  Please state your

 6     name and spell your last name.

 7            THE WITNESS:  Gary Wrubleski,

 8     W-R-U-B-L-E-S-K-I.

 9     (Witness sworn.)

10

11            WITNESS:  GARY WRUBLESKI

12   DIRECT EXAMINATION BY MR. BROWNE:

13     Q.  Please state your name.

14     A.  My name is Gary Wrubleski.  I'm an R.N.

15   paramedic with Webster EMS.

16     Q.  And how long have you been working there?

17     A.  I've been full-time employed for five

18   years, but I've worked about eighteen years.

19     Q.  And you were involved in the investigation

20   into detainee number 2, I think; is that correct?

21     A.  Yes, that's correct.

22     Q.  And you were called to bring some ring

23   cutters?
```

1    A.  Yes, we were dispatched from the police

2  station around two o'clock in morning.  I was

3  working with my partner whose name is Jeff Becker,

4  and we were called from the station to bring ring

5  cutters, and we left the station.  We were directed

6  to the booking room, and we when got to the booking

7  room, they asked if we had ring cutters, and we

8  said yes, and we brought them in, and I didn't see

9  anything as far as anybody using the ring cutters,

10  but we brought them in, and just John asked if he

11  could use them to get the jewelry off because he

12  had to get them off in order to put the prisoner in

13  a cell, and he used the ring cutter, and they

14  didn't work.  So then he said, Do you have anything

15  else?  I wasn't sure at first, and I didn't see

16  anything as far as anybody using anything, but this

17  morning when I was called, one of my partners read

18  to me what was stated on here, and there was a

19  couple of things stated on here that I didn't

20  really state.  The fact that Deputy Ralph was at

21  the station at the time, I don't remember stating

22  that.  And the fact that also on the end of this

23  statement Deputy Ralph was standing there.  I don't

1    remember stating that as well when I made the

2    statement.

3              MR. LABELLA:  Can I ask to see the

4         document.  I want to make sure this document is

5         the same document.

6              HEARING OFFICER:  Do we have this as an

7         exhibit?

8              MR. BROWNE:  I think it's part of --

9         what exhibit is it part of?

10              MR. LABELLA:  Involving detainee number

11         2, Exhibit 7, so it should be part of

12         Exhibit 7.

13         Q.  (By Mr. Browne)  You just said lot of

14    stuff, so I want to clarify one or two things.

15              HEARING OFFICER:  Can you wait, please.

16         Is this your signature?

17              THE WITNESS:  Yes.

18              HEARING OFFICER:  Is this your writing

19         THE WITNESS:  No.

20              HEARING OFFICER:  Do you know who wrote

21         it?

22              THE WITNESS:  I don't know for sure,

23         but the only one that took the statement was

242

1    Officer Keefe.

2         HEARING OFFICER:  Did you read it

3    before you signed it?

4         THE WITNESS:  Briefly.  I signed it

5    rather rapidly, but I didn't really read it,

6    no.

7         MR. LABELLA:  I'll reserve my questions

8    for cross.

9         MR. BROWNE:  I didn't finish.

10        MR. LABELLA:  That is what I meant.

11        HEARING OFFICER:  Can I ask you a

12   question.  You said ring cutter versus bolt

13   cutter.  Now, we've just seen a pair of bolt

14   cutters.  What is the size of the ring cutter.

15        THE WITNESS:  They're about the size of

16   a hand, like a can opener.

17        HEARING OFFICER:  Do you use it with

18   one hand.

19        THE WITNESS:  You would have to use two

20   hands, one to turn.  There is a little blade in

21   there.  It's not a sharp blade.  It's rigid

22   like and it's used to grind away the metal to

23   cut the ring.

243

1          HEARING OFFICER:  So it would be about

2     this big?

3          THE WITNESS:  The size of a can opener.

4     Q.  (By Mr. Browne)  So Sgt. Bolduc tried to

5  use the ring cutters first?

6     A.  Yes, that's correct.

7     Q.  And the ring cutter didn't work because of

8  the jewelry was too thick?

9     A.  That's correct.

10     Q.  And that is when he went to something

11  larger?

12     A.  Right.

13     Q.  And were you present when he used something

14  larger?

15     A.  Yes.

16     Q.  And was he trying to hurt the prisoner in

17  any manner?

18     A.  No, not to my knowledge.  I didn't see, no.

19     Q.  And was he offering the prisoner an

20  opportunity to take off the jewelry himself?

21     A.  Yes, he did, yes.

22     Q.  And lastly, you didn't write this

23  statement; is that correct?

1    A.  That's correct.

2    Q.  And with regard to the statement, what part

3  or parts did you take issue with again?

4    A.  Okay.  There are two statement here.  I

5  never wrote, "Ralph was just standing there

6  watching," and the fact that there is a statement

7  in the beginning where it says, "We came over with

8  the truck.  We went into the booking room.  I saw

9  Deputy Ralph standing behind the counter," when in

10  fact I didn't really see him.  I didn't know who

11  the officers were, and I didn't state that.  I

12  didn't write that.

13    Q.  Do you know who Deputy Ralph is?

14    A.  Yes, I just introduced myself to him this

15  afternoon.

16    Q.  But did you know who he was back at the

17  time the statement was taken?

18    A.  No.

19    Q.  And again this statement isn't something

20  that you wrote?

21    A.  Right.  That is correct.

22        MR. BROWNE:  I have no further

23  questions.

245

1        MR. LABELLA:  Just a few.

2

3   CROSS-EXAMINATION BY MR. LABELLA:

4        Q.  So you sat down with Acting Chief Keefe and

5   he interviewed you on February 4 of this year,

6   correct?

7        A.  That's correct.

8        Q.  And he asked you about the specifics

9   involving the incident with the bolt cutters,

10  correct?

11       A.  Not the bolt cutters.  In regards to --

12  yes, actually it was the bolt cutters.

13       Q.  And while he was asking you questions, he

14  was writing this statement; is that correct?

15       A.  Yes.

16       Q.  And at the conclusion of his meeting with

17  you, interview if you will, he handed you this

18  document to review, correct?

19       A.  Yes.

20       Q.  And you had an opportunity to read this

21  document, correct?

22       A.  Yes.

23       Q.  And you then signed the document, correct?

246

1      A.  Yes.

2      Q.  And by signing the document, you were

3  verifying the accuracy of the statement, correct?

4      A.  Yes.

5      Q.  Because your signature on the document

6  wouldn't mean anything other, correct?

7      A.  Yes, correct.

8      Q.  Okay.  And you have had conversations with

9  other individuals about this issue since the 4th,

10  correct?

11      A.  No.

12      Q.  You've had conversations with other

13  individuals about the use of the bolt cutters and

14  detainee number 2 since that day, correct?

15      A.  Just with my supervisor.

16      Q.  The supervisor of EMS?

17      A.  Yes.

18      Q.  And have you had any conversations with

19  Deputy Chief Ralph?

20      A.  No.

21      Q.  Did you have any conversations with Deputy

22  Chief Ralph today in the hallway?

23      A.  No.

247

1      Q.   With regard to this document, when did you

2   review it?

3      A.   This morning.

4      Q.   That is the most recent time that you've

5   reviewed it?

6      A.   Yes.

7      Q.   Since the 4th of February you reviewed it

8   this morning?

9      A.   Yes.  I didn't know it was going to be

10  brought up here today.

11     Q.   Who handed you this document?

12     A.   My supervisor at EMS.

13     Q.   What, if anything, did your supervisor say

14  to you?

15     A.   He just said I probably would have to be

16  here at the court, well, not the court, the town

17  hall possibly, for a statement, not a statement,

18  but a hearing.

19     Q.   And with regard to Sgt. Bolduc, you do know

20  Sgt. Bolduc, correct?

21     A.   Yes.

22     Q.   And you knew him before the incident

23  involving detainee number 2?

248

1      A.   That is correct.   I dealt with him with

2   multiple prisoners.

3      Q.   But you had no dealings prior to that with

4   Deputy Chief Ralph?

5      A.   No.

6      Q.   You had no idea who he was?

7      A.   No.

8      Q.   You couldn't identify him prior to that

9   date?

10     A.   No.

11     Q.   Do you remember describing what he looked

12  look to Acting Chief Keefe when he was asking

13  questions?

14     A.   No.

15          MR. LABELLA:   No further questions --

16  just one moment.

17     Q.   (By Mr. LaBella)   Just quickly, on the

18  bottom left-hand corner there is initials.   Are

19  those your initials?

20     A.   Yes.

21     Q.   And you did in fact initial that page as

22  well?

23     A.   Yes.

249

1          MR. LABELLA:  No further questions for

2     this witness at this time.

3

4     <u>REDIRECT EXAMINATION BY MR. BROWNE:</u>

5       Q.  When you signed that thing, did you assume

6     that the chief would put it down as you said it?

7       A.  I assumed because I mean I was speaking

8     with the assistant chief.  That is correct.  I

9     assumed it was honest.

10          HEARING OFFICER:  I have a question.

11     You're saying you signed it, but you didn't

12     read it, right?

13          THE WITNESS:  I read it briefly and

14     looked it over.

15          HEARING OFFICER:  When you're looking

16     at where your signature is right here, the one

17     line above it says, "Ralph was just standing

18     there," and you didn't even notice that was

19     there when you wrote your signature.

20          THE WITNESS:  No.

21          HEARING OFFICER:  That's all.

22          MR. BROWNE:  I would like to call Gary

23     Milliard.

250

1          HEARING OFFICER:  Please state your

2      name.

3          THE WITNESS:  Gary Milliard,

4      M-I-L-L-I-A-R-D.

5      (Witness sworn.)

6

7          WITNESS:  GARY MILLIARD

8  DIRECT EXAMINATION BY MR. BROWNE:

9      Q.  At some point were you called over to the

10  chief's office?

11      A.  Yes.

12      Q.  And with regard to going to the chief's

13  office, when you first got there, did you have an

14  interaction with him?

15      A.  Yes, I did.

16      Q.  And what was the interaction that you had

17  with him?

18      A.  I asked him casually, what's up?  And he

19  said, What the hell's up.  And I said, Before Gary

20  goes into your office and gives a statement -- we

21  originally asked if Chief Keefe could go to our

22  office so we wouldn't have to parade Gary Wrubleski

23  through the police station to give a report against

251

1  another officer, and Chief Keefe said, No, we need

2  to go to the police station.  I didn't want Gary to

3  go by himself, so I told our executive director

4  that I would be going with him.  When Chief Keefe

5  stated that, I stated that I wanted to speak with

6  him first, and I went into the office, and my first

7  comment was, Why were you treating me like that?

8       Q.  What did he say?

9       A.  He said, You're friends with John.  I can't

10  really recall a hundred percent.  You're friends

11  with John.  You know what this is all about.  Why

12  were you playing games, something to that effect.

13      Q.  Was he being nice to you, or was he being

14  rude to you?

15      A.  I think after that initial contact that had

16  taken place in the computer room, I think things

17  calmed down a little bit after that.

18      Q.  And at some point did you give a statement?

19      A.  Yes.  I stated I wanted to talk to him

20  about the situation myself because I had already

21  spoken to John about it, and stated I wanted to

22  tell Chief Keefe what I had known and what John had

23  spoken to me about.

252

