# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
JOHN A. BOLDUC, JR.,                    )
                                        )
       **Plaintiff,**                         )
                                        )    **Civil Action No.**
       **v.**                               )    **05-40030-FDS**
                                        )
**TOWN OF WEBSTER and RICHARD**         )
**BERGERON,**                           )
                                        )
       **Defendants.**                       )
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

      This action involves the allegedly wrongful discipline and discharge of a police officer.

Plaintiff John Bolduc contends that the Town of Webster and its chief of police (defendant

Richard Bergeron) retaliated against him for disclosing that he had heard another officer make a

racist comment, and for filing a complaint with the Massachusetts Commission Against

Discrimination ("MCAD").  Specifically, Bolduc brings claims for (1) deprivation of civil rights

guaranteed by the First, Fifth and Fourteenth Amendments to the U.S. Constitution in violation

of 42 U.S.C. § 1983; (2) violation of 42 U.S.C. § 1985(2); (3) violation of Mass. Gen. Laws ch.

151B; (4) violation of 42 U.S.C. § 2000e *et seq.* (Title VII); (5) violation of Mass. Gen. Laws ch.

149, § 185 (the Massachusetts Whistleblower Act) against the Town only; and (6) violation of

Mass. Gen. Laws ch. 12, §§ 11H & I (Massachusetts Civil Rights Act, or "MCRA").

      Defendants have jointly moved for summary judgment.  The determination of the merits

of that motion is complicated by the fact that plaintiff has failed to specify his causes of action

with any precision.  In addition, in his memorandum opposing summary judgment, plaintiff treats

certain theories superficially without any factual or legal development, mentions others only in

passing, and ignores others altogether.  This makes it exceedingly difficult for the Court to

ascertain the exact nature of the claims and to determine whether there is evidence to support

them.  It is not the obligation of the Court to play the role of plaintiff's advocate, or to scour the

record for evidence supporting a theory when plaintiff himself has neglected to do so.  "Judges

are not like pigs, hunting for truffles buried in briefs."  *United States v. Dunkel*, 927 F.2d 955, 956

(7th Cir. 1991).

In any event, and for the reasons stated below, defendants' motion for summary judgment

will be granted in part and denied in part.

I.      **Factual Background**

The facts are set forth in the light most favorable to the plaintiff, except as noted.

A.      **Bolduc's Promotion to Sergeant**

Plaintiff John A. Bolduc became a police officer with the Webster Police Department in

March 1995.  In October 2001, he was appointed to the position of provisional sergeant.

In June 2002, the Town had an opening for the position of sergeant.  Three candidates

took a civil service examination and participated in oral interviews for the position:  Bolduc,

Officer Michaela Kelley, and Officer Aaron Suss.  The officials filling the position could select

any one of the top three scoring applicants on the examination.  Kelley received the highest grade

on the examination.  Bolduc, however, scored the highest grade in the oral interview, and was

awarded the promotion on June 30, 2002.  The decision to promote him was made by defendant

Richard Bergeron, who was the Chief of Police at the time.

Bolduc was normally assigned to uniform patrol duty on the night shift.  However, he was permitted to work days in plainclothes, as necessary, because he was assigned to a cold case murder investigation known as the Amato case.

### B.   The Colonial Club Incident

On February 22, 2003, Bolduc, Officer Brian Barnes, Deputy Chief Thomas Ralph, and several other town employees met for lunch at the Colonial Club Restaurant in Webster.  The purpose of the lunch was to celebrate the birthday of the Town Administrator's secretary.  During the lunch, Barnes, while in uniform, told a story about an airplane flight he had recently taken. Bolduc contends that Barnes "first began talking about an overweight woman who was seated in front of him . . . then elaborated as to why he did not find the flight pleasant, at one point stating, 'I had to sit in the middle seat between two niggers.  I felt like a fuckin' Oreo cookie. . . .'" (Pl. Opp. at Ex. 21; Bolduc Dep. 8/31/2006 at 54-56).

About two weeks later, on March 6, Barnes informed a union representative, Detective Michael Shaw, that he believed that Bolduc had cheated on the oral interview for the position of sergeant.  According to Barnes, he was in a room with Deputy Chief Ralph on the night before the oral interviews.  Barnes reported that he heard Ralph reading the oral interview questions to Bolduc over the telephone, that he remembers the incident quite "vividly," and that Ralph told him "not to 'fucking say anything to anybody' about the conversation."  Barnes contends that he also told Officer Kelley and Chief Bergeron about the allegations the same day.  Bolduc denies any cheating in connection with the oral interview.

On April 15, Deputy Chief Ralph delivered a letter to Chief Bergeron that he contended was a "formal complaint" against Barnes for acting in a "manner that is racist, slanderous and

libelous." In the letter, Ralph stated that Barnes, while on duty, made racist statements in public by "referring to blacks as 'niggers,' Hispanics as 'spics' and Asians as 'chinks.'" The letter also stated that in early 2003, the police department had received negative media publicity because Barnes was "the number one Officer in the state failing to comply with the state mandated racial profiling law." According to Ralph, Chief Bergeron became upset upon hearing the allegations against Barnes and told Ralph to leave his office. Later that day, Bergeron ordered Ralph to turn in the keys to his police car.

### D.     Allegations of Retaliation Against Bolduc

Also on April 15, Bolduc stopped by Chief Bergeron's office to discuss the Amato investigation. Chief Bergeron showed him the complaint letter from Deputy Chief Ralph. Bergeron accused Bolduc of "displaying inappropriate loyalty to Ralph," and collaborating with Ralph on the letter; he also told him that his "friendship, support and loyalty to the Deputy Chief is going to cost [him]."[1]

On April 16, Deputy Chief Ralph sent a letter to Chief Bergeron inquiring about his employment status. On April 17, Bergeron ordered Ralph to give a formal written report explaining his "insubordination"—a reference to Ralph's alleged failure to respond to the dispatcher between the time he left Bergeron's office and when he was later asked to turn in the keys to his patrol car on April 15. That same day, Barnes gave Bergeron a statement concerning Bolduc's alleged cheating. Bergeron then left for vacation, leaving Sergeant William Keefe in charge while he was gone. Also that same day, Ralph told Bolduc that he had given Bergeron a list of witnesses to Barnes's comments at the Colonial Club lunch, and that Bolduc's name was

---

[1] According to Chief Bergeron, he told Bolduc that if he and Ralph had concocted false allegations of racist behavior it would cost them both.

on the list.  Ralph also told Bolduc that his name would appear on a list of witnesses in a discrimination claim that Ralph intended to file against the police department.

While Bergeron was away on vacation, Ralph returned to work.  Ralph then suspended Barnes for not following the proper chain of command, refusal to obey a direct order, and insubordination and discourtesy.

On May 1, Ralph filed a claim with the MCAD.  The complaint made no mention of Bolduc's witnessing of the Colonial Club incident.  That same day, Bolduc entered Bergeron's office to discuss an unrelated investigation.  During that meeting, Bergeron asked him if he ever heard Barnes make racist comments.  Bolduc responded that he had.  Bergeron ordered Bolduc to provide him "a written statement with names and dates."

On May 6, after a hearing, Barnes was reinstated with back pay.

On May 12, Bergeron asked Bolduc if he had prepared the statement he had requested regarding Barnes.  Bolduc gave Bergeron a one-page statement, dated May 2, that addressed the incident at the Colonial Club.  After Bolduc provided the statement, Bergeron told Bolduc that he was to return to uniformed patrol duty, effective immediately.  Bolduc contends that his schedule of duties was also changed from the day shift to the night shift.