```
 1        Q.   Now, did you write this statement?

 2        A.   No, I did not.  Chief Keefe did.

 3        Q.   He wrote it?

 4        A.   Yes.

 5        Q.   And he held it for you; it's his language,

 6   not your language?

 7        A.   It's his writing, and yes, his language,

 8   yes.

 9        Q.   And with regard to it, did you end up

10   signing the statement?

11        A.   Absolutely.

12        Q.   Are there any issues that you have with the

13   statement?

14        A.   I'm in same boat as Gary was.  As I was

15   talking, Chief Keefe was writing.  I've known Chief

16   Keefe about ten years now.  As he was writing, as I

17   was talking, he was writing.  At the end of the

18   thing, I just stood up and signed it.  I didn't

19   bother reading it.  There is no reason for me not

20   to trust what was in here.  There are some issues.

21   I do take issue with some things in here, but.

22        Q.   Like what?

23        A.   One comment was, "John Bolduc said he was
```

1  disappointed with Gary W."  It wasn't -- I didn't

2  paraphrase when I was talking.  I clearly said and

3  articulated to the chief exactly what I was saying.

4  When I spoke to John on the phone.  The reason John

5  Bolduc called me was that he stated that there was

6  an investigation into him using bolt cutters on a

7  prisoner.  I'm not sure who the prisoner is, you

8  know.  I'm trying to get more information, but I

9  think EMS was over there.  Is there any way that

10  you can come up with a name?  I said you have to

11  narrow it down a little more.  He called back and

12  he said I wasn't sure.  I think it's John Maynard,

13  and he gave me a date of birth of the person and

14  the date, but he wasn't sure of the year.  He said

15  it was February 1.  He said it could be 2001, 2002.

16  He's not really sure of it.

17       Q.  Was he just trying to determine --

18       A.  Who the person was.

19            MR. BROWNE:  No further questions.

20

21  CROSS-EXAMINATION BY MR. LABELLA:

22       Q.  Gary Milliard?

23       A.  Yes.

254

Q.   Mark LaBella.  With regard to your position, first of all, what is your rank and title?

A.   Operations manager paramedic force.

Q.   So you respond to 911 emergency calls?

A.   Yes.

Q.   And when you respond to those calls, do you fill out reports?

A.   Yes.

Q.   Ambulance reports?

A.   Yes, if there's an injured patient, yes.

Q.   And you're trained in how to fill out reports, correct?

A.   Absolutely.

Q.   You understand the responsibility of filling out report, correct?

A.   Patient care reports, yes.

Q.   There are several reports, correct?

A.   Yes, we have two reports, patient care report and another form, call for service report.

Q.   And is that a form that you have the person sign off on that they weren't taking a ride to the hospital, that sort of form?

255

1    A.  A call for service can fall under multiple
2    guidelines.  It could be a structure fire, a water
3    rescue, it could be numerous things, but a patient
4    care report is specific.  You have a person that is
5    injured and you need to file a report that will be
6    either signed as a patient refusal or if it's going
7    to a permanent medical record.
8       Q.  And when you're done with those, of course,
9    you sign off on those, correct?
10      A.  I don't sign off any.  Individuals that I
11   take care of, yes.
12      Q.  And by signing that that means that the
13   information in that report is accurate?
14      A.  That's correct.
15      Q.  Now, with regard to your report here dated
16   2-3-04, you sat down with the Acting Chief Keefe
17   and went over the circumstances surrounding
18   detainee number 2, correct?
19      A.  I didn't know -- that photograph came in at
20   the latter part of our conversation.  He asked
21   another officer to go get the photograph of it,
22   because there was a question as to whether there
23   was a laceration, and when I spoke with John --

256

1    Q.  Mr. Bolduc?

2    A.  Mr. Bolduc.  He thought that the prisoner

3  had a laceration.

4    Q.  So your understanding was that John Bolduc

5  discussed this matter with you, and his position

6  was that it was EMS's idea to cut off the rings and

7  facial piercings, correct?

8    A.  Correct.  But he was somewhat unsure.

9  Again, he was not sure.  He got the name on the

10  second day he called me, so he wasn't sure.  He had

11  assumed that it was a patient that was in a fight

12  or something like that and had a laceration at the

13  area of the eye, and that is who he thought it was.

14    Q.  And he told you that?

15    A.  Yes, he did.

16    Q.  That was the day before this report was

17  filed?

18    A.  That would have been either on Friday

19  1-30-04 or Saturday 1-31-04.

20         HEARING OFFICER:  Are you saying that

21    Bolduc used bolt cutters on separate people and

22    he couldn't understand which one he was talking

23    about.

257

1          THE WITNESS:  No, that is not what I'm

2      saying.  He thought that this person had a

3      laceration, and to his recollection at the

4      time, he stated it was a piece of jewelry that

5      he recalled being taken off, and he thought it

6      was due to a laceration in the area of eye, but

7      he wasn't sure.

8          Q.  (By Mr. LaBella)  So on Saturday the 31st,

9      he communicated to you and said, I don't know why I

10     didn't think of this, but it was Gary who wanted

11     the jewelry off; is that what he said to you on

12     January 31st?

13         A.  He was on his way to his mom's birthday,

14     and he called back and he was -- I think it was

15     Gary Wrubleski and Jeff Becker that were on call,

16     and I'm pretty sure it was either Gary Wrubleski

17     or Jeff Becker that wanted the jewelry off.

18         Q.  That was what he indicated to you?

19         A.  Yes.

20         Q.  And that was in reference to the bolt

21     cutters involving detainee number 2?

22         A.  Yes.

23         Q.  And then you sat down on February 4, 2004

258

1    with Acting Chief Keefe?

2        A.  Yes.

3        Q.  And while you were giving the statement, he

4    was writing down the document that is before you,

5    correct?

6        A.  Yes.

7        Q.  And you said to the Acting Chief Keefe that

8    you weren't going to let John Bolduc blame you guys

9    for using the bolt cutters or using the bolt

10   cutters on this individual, correct?

11       A.  No, I don't recall saying that.  We were

12   definitely concerned whether or not EMS has any

13   involvement in cutting any jewelry off.  That is

14   why --

15            HEARING OFFICER:  What is the

16       director's name?

17            THE WITNESS:  Kevin Kelly.

18       Q.  (By Mr. LaBella)  So did you say words to

19   the effect that you weren't going to accept the

20   responsibility or let John Bolduc blame it on EMS

21   by making a decision to use the bolt cutters to

22   remove jewelry?

23       A.  No, I didn't say that.  I had a very long

1  conversation with Gary Wrubleski as well as Jeff

2  Becker regarding this whole incident, and I wanted

3  to know what our involvement was in this.  It's not

4  uncommon for us to bring ring cutters, all types of

5  equipment to the police department.  We have the

6  equipment.  If they ask for it, we bring it over.

7  I wanted to make sure it wasn't any of our people

8  that were actually going over there, and our second

9  concern was, if we had a patient, why no

10  documentation of it.

11      Q.  During that conversation with the acting

12  chief, you never said to the acting chief that you

13  weren't going to let EMS be the one that takes the

14  fall for this in regard to using the bolt cutters?

15      A.  I don't recall making that statement, no.