On May 14, according to Bolduc, Chief Bergeron and another officer met with John Stevens, a former Webster police officer.  Bergeron allegedly offered to reinstate Stevens if he could provide negative information about Bolduc or Ralph.

The next day, May 15, Bolduc sent a memorandum to Town Administrator Steven Boudreau.  The memorandum stated (inaccurately) that Bolduc had filed a complaint with the MCAD, charging that he was the "target of retaliation" by Bergeron because he was identified as

a witness in the MCAD proceeding filed by Ralph.[2]  Also on May 15, Bergeron told Bolduc and Officer Suss to relinquish their lower-level office space.  Bolduc contends this loss of space required him to maintain police records at home.[3]

On May 18, Ralph was placed on administrative leave by Bergeron for suspending Barnes without cause.  On May 19, Bolduc sent a further letter to Town Administrator Boudreau alleging that Bergeron was retaliating against him.

On June 15, Chief Bergeron and another officer questioned Earl Burgess, a bartender acquainted with Bolduc.  Bergeron asked Burgess if he was aware of any drug use, specifically cocaine, by Bolduc.  Burgess said that he had no knowledge of any sort of illegal activity on the part of Bolduc.

Bolduc learned about the incident that same day and confronted Bergeron.  He told Bergeron that he would submit to blood and urine tests to prove that he was not taking drugs.  Bolduc contends that Bergeron told him not to worry about it because he "never put any credence" in the allegation.  The following day, June 16, Bolduc filed a complaint with the MCAD against the police department and Bergeron.  Citing his loss of office space and shift change, he alleged that "the Webster Police Department has subjected me to unequal terms and conditions in my employment and in retaliation for being a witness in a discrimination case against [the department]."

On July 14, Bergeron was placed on paid administrative leave by Town Administrator Boudreau.  Bolduc did not work with Bergeron again after July 14.  Sgt. William Keefe was

---

[2]  In fact, Bolduc's MCAD complaint would not be filed for another month.

[3]  Bergeron contends that he asked Bolduc and Suss to vacate the office because the department had limited space and the office was needed for an ongoing political corruption investigation.

appointed Acting Chief.[4]

On July 29 and August 1, the Massachusetts Human Resources Division held an investigative hearing on Barnes's allegations that Bolduc cheated on the promotion examination. On November 10, the HRD issued a decision in Bolduc's favor, upholding his promotion to sergeant. The hearing officer concluded that Barnes's credibility was diminished by the fact that he waited almost nine months to reveal the information.

On October 1, Robin Leal was appointed as Town Administrator.[5]

### E.      The Catherine Abbe Incident and Ralph's Disciplinary Hearing

On November 30, a woman named Catherine Abbe was arrested. Abbe was uncooperative with respect to her booking photograph; she put her hair in front of her face and refused to look at the camera. Bolduc was present, as were an Officer DiFusco and two others. According to Bolduc, he attempted to get Abbe to cooperate for at least five or six minutes, but she closed her eyes and swore at the officers. Bolduc admits that he held Abbe's head and raised her eyelids with his fingers so that DiFusco could take the booking photograph. Abbe was crying during the incident.

At some point, Acting Chief Keefe learned about the incident. In early December, DiFusco told Keefe that he had brought Abbe in for booking, that she was unruly and uncooperative, that Bolduc "came and squeezed her face, pried her eyes open with his other hand and squeezed her jaw," and that Bolduc then told DiFusco to take the picture. DiFusco said that

---

[4] On July 16 and August 15, Keefe, as Acting Chief, approached Boudreau and requested that he terminate Bolduc and Ralph. Boudreau refused.

[5] On October 16, the Town engaged retired state judge Robert Barton to investigate the police department. Judge Barton issued a report as a result of his investigation on December 8. The record does not include the contents of that report or its conclusions.

he had deleted the photos from the booking camera.  Keefe notified Town Administrator Leal about the incident.

On December 9, a police department disciplinary hearing was held concerning Ralph. Bolduc testified on behalf of Ralph at the hearing.[6]

On December 11 or 12, DiFusco provided Keefe with a disk containing the booking photographs of Abbe.[7]  Keefe showed the photographs to Leal the afternoon of that same day.  On December 12, Bolduc came into the station and told Keefe not to worry about the incident, as he had spoken to Abbe's family who thought it was "no big deal."  Beyond that statement, Bolduc invoked his union rights not to speak about the incident.

As a result of the Abbe incident, Leal asked Keefe to investigate two other alleged excessive use of force incidents involving Bolduc:  the February 2002 Jonah Mayotte incident, and the November 9, 2002 Heath Greenwood incident.

On December 12, Bolduc was placed on paid administrative leave pending the outcome of the three investigations.[8]

### F.    The Jonah Mayotte Incident

On February 19, 2002, officer Michaela Kelley arrested Jonah Mayotte following an altercation at a bar.  When Mayotte was brought to the station he was uncooperative and refused to remove his jewelry.  Officer Kelley and another officer tried to remove the jewelry but were

---

[6] There is no evidence in the record that Bolduc ever testified on behalf of Ralph in an MCAD proceeding.

[7]  The apparent contradiction between the production of these photographs and DiFusco's earlier statement that the photographs had been deleted is not explained in the record.

[8]  Bolduc contends that on December 18, he and Ralph met with Robert Miller, the chairman of the Town Board of Selectmen.  Miller stated he was meeting with them at the request of Town Administrator Leal, and requested that they both resign.  Both men refused.

unsuccessful.  They asked for assistance, and Bolduc responded.[9]  Mayotte was lying face down on the floor when Bolduc arrived; Bolduc removed his necklace by using his utility knife.  He then instructed two officers to place Mayotte in a chair.  Bolduc asked Gary Wrubleski, an EMT, to give him a ring cutter to remove Mayotte's facial jewelry.  However, when Bolduc tried to use the ring cutter, it did not work.  A part-time officer then suggested that he use a pair of bolt cutters from the fire department rescue truck.  Bolduc showed the bolt cutters to Mayotte and told him that if he did not remove his jewelry himself, Bolduc would use the bolt cutters to do it.  Bolduc told the officers to hold Mayotte still.  He then used the bolt cutters to cut off facial jewelry from Mayotte's left ear and above his left eye.  Mayotte then removed the rest of the jewelry himself.

### G.    The Heath Greenwood Incident

On November 9, 2002, Heath Greenwood was arrested on the scene after breaking into a home.  Officer Leonard Gevry transported Greenwood to the station for booking.  At the police station, Greenwood became combative, threatening Gevry verbally and physically.  Ultimately a physical struggle ensued between Gevry and Greenwood, prompting the dispatcher to put out an emergency call for all units.  Bolduc responded.  According to Bolduc, when he arrived at the station, he saw Greenwood forcing his handcuffs under Gevry's chin and choking him.  According to Bolduc, he yelled at the suspect, but Greenwood ignored him.  At his deposition, Bolduc provided the following account of the incident:  "I reached across Greenwood, grabbed his shirt from the far shoulder, spun him toward me and punched him in the chin."  Greenwood then fell to the ground.  Another officer then "bumped" Bolduc out of the way.  The account of

---

[9] According to Bolduc, Ralph was also present but did not participate.

the incident provided by Officer Gevry in his written report diverges sharply from Bolduc's version of the events.[10]  Bolduc contends that the Gevry report of the incident is untrue. Greenwood was not charged with assault and battery on an officer.