16      Q.  You don't recall making that statement?

17      A.  No.

18      Q.  And it is your initials on the bottom of

19  the front page next to the date?

20      A.  No, that is actually my signature.

21      Q.  That is your signature on the back page as

22  well?

23      A.  Yes, two lines down from the last

260

1  paragraph.

2      Q.  And you were provided this document and an

3  opportunity to review it?

4      A.  I was provided this document last night.

5      Q.  Were you provided the document on February

6  4 when you signed it?

7      A.  No.  He showed to me, I signed it, and I

8  left.

9      Q.  And did you read it over before you signed

10  it?

11     A.  No, the chief knows I didn't read it.  He

12  handed it to me, and he said sign the front of it

13  and I did, and he asked me to put the date on it.

14     Q.  Did you have an opportunity to review it?

15     A.  That day, yes, I could have looked at it,

16  but I wanted to get out of the office.

17     Q.  And were you asked to come here today to

18  testify by the acting chief?

19     A.  No, not at all.

20         MR. LABELLA:  I have no further

21     questions for this witness at this time.

22         MR. BROWNE:  No further questions.  I

23     Just want to call Acting Chief Keefe for one

# EXHIBIT 15

## Affidavit of Robert J. Miller

I, Robert J. Miller, do hereby depose and say:

1.  I am currently a member of the Webster Board of Selectman. I have been a Board Member since May 2001.

2.  I served as the Chairman of the Board of Selectman from May 2003 until May 2004.

3.  On or about December 18, 2003, Webster Town Administrator Robin Leal, asked me to meet with Thomas Ralph and John Bolduc, in my capacity as the Chairman, to get them to resign from their positions with the Webster Police Department.

4.  Robin Leal informed me at that time that if Ralph and Bolduc did not resign, she was going to fire them.

Signed under the pains and penalties of perjury this _11_ day of December 2006.

Robert J. Miller

# EXHIBIT 16

## AFFIDAVIT OF RAYMOND REGIS

I, Raymond Regis, do hereby depose and say:

1. I was a member of the Town of Webster Board of Selectman from 2002 to 2006.

2. On or about December 18, 2003 I was told by Robin Leal then Town Administrator of the Town of Webster that she intended to fire John A. Bolduc Jr. if he refused to resign from the police department, after a hearing. Shortly thereafter, I was present at Robert Miller's funeral home when he asked Ralph and Bolduc to resign. They refused. I told Bolduc that Leal had stated to me that she intended to fire him after a hearing.

3. In February 2004 Robin Leal stated to me that she intended to terminate John A. Bolduc, Jr. but had to conduct a hearing to make it "look good".

4. In February 2004 the Webster Board of Selectmen voted unanimously to commend John Bolduc for the work he had done on the Amato murder investigation.

5. On or about March 1, 2004 Robin Leal requested the Selectboard members to individually rescind their vote to award to John Bolduc the commendation because it would weaken her position before the Massachusetts Commission Against Discrimination and in the Civil Service hearings she was to conduct regarding Bolduc. Two of the members of the selectboard [Martel and Dowgiewicz] changed their vote. Though Miller and I did not change our vote, Bolduc was never awarded his commendation.

Signed under the pains and penalties of perjury this ___12___ day of ___12___ 2006

_Raymond Regis_
Raymond Regis

# EXHIBIT 17

November 19, 2003

I Thomas E. Pysell, I being sworn police officer for the Town of Webster since January 1, 1998, hereby depose and say:

That on November 9, 2002 I was working the 2300 to 0700 shift along with Sgt. John Bolduc, Officer Lenny Gevry and Officer Michael Kehoe. We received a call to respond to the area of Blackpoint Road, Webster for a report of a home invasion. Sgt. Bolduc and I were the first to arrive. Officer Gevry was second then Officer Kehoe.

Once we exited the vehicle I observed a male standing over a second male who was lying on the ground, up against the house next to the garbage cans. Sgt. Bolduc instructed the first male, who was later identified as the home owner, to stop and step back away from the male on the ground. Heath Greenwood was the male on the ground.

Greenwood was intoxicated to the point that he continued to argue after being told several times to be quiet. The home owner stated that Greenwood was in his house going through the pocketbooks of the female guest. Once confronted, Greenwood became combative. Officer Gevry transported Greenwood back to the station to start the booking process while Sgt. Bolduc, Officer Kehoe and I stayed at the scene to take statements. Outside the house we found several items that were identified as personal belongings of the home owner along with several cans of beer.

While we were talking to the home owner and victims, Dispatch radioed that we were to return to the station. During the transmission from dispatch I heard yelling and screaming in the background. Sgt. Bolduc and I responded to the station along with Officer Kehoe. Sgt. Bolduc and I were the first to arrive. We entered the station from the garage. Sgt. Bolduc was the first to Booking Room 1. As I entered the room, I noticed Officer Gevry and Greenwood standing with Officer Gevry being pushed back against the computer desk with Greenwood hands holding onto Officer Gevry's shirt. Sgt. Bolduc yelled at Greenwood to stop and let go of his officer. Greenwood continued yelling at Officer Gevry, Sgt. Bolduc then struck Greenwood to make him release his grip of Officer Gevry.    2-3 Times TEP 2-3-04 /Sgt Wm J. Keek 2/8/04 19:55 hrs.

Once Greenwood was back under control and secured in the booking room chair Officer Kehoe arrived in the room. Officer Kehoe and I then exited the room and I walked over to talk with Dispatcher O'Leary. Sgt. Bolduc and Officer Gevry continued the booking. Greenwood was placed in the cell.

Deputy Chief Thomas Ralph had interviewed me about the incident. Deputy Chief Ralph stated that Officer Gevry filed a complaint with Sgt. Bent over the force that Sgt. Bolduc used on Greenwood. I explained to Deputy Chief Ralph what I saw. Deputy asked if I thought that Sgt. Bolduc used too much force or if Sgt. Bolduc was out of control. I told Deputy that the mistake that Officer Gevry made and the amount of force used was well within the order. I also stated to Deputy that if I thought Sgt. Bolduc was out of control or used too much force on any arrest, I would be the first one to file a report.

Several months later this matter is brought up after Sgt. Bolduc had filed a complaint against Chief Bergeron with the MCAD. I was present in Sgt. Keefe's Office, located downstairs in the station, when Greenwood called. Greenwood stated that he received a letter which wanted him to pursue charges on Sgt. Bolduc. That several Officers have already came forward and made statements about the incident. One of the officers was supposedly myself. Greenwood stated on the phone that Sgt. Bolduc did nothing wrong and that he was getting his life together since the incident.

Sgt. Bolduc had done nothing wrong in this matter; he aided in the arrest and stopped the possible injury to a fellow officer.

Respectfully submitted,

Thomas E. Pysell #1026
Webster Police

MR THOMAS E PYSELL APPEARED BEFORE ME OF HIS OWN FREE WILL ON 12/01/03.

NOTARY

MY COMMISSION EXPIRES
JANUARY 1, 2004

## AFFIDAVIT OF THOMAS PYSELL

Now comes Thomas Pysell and does hereby depose and say:

1. I was employed as a Town of Webster police officer from January 1998 until August 2005.

2. I am currently employed as a police officer at the UMASS Memorial Hospital, Worcester, Massachusetts.