On February 26, 2003, Ralph made a report to Bergeron based on his investigation of the Greenwood incident that absolved Bolduc of any wrongdoing.[11]

### H.    Bolduc's Termination

After Bolduc's administrative leave began on December 12, 2003, Acting Chief Keefe and Town Administrator Leal sent Bolduc for a "fit-for-duty" screening.  The screening was performed by Leo Polizoti, Ph.D., a licensed psychologist, on January 5, 2004.  Prior to the assessment, Keefe provided Dr. Polizoti with a summary of the three incidents.[12]

Dr. Polizoti made his report on January 27.  That report stated that if the allegations of excessive force arising out of the Greenwood, Mayotte, and Abbe incidents were true, he believed that Bolduc was unfit for law enforcement duty and would recommend that Bolduc not return to full-duty status.  He also reported that if the incidents occurred, he believed that Bolduc had personality issues that were detrimental to his functions as a police officer.

According to Bolduc, on February 23, the Board of Selectmen unanimously voted to

---

[10]  In the report, Gevry stated Greenwood was handcuffed behind his back at the scene and transported to the station for booking.  Greenwood became unruly and began physically fighting with Gevry, although Gevry contends Greenwood never choked him.  According to Gevry, Bolduc "rushed out of nowhere yelling, 'You want to fuck with my guys, huh?  Then you are fucking with me too!'"  Bolduc then pushed Gevry away and grabbed Greenwood and spun him out of the way, causing him to fall on the floor.  Bolduc then pulled back and punched him below his left eye three times.  Gevry hooked elbows with Bolduc to stop him from punching Greenwood.  Bolduc then kicked Greenwood on the right side of his chest.  When Gevry pulled Bolduc back, he stomped on Greenwood once.  Another officer intervened and told Officer Kehoe, "Put a leash on [Bolduc], and get him out of here."  Bolduc contends that Greenwood's handcuffs were in front rather than behind his back; that he only hit Greenwood once; and that he never stepped on him.

[11]  In his deposition, Bergeron testified that he never assigned Ralph to investigate the Greenwood incident.

[12]  Bolduc disputes the accuracy and fairness of the summary.

award him a commendation for his work on the Amato murder investigation.  However, on March 1, Leal requested that each member of the Board rescind the commendation, because it would weaken her position at the disciplinary hearing and in the matters pending before the MCAD. Two members did change their votes and the commendation was rescinded.  On the same day, Keefe, as Acting Chief, sent a letter to Leal recommending Bolduc's termination.

**J.**     **Termination Hearing**

On March 9, 2004, the Town informed Bolduc that his personnel file had been lost.  He did not receive information that had been requested by his attorney until twelve hours before the start of his hearing.  He was offered a postponement, but his attorney declined it.

According to Bolduc, Bergeron played a role in the disappearance of his personnel file. The only evidence in support of that allegation is a letter written by Ralph that he had no knowledge of where the file "went after [it was] turned over by me to Chief Bergeron."  (Pl. Mem. at Ex. 30).  At the time Ralph turned the file over to Bergeron, its intended ultimate recipient was an Officer Novick, who wanted it for an internal investigation. (*Id.*).

On March 10, the termination hearing was held before Leal.  The subjects of the hearing were the Mayotte, Greenwood, and Abbe incidents.  On March 19, Leal terminated Bolduc.

On March 25, Bolduc filed a civil service appeal pursuant to Mass. Gen. Laws ch. 31, §§ 41-44.  According to Bolduc, on April 15, Selectman Raymond Regis told Ralph and O'Donnell that Leal had told him prior to the termination hearing that she intended to fire Bolduc, but had to conduct the hearing "to make it look good."  On May 11, Bolduc's MCAD claim was dismissed.

**K.**     **Whistleblower Allegations**

On August 5, 2004—more than four months after he was terminated—Bolduc sent a letter

to the Town labeled as a "notice pursuant to M.G.L c. 149, § 185(c)(1)," the Massachusetts

whistleblower statute.  In the letter, Bolduc alleged that employees of the Town retaliated against

him because he "substantiated racist public behavior by a uniformed officer."  He also alleged

that the police department violated "Massachusetts and Federal law, both in practice generally

and specifically as applied to him."  He stated that the police department failed to comply with the

administrative requirement of recording the race of individuals detained by the police for traffic

violations.  He also alleged failure to discipline officers for making overtly racist remarks in

uniform, on duty and in a public place.

Bolduc then filed this action.

## II.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

issue is "one that must be decided at trial because the evidence, viewed in the light most flattering

to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either

party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  "[T]here is

no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249-50 (1986) (internal citations omitted).

## III.    Analysis

### A.    Count 1:  § 1983 Claim

Plaintiff first contends that defendants, acting under color of state law, terminated his employment in retaliation for the exercise of his right of free speech and in violation of his rights to procedural and substantive due process under the First, Fifth, and Fourteenth Amendments.  As this case does not appear to involve any federal action, plaintiff's claims will be analyzed under the First and Fourteenth Amendments.[13]

### 1.   Claim Against Bergeron

#### a.   First Amendment Claim

Plaintiff contends that he was terminated as a police officer, and that he suffered various adverse actions in the workplace prior to his termination, in retaliation for his exercise of free speech.  It appears that the relevant acts of speech were plaintiff's statements on May 1 and 12, 2003, corroborating the Colonial Club incident.[14]

In order to determine the scope of free speech protections applicable to public officials,

---

[13]  Plaintiff has generally framed his First Amendment claim as a free speech issue throughout the pleadings. *See, e.g.*, Compl. ¶ 77 ("Defendants' concerted and joint and several actions leading to the termination of Bolduc were undertaken pursuant to the aforesaid unlawful agreement, in order to retaliate against and punish Bolduc for the exercise of his freedom of speech as protected by the First Amendment to the United States Constitution and to attempt to prevent further exercise of those rights.").

The complaint, however, also alleges a violation of plaintiff's rights to freedom of association and inquiry. Freedom of association is constitutionally protected "in two distinct senses":  (1) the right to enter into and maintain certain intimate human relationships and (2) the right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).  Freedom of inquiry is a doctrine normally associated with academic freedom. *See, e.g., Wieman v. Updegraff*, 344 U.S. 183, 194-95 (1952) (Frankfurter, J., concurring).  Plaintiff has not addressed either claim in his opposition papers, or suggested how those claims might apply to the facts of this case (or differ, if at all, from the free speech claims).  Again, it is not the role of the Court to come up with arguments or evidence supporting claims when plaintiff himself neglects to do so.  The Court will accordingly treat the claim solely as a free speech claim.

[14] Plaintiff does not identify the actual speech at issue. Paragraph 69 of the complaint, however, states that defendants "initiated a systematic pattern of unfair and abusive behavior aimed at chilling Bolduc's exercise of his First Amendment rights" that was triggered by "Bolduc's corroboration and identification of Ralph's statements, and identification of him as a witness to racist behavior by Officer Barnes."

the First Circuit has employed a three-part test extracted largely from two Supreme Court opinions. *See Mullin v. Town of Fairhaven*, 284 F.3d 31, 37 (1st Cir. 2002) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)); *see also Tang v. Rhode Island Dept. of Elderly Affairs*, 163 F.3d 7, 11 (1st Cir. 1998); *O'Connor v. Steeves*, 994 F.2d 905, 911 (1st Cir. 1993). To prevail on a § 1983 retaliation claim, a public-employee plaintiff must establish: (1) that he spoke as a citizen on a matter of public concern; (2) that his interest in commenting upon these matters outweighed defendant's interest in the efficient performance of its public services; and (3) that the "protected speech" was a substantial or motivating factor in the defendant's adverse employment action. *Lewis v. City of Boston*, 321 F.3d 207, 218-19 (1st Cir. 2003). The first two factors raise questions of law for the court. *Id.* at 219; *see also Bergeron v. Cabral*, 535 F. Supp. 2d 204, 211 (D. Mass. 2008). Whether protected speech was a motivating or substantial factor in the decision to take an adverse employment action raises issues of fact, the resolution of which is ordinarily a question of fact for the jury. *See Nethersole v. Bulger*, 287 F.3d 15, 18-19 (1st Cir. 2002).[15]

The first step itself has two subparts: the plaintiff must establish (a) that he spoke as a citizen and (b) that the speech was on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007). The Court is willing to assume that the speech at issue—communications corroborating a racist remark by a fellow police officer—addressed a matter of public concern, and therefore satisfies the second prong. *See*

---

[15] If the plaintiff satisfies his burden on the "substantial or motivating factor" element, the defendant must then be afforded an opportunity to show by a preponderance of the evidence that he would have reached the same decision even in the absence of the protected conduct. *O'Connor*, 994 F.2d at 913 (quoting *Mt. Healthy*, 429 U.S. at 287). However, resolution of these questions of fact must ordinarily await consideration by the jury at trial.

*Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (finding that police department's systemic racism and anti-Semitism were "clearly matters of public concern"); *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 224 (D. Mass. 2002) (finding "that the statements made by [plaintiff] regarding corruption and racism within the Holyoke police department were on matters of public concern"). Plaintiff cannot, however, satisfy the first prong—that he was speaking "as a citizen," as opposed to pursuant to his employment duties. *Garcetti*, 547 U.S. at 418.

A public employee who is speaking as an employee, rather than as a citizen, has no First Amendment cause of action based on his "employer's reaction to the speech." *Id.* In other words, the focus in this context is not on the content of the speech, but "the role the speaker occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007). Again, that issue presents a threshold question of law for the court. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) ("The 'inquiry into the protected status of speech is one of law, not fact.'") (quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983)); *Foley v. Town of Randolph*, 2009 U.S. Dist. LEXIS 20334, at *11 (D. Mass. Mar. 11, 2009).

There can be little doubt that plaintiff's statements on May 1 and 12, 2003, corroborating the Colonial Club incident were made pursuant to his employment duties. According to plaintiff, those statements were made in direct response to orders from his superior officer as part of an internal investigation of claims of racism against a fellow officer within the department. That is not, under any view of the evidence, speech made as a mere citizen. *See Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job.") (collecting post-

*Garcetti* cases); *Spiegla*, 481 F.3d at 962 (holding that in bringing a possible security lapse and a complaint about an immediate supervisor to the assistant superintendent's attention, a prison guard was speaking not as a citizen but as a correctional officer charged with the duty to ensure the prison's safety and so "the First Amendment does not insulate her statements from employer discipline").

Plaintiff's statements are thus not entitled to the constitutional protection afforded to "participati[on] in public debate" and "contributions to the civic discourse." *Garcetti*, 547 U.S. at 422.[16] Rather than participating in public debate or contributing to civic discourse, plaintiff was providing information (under direct orders) in an investigation being conducted by the police chief. He "'acted as a government employee' when []he reported the possible misconduct to h[is] superior . . . . [H]e did not make a public statement, discuss politics with a coworker, write a letter to newspapers or legislators, or otherwise speak as a citizen." *Spiegla*, 481 F.3d at 967.

In summary, the record does not reflect any speech made by plaintiff as a citizen addressing matters of public concern prior to the adverse retaliatory actions attributable to Bergeron. Summary judgment will therefore be granted to defendant Bergeron as to any claim

---

[16] *Garcetti* also addressed the potential for reprisals arising from official communications: "Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. . . . If [plaintiff's] superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action." 547 U.S. at 422-23. "Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* at 424. In such cases, the employee's remedy for any mistreatment is more appropriately found in "the powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing." *Id.* at 425. Plaintiff's claims under such enactments are discussed below.

based on a violation of the First Amendment right to freedom of speech.[17]

###           b.          Procedural Due Process

In order to establish a procedural due process claim under § 1983, "a plaintiff must allege

first that [he] has a property interest as defined by state law and, second, that the defendants,

acting under color of state law, deprived [him] of that property interest without constitutionally

adequate process." *SWF Arecibo, Ltd. v. Rodriguez*, 415 F.3d 135, 139 (1st Cir. 2005) (internal

quotation and citation omitted).

Plaintiff appears to contend that his employment with the police department is the

property interest at issue.[18]  With certain exceptions not relevant here, the Fourteenth Amendment

protects government employees "who possess property interests in continued public

employment."  *Maymi v. Puerto Rico Ports Auth.*, 515 F.3d 20, 29 (1st Cir. 2008) (citations

omitted).

Plaintiff cannot, however, establish that Bergeron terminated his employment—that is,

deprived him of that property—without "constitutionally adequate process."  Plaintiff was

terminated on March 19, 2004.  Bergeron, however, was placed on administrative leave on July

14, 2003, and never returned to the police force; he retired in January or February 2004.  There is

---

[17] Defendants contend that the § 1983 claims are barred by plaintiff's initiation of an action under the Massachusetts whistleblower statute, by which he is deemed to have waived "the rights and remedies available to him, for the actions of the employer, under any other contract, collective bargaining agreement, state law, rule or regulation, or under the common law." Mass. Gen. Laws ch. 149, § 185(f). That contention is incorrect; while initiation of a whistleblower action may bar other *state* claims, the waiver of remedies does not extend to rights and remedies available under *federal* law. In addition, the whistleblower statute only bars claims against the employer. *Mailloux v. Town of Littleton*, 473 F. Supp. 2d 177, 185 (D. Mass. 2007); *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 221 (D. Mass. 2002).

[18] *See* Pl. Opp. at 13 ("Plaintiff alleges he was denied substantive and procedural due process when his employment was terminated in violation of 42 U.S.C. § 1983."). To the extent plaintiff claims due process violations, procedural or substantive, for adverse employment actions prior to his termination, such claims overlap entirely with the First Amendment claims discussed above.

no evidence that Bergeron had anything to do with plaintiff's termination.[19]  Plaintiff's strained

contention that the retaliatory process leading to his termination began with the initiation of

investigatory procedures by Bergeron in the spring of 2003 is not sufficient to save the claim.  *See*

*Stimpson v. Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999) (stating, in Title VII causation

context, that "[w]hen the biased recommender and the actual decisionmaker are not the same

person or persons, a plaintiff may not benefit from the inference of causation that would arise

from their common identity").

In any event, plaintiff had an adequate post-deprivation remedy.  "When a deprivation of a

property interest is occasioned by random and unauthorized conduct by state officials, . . . the

[Supreme] Court has repeatedly emphasized that the due process inquiry is limited to the issue of

the adequacy of postdeprivation remedies provided by the state."  *Lowe v. Scott*, 959 F.2d 323,

340 (1st Cir. 1992) (citing *Zinermon v. Burch*, 494 U.S. 113 (1990)).  Accordingly, "if a state

provides adequate post-deprivation remedies—either by statute or through the common-law tort

remedies available in its courts—no claim of violation of procedural due process can be brought

under Section 1983 against the officials whose random and unauthorized conduct caused the

deprivation."  *Lowe*, 959 F.2d at 340*; see also Cronin v. Town of Amesbury*, 81 F.3d 257, 260 (1st

Cir. 1996) (per curiam).  Here, plaintiff had the right to appeal (and did appeal) his termination

pursuant to the Massachusetts Civil Service Law, Mass. Gen. Laws ch. 31, §§ 41-44.  Under that

statute, any government employee aggrieved by a decision of his "appointing authority" may

appeal to the Civil Service Commission and be given a hearing before a member of the

---

[19] The only adverse employment actions against plaintiff by Bergeron were his return to uniformed patrol duty on the night shift (which occurred on May 12, 2003); the order that he relinquish lower-level office space (which occurred a few days later); and the alleged loss of his personnel file (which, if Bergeron destroyed it, occurred prior to July 14, 2003).