3. I was one of the officers involved in the Jonah Mayotte arrest and I was present in the Webster Police Department booking room when John Bolduc removed Mayotte's jewelry. As I stated in previous hearings, I believe John Bolduc's acted appropriately. I do not believe that the amount of force used was excessive or unnecessary.

4. I entered the Webster Police Department booking room with John Bolduc on the night of November 9, 2002 in response to an emergency call from the dispatcher. I observed that Officer Leonard Gevry had lost control of his prisoner, Heath Greenwood, and was in immediate danger of being seriously hurt or even killed.

5. I observed John Bolduc's actions as he regained control of Heath Greenwood, thereby saving Officer Gevry. As I stated in previous hearings, I believe John Bolduc's use of force was appropriate and necessary. At no time were his actions unjustified or excessive.

Signed under the pains and penalties of perjury this ___9TH___ day of December 2006.

Thomas Pysell

# EXHIBIT 18

CM



# Webster Police Department

### Office of the Chief of Police

Webster, Massachusetts 01570

### (508) 943-1212
### FAX (508) 949-3898

Richard E. Bergeron, Jr.
*Chief of Police*

February 26, 2003

Richard E. Bergeron, Jr.
Chief of Police
Webster Police Department
57 Thompson Road
Webster, MA 01570

**Re:**     **Greenwood Incident, #I0218892**

Dear Chief Bergeron:

As you are aware Officer Gevry went to Sgt. Bent informally in November 2002 regarding an alleged assault by Sgt. Bolduc on a handcuffed prisoner by the name of Heath Greenwood. As a result of this information being brought to my attention, I conducted an investigation.

On November 14-15, 2002 I meet with Officer Kehoe and Officer Pysell separately. At that time Officer Kehoe informed me that he had not witnessed the incident and therefore was unable to provide any additional information.

Officer Pysell informed me that he was one step behind Sergeant Bolduc and witnessed Greenwood choking Officer Gevry. Officer Pysell informed me that Sergeant Bolduc only hit the prisoner once in order to free Gevry from the prisoner's assault. Officer Pysell further stated that he would have reported Sgt. Bolduc for inappropriate behavior if he suspected that Bolduc's actions were unjustified.

I interviewed Sgt. Bolduc on December 27, 2002. At this time I informed Sergeant Bolduc of the complaint against him. I also informed him he had the right to counsel and provided him with his Miranda warning. During the interview Sgt. Bolduc admitted to hitting Greenwood once in order to protect Gevry from being choked. Sergeant Bolduc denied any additional physical contact between himself and Greenwood.

Attempts to contact Mr. Greenwood at this home in Worcester have been unsuccessful. The booking sheet does not contain a phone number. Attempts to locate a current, working and correct number have proven unsuccessful.

The above information is in conformance with the report filed by Sgt. Bolduc. Bolduc's report contains a use of force paragraph at the end. To date, Officer Gevry has never filed a formal complaint either verbal or written regarding this incident.

Based on the department's current use of force policy, Sgt. Bolduc acted appropriately by using physical strength to overcome Greenwood's assault towards Gevry. Also, based on the department's present definition of unnecessary force, Bolduc force is deemed necessary.

While I did not interview Gevry, I believe that Sgt. Bent provided me with a correct and complete reiteration of Gevry's complaint. Gevry is alleging that Sgt. Bolduc assaulted the prisoner when Gevry had control of his prisoner and the prisoner was handcuffed behind his back.

Since Gevry and Bolduc have opposite versions of the situation, up to and including the location of the handcuffs, I must rely upon Officer Pysell's independent version of the situation. As stated above Pysell's statement to me is that he believes Sgt. Bolduc acted properly based upon the fact that Greenwood was strangling Gevry. I must concur based on the facts revealed to date.

As this is the only independent verifiable information available at this time, I recommend that you make a final determination that the allegation by Gevry is either not sustained due to insufficient evidence or unfounded.

Chief, I would also recommend that the use of force policy for the department be amended to make the use of OC spray as step one before use of physical strength. I would also recommend that the definition of unnecessary force be revised.


Respectfully,

Thomas V. Ralph
Deputy Chief

# EXHIBIT 19

3



**TOWN OF WEBSTER**
**TOWN ADMINISTRATOR'S OFFICE**
**PO BOX 339**
**WEBSTER, MA  01570**
Phone: (508) 949-3800, Fax: (508) 949-3888

December 12, 2003

Sergeant John Bolduc
P.O. Box 326
Webster, MA 01570

RE:    Investigation of Excessive and/or Unnecessary Use of Force

Dear Sergeant,

Please be advised that I have become aware of several incidences of excessive and /or unnecessary force that you have used during bookings, calls and interviews. As you know, the Town of Webster has regulations that prohibit the use of force except to overcome resistance directed against you or to assist another person who is in danger of bodily injury.

The incidents that have come to my attention did not warrant such force including the booking (picture taking) of a woman, rough handling of another woman while putting her in a car, and cutting head jewelry off a man while in the station with bolt cutters while he was handcuffed.

I have asked the Interim Police Chief to investigate this matter and until you have been either cleared or otherwise, you will be placed on paid administrative leave. You shall be assigned to your house between the hours of 9:00 AM to 5:00 PM and will notify the Acting Chief if you need to leave for an emergency.

I will inform you when the investigation is complete. If you have any questions, please contact me.

Sincerely,

Robin J. Leal
Town Administrator

Cc:    Board of Selectmen
       Acting Chief Keefe

RECEIVED ON 12-12-03 @ 18:09 HRS.

# EXHIBIT 20





# Webster Police Department

*Office of the Chief of Police*

Webster, Massachusetts 01570

**(508) 943-1212**
**FAX (508) 949-3898**

Richard E. Bergeron, Jr.
*Chief of Police*

Date: April 17, 2003  (Reissued April 27, 2003.  Your first response is inadequate )

To: Deputy Chief Thomas Ralph

From: Chief Richard E. Bergeron, Jr.

Re: Your Serious Allegations Concerning Officer Brian Barnes being a racist in your letter of April 15, 2003

You are herby ordered to complete a detailed report concerning the above allegations. Your report is to be completed by the end of your next working shift and shall include the following

- All witnesses to the allegations and circumstances of how the information was obtained

- Who you collaborated with you concerning these allegations

- Details of what the witness conveyed to you or others

*On the Shores of*

# LAKE CHARGOGGAGOGGMANCHAUGGAGOGGCHAUBUNAGUNGAMAUGG

# EXHIBIT 21

To:    Chief Bergeron

From:  Sgt. Bolduc

Date:    05/02/03

Re:    Officer Barnes


Sir:

During our last conversation (your office, afternoon of 05/01/03) you asked me if I had ever heard Officer Barnes make any inappropriate racial comments. When I answered that I had, you ordered me to write a statement.

On or about February 22, 2003 I attended a birthday lunch at the Colonial Club Restaurant for Town Administrator Secretary Heidi Courtnay. Present at that lunch were Lee Ellen Olmstead, Pamela Leduc, Deputy Chief Ralph, Officer Barnes, Heidi, and I.

At one point during the meal, Officer Barnes told us about an unpleasant airplane flight he had recently taken. He first began talking about an overweight woman who was seated in front of him and then repeated the sarcastic remarks he claimed he made to the flight attendant when she asked whether or not the woman "cared for a snack." He went on about the size of the woman and the amount of snacks she would require. The aforementioned people smiled sheepishly at best.