Commission.  If the employee is dissatisfied with the Commission's decision, he or she may

appeal to the Superior Court within thirty days after receipt of such order or decision.  *Id.* at § 44.

Accordingly, summary judgment will be granted to defendant Bergeron as to any

procedural due process claim.

### c.   <u>Substantive Due Process</u>

Plaintiff also contends, without elaboration, that his termination violated his substantive

due process rights.[20]  His theory is not, however, readily apparent.  Count 1 of the complaint

contains a passing reference to substantive due process; it refers to efforts to "punish and retaliate

against Bolduc for the exercise of his freedoms of speech, association, and inquiry, [which] were

intended to an did deny him substantive . . . due process."  (Compl. ¶ 84).  Framed in this way, the

substantive due process allegation appears to duplicate his First Amendment claim.[21]  In his

opposition to summary judgment, plaintiff lumps the discussion of his substantive due process

claim together with his procedural due process and Title VII claims:

> Plaintiff alleges he was denied substantive and procedural due process when his
> employment was terminated in violation of 42 U.S.C. § 1983.  He asserts that
> Keefe and Bergeron are liable because their actions did violate a "clearly
> established statutory or constitutional right of which a reasonable person
> should've known."  *Kelley v. LaForce*, 288 F.3d 1, 6 (1st Cir. 2002).  That right,

---

[20] There are essentially two approaches to a substantive due process claim.  *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991).  Under the first approach, a plaintiff can allege a substantive due process violation without having to show the violation of a specific liberty or property interest, but only if the state's conduct is such that it "shocks the conscience" or "offends the community's sense of fair play and decency."  *Id.*  Plaintiff appears to make no such allegation here.  Under the second approach, a plaintiff must demonstrate an arbitrary or capricious violation of a protected liberty or property interest.  *Id.*  Again, it appears that the property interest claimed by plaintiff is his continued employment as a police officer.

[21] Count 2 contains a more general reference to "due process," alleging that, "by acting in concert," defendants "deprived Bolduc of his liberty interests in free speech and association and of his protected property interest in his occupation, without due process and equal protection."  (Compl. ¶ 85).  To the extent plaintiff alleges a conspiracy to intimidate him as a witness, that claim is evaluated under plaintiff's stated cause of action provided by 42 U.S.C. § 1985(2).

> without considering Bolduc's rights under the First Amendment to the United
> States Constitution would have included his right to be free from adverse
> employment actions pursuant to 42 U.S.C. 2000e 3 (a) as one who was
> participating in the assertion of rights pursuant to 42 U.S.C. 2000e. (Ralph
> complaints of racist behavior by Barnes, Exhibit 18, Bolduc's corroboration of
> the same by memo dated May 2, 2003[)].

(Pl. Opp. at 13-14).[22]  Framed in that manner, the alleged substantive due process right is entirely

duplicative of plaintiff's procedural due process claim (discussed above) or Title VII claim

(discussed below).

Accordingly, summary judgment will be granted to defendant Bergeron as to any

substantive due process claim.[23]

### 2.     Claim against the Town

Plaintiff has also asserted a § 1983 claim against the Town.  To prevail on such a claim, he

must show that "the municipality *itself* cause[d] the constitutional violation at issue.  Respondeat

superior or vicarious liability will not attach under § 1983."  *City of Canton v. Harris*, 489 U.S.

378, 385 (1989); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978).  A municipality

may be held liable under § 1983 only when the "execution of the government's policy or custom"

causes the injury.  *City of Canton*, 489 U.S. at 385 (internal quotations and citations omitted).

Thus, plaintiff is required to demonstrate both the existence of a policy or custom and a "direct

causal link" between that policy and the alleged constitutional deprivation.  *Id.*; *see also Monell*,

436 U.S. at 694 (finding municipal liability appropriate where official policy was the "moving

---

[22]  The (partially misquoted) language from *Kelley* is inapposite as it relates to qualified immunity, not a substantive due process violation.

[23]  Given the failure of plaintiff's § 1983 theories on the stated grounds, the Court need not reach the issue of whether defendant Bergeron is entitled to qualified immunity.  *See, e.g.*, *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989).

The alleged constitutional violation on which the § 1983 claim against the Town is premised is not clear. To the extent it is based on the constitutional claims described above, it fails for similar reasons. Plaintiff also contends that the Town had a "policy of refraining from inquiry into the racist behaviors of officers of the Town of Webster Police Department." (Pl. Mem. at 15). As evidence of that policy, plaintiff points to the fact that Ralph complained to various town officials and selectmen about Barnes's racial attitudes (and Bergeron's support of Barnes), and they did little or nothing in response. Plaintiff does not, however, indicate what constitutional right of his own (as opposed to the rights of Ralph, or any member of a minority injured by the policy) was implicated by that policy.

In any event, even assuming that town officials failed to respond to racist behavior in the police department—and even assuming that their inaction constituted a municipal "policy"—there is insufficient evidence that that "policy" caused plaintiff's injury. Barnes (the alleged racist officer) had no power to terminate plaintiff, and there is no evidence that he took part in the termination decision. As set forth above, Bergeron (who allegedly protected and supported a racist officer) had left the department well before plaintiff was terminated. And there is simply no evidence that Leal or anyone else terminated plaintiff as part of a municipal policy of apathy and inaction toward racist behavior. Accordingly, summary judgment will be granted to the Town as to Count 1.

**B.      Count 2:  § 1985 Claim**

Plaintiff next contends that the defendants, acting in concert, violated 42 U.S.C. § 1985.[24]

Plaintiff does not specifically state the subsection of § 1985 under which he asserts his claim,

either in the complaint or in his opposition papers.  In fact, his opposition memorandum fails to

refer to § 1985 at all.  Thus, the only clues to plaintiff's theory of this claim come from the

complaint, which alleges as follows:

> the decision to terminate Bolduc's employment as a Webster police officer on or
> about March 19, 2004, which termination: a. was based upon invidious, race-
> based animus to retaliate against Bolduc for his refusal to ignore racist conduct by
> a fellow officer and for his support of the investigation of complaints of racism
> made by then Deputy Chief Ralph; and b. was accomplished by two or more of
> the Defendants acting in concert and pursuant to invidious, race-based and class-
> based animus, and the purpose of which was to obstruct the due course of justice
> in Massachusetts, a Commonwealth of the United States, all in violation of 42
> U.S.C. § 1985.

(Compl. ¶ 85).  The reference to obstruction of the "due course of justice" suggests that plaintiff

is proceeding under the second clause of § 1985(2), which prohibits witness intimidation in state-

court proceedings.  The Court will analyze the sufficiency of the record evidence accordingly.[25]

The second clause of § 1985(2) prohibits "two or more persons [from] conspir[ing] for the

purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of

---

[24]  Count 2 also includes references to Bolduc's "liberty interests in free speech and association,"as well as
due process.  However, as the First Amendment and Due Process claims are treated here separately under § 1983 and
plaintiff explicitly invokes 42 U.S.C. § 1985 in the count's header, the Court will treat the count simply as one
arising under § 1985.