Officer Barnes then elaborated as to why he did not find the flight pleasant, at one point stating, "I had to sit in the middle seat between two niggers. I felt like a fuckin' oreo cookie." At that point, he became aware of the awkwardness he was creating as no one was laughing or smiling, but instead looking at each other. Officer Barnes paused briefly, and then changed the subject.

Respectfully,
Sgt. John Bolduc, Jr.


END

# EXHIBIT 22

> ------Original Message------
> From:        Bergeron, Richard
> Sent: Thursday, May 15, 2003 11:48 AM
> To:   Bolduc, John; Suss, Aaron
> Subject:
>
> Please vacate the basement office by Monday, 5, 19, 03.   Turn all keys
> into my office.

# EXHIBIT 23

## AFFIDAVIT OF MICHAEL D. KEHOE

Now comes Michael D. Kehoe and does hereby depose and say:

1. I was employed as a Town of Webster police officer from January 1998 until _June 2004_ .

2. I am currently employed as a police officer with the Town of Milford, Massachusetts.

3. On May 15, 2003 while on duty with the midnight shift myself and Officer Joseph Brooks were approached by Richard Bergeron then Chief of police of Webster and asked if we had any negative information with regard to John Bolduc to include specifically mistreating prisoners. I said I had no such information.

4. I was present in the Webster Police Station on the night of Novenber 9, 2002 when John Bolduc subdued Heath Greenwood in the booking room and was in the booking room seconds after Bolduc and Officer Thomas Pysell. Nothing I saw or heard that night gave any reason to believe that excessive force had been used in removing Greenwood from his assault of Officer Gevry.

5. I was in the station in response to the same emergency call from the dispatcher indicating there was a fight in the booking room. The State Police also responded.

Signed under pains of perjury this ___12th___ day of December 2006.

_____
Michael D. Kehoe

# EXHIBIT 24

TO:     Steven Boudreau, Webster Town Administrator

FROM:    Webster Police Sergeant John Bolduc, Jr.

DATE:    May 19, 2003

Re:    Intimidation Complaint

Sir:

In the second paragraph of my memo to you dated May 15, 2003, I expressed a concern that Chief Richard Bergeron would continue to take negative actions against me. On May 16, 2003 I, along with Webster Police Officer Aaron Suss, received an email from Chief Bergeron (dated 05/15/03) instructing us to vacate my office and to turn all keys to said office into him by May 19, 2003 (see attached). At this point, I am the only sergeant in the department not permitted to have office space. Along with my patrol, supervisory and investigative duties, I am also the department's training coordinator, reserve police liaison sergeant, and the department's domestic violence coordinator. There are several patrol officers with assigned office space, but I have been forced to establish an office at my home. I am concerned that every time I need to access information from my home office, further negative action will be taken against me for stopping at my home either too frequently or for too long a period of time. It is also my belief that one of the reasons for my eviction from my office is to hinder my job performance thereby enabling Chief Bergeron to justify future negative actions against me.

Further, Webster Police Officers Joseph Brooks and Michael Kehoe have informed me that on the night of May 15, 2003 Chief Bergeron attempted to solicit from them, incidents of mistreatment or abuse of prisoners in the Webster Police Lock-up by me. This is clearly the same negative tactics used with John P. Stevens (ref: second to last paragraph, page 3, complaint narrative dated May 15, 2003).

The aforementioned incidents are yet two more clear attempts to harass and intimidate me. Again I appeal to you for relief.

I have forwarded the aforementioned information to Jessica Thrall at the Massachusetts Commission Against Discrimination (MCAD), and to John Grossman at the Massachusetts Attorney General's Office, as I am a named witness in their investigation.

I will make myself available to you should you want to speak with me or if you require more information. You can reach me at 508-943-9907 (home) or ~~508-326-1070~~ (cell).

# EXHIBIT 25

**Discrimination Complaint**
**Massachusetts Commission Against Discrimination And EEOC**

RECEIVED

FEPA No.: 03-23-0179  Filing Date: 6/14/13
EEOC No.: 16CA302081  Violation Date: April 15, 2003

JUN 16 2003

COMMISSION AGAINST
DISCRIMINATION/SPRINGFIELD

**Name of Aggrieved Person Or Organization:**
John Bolduc
P.O. Box 326
Webster, MA 01570

Telephone Number: (508) 943-9907
Home:
Business: (508) 326-1078

**Named is the Employer, Labor Organization, Employment Agency, or State/Local Government Agency Who Discriminated Against Me:**
Webster Police Department
57 Thompson Road
Webster, MA 01570

Number of Employees: 25+
Telephone Number: 508-943-1212

Webster Police Chief
Richard Bergeron Jr.
57 Thompson Rd.
Webster MA 01570

**Cause of Discrimination Based On: Retaliation**
**The Particulars Are:**

On May 12, 2003, the Webster Police department has subjected me to unequal terms and conditions in my employment in retaliation for being a witness in a discrimination case against the Webster Police Department. Police Chief Bergeron, has interfered with my civil rights, granted and protected by law, by changing my rotation schedule from days to nights in the middle of an investigation. Chief Bergeron has created a hostile environment with intimidation and unequal treatment. I believe the respondent's conduct violates M.G.L.C. 151B s4(4), (4a) and Title VII of the 1964 Civil Rights Act, as amended.

1.) I have been a police officer with the Webster Police Department since March 1995. I have held the rank of Sergeant since October 2001.
2.) On April 15, 2003, I went to see Chief Bergeron and he immediately started to raise his voice, use profanity directed against me, and threaten me.
3.) On April 17, 2003, Deputy Chief Thomas Ralph, informed me that my name would appear on the list as a witness in his discrimination suit against the Webster Police Department.
4.) On May 1, 2003, Webster Deputy Police Chief, Thomas V. Ralph, filed a discrimination claim against the Webster Police Department alleging race discrimination.
5.) On May 12, 2003, I was informed that my scheduled duty of working days was changed to nights, effective immediately. Being pulled back into rotation to uniformed patrol duties during an ongoing investigation is not common practice.
6.) On May 14, 2003, I learned that John Stevens, a former Webster Reserve Police Officer, was told by Chief Bergeron that he would be reinstated if he was able to provide the chief with any negative information concerning myself or deputy chief Ralph.
7.) On or about May 15 2003, officer Brooks and officer Kehoe of the Webster Police Department, informed me that Chief Bergeron had questioned them as to whether I was involved at any time in any mistreatment of prisoners that they knew of.

**8.)** On May 19,2003, I was informed via e-mail by Chief Bergeron that I was to exit the office I have had for the last three years, and relinquish all keys to him by end of business day. I am a patrol supervisor and have investigative duties. I am also the Domestic Violence Coordinator, Liaison Sergeant to the Reserve Police Unit, and the Department Training officer. Since losing my office, I have been forced to continue performing my duties from my home. Patrolmen lower in rank have an office to work out of. Being home for too long a period of time on duty is against regulations. I am concerned that I will lose my job as a result of this.

**9.)** I believe the reason these actions are being taken against me are in retaliation for participation and assisting in proceedings of opposing discriminatory practices.

**I ALSO WANT THIS CHARGE FILED WITH EEOC: xx**
**I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.**
**I SWEAR OF AFFIRM THAT I HAVE READ THIS COMPLAINT AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.**

Sgt. John Bolduc, Jr.