[25]  *See Kush v. Rutledge*, 460 U.S. 719, 725 (1983) ("The second part of § 1985(2) applies to conspiracies
to obstruct the course of justice in state courts [where] the conspirators' actions [are] motivated by an intent to
deprive their victims of the equal protection of the laws.").  The more frequently invoked first clause of § 1985(2)
applies only to witness intimidation in proceedings in federal court.  *See Portman v. County of Santa Clara*, 995 F.2d
898, 908-09 (9th Cir. 1993).  Unlike the second clause, the first clause does not require class- or race-based animus.
*Beyah v. Scully*, 1992 U.S. Dist. LEXIS 2979, at *9 (S.D.N.Y. Mar. 12, 1992).

justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."  There are thus four elements of a § 1985(2) claim:  (1) a conspiracy between two or more persons, (2) to impede, hinder, obstruct, or defeat, in any manner, the due course of justice in any State, (3) with invidiously discriminatory animus, (4) which results in injury to plaintiff.  *See Greco v. Fitzpatrick*, 1995 U.S. App. LEXIS 15563, at *3 (1st Cir. June 23, 1995) ("In order to state a cause of action under the second clause of 42 U.S.C. § 1985(2), plaintiff was required to allege class-based, invidiously discriminatory animus."); *cf. Chahal v. Paine Webber*, Inc., 725 F.2d 20, 23 (2d Cir. N.Y. 1984) (setting forth elements of a witness intimidation claim under the first clause of § 1985(2)).

Any such claim here fails for lack of evidence of a conspiracy.  "[S]ubsection 1985(2) applies to 'conspiracies,' not to individual actions."  *Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir. 1983).  The allegedly retaliatory actions Bergeron took prior to his own separation from the department appear to have been taken alone.  Plaintiff has not suggested that Bergeron entered into an agreement with anyone else before he transferred him to uniform patrol duty on the night shift, deprived him of his lower-level office space, or lost or destroyed his personnel file.

Furthermore, plaintiff has not pointed to any actual evidence that Bergeron was part of a § 1985(2) conspiracy after Bergeron was suspended.[26]  There is no shortage of evidence of efforts by Leal and Keefe to remove plaintiff from the police department.  But there is no evidence of

---

[26] Plaintiff also puts forward a theory of "continuing violation."  A "continuing violation," however, is not a theory of recovery; it is a theory under which a limitations period may be extended.  The "continuing violation" doctrine is an equitable exception that saves otherwise time-barred claims if they are based on an ongoing series of acts anchored by similarity to some violation that is not time-barred.  *See O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001).

any connection between Bergeron and the actions of Leal and Keefe.  Even if it were true, as

plaintiff contends, that Bergeron *began* a series of acts targeting him, there is no reason to believe

that Keefe and Leal *agreed with Bergeron to continue* that conduct because of Bolduc's

willingness to corroborate the Colonial Club incident.[27]

In short, because Bergeron left the police department months before Bolduc's termination,

Bergeron would have needed to act through others, like Leal and Keefe, in order to effectuate any

retaliation or witness intimidation.  Such a thing is, of course, entirely possible, but it was

incumbent upon plaintiff to produce evidence as to how this was orchestrated and accomplished.

That he has failed to do.  Plaintiff has presented absolutely no evidence that Bergeron conspired

with either Keefe and Leal on any matter relating to plaintiff's employment.  Leal was not even

appointed as Town Administrator until October 1, well after Bergeron's departure.  Indeed, there

is no evidence that Bergeron communicated, let alone acted in concert, with either Keefe or Leal

after he was put on leave.

Accordingly, summary judgment will be granted as to Count 2.[28]

---

[27] Indeed, in his deposition, plaintiff himself put forward the more likely explanation that any mistreatment by Leal and Keefe reflected an agreement, not to punish him for his corroboration of the Colonial Club incident, but to remove a rival to Keefe:

Q. How do you believe that William Keefe has conspired against you?

A. My belief is that where Bergeron—where they started this and Keefe furthered this to—in part my belief is to clear the way for him to the Chief's office; that I would have been seen as either standing in his way or competition for him in testing.

(Bolduc Dep. 328:4-11).

[28] It is unclear from the complaint whether plaintiff is asserting a § 1985 claim against the Town.  To the extent such a claim is even cognizable, plaintiff would be required to demonstrate both the existence of a policy or custom of race-based witness intimidation and a "direct causal link" between that policy and the alleged conspiracy. *See Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979) (applying *Monell* to § 1985(3) claim).  Plaintiff has not even approached meeting his evidentiary burden in that regard.  Summary judgment will therefore be granted as to the Town on Count 2.

C.     **Count 4:  Retaliation and Intimidation under Title VII**

1.     **Claim Against Bergeron**

Plaintiff contends that the actions of defendants "constitute retaliation and intimidation, in violation of 42 U.S.C. 2000e § 1 *et seq.* (Title VII)."  (Compl. ¶ 89).  There is, however, no individual liability under Title VII.  *See, e.g.*, *Booker v. Massachusetts Dept. of Public Health*, 527 F. Supp. 2d 216, 229 n.19 (D. Mass. 2007); *Bourbeau v. City of Chicopee*, 445 F. Supp. 2d 106, 111 (D. Mass. 2006); *Homey v. Westfield Gage Co.*, 95 F. Supp. 2d 29, 33-36 (D. Mass. 2000) (noting that "every [] circuit court which has addressed the issue has found that there is no individual liability under Title VII"); *see also Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 191 (1st Cir. 2003) (noting that the First Circuit has declined to "enter the thicket" of determining whether individual liability exists under Title VII) (quoting *Serapion v. Martinez*, 119 F.3d 982, 992 (1st Cir. 1997)).  Summary judgment will therefore enter for Bergeron as to Count 4.

2.     **Claim Against Town**

Plaintiff has also brought a claim under Title VII against his employer, the Town of Webster.  Title VII forbids, among other things, any "employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that statute.  *See* 42 U.S.C. § 2000e-3(a).  Such retaliation claims are evaluated under the *McDonnell-Douglas* burden-shifting framework.  *See, e.g.*, *Mariani-Colon v. Department of Homeland Sec.*, 511 F.3d 216, 223 (1st Cir. 2007).  In order to establish a *prima facie* case of retaliation, plaintiff must establish three elements:  (1) that plaintiff engaged in a protected activity; (2) that plaintiff suffered a materially adverse action,

causing him harm either inside or outside of the workplace; and (3) that the adverse action was causally linked to his protected activity. *See id.* (citing *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 & n.4 (1st Cir. 2007)).  If the plaintiff makes this showing, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *See McDonough v. City of Quincy*, 452 F.3d 8, 17 (1st Cir. 2006).  If the defendant presents such a reason, the plaintiff must demonstrate that the defendant's proffered reason is pretext masking illegal retaliation. *See id.*

Plaintiff has made out a *prima facie* case of retaliation.  Both MCAD complaints (plaintiff's own and that of Ralph) contain explicit (if inapposite) references to Title VII. Accordingly, plaintiff's filing of his own MCAD complaint, as well as any actual involvement he had in the prosecution of Ralph's MCAD complaint, constitute "protected activity" under § 2000e.[29]  Furthermore, he suffered an adverse action, not only in his termination from the department, but also in the rescission of a commendation he was to receive.  There is evidence in the record that Leal, one of the Town's chief decision-makers regarding plaintiff's employment, requested that the members of the Board of Selectmen individually rescind their votes to award plaintiff his commendation because his receipt of such an award would weaken her position

---

[29] For purposes of clarification, it must be noted that plaintiff's corroboration of the Colonial Club incident, and any retaliation plaintiff suffered as a result, are not within the scope of the anti-retaliation provisions of Title VII.  "The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, *but the eradication of discrimination by employers against employees.*" *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) (emphasis added).  Activity is therefore protected under the statute only insofar as it relates to employment practices—specifically, employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Neither plaintiff's corroboration of the Colonial Club incident nor his subsequent MCAD complaint actually involve employment discrimination based on a prohibited classification.  Plaintiff has not been discriminated against in his employment on the basis of race nor has anyone else as far as can be determined from the record.  The alleged discriminatory acts were by Barnes against various citizens, and (arguably) by Bergeron for supporting Barnes.  Those actions may be wrongful or tortious, but they do not violate any right granted to plaintiff under Title VII.  *See Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125 (2d Cir. 1999); *Crowley v. Prince George's Cty.*, 890 F.2d 683 (4th Cir. 1989).

before the MCAD.  (Regis Aff. ¶ 5).  Because Leal allegedly mentioned the MCAD proceedings

and disciplinary hearings in the same breath, there is evidence not only that rescission of the

medal was in direct response to the MCAD proceeding, but that plaintiff's termination arose out

of the same improper motivations.  *Id.*

This is sufficient evidence to shift the burden of production to the Town.  Although the

record is replete with evidence that the Town possessed a legitimate, nondiscriminatory reason

for plaintiff's termination—specifically, his mistreatment of arrestees—there is a material dispute

as to the actual motivations.  Summary judgment will therefore be denied as to the Town as to

Count 4.