**SWORN TO AND SUBSCRIBED BEFORE ME THIS** 1st **DAY OF** June ,
**2003**

**NOTARY PUBLIC**

**My Commission Expires:** / /

SHERRIE L CONDOS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 26, 2009

**EXHIBIT 26**



## *POLICY*

It shall be the policy of the Webster Police Department to inventory the contents of all persons that are arrested or placed in protective custody by members of this department. The purposes of this inventory are to:

1. Determine whether there is any personal property on the person that needs to be protected from loss or damage.

2. To protect the department and its personnel from claims of a failure to protect such property.

3. To protect the department and its personnel from false claims of loss of property that was never on the person.

4. To protect department personnel and the person against injury from dangerous substances or items that may be in that person's possession or on his person.

## *PROCEDURE*

Whenever a person is arrested or placed in protective custody by a department member, that member shall assume the responsibility for inventorying and safeguarding the contents of the person. The scope of this inventory shall include any locked or closed containers within the person's possession that can be opened by the booking officer without damage. The booking officer shall list all items found on the person on the booking inventory sheet. Any monies or articles of value that may be subject to loss or damage shall be recorded on the booking sheet and secured for safekeeping. Anything believed to be dangerous, contraband, or evidence of a crime shall be seized and tagged and submitted for storage in the evidence room.

The booking officer shall also conduct a thorough search of the prisoner or person held in protective custody at the booking desk prior to removing the handcuffs or other restraints. If the prisoner or person held in protective custody is of the opposite sex, a police employee of the same sex as the prisoner or person held in protective custody shall conduct the search, if possible.

Items, which are not apparently contraband or dangerous, can be examined only to the extent necessary to ensure they are not illegal or dangerous. Checking of papers, documents or other writings found on the prisoner or person placed in protective custody may be examined only to the extent necessary to ensure the person has provided his true name, address, date of birth, social security number and any medical conditions.

**RICHARD E. BERGERON, JR.**
**CHIEF OF POLICE**

Any writings, which are discovered during this search, which suggest illegal activity or are associated with the offense(s) charged, may be seized as evidence. If a search of papers or other possessions is to be conducted for non-booking reasons, such as investigative purposes, it may only be effected with the written consent of the prisoner or person held in protective custody or with a search warrant.

Supervision of females will be the responsibility of a qualified matron. The matron or a female officer shall conduct all searches and cell checks of female prisoner or person held in protective custody. The shift supervisor shall make every effort to obtain a matron or female officer to be present in the station at all times when females are in custody. If no matron or female officer is available, an attempt shall be made to relocate the female to a facility with matrons or females officers. As a last resort, the male dispatcher shall conduct the cell check of the female cells.

When a prisoner or person held in protective custody is released, the officer releasing the prisoner or person held in protective custody shall have the prisoner or person held in protective custody sign for all articles actually returned. If the prisoner or person held in protective custody refuses to sign for the return of their property, this fact shall be noted on the booking slip and witnessed.

Since a policy can not cover all encountered situations, discretion shall be at the forefront of this policy.

RICHARD E. BERGERON, JR.
CHIEF OF POLICE

# EXHIBIT 27



# Webster Police Department

57 Thompson Road
Webster, MA 01570
Phone: (508) 943-1212    Fax: (508) 949-3898



January 5, 2004

*oi Cell O'Keefe .*
*Get info fun Judge*
*Borten .*
*(cement abt*
*"Knock him (Chevy) out "*

Leo f. Polizoti Ph.D
Direct Decision Institute

RE: Sgt John Bolduc

Dear Dr Polizoti:

Attached is a summary of cases that are being looked into against Sgt John Bolduc, of excessive force.

Sgt Bolduc is a very educated and knowledgeable individual, who can say the right things when needed.  I have worked with him for several years and can be a good police officer.  *who?*  Unfortunately he has a temper that seems to ignite very fast.  Prior to his promotion, it was a concern not only by this Sgt, but the other 2 Sergeants, that he has a temper and has  *what specific?*  shown aggressive behavior.  Of course this was over looked and he was promoted.

I am asking you that the things included in this package be for you eyes only, seeing that there is an on going investigation into many of these cases.

If you have any questions concerning this report, please feel free to contact me at 508-943-1212.

Thank you,

William Keefe
Sgt, Acting Chief



PLAINTIFF'S
EXHIBIT
27 Keefe
8/17/06
PENGAD 800-631-6989

# EXHIBIT 28



**TOWN OF WEBSTER**
**TOWN ADMINISTRATOR'S OFFICE**
**PO BOX 339**
**WEBSTER, MA  01570**
Phone: (508) 949-3800, Fax: (508) 949-3888

March 19, 2004

Mr. John Bolduc, Jr.
P.O. Box 326
Webster, MA 01570

Re:    Town of Webster and John Bolduc

Dear Mr. Bolduc:

Please be advised that this letter constitutes my decision regarding the hearing conducted, pursuant to M.G.L. c. 31, on March 10, 2004. Effective immediately your employment with the Town of Webster is terminated. Attached please find the specification of charges letter dated February 26, 2004 from Acting Chief of Police William Keefe which outlines the charges that were substantiated at the March 10, 2004 hearing. Further it is my position that the charges individually or collectively would justify your termination.

All of the Town's property which is in your possession is to be returned to Acting Chief of Police William Keefe immediately.

I have enclosed a copy of M.G.L. c. 31, §§41-45 for your review.

Sincerely,

Robin J. Leal

Enc.


cc:    Board of Selectmen
       Acting Police Chief
       Town Counsel

App B



# WEBSTER POLICE DEPARTMENT
Office of the Chief of Police
Webster Massachusetts 01570
(508) 943-1212
FAX (508) 949-3898

BY HAND AND FIRST CLASS MAIL

March 1, 2004

Mr. John Bolduc, Jr.                    **CONFIDENTIAL-NOT A PUBLIC DOCUMENT**
P.O. Box 326
Webster, MA 01570

Re:    SPECIFICATION OF CHARGES AND RECOMMENDATION
       OF DISCIPLINARY ACTION

Dear Mr. Bolduc:

Please be advised that I have requested a hearing before the Town Administrator based on your conduct on or about February 19, 2002, November 9, 2003 and November 30, 2003.

As you are aware, an investigation was conducted into your conduct as a Sergeant of the Police Department for the Town of Webster regarding your actions during the above dates. Internal investigations into your conduct illustrate that you have violated several department rules and regulations. This conduct included use of excessive force, conduct unbecoming, failure to file a report and failure to follow appropriate departmental procedures. If the Town Administrator chooses to subsequently suspend you for a period of more than five days, reinstatement shall be subject to the approval of the Personnel Administrator of the Massachusetts Human Resources Division as provided in M.G.L. c.31, §41.