### D.      Count 5:  Violation of Whistleblower Statute

In Count 5, plaintiff alleges violations of the Massachusetts whistleblower statute, Mass.

Gen. Laws ch. 149, § 185, against the Town.[30]

The whistleblower statute provides a public employee with a civil claim for damages

against a public entity that takes "retaliatory action" against him because he engages in certain

protected conduct.  *Id.*, § 185(b).  Among other things, the act protects the following three types

of conduct:  (1) disclosing or threatening to disclose "to a supervisor or to a public body an

activity, policy or practice of the employer . . . that the employee reasonably believes is in

violation of a law . . . or which the employee reasonably believes poses a risk to public health [or]

safety" (§ b(1)); (2) providing information to, or testifying before, "any public body conducting

an investigation, hearing or inquiry into any violation of law . . . or activity, policy or practice

---

[30] The statute applies only to "employers," and thus does not apply to Bergeron.  *See* Mass. Gen. Laws ch. 149, § 185(b).

which the employee reasonably believes poses a risk to public health [or] safety . . . by the employer" (§ b(2)); and (3) objecting to or refusing to participate in "any activity, policy or practice which the employee reasonably believes is in violation of a law . . . or which the employee reasonably believes poses a risk to public health [or] safety" (§ b(3)). *Id.*, § 185(b)(1)-(3).  A "retaliatory action" is defined as "the discharge, suspension or demotion of an employee in the terms and conditions of employment" by an employer. *Id.*, § 185(a)(5).

With certain exceptions, not relevant here, the "protection against retaliatory action provided by subsection (b)(1)" does not apply unless the employee has brought the complained-of practice to the attention of his supervisor by written notice and has given the employer a reasonable opportunity to correct the practice. *Id.*, § 185(c).  Plaintiff here did not give written notice until August 5, 2004, more than four months after he was terminated.  He is not, therefore, entitled to the protections of subsection (b)(1).

Subsection (b)(2), among other things, protects employees who provide information to, or testify before, any "public body" conducting an investigation, hearing, or inquiry into any violation of law, or any activity, policy, or practice which the employee reasonably believes poses a risk to public safety. *Id.*, § 185(b)(2).  The term "public body" is defined broadly, and includes both a chief of police and a police department disciplinary board. *Id.*, § 185(a)(3).[31]  Here, plaintiff provided information to Chief Bergeron (on May 1 and 12, 2003) and testified at a police disciplinary hearing concerning Ralph (on December 9, 2003).  Although not free from doubt, it

---

[31] The statutory definition of "public body" includes the following:

(C) any . . . local regulatory, administrative or public agency or authority, or instrumentality thereof; (D) any . . . local law enforcement agency . . . or police or peace officer; or (E) any division, board, bureau, office, committee or commission of any of the public bodies described in the above paragraphs of this subsection.

28

would appear that racist practices by a police officer, or the condonation of such practices by a supervisor, would constitute either a "violation of law" or an "activity, policy, or practice" that plaintiff could reasonably believe posed a risk to public safety.  Finally, there is evidence that the alleged retaliation was connected, at least in part, to the protected activity.[32]  Accordingly, plaintiff's claim under § 185(b)(2) is sufficient to survive summary judgment.

Subsection (b)(3), among other things, protects an employee who objects to, or refuses to participate in, any activity, policy, or practice that the employee reasonably believes is in violation of a law or poses a risk to public safety.  Again, while not free from doubt, it appears that plaintiff's conduct here—supporting and corroborating Ralph's objections to the racist behavior of Barnes—is sufficient to fall within the statutory language.  Accordingly, the claim under § 185(b)(3) is likewise sufficient to survive summary judgment.

Summary judgment will therefore be denied as to Count 5.

### E.    Count 3:  Retaliation and Intimidation under Mass. Gen. Laws ch. 151B

In Count 3, Bolduc alleges that the Town and Bergeron, both individually and in his official capacity as Chief of Police, violated Mass. Gen . Laws ch. 151B, § 4(4), (4A), and (5). Unlike Title VII, chapter 151B provides for individual liability.  *See Beaupre v. Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 491 (2000).[33]

---

[32]  The causal connection between plaintiff's statement to Bergeron and the adverse employment actions is very strong; indeed, the adverse actions followed immediately.  *See* Bolduc Aff. ¶¶ 10, 11 ("When Bergeron read my written narrative, he indicated that I was to be returned to uniformed patrol duty, effective immediately.  On May 12, 2003, I was informed by Bergeron that my schedule of duty and working days was to be changed to nights, effective immediately, that I was removed from the Amato murder investigation and that I was to be put back into rotation to uniform patrol duties.").

[33]  Chapter 151B, § 4(4) makes it unlawful for any person or employer to discharge, expel, or otherwise discriminate against any person because he has opposed any practice forbidden under Chapter 151B or because he has filed a complaint, testified, or assisted in any proceeding under § 5.  Section 4(4A) provides that it shall be unlawful for any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment

To maintain a claim of retaliation under sections 4(4) and 4(4A), the plaintiff has the burden of establishing (1) that he engaged in protected conduct; (2) that he suffered adverse action; and (3) that a causal connection existed between the protected conduct and the adverse action. *Mole v. University of Mass.*, 442 Mass. 582, 591 (2004). Conduct protected from retaliation under the statute includes, among other things, opposing any practices prohibited by chapter 151B (e.g., discrimination in employment on the basis of race), and filing a complaint, testifying, or assisting in any MCAD proceeding. *Id.* § 4(4A).

If the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *Wooster v. Abdow Corp.*, 46 Mass. App. Ct. 665, 668 (1999). If the defendant meets its burden, the plaintiff must show that the defendant's proffered reason was not, in fact, the real reason for the decision and that the decision was the result of retaliatory animus. *Melnychenko v. 84 Lumber Co.*, 424 Mass. 285, 293 (1997).

### 1.    Claim Against Bergeron

The nature of the allegedly protected conduct by plaintiff in this case is unclear, but it appears to include (1) corroborating Ralph's assertions of racist behavior by Barnes, (2) supporting Ralph's MCAD complaint, and (3) filing his own MCAD complaint.

Although far from clear, it appears that plaintiff's claim here fits within the framework of chapter 151B. Giving a truthful statement in an investigation related to an MCAD proceeding may, under some circumstances, qualify as "assisting" in that proceeding. *See Scott v. County of*

---

of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by Chapter 151B. Section 4(5) provides that it is unlawful for any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under Chapter 151B or to attempt to do so.