The specifics of these allegations are summarized as follows:

First, on or about February 19, 2002 you failed to follow the police department practice involving booking procedure. Specifically, you requested a prisoner, referenced herein as Detainee 1, to remove all of his jewelry while you were processing him through the booking procedure. You contacted Webster EMS and requested a ring cutter and a bolt cutter. You proceeded to cut the facial piercings off of Detainee 1 with bolt cutters. This is a violation of the departmental practice for booking procedures as well as constitutes conduct unbecoming.

Second, on or about November 9, 2003, you used excessive force when dealing with a prisoner, referenced herein as Detainee 2. Specifically, while Detainee 2 was being processed through the booking procedure he became unruly. At this time you arrived at the scene and said words to the effect of: "You want to fuck with my guy, huh? Then you are fucking with me." You then forcefully turned Detainee 2 around and punched him several times below his left eye. Further, you proceeded to kick and stomp Detainee 2 in the chest. You then stated words to the effect of "Put a leash on him, and get him out of here." These actions violate the department's use of

Mr. John Bolduc, Jr.
March 1, 2004
Page 2

force policy, integrated force management procedure and constitutes conduct unbecoming a police officer.

Third, on or about November 30, 2003 you were involved in an altercation with a female prisoner, referenced herein as Detainee 3, while she was being processed through the booking procedure. During the booking and processing procedure Detainee 3 refused to follow the directions of a fellow officer and allow herself to be photographed. You began to yell at Detainee 3 to follow the directions that she had been given. Once Detainee 3 continued to refuse to be photographed you held her face toward the camera so that a picture could be taken. You then held her head and eyes open for a second photograph. This conduct constitutes a violation of the department's use of force policy, the integrated force management procedure, and constitutes conduct unbecoming.

Each of these violations on or about February 19, 2002, November 9, 2003 and November 30, 2003 independently, as well as collectively, provides just cause for serious discipline. After a compete review of these matters, I am compelled for the good order and discipline of the Webster Police Department to request the appointing authority, the Town Administrator, to terminate your employment with the Town.

I have enclosed copies of Massachusetts General Laws Chapter 31, §41-45 for your review.

Respectfully,

William Keefe
Acting Chief of Police

/hc
Encl:
cc:    Robin Leal, Town Administrator
       Board of Selectmen

# EXHIBIT 29



# TOWN OF WEBSTER
## TOWN ADMINISTRATOR'S OFFICE
### PO BOX 339
### WEBSTER, MA 01570
Phone: (508) 949-3800, Fax: (508) 949-3888

BY HAND AND FIRST CLASS MAIL

March 1, 2004

Mr. John Bolduc, Jr.                    **CONFIDENTIAL-NOT A PUBLIC DOCUMENT**
P.O. Box 326
Webster, MA 01570

Re:    NOTICE OF HEARING

Dear Mr. Bolduc:

Please be advised that a hearing will be held on Thursday, March 10, 2004 at 10:00a.m. at the
Town Hall before the Town Administrator, the appointing authority, regarding your conduct on
or about February 19, 2002, November 9, 2003 and November 30, 2003. The Town
Administrator shall issue a decision pursuant to M.G.L. c31. If the Town Administrator chooses
to subsequently suspend you for a period of more than five days, reinstatement shall be subject to
the approval of the Personnel Administrator of the Massachusetts Human Resources Division as
provided in M.G.L. c. 31 §41. The specific charges against you are detailed in the attached letter
from Acting Police Chief Keefe specifying the charges and recommending disciplinary action.

The hearing will be held open to the public at your request. Please note that you have the right to
be represented by a union representative and/or counsel at this hearing to assist you in answering
and responding to the charges against you.

I have enclosed copies of Massachusetts General Laws Chapter 31, §41-45 for your review. If
you have any questions, please do not hesitate to contact me. Thank you for your attention to
this matter.

Very truly yours,

Robin J. Leal
Town Administrator

/hc
Encl:
CC:    Board of Selectmen
       Acting Police Chief Keefe
       Town Counsel

# EXHIBIT 30

Employee Exhibit 1




# Webster Police Department

57 Thompson Road
Webster, MA 01570

*Phone:* (508) 943-1212    *Fax:* (508) 949-3898

March 9, 2004

Christopher M. Browne, Esq.
IBPO

RE: John Bolduc

Dear Attorney Brown:

Responding to your letter requestig documents of John Bolduc, the following are attached
as well as explanations:

1. Tape of November 9, 2002, Heath Greenwood: Enclosed
2. Copy of Gevry's attendance record: Enclosed
3. Copy of first Greenwood Investigation: Unknown, One given to me by Ralph
   Enclosed
4. Copies of all transcripts: Enclosed

Second request same letter.
1. Audio tape of Greenwood in July: Need more specific date
2. Video tape of Greenwood: None
3. Correspondence to Dr. Polizoti: Enclosed
4. Bolduc's Personnel file: Missing see note *
5. Personnel file sent to Kopelman and Paige: See Note *
*Note: Accoring to Town Administrators Secretary, Sgt Bolduc had recievd two
copies of his Personnel File June 30, 2002 as well as Sept 10, 2003.

Regarding Sgt Bolduc's Personnel file:
1. This was brought to my attention by Sgt Bolduc, I believe around August 2003.
2. I made several attempts to locate this file without success.
3. Deputy Ralph informed me that he had given it to Chief Bergeron and Officer Steve
   Novick, when he was to hand over all investigation and files. See attached letter
   from Depuy Chief Ralph.
4. To this day the file has not been found.

Respectfully Submitted

William Keefe
Sgt, Acting Chief of Police

TO    :                    PHONE NO. : *705089493898                SEP. 30. 2003  12:20PM  P 1/2
FROM : Attorney Thomas V. Ralph                         PHONE NO. : 508 949 8918

**Thomas V. Ralph**
**11 Chestnut Hill Drive**
**Webster, Massachusetts 01570**
**(508) 949 – 7976**

September 30, 2003

Chief William Keefe
Webster Police Department
57 Thompson Road
Webster, MA 01570

**Re: Personnel Files**

Dear Chief Keefe:

Per your request I am submitting the following letter to you regarding the personnel files of Sergeant John Bolduc and Officer Michaela Kelly. Hopefully, this will help you to determine the location of the files.

On Friday May 2, 2003 I was called back to the police station per order of Chief Bergeron to complete a second report on allegations of racist statements being made by Officer Barnes. I was ordered to remain at my desk until the report was completed.

While sitting at my desk completing the report as ordered, Chief Bergeron and Officer Novick entered my office. The Chief informed me that he and Officer Novick had just left the District Attorney's Office and Officer Novick would now be handling all internal affairs investigations. At this time Chief Bergeron ordered me to turn over all files that I had on the Moran, Bolduc, Kelley investigations as well as any other internal investigation files I possessed. I immediately handed all of the files I possessed over to Chief Bergeron.

Included in these files was a large manila envelope, which contained the personnel files of both Sergeant Bolduc and Officer Kelley. These files were packaged this way when they were returned to me from the town administrator's office. The files were kept together for presentation at Officer Kelly's Civil Service Commission hearing, should they be needed.

I have no knowledge of where these files went after they were turned over by me to Chief Bergeron.

Respectfully,

Thomas V. Ralph
Deputy Chief