*Ramsey*, 180 F.3d 913 (8th Cir. 1999) (stating that, under Title VII and Minnesota law, providing a statement in an internal investigation regarding a sexual harassment claim by another employee qualified as protected conduct). Ralph filed his MCAD claim on May 1; Bergeron asked plaintiff to file a written statement concerning the Colonial Club incident that day, and followed up on May 12. Bergeron then took retaliatory action as soon as the written statement was filed. Although there are gaps in the evidence on the record before the Court, a jury might reasonably infer a causal connection. Plaintiff also effectively stated in writing that he intended to file an MCAD complaint on May 15 (he actually did not file it until June), which may also qualify as protected conduct. *See Croushon v. Board of Trs. of Univ. of Tenn.*, 518 F. Supp. 9, 12 (M.D. Tenn. 1980) (stating that, under Title VII, an indication of an intent to file a discrimination charge qualified as protected conduct). The loss of lower-level office space, and possibly the loss of his personnel file, occurred around the same time. Although there is no direct proof that Bergeron knew of plaintiff's intention to file a complaint, again, a jury might reasonably infer a causal connection.[34]

Summary judgment will therefore be denied as to Bergeron as to Count 3.

### 2.      Claim against the Town

As noted, plaintiff has asserted a claim under the Massachusetts whistleblower statute, Mass. Gen. Laws ch. 149, § 185. That statute provides that the "institution of a private action in accordance with [the statute] shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any . . . state law, rule or regulation, or

---

[34] Plaintiff's filing of his own MCAD complaint is clearly protected conduct; that complaint, however, was filed on June 16, 2003, after he suffered almost all of the adverse employment actions attributable to Bergeron, with the possible exception of the loss of the personnel file.

under the common law." Accordingly, the filing of this lawsuit waived any claim by plaintiff against the Town under Mass. Gen. Laws ch. 151B for retaliation. *See Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 220 (D. Mass. 2002) (stating that the waiver applies "to related claims seeking damages essentially for the same conduct . . . that constituted the core retaliation for the whistleblowing"); *Reilly v. Robbins*, 2006 U.S. Dist. LEXIS 46121, at *4 (D. Mass. July 10, 2006) (noting that the language of the statute provides that it is "the *institution* of a private [whistleblower] action" that triggers the waiver) (emphasis in original); *Stoyle v. Mansfield Mun. Elec. Dep't*, 2009 U.S. Dist. LEXIS 24418 (D. Mass. Mar. 20, 2009).

This issue is considerably complicated by the fact that Chapter 151B contains an exclusivity provision of its own. *See* Mass. Gen. Laws ch. 151B , § 9 ("[A]s to acts declared unlawful by section 4, the administrative procedure provided in this chapter shall, while pending, be exclusive; and the final determination on the merits shall exclude any other civil action, based on the same grievance of the individual concerned."). According to the Supreme Judicial Court, "where applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Charland v. Muzi Motors*, 417 Mass. 580, 586 (1994); *see also Thurdin v. SEI Boston, LLC*, 452 Mass. 436, 442 (2008) ("Moreover, if G. L. c. 151B is available, an aggrieved employee may not bring a claim under another statute in the first instance.") (citing *Charland*). While the 151B exclusivity provision clearly requires exhaustion of administrative remedies, it appears to have a wider sweep. *See, e.g.*, *LaFountaine v. BJ's Wholesale Club, Inc.*, 24 Mass. L. Rep. 647 (Mass. Super. Ct. 2008) (holding that plaintiff's MCRA claim was "barred by the exclusivity provision of G.L.c. 151B, §

9").[35]

The intended interaction of the two exclusivity provisions is very uncertain, but it seems highly unlikely that the legislature intended *both* exclusivity provisions to apply simultaneously, which would leave plaintiffs in some types of retaliation cases with no remedy at all.  It is equally unlikely that the legislature intended that *neither* provision apply, which would render both provisions nullities.  Complicating matters further is the fact that the two statutes are not congruent in critical respects; most notably, Chapter 149, § 185 provides a remedy only against employers, whereas Chapter 151B reaches both employers and individuals.

Under the circumstances of this case, it appears to best comport with legislative intent to permit the plaintiff to elect one or the other remedy, but not both, at least as to the claim against the employer.  Plaintiff could have proceeded against the Town solely under Chapter 151B, without asserting a claim under the whistleblower statute.  Having elected, however, to assert a whistleblower claim, he is deemed by statute to have waived any other statutory remedy.  Nonetheless, his claim under Chapter 151B against Bergeron—who was not his employer—is not affected by the waiver provision of ch, 149, § 185.

Summary judgment will therefore enter for the Town as to Count 3.

F.      Count 6:  Massachusetts Civil Rights Act

Count 6 alleges claims under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H & 11I, against the Town and Bergeron for deprivation of civil rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and Article I and X of the Declaration of Rights of the Commonwealth of Massachusetts.

---

[35] Plaintiff here appears to have satisfied the exhaustion requirements of Chapter 151B.

1.        **Claim against Bergeron**

The Massachusetts Civil Rights Act, Mass. Gen. Laws. ch. 12, § 11I, provides a right of

action to any person whose exercise or enjoyment of rights secured by the federal or state

constitution or laws has been interfered with by "threats, intimidation, or coercion." *See Bally v.*

*Northeastern Univ.*, 403 Mass. 713, 717 (1989).  A "threat" means the "intentional exertion of

pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood*

*League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994).  "Intimidation" means putting

a person in fear for the purpose of compelling or deterring his or her conduct.  *Id.*  "Coercion"

means application of physical or moral force to another to constrain him to do against his will

something he would not otherwise do.  *Id.*  On its face, the MCRA contemplates a two-part

sequence:  (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause

the plaintiff to give up something that the plaintiff has the constitutional right to do.

For the reasons stated above, the MCRA claim against Bergeron is barred by the

exclusivity provision of Mass. Gen. Laws ch. 151B, § 9.  Furthermore, and in any event, plaintiff

does not identify the constitutional rights at issue with any specificity.  The complaint alleges that

plaintiff was deprived of "his civil rights as guaranteed by the First and Fourteenth Amendments

of the United States Constitution and Articles I and X of the Declaration of Rights of the

Commonwealth of Massachusetts."  (Compl. ¶ 95).  His opposition papers do not mention the

MCRA claim at all, much less explain how the evidence supports such a claim.  The claims under

the First and Fourteenth Amendments, as addressed above, do not appear to be supported by the

evidence.  If there is any different claim based on Articles 1 or 10 of the Massachusetts

Declaration of Rights, plaintiff has elected not to discuss it.  Such a response is not sufficient to

defeat summary judgment.

Accordingly, summary judgment will be granted to Bergeron as to Count 6.

### 2. Claim against the Town

As noted above, the filing of the claim under the Massachusetts whistleblower statute waived any claims under any other state statute based on the same underlying facts.  Mass. Gen. Laws ch. 149, § 185(f).  *See Mouradian v. General Electric Co.*, 23 Mass. App. Ct. 538, 541-43 (1987).   Furthermore, and in any event, under Massachusetts law a municipality cannot be sued under the MCRA.   *Kelley v. LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citing *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 593 (2001) (concluding that, unlike § 1983, a municipality is not a "person" within terms of MCRA)).

## IV. Conclusion

For the reasons stated above, defendants' motion for summary judgment is:

GRANTED as to Count 1;

GRANTED as to Count 2;

DENIED as to defendant Bergeron, and GRANTED as to defendant the Town of Webster, as to Count 3;

GRANTED as to defendant Bergeron, and DENIED as to defendant the Town of Webster, as to Count 4;

DENIED as to Count 5; and

GRANTED as to Count 6.

**So Ordered.**

  /s/ F. Dennis Saylor
F. Dennis Saylor IV

United States District Judge

Dated: May 22, 2009