# EXHIBIT 31

## IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

## DEPOSITION OF:

ROBIN LEAL
DATE:   SEPTEMBER 15, 2006

---

### PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## ROBIN LEAL          SEPTEMBER 15, 2006

### 5

1   ROBIN LEAL, the Deponent, having been
2 satisfactorily identified by the production of her
3 driver's license and having been first duly sworn
4 by the Notary Public, deposes and says as follows:
5                    *****
6        DIRECT EXAMINATION BY MR. GREEN
7   Q.   Ms. Leal, after having spent the last
8 several weeks I'm sure you know who I am but just
9 for the record, I'm Attorney John Green.  I
10 represent John Bolduc in an action filed in the
11 Federal District Court against the Town of Webster
12 and against yourself, Mr. Keith, and former Chief
13 Bergeron.
14        I'm here to ask questions with respect
15 to what you may know with regard to the events
16 leading to the termination of Mr. Bolduc from the
17 Webster Police Department among other things.
18        If at any time you wish to take a break
19 and confer with counsel, please let me know, I'll
20 be happy to accommodate you.
21        If for any reason I haven't put a
22 question to you in a form that you feel you can
23 respond, please let me know and I'll try to
24 appropriately adjust it to allow for a response.

### 6

1 I know you know, but I'll say again for the
2 record, please make all your responses verbal so
3 they can be made a part of the record.
4        Are you under the influence of any kind
5 of medication that would inhibit your ability to
6 answer my questions today?
7   A.   No.
8   Q.   Would you please state full name for the
9 record?
10   A.   Robin Leal Craver.
11   Q.   Where do you live?
12   A.   35 Bayview Road, Webster, Mass.
13   Q.   What city?
14   A.   Webster.
15   Q.   With whom do you live at that address?
16   A.   My husband Bob Craver and my son Michael
17 Leal.
18   Q.   Are you recently married?
19   A.   Yes.
20   Q.   Were you married to Mr. Craver when you
21 were employed by the Town of Webster?
22   A.   No.
23   Q.   When did you and Mr. Craver marry?
24   A.   October, 2005.

### 7

1   Q.   If you could, please, where were you
2 born?
3   A.   Middleboro, Massachusetts.
4   Q.   Do you have a résumé or any type of CV?
5 You know what I'm talking about?
6   A.   I don't know what a CV is.
7   Q.   A curriculum vitae -- a listing of your
8 educational background and your previous
9 employment history?
10   A.   Yes; I do.  I have a résumé.
11   Q.   Would you be willing to provide me a
12 copy of that to kind of reduce the number of
13 questions I have to ask along those lines?
14   A.   Absolutely.
15        MR. McCULLOUGH:  We will produce
16 that, certainly.
17        MS. GREEN:  It just will save a
18 little bit of time.
19   Q.   (BY MR. GREEN)  When did you begin your
20 employment with the Town of Webster?
21   A.   October, 2003.
22   Q.   Prior to October of 2003 were you
23 employed?
24   A.   Yes.

### 8

1   Q.   Where were you employed?
2   A.   The Town of Georgetown.
3   Q.   Is that --
4   A.   (Interposing) Massachusetts.
5   Q.   How long have you been employed by the
6 Town of Georgetown?
7   A.   Three years.
8   Q.   Prior to that, were you also employed?
9   A.   Yes; I was the assistant town manager in
10 the Town of Norton.
11   Q.   How long were you employed at the Town
12 of Norton?
13   A.   A year and a half.
14   Q.   Prior to working at Norton, where were
15 you employed?
16   A.   I was employed at Bridgewater State
17 College and the Town of Easton.
18   Q.   You were working for both
19 simultaneously?
20   A.   Yes.
21   Q.   What did you do for Bridgewater State
22 College?
23   A.   I was a graduate assistant.
24   Q.   Do you have a graduate degree?

# EXHIBIT 32

IN THE MATTER OF:

JOHN A. BOLDUC vs.

TOWN OF WEBSTER ET AL

---

DEPOSITION OF:

WILLIAM KEEFE
DATE:  AUGUST 17, 2006

---

## PERLIK and COYLE REPORTING
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

## COMPRESSED TRANSCRIPT & WORD INDEX

# JOHN A. BOLDUC vs. TOWN OF WEBSTER ET AL
## WILLIAM KEEFE          AUGUST 17, 2006

**49**

1       You said you had your hands full. What
2 sorts of things -- what responsibilities of the
3 chief were they that filled your agenda?
4     A. I had to go to several meetings; I had
5 to go deal with the citizens of -- at times maybe
6 they're unhappy with things or they had some
7 issues with traffic control and community
8 meetings.
9       It took me -- and most of my time when I
10 was first appointed was -- I had to do the
11 payroll; I had to do all the secretarial work and
12 I just didn't have time enough to spend doing the
13 scheduling, making sure the guys had their things
14 that they needed, stuff like that.
15     Q. There was a relatively brief window of
16 time that you were acting as deputy chief before
17 you moved on to become acting chief?
18     A. Yes.
19     Q. Full chief. Were you doing the
20 scheduling and those types of tasks during that
21 window where you were the acting deputy?
22     A. Yes, sir.
23     Q. Do you recall -- did you ever recommend
24 to the town administer that he take steps to

**50**

1 terminate Ralph?
2     A. No.
3     Q. Did you ever take -- did you ever make
4 specific recommendations to the town
5 administrator, Mr. Boudreau, that he terminate
6 Bolduc?
7     A. No.
8     Q. Did you have any conversations with the
9 town administrator, Mr. Boudreau, regarding Ralph
10 or Bolduc?
11     A. I had many conversations.
12     Q. Did you have any with him specifically
13 about those two individuals?
14     A. Again, we've had -- we had many
15 conversations because Tom Ralph was on paid
16 administrative leave and Bergeron was on paid
17 administrative leave.
18     Q. What was it that you --
19     A. (Interposing) And John Bolduc was
20 working his shift so I had no problem with
21 Sergeant Bolduc at that time.
22     Q. When you became appointed as deputy
23 chief, had you taken the civil service exam for
24 qualification for appointment as a chief?

**51**

1     A. For where?
2     Q. For Webster?
3     A. They didn't give one. There hadn't been
4 a chief's exam for Webster.
5     Q. Have you ever taken the Chief's exam for
6 Webster?
7     A. No -- or maybe I did. Maybe when -- I
8 don't recall taking one. I probably, if -- when
9 Chief Bergeron left, I would say I would have to
10 have taken the test. I was a sergeant so I took
11 the test.
12     Q. When Chief Bergeron left?
13     A. There was no test given until --
14     Q. (Interposing) Strike that. Is it your
15 testimony that you believe that at the time
16 Bergeron was appointed that you took the test?
17     A. In the interim between Chief Minarik and
18 Chief Bergeron they gave a civil service test.
19     Q. For the chief position?
20     A. Correct.
21     Q. Did you take that?
22     A. I would have to say yes, I probably did
23 take it.
24     Q. Do you recall having taken the test at

**52**

1 any time subsequent to that test?
2     A. I've taken so many civil service tests
3 I'm not sure if they were chief's or sergeant's.
4 I couldn't say.
5     Q. Did you specifically take a civil
6 service test for the purposes of qualifying for
7 appointment as chief after Chief Bergeron was
8 terminated?
9     A. Back in?
10     Q. 2003.
11     A. No; I think it was 2004 maybe they gave
12 the test.
13     Q. Did you take the test in 2004?
14     A. I did.
15     Q. Did you pass the test?
16     A. That's why I'm a sergeant today; no.
17     Q. I'm going to just go back and ask
18 whether or not you specifically recall having
19 had -- the substance of any conversations you had
20 with Mr. Boudreau regarding Bolduc or Ralph?
21     A. Can you be more specific on what
22 conversations I could have had?
23       I told you we've had conversations about
24 people in the police department. If you can